## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| INDEPENDENT PET PARTNERS | ) |
| HOLDINGS, LLC, *et al.*,[1] | ) Case No. 23-10153 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) AUTHORIZING THE USE OF CASH COLLATERAL; (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (V) MODIFYING THE AUTOMATIC STAY; (VI) SCHEDULING FINAL HEARING; AND (VII) GRANTING RELATED RELIEF**

The above-captioned affiliated debtors and debtors in possession (the "Debtors") hereby

submit this motion (this "Motion"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2),

364(c)(3), 364(d)(1), 364(e), 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-

1532 (the "Bankruptcy Code"), Rules 2002, 4001, 6003, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "Local Rules"), for entry of an interim order, in substantially the form attached

hereto as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order," and, together, the

"Financing Orders"), granting the relief requested below.  In support of this Motion, the Debtors

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Independent Pet Partners Holdings, LLC (5913), Independent Pet Partners Intermediate Holdings I, LLC (4827), Independent Pet Partners Intermediate Holdings II, LLC (7550), Independent Pet Partners Employer Holdings, LLC (6785), Independent Pet Partners Employer, LLC (7531), Independent Pet Partners Intermediate Holdings, LLC (8793), IPP - Stores, LLC (6147), IPP Stores Employer, LLC (0847), Especially For Pets, LLC (6801), Pet Life, LLC (3420), Whole Pet Central, LLC (7833), Natural Pawz, LLC (5615), and Pet Source, LLC (1905). The corporate headquarters and the mailing address for the Debtors is 8450 City Centre Dr., Woodbury, MN 55125.

rely on the *Declaration of Stephen Coulombe in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") and the *Declaration of Adam Dunayer in Support of the Motion* (the "Financing Declaration" and, together with the First Day Declaration, the "Declarations"), each filed contemporaneously with this Motion.  In further support of this Motion, the Debtors respectfully state as follows:

### PRELIMINARY STATEMENT[2]

1.     As set forth in the Declarations, the Debtors have faced a number of challenges, some resulting from external factors outside their control and others more specific to their operations.  In late 2022, the Debtors identified a need for additional liquidity to attempt to address those factors.   Certain of the Debtors' Prepetition Secured Parties (as defined below) (the "Prepetition Lender Group") worked cooperatively with the Debtors, agreeing to provide the Debtors with $2.67 million in net incremental liquidity under the Priming Facility (as defined below) in November 2022.  Despite this liquidity injection, the Debtors experienced continued financial distress, and it became clear that a restructuring through these chapter 11 cases (the "Chapter 11 Cases") would be necessary to shed unprofitable operations and preserve as much of the business as possible as a going concern.  The Debtors then began intensive negotiations with their Prepetition Lender Group, resulting in: (i) a January 25, 2023 amendment to the Priming Facility, under which the Prepetition Lender Group provided additional net liquidity of $5 million to "bridge" to a chapter 11 filing, and (ii) a commitment by the members of the Prepetition Lender Group (the "DIP Lenders") to provide a new senior secured superpriority debtor-in-possession term loan credit facility (the "DIP Facility"), which will permit the Debtors to fund these Chapter

---

[2]     Any capitalized terms used but not otherwise defined in this Motion shall have the respective meanings ascribed to such terms in the DIP Documents or the proposed Interim Order, as applicable.

11 Cases and pursue a full, fair, and transparent sale process in accordance with the Debtors' proposed bidding procedures (the "Sale Process") for the benefit of all stakeholders, followed, in the event of a successful Sale Process, by a chapter 11 plan process.

2.      Additionally, in parallel with the DIP Facility, the Debtors and the Prepetition Lender Group negotiated and entered into that certain Asset Purchase Agreement by and among the Debtors and IPP Buyer Acquisition, LLC dated February 5, 2023 (as amended, restated, modified, or supplemented from time to time, the "Stalking Horse Agreement").  Under the Stalking Horse Agreement, the members of the Prepetition Lender Group will credit bid their DIP Loans (as defined herein) and certain of their prepetition debt, subject to higher and better offers, to purchase a reduced going-concern footprint of the Debtors' stores and banners.

3.      As more fully discussed below, the DIP Lenders will provide net liquidity under new money DIP Loans of up to $9,080,000.00—$5,000,000.00 upon entry of the Interim Order (the "Initial New Money Draw"), with the balance available upon entry of the Final Order (the "Final New Money Draw").

4.      Upon entry of the Interim Order, the DIP Facility includes a roll-up of the Debtors' obligations under the ABL Facility (defined herein) on a dollar-for-dollar basis in an amount equal to the amount of the Initial New Money Draw.  Upon entry of the Final Order, the DIP Facility includes a roll-up of the balance of the Debtors' obligations under the ABL Facility, minus the amount that was rolled-up as part of the Initial New Money Draw.

5.      The Debtors require immediate access to additional liquidity to fund these Chapter 11 Cases and to maximize the value of their estates.  It is also vitally important that the Debtors' message to their customers, employees, and vendors is clear: that it's business as usual, and that the Debtors have sufficient liquidity to seamlessly and quickly transition their business on a going-

concern basis, albeit with a smaller footprint.  Thus, immediate access to the interim funding provided under the DIP Facility and the continued use of Cash Collateral (defined below) is necessary to avoid immediate and irreparable harm to the Debtors, and is critical to the Debtors' efforts to maximize value for their stakeholders through these Chapter 11 Cases and Sale Process. Notably, in furtherance of those efforts, the DIP Lenders have agreed, in the event of a successful Sale Process, to provide funding for the Debtors to pursue a chapter 11 plan process and orderly wind-down of the estates.

6.      As addressed in the Declarations, the Debtors could not locate alternative debtor-in-possession financing on more favorable terms than offered by the DIP Lenders.  Specifically, the Debtors and their advisors participated in discussions with various alternative lenders known to provide debtor-in-possession financing, however, no lender indicated that it would agree to provide financing, which is not surprising given the magnitude of the Debtors' prepetition secured debt and indications of value received through the prepetition marketing process.  Moreover, through the DIP Facility, the Debtors are able to secure postpetition financing and utilize Cash Collateral on a fully consensual basis, avoiding costly, uncertain, and possibly value destructive litigation that would have resulted if the Debtors sought to prime the Prepetition Secured Parties without their consent (which they would not provide).

7.      For all the foregoing and other reasons set forth herein, the Debtors submit that the DIP Facility is the best available financing under the circumstances, reasonable and appropriate, and in the best interests their estates and stakeholders.  Accordingly, the Debtors respectfully request that the Court grant the relief requested herein.

## JURISDICTION AND VENUE

8.      The United States Bankruptcy Court for the District of Delaware (the  "Court") has jurisdiction over these Chapter 11 Cases, the Debtors and their estates, and this matter under 28

U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

9.      Pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final judgment or order if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

10.     Venue of these Chapter 11 Cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

11.     The statutory bases for the relief requested in this Motion are sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, and 9014, and Local Rule 4001-2.

## BACKGROUND

### A.      General Background

12.     On the date hereof (the "Petition Date"), the Debtors each filed with the Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

13.     The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee, examiner, or official committee of unsecured creditors has been appointed in these Chapter 11 Cases.

14.    Additional factual background relating to the Debtors, including their business, capital structure, and the events leading to the filing of these Chapter 11 Cases is set forth in detail in the First Day Declaration, which if fully incorporated into this Motion by reference.

**B.    Prepetition Indebtedness**

15.    As of the Petition Date, the Debtors' prepetition capital structure includes funded debt with an aggregate outstanding balance (including principal and interest) of approximately $111,442,419.28.  As discussed below, the Debtors (other than Independent Pet Partners Holdings, LLC, and Independent Pet Partners Intermediate Holdings I, LLC) are obligors (the "Debtor Prepetition Loan Parties") under the ABL Facility and the DDTL Facility (each as defined below), both executed at the Debtors' inception as part of the initial capitalization of the company, and the Priming Facility, executed in November 2022, and subsequently amended and upsized in January 2023, to provide the Debtors "bridge" liquidity prior to these Chapter 11 Cases.  Pursuant to the intercreditor arrangements in connection with the ABL Facility and the DDTL Facility, in general, the ABL Secured Parties (as defined below) prime the DDTL Secured Parties (as defined below) with respect liens on working capital assets (including inventory and receivables), while the DDTL Secured Parties prime the ABL Secured Parties with respect to liens on non-working capital assets. The ABL Secured Parties and the DDTL Secured Parties consensually subordinated their liens and claims to the Priming Secured Parties (as defined below), which have senior liens on all the Debtors' assets.

16.    Significant overlap exists among the ABL Lenders, the DDTL Lenders, and the Priming Lenders (each as defined below), and the DIP Lenders.  The Prepetition Lender Group and the DIP Lenders are subsidiaries or affiliates of CION Investment Corporation, Main Street Capital Corporation, and Newstone Capital Partners.

17.     The Debtors' funded debt obligations are further summarized below:

**(i)     ABL Credit Facility**

18.     On December 22, 2017, the Debtor Prepetition Loan Parties entered into that certain Credit Agreement (as amended, restated, modified, or supplemented from time to time, the "ABL Credit Agreement") with Acquiom Agency Services LLC, as administrative agent and collateral agent (the "ABL Agent"), and certain members of the Prepetition Lender Group, as lenders (the "ABL Lenders," and together with the ABL Agent, the "ABL Secured Parties").

19.     Under the ABL Credit Agreement and related loan documents, the ABL Lenders provided an asset-based revolving facility (the "ABL Facility") to the Debtor Prepetition Loan Parties of up to $15,000,000.  Availability under the ABL Facility is subject to a borrowing base comprised of portions of the Debtor Prepetition Loan Parties' receivables and inventory, and subject to customary reserves and adjustments.

20.     Under the ABL Credit Agreement, the Debtor Prepetition Loan Parties can choose between LIBOR Rate or Base Rate loans. As of the Petition Date, the Debtors estimate that approximately $17,471,709.04 in principal, plus accrued and unpaid interest in the amount of $228,707.70, is outstanding under the ABL Facility, which matures on February 27, 2023.

21.     The DDTL Agent (as defined below), the ABL Agent, and the Debtor Prepetition Loan Parties are party to that certain Intercreditor Agreement dated as of November 20, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "ABL/DDTL Intercreditor Agreement").  Under the ABL/DDTL Intercreditor Agreement, the ABL Secured Parties have liens (the "ABL Priority Liens") senior to the DDTL Secured Parties' liens (but junior to the Priming Secured Parties' liens) on the Debtor Prepetition Loan Parties' working capital assets.   Specifically, the "ABL Priority Collateral" includes all inventory,

receivables, and cash.[3]  Also, as already mentioned, the ABL Secured Parties have third-priority liens and security interests on all the Debtor Prepetition Loan Parties' assets that are not ABL Priority Collateral (the "ABL Junior Liens," and together with the ABL Priority Liens, the "ABL Liens"), behind the Priming Secured Parties' senior liens and the DDTL Secured Parties' second liens.

### (ii)    Delayed Draw Term Loan Credit Facility

22.    On November 20, 2018, the Debtor Prepetition Loan Parties entered into that certain Credit Agreement (as amended, restated, modified, or supplemented from time to time, the "DDTL Credit Agreement") with Wilmington Trust, National Association, as administrative agent (the "DDTL Agent," and collectively with the ABL Agent, "DDTL Secured Parties"), and the lenders party thereto, including the members of the Prepetition Lender Group (the "DDTL Lenders").

23.    Under the DDTL Credit Agreement, the DDTL Lenders provided a term loan facility (the "DDTL Facility") to the Debtor Prepetition Loan Parties with the aggregate initial principal amount of $75,000,000.00.  Interest on the DDTL Facility accrues at a fixed rate of six percent (6.00%) per annum.  As of the Petition Date, the Debtors estimate that approximately $84,014,429.46 in principal, plus accrued and unpaid interest in the amount of $532,091.39, is outstanding under the DDTL Facility, which matures on November 20, 2023.

---

[3]    The full set of ABL Priority Collateral is set forth in detail in the ABL/DDTL Intercreditor Agreement, but generally consists of: (i) all accounts; (ii) all inventory; (iii) all deposit accounts and securities accounts into which any proceeds of the foregoing are deposited; (iv) all payment intangibles; (v) all instruments, chattel paper, and other contracts constituting proceeds of the foregoing described in (i) through (iv) above; (vi) all guaranties, contracts of suretyship, insurance, and letters of credit; (vii) all commercial tort claims; (viii) all cash and cash equivalents of any kind with any claimholder related to the foregoing; (ix) all investment property; (x) all claims under policies of casualty insurance and all proceeds thereof; (xi) all intercompany loans and advances; (xii) all receivables; and (xiii) all substitutions, replacements, accessions, and products of proceeds of any kind related to the foregoing.

24.     Under the ABL/DDTL Intercreditor Agreement, the DDTL Secured Parties have liens (the "DDTL Priority Liens") senior to the liens of the ABL Secured Parties (but junior to the Priming Secured Parties' liens) on the Debtor Prepetition Loan Parties' assets that are not ABL Priority Collateral (the "DDTL Priority Collateral").  Further, the DDTL Secured Parties have third-priority liens and security interests on all the Debtor Prepetition Loan Parties' assets that are not DDTL Priority Collateral (the "DDTL Junior Liens," and together with the DDTL Priority Liens, the "DDTL Liens"), behind the Priming Secured Parties' senior liens and the ABL Secured Parties' second liens.

### (iii)     Priming Facility

25.     In light of certain immediate liquidity needs they encountered before the Petition Date, the Debtors approached the Priming Lenders to negotiate for additional funding to continue their business and operation without interruption.

26.     Just days before the Petition Date, on January 25, 2023, the Debtor Prepetition Loan Parties entered into an amendment (the "Priming Amendment") to that certain Credit Agreement, dated as of November 28, 2022 (the "Priming Credit Agreement"), with Acquiom Agency Services LLC, as administrative agent (the "Priming Agent"), and the members of the Prepetition Lender Group, as lenders party thereto (the "Priming Lenders," and (a) together with the Priming Agent, the "Priming Secured Parties" and (b) collectively with the ABL Lenders and the DDTL Lenders, the "Prepetition Secured Parties"), providing the Debtor Prepetition Loan Parties an additional term loan (the "Priming Amendment Facility") in the aggregate principal amount of $5,920,000.00.

27.     On November 28, 2022, the Priming Lenders provided the Debtor Prepetition Loan Parties a term loan (the "Original Priming Facility," and together with the Priming Amendment

Facility, the "Priming Facility," and together with the ABL Facility and the DDTL Facility, the "Prepetition Credit Facilities") under the Priming Credit Agreement in the amount of $3,157,894.74.  Accordingly, prior to the Petition Date, the Priming Lenders made loans under the Priming Credit Agreement (as amended by the Priming Amendment) to the Debtors in the aggregate principal amount of $9,077,894.74.

28.    The Priming Facility is secured by a continuing first priority lien and security interest (the "Priming Liens") on substantially all of the Debtors' assets (the "Priming Collateral").

29.    Interest on the Priming Facility accrues at different rates, dependent upon whether the Debtor Prepetition Loan Parties opt for either LIBOR Rate or Base Rate Loans.  As of the Petition Date, the Debtors estimate that approximately $9,157,387.44 in aggregate principal, plus accrued and unpaid interest in the amount of $38,094.25, is outstanding under the Priming Facility, which matures on February 27, 2023.[4]

### C.    The Debtors' Urgent and Immediate Liquidity Needs

30.    In recognition of their immediate need for debtor-in-possession financing and the use of Cash Collateral (defined below), the Debtors have, in consultation with their financial advisors, Houlihan Lokey Capital, Inc. and Berkley Research Group, LLC, reviewed and analyzed their projected cash needs.  Based upon that review and analysis, the Debtors and their advisors prepared a cash budget outlining the Debtors' postpetition needs (as may be amended, modified, or supplemented from time to time, the "DIP Budget"), a copy of which is attached as Exhibit B to the Interim Order.  The Debtors submit that the DIP Budget accurately reflects their funding requirements and will allow them to meet their obligations, including administrative expenses, in

---

[4]    Terms used in this Paragraph 29 but not defined in this Motion have the meaning ascribed to them in the Priming Facility.

these Chapter 11 Cases.  The Debtors believe that the DIP Budget is fair, reasonable, and appropriate under the circumstances.

31.    The immediate infusion of liquidity is necessary to provide sufficient working capital to operate the Debtors' business and to administer the Debtors' estates in these Chapter 11 Cases.  More specifically, the Debtors, with the guidance of their advisors, have determined that the DIP Facility is necessary to, among other things: (a) ensure payments to employees, third-party vendors, utilities, taxing authorities, and insurance companies, among others, who provide essential services needed to operate, maintain, and insure the Debtors' assets; (b) ensure the timely payment of Chapter 11 administrative expenses; and (c) present a positive image to the market that these Chapter 11 Cases are sufficiently funded, which is critical to ensure confidence in the Debtors from their customers, employees, and vendors and to the success of the Sale Process.

**D.     Negotiation of the DIP Facility**

32.    As discussed more fully herein and in the Declarations, locating and securing debtor in possession financing from any party other than the Prepetition Lender Group proved challenging because all of the Debtors' assets are encumbered under the Priming Facility, ABL Facility, and DDTL Facility.  Under the circumstances, no lender would provide a DIP loan with liens and claims junior to the Prepetition Secured Parties.  Without the Petition Secured Lenders consenting to priming of the Prepetition Credit Facilities, which they would not do, neither the Debtors nor any other third-party lender have the wherewithal or appetite for a priming fight with the Prepetition Secured Parties.  And even if any such alternative DIP lender exists (which does not), such an alternative would not lend on terms as favorable as the DIP Facility.

33.    Therefore, the Debtors and their advisors focused on negotiating the best possible debtor-in-possession financing they could secure from the Prepetition Lender Group.  With the

assistance of their legal and financial advisors, the Debtors engaged in extensive and multiple rounds of good faith and arm's length negotiations with the Prepetition Lender Group prior to the Petition Date to achieve that objective.

**E.      Material Terms of the DIP Facility[5]**

34.      The following chart contains a summary of (a) the material terms of the DIP Facility and (b) the use of the Cash Collateral, each with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2. The justification for inclusion of the provisions set forth in subsections N through X of Local Rule 4001-2(a)(i) are set forth more fully below in the "Basis for Relief Requested" section of this Motion.

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| **Parent and Borrower**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Independent Pet Partners Holdings, LLC ("<u>Parent</u>") and Independent Pet Partners Intermediate Holdings, LLC ("<u>Borrower</u>"). | DIP Credit Agmt. pmbl.<br><br>Interim DIP Order pmbl. ¶ (i) |
| **Loan Parties**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Independent Pet Partners Employer Holdings, LLC; Independent Pet Partners Employer, LLC; Independent Pet Partners Intermediate Holdings I, LLC; IPP-Stores, LLC; IPP Stores Employer, LLC; Pet Life, LLC; Especially for Pets, LLC; Whole Pet Central, LLC; Natural Pawz, LLC; and Pet Source, LLC (collectively, the "<u>Loan Parties</u>" and together with the Borrower and Parent, the "<u>DIP Obligors</u>"). | DIP Credit Agmt. § 1.01<br><br>Interim DIP Order pmbl. ¶ (i) |
| **Administrative Agent**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Acquiom Agency Services, LLC ("<u>Acquiom</u>") as administrative and collateral agent (in such capacity, the "<u>DIP Administrative Agent</u>," and together with the DIP Lenders (as defined herein), the "<u>DIP Parties</u>"). | Interim DIP Order pmbl. ¶ (i) |

---

[5]    The following summary of the DIP Facility is qualified in its entirety by reference to the applicable provisions of the relevant DIP Documents or the Interim Order, as applicable. To the extent that there are any inconsistencies between this summary and the provisions of the DIP Documents or the Interim Order, the provisions of the DIP Documents or the Interim Order, as applicable, shall control. The Debtors reserve the right to supplement the statements made pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2 herein.

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| **DIP Lenders**<br><br>Bankruptcy Rule 4001(c)(1)(B) | (i) CION Investment Corporation; (ii) Main Street Capital Corporation; (iii) MCS Income Fund, Inc.; (iv) Newstone Capital Partners III, L.P; (v) Newstone Capital Partners III-A, L.P.; and (vi) Newstone Capital Partners III-B, L.P. (the "DIP Lenders"). | Interim DIP Order pmbl. ¶ (i) |
| **Commitment**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(A) | A postpetition senior secured debtor-in-possession term loan credit facility in an aggregate principal amount of up to $27,258,311.48 (the "DIP Facility") provided by the DIP Lenders. | DIP Credit Agmt. Recitals<br><br>Interim DIP Order pmbl. ¶ (i) |
| **Maturity Date**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i) | The Maturity Date is April 16, 2023. | DIP Credit Agmt. § 1.01 |
| **Restrictions on Use of Proceeds**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i) | Proceeds of the DIP Facility and collateral (including prepetition collateral and cash collateral) will be used in compliance with the terms of the Approved Budget for the applicable funding period and each funding shall be in an amount not to exceed the corresponding line item amount set forth in the Approved Budget, all subject to certain restrictions to be set forth in the Financing Orders and the final DIP Documents, including restrictions on the use of proceeds from the DIP Facility to challenge the scope, priority, or perfection of any claims or liens arising under the Prepetition Loan Documents. Investigation budget for creditor's committee subject to aggregate cap of $50,000. | DIP Credit Agmt. § 7.11<br><br>Interim DIP Order ¶¶ 18 and 28 |
| **Interest Rate**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i) | "Applicable Margin" means, for any day, (1) with respect to any SOFR Loan, 10.0% per annum and (2) with respect to any Base Rate Loan, 9.0% per annum.<br><br>Adjusted Term SOFR means the per annum rate equal to the sum of (i) Term SOFR plus (ii) 0.10% (10.0 basis points); provided, that if Adjusted Term SOFR determined as provided above shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor. | DIP Credit Agmt. §§ 1.01 and 2.08 |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| | Base Rate means a fluctuating rate per annum equal to the highest of: (a) the Federal Funds Rate as in effect for such day, <u>plus</u> one half of one percent (0.5%); (b) the Prime Rate as in effect for such day; and (c) the sum of (i) Adjusted Term SOFR for a one-month tenor in effect on such day plus (ii) 1.00%.<br><br>A SOFR Loan bears interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to Adjusted Term SOFR for such Interest Period <u>plus</u> the Applicable Margin for SOFR Loans, and a Base Rate Loan bears interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate <u>plus</u> the Applicable Margin for Base Rate Loans. | |
| **Fees and Expenses**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(B), 4001-2(a)(i)(K) | Each of the Initial Draw and Final Draw shall include a commitment fee payable to the DIP Lenders for their own account of 5% of the New Money Loans provided, payable at the time of each draw.  Such fees shall be fully earned when due and shall not be refundable for any reason whatsoever.<br><br>The Borrower shall pay to the Agent for its own account the fees in the amount of $25,000 and at the times specified in the Agency Fee Letter. Such fees shall be fully earned when due and shall not be refundable for any reason whatsoever | DIP Credit Agmt. §§ 2.09(a) and (b) |
| **Provisions Limiting Court's Power or Discretion to Enter Future Orders**<br><br>Local Rule 4001-2(a)(i)(C) | None. | N/A |
| **Provisions Providing for Funding of Non-Debtor Affiliates**<br><br>Local Rule 4001-2(a)(i)(D) | None. | N/A |
| **Material Conditions to Closing and** | Certain  customary  conditions  precedent  to extensions of credit, including, among other things, (i) execution of DIP Documents, (ii) entry of the | DIP Credit Agmt. § 4.02 |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| **Borrowing, Including Budgets**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(E) | Financing Orders (as applicable), (iii) payment of certain fees and expenses required by the DIP Documents, (iv) receipt of a certain documents and certificates from the Debtors, (v) compliance with the Approved Budget, and (vi) no Default or Event of Default shall have occurred or be occurring. | |
| **Carve Out**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii)<br><br>Local Rule 4001-2(a)(i)(F) | As used in the Interim Order, the "Carve-Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $35,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below), which shall not be subject to the Approved Budget or any other budget; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, but subject to the amounts in the Approved Budget, as set forth on the line for Debtors' Professionals for the Debtors' Professionals, and as set forth on the line for Committee's Professionals for the Committee's Professionals, all accrued and unpaid fees and expenses (collectively, the "Professional Fees") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Committee pursuant to sections 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent (at the direction of the Required DIP Lenders) (or by the Prepetition Secured Parties after repayment of the DIP Obligations in full) of a Termination Declaration (as defined below), whether allowed by the Court (such Professional Fees allowed by the Court, the "Allowed Professional Fees") prior to or after delivery of a Termination Declaration, (the amounts set forth in clauses (i) through (iii), the "Pre-Termination Declaration Cap"); and (iv) | Interim DIP Order ¶ 9 |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| | Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $300,000 (consisting of $75,000 for Committee Professionals and $225,000 for Debtor Professionals) incurred after the first business day following delivery by the DIP Agent of a Termination Declaration (or by the Prepetition Secured Parties after repayment of the DIP Obligations in full) (such date, the "Trigger Date"), to the extent allowed at any time, whether by interim order, procedural order, or otherwise, less the amount of any prepetition retainers received by any such Professional Persons and not previously returned or applied to fees and expenses (the amounts set forth in this clause (iv) being the "Post-Termination Declaration Cap" and, together with the Pre-Termination Declaration Cap, the "Carve-Out Cap"); provided, however, nothing herein shall be construed to impair any party's ability to object to court approval of the fees, expenses, reimbursement of expenses or compensation of any Professional Person. | |
| **Security and Priority Under the DIP Facility**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii)<br><br>Local Rule 4001-2(a)(i)(G), 4001-2(a)(i)(N), 4001-2(a)(i)(P) | Subject and subordinate only to the Carve-Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors' estates (the "DIP Superpriority Claims") (without the need to file any proof of claim) to the extent set forth in the Bankruptcy Code, with priority over any and all administrative expenses, adequate protection claims, diminution claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise, which allowed claims shall for the purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from | Interim DIP Order ¶¶ 6 and 7 |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| | and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, subject to entry of the Final Order, any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any (the "Avoidance Actions").

As security for the DIP Obligations, effective and perfected upon the date of the Interim Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP Agent or any DIP Lender of, or over, any DIP Collateral (as defined below), the following security interests and liens are hereby granted by the Debtors to the DIP Agent, for the benefit of the DIP Secured Parties (all property identified in clause (a) and (b) below being collectively referred to as the "DIP Collateral"), subject and subordinate only to (x) valid, perfected and unavoidable liens, if any, existing as of the Petition Date that are senior to the liens or security interests of the Prepetition Priming Secured Parties as of the Petition Date by operation of law or permitted by the Prepetition Loan Documents and liens that are perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code (the "Prior Senior Liens"), and (y) the Carve-Out (all such liens and security interests granted to the DIP Agent, for the benefit of the DIP Lenders, pursuant to the Interim Order and the DIP Loan Documents, the "DIP Liens"):

(a)  Subject and subordinate only to the Carve-Out, pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, non-avoidable, automatically, and properly perfected first priority senior security interest in and lien upon all property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to Prepetition Liens or Prior Senior Liens including, without limitation (in each case, to the |

30096151.2

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| | extent not subject to valid, perfected, and non-avoidable liens), all prepetition property and post-petition property of the Debtors' estates, and the proceeds, products, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, including, without limitation, unencumbered cash (and any investment of such cash) of the Debtors (whether maintained with the DIP Agent or otherwise); all equipment, all goods, all accounts, cash, payment intangibles, bank accounts and other deposit or securities accounts of the Debtors (including any accounts opened prior to, on, or after the Petition Date); all insurance policies and proceeds thereof, equity interests, instruments, intercompany claims, accounts receivable, other rights to payment, all general intangibles, all contracts and contract rights, securities, investment property, letters of credit and letter of credit rights, chattel paper, all interest rate hedging agreements of the Debtors; all owned real estate, real property leaseholds and fixtures of the Debtors; patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property of the Debtors; all commercial tort claims of the Debtors; and all claims and causes of action (including causes of action arising under section 549 of the Bankruptcy Code, claims arising on account of transfers of value from a Debtor to (x) another Debtor and (y) a non-Debtor affiliate incurred on or following the Petition Date), and any and all proceeds, products, rents, and profits of the foregoing, all products and proceeds of the foregoing and, subject to entry of the Final Order, all proceeds and property recovered in respect of Avoidance Actions (collectively, the "Previously Unencumbered Property"); provided, for the avoidance of doubt, and notwithstanding anything to the contrary contained herein, to the extent a lien cannot attach to any of the foregoing pursuant to applicable law, the liens granted pursuant to the Interim Order shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of the foregoing. | |

| **SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY** | | |
|---|---|---|
| | (b)  Subject and subordinate only to the Carve-Out and Prior Senior Liens, pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all property of the Debtors that was subject to the Prepetition Liens, including, without limitation, the Prepetition Collateral and Cash Collateral; provided, for the avoidance of doubt, and notwithstanding anything to the contrary contained herein, to the extent a lien cannot attach to any of the foregoing pursuant to applicable law, the liens granted pursuant to the Interim Order shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of the foregoing. | |
| | (c)  Subject and subordinate only to the Carve-Out, pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all prepetition and post-petition property of the Debtors immediately junior to the Prior Senior Liens. | |
| **Milestones**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vi)<br><br>Local Rule 4001-2(a)(i)(H) | The Debtors are to administer these Chapter 11 Cases consistent with various milestones (the "Milestones"):<br><br>(a)      these Chapter 11 Cases shall have been filed on the Petition Date;<br><br>(b)      the Debtors shall have filed the Bid Procedures Motion on or prior to the date that is one (1) Business Day after the Petition Date;<br><br>(c)      the Bankruptcy Court shall have entered the Interim DIP Order on or prior to the date that is three (3) Business Days after the Petition Date;<br><br>(d)      the Bankruptcy Court shall have entered the Bid Procedures Order on or prior to the date that is nineteen (19) days after the Petition Date;<br><br>(e)      the Debtors shall have filed a motion for entry of the Store Closing Sales on or prior to the date that is one (1) Business Day after the Petition Date;<br><br>(f)      the Bankruptcy Court shall have entered the interim Store Closing Sales Order on or prior to the | DIP Credit Agmt. § 1.01 |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| | date that is three (3) Business Days after the Petition Date;<br><br>(g)    the Bankruptcy Court shall have entered the final Store Closing Sales Order on or prior to the date that is thirty-five (35) days after the Petition Date;<br><br>(h)    the consummation of the Store Closing Sales shall have occurred in accordance with the Store Closing Sales Order on or prior to the date that is thirty (30) days after the Petition Date;<br><br>(i)    the Bankruptcy Court shall have entered the Final DIP Order on or prior to the date that is thirty-five (35) days after the Petition Date;<br><br>(j)    the Bankruptcy Court shall have entered a Sale Order on or prior to the date that is fifty-five (55) days after the Petition Date; and<br><br>(k)    the consummation of a Sale shall have occurred on or prior to the date that is seventy (70) days after the Petition Date. | |
| **Prepayment**<br><br>Local Rule 4001-2(a)(i)(I) | The DIP Borrower has the right to prepay the DIP Loans, without a prepayment fee, in whole or in part, from time to time, subject to the terms contained therein. | DIP Credit Agmt. § 2.05 |
| **Provisions Governing Joint Liability**<br><br>Local Rule 4001-2(a)(i)(J) | The DIP Borrower and DIP Guarantors are jointly and severally liable for all obligations under the DIP Facility. | Interim DIP Order pmbl. ¶ (i) |
| **Provisions Requiring Debtors to Pay Agent or Lender's Expenses and Attorneys' Fees Without Notice or Review**<br><br>Local Rule 4001-2(a)(i)(K) | None. | N/A; a notice period is provided. See Interim Order ¶ 19 |
| **Provisions Prohibiting Use of Estate Funds to** | Notwithstanding anything to the contrary set forth in the Interim Order, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral, including | Interim DIP Order ¶ 28.  Up to $50,000 may be |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| **Investigate Liens and Claims of Prepetition Lenders**<br><br>Local Rule 4001-2(a)(i)(L) | Cash Collateral, or the Carve-Out or proceeds thereof may be used: (a) to investigate (including by way of examinations or discovery proceedings), initiate, assert, prosecute, join, commence, support, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other litigation of any type (i) against any of the DIP Secured Parties or the Prepetition Secured Parties (each in their capacities as such), and each of their respective affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the DIP Secured Parties or the Prepetition Secured Parties (each in their capacities as such) under the DIP Loan Documents, the Prepetition Loan Documents, or the Interim Order, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any Committee appointed in these Chapter 11 Cases in connection with the assertion of or joinder in any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties to recover on the DIP Collateral or the Prepetition Collateral or seeking affirmative relief against any of the DIP Secured Parties or the Prepetition Secured Parties related to the DIP Obligations or the Prepetition Secured Obligations; (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the DIP Obligations or the Prepetition Secured Obligations, or the DIP Agent's, the DIP Lenders', and the Prepetition Secured Parties' liens or | used under the conditions described therein. |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| | security interests in the DIP Collateral or Prepetition Collateral, as applicable; or (iii) for monetary, injunctive, or other affirmative relief against the DIP Secured Parties or the Prepetition Secured Parties, or the DIP Agent's, the DIP Lenders,' or the Prepetition Secured Parties' respective liens on or security interests in the DIP Collateral or the Prepetition Collateral that would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties, as applicable, to assert or enforce any lien, claim, right, or security interest or to realize or recover on the DIP Obligations or the Prepetition Secured Obligations, to the extent applicable; (b) for objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Secured Obligations, or by or on behalf of the DIP Agent and the DIP Lenders related to the DIP Obligations; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the DIP Obligations, the DIP Liens, the Prepetition Secured Obligations, or the Prepetition Liens; or (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of: (x) any of the DIP Liens or any other rights or interests of the DIP Agent or the DIP Lenders related to the DIP Obligations or the DIP Liens, or (y) any of the Prepetition Liens or any other rights or interests of any of the Prepetition Secured Parties related to the Prepetition Secured Obligations or the Prepetition Liens, *provided* that no more than $50,000 of the proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used by any Committee appointed in these Chapter 11 Cases, if any, solely to investigate, within the Challenge Period (as defined below), the claims, causes of action, adversary proceedings, or other litigation against the Prepetition Secured Parties solely concerning | |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| | the legality, validity, priority, perfection, enforceability or extent of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Secured Obligations | |
| **Termination or Events of Default**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(M) | Usual and customary for debtor-in-possession facilities of this kind, including, but not limited to:<br><br>(a) the occurrence of an Event of Default (as defined in the DIP Credit Agreement), including the failure by the Debtors to comply with any of the "Milestones" set forth in the DIP Credit Agreement to the extent not waived or subject to a forbearance or similar agreement with the applicable lenders;<br><br>(b) the Debtors' failure to comply in any material respect with any provision of the Interim Order unless waived by the Required DIP Lenders; or<br><br>(c) the occurrence of certain events in these Chapter 11 Cases (as described in the DIP Credit Agreement). | DIP Credit Agmt. § 8.01<br><br>Interim Order ¶ 14 |
| **Provisions (a) Granting Cross-Collateralization Protection, (b) Elevating Pre-petition Debt to Admin. Expense, or (c) Securing Pre-petition Debt with Liens on Postpetition Assets**<br><br>Local Rule 4001-2(a)(i)(N) | None. | N/A |
| **"Roll-Up" Provisions**<br><br>Local Rule 4001- 2(a)(i)(O) | On the date of the Initial New Money Draw, $5,263,157.89 in aggregate amount of Prepetition ABL Secured Obligations shall be deemed converted into and exchanged for Roll-Up Loans (the "Initial Roll-Up Loans"), and the Initial Roll-Up Loans shall be deemed funded on the date of the Initial New Money Draw, without constituting a novation, and shall satisfy and discharge $5,263,157.89 in aggregate amount of Prepetition | DIP Credit Agmt. § 2.02<br><br>Interim DIP Order pmbl. ¶ (i)(b) |

30096151.2

23

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| | ABL Secured Obligations as if a payment in such amount had been made under the Prepetition ABL Credit Agreement.<br><br>On the date the Final Order is entered, $12,437,258.85 in aggregate amount of Prepetition ABL Secured Obligations (comprising all Prepetition ABL Secured Obligations outstanding as of the Petition Date (including, without limitation, all accrued and unpaid principal, interest, premiums and fees) *minus* the principal amount of the Initial Roll-Up Loans) shall be deemed converted into and exchanged for Roll-Up Loans (the "Final Roll-Up Loans", together with the Initial Roll-Up Loans, the "DIP Loans"), and the Final Roll-Up Loans shall be deemed funded on the date of entry of the Final Order, without constituting a novation, and shall satisfy and discharge $12,437,258.85 (the    in aggregate amount of Prepetition ABL Secured Obligations as if a payment in such amount had been made under the Prepetition ABL Credit Agreement (as defined below). The Final Roll-Up Loans shall be deemed to be made by each DIP Lender (the "Final Roll-Up Lenders") in an amount equal to its pro rata share of the aggregate amount of the Prepetition ABL Secured Obligations owing to all Final Roll-Up Lenders on the Closing Date. | |
| **Priming Provisions**<br><br>Local Rule<br>4001-2(a)(i)(P) | See "Security and Priority Under the DIP Facility" above.<br><br>See also, "Adequate Protection" below. | |
| **Provisions or Findings of Fact (i) Binding Estate or Parties in Interest w/r/t Validity, Perfection, or Amount of Prepetition Liens or the Waiver of Claims Against the Secured Creditor Without Giving Parties in Interest at Least Seventy-Five** | The Prepetition Liens granted to the respective Prepetition Agents on behalf of the applicable Prepetition Secured Parties (including, from and after the deemed funding of the Initial Roll-Up Loans, and the Prepetition ABL Liens, which shall continue in effect to secure the Remaining Prepetition ABL Secured Obligations) (1) constitute legal, valid, binding, enforceable (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and perfected security interests in and liens on the Prepetition Collateral, (2) encumber all of the Prepetition Collateral, as the same existed on the Petition Date, (3) were granted to, or for the benefit | Interim DIP Order ¶ E(xv) |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| **(75) Days from the Entry of the Initial Interim Order to Investigate Such Matters**<br><br>Local Rule 4001-2(a)(i)(Q) | of, the applicable Prepetition Secured Parties for fair consideration and reasonably equivalent value and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or commitments and other financial accommodations secured thereby, (4) are entitled to adequate protection as set forth herein, and (5) are not subject to defense, counterclaim, recharacterization, subordination, avoidance, or recovery pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity. | |
| **Provisions Immediately Approving All Terms and Conditions of the DIP Credit Agreement**<br><br>Local Rule 4001-2(a)(i)(R) | <u>Binding Effect; Successors and Assigns</u>. The DIP Loan Documents and the provisions of the Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Secured Parties, the Prepetition Secured Parties, any Committee appointed in these Chapter 11 Cases, and the Debtors and their respective successors and permitted assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties and the applicable Prepetition Secured Parties; *provided* that, except to the extent expressly set forth in the Interim Order, the Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors. In determining to make any loan (whether under the DIP Credit Agreement, a promissory note or otherwise), to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to the Interim Order or the DIP Loan Documents, the DIP Secured Parties and the Prepetition Secured Parties shall not (i) be deemed to be in control of the operations of the Debtors, or | Interim DIP Order ¶¶ 32, 42 and 43 |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| | (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.<br><br>Additionally, under the Interim Order, the requirements of Bankruptcy Rule 6004(a) are deemed waived, or are inapplicable due to Bankruptcy Rules 4001(b)(2) and (c)(2) and, further, notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of the Interim Order shall be immediately effective and enforceable upon entry of the Interim Order. | |
| **Waivers/Modification of Automatic Stay and Provisions Allowing Lenders to Enforce Remedies Without at Least Five (5) Days Written Notice**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv)<br><br>Local Rule 4001-2(a)(i)(S) | Rights and Remedies Upon Event of Default. Immediately upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of the Interim Order, subject to the Remedies Notice Period (defined below), (a) the DIP Agent (at the direction of the Required DIP Lenders) may send a Termination Declaration to the parties set forth in Paragraph 9(b) declaring (i) all DIP Obligations owing under the DIP Loan Documents to be immediately due and payable, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (iii) termination of the DIP Facility and the DIP Loan Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and (iv) that the Carve-Out shall be triggered and (b) subject to paragraph 12(b), the Prepetition Agents (at the direction of the applicable required lenders) may declare a termination, reduction or restriction on the ability of the Debtors to use Cash Collateral (the date on which a Termination Declaration is delivered, the "Termination Date"). The automatic stay in these Chapter 11 Cases otherwise applicable to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties is hereby modified so that five (5) business days after the Termination Date (the "Remedies Notice Period"): (a) the DIP Agent (at | Interim DIP Order ¶ 16 |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| | the direction of the Required DIP Lenders) shall be entitled to exercise its rights and remedies in accordance with the DIP Loan Documents and the Interim Order to satisfy the DIP Obligations, DIP Superpriority Claims, and DIP Liens, subject to the Carve-Out; and (b) subject to the foregoing clause (a), the applicable Prepetition Secured Parties shall be entitled to exercise their respective rights and remedies to the extent available in accordance with the applicable Prepetition Loan Documents and the Interim Order with respect to the Debtors' use of Cash Collateral. During the Remedies Notice Period, the Debtors shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court for the sole purpose of contesting whether an Event of Default has occurred or is continuing. Unless the Court orders otherwise prior to the expiration of the Remedies Notice Period, the automatic stay, as to all of the DIP Agent, DIP Lenders, and Prepetition Secured Parties, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order.  Upon expiration of the Remedies Notice Period, the DIP Agent (at the direction of the Required DIP Lenders) and the Prepetition Secured Parties shall be permitted to exercise all remedies set forth herein, in the DIP Loan Documents, and as otherwise available at law without further order of or application or motion to the Court consistent with the Interim Order. | |
| **Provisions Limiting What Parties in Interest (Other Than the Debtors) May Raise** Local Rule 4001-2(a)(i)(T) | Effect of Stipulations on Third Parties.  The stipulations, admissions, and waivers contained in the Interim Order, including the Debtors' Stipulations, shall be binding upon all other parties in interest, including any Committee and any other person acting on behalf of the Debtors' estates, unless and to the extent that a party in interest with proper standing granted by order of the Court has timely and properly filed an adversary proceeding or contested matter under the Bankruptcy Rules (i) seeking to avoid, object to, or otherwise challenge the findings or Debtors' Stipulations, including, without limitation, regarding: (a) the validity, enforceability, extent, priority, or perfection of the mortgages, security interests, and liens of any of the | Interim DIP Order ¶ 12 |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| | Prepetition Secured Parties; (b) the validity, enforceability, allowability, priority, secured status, or amount of the Prepetition Secured Obligations; (c) asserting or prosecuting any so-called "lender liability" claims, avoidance actions or any other claim, counter claim, cause of action, objection, contest or defense, of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable law or otherwise, against any of the Prepetition Secured Parties or their representatives (any such claim, a "Challenge"), and, (ii) in which the Court enters a final order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter. Upon the occurrence of the Challenge Period Termination Date (defined below) without the filing of a Challenge (defined below) (or if any such Challenge is filed and overruled): (a) any and all such Challenges by any party (including the Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in these Chapter 11 Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever barred; (b) the Prepetition Secured Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in the Debtors' Chapter 11 Cases and any Successor Cases; (c) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected liens and security interests, not subject to recharacterization, subordination, or avoidance; and (d) all of the Debtors' stipulations and admissions contained in the Interim Order, including the Debtors' Stipulations, and all other waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the Prepetition Secured Parties' claims, liens, and interests contained in the Interim Order shall be of full force and effect and forever binding upon the Debtors, the Debtors' estates, and all creditors, interest holders, and other parties in interest in these | |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| | Chapter 11 Cases and any Successor Cases. If any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules and remains pending and these Chapter 11 Cases are converted to chapter 7, the chapter 7 trustee may continue to prosecute such adversary proceeding or contested matter on behalf of the Debtors' estates.    Furthermore, if any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules, the stipulations and admissions contained in the Interim Order, including the Debtors' Stipulations, shall nonetheless remain binding and preclusive on any Committee and any other person or entity except to the extent that such stipulations and admissions were expressly challenged in such adversary proceeding or contested matter prior to the Challenge Period Termination Date (and solely as to the plaintiff party that timely filed such Challenge and not, for the avoidance of doubt, any other party-in-interest). Nothing in the Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including, without limitation, any Committee appointed in these Chapter 11 Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation any challenges (including a Challenge) with respect to the Prepetition Loan Documents, the Prepetition Liens, and the Prepetition Secured Obligations, and a separate order of the Court conferring such standing on any Committee or other party-in-interest shall be a prerequisite for the prosecution of a Challenge by such Committee or such other party-in-interest. | |
| **Immediate Liens on Avoidance Actions**<br><br>Bankruptcy Rule 4001(c)(1)(b)<br><br>Local Rule 4001-2(a)(i)(U) | The DIP Collateral does not include liens on Avoidance Actions. However, upon entry of the Final Order, the DIP Collateral shall include the proceeds of Avoidance Actions under chapter 5 of the Bankruptcy Code and the proceeds thereof. | Interim DIP Order ¶ 6 |
| **Immediate Waivers Section 506(c), 552(b) "Equities of** | In light of the DIP Secured Parties' agreement to extend credit to the Debtors on the terms of the DIP Credit Agreement, upon entry of the Final Order, | Interim DIP Order ¶¶ G, 36, and 38. Provides that |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| **the Case," and Marshalling**<br><br>Bankruptcy Rule 4001(c)(1)(B)(x);<br><br>Local Rule 4001-2(a)(i)(V)-(X) | each of the DIP Secured Parties shall be entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code in respect of the DIP Collateral, subject to the Carve-Out.<br><br>Subject to entry of the Final Order, the DIP Agent and the DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral. Furthermore, the Prepetition Secured Parties shall each be entitled to all the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to and upon entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits of any of the DIP Collateral (including the Prepetition Collateral). | these terms are subject to the entry of a final order. |
| **Adequate Protection**<br><br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii)<br><br>Local Rule 4001-2(a)(i)(B), 4001-2(a)(i)(K), 4001-2(a)(i)(N), 4001-2(a)(i)(P) | The Prepetition Secured Parties are entitled to adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), in an amount equal to the aggregate diminution in value of such interests from and after the Petition Date (each such diminution, a "<u>Diminution in Value</u>"), resulting from the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve-Out, the Debtors' use of the Prepetition Collateral (including Cash Collateral) and the Debtors shall, as described in the Interim DIP Order, grant to such Prepetition Secured Parties: (i) as security for any Diminution in Value of the Prepetition Priming Loan Collateral, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of the Interim Order (together, the "<u>Prepetition Priming Loan Adequate Protection Liens</u>"); (ii) as security for any Diminution in Value of the Prepetition ABL Collateral, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of the Interim Order (together, the "<u>Prepetition ABL Adequate Protection Liens</u>"); | DIP Credit Agt. §§ 6.22 and 7.19<br><br>Interim DIP Order ¶ 8 |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| | (iii) as security for any Diminution in Value of the Prepetition DDTL Collateral, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of the Interim Order (together, the "Prepetition DDTL Adequate Protection Liens," and collectively with the Prepetition Priming Loan Adequate Protection Liens and the Prepetition ABL Adequate Protection Liens, the "Adequate Protection Liens"); (iv) as further adequate protection, and to the fullest extent provided by sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, the Adequate Protection Claims shall be allowed superpriority administrative expense claims; (v) further adequate protection through the payment, in accordance with the terms of paragraph 19 of the Interim Order, all reasonable and documented fees and expenses (the "Adequate Protection Fees") of the Prepetition Secured Parties, whether incurred before or after the Petition Date; (vi) subject to any applicable intercreditor agreement, the request of further or alternative forms of adequate protection, and (vii) other forms of adequate protection as described therein; (viii) through the maintenance of the Debtors' cash management arrangements in a manner consistent with the Cash Management Order; (ix) through the compliance with all reporting requirements set forth in the DIP Credit Agreement. | |
| **Loan Covenants**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i) | The DIP Credit Agreement contains covenants customary and appropriate for debtor-in-possession financings of this type, including, but not limited to, (i) provision of and compliance with the Approved Budget, (ii) reporting of financial information, (iii) maintenance of cash management, and (iv) maintenance of insurance. | DIP Credit Agmt. Arts. VI and VII |
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors will indemnify each of the DIP Lenders, the DIP Agent, the Prepetition Agents, and each of their respective affiliates, successors, and assigns and the officers, directors, employees, agents, attorneys, advisors, controlling persons, and members of each of the foregoing (each an "Indemnified Person") and hold them harmless | Interim DIP Order ¶ 19 |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| | from and against all costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facility as and to the extent provided in the DIP Credit Agreement or the applicable Prepetition Loan Documents.    No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence, fraud, or willful misconduct or breach of their obligations under the DIP Facility, which indemnity shall have equal priority and lien status to the DIP Superpriority Claims.  Further, in no event will any Indemnified Person or any Debtor be liable on any theory of liability for any special, indirect, consequential, or punitive damages; provided, that this shall not affect the Debtor's indemnification obligations pursuant to the above. | |
| **Variance Covenant**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i) | The Loan Parties shall not permit (i) for the rolling four-week period ending on any Variance Report Deadline beginning with the fourth Variance Report Deadline, the Loan Parties' actual disbursements (in the aggregate for the prior four weeks) to be more than 115% of the projected disbursements (in the aggregate for all disbursements included in the four prior weeks in the Approved Budget) as set forth in the Approved Budget with respect to such period and four prior weeks in the Approved Budget (a variance of 15% or less, a "Permitted Disbursements Variance"); and (ii) for the rolling four-week period ending on any Variance Report Deadline beginning with the fourth Variance Report Deadline, the Loan Parties' actual receipts (in the aggregate for the prior four weeks) to be less than 85% of the projected receipts (in the aggregate for all receipts included in the four prior weeks in the Approved Budget) as set forth in | DIP Credit Agmt. § 7.19<br><br>Interim DIP Order ¶ F |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| | the Approved Budget with respect to such rolling four-week period (a variance of 15% or more, a "Permitted Receipts Variance," and each of a Permitted Receipts Variance and a Permitted Disbursements Variance, a "Permitted Variance"); all references herein to "Approved Budget" shall mean the Approved Budget as it is subject to Permitted Variances). For the avoidance of doubt, for purposes of budget variances testing, the amounts set forth in the Approved Budget under "Professional Fees" shall be excluded. | |
| **Use of Cash Collateral; Entities with Interest in Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(l)(B)(i) | The Interim Order authorizes the Debtors to use all Cash Collateral solely in accordance with the Interim Order, the DIP Documents and the Approved Budget including, without limitation, to make payments on account of the Adequate Protection Obligations provided for in the Interim Order, from the date of the Interim Order through and including the date of the Final Hearing. Except on the terms and conditions of the Interim Order, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral absent further order of the Court. | Interim DIP Order ¶ 18 |
| **Challenge Period**<br><br>Bankruptcy Rule 4001(c)(1)(B), 4001(c)(1)(B)(viii) | Under the Interim Order, unless and to the extent that a party in interest with proper standing granted by order of the Court has timely and properly filed an adversary proceeding or contested matter under the Bankruptcy Rules on or prior to, subject to entry of a Final Order, the Challenge Period (defined below) is the earlier of (x) seventy-five (75) calendar days following the Petition Date and (y) two (2) business days prior to a sale hearing scheduled pursuant to the Bidding Procedures Order to approve the sale of substantially all of the Debtors' assets to the Stalking Horse Purchaser or other bidder(s) in such process (the "Challenge Period" and the date of expiration of the Challenge Period, the "Challenge Period Termination Date"); *provided, however,* that if, prior to the end of the Challenge Period, (x) these Chapter 11 Cases convert to chapter 7, or (y) if a chapter 11 trustee is appointed, then, in each such case, the Challenge Period shall be extended by the later of (A) the time | Interim DIP Order ¶ 12 |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| | remaining under the Challenge Period plus ten (10) days or (B) such other time as ordered by the Court solely with respect to any such trustee, commencing on the occurrence of either of the events discussed in the foregoing clauses (x) and (y). | |

## **RELIEF REQUESTED**

35.    The Debtors respectfully request entry of the Interim Order and the Final Order

(together, the "Financing Orders"):

(i)    authorizing DIP Borrower to obtain postpetition financing, and for each of the other DIP Guarantors to guarantee unconditionally on a joint and several basis, the DIP Borrower's obligations in connection the DIP Facility and the DIP Loans subject to the terms and conditions set forth in the DIP Credit Agreement, by and among DIP Borrower, the DIP Guarantors, and the DIP Secured Parties, consisting of:

a.    New Money Loans.  New Money Commitments in an aggregate principal amount not to exceed $9,557,894.74, consisting of:

(1)    upon entry of the Interim Order, the Initial New Money Draw in an aggregate principal amount of up to $5,263,157.89 representing the Interim "New Money DIP Loans; and

(2)    upon entry of the Final Order, an additional draw in an aggregate principal amount that will not, when combined with all Interim New Money DIP Loans advanced prior to such date, exceed $9,557,894.74 in aggregate principal amount, representing the Final New Money DIP Loans; and

b.    Roll-Up Loans.  A superpriority term loan facility in the principal amount of up to $17,700,416.74, of which (x) $5,263,157.89 will be deemed funded in accordance with clause (1) below on the date of the Interim Draw, and (y) an additional $12,437,258.85 will be deemed funded in accordance with clause (2) below, subject to the entry of and the terms of the Final Order, which Roll-Up Loans shall be deemed funded and an equal amount of Prepetition ABL Secured Obligations shall be deemed converted into and exchanged for, such Roll-Up Loans, in each case, at the times, and in accordance with the terms and conditions, set forth in the DIP Credit Agreement and the other DIP Loan Documents  and as set forth below.

(1)    On the date of the Initial New Money Draw, $5,263,157.89 in aggregate amount of Prepetition ABL Secured Obligations shall be deemed converted into and exchanged for the Initial Roll-Up Loans, and the Initial Roll-Up Loans shall be deemed funded on the date of the Initial New Money Draw, without

constituting a novation, and shall satisfy and discharge $5,263,157.89 in aggregate amount of Prepetition ABL Secured Obligations as if a payment in such amount had been made under the Prepetition ABL Credit Agreement. The Initial Roll-Up Loans shall be deemed to be made by each Initial Roll-Up Lender in an amount equal to its pro rata share of the aggregate amount of the Prepetition ABL Secured Obligations owing to all Initial Roll-Up Lenders on the Closing Date.

(2)    On the date the Final Order is entered, $12,437,258.85 in aggregate amount of Prepetition ABL Secured Obligations (comprising all Prepetition ABL Secured Obligations outstanding as of the Petition Date (including, without limitation, all accrued and unpaid principal, interest, premiums and fees) *minus* the principal amount of the Initial Roll-Up Loans) shall be deemed converted into and exchanged for the Final Roll-Up Loans, and the Final Roll-Up Loans shall be deemed funded on the date of entry of the Final Order, without constituting a novation, and shall satisfy and discharge $12,437,258.85 in aggregate amount of Prepetition ABL Secured Obligations as if a payment in such amount had been made under the Prepetition ABL Credit Agreement. The Final Roll-Up Loans shall be deemed to be made by each Final Roll-Up Lender in an amount equal to its pro rata share of the aggregate amount of the Prepetition ABL Secured Obligations owing to all Final Roll-Up Lenders on the Closing Date.

(ii)    authorizing the Debtors to execute, deliver and perform under the DIP Credit Agreement and any of the DIP Loan Documents that may be reasonably necessary, desirable or required to implement the DIP Facility and perform thereunder and/or that may be reasonably requested by the DIP Agent, each of which shall be in form and substance satisfactory to the DIP Secured Parties; and to perform such other acts as may be reasonably necessary, desirable or appropriate in connection with the DIP Loan Documents;

(iii)    granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, (a) DIP Liens on all of the DIP Collateral pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, which DIP Liens shall be senior to all liens, security interests, and pledges on the DIP Collateral, except for only Prior Senior Liens, and shall be subject to the Carve-Out; (b) valid, perfected second liens on any collateral subject to a Prior Senior Lien; and (c) to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, pursuant to section 364(c)(1) of the Bankruptcy Code, a superpriority administrative claim, subject and subordinate to the Carve-Out;

(iv)    authorizing and directing the Debtors to pay all principal, interest, fees, costs, expenses, and other amounts payable under the DIP Loan Documents as such become due and payable, as provided and in accordance therewith;

(v)    authorizing the Debtors to use Cash Collateral, including any Cash Collateral in which any or all of the Prepetition Secured Parties have a lien or other interest, in each case whether existing on the Petition Date, arising pursuant to the Interim Order, or otherwise;

(vi)     modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Interim Order;

(vii)    granting adequate protection to the Prepetition Secured Parties as provided in the Interim Order;

(viii)   scheduling a <u>Final Hearing</u> within 30 days of entry of the Interim Order to consider entry of a Final Order that grants all of the relief requested in the Motion, and approving the form of notice with respect to the Final Hearing; and

(ix)     providing for the immediate effectiveness of the Interim Order and waiving any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness.

## BASIS FOR RELIEF REQUESTED

**A.      Entry into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment**

36.     The Debtors request that the Court authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the proceeds of the DIP Facility, and continue using the Cash Collateral. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances. Courts grant debtors considerable deference in acting in accordance with their business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. See, e.g., In re L.A. Dodgers LLC, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain

terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

37.    Bankruptcy courts generally will not second-guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." In re Curlew Valley Assoc.'s, 14 B.R. 506, 513–14 (Bankr. D. Utah. Oct 8, 1981).  To determine whether the business judgment test is met, the court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." In re Dura Auto. Sys. Inc., No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).

38.    In determining whether the Debtors have exercised sound business judgment in entering into the DIP Documents, the Court should consider the economic terms of the DIP Facility under the totality of circumstances.  See Hr'g Tr. at 734–35:24, In re Lyondell Chem. Co., No. 09-10023 (Bankr. S.D.N.Y. February 27, 2009) (recognizing that "the terms that are now available for DIP financing in the current economic environment aren't as desirable" as they once were previously, referring to the period following the 2008 financial markets collapse); In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); In re Elingsen McLean Oil Co., Inc., 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).

39.    Moreover, the Court may appropriately take into consideration non-economic benefits to the Debtors offered under the proposed postpetition facility.  See In re ION Media Networks, Inc., No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009)

(holding that "a business decision to obtain credit from a particular lender is almost never based purely on economic terms. . . .  Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. . . .").

40.     The Debtors' decision to enter into the DIP Documents is an exercise of their sound business judgment.  As further discussed in the Declarations, the DIP Facility was a product of good faith, arms'-length negotiation among the Debtors and the Prepetition Lender Group, which were the best (and only) available source of postpetition financing.  The Debtors ultimately decided that moving forward with the proposed DIP Facility was an appropriate step given that: (a) the DIP Facility allows the Debtors to avoid a value-destructive priming fight; (b) obtaining third-party debtor-in-possession financing was virtually impossible due to the amount of existing secured debt relative to the Debtors' financial position; (c) the DIP Facility will allow the Debtors to fund these Chapter 11 Cases and conduct a robust and value-maximizing Sale Process; and (d) in the event of a successful Sale Process, pursue confirmation of a chapter 11 plan liquidation and orderly wind-down of the bankruptcy estates.

41.     Ultimately, the Debtors and their advisors determined that the DIP Facility was appropriate and in the Debtors' best interests under the totality of circumstances.  The incremental liquidity provided under the DIP Facility is needed to ensure adequate working capital and funding for the other administrative expenses associated with these Chapter 11 Cases.  Absent this funding, the Debtors could not sustain operations throughout the Sale Process and would likely have to liquidate.  In light of the above, the Debtors determined that entry into the DIP Facility was the best path available, and they have obtained the best terms currently achievable under the circumstances.

**B.     The Debtors should Be Authorized to Grant Liens and Superpriority Claims**

42.     The Debtors propose to obtain the DIP Facility by providing security interests and liens as set forth in the DIP Documents and described herein.   The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to incur secured or superpriority debt under certain circumstances.   Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3)     secured by a junior lien on property of the estate that is subject to a lien[.]

11 U.S.C. § 364(c).

43.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.  See In re Crouse Grp., Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). "[Section 364(c)] imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp., 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).

44.     When few (or no) lenders are likely to be able or willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Savs. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); see also In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); In re Stanley Hotel, Inc., 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); In re Ames Dep't Stores, 115 B.R. at 40 (approving financing facility and holding that debtor made reasonable efforts to satisfy standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected most favorable of two offers it received).

45.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

    a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, i.e., by allowing a lender only an administrative claim;

    b.    the credit transaction is necessary to preserve the assets of the estate; and

    c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

See In re L.A. Dodgers LLC, 457 B.R. at 312; In re Aqua Assocs., 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991); see also In re St. Mary Hosp., 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988).

46.     As described herein, the Debtors are in need of an immediate infusion of liquidity to ensure sufficient working capital to operate their business and administer their estates in these

Chapter 11 Cases. Given the realities of the Debtors' prepetition finances and capital structure, third-party debtor-in-possession financing simply is not available. Likewise, the Debtors could not obtain junior unsecured postpetition financing sufficient to fund these Chapter 11 Cases, the Sale Process, and the chapter 11 plan process. Accordingly, the Debtors determined in their business judgment and in consultation with their legal and financial advisors that the only available avenue was to obtain debtor-in-possession financing from the Prepetition Lender Group. Under the circumstances, the Debtors believe the DIP Facility is fair, reasonable, and adequate.

47. Additionally, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, when the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Consent by the secured creditors to liens priming their interests in collateral obviates the need to show adequate protection. See Anchor Savs. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Accordingly, the Debtors may incur "priming" liens under the DIP Credit Agreement if either (a) the Prepetition Secured Parties consent to the priming or (b) the Prepetition Secured Parties' interests in collateral are adequately protected.

48. Here, the Prepetition Secured Parties have consented to priming under the DIP Facility. Additionally, the Interim Order provides the Prepetition Secured Parties shall receive as adequate protection for any diminution of their interest in the Prepetition Collateral (a) replacement liens pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code on the DIP Collateral, (b) superpriority administrative expense claims pursuant to sections 503(b), 507(a), and 507(b) of the

Bankruptcy Code, and (c) reimbursement of reasonable fees and expenses including any professional fees.  Further, Debtors do not believe that alternative sources of financing on equal or better terms than the DIP Facility are reasonably available.  The DIP Facility is the product of extensive good faith negotiations and the Debtors concluded after consulting with advisors that third-party debtor-in-possession financing was a virtual impossibility given the Debtors' existing capital structure and that the Prepetition Secured Parties would not consent to the priming of their liens by a third party.  Thus, the Debtors have determined that the DIP Facility provides the best option under the circumstances to fund these Chapter 11 Cases and the Sale Process.  Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

### C.    The Debtors Should Be Authorized to Use Cash Collateral

49.    Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's Cash Collateral.  Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).

50.    Parties with an interest in cash collateral are entitled to adequate protection under section 363(e) of the Bankruptcy Code.  See 11 U.S.C. § 363(e).  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  See In re Cont'l Airlines, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient

adequate protection on a case-by-case basis.  In re Swedeland Dev. Grp., Inc., 16 F.3d 552, 564 (3d Cir. 1994); In re Satcon Tech. Corp., No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); In re Columbia Gas Sys., Inc., Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); see also In re Dynaco Corp., 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

51.     As noted above, the Prepetition Secured Parties have consented to the use of Cash Collateral, and the Debtors are providing the Prepetition Secured Parties with adequate protection in the form of replacement liens, superpriority administrative expense claims, and payment of reasonable fees and expenses, which (i) is fair and reasonable and (ii) adequately protects against the diminution in value of the Prepetition Secured Parties interest in the Prepetition Collateral.  In light of the foregoing, the Debtors submit, and the Prepetition Secured Parties agree, that the proposed adequate protection to be provided is appropriate.

**D.     The Proposed Roll-Up Loans Should Be Approved**

52.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  It is well-settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.  See In re Abbots Dairies, Inc., 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) should be approved if the debtor can demonstrate a sound business justification for the proposed transaction).  The business judgment rule shields a debtor's management from judicial second-guessing.  In re Johns-Manville Corp., 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he

[Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

53.     The provisions providing for the replacement and refinancing (the "Roll-Up") of the ABL Facility (the "Roll-Up Provisions") into the DIP Obligations upon entry of the Interim Order and Final Order are necessary and appropriate components of the DIP Facility.  Further, "roll-ups" of prepetition obligations are commonly seen features in retail bankruptcies, in this and other jurisdictions, see, e.g., In re Charming Charlie Holdings, Inc., No. 17-12906 (Bankr. D. Del. Dec. 13, 2017) (approving in interim order the "roll-up" of all outstanding prepetition revolving obligations); In re American Apparel, Inc., No. 15-12055 (Bankr. D. Del. Oct. 6, 2015) (approving in interim order the repayment in full of all outstanding amounts under the prepetition revolving credit agreement); In re BCBG Max Azria Holdings, LLC, No. 17-10466 (Bankr. S.D.N.Y. Mar. 2, 2017) (approving in interim order the "roll-up of all outstanding prepetition revolving obligations), and the amount of the Roll-Up relative to the new money to be provided under the DIP Facility (a ratio of 1.85:1) is significantly more advantageous to the Debtors when compared with ratios that have been approved in many other cases.  See, e.g., In re Bon-Ton Stores, Inc., No. 18-10248 (Docket No. 120) (Bankr. D. Del. Feb. 6, 2018) (2.1:1 ratio); In re Real Indus. Inc., No. 17-12464 (Docket No. 50) (Bankr. D. Del. Nov. 20, 2017) (2.69:1 ratio); In re BCBG Max Azria Global Holdings LLC, No. 17-10466 (Docket No. 69) (Bankr. S.D.N.Y. Mar. 2, 2017) (2.93:1 ratio); In re Cal Dive Intl, Inc., No. 15-10458 (Docket No. 282) (Bankr. D. Del. Apr. 20, 2015) (4.9:1 ratio); In re RadioShack Corp., No. 15-10197 (Docket No. 947) (Bankr. D. Del. Mar. 12, 2015) (7.1:1 ratio).

54.     Here, the Roll-Up Provisions are: (a) required by the DIP Lenders as a condition to their commitment to provide postpetition new-money financing; (b) integral to the economic terms

of the DIP Facility; and (c) effectively a continuation of the prepetition status quo and will not layer any additional debt on top of the Debtors' capital structure. In addition, the DDTL Secured Parties and Priming Secured Parties have consented to the Roll-Up Provisions.

55.     Indeed, the relief sought in this Motion with respect to the repayment of prepetition debt is a common feature in debtor-in-possession financing arrangements, and courts routinely authorize roll-up arrangements. Further, the Interim Order makes clear that the prepetition obligations being rolled-up into the DIP Facility remain subject to investigation and challenge rights, and, accordingly, no parties in interest are prejudiced by the contemplated roll-ups. See Interim DIP Order ¶ 11.

**E.     The Rates and Fees of the DIP Facility Are Reasonable**

56.     Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the DIP Agents and the DIP Lenders. With respect to interest, the Debtors may request either "Base Rate Loans" or "SOFR Loans." Base Rate Loans accrue interest at a fluctuating rate per annum equal to the highest of: (a)(i) the Federal Funds Rate as in effect for such day, plus one half of one percent (0.5%); (ii) the Prime Rate as in effect for such day; and (iii) the sum of (x) Adjusted Term SOFR for a one-month tenor in effect on such day, plus (y) 1.00% plus (b) the Applicable Margin for Base Rate Loans (9% per annum). SOFR Loans accrue interest on a rate per annum equal to the sum of (i) Term SOFR plus (ii) 0.10% plus (iii) the Applicable Margin for SOFR Loans (10% per annum). In addition, the Debtors have agreed to pay certain customary fees associated with the DIP Facility.

57.     The collateral terms, covenants, interest rates, and fees under the DIP Facility were subject to negotiation and required by the DIP Agents and the DIP Lenders, and thus are an integral component of the overall terms of the DIP Facility. The Debtors considered the fees when

determining, in their sound business judgment, whether the DIP Facility constituted the best terms on which the Debtors could obtain sufficient debtor in possession financing.

58.     Under the circumstances, and particularly in light of the fact that the DIP Facility is being provided in connection with the Sale Process and, in the event of a Successful Sale Process, funding for a chapter 11 plan process, the interest rates and fees reflected in the DIP Credit Agreement are reasonable and substantially in line with other debtor in possession financings generally, including debtor in possession financings approved by courts in other comparable chapter 11 cases. Thus, the Debtors believe paying these fees in order to obtain the DIP Facility is in the best interests of the Debtors' estates.

**F.      The Milestones that the Debtors Must Meet Under the Terms of the DIP Facility Are Reasonable**

59.     As set forth in the chart above, the DIP Credit Agreement also contemplates, as a condition to providing the DIP Facility, certain (i) conditions precedent, (ii) milestones  in connection with the Sale Process (the "Milestones"), and (iii) Events of Default, all of which are customary for postpetition financing in chapter 11.

60.     The DIP Facility is an important component of the Debtors' chapter 11 efforts because it provides the Debtors the stability and certainty needed to ensure that the Sale Process is robust and conducted in a timely and efficient manner. The continued and viable operation of the Debtors' businesses during the Sale Process will not be possible absent access to the DIP Facility. The DIP Facility will prevent interruptions to the Debtors' operation, preserve the Debtors' ability to maintain ordinary course relationships with vendors, customers, and suppliers, and satisfy working capital needs in the ordinary course of business during the Sale Process. Moreover, the Milestones are reasonable under the circumstances and are not designed to make

the Debtors disproportionately susceptible to a breach of such terms.  Accordingly, the Milestones

and other conditions precedent and Events of Default are reasonable and should be approved.

**G.      The Carve-Out Is Appropriate**

61.      The liens granted pursuant to the DIP Documents, the Replacement Liens on

account of adequate protection, and the superpriority claims of the Prepetition Secured Parties are

subject and subordinate to the Carve-Out.  The Carve-Out contains similar terms to others that

courts have found to be reasonable and necessary to ensure that a debtor's estate and any statutory

committee can retain assistance from counsel and other appropriate advisors.   Without the

Carve-Out, the Debtors' estates may be deprived of possible rights and powers if the services for

which professionals may be compensated is restricted.  See In re Ames Dep't Stores, 115 B.R. at

38 (observing that courts insist on carve outs for professionals representing parties in interest

because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest

are sorely prejudiced").   Additionally, the Carve-Out protects against administrative insolvency

during the course of these Chapter 11 Cases by ensuring that assets remain for the payment of the

U.S. Trustee fees and professional fees, notwithstanding the grant of superpriority claims and

replacement liens as part of the adequate protection of the Prepetition Secured Parties' interests in

the Prepetition Collateral.  Accordingly, the Carve-Out is appropriate and should be approved.

**H.      The DIP Lenders Should Be Deemed Good Faith Lenders**

62.      Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect

on loans extended to a debtor, and its right in any lien securing those loans, even if the authority

of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.

Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this
> section [364 of the Bankruptcy Code] to obtain credit or incur debt,
> or of a grant under this section of a priority or a lien, does not affect

> the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

63.    Here, the Debtors believe the DIP Facility embodies the most favorable terms on which the Debtors could obtain postpetition financing.  Negotiations of the terms of the DIP Facility with the DIP Lenders were conducted in good faith and at arm's-length.   The terms and conditions of the DIP Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, and in accordance with the Financing Orders and the DIP Documents, including, for the avoidance of doubt, the DIP Budget (subject to any permitted variances).  Further, no consideration is being provided to any party to the DIP Documents other than as described herein and in the First Day Declaration.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

## I.    Modification of the Automatic Stay Is Warranted

64.    The relief requested herein contemplates a modification of the automatic stay to permit the Debtors to, among other things: (a) grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (b) upon the occurrence of an Event of Default (as defined in the DIP Documents), subject to any applicable notice periods set forth in the Financing Orders, for the DIP Lenders to exercise any remedies available to them; and (c) implement the terms of the proposed Financing Orders, including payment of all amounts referred to in the DIP Documents.

65.    Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these Chapter 11 Cases.

**J.    The Challenge Period Is Appropriate**

66.    Local Rule 4001-2(a)(i)(Q) requires that debtors set forth justification for provisions in financing orders that bind the estate or other parties in interest with respect to the validity, perfection or amount of a secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the initial interim order to investigate such matters.  Under the Interim Order, the Debtors' stipulations, admissions, agreements and releases contained in the Interim Order shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors) in all circumstances and for all purposes in the event that the Challenge Period terminates without the filing of a Challenge, or if any such Challenge is filed and overruled.

67.    The proposed Interim Order provides that, subject to the entry of a Final Order, the Challenge Period ends on the earlier of (x) seventy-five (75) calendar days following the Petition Date and (y) two (2) business days prior to a sale hearing scheduled pursuant to the Bidding Procedures Order to approve the sale of substantially all of the Debtors' assets to the Stalking Horse Purchaser or other bidder(s) in such process.  Accordingly, pursuant to the terms of the Interim Order, the Challenge Period may be shorter than the seventy-five (75) day period set forth in the Local Rules.  This potential shortening is justified by the facts and circumstances of these Chapter 11 Cases.

68.    These Chapter 11 Cases were filed after (i) the Prepetition Lender Group provided, on two separate occasions within the three months prior to the Petition Date, secured rescue/bridge

financing to sustain the Debtors' operations, and (ii) the Debtors' comprehensive marketing process failed to produce value-maximizing alternatives for the restructuring of the Debtors' businesses or the sale of its assets.  After undertaking these considerable efforts to identify an out-of-court solution to the Debtors' challenges, the Debtors concluded that a chapter 11 filing that included an expedited process for the sale of a material portion of their business was necessary to avoid damage to the customer and supplier goodwill that is essential to the success of a post-bankruptcy going concern.  The Debtors negotiated in good faith with the Prepetition Lender Group and reached consensus on a sale timeline that provides a full and fair opportunity for interested parties to bid on the assets while minimizing the negative effects on the Debtors' business.  Through these negotiations, the Prepetition Lender Group – through its designee, the Stalking Horse Purchaser – agreed to set the floor for the value of the Debtors' going concern assets through its stalking horse bid, but conditioned that bid, and the Prepetition Lender Group's agreement to provide the DIP Facility to continue to fund the Debtors' ongoing operations, on the completion of a sale process on the agreed expedited timeline.  Because the Stalking Horse Purchaser's bid for the assets includes a credit bid of Prepetition Secured Obligations, the shortening of the seventy-five (75) day challenge period provided by the Local Rules is necessary to ensure the sale transaction can close on that timeline.  The Debtors have requested a sale hearing for March 24, 2023, and therefore, if such hearing is scheduled by the Court, the shortened Challenge Period would be forty-five (45) days from the Petition Date.

69.    To expedite the review by any creditors' committee appointed in these Chapter 11 Cases of the Prepetition Secured Parties' claims and liens, the Debtors and the Prepetition Lender Group are prepared to provide any such committee with documentation related to the Prepetition Secured Debt immediately upon such committee's appointment.  Accordingly, the Debtors believe

that the Challenge Period provides any committee and other parties in interest with sufficient time within which to investigate and/or challenge the Debtors' stipulations, admissions, agreements and releases contained in the Interim Order.

## REQUEST FOR A FINAL HEARING

70.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request the Court set a date for the Final Hearing that is as soon as practicable, and in no event more than thirty (30) days following the entry of the Interim Order, in accordance with the Milestones, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## BANKRUPTCY RULE 6003

71.     The Court may grant the relief requested in this Motion immediately if the "relief is necessary to avoid immediate and irreparable harm." Bankruptcy Rule 6003; see also In re First NLC Fin. Servs., LLC, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008). The Third Circuit Court of Appeals has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions. In that context, the Third Circuit has instructed that irreparable harm is that which "cannot be redressed by a legal or an equitable remedy following a trial." Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989). As explained above and in the Declarations, access to the DIP Facility and the use of Cash Collateral, in the interim amounts proposed, are essential and the relief requested is narrowly tailored to only the relief that is necessary to prevent immediate and irreparable damage to the Debtors' operations, and, therefore, Bankruptcy Rule 6003 is satisfied.

## BANKRUPTCY RULE 6004(a) AND (h) WAIVERS ARE APPROPRIATE

72.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and waive the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy

Rule 6004(h).  The relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

### DEBTORS' STATEMENT PURSUANT TO LOCAL RULE 4001-2(a)(iii)

73.    The Debtors believe that the DIP Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the DIP Budget.

### RESERVATION OF RIGHTS

74.    Except as otherwise provided in the Financing Orders, nothing contained herein is intended or shall be construed as (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission to the validity, priority, enforceability, or perfection of any lien on, security interest in, or encumbrance on property of the Debtors' estates; or (g) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.

### NOTICE

75.    Notice of this Motion will be provided to: (a) the Office of the United States Trustee (Attn: Rosa Sierra-Fox); (b) counsel for any of the Prepetition Secured Parties, including the Prepetition Lender Group, the Priming Agent, ABL Agent, and  the DDTL Agent; (c) counsel for

the DIP Administrative Agent; (d) the Internal Revenue Service; (e) the parties included on the Debtors' consolidated list of their 30 largest unsecured creditors; (f) the United States Attorney for the District of Delaware; (g) the state attorneys general in states where the Debtors are authorized to do business; (h) any known party having a lien against the Prepetition Collateral; and (i) all parties entitled to notice pursuant to Bankruptcy Rule 2002-1. Notice of this Motion and any order entered in connection with this Motion will be served on all parties in accordance with Local Rule 9013-1(m). The Debtors respectfully submit that, in light of the nature of the relief requested, no further notice of this Motion is required.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order, substantially in the form annexed hereto as **Exhibit A**, and the Final Order, granting the relief requested herein and such other and further relief as the Court deems appropriate under the circumstances.

Dated:  February 6, 2023
Wilmington, Delaware

Respectfully submitted,

/s/ *Andrew L. Magaziner*
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Andrew L. Magaziner (No. 5426)
S. Alexander Faris (No. 6278)
Kristin L. McElroy (No. 6871)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile:  (302) 571-1253
Email:  amagaziner@ycst.com
          afaris@ycst.com
          kmcelroy@ycst.com

- and -

**MCDONALD HOPKINS LLC**
David A. Agay (*pro hac vice* admission pending)
Marc Carmel (*pro hac vice* admission pending)
Joshua Gadharf (*pro hac vice* admission pending)
Maria G. Carr (*pro hac vice* admission pending)
Ashley Jericho (*pro hac vice* admission pending)
300 North LaSalle Street, Suite 1400
Chicago, Illinois 60654
Telephone: (312) 280-0111
Facsimile:  (312) 280-8232
Email: dagay@mcdonaldhopkins.com
          mcarmel@mcdonaldhopkins.com
          jgadharf@mcdonaldhopkins.com
          mcarr@mcdonaldhopkins.com
          ajericho@mcdonaldhopkins.com

*Proposed Counsel to the Debtors and Debtors in Possession*

30096151.2

54

**<u>EXHIBIT A</u>**

**Interim DIP Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| INDEPENDENT PET PARTNERS | ) |
| HOLDINGS, LLC, *et al.*,[1] | ) Case No. 23-10153 (___) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507
(I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING;
(II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE
CLAIMS; (III) AUTHORIZING THE USE OF CASH COLLATERAL; (IV) GRANTING
ADEQUATE PROTECTION TO PREPETITION SECURED
PARTIES (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING
FINAL HEARING; AND (VII) GRANTING RELATED RELIEF**

Upon the *Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§
105, 361, 362, 363, 364, and 507 (I) Authorizing the Debtors to Obtain Postpetition Financing;
(II) Granting Liens and Superpriority Administrative Expense Claims; (III) Authorizing the Use
of Cash Collateral; (IV) Granting Adequate Protection to Prepetition Secured Parties;
(V)Modifying the Automatic Stay; (VI) Scheduling Final Hearing; and (VII) Granting Related
Relief* (the "Motion")[2] filed by the above-captioned debtors and debtors in possession (collectively,
the "Debtors") for entry of an interim order (the "Interim Order") pursuant to sections 105, 361,
362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), 507, and 552 of title 11 of the United

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are: Independent Pet Partners Holdings, LLC (5913), Independent Pet Partners Intermediate Holdings I,
LLC (4827), Independent Pet Partners Intermediate Holdings II, LLC (7550), Independent Pet Partners Employer
Holdings, LLC (6785), Independent Pet Partners Employer, LLC (7531), Independent Pet Partners Intermediate
Holdings, LLC (8793), IPP - Stores, LLC (6147), IPP Stores Employer, LLC (0847), Especially For Pets, LLC
(6801), Pet Life, LLC (3420), Whole Pet Central, LLC (7833), Natural Pawz, LLC (5615), and Pet Source, LLC
(1905). The corporate headquarters and the mailing address for the Debtors is 8450 City Centre Dr., Woodbury,
MN 55125.

[2]    Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Motion or the DIP
Credit Agreement (as defined herein).

States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b), 4001-1, 4001-2,

and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware (the "Local Rules"), *inter alia*:

> (i) authorizing Independent Pet Partners Intermediate Holdings, LLC, in its capacity as borrower (the "DIP Borrower"), to obtain postpetition financing, and for each of the other Debtors to guarantee unconditionally (the Debtors, other than the DIP Borrower, the "DIP Guarantors," and together with the DIP Borrower, the "DIP Loan Parties") on a joint and several basis, the DIP Borrower's obligations in connection with a senior secured superpriority debtor-in-possession term loan credit facility (the "DIP Facility") in the aggregate principal amount of up to $27,258,311.48 (the "DIP Loans") subject to the terms and conditions set forth in that certain *Senior Secured Superpriority Priming Debtor-in-Possession Credit Agreement* attached hereto as **Exhibit A** (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement"), by and among Independent Pet Partners Intermediate Holdings II, LLC, as parent, the DIP Borrower, as borrower, the DIP Guarantors, as guarantors, the several financial institutions or entities from time to time party thereto as Lenders (as defined in the DIP Credit Agreement) (the "DIP Lenders"), and Acquiom Agency Services LLC, as administrative and collateral agent (in such capacity, together with its successors and permitted assigns, the "DIP Agent," and together with the DIP Lenders and all holders of all other DIP Obligations (as defined below), the "DIP Secured Parties"), consisting of:

>> (a) New Money Loans. A superpriority senior secured delayed draw term loan credit facility in an aggregate principal amount not to exceed $9,557,894.74 (the "New Money Commitments" and the term loans made thereunder, the "New Money DIP Loans"), consisting of:

>>> (1) upon entry of the Interim Order, an initial draw (the "Initial New Money Draw") in an aggregate principal amount of up to $5,263,157.89 (the "Interim New Money DIP Loans"); and

>>> (2) upon entry of the Final Order (as defined below), an additional draw in an aggregate principal amount that will not, when combined with all Interim New Money DIP Loans advanced prior to such date, exceed $9,557,894.74 in aggregate principal amount (the "Final New Money DIP Loans"); and

>> (b) Roll-Up Loans. A superpriority term loan facility in the principal amount of up to $17,700,416.74 (the "Roll-Up Loans"), of which (x) $5,263,157.89 will be deemed funded in accordance with clause (1) below on the date of the Interim Draw, and (y) an additional $12,437,258.85 will be deemed funded in

accordance with clause (2) below, subject to the entry of and the terms of the Final Order, which Roll-Up Loans shall be deemed funded and an equal amount of Prepetition ABL Secured Obligations (as defined below) shall be deemed converted into and exchanged for, such Roll-Up Loans, in each case, at the times, and in accordance with the terms and conditions, set forth in the DIP Credit Agreement and the other DIP Loan Documents (as defined below) and as set forth below.

(1)     On the date of the Initial New Money Draw, $5,263,157.89 in aggregate amount of Prepetition ABL Secured Obligations shall be deemed converted into and exchanged for Roll-Up Loans ((the "Initial Roll-Up Loans") and, the Prepetition ABL Secured Obligations that are not rolled up into the Initial Roll-Up Loans, the "Remaining Prepetition ABL Secured Obligations")), and the Initial Roll-Up Loans shall be deemed funded on the date of the Initial New Money Draw, without constituting a novation, and shall satisfy and discharge $5,263,157.89 in aggregate amount of Prepetition ABL Secured Obligations as if a payment in such amount had been made under the Prepetition ABL Credit Agreement (as defined below). The Initial Roll-Up Loans shall be deemed to be made by each DIP Lender (the "Initial Roll-Up Lenders") in an amount equal to its pro rata share of the aggregate amount of the Prepetition ABL Secured Obligations owing to all Initial Roll-Up Lenders on the Closing Date.

(2)     On the date the Final Order is entered, $12,437,258.85 in aggregate amount of Prepetition ABL Secured Obligations (comprising all Prepetition ABL Secured Obligations outstanding as of the Petition Date (including, without limitation, all accrued and unpaid principal, interest, premiums and fees) *minus* the principal amount of the Initial Roll-Up Loans) shall be deemed converted into and exchanged for Roll-Up Loans (the "Final Roll-Up Loans"), and the Final Roll-Up Loans shall be deemed funded on the date of entry of the Final Order, without constituting a novation, and shall satisfy and discharge $12,437,258.85 in aggregate amount of Prepetition ABL Secured Obligations as if a payment in such amount had been made under the Prepetition ABL Credit Agreement (as defined below). The Final Roll-Up Loans shall be deemed to be made by each DIP Lender (the "Final Roll-Up Lenders") in an amount equal to its pro rata share of the aggregate amount of the Prepetition ABL Secured Obligations owing to all Final Roll-Up Lenders on the Closing Date.

(ii)     authorizing the Debtors to execute, deliver and perform under the DIP Credit Agreement and any other related documents, including security agreements, pledge agreements, mortgages, guaranties, promissory notes, certificates, instruments, and

such other documents that may be reasonably necessary, desirable or required to implement the DIP Facility and perform thereunder and/or that may be reasonably requested by the DIP Agent (collectively, as such may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "<u>DIP Loan Documents</u>"), each of which shall be in form and substance satisfactory to the DIP Secured Parties; and to perform such other acts as may be reasonably necessary, desirable or appropriate in connection with the DIP Loan Documents;

(iii)    granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, (a) DIP Liens (as defined below) on all of the DIP Collateral (as defined below) pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, which DIP Liens shall be senior to all liens, security interests, and pledges on the DIP Collateral, except for only Prior Senior Liens (as defined below), and shall be subject to the Carve-Out (as defined below); (b) valid, perfected second liens on any collateral subject to a Prior Senior Lien; and (c) to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, pursuant to section 364(c)(1) of the Bankruptcy Code, a superpriority administrative claim, subject and subordinate to the Carve-Out;

(iv)    authorizing and directing the Debtors to pay all principal, interest, fees, costs, expenses, and other amounts payable under the DIP Loan Documents as such become due and payable, as provided and in accordance therewith;

(v)    authorizing the Debtors to use Cash Collateral (as defined below), including any Cash Collateral in which any or all of the Prepetition Secured Parties (as defined below) have a lien or other interest, in each case whether existing on the Petition Date, arising pursuant to this Interim Order, or otherwise;

(vi)    modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order;

(vii)    granting adequate protection to the Prepetition Secured Parties (as defined below) as provided in this Interim Order;

(viii)    scheduling a final hearing (the "<u>Final Hearing</u>") within 30 days of entry of this Interim Order to consider entry of a final order that grants all of the relief requested in the Motion on a final basis (the "<u>Final Order</u>"), and approving the form of notice with respect to the Final Hearing; and

(ix)    providing for the immediate effectiveness of this Interim Order and waiving any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness.

Having considered the Motion, the *Declaration of Stephen Coulombe in Support of Chapter 11 Petitions and First Day Pleadings* (the "<u>First Day Declaration</u>"), the *Declaration of*

*Adam Dunayer in Support of Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Authorizing the Use of Cash Collateral; (IV) Granting Adequate Protection to Prepetition Secured Parties (V) Modifying The Automatic Stay, (VI) Scheduling Final Hearing; and (VII) Granting Related Relief* (the "<u>Dunayer Declaration</u>") and evidence submitted or proffered at the hearing on the Motion held on February __, 2023 (the "<u>Interim Hearing</u>"); and the Court having jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012; and the Court having determined that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having determined that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having considered the Motion, the First Day Declaration, the Dunayer Declaration and the arguments of counsel at the Interim Hearing; and the Court having found that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, as contemplated by Bankruptcy Rules 4001 and 6003; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors and their respective estates, creditors, and other parties in interest; and it appearing that the Debtors' entry into the DIP Facility is a sound and prudent exercise of the Debtors' business judgment; and the Court having found that proper and adequate notice of the Motion and Interim Hearing thereon has been given under the circumstances and that no other or further notice is necessary for the interim relief requested in the Motion; and the Court having found that good and sufficient cause exists for the granting of the

relief requested in the Motion after having given due deliberation to the Motion and all of the proceedings had before the Court in connection with the Motion, **THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A.      Petition Date.  On February 5, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court"), commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases").

B.      Debtors in Possession.  The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 Cases.

C.      Jurisdiction and Venue.  This Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue of the Chapter 11 Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and other bases for the relief sought herein are sections 105, 361, 362, 363, 364, 503, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, 9013, and 9014, and Local Rules 2002-1, 4001-1, 4001-2, 7007-1, 9013-1, 9013-4, and 9014-2.

D.      Committee.  As of the date hereof, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has not yet appointed an official committee in these

---

[3]      Where appropriate in this Interim Order, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact pursuant to Bankruptcy Rule 7052.

Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (any such committee, "Committee").

        E.      <u>Debtors' Stipulations</u>. In requesting the DIP Facility and the use of Cash Collateral, and in exchange for and as a material inducement to the DIP Lenders and the Prepetition Secured Parties to agree to provide, or consent to, the DIP Facility, the Debtors' access to the Cash Collateral, and subordination of the Prepetition Liens to the Carve-Out and the DIP Liens (which DIP Liens shall be subject and subordinate to the Carve-Out) and as a condition to providing financing under the DIP Facility and consenting to the use of Cash Collateral, subject to the rights of the parties-in-interest (other than the Debtors) set forth in paragraph 12 hereof, the Debtors permanently and irrevocably admit, stipulate, acknowledge, and agree, as follows (collectively, the "<u>Debtors' Stipulations</u>"):

(i)    <u>Prepetition Priming Term Loan Facility</u>. Pursuant to that certain Credit Agreement, dated as of November 28, 2022 (as amended by the First Amendment to Credit Agreement, dated as of January 25, 2023, and as further amended, supplemented or otherwise modified prior to the date hereof, the "<u>Prepetition Priming Credit Agreement</u>," and collectively with the other Loan Documents (as defined in the Prepetition Priming Credit Agreement), the "<u>Prepetition Priming Loan Documents</u>")), by and among, Parent, as parent, IPP Intermediate Holdings, as borrower, (together with the Debtor guarantors party thereto, collectively, the "<u>Prepetition Priming Loan Parties</u>"), the financial institutions party thereto from time to time, as lenders (the "<u>Prepetition Priming Loan Lenders</u>") and Acquiom Agency Services LLC, as administrative and collateral agent (the "<u>Prepetition Priming Agent</u>," and together with the Prepetition Priming Loan Lenders, the "<u>Prepetition Priming Secured Parties</u>"), the Prepetition Priming Loan Parties incurred indebtedness to the Prepetition Priming Secured Parties under a term loan credit facility (the "<u>Prepetition Priming Loans</u>").

(ii)    <u>Prepetition Priming Secured Obligations</u>. As of the Petition Date, each of the Debtors was justly and lawfully indebted and liable to the Prepetition Priming Secured Parties, without defense, counterclaim or offset of any kind, in respect of the Prepetition Priming Loans in the aggregate principal amount of not less than $9,157,387.44 (such indebtedness together with accrued and unpaid interest thereon and fees, expenses, charges, indemnities and all other obligations of whatever nature, whether or not contingent, whenever arising, due, or owing, and all other Obligations (as defined in the Prepetition Priming Credit Agreement) incurred in connection therewith as provided in the Prepetition Priming Loan Documents, the "<u>Prepetition Priming Secured Obligations</u>").

(iii)    <u>Prepetition Priming Loan Liens</u>.  Pursuant to the Prepetition Priming Loan Documents, the Prepetition Priming Secured Obligations are secured by valid, binding, perfected, and enforceable first priority security interests and liens (the "<u>Prepetition Priming Loan Liens</u>") on the "Collateral" (the "<u>Prepetition Priming Loan Collateral</u>"), as such term is defined in the Prepetition Priming Credit Agreement.  The Prepetition Priming Loan Collateral consists of substantially all of the assets of the Debtors, except as set forth in the Prepetition Priming Credit Agreement.

(iv)    <u>Prepetition ABL Credit Facility</u>.  Pursuant to that certain Credit Agreement, dated as of December 22, 2017 (as amended, supplemented or otherwise modified prior to the date hereof, the "<u>Prepetition ABL Credit Agreement</u>," and collectively with the other Loan Documents (as defined in the Prepetition ABL Credit Agreement), the "<u>Prepetition ABL Loan Documents</u>"), by and among, Parent, as parent and guarantor, IPP Holdings, as borrower, the Debtor borrowers named therein, as borrowers, and the Debtor guarantor named therein (collectively, the "<u>Prepetition ABL Loan Parties</u>"), the financial institutions party thereto from time to time, as Lenders (the "<u>Prepetition ABL Lenders</u>") and Acquiom Agency Services LLC as successor in such capacity to CIT Bank, N.A., as administrative and collateral agent (the "<u>Prepetition ABL Agent</u>," and together with the Prepetition ABL Lenders, the "<u>Prepetition ABL Secured Parties</u>"), the Prepetition ABL Loan Parties incurred indebtedness to the Prepetition ABL Secured Parties under a revolving credit facility (the "<u>Prepetition ABL Loans</u>").

(v)    <u>Prepetition ABL Secured Obligations</u>.  As of the Petition Date, each of the Debtors was justly and lawfully indebted and liable to the Prepetition ABL Secured Parties, without defense, counterclaim or offset of any kind, in respect of the Prepetition ABL Loans in the aggregate principal amount of not less than $17,471,709.04 (such indebtedness together with accrued and unpaid interest thereon and fees, expenses, charges, indemnities and all other obligations of whatever nature, whether or not contingent, whenever arising, due, or owing, and all other Obligations (as defined in the Prepetition ABL Credit Agreement) incurred in connection therewith as provided in the Prepetition ABL Loan Documents, the "<u>Prepetition ABL Secured Obligations</u>").

(vi)    <u>Prepetition ABL Liens</u>.  Pursuant to the Prepetition ABL Loan Documents, the Prepetition ABL Secured Obligations are secured by:

    a.    valid, binding, perfected, and enforceable second priority (subject to the Prepetition Priming Loan Liens) security interests and liens (the "<u>Prepetition ABL Priority Liens</u>") on the following assets of the Debtors (the "<u>Prepetition ABL Priority Collateral</u>"): (1) all accounts (except to the extent that such accounts constitute identifiable proceeds of Prepetition DDTL Priority Collateral (as defined below)); (2) all inventory; (3) all deposit accounts and securities accounts into which any proceeds of Prepetition ABL Priority Collateral are deposited (including any cash and other funds or other property held in or on deposit therein, except to the extent that such deposit accounts or securities accounts contain identifiable proceeds of Prepetition DDTL Priority Collateral); (4) all payment intangibles; (5) all instruments, chattel paper (including all tangible and

electronic chattel paper) and other contracts, in each case to the extent governing, evidencing, substituting for, arising from or constituting proceeds of Prepetition ABL Priority Collateral described in clauses (1) through (4) above; (6) all contracts, documents of title, and other documents that evidence the ownership of, right to receive or possess, or that otherwise relate to Prepetition ABL Priority Collateral, including contracts, documents of title, and other documents to the extent relating to the acquisition of, or sale or other disposition of Prepetition ABL Priority Collateral described in clauses (1) through (4) above; (7) all guaranties, contracts of suretyship, insurance, letters of credit, letter-of-credit rights, security and other credit enhancements (including repurchase agreements), and supporting obligations, in each case in respect of Prepetition ABL Priority Collateral described in clauses (1) through (4) above, including (i) rights of stoppage in transit, replevin, repossession, reclamation, and other rights and remedies of an unpaid vendor, and (ii) identifiable deposits by and property of account debtors or other persons securing the obligations of account debtors in respect of accounts or other receivables; (8) all commercial tort claims and general intangibles (other than intellectual property) to the extent (i) arising from, relating to, or constituting proceeds of Prepetition ABL Priority Collateral described in clauses (1) through (4) above, (ii) relating to or arising out of the manufacture, distribution, sale, or other Disposition of inventory, or (iii) relating to or arising out of the collection of, or realization upon Prepetition ABL Priority Collateral; (9) all cash and cash equivalents of any kind at any time deposited with or held by any Prepetition ABL Secured Party that arise from or constitute proceeds of Prepetition ABL Priority Collateral described in clauses (1) through (4) above; (10) all investment property (including securities, whether certificated or uncertificated, securities accounts, security entitlements, commodity contracts, or commodity accounts) and all monies, credit balances, deposits, and other property of any Grantor now or hereafter held, or received by, or in transit to, a Prepetition ABL Secured Party, any bank, securities intermediary, depository, or other institution from or for the account of any Grantor, whether for safekeeping, pledge, custody, transmission, collection, or otherwise, in each case, to the extent arising from or constituting proceeds of Prepetition ABL Priority Collateral described in clauses (1) through (4) above; (11) all claims under policies of casualty insurance and all proceeds of casualty insurance, in each case, payable by reason of loss or damage to Prepetition ABL Priority Collateral described in clauses (1) through (4) above and all claims under policies of business interruption insurance and all proceeds of business interruption insurance; (12) all intercompany loans and advances (unless funded directly with the proceeds of Prepetition DDTL Loans (as defined below) or Prepetition DDTL Priority Collateral); (13) to the extent not otherwise described above, all receivables; (14) all books and records evidencing, relating to, or referring to any of the foregoing; and (15) all substitutions, replacements, accessions, products, or proceeds of any of the foregoing, in

any form, including insurance proceeds and all claims against third parties for loss or damage to, or destruction of, or other involuntary conversion (including claims in respect of condemnation) of any kind or nature of any or all of the foregoing; and

b.  valid, binding, perfected, and enforceable third priority (subject to the Prepetition Priming Loan Liens and Prepetition DDTL Priority Liens (as defined below)) security interests and liens (the "Prepetition ABL Junior Liens," and together with the Prepetition ABL Priority Liens, the "Prepetition ABL Liens") on all assets of the Debtors other than (1) Prepetition ABL Priority Collateral and (2) assets that are excluded from collateral under the Prepetition ABL Loan Documents (the "Prepetition DDTL Priority Collateral," and collectively with the Prepetition ABL Priority Collateral and the Prepetition Priming Loan Collateral, the "Prepetition Collateral").

(vii)  Delayed Draw Term Loan Facility.  Pursuant to that certain Credit Agreement, dated as of November 20, 2018 (as amended, supplemented or otherwise modified prior to the date hereof, the "Prepetition DDTL Credit Agreement," and collectively with the other Loan Documents (as defined in the Prepetition DDTL Credit Agreement, the "Prepetition DDTL Loan Documents," and collectively with the Prepetition Priming Loan Documents and the Prepetition ABL Loan Documents, the "Prepetition Loan Documents"), by and among, Parent, as parent, IPP Intermediate Holdings, as borrower (collectively with the Debtor guarantors party thereto, the "Prepetition DDTL Loan Parties," and collectively with the Prepetition Priming Loan Parties and the Prepetition ABL Loan Parties, the "Prepetition Loan Parties"), the financial institutions party thereto from time to time, as lenders (the "Prepetition DDTL Lenders," and collectively with the Prepetition Priming Loan Lenders and the Prepetition ABL Lenders, the "Prepetition Lenders") and Wilmington Trust, National Association, as administrative and collateral agent (the "Prepetition DDTL Agent," and together with the Prepetition DDTL Lenders, the "Prepetition DDTL Secured Parties," and collectively with the Prepetition Priming Secured Parties and the Prepetition ABL Secured Parties, the "Prepetition Secured Parties"), the Prepetition DDTL Loan Parties incurred indebtedness to the Prepetition DDTL Secured Parties under a term loan credit facility (the "Prepetition DDTL Loans").

(viii)  Prepetition DDTL Secured Obligations.  As of the Petition Date, each of the Debtors was justly and lawfully indebted and liable to the Prepetition DDTL Secured Parties, without defense, counterclaim or offset of any kind, in respect of the Prepetition DDTL Loan Documents in the aggregate principal amount of not less than $84,014,429.46 (such indebtedness together with accrued and unpaid interest thereon and fees, expenses, charges, indemnities and all other obligations of whatever nature, whether or not contingent, whenever arising, due, or owing, and all other Obligations (as defined in the Prepetition DDTL Credit Agreement) incurred in connection therewith as provided in the Prepetition DDTL Loan Documents, the "Prepetition DDTL Secured Obligations," and together with the Prepetition Priming Secured Obligations, and the Prepetition ABL Secured Obligations, the "Prepetition Secured Obligations").

(ix)  <u>Prepetition DDTL Liens</u>.  Pursuant to the Prepetition DDTL Loan Documents, the Prepetition DDTL Secured Obligations are secured by:

a.  valid, binding, perfected, and enforceable second priority (subject to the Prepetition Priming Loan Liens) security interests and liens (the "<u>Prepetition DDTL Priority Liens</u>") on the Prepetition DDTL Priority Collateral; and

b.  valid, binding, perfected, and enforceable third priority (subject to the Prepetition Priming Loan Liens and the Prepetition ABL Priority Liens) (the "<u>Prepetition DDTL Junior Liens</u>," and together with the Prepetition DDTL Priority Liens, the "<u>Prepetition DDTL Liens</u>," and collectively with the Prepetition Priming Loan Liens and the Prepetition ABL Liens, the "<u>Prepetition Liens</u>") on the Prepetition ABL Priority Collateral.

(x)  <u>Prepetition Collateral</u>. To secure the Prepetition Obligations, the Debtors entered into certain security agreements and certain intercreditor agreements, including the Prepetition ABL/DDTL Intercreditor Agreement and the Prepetition Priming Intercreditor Agreement (each as defined below), governing the Prepetition Secured Parties' respective security interests in the Prepetition Collateral (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, and together with any ancillary collateral documents, including, without limitation, any related mortgages and deeds of trust, the "<u>Prepetition Collateral Documents</u>"). Pursuant to the Prepetition Collateral Documents, and on the terms set forth therein and subject to the Prepetition ABL/DDTL Intercreditor Agreement, the Prepetition Priming Intercreditor Agreement and any other applicable intercreditor agreements, the Debtors granted to the Prepetition Agents (as defined below), for the benefit of their respective Prepetition Secured Parties, the respective Prepetition Liens on the Prepetition Collateral.

(xi)  <u>Cash Collateral</u>. Any and all of the Debtors' cash, including all amounts on deposit or maintained in any banking, checking, or other deposit accounts by the Debtors, any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral existing as of the Petition Date or deposited into the Debtors' banking, checking, or other deposit accounts after the Petition Date, and the proceeds of any of the foregoing is the Prepetition Secured Parties' cash collateral within the meaning of Bankruptcy Code section 363(a) (the "<u>Cash Collateral</u>").

(xii)  <u>Bank Accounts</u>. The Debtors acknowledge and agree that as of the Petition Date, none of the Debtors has either opened or maintains any bank accounts other than the accounts listed in the exhibit attached to any order authorizing the Debtors to continue to use the Debtors' existing cash management system (the "<u>Cash Management Order</u>").

(xiii)  <u>No Control</u>.  None of the Prepetition Loan Parties controls the Debtors or their properties or operations, has authority to determine the manner in which any Debtors' operations are conducted or are control persons or insiders of the Debtors by virtue of

any of the actions taken with respect to, in connection with, related to, or arising from the Prepetition Secured Obligations.

(xiv) <u>Prepetition Secured Obligations</u>. The Prepetition Secured Obligations owing to the Prepetition Secured Parties (including, from and after the deemed funding of the Initial Roll-Up Loans, the Remaining Prepetition ABL Secured Obligations) constitute legal, valid, and binding obligations of the Debtors and their applicable affiliates, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of the Prepetition Secured Obligations owing to the Prepetition Secured Parties is subject to avoidance, recharacterization, reduction, set-off, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery, subordination, or any other challenges pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity, including in any cases under chapter 7 of the Bankruptcy Code upon the conversion of any of these Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "<u>Successor Cases</u>").

(xv) <u>Prepetition Liens</u>. The Prepetition Liens granted to the respective Prepetition Agents on behalf of the applicable Prepetition Secured Parties (including, from and after the deemed funding of the Initial Roll-Up Loans, the Prepetition ABL Liens, which shall continue in effect to secure the Remaining Prepetition ABL Secured Obligations) (1) constitute legal, valid, binding, enforceable (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and perfected security interests in and liens on the Prepetition Collateral, (2) encumber all of the Prepetition Collateral, as the same existed on the Petition Date, (3) were granted to, or for the benefit of, the applicable Prepetition Secured Parties for fair consideration and reasonably equivalent value and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or commitments and other financial accommodations secured thereby, (4) are entitled to adequate protection as set forth herein, and (5) are not subject to defense, counterclaim, recharacterization, subordination, avoidance, or recovery pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity.

(xvi) <u>No Challenges/Claims</u>. No offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Secured Obligations exist, and no portion of the Prepetition Liens or Prepetition Secured Obligations is subject to any challenge or defense including, without limitation, impairment, set-off, avoidance, disallowance, disgorgement, reduction, recharacterization, recovery, subordination (equitable or otherwise), attack, offset, defense, counterclaims or cross-claims pursuant to the Bankruptcy Code or applicable non-bankruptcy law. The Debtors and their respective Estates have no valid Claims (as such term is defined in section 101(5) of the Bankruptcy Code) objections, challenges, causes of action, and/or choses in action against any of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees with respect to the Prepetition Loan Documents, the Prepetition Secured Obligations, the Prepetition Liens, or otherwise, whether arising at

law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents.

F.    Findings Regarding Postpetition Financing and Use of Cash Collateral.

(a)    The Debtors have requested from each of the DIP Secured Parties, and the DIP Secured Parties are willing to provide financing to the Debtors subject to: (a) for the Initial New Money Draw, entry of this Interim Order and, for subsequent borrowings, the Final Order; (b) Court approval of the terms and conditions of the DIP Facility and the DIP Loan Documents; (c) satisfaction or waiver of the closing conditions set forth in the DIP Loan Documents; and (d) findings by this Court that the DIP Facility is essential to the Debtors' estates, that the DIP Secured Parties are extending credit to the Debtors pursuant to the DIP Loan Documents in good faith, and that the DIP Secured Parties' claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order and the DIP Loan Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

(b)    The Debtors have an immediate and critical need to obtain (a) postpetition financing in the amount of the Initial New Money Draw on an interim basis pursuant to the DIP Facility, and (b) permission to use Cash Collateral (solely to the extent consistent with the Approved Budget, subject to any Permitted Variance set forth herein and in the DIP Credit Agreement), in order to, among other things, permit the orderly continuation of the operation of their businesses, to maintain business relationships, to make capital expenditures, to satisfy other working capital and operational needs, to conduct an orderly and value-maximizing process for the sale of a substantial portion of the Debtors' businesses as a going concern, and an orderly liquidation of the remaining portion of such businesses and wind-down of the Debtors' estates, for the benefit of the Debtors' stakeholders.   The ability of the Debtors to maintain business

relationships with their vendors, suppliers, and customers requires the availability of working capital from the DIP Facility and Cash Collateral, the absence of which would immediately and irreparably harm the Debtors, their estates, and parties-in-interest.  The Debtors do not have sufficient available sources of working capital and financing to preserve the value of their businesses without the ability to borrow under the DIP Facility and use Cash Collateral.  Immediate and irreparable harm will be caused to the Debtors and their estates if the financing under the DIP Facility is not obtained in accordance with the terms of this Interim Order and, as applicable, the DIP Loan Documents, or if the Debtors are unable to use Cash Collateral.

(c)    The Debtors are unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the terms of the DIP Facility.  The Debtors are unable to obtain, pursuant to sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code, (a) unsecured credit allowable under section 503(b) of the Bankruptcy Code as an administrative expense, (b) credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  The Debtors are further unable to obtain secured credit under section 364(d)(1) without (a) granting to the DIP Secured Parties the rights, remedies, privileges, benefits and protections provided herein and in the DIP Loan Documents, including the DIP Liens and the DIP Superpriority Claim (as defined below), and (b) granting to the Prepetition Loan Parties the rights, remedies, privileges, benefits and protections provided herein, including the Prepetition Loan Adequate Protection Liens.  The Roll-Up Loans are an integral part of the DIP Facility, without which the DIP Lenders would be unwilling to extend the New Money Commitments.

(d)     The DIP Facility has been negotiated in good faith and at arm's length among the Debtors and the DIP Secured Parties, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Loan Documents, including, without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Loan Documents and all other obligations under the DIP Loan Documents (collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Secured Parties in good faith as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code. The DIP Obligations, the DIP Liens, and the DIP Superiority Claims shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, and any liens or claims granted to, or payments made to, the DIP Agent or the DIP Lenders hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

(e)     Each of the Prepetition Secured Parties (including, from and after the deemed funding of the Initial Roll-Up Loans, the Prepetition ABL Secured Parties with respect to the Prepetition ABL Liens, which shall continue in effect to secure the Remaining Prepetition ABL Secured Obligations) are entitled, pursuant to sections 105, 361, 362 and 363(e) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including Cash Collateral, for any diminution in the value thereof.

(f)     In light of the Prepetition Secured Parties' agreement to subordinate their liens and superiority claims to the DIP Obligations and the Carve-Out and to permit the use of

their Cash Collateral as set forth herein, the Prepetition Secured Parties are entitled to the rights and benefits of section 552(b) of the Bankruptcy Code and, subject to and upon entry of the Final Order, a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code.

(g)     Holders constituting Required Lenders (as such term is defined in each of the Prepetition Priming Credit Agreement, Prepetition ABL Credit Agreement, and the Prepetition DDTL Credit Agreement) have consented to, conditioned on the entry of this Interim Order, the Debtors' incurrence of the DIP Facility, and proposed use of Cash Collateral on the terms and conditions set forth in this Interim Order, including, without limitation, the terms of the adequate protection provided for in this Interim Order.

G.     Section 506(c).  In light of the DIP Secured Parties' agreement to extend credit to the Debtors on the terms described herein, upon entry of the Final Order, each of the DIP Secured Parties shall be entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code in respect of the DIP Collateral, subject to the Carve-Out.

H.     Business Judgment and Good Faith Pursuant to Section 364(e).  The terms and conditions of the DIP Facility, the DIP Loan Documents, and the fees paid and to be paid thereunder to the DIP Secured Parties, are fair, reasonable, and the best available to the Debtors under the circumstances, are ordinary and appropriate for secured postpetition financing to debtors in possession, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  Good cause has been shown for entry of this Interim Order, and entry of this Interim Order is in the best interests of the Debtors and their estates and creditors.  The terms and conditions of the DIP Facility and the use of Cash Collateral were negotiated in good faith and at arms' length among the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties with the assistance and counsel of

their respective advisors.  Credit to be extended under the DIP Facility shall be deemed to have been allowed, advanced, made or extended in good faith by the DIP Secured Parties, within the meaning of section 364(e) and shall be entitled to the full protection of section 364(e).  The Prepetition Secured Parties have agreed to the use of Cash Collateral in good faith, and the Prepetition Secured Parties shall be entitled to the full protection of sections 363(m) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.  Based on the Motion, the First Day Declaration and the Dunayer Declaration, and on the record presented at the Interim Hearing, the terms of the DIP Facility are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration.

I.    Notice.  Notice of the interim relief requested in the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or entry of this Interim Order is or shall be required.

J.    Immediate Entry.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2), 4001(c)(2), and 6003.  Absent entry of this Interim Order, the Debtors' businesses, and estates would be immediately and irreparably harmed. This Court concludes that entry of this Interim Order is in the best interests of the Debtors' respective estates and stakeholders.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.     <u>Interim Financing Approved</u>.  The Motion is GRANTED on an interim basis as set forth herein.

2.     <u>Objections Overruled</u>.  Any objections, reservations of rights, or other statements with respect to entry of the Interim Order, to the extent not withdrawn or resolved, are OVERRULLED on the merits.

3.     <u>Authorization of the DIP Facility and the DIP Loan Documents</u>.

(a)     The DIP Borrower and the DIP Guarantors are hereby immediately authorized and empowered to enter into, and execute and deliver, the DIP Loan Documents, including the DIP Credit Agreement, and such additional documents, instruments, certificates and agreements as may be reasonably required or requested by the DIP Secured Parties or the Prepetition Secured Parties to implement the terms or effectuate the purposes of this Interim Order and the DIP Loan Documents and to effectuate the exchange of  Prepetition ABL Secured Obligations for Initial Roll-Up Loans. To the extent not entered into as of the date hereof, the Debtors and the DIP Secured Parties shall negotiate the DIP Loan Documents in good faith, and in all respects such DIP Loan Documents shall be, subject to the terms of this Interim Order and the Final Order, consistent with the terms of the DIP Credit Agreement and otherwise reasonably acceptable to the DIP Agent (acting at the direction of the required lenders under and pursuant to the DIP Credit Agreement (the "<u>Required DIP Lenders</u>")) and the Required DIP Lenders.  Upon entry of this Interim Order, the Interim Order, the DIP Credit Agreement, and other DIP Loan Documents shall govern and control the DIP Facility.  The DIP Agent is hereby authorized to execute and enter into its respective obligations under the DIP Facility Documents, subject to the terms and conditions set forth therein and this Interim Order.  Upon execution and delivery thereof, the DIP Loan Documents shall constitute valid and binding obligations of the Debtors enforceable

in accordance with their terms.  To the extent there exists any conflict among the terms and conditions of the DIP Loan Documents and this Interim Order, the terms and conditions of this Interim Order shall govern and control.

(b)    Upon entry of this Interim Order, the DIP Borrower is hereby authorized to borrow, and the DIP Guarantors are hereby authorized to guaranty, borrowings up to an aggregate principal amount of $10,526,315.78 of DIP Loans (inclusive of the Initial Roll-Up Loans), of which (i) $5,263,157.89 of New Money DIP Loans will be made available to the DIP Borrower on the date of this Interim Order, and (ii) $5,263,157.89 of Initial Roll-Up Loans shall be deemed funded and converted from and exchanged for Prepetition ABL Secured Obligations upon the Initial New Money Draw as if a payment in such amount had been made under the Prepetition ABL Credit Agreement, subject to and in accordance with this Interim Order, without any further action by the Debtors or any other party.

(c)    In accordance with the terms of this Interim Order and the DIP Loan Documents, proceeds of the DIP Loans shall be used solely for the purposes permitted under the DIP Loan Documents and this Interim Order, and in accordance with the Approved Budget, subject to any Permitted Variance as set forth in this Interim Order and the DIP Loan Documents; provided, however, that, notwithstanding the inclusion of a line item in the Approved Budget for the payment of $2,000,000 (the "Wind-Down Amount") for the actual expenses of the wind down of the Sellers' estates, or anything to the contrary contained herein, the funding of the Wind-Down Amount from Cash Collateral or proceeds of the DIP Facility shall be conditioned upon the closing of an Acceptable Sale (as defined in the DIP Credit Agreement) (the foregoing proviso, the "Wind-Down Proviso").  Attached as **Exhibit B** hereto and incorporated herein by reference is a budget

prepared by the Debtors and approved by the Required DIP Lenders in accordance with the DIP Credit Agreement (the "Initial Budget").

(d)     In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted solely to the extent necessary to perform all acts and to make, execute, and deliver all instruments and documents (including, without limitation, the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent contemplated thereby, or the DIP Credit Agreement), and to pay all fees (including all amounts owed to the DIP Lenders and the DIP Agent under the DIP Loan Documents and the Prepetition Agents under the Prepetition Loan Documents) that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Facility, including, without limitation:

(1) the execution, delivery, and performance of the DIP Loan Documents, including, without limitation, the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent required thereby;

(2) the execution, delivery, and performance of one or more amendments, waivers, consents, or other modifications to and under the DIP Loan Documents (in each case in accordance with the terms of the applicable DIP Loan Documents and in such form as the Debtors, the DIP Agent, and the Required DIP Lenders may reasonably agree), it being understood that no further approval of the Court shall be required for amendments, waivers, consents, or other modifications to and under the DIP Loan Documents or the DIP Obligations that are not material; provided, that, any such non-

material amendment shall be provided to the U.S. Trustee and counsel for the Committee to the extent one has been appointed at such time;

(3) the non-refundable payment to each of and/or on behalf of the DIP Secured Parties, as applicable, of the fees referred to in the DIP Loan Documents, including (x) all fees and other amounts owed to the DIP Agent and the DIP Lenders and (y) all reasonable and documented costs and expenses as may be due from time to time, including, without limitation, the reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Loan Documents and this Interim Order (whether incurred before or after the Petition Date), including, for the avoidance of doubt, (a) Dechert LLP (as counsel), Richards Layton & Finger, P.A. (as local bankruptcy counsel), Vinson & Elkins LLP (as counsel to certain DIP Lenders), and any other professionals necessary to represent the interests of the DIP Lenders and Prepetition Lenders in connection with the Chapter 11 Cases (collectively, the "DIP/Prepetition Lender Advisors"); and (b) Paul Hastings, LLP, as counsel to the DIP Agent; and, to the extent necessary to exercise its rights and fulfill its obligations under the DIP Loan Documents, one counsel to the DIP Agent in each local jurisdiction, which such fees and expenses shall not be subject to the approval of the Court, nor shall any recipient of any such payment be required to file with respect thereto any interim or final fee application with the Court, provided that any fees and expenses of a professional shall be subject to the provisions of paragraph 19 of this Interim Order; and

(4) the performance of all other acts required under or in connection with the DIP Loan Documents, including, without limitation, pursuant to the Escrow Agreement.

(e)    Upon entry of this Interim Order and subject and subordinate to the Carve-Out, such DIP Loan Documents, the DIP Obligations, and the DIP Liens shall constitute valid, binding, and non-avoidable obligations of the Debtors enforceable against each Debtor in accordance with their respective terms and the terms of this Interim Order for all purposes during the Chapter 11 Cases, any subsequently converted Chapter 11 Case of any Debtor to a case under chapter 7 of the Bankruptcy Code or after the dismissal of any Chapter 11 Case.  No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Loan Documents, or this Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim.  All payments or proceeds remitted (a) to or on behalf of the DIP Agent on behalf of any DIP Secured Parties or (b) to or on behalf of any Prepetition Secured Parties, in each case, pursuant to the DIP Loan Documents, the provisions of this Interim Order, or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) or the "equities of the case" exception of section 552(b) of the Bankruptcy Code (and, solely in the case of waivers of rights under sections 506(c) and the "equities of the case" exception of section 552(b), subject to the entry of the Final Order).

(f)      The DIP Guarantors are hereby authorized and directed to jointly, severally, and unconditionally guarantee, and upon entry of this Interim Order shall be deemed to have guaranteed, in full, all of the DIP Obligations of the DIP Borrower.

4.      Budget and Variance Reporting.  The Debtors will deliver to the DIP Agent, the Prepetition Agents, and the DIP/Prepetition Lender Advisors a supplement to the Approved Budget then in effect (each, a "Budget Supplement"), in addition to a variance report, in each case, in form, scope and detail satisfactory to the Required DIP Lenders (the "Approved Budget Variance Report"), at such times as required and set forth in the DIP Credit Agreement.

5.      Access to Records.  The Debtors shall provide the DIP/Prepetition Lender Advisors and the Prepetition Agents with all reporting and other information required to be provided to the DIP Agent under the DIP Loan Documents.  In addition to, and without limiting, whatever rights to access the DIP Secured Parties have under the DIP Loan Documents, upon reasonable notice to counsel to the Debtors (email being sufficient), the Debtors shall permit representatives, agents, and employees of the DIP Secured Parties to have reasonable access to (i) inspect the Debtors' assets, and (ii) all information (including historical information and the Debtors' books and records) and personnel, including regularly scheduled meetings as mutually agreed with senior management of the Debtors and other company advisors (during normal business hours), and the DIP Secured Parties shall be provided with access to all information they shall reasonably request, excluding any information for which confidentiality is owed to third parties, information subject to attorney client or similar privilege, or where such disclosure would not be permitted by any applicable requirements of law.

6.      DIP Superpriority Claims.  Subject and subordinate only to the Carve-Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed

superpriority administrative expense claims against each of the Debtors' estates (the "DIP Superpriority Claims") (without the need to file any proof of claim) to the extent set forth in the Bankruptcy Code, with priority over any and all administrative expenses, adequate protection claims, diminution claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise, which allowed claims shall for the purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, subject to entry of the Final Order, any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any (the "Avoidance Actions").  Except as set forth in this Interim Order or the Final Order and the *Order (I) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances other than Assumed Liabilities and Permitted Encumbrances, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures and Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, (III) Approving Bidding Protections, and (IV) Granting Related Relief* (the "Bidding Procedures Order" and the superpriority administrative claim to be granted to the Stalking Horse Purchaser (as defined in the Bidding Procedures Order) upon entry of the Bidding Procedures Order on account of the Expense Reimbursement (the "Expense Reimbursement

Superpriority Claim")), no other superpriority claims shall be granted or allowed in these Chapter 11 Cases.

7.    DIP Liens.  As security for the DIP Obligations, effective and perfected upon the date of this Interim Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP Agent or any DIP Lender of, or over, any DIP Collateral (as defined below), the following security interests and liens are hereby granted by the Debtors to the DIP Agent, for the benefit of the DIP Secured Parties (all property identified in clause (a) and (b) below being collectively referred to as the "DIP Collateral"), subject and subordinate only to (x) valid, perfected and unavoidable liens, if any, existing as of the Petition Date that are senior to the liens or security interests of the Prepetition Priming Secured Parties as of the Petition Date by operation of law or permitted by the Prepetition Loan Documents and liens that are perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code (the "Prior Senior Liens"), and (y) the Carve-Out (all such liens and security interests granted to the DIP Agent, for the benefit of the DIP Lenders, pursuant to this Interim Order and the DIP Loan Documents, the "DIP Liens"):

(a)    First Priority Lien On Any Unencumbered Property.  Subject and subordinate only to the Carve-Out, pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, non-avoidable, automatically, and properly perfected first priority senior security interest in and lien upon all property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to Prepetition Liens or Prior Senior Liens including, without limitation (in each case, to the extent not subject to valid, perfected, and non-avoidable liens), all prepetition property and post-petition

25

property of the Debtors' estates, and the proceeds, products, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, including, without limitation, unencumbered cash (and any investment of such cash) of the Debtors (whether maintained with the DIP Agent or otherwise); all equipment, all goods, all accounts, cash, payment intangibles, bank accounts and other deposit or securities accounts of the Debtors (including any accounts opened prior to, on, or after the Petition Date); all insurance policies and proceeds thereof, equity interests, instruments, intercompany claims, accounts receivable, other rights to payment, all general intangibles, all contracts and contract rights, securities, investment property, letters of credit and letter of credit rights, chattel paper, all interest rate hedging agreements of the Debtors; all owned real estate, real property leaseholds and fixtures of the Debtors; patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property of the Debtors; all commercial tort claims of the Debtors; and all claims and causes of action (including causes of action arising under section 549 of the Bankruptcy Code, claims arising on account of transfers of value from a Debtor to (x) another Debtor and (y) a non-Debtor affiliate incurred on or following the Petition Date), and any and all proceeds, products, rents, and profits of the foregoing, all products and proceeds of the foregoing and, subject to entry of the Final Order, all proceeds and property recovered in respect of Avoidance Actions (collectively, the "Previously Unencumbered Property"); provided, for the avoidance of doubt, and notwithstanding anything to the contrary contained herein, to the extent a lien cannot attach to any of the foregoing pursuant to applicable law, the liens granted pursuant to this Interim Order shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of the foregoing.

(b)      Liens Priming the Prepetition Liens.  Subject and subordinate only to the Carve-Out and Prior Senior Liens, pursuant to section 364(d)(1) of the Bankruptcy Code, a valid,

binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all property of the Debtors that was subject to the Prepetition Liens, including, without limitation, the Prepetition Collateral and Cash Collateral; provided, for the avoidance of doubt, and notwithstanding anything to the contrary contained herein, to the extent a lien cannot attach to any of the foregoing pursuant to applicable law, the liens granted pursuant to this Interim Order shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of the foregoing.

(c)    Liens Junior to Certain Other Liens.  Subject and subordinate only to the Carve-Out, pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all prepetition and post-petition property of the Debtors immediately junior to the Prior Senior Liens.

8.    Adequate Protection for the Prepetition Secured Parties.

(a)    Pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, the Prepetition Secured Parties are entitled to adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), in an amount equal to the aggregate diminution in value of such interests from and after the Petition Date (each such diminution, a "Diminution in Value"), resulting from the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve-Out, the Debtors' use of the Prepetition Collateral (including Cash Collateral), and the imposition of the automatic stay (each Prepetition Priming Secured Party's claim for such Diminution in Value, a "Prepetition Priming Loan Adequate Protection Claim," each Prepetition ABL Secured Party's claim for such Diminution in Value, a "Prepetition ABL Adequate Protection Claim," and each Prepetition DDTL Secured Party's claim for such Diminution in Value, a "Prepetition DDTL Adequate Protection

Claim," and collectively with the Prepetition Priming Loan Adequate Protection Claims and the Prepetition ABL Adequate Protection Claims, the "Adequate Protection Claims").  On account of such Adequate Protection Claims, each Prepetition Agent, for the benefit of itself and the Prepetition Secured Parties for which it serves as Prepetition Agent, is hereby granted the following (collectively, the "Adequate Protection Obligations"):

(b)       Prepetition Priming Loan Adequate Protection Liens.  As security for any Diminution in Value of the Prepetition Priming Loan Collateral, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of this Interim Order (together, the "Prepetition Priming Loan Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral and, upon entry of the Final Order, all proceeds or property recovered from Avoidance Actions. Subject to the terms of this Interim Order, the Prepetition Priming Loan Adequate Protection Liens shall be subordinate only to (A) the Carve-Out, (B) the DIP Liens, and (C) Prior Senior Liens.  The Prepetition Priming Loan Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code).

(c)       Prepetition ABL Adequate Protection Liens.   As security for any Diminution in Value of the Prepetition ABL Collateral, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of this Interim Order (together, the "Prepetition ABL Adequate

Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral and, upon entry of the Final Order, all proceeds or property recovered from Avoidance Actions. Subject to the terms of this Interim Order, the Prepetition ABL Adequate Protection Liens shall be (A) with respect to the Prepetition ABL Priority Collateral, whether now existing or hereafter arising or acquired, subject and subordinate only to the Carve-Out, the Prior Senior Liens, the DIP Liens, and the Prepetition Priming Loan Adequate Protection Liens, (B) with respect to the Prepetition DDTL Priority Collateral, whether now existing or hereafter arising or acquired, subject and subordinate only to the Carve-Out, the Prior Senior Liens, the DIP Liens, the Prepetition Priming Loan Adequate Protection Liens and the Prepetition DDTL Adequate Protection Liens, and (C) with respect to Previously Unencumbered Property, subject and subordinate only to the Carve-Out, the Prior Senior Liens, the DIP Liens, and the Prepetition Priming Loan Adequate Protection Liens and *pari passu* with the Prepetition DDTL Adequate Protection Liens. The Prepetition ABL Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code). Upon the deemed funding of the Initial Roll-Up Loans in accordance with the terms of this Interim Order, the Prepetition ABL Adequate Protection Liens shall continue to secure the Remaining Prepetition ABL Secured Obligations.

(d)     Prepetition DDTL Adequate Protection Liens. As security for any Diminution in Value of the Prepetition DDTL Collateral, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition

security interests in and liens as of the date of this Interim Order (together, the "Prepetition DDTL Adequate Protection Liens," and collectively with the Prepetition Priming Loan Adequate Protection Liens and the Prepetition ABL Adequate Protection Liens, the "Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral and, upon entry of the Final Order, all proceeds or property recovered from Avoidance Actions.   Subject to the terms of this Interim Order, the Prepetition ABL Adequate Protection Liens shall be (A) with respect to the Prepetition DDTL Priority Collateral, whether now existing or hereafter arising or acquired, subject and subordinate only to the Carve-Out, the Prior Senior Liens, the DIP Liens, and the Prepetition Priming Loan Adequate Protection Liens, (B) with respect to the Prepetition ABL Priority Collateral, whether now existing or hereafter arising or acquired, subject and subordinate only to the Carve-Out, the Prior Senior Liens, the DIP Liens, the Prepetition Priming Loan Adequate Protection Liens, and the Prepetition ABL Adequate Protection Liens, and (C) with respect to Previously Unencumbered Property, subject and subordinate only to the Carve-Out, the Prior Senior Liens, the DIP Liens, and the Prepetition Priming Loan Adequate Protection Liens, and *pari passu* with the Prepetition ABL Adequate Protection Liens.   The Prepetition DDTL Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code).

(e)     Adequate Protection Superpriority Claims.  As further adequate protection, and to the fullest extent provided by sections 503(b), 507(a), and 507(b) of the Bankruptcy Code,

the Adequate Protection Claims shall be allowed superpriority administrative expense claims in each of the Chapter 11 Cases. The Adequate Protection Claims shall be payable from and have recourse to all pre- and postpetition property of the Debtors and shall be ahead of and senior to any and all other administrative expense claims in such Chapter 11 Cases now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(d), 726, 1113 and 1114 of the Bankruptcy Code ("Other Administrative Expense Claims") to the extent of any postpetition Diminution in Value, but junior to the Carve-Out, the DIP Superpriority Claims, and, upon entry of the Bidding Procedures Order by the Bankruptcy Court, if approved, the Expense Reimbursement Superpriority Claim (which Expense Reimbursement Superpriority Claim shall be junior and subordinate to the Carve-Out and the DIP Superpriority Claims). The Prepetition Priming Loan Adequate Protection Claims shall be junior to and subordinate only to the Carve-Out, the DIP Superpriority Claims, and upon entry of the Bidding Procedures Order by the Bankruptcy Court, the Expense Reimbursement Superpriority Claim, and shall be senior to the Prepetition ABL Adequate Protection Claims, the Prepetition DDTL Adequate Protection Claims, and any Other Administrative Expense Claims. The Prepetition ABL Adequate Protection Claims shall be *pari passu* with the Prepetition DDTL Adequate Protection Claims, and each shall be junior and subordinate only to the Carve-Out, the DIP Superpriority Claims, and upon entry of the Bidding Procedures Order by the Bankruptcy Court, if approved, the Expense Reimbursement Superpriority Claim, and the Prepetition Priming Loan Adequate Protection Claims and shall be senior to any Other Administrative Expense Claims.

(f)    <u>Adequate Protection Payments</u>.  As further adequate protection, the Debtors are authorized and directed to pay, in accordance with the terms of paragraph 19 of this Interim Order, all reasonable and documented fees and expenses (the "<u>Adequate Protection Fees</u>") of the Prepetition Secured Parties, whether incurred before or after the Petition Date, to the extent not duplicative of any fees and/or expenses paid pursuant to paragraph 3(d)(3) hereof, including all reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Loan Documents and this Interim Order, including, for the avoidance of doubt, of (i) Paul Hastings LLP, as counsel to the DIP Agent, Prepetition Priming Agent and Prepetition ABL Agent, (ii) Arnold & Porter LLP, as counsel to the Prepetition DDTL Agent, (iii) Ropes & Gray LLP, as counsel to certain Prepetition DDTL Lenders (in an amount not to exceed $290,000) and (iv) the DIP/Prepetition Lender Advisors (all payments referenced in this sentence, collectively, the "<u>Adequate Protection Payments</u>").  None of the Adequate Protection Fees or Adequate Protection Payments shall be subject to separate approval by this Court or the U.S. Trustee Guidelines, and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto or otherwise seek the Court's approval of any such payments.

(g)    <u>Right to Seek Additional Adequate Protection</u>.  Subject to any applicable intercreditor agreement, this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Secured Parties to request further or alternative forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request.  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the

Prepetition Collateral during the Chapter 11 Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition Secured Parties against any Diminution in Value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

(h)    Other Covenants.    The Debtors shall maintain their cash management arrangements in a manner consistent with the Cash Management Order approving the Debtors' cash management motion.  The Debtors shall comply with the covenants contained in the DIP Credit Agreement regarding conduct of business, including, without limitation, preservation of rights, qualifications, licenses, permits, privileges, franchises, governmental authorizations, and intellectual property rights material to the conduct of their business and the maintenance of properties and insurance.

(i)    Reporting Requirements.    As additional adequate protection to the Prepetition Secured Parties, the Debtors shall comply with all reporting requirements set forth in the DIP Credit Agreement and shall provide all such reports, documents and other information to the Prepetition Agents.

(j)    Miscellaneous.  Except for (i) the Carve-Out and (ii) as otherwise provided in paragraph 4, the Adequate Protection Liens and Adequate Protection Claims granted to the Prepetition Secured Parties pursuant to this Interim Order shall not be subject, junior, or *pari passu*, to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under the Bankruptcy Code, including, without limitation, pursuant to section 551 or otherwise, and shall not be subordinate to or made *pari passu* with any lien, security interest or administrative

claim under the Bankruptcy Code, including, without limitation, pursuant to section 364 or otherwise.

9.          Carve-Out.

(a)          Priority of Carve-Out.  Subject to the terms and conditions contained in this paragraph 9, each of the DIP Liens, DIP Superpriority Claims, Prepetition Liens, Adequate Protection Liens, and Adequate Protection Claims shall be subject and subordinate to payment of the Carve-Out.  The Carve-Out shall have such priority claims and liens over all assets of the Debtors, including any DIP Collateral and Prepetition Collateral.

(b)          Definition of Carve-Out.  As used in this Interim Order, the "Carve-Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $35,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below), which shall not be subject to the Approved Budget or any other budget; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, but subject to the amounts in the Approved Budget, as set forth on the line for Debtors' Professionals for the Debtors' Professionals, and as set forth on the line for Committee's Professionals for the Committee's Professionals, all accrued and unpaid fees and expenses (collectively, the "Professional Fees") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Committee pursuant to sections 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent (at the direction of the

Required DIP Lenders) (or by the Prepetition Secured Parties after repayment of the DIP Obligations in full) of a Termination Declaration (as defined below), whether allowed by the Court (such Professional Fees allowed by the Court, the "Allowed Professional Fees") prior to or after delivery of a Termination Declaration, (the amounts set forth in clauses (i) through (iii), the "Pre-Termination Declaration Cap"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $300,000 (consisting of $75,000 for Committee Professionals and $225,000 for Debtor Professionals) incurred after the first business day following delivery by the DIP Agent of a Termination Declaration (or by the Prepetition Secured Parties after repayment of the DIP Obligations in full) (such date, the "Trigger Date"), to the extent allowed at any time, whether by interim order, procedural order, or otherwise, less the amount of any prepetition retainers received by any such Professional Persons and not previously returned or applied to fees and expenses (the amounts set forth in this clause (iv) being the "Post-Termination Declaration Cap" and, together with the Pre-Termination Declaration Cap, the "Carve-Out Cap"); provided, however, nothing herein shall be construed to impair any party's ability to object to court approval of the fees, expenses, reimbursement of expenses or compensation of any Professional Person. For purposes of the foregoing, "Termination Declaration" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (at the direction of the Required DIP Lenders) (or by the Prepetition Secured Parties after repayment of the DIP Obligations in full) to the Debtors, their lead restructuring counsel (McDonald Hopkins LLC and Young Conaway Stargatt & Taylor, LLP), the U.S. Trustee, the Prepetition Agents, and counsel to the Committee (to the extent one has been appointed), which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined herein) and acceleration of the DIP Obligations under the DIP Facility (or the Debtors' breach of the provisions of this Interim Order

governing use of Cash Collateral that is not timely cured), stating that the Post-Termination Declaration Cap has been invoked.  Upon issuance of the Termination Declaration, the Debtors shall fund, from cash on hand, the full amount of the Carve-Out, up to the Carve-Out Cap, into a separate bank account designated by the Debtors.

(c)    No Direct Obligation To Pay Professional Fees.  The Prepetition Secured Parties reserve the right to object to the allowance of any fees and expenses, whether or not such fees and expenses were incurred in accordance with the Approved Budget.  None of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person or any fees or expenses of the U.S. Trustee or Clerk of the Court incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(d)    Payment of Carve-Out On or After the Termination Declaration Date.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.

10.    Establishment of Escrow Account.  Upon entry of the Interim Order and until the Termination Date, the Debtors shall deposit into escrow in the Bank Account ending in **** the Professional Fees on a weekly basis in the amounts and in accordance with the schedule as set forth in the Approved Budget, including, without limitation, fees billed by the hour, fees billed by the month, and on account of any transaction fees, as same may be described in any engagement

letter between the Debtors and its professionals, and expenses.  The Debtors shall use funds held in such escrow account exclusively to pay Allowed Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any interim or final orders of the Court; _provided_ that when all Allowed Professional Fees have been paid in full (regardless of when such Professional Fees are allowed by the Court), any funds remaining in the escrow account shall revert to the Debtors for use in a manner consistent with the DIP Credit Agreement and this Interim Order.

11.     <u>Reservation of Rights of the DIP Agent, DIP Lenders, and Prepetition Secured Parties</u>.  Subject only to the Carve-Out, notwithstanding any other provision in this Interim Order or the DIP Loan Documents to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair: (a) any of the rights of any of the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Debtors including the right to seek additional adequate protection at and following the Final Hearing; _provided_ that any such further or different adequate protection shall at all times be subordinate and junior to the Carve-Out and the claims and liens of the DIP Secured Parties granted under this Interim Order and the DIP Loan Documents; (b) any of the rights of the DIP Secured Parties or the Prepetition Secured Parties under the DIP Loan Documents, the Prepetition Loan Documents, any intercreditor agreement, or the Bankruptcy Code or under non-bankruptcy law (as applicable), including, without limitation, the right of any of the DIP Secured Parties or the Prepetition Secured Parties to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Chapter 11 Cases, or (iii) seek to propose, subject to the provisions

of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Secured Parties or the Prepetition Secured Parties. The delay in or failure of the DIP Secured Parties and/or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Secured Parties' or the Prepetition Secured Parties' rights and remedies. For all adequate protection purposes throughout the Chapter 11 Cases, each of the Prepetition Secured Parties shall be deemed to have requested relief from the automatic stay and adequate protection for any Diminution in Value from and after the Petition Date. For the avoidance of doubt, such request will survive termination of this Interim Order.

12.     <u>Reservation of Certain Committee and Third-Party Rights and Bar of Challenges and Claims</u>. Subject to the Challenge Period (as defined herein), the stipulations, admissions, waivers, and releases contained in this Interim Order, including the Debtors' Stipulations, shall be binding upon the Debtors, their estates, and any of their respective successors in all circumstances and for all purposes and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date. The stipulations, admissions, and waivers contained in this Interim Order, including the Debtors' Stipulations, shall be binding upon all other parties in interest, including any Committee and any other person acting on behalf of the Debtors' estates, unless and to the extent that a party in interest with proper standing granted by order of the Court has timely and properly filed an adversary proceeding or contested matter under the Bankruptcy Rules on or prior to, subject to entry of a Final Order, the earlier of (x) seventy-five (75) calendar days following the Petition Date and (y) two (2) business days prior to a sale hearing scheduled pursuant to the Bidding Procedures Order to approve the sale of substantially all of the Debtors' assets to the Stalking Horse Purchaser or other bidder(s) in such process (the "<u>Challenge</u>

Period" and the date of expiration of the Challenge Period, the "Challenge Period Termination Date"); *provided*, *however*, that if, prior to the end of the Challenge Period, (x) the Chapter 11 Cases convert to chapter 7, or (y) if a chapter 11 trustee is appointed, then, in each such case, the Challenge Period shall be extended by the later of (A) the time remaining under the Challenge Period plus ten (10) days or (B) such other time as ordered by the Court solely with respect to any such trustee, commencing on the occurrence of either of the events discussed in the foregoing clauses (x) and (y); (i) seeking to avoid, object to, or otherwise challenge the findings or Debtors' Stipulations, including, without limitation, regarding: (a) the validity, enforceability, extent, priority, or perfection of the mortgages, security interests, and liens of any of the Prepetition Secured Parties; (b) the validity, enforceability, allowability, priority, secured status, or amount of the Prepetition Secured Obligations; (c) asserting or prosecuting any so-called "lender liability" claims, avoidance actions or any other claim, counter claim, cause of action, objection, contest or defense, of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable law or otherwise, against any of the Prepetition Secured Parties or their representatives (any such claim, a "Challenge"), and (ii) in which the Court enters a final order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter. Upon the occurrence of the Challenge Period Termination Date without the filing of a Challenge (or if any such Challenge is filed and overruled): (a) any and all such Challenges by any party (including the Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in these Chapter 11 Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever barred; (b) the Prepetition Secured Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination,

recharacterization, defense, or avoidance for all purposes in the Debtors' Chapter 11 Cases and any Successor Cases; (c) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected liens and security interests, not subject to recharacterization, subordination, or avoidance; and (d) all of the Debtors' stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, and all other waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the Prepetition Secured Parties' claims, liens, and interests contained in this Interim Order shall be of full force and effect and forever binding upon the Debtors, the Debtors' estates, and all creditors, interest holders, and other parties in interest in these Chapter 11 Cases and any Successor Cases. If any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules and remains pending and the Chapter 11 Cases are converted to chapter 7, the chapter 7 trustee may continue to prosecute such adversary proceeding or contested matter on behalf of the Debtors' estates. Furthermore, if any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules, the stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, shall nonetheless remain binding and preclusive on any Committee and any other person or entity except to the extent that such stipulations and admissions were expressly challenged in such adversary proceeding or contested matter prior to the Challenge Period Termination Date (and solely as to the plaintiff party that timely filed such Challenge and not, for the avoidance of doubt, any other party-in-interest). Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including, without limitation, any Committee appointed in the Chapter 11 Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation any challenges (including a Challenge) with respect to the Prepetition Loan Documents,

the Prepetition Liens, and the Prepetition Secured Obligations, and a separate order of the Court conferring such standing on any Committee or other party-in-interest shall be a prerequisite for the prosecution of a Challenge by such Committee or such other party-in-interest.

13.     Termination Date.  On the Termination Date (as defined below), consistent with Article VII of the DIP Credit Agreement, (a) all DIP Obligations shall be immediately due and payable and all New Money Commitments will terminate; (b) all authority to use Cash Collateral shall cease; *provided*, *however*, that during the Remedies Notice Period (as defined below), the Debtors may use Cash Collateral solely to fund the Carve-Out and pay payroll and other expenses critical to the administration of the Debtors' estates strictly in accordance with the Approved Budget, subject to any Permitted Variance provided for in the DIP Credit Agreement; and (c) the DIP Secured Parties shall be otherwise entitled to exercise rights and remedies under the DIP Loan Documents in accordance with this Interim Order.

14.     Events of Default.  The occurrence of any of the following events, unless waived by the Required DIP Lenders in accordance with the terms of the DIP Loan Documents, shall constitute an event of default (collectively, the "Events of Default"): (a) the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order, (b) the failure of the Debtors to comply with any of the Required Milestones (as defined below) or (c) the occurrence of an "Event of Default" under the DIP Credit Agreement.

15.     Milestones.  The Debtors' failure to comply with those certain case milestones set forth in the definition of "Milestones" in the DIP Credit Agreement (collectively, the "Required Milestones") shall constitute an "Event of Default" in accordance with the terms of the DIP Credit Agreement.

16.    <u>Rights and Remedies Upon Event of Default</u>.  Immediately upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of this Interim Order, subject to the Remedies Notice Period (defined below), (a) the DIP Agent (at the direction of the Required DIP Lenders) may send a Termination Declaration to the parties set forth in Paragraph 9(b) declaring (i) all DIP Obligations owing under the DIP Loan Documents to be immediately due and payable, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (iii) termination of the DIP Facility and the DIP Loan Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and (iv) that the Carve-Out shall be triggered and (b) subject to paragraph 12(b), the Prepetition Agents (at the direction of the applicable required lenders) may declare a termination, reduction or restriction on the ability of the Debtors to use Cash Collateral (the date on which a Termination Declaration is delivered, the "<u>Termination Date</u>").  The automatic stay in the Chapter 11 Cases otherwise applicable to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties is hereby modified so that five (5) business days after the Termination Date (the "<u>Remedies Notice Period</u>"): (a) the DIP Agent (at the direction of the Required DIP Lenders) shall be entitled to exercise its rights and remedies in accordance with the DIP Loan Documents and this Interim Order to satisfy the DIP Obligations, DIP Superpriority Claims, and DIP Liens, subject to the Carve-Out; and (b) subject to the foregoing clause (a), the applicable Prepetition Secured Parties shall be entitled to exercise their respective rights and remedies to the extent available in accordance with the applicable Prepetition Loan Documents and this Interim Order with respect to the Debtors' use of

Cash Collateral. During the Remedies Notice Period, the Debtors shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court for the sole purpose of contesting whether an Event of Default has occurred or is continuing. Unless the Court orders otherwise prior to the expiration of the Remedies Notice Period, the automatic stay, as to all of the DIP Agent, DIP Lenders, and Prepetition Secured Parties, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order.  Upon expiration of the Remedies Notice Period, the DIP Agent (at the direction of the Required DIP Lenders) and the Prepetition Secured Parties shall be permitted to exercise all remedies set forth herein, in the DIP Loan Documents, and as otherwise available at law without further order of or application or motion to this Court consistent with this Interim Order.

17.    <u>Limitation on Charging Expenses Against Collateral</u>.  Subject to entry of the Final Order, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from (a) the DIP Collateral (except to the extent of the Carve-Out), the DIP Agent, or the DIP Lenders or (b) the Prepetition Collateral (except to the extent of the Carve-Out) or the Prepetition Secured Parties, in each case, pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties.

18.    <u>Use of Cash Collateral</u>.  The Debtors are hereby authorized to use all Cash Collateral of the Prepetition Secured Parties, but solely for the purposes set forth in this Interim Order and in accordance with the Approved Budget (subject to Permitted Variances as set forth in

this Interim Order and the DIP Loan Documents and the Wind-Down Proviso), including, without limitation, to make payments on account of the Adequate Protection Obligations provided for in this Interim Order, from the date of this Interim Order through and including the date of termination of the DIP Credit Agreement.

19.    <u>Expenses and Indemnification</u>.

(a)    The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, the principal, interest, fees, payments, expenses, and other amounts described in the DIP Loan Documents as such amounts become due and without need to obtain further Court approval, including, without limitation, closing, arrangement or commitment payments (including all payments and other amounts owed to the DIP Lenders), administrative agent's fees and collateral agent's fees (including all fees and other amounts owed to the DIP Agent), the reasonable and documented fees and disbursements of counsel and other professionals to the extent set forth in paragraphs 3(d)(iii) and 8(c) of this Interim Order, whether or not such fees arose before or after the Petition Date, all to the extent provided in this Interim Order or the DIP Loan Documents. Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the Closing Date (as defined in the DIP Loan Documents) all reasonable and documented fees, costs, and expenses, including the fees and expenses of counsel to the DIP Lenders, the DIP Agent, the Prepetition Agents, and the Prepetition Lenders, incurred on or prior to such date without the need for any professional engaged by the DIP Lenders, the DIP Agent, the Prepetition Agents, or the Prepetition Lenders to first deliver a copy of its invoice as provided for herein.

(b)    The Debtors shall be jointly and severally obligated to pay all fees and expenses described above, which obligations shall constitute DIP Obligations. The Debtors shall pay the reasonable and documented professional fees, expenses, and disbursements of

professionals to the extent provided for in paragraphs 3(d)(3) and 8(c) of this Interim Order (collectively, the "Lender Professionals" and, each, a "Lender Professional") no later than five (5) business days (the "Review Period") after the receipt by counsel for the Debtors, any Committee, or the U.S. Trustee of each of the invoices therefor (the "Invoiced Fees") and without the necessity of filing formal fee applications or complying with the U.S. Trustee Guidelines, including such amounts arising before the Petition Date. Invoiced Fees shall be in the form of an invoice summary for professional fees and categorized expenses incurred during the pendency of the Chapter 11 Cases, and such invoice summary shall not be required to contain time entries, but shall include a general, brief description of the nature of the matters for which services were performed (which shall provide sufficient information to determine if such fees and expenses are reasonable), and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any work product doctrine, privilege or protection, common interest doctrine privilege or protection, any other evidentiary privilege or protection recognized under applicable law, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege, work product doctrine, privilege or protection, common interest doctrine privilege or protection, or any other evidentiary privilege or protection recognized under applicable law. The Debtors, any Committee, or the U.S. Trustee may dispute the payment of any portion of the Invoiced Fees (the "Disputed Invoiced Fees") if, within the Review Period, a Debtor, any Committee that may be appointed in these Chapter 11 Cases, or the U.S. Trustee notifies the submitting party in writing setting forth the specific objections to the Disputed Invoiced Fees (to be followed by the filing with the Court, if necessary, of a motion or other pleading, with at least ten (10) days prior written notice to the submitting party of any hearing on such motion or other pleading). Any hearing to consider such an objection to the payment of

any fees, costs or expenses set forth in a professional fee invoice hereunder shall be limited to the reasonableness of the fees, costs and expenses that are the subject of the objection.  For avoidance of doubt, the Debtors shall promptly pay in full all Invoiced Fees other than the Disputed Invoiced Fees.

(c)     In addition, the Debtors hereby indemnify each of the DIP Lenders, the DIP Agent, the Prepetition Agents, and each of their respective affiliates, successors, and assigns and the officers, directors, employees, agents, attorneys, advisors, controlling persons, and members of each of the foregoing (each an "Indemnified Person") and hold them harmless from and against all costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facility as and to the extent provided in the DIP Credit Agreement or the applicable Prepetition Loan Documents. No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence, fraud, or willful misconduct or breach of their obligations under the DIP Facility, which indemnity shall have equal priority and lien status to the DIP Superpriority Claims. In no event shall any Indemnified Person or any Debtor be liable on any theory of liability for any special, indirect, consequential, or punitive damages; provided, that this shall not affect the Debtor's indemnification obligations pursuant to the immediately preceding sentence.

20.     <u>No Third-Party Rights</u>.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

21.     <u>Section 507(b) Reservation</u>.  Subject only to the Carve-Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Chapter 11 Cases. Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition Secured Parties against any Diminution in Value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

22.     <u>Insurance</u>.  Until the DIP Obligations have been indefeasibly paid in full, at all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date and shall name the DIP Agent as loss payee or additional insured, as applicable, thereunder.

23.     <u>No Waiver for Failure to Seek Relief</u>.  The failure or delay of the DIP Agent or the Required DIP Lenders to exercise rights and remedies under this Interim Order, the DIP Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder, or otherwise.

24.     <u>Perfection of the DIP Liens and Adequate Protection Liens</u>.

(a)     Without in any way limiting the automatically effective perfection of the DIP Liens granted pursuant to paragraph 7 hereof and the Adequate Protection Liens granted pursuant to paragraph 8 hereof, the DIP Agent and the Prepetition Agents are hereby authorized,

but not required, to file or record financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder. Whether or not the DIP Agent or the Prepetition Agents shall (at the direction of the applicable required lenders) choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not, subject to the Challenge Period, subject to challenge, dispute, or subordination as of the date of entry of this Interim Order. If the DIP Agent or the Prepetition Agents (at the direction of the applicable required lenders) determines to file or execute any financing statements, agreements, notice of liens, or similar instruments (which, in each case, shall be at the sole cost and expense of the Debtors), the Debtors shall cooperate and assist in any such execution and/or filings as reasonably requested by the DIP Agent or any Prepetition Agent (at the direction of the applicable required lenders), and the automatic stay shall be modified solely to allow such filings as provided for in this Interim Order.

(b)     A certified copy of this Interim Order may, at the direction of the applicable Required DIP Lenders, be filed with or recorded in filing or recording offices by the DIP Agent or the Prepetition Agents in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording; *provided*, *however*, that notwithstanding the date of any such filing, the date of such perfection shall be the date of this Interim Order.

(c)     Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords, lessors, or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge,

grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code, subject to applicable law. Any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor in accordance with the terms of the DIP Credit Agreement or this Interim Order, subject to applicable law.

25.    <u>Release</u>.  Subject to the rights and limitations set forth in paragraph 12 of this Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns, shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully and forever release, remise, acquit, relinquish, irrevocably waive, and discharge, effective upon entry of this Interim Order, each of the DIP Secured Parties and each of their respective affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each in their capacity as such (collectively, the "<u>Related Parties</u>"), and, effective upon entry of the Final Order, each of the Prepetition Secured Parties and each of their respective Related Parties, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or

regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations, the DIP Liens, the DIP Loan Documents, the Prepetition Secured Obligations, the Prepetition Liens or the Prepetition Loan Documents, as applicable, including, without limitation: (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Secured Parties and the Prepetition Secured Parties; *provided* that nothing in this paragraph shall in any way limit or release the obligations of any DIP Secured Party under the DIP Loan Documents.

26.    <u>Credit Bidding</u>.  The DIP Agent (at the direction of the Required DIP Lenders) and the Prepetition Agents (at the direction of the applicable required lenders) (as to the Prepetition Agents, subject to the preservation of rights provided in paragraph 12) shall have the unqualified right to credit bid (either directly or through one or more acquisition vehicles), up to the full amount of the underlying lenders' respective claims, including, for the avoidance of doubt, in the case of the DIP Agent, the Roll-Up Loans, and in the case of the Prepetition Agents, the Adequate Protection Claims, if any, in any sale of all or any portion of the Prepetition Collateral or the DIP Collateral including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code (including the sale contemplated under the Bidding Procedures Order upon entry by the Court) or included as part of any chapter 11 plan subject to confirmation under Bankruptcy Code section 1129(b)(2)(A)(ii)-(iii).

27.    <u>Preservation of Rights Granted Under this Interim Order</u>.

(a)    Unless and until all DIP Obligations are indefeasibly paid in full, in cash, and all New Money Commitments are terminated, the Prepetition Secured Parties shall: (i) have

no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Loan Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral; and (ii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral, except as set forth in paragraph 23 herein.

(b)    In the event this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, any liens or claims granted to the DIP Secured Parties or the Prepetition Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein, and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges, and benefits afforded in section 364(e) of the Bankruptcy Code.

(c)    Unless and until all DIP Obligations, Prepetition Secured Obligations, and Adequate Protection Obligations are indefeasibly paid in full, in cash, and all New Money Commitments are terminated, it shall be an Event of Default if any of the Debtors seek or consent to, directly or indirectly (i) except as permitted under the DIP Loan Documents or, if not provided for therein, with the prior written consent of the DIP Agent, the Required DIP Lenders, and the Prepetition Agents (acting at the direction of the applicable required lenders), (x) any modification, stay, vacatur, or amendment of this Interim Order or (y) a priority claim for any administrative expense or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 503(b), 507(a), or 507(b) of the Bankruptcy Code) in any of the Chapter 11

Cases, *pari passu* with or senior to the DIP Superpriority Claims, the Adequate Protection Superpriority Claims, or the Prepetition Secured Obligations, or (z) any other order allowing use of the DIP Collateral; (ii) any lien on any of the DIP Collateral or the Prepetition Collateral with priority equal or superior to the DIP Liens, the Adequate Protection Liens or the Prepetition Liens, as applicable; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Loan Documents and this Interim Order; (iv) the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor; (v) an order converting or dismissing any of the Chapter 11 Cases; (vi) an order appointing a chapter 11 trustee in any of the Chapter 11 Cases; or (vii) an order appointing an examiner with enlarged powers in any of the Chapter 11 Cases.

(d)     Notwithstanding any order dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under chapter 7 entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims, and the other administrative claims granted pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations are indefeasibly paid in full in cash (otherwise satisfied in a manner agreed to by the Required DIP Lenders and the DIP Agent (acting at the direction of the Required DIP Lenders)) and Adequate Protection Payments are indefeasibly paid in full in cash (and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Claims, and the other administrative claims granted pursuant to this Interim Order, shall, notwithstanding such dismissal, remain binding on all parties in interest); and (y) to the fullest extent permitted by law the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in clause (x) above.

(e)     Except as expressly provided in this Interim Order or in the DIP Loan Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims, and all other rights and remedies of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Loan Documents shall survive, and shall not be modified, impaired, or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, terminating the joint administration of these Chapter 11 Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Prepetition Collateral or DIP Collateral pursuant to section 363(b) of the Bankruptcy Code, or (iii) the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations. The terms and provisions of this Interim Order and the DIP Loan Documents shall continue and be binding in these Chapter 11 Cases, in any successor cases if these Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code.  The DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims, and all other rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties granted by the provisions of this Interim Order shall continue in full force and effect until the DIP Obligations and the Adequate Protection Payments are indefeasibly paid in full, in cash (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the Required DIP Lenders and the DIP Agent (acting at the direction of the Required DIP Lenders)).

(f)     Other than as set forth in this Interim Order, subject and subordinate to the Carve-Out, neither the DIP Liens nor the Adequate Protection Liens shall be made subject to or

*pari passu* with any lien or security interest granted in any of the Chapter 11 Cases or arising after the Petition Date, and neither the DIP Liens nor the Adequate Protection Liens shall be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

28.    <u>Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral</u>. Notwithstanding anything to the contrary set forth in this Interim Order, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral, including Cash Collateral, or the Carve-Out or proceeds thereof may be used: (a) to investigate (including by way of examinations or discovery proceedings), initiate, assert, prosecute, join, commence, support, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other litigation of any type (i) against any of the DIP Secured Parties or the Prepetition Secured Parties (each in their capacities as such), and each of their respective affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the DIP Secured Parties or the Prepetition Secured Parties (each in their capacities as such) under the DIP Loan Documents, the Prepetition Loan Documents, or this Interim Order, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any Committee appointed in these Chapter 11 Cases in connection with the assertion of or joinder in any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other contested matter, the purpose of which is to seek, or the

result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties to recover on the DIP Collateral or the Prepetition Collateral or seeking affirmative relief against any of the DIP Secured Parties or the Prepetition Secured Parties related to the DIP Obligations or the Prepetition Secured Obligations; (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the DIP Obligations or the Prepetition Secured Obligations, or the DIP Agent's, the DIP Lenders', and the Prepetition Secured Parties' liens or security interests in the DIP Collateral or Prepetition Collateral, as applicable; or (iii) for monetary, injunctive, or other affirmative relief against the DIP Secured Parties or the Prepetition Secured Parties, or the DIP Agent's, the DIP Lenders,' or the Prepetition Secured Parties' respective liens on or security interests in the DIP Collateral or the Prepetition Collateral that would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties, as applicable, to assert or enforce any lien, claim, right, or security interest or to realize or recover on the DIP Obligations or the Prepetition Secured Obligations, to the extent applicable; (b) for objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Secured Obligations, or by or on behalf of the DIP Agent and the DIP Lenders related to the DIP Obligations; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the DIP Obligations, the DIP Liens, the Prepetition Secured Obligations, or the Prepetition Liens; or (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of: (x) any of the DIP Liens or any other rights or interests of the DIP Agent or the DIP Lenders related to the DIP Obligations or the

DIP Liens, or (y) any of the Prepetition Liens or any other rights or interests of any of the Prepetition Secured Parties related to the Prepetition Secured Obligations or the Prepetition Liens, *provided* that no more than $50,000 of the proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used by any Committee appointed in these Chapter 11 Cases, if any, solely to investigate, within the Challenge Period (as defined below), the claims, causes of action, adversary proceedings, or other litigation against the Prepetition Secured Parties solely concerning the legality, validity, priority, perfection, enforceability or extent of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Secured Obligations.

29.    Conditions Precedent.  No DIP Lender shall have any obligation to make any DIP Loan under the respective DIP Loan Documents unless all of the conditions precedent to the making of such extensions of credit under the applicable DIP Loan Documents have been satisfied in full or waived in accordance with such DIP Loan Documents.

30.    Repayment of DIP Superpriority Claims.  Notwithstanding anything to the contrary herein or in the other DIP Loan Documents, the Debtors shall indefeasibly pay to each holder of a DIP Superpriority Claim cash equal to the full amount of such DIP Superpriority Claim on the effective date of a chapter 11 plan, unless such holder of a DIP Superpriority Claim consents to a different treatment with respect to such DIP Superpriority Claim. The requirements set forth in this paragraph 29 may not be amended without the prior written consent of each holder of a DIP Superiority Claim adversely affected thereby.

31.    Intercreditor Provisions.  The Prepetition DDTL Agent, the Prepetition ABL Agent, and the Prepetition Loan Parties are party to that certain Intercreditor Agreement dated as of

November 20, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition ABL/DDTL Intercreditor Agreement"), and the Prepetition Priming Agent, Prepetition DDTL Agent, the Prepetition ABL Agent (collectively, the "Prepetition Agents") and the Prepetition Loan Parties are parties to that certain Intercreditor Agreement, dated as of November 28, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Priming Intercreditor Agreement"). Pursuant to section 510 of the Bankruptcy Code, any applicable intercreditor or subordination provisions contained in any of, or entered into as permitted by and in accordance with, the Prepetition ABL/DDTL Intercreditor Agreement, the Prepetition Priming Intercreditor Agreement, and any other Prepetition Loan Documents shall (i) remain in full force and effect, and (ii) not be deemed to be amended, altered or modified by the terms of this Interim Order or the DIP Loan Documents, in each case, unless expressly set forth herein or therein; provided that nothing in this Interim Order shall be deemed to provide liens to any Prepetition Secured Party on any assets of the Debtors except as set forth herein.

32.    Binding Effect; Successors and Assigns. The DIP Loan Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Secured Parties, the Prepetition Secured Parties, any Committee appointed in these Chapter 11 Cases, and the Debtors and their respective successors and permitted assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties and the applicable Prepetition

Secured Parties; *provided* that, except to the extent expressly set forth in this Interim Order, the Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors. In determining to make any loan (whether under the DIP Credit Agreement, a promissory note or otherwise), to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Secured Parties and the Prepetition Secured Parties shall not (i) be deemed to be in control of the operations of the Debtors, or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.

33.     <u>Limitation of Liability</u>.  In determining to make any loan under the DIP Loan Documents, permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Secured Parties and the Prepetition Secured Parties shall not, solely by reason thereof, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute). Furthermore, nothing in this Interim Order or in the DIP Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, or any Prepetition Secured Parties of any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors.

34.     <u>No Requirement to File Claim for DIP Obligations</u>.  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation,

any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, neither the DIP Agent nor any DIP Lender shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the DIP Obligations, all of which shall be due and payable in accordance with the DIP Loan Documents without the necessity of filing any such proof of claim or request for payment of administrative expenses, and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the DIP Loan Documents or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the DIP Agent's or any DIP Lender's rights, remedies, powers, or privileges under any of the DIP Loan Documents, this Interim Order, or applicable law. The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

35.      No Requirement to File Claim for Prepetition Secured Obligations. Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, neither the Prepetition Agents nor any other Prepetition Secured Party shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the Prepetition Secured Obligations; and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the Prepetition Loan Documents or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the Prepetition Agents' or any other

Prepetition Secured Party's rights, remedies, powers, or privileges under any of the Prepetition Loan Documents, this Interim Order, or applicable law. The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

36.    <u>No Marshaling</u>.  Subject to entry of the Final Order, the DIP Agent and the DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, and proceeds of the DIP Collateral shall be received and applied pursuant to this Interim Order, the DIP Loan Documents and the Prepetition Loan Documents, notwithstanding any other agreement or provision to the contrary, and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral and proceeds of the Prepetition Collateral shall be received and applied pursuant to this Interim Order, the DIP Loan Documents and the Prepetition Loan Documents, notwithstanding any other agreement or provision to the contrary.

37.    <u>Application of Proceeds of DIP Collateral</u>.  Subject to entry of a Final Order, the DIP Obligations, at the option of the Required DIP Lenders, to be exercised in their sole and absolute discretion, shall be repaid (a) first, from the DIP Collateral comprising Previously Unencumbered Property and (b) second, from all other DIP Collateral.

38.    <u>Equities of the Case</u>.  The Prepetition Secured Parties shall each be entitled to all the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to and upon entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits of any of the DIP Collateral (including the Prepetition Collateral).

39.    <u>Final Hearing</u>.  The Final Hearing on the Motion shall be held on _____, 2023, at __:__ _.m., prevailing Eastern Time.  Any objections or responses to entry of the Final Order shall be filed on or before 5:00 p.m., prevailing Eastern Time, on _____, 2023, and shall be served on: the Debtors, c/o BRG, 700 Louisiana Street, Suite 2600, Houston, TX 77002 (Attn: Charlie Reeves (creeves@thinkbrg.com)); (b) proposed counsel to the Debtors, McDonald Hopkins LLC, 300 North LaSalle Street, Suite 1400, Chicago, Illinois 60654 (Attn: David Agay, Esq. (dagay@mcdonaldhopkins.com), Marc Carmel, Esq. (mcarmel@mcdonaldhopkins.com), and Joshua Gadharf, Esq. (jgadharf@mcdonaldhopkins.com)); (c) proposed co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 1980 (Attn: Andrew Magaziner, Esq. (amagaziner@ycst.com)); (d) counsel to the DIP Lenders and Prepetition Lenders, Dechert LLP, 1095 Avenue of the Americas, New York, New York 10036 (Attn: Shmuel Vasser, Esq. (shmuel.vasser@dechert.com) and Stephen Wolpert, Esq. (stephen.wolpert@dechert.com)); (e) co-counsel to the DIP Lenders and Prepetition Lenders, Richards, Layton & Finger, P.A., P.O. Box 551, Wilmington, Delaware 19899 (Attn: Russell Silberglied, Esq. (silberglied@rlf.com) and Brendan Schlauch, Esq. (schlauch@rlf.com)); (f) counsel to the DIP Agent, Prepetition ABL Agent, and Prepetition Priming Agent, Paul Hastings, LLP, 200 Park Avenue, New York, NY 10166 (Attn: Alex Cota, Esq.  (alexcota@paulhastings.com)  and  Daniel  Ginsberg,  Esq. (danielginsberg@paulhastings.com)); (g) counsel to the Prepetition DDTL Agent, Arnold & Porter Kaye Scholer LLP, 250 West 55th Street, New York, NY 10019-9710 (Attn: Chad Pearlman, Esq. (Chad.Pearlman@arnoldporter.com)); (h) the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Rosa Sierra-Fox, Esq. (rosa.sierra@usdoj.gov)); and (i) counsel to any statutory committee appointed in these Chapter 11 Cases.  In the event no

objections to entry of the Final Order on the Motion are timely received, this Court may enter such Final Order without need for the Final Hearing.

40.    <u>Effect of this Interim Order</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon execution hereof.

41.    Bankruptcy Rule 6003(b) has been satisfied.

42.    The requirements of Bankruptcy Rule 6004(a) are waived, or are inapplicable due to Bankruptcy Rules 4001(b)(2 and (c)(2).

43.    Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order shall be immediately effective and enforceable upon entry of this Interim Order.

44.    <u>Retention of Jurisdiction</u>.  The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Interim Order.

**<u>Exhibit A</u>**

**DIP Credit Agreement**

*Execution Version*
*PRIVILEGED AND CONFIDENTIAL*
*ATTORNEY WORK PRODUCT*

**SENIOR SECURED SUPERPRIORITY PRIMING DEBTOR IN POSSESSION CREDIT AGREEMENT**

Dated as of February 5, 2023

among

INDEPENDENT PET PARTNERS HOLDINGS, LLC
as Parent,

INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS, LLC
as Borrower,

The Other Loan Parties Party Hereto,

ACQUIOM AGENCY SERVICES LLC,
as Agent,

and

The Lenders Party Hereto

29848397

# TABLE OF CONTENTS

<u>Section</u>                                                                                                      <u>Page</u>

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ........................................ 1

    **1.01**    **Defined Terms** .......................................................................... **1**

    **1.02**    **Other Interpretive Provisions** ................................................ **37**

    **1.03**    **Accounting Terms** ................................................................... **38**

    **1.04**    **[Reserved]** ............................................................................... **38**

    **1.05**    **Times of Day** ........................................................................... **38**

    **1.06**    **[Reserved].** .............................................................................. **38**

    **1.07**    **Currency Equivalents Generally** ........................................... **38**

    **1.08**    **Interest Rates.** ......................................................................... **38**

ARTICLE II THE LOANS ........................................................................................ 39

    **2.01**    **New Money Loans** .................................................................. **39**

    **2.02**    **Roll-Up Loans** ........................................................................ **40**

    **2.03**    **Conversions and Continuations of Loans.** ............................. **40**

    **2.04**    **[Reserved].** .............................................................................. **42**

    **2.05**    **Prepayments.** .......................................................................... **42**

    **2.06**    **[Reserved].** .............................................................................. **43**

    **2.07**    **Repayment of Obligations.** .................................................... **43**

    **2.08**    **Interest.** ................................................................................... **43**

    **2.09**    **Fees** ......................................................................................... **43**

    **2.10**    **Computation of Interest and Fees** ......................................... **44**

    **2.11**    **Evidence of Debt.** ................................................................... **44**

    **2.12**    **Payments Generally; Agent's Right to Recoupment.** ........... **45**

    **2.13**    **Sharing of Payments by Lenders** .......................................... **46**

    **2.14**    **[Reserved].** .............................................................................. **47**

    **2.15**    **Defaulting Lenders.** ................................................................ **47**

ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY .......................... 48

    **3.01**    **Taxes.** ...................................................................................... **48**

    **3.02**    **Illegality** ................................................................................. **51**

    **3.03**    **Inability to Determine Rates** ................................................. **52**

    **3.04**    **Increased Costs; Reserves on SOFR Loans.** ......................... **54**

    **3.05**    **Compensation for Losses** ....................................................... **55**

    **3.06**    **Mitigation Obligations; Replacement of Lenders.** ................ **55**

# TABLE OF CONTENTS
### (cont'd)

| Section | | Page |
|---|---|---|
| **3.07** | **Survival** | 55 |
| ARTICLE IV CONDITIONS PRECEDENT | | 55 |
| **4.01** | **Conditions Precedent to Closing Date** | 55 |
| **4.02** | **Conditions Precedent to the Initial New Money Draw** | 56 |
| **4.03** | **Conditions Precedent to all Borrowings** | 58 |
| ARTICLE V REPRESENTATIONS AND WARRANTIES | | 60 |
| **5.01** | **Existence, Qualification and Power** | 60 |
| **5.02** | **Authorization; No Contravention** | 60 |
| **5.03** | **Governmental Authorization; Other Consents** | 60 |
| **5.04** | **Binding Effect** | 60 |
| **5.05** | **Financial Statements; No Material Adverse Effect.** | 61 |
| **5.06** | **Litigation** | 61 |
| **5.07** | **No Default** | 61 |
| **5.08** | **Ownership of Property; Liens** | 61 |
| **5.09** | **Environmental Compliance.** | 62 |
| **5.10** | **Insurance** | 63 |
| **5.11** | **Taxes** | 63 |
| **5.12** | **ERISA Compliance.** | 63 |
| **5.13** | **Subsidiaries; Equity Interests** | 64 |
| **5.14** | **Margin Regulations; Investment Company Act.** | 64 |
| **5.15** | **Disclosure** | 64 |
| **5.16** | **Compliance with Laws** | 65 |
| **5.17** | **Intellectual Property; Licenses, Etc.** | 65 |
| **5.18** | **Labor Matters.** | 65 |
| **5.19** | **Security Documents.** | 66 |
| **5.20** | **No Intent to Hinder, Delay, or Defraud.** | 66 |
| **5.21** | **Deposit Accounts.** | 67 |
| **5.22** | **Brokers** | 67 |
| **5.23** | **Customer and Trade Relations** | 67 |
| **5.24** | **Material Contracts** | 67 |
| **5.25** | **Casualty** | 67 |
| **5.26** | **EEA Financial Institution** | 67 |
| **5.27** | **Sanctions and Anti-Corruption Laws** | 67 |

**TABLE OF CONTENTS**
(cont'd)

| Section | | Page |
|---|---|---|
| 5.28 | Designated Senior Indebtedness. | 68 |
| 5.29 | Indictment. | 68 |
| 5.30 | Conduct of Business. | 68 |
| 5.31 | Budget | 68 |
| 5.32 | Bankruptcy Matters. | 68 |
| 5.33 | Security Interests | 68 |
| ARTICLE VI AFFIRMATIVE COVENANTS | | 69 |
| 6.01 | [Reserved] | 69 |
| 6.02 | Certificates; Other Information | 69 |
| 6.03 | Notices | 70 |
| 6.04 | Payment of Obligations | 71 |
| 6.05 | Preservation of Existence, Etc. | 71 |
| 6.06 | Maintenance of Properties | 71 |
| 6.07 | Maintenance of Insurance | 71 |
| 6.08 | Compliance with Laws | 72 |
| 6.09 | Books and Records; Accountants. | 73 |
| 6.10 | Inspection Rights. | 73 |
| 6.11 | Additional Loan Parties | 73 |
| 6.12 | Real Estate. | 73 |
| 6.13 | Information Regarding the Collateral. | 74 |
| 6.14 | Cash Management. | 74 |
| 6.15 | Environmental Laws. | 75 |
| 6.16 | Post-Closing Obligations and Further Assurances. | 75 |
| 6.17 | Compliance with Terms of Leaseholds. | 76 |
| 6.18 | Material Contracts | 76 |
| 6.19 | [Reserved | 76 |
| 6.20 | Budget Reporting | 76 |
| 6.21 | Milestones | 77 |
| 6.22 | Bankruptcy Related Matters. | 77 |
| 6.23 | Priority of Liens and Claims | 78 |
| ARTICLE VII NEGATIVE COVENANTS | | 78 |
| 7.01 | Liens | 78 |
| 7.02 | Investments | 79 |

**TABLE OF CONTENTS**
(cont'd)

| Section | | Page |
|---|---|---|
| 7.03 | **Indebtedness; Disqualified Stock; Equity Issuances** | 79 |
| 7.04 | **Fundamental Changes** | 79 |
| 7.05 | **Dispositions** | 79 |
| 7.06 | **Restricted Payments** | 79 |
| 7.07 | **Prepayments of Indebtedness** | 80 |
| 7.08 | **Change in Nature of Business.  Notwithstanding any provision of any Loan Document to the contrary,** | 80 |
| 7.09 | **Transactions with Affiliates** | 80 |
| 7.10 | **Burdensome Agreements** | 81 |
| 7.11 | **Use of Proceeds** | 82 |
| 7.12 | **Amendment of Material Documents.** | 82 |
| 7.13 | **Fiscal Year.** | 82 |
| 7.14 | **Deposit Accounts.** | 82 |
| 7.15 | **Sanctions.** | 82 |
| 7.16 | **Anti-Corruption Laws.** | 83 |
| 7.17 | **[Reserved].** | 83 |
| 7.18 | **[Reserved].** | 83 |
| 7.19 | **Budget Covenant** | 83 |
| 7.20 | **Chapter 11 Case.** | 83 |
| | **The Loan Parties shall not:** | 83 |
| ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES | | 84 |
| 8.01 | **Events of Default** | 84 |
| 8.02 | **Remedies Upon Event of Default** | 89 |
| 8.03 | **Application of Funds** | 90 |
| ARTICLE IX THE AGENT | | 90 |
| 9.01 | **Appointment and Authority.** | 90 |
| 9.02 | **Rights as a Lender** | 91 |
| 9.03 | **Exculpatory Provisions** | 91 |
| 9.04 | **Reliance by Agent.** | 93 |
| 9.05 | **Delegation of Duties** | 93 |
| 9.06 | **Resignation and Removal of Agent** | 93 |
| 9.07 | **Non-Reliance on Agent and Other Lenders** | 94 |
| 9.08 | **[Reserved].** | 94 |

**TABLE OF CONTENTS**
(cont'd)

| Section | | Page |
|---|---|---|
| 9.09 | **Agent May File Proofs of Claim** | 94 |
| 9.10 | **Collateral and Guaranty Matters** | 95 |
| 9.11 | **Notice of Transfer.** | 96 |
| 9.12 | **Reports.** | 96 |
| 9.13 | **Agency for Perfection.** | 96 |
| 9.14 | **Indemnification of Agent** | 96 |
| 9.15 | **Relation among Lenders** | 97 |
| 9.16 | **PATRIOT Act** | 97 |
| 9.17 | **Intercreditor Agreements.** | 97 |
| 9.18 | **Erroneous Payments** | 97 |
| 9.19 | **Credit Bidding.** | 100 |
| 9.20 | **Plan Process.** | 100 |
| ARTICLE X MISCELLANEOUS | | 101 |
| 10.01 | **Amendments, Etc.** | 101 |
| 10.02 | **Notices; Effectiveness; Electronic Communications.** | 103 |
| 10.03 | **No Waiver; Cumulative Remedies** | 105 |
| 10.04 | **Expenses; Indemnity; Damage Waiver.** | 106 |
| 10.05 | **Payments Set Aside** | 107 |
| 10.06 | **Successors and Assigns.** | 107 |
| 10.07 | **Treatment of Certain Information; Confidentiality** | 110 |
| 10.08 | **Right of Setoff** | 112 |
| 10.09 | **Interest Rate Limitation** | 112 |
| 10.10 | **Counterparts; Integration; Effectiveness** | 112 |
| 10.11 | **Survival** | 113 |
| 10.12 | **Severability** | 113 |
| 10.13 | **Replacement of Lenders** | 113 |
| 10.14 | **Governing Law; Jurisdiction; Etc.** | 114 |
| 10.15 | **Waiver of Jury Trial** | 115 |
| 10.16 | **No Advisory or Fiduciary Responsibility** | 115 |
| 10.17 | **USA PATRIOT Act Notice** | 116 |
| 10.18 | **Foreign Asset Control Regulations** | 116 |
| 10.19 | **Time of the Essence** | 116 |
| 10.20 | **Press Releases.** | 116 |

**TABLE OF CONTENTS**
(cont'd)

Section                                                                                                    Page

**10.21**   **Additional Waivers.**                                                                        **117**

**10.22**   **No Strict Construction.**                                                                     **118**

**10.23**   **Attachments.**                                                                                **118**

**10.24**   **Electronic Execution of Assignments and Certain Other Documents.**                            **118**

**10.25**   **Release.**                                                                                    **118**

**10.26**   **Acknowledgement and Consent to Bail-In of EEA Financial Institutions**                        **118**

**10.27**   **Acknowledgments**                                                                             **119**

**10.28**   **Managerial Assistance**                                                                       **119**

**10.29**   **The DIP Orders**                                                                              **119**

**SCHEDULES**

2.01              Commitments and Applicable Percentages
5.01              Loan Parties Organizational Information
5.06(a)           Litigation
5.06(b)           Material Lease or Contract Disputes
5.07              Defaults Under any Material Contracts
5.08(b)(1)        Owned Real Estate
5.08(b)(2)        Leased Real Estate
5.09              Environmental Matters
5.10              Insurance
5.13(a)           Loan Parties and Subsidiaries
5.13(b)           Outstanding Purchase Rights in Equity Interests
5.13(c)           Other Equity Investments
5.17              Intellectual Property Matters
5.18              Collective Bargaining Agreements
5.21              Deposit Accounts and Securities Accounts
5.24              Material Contracts
6.17              Affected Leaseholds
7.01              Existing Liens
7.02              Existing Investments
7.03              Existing Indebtedness
7.08              Conduct of Business
7.09              Affiliate Transactions
10.02             Agent's Office; Certain Addresses for Notices

**EXHIBITS**

                  ***Form of***
A                 Committed Loan Notice
B                 Loan Note
C                 Assignment and Assumption
D-1 to D-4        U.S. Tax Compliance Certificates
E                 Initial Budget

# CREDIT AGREEMENT

This SENIOR SECURED SUPERPRIORITY PRIMING DEBTOR IN POSSESSION CREDIT AGREEMENT ("Agreement") is entered into as of February 5, 2023, among INDEPENDENT PET PARTNERS HOLDINGS, LLC, a Delaware limited liability company (the "Parent"), INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS, LLC, a Delaware limited liability company (the "Borrower" and "IPP Intermediate"), as borrower, the other Loan Parties (as hereinafter defined) from time to time party hereto, the Lenders (as hereinafter defined) from time to time party hereto, and Acquiom Agency Services LLC, as Agent.

## W I T N E S S E T H

On February 5, 2023 (the "Petition Date"), Parent, the Borrower and certain Subsidiaries of Parent (collectively, the "Debtors" and, each individually, a "Debtor") commenced cases (the "Chapter 11 Cases") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and the Debtors have retained possession of their assets and are authorized under the Bankruptcy Code to continue the operations of their businesses as debtors-in-possession.

The Borrower has requested, and, upon the terms set forth in this Agreement, the Lenders have agreed to make available to the Borrower, a senior secured superpriority debtor in possession term loan credit facility of up to $27,258,311.48 (the "DIP Facility"), consisting of: (i) a new money term loan in an aggregate principal amount not to exceed $9,557,894.74 and (ii) Roll-Up Loans (as hereinafter defined) in an aggregate principal amount not to exceed $17,700,416.74, resulting from the roll-up and exchange of the Prepetition ABL Secured Obligations pursuant to the DIP Orders, in each case subject to the conditions set forth herein and in the DIP Orders.

The Lenders are willing to make the DIP Facility available to the Borrower, subject to the terms and conditions set forth in this Agreement and the DIP Orders.

Subject to the terms hereof and the DIP Orders, the Loan Parties have agreed to secure all of their Obligations under the Loan Documents by granting to the Agent, for the benefit of the Credit Parties, a security interest in and lien upon all of their existing and after-acquired personal property.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**1.01    Defined Terms**.  As used in this Agreement, the following terms shall have the meanings set forth below:

"Acceptable Plan" has the meaning set forth in Section 8.01(q)(ii).

"Acceptable Sale" has the meaning set forth in Section 8.01(q)(ii).

"Account" means "accounts" as defined in the UCC, and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold,

leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered or (c) arising out of the use of a credit or charge card or information contained on or for use with the card.

"Acquisition" means, with respect to any Person (a) a purchase of a Controlling interest in the Equity Interests of any other Person, (b) a purchase or other acquisition of all or substantially all of the assets or properties of another Person or of any business unit (including Store locations constituting a business unit or all or substantially all of the assets of any Person) of another Person, or (c) any merger or consolidation of such Person with any other Person or other transaction or series of related transactions resulting in the acquisition of all or substantially all of the assets, or Controlling interest in the Equity Interests, of any Person, in each case in any transaction or group of transactions which are part of a common plan.

"Adequate Protection Claims" shall have the meaning assigned to such term in the DIP Orders.

"Adequate Protection Payments" shall have the meaning assigned to such term in the DIP Orders.

"Adjusted Term SOFR" means, with respect to any tenor, the per annum rate equal to the sum of (i) Term SOFR plus (ii) 0.10% (10.0 basis points); provided, that if Adjusted Term SOFR determined as provided above shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by or otherwise reasonably acceptable to the Agent.

"Affiliate" means, with respect to any Person, (i) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified, (ii) any other Person directly or indirectly holding 20% or more of any class of the Equity Interests of that Person, or (iii) any other Person 20% or more of any class of whose Equity Interests is held directly or indirectly by that Person. Solely for purposes of Section 7.09, any director, officer or holder of the Equity Interests of Parent, any direct or indirect parent entity of Parent or any Subsidiary thereof, together with their family members and Affiliates, shall be deemed to be an Affiliate of Parent and its Subsidiaries.  For the avoidance of doubt, HMS Income Fund, Inc. and its Affiliates shall be deemed to be Affiliates of Main Street for all purposes under the Loan Documents.

"Agency Fee Letter" means the letter agreement, dated as of the date hereof, by and between the Borrower and the Agent.

"Agent" means Acquiom Agency Services LLC in its capacity as administrative agent and collateral agent under any of the Loan Documents, or any successor thereto or assignee thereof in such capacity.

"Agent's Account" means the account of the Agent designated in writing as such by the Agent to the other parties hereto from time to time.

"Applicable Law" means, with respect to any Person, the Laws and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of, any Governmental Authority (including, any order of the Bankruptcy Court, pursuant to the Bankruptcy Code or otherwise in connection with the Chapter 11 Cases), in each case whether or not having the force of law and that are applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Applicable Lenders" means the Required Lenders, all affected Lenders, or all Lenders, as the context may require.

"Applicable Margin" means, for any day, (1) with respect to any SOFR Loan, 10.0% per annum and (2) with respect to any Base Rate Loan, 9.0% per annum.

"Applicable Percentage" means, with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) equal to (x) the aggregate principal amount of Loans held by such Lender at such time, divided by (y) the sum of the aggregate principal amount of Loans held by all Lenders and outstanding at such time. The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Approved Budget" means (a) the Initial Budget, at all times, until superseded by an Updated Budget in accordance with (and subject to receipt of Lender Consent and all other approvals required pursuant to) Section 6.20 and (b) as of any time of determination thereafter, the most recent Budget Supplement (if any) that constitutes the Updated Budget in effect as of such time in accordance with (and subject to receipt of Lender Consent and all other approvals required pursuant to Section 6.20); provided, that, no Budget Supplement or other cash flow forecast shall in any event constitute an Approved Budget unless, in addition to being in accordance with the terms hereof, the same is also sufficient to constitute the "Approved Budget" for purposes of (and as such term or equivalent is defined in) the DIP Orders.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, (c) an entity or an Affiliate of an entity that administers or manages a Lender or (d) the same investment advisor or an advisor under common control with such Lender, Affiliate or advisor, as applicable.

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another, or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.06(b)), and accepted by the Agent, in substantially the form of Exhibit C or any other form approved by the Agent.

"Attributable Indebtedness" means, on any date, (a) in respect of any Capital Lease Obligation of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease, agreement or instrument were accounted for as a capital lease.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark, in each case, as of such date.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" means title 11 of the United States Code, as in effect from time to time.

"Bankruptcy Court" has the meaning specified in the recitals hereto.

"Base Rate" means for any day, a fluctuating rate per annum equal to the highest of: (a) the Federal Funds Rate as in effect for such day, plus one half of one percent (0.5%); (b) the Prime Rate as in effect for such day; and (c) the sum of (i) Adjusted Term SOFR for a one-month tenor in effect on such day plus (ii) 1.00%. Any change in the Base Rate due to a change in the Prime Rate, the Federal Funds Rate or Term SOFR, as applicable, shall be effective from and including the effective date of the change in such rate. If the Base Rate is being used as an alternative rate of interest pursuant to Section 3.03, then the Base Rate shall be the greater of clauses (a) and (b) above and shall be determined without reference to clause (c) above, provided that if Base Rate as determined above shall ever be less than the Floor plus 1.00%, then Base Rate shall be deemed to be the Floor plus 1.00%.

"Base Rate Loan" means a Loan that bears interest based on the Base Rate.

"Benchmark" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 3.03.

"Benchmark Replacement" means either of the following to the extent selected by the Required Lenders in their sole discretion:

      (a)      Daily Simple SOFR; or

      (b)      the sum of: (i) the alternate benchmark rate that has been selected by the Required Lenders and the Borrower giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body and (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities and (ii) the related Benchmark Replacement Adjustment.

      If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Required Lenders and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body and (b) any evolving or then-prevailing market

convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities.

"Benchmark Replacement Date" means the earliest to occur of the following events with respect to the then-current Benchmark:

(a)     in the case of clause (a) or (b) of the definition of "Benchmark Transition Event", the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)     in the case of clause (c) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by or on behalf of the administrator of such Benchmark (or such component thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be no longer representative or not to comply with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks; provided, that such non-representativeness or non-compliance will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means, the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)     a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)     a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) or the

regulatory supervisor for the administrator of such Benchmark (or such component thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer, or as of a specified future date will no longer be, representative or do not, or as a specified future date will not, comply with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark in accordance with Section 3.03 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark in accordance with Section 3.03.

"Bid Procedures Motion" means a motion that seeks, among other things, (a) approval of the Stalking Horse Asset Purchase Agreement; (b) approval of bid procedures with respect to the sale of all or substantially all of the Loan Parties' Property free and clear of all Liens, claims, successor liability, security interests and other encumbrances (including, without limitation, easements, restrictions, conditions, covenants, exceptions or reservations) (except assumed liabilities) pursuant to section 363(f) of the Bankruptcy Code; and (c) "good faith" protections pursuant to section 363(m) of the Bankruptcy Code.

"Bid Procedures Order" means an order approving the bid procedures with respect to the sale of all or substantially all of the Loan Parties' Property free and clear of all Liens, claims, successor liability, security interests and other encumbrances (including, without limitation, easements, restrictions, conditions, covenants, exceptions or reservations) (except assumed liabilities) pursuant to section 363(f) of the Bankruptcy Code, in form and substance, and on terms and conditions, satisfactory to the Required Lenders and Agent.

"Borrower" has the meaning specified in the introductory paragraph hereto.

"Borrowing" means (i) any simultaneous borrowing of Loans that are Base Rate Loans and (ii) any simultaneous borrowing of Loans that are SOFR Loans having the same Interest Period.

"Borrowing Date" means the date that any Borrowing is funded by the applicable Lenders.

"Budget Covenant" has the meaning set forth in Section 7.19.

"Budget Reporting Deadline" has the meaning set forth in Section 6.20.

"Budget Supplement" has the meaning set forth in Section 6.20.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the State of New York.

"Capital Lease Obligations" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified

and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve-Out" has the meaning assigned to such term in the Interim DIP Order (with respect to the period prior to the entry of the Final DIP Order) or the Final DIP Order (from and after the date on which the Final DIP Order is entered).

"Casualty Event" means the damage, destruction or condemnation, as the case may be, of property of any Person or any of its Subsidiaries, including any taking of all or any part of any real property of any Person in or by condemnation or other eminent domain proceedings pursuant to any Applicable Law, or by reason of the temporary requisition of the use or occupancy of all or any part of any real property of any Person by any Governmental Authority, civil or military, or any settlement in lieu thereof.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq.

"CERCLIS" means the Comprehensive Environmental Response, Compensation, and Liability Information System and the Superfund Enterprise Management System maintained by the United States Environmental Protection Agency.

"CFC" means a "controlled foreign corporation" within the meaning of Section 957(a) of the Code.

"CFC Holdco" means a Domestic Subsidiary all or substantially all of whose assets consist of (a) Equity Interests of one or more Foreign Subsidiaries that are CFCs or (b) Domestic Subsidiaries that themselves are CFC Holdcos.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a)   Sponsor, together with its Controlled Investment Affiliates, shall cease to beneficially own, directly or indirectly, (i) at least 50.0% on a fully diluted basis of the economic and voting interests of the Equity Interests of Parent, (ii) all of the Equity Interests of Parent owned by Sponsor and its Controlled Investment Affiliates as of the Closing Date other than for Equity Interests transferred in connection with an acquisition or other strategic transaction not prohibited hereunder or (iii) Equity Interests having a majority of the ordinary voting power (whether or not exercised) for the election of directors (or similar governing body) of Parent (on a fully diluted basis);

(b)    Sponsor, together with its Controlled Investment Affiliates, shall cease to have the power to appoint, remove or replace the majority of the seats on the board of directors (or similar governing body) of Parent;

(c)    Parent shall cease to directly and beneficially own and control one hundred percent (100%) of the economic and voting interests in the Equity Interests of the Borrower;

(d)    Parent shall cease to beneficially own and control one hundred percent (100%), on a fully diluted basis, of the economic and voting interests in the Equity Interests of any Guarantor; or

(e)    a "Change of Control" or any term of similar effect, as defined in the Prepetition ABL Credit Agreement, the Prepetition DDTL Credit Agreement or any document governing any Material Contract, shall occur.

"Chapter 11 Cases" has the meaning specified in the recitals hereto.

"Chapter 11 Order" means any order of the Bankruptcy Court in the Chapter 11 Cases in form and substance, and on terms and conditions, satisfactory to the Required Lenders (including, without limitation, as applicable, the Interim DIP Order, Final DIP Order, the First Day Orders, and the Second Day Orders).

"Chapter 11 Plan" means any plan of reorganization or liquidation (as the case may be) confirmed in any or all of the Chapter 11 Cases.

"Chapter 11 Plan Effective Date" means, with respect to any Chapter 11 Plan, the date of "substantial consummation" (as such term is defined in Section 1101 of the Bankruptcy Code) of such Chapter 11 Plan; provided, that, for purposes of this Agreement, "substantial consummation" shall in any event be deemed to occur no later than the effective date of such Chapter 11 Plan.

"Claims" means a "claim" as defined in section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing Date" means the first date on which all the conditions precedent in Section 4.01 are satisfied or waived by each Lender in accordance with Section 10.01.

"Closing Date Financial Statements" means, the unaudited Consolidated balance sheet of Original Parent and its Subsidiaries for the Fiscal Quarters ending October 29, 2022 and July 30, 2022, and related Consolidated statements of income or operations, and cash flows for such Fiscal Quarters and for the portion of Original Parent's Fiscal Year then ended.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means any and all "Collateral" or "Mortgaged Property" as defined in any applicable Security Document and all other property that is or is intended under the terms of the Security Documents to be subject to Liens in favor of the Agent.

"Committed Loan Notice" means a notice of (a) a Borrowing, (b) a Conversion of Loans from one Type to another, or (c) a continuation of SOFR Loans, pursuant to Section 2, which shall be substantially in the form of Exhibit A.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"Company Data" means all data and information, including Personal Information, whether in electronic or any other form or medium, that is accessed, collected, used, processed, stored, shared, distributed, transferred, disclosed, destroyed, or disposed of or otherwise held by or on behalf of any Loan Party or any of its Subsidiaries.

"Conforming Changes" means with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "Interest Period," the definition of "U.S. Government Securities Business Day", the timing and frequency of determining rates and making payments of interest, the timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Agent decides in good faith is appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Agent in a manner substantially consistent with market practice (or, if the Agent decides in good faith that adoption of any portion of such market practice is not administratively feasible or if the Agent determines in good faith that no market practice for the administration of any such rate exists, in such other manner of administration as the Agent decides in good faith is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated" means, when used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"Contractual Obligation" means, as to any Person, any provision of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means, with respect to any deposit account or securities account (including any DDA), an agreement, in form and substance reasonably satisfactory to the Agent and the Required Lenders, among the Agent, the financial institution or other Person at which such account is maintained, and the Loan Party maintaining such account, which grants "control" (within the meaning of Articles 8 or 9, as applicable under the applicable UCC) over such account to the Agent (and, if applicable, its representative) and whereby the financial institution or other Person at which such account is maintained agrees, upon notice received by such Person from the Agent (or its representative), to comply only with the instructions originated by the Agent without the further consent of such Loan Party.

"Controlled Investment Affiliates" means, with respect to the Sponsor, any fund or investment vehicle that is (i) organized by the Sponsor for the purpose of making equity investments in one or more companies, (ii) controlled by, or is under common control with, the Sponsor and (iii) engaged in the business of making equity investments in the Ordinary Course of Business. For purposes of this definition

"control" means the power to direct or cause the direction of management and policies of a person, whether by contract or otherwise.

"Convert", "Conversion" and "Converted" each refers to a conversion of Loans of one Type into Loans of the other Type.

"Credit Party" or "Credit Parties" means (a) individually, (i) each Lender and its Affiliates, (ii) the Agent, (iii) each beneficiary of each indemnification obligation undertaken by any Loan Party under any Loan Document, (iv) any other Person to whom Obligations under this Agreement and other Loan Documents are owing, and (v) the successors and permitted assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Credit Party Expenses" means all reasonable and documented out-of-pocket costs and expenses incurred by (a) the Agent and its Affiliates and (b) the Lenders and their Affiliates, in each case in connection with this Agreement and the other Loan Documents including, without limitation (i) the reasonable fees, charges and disbursements of (A) the Lender Professionals, (B) appraisers, and (C) commercial finance examiners, (ii) all such out-of-pocket costs and expenses incurred during any workout, restructuring or negotiations in respect of any Obligations, (iii) in connection with (A) the preparation, negotiation, administration, management, execution and delivery of this Agreement, the other Loan Documents, or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) or (B) the enforcement or protection of their rights in connection with this Agreement, the other Loan Documents or efforts to preserve, protect, collect, or enforce the Collateral or in connection with any proceeding under any Debtor Relief Laws, or (C) any workout, restructuring or negotiations in respect of any Obligations, and (iv) all reasonable customary fees and charges of the Agent with respect to the disbursement of funds (or the receipt of funds) to or for the account of the Borrower (whether by wire transfer or otherwise), together with any reasonable and documented out-of-pocket costs and expenses incurred in connection therewith; provided that the Lenders (taken as a group) and the Agent shall each be entitled to reimbursement for no more than one primary counsel representing such Agent or Lenders, as applicable (absent a conflict of interest in which case such Credit Parties may engage and be reimbursed for additional counsel), and, to the extent reasonably necessary, one local counsel in each applicable jurisdiction and one regulatory counsel.

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided, that if the Agent decides in good faith that any such convention is not administratively feasible for the Agent, then the Agent may establish another convention in its reasonable discretion.

"Data Security Breach" means any unauthorized or unlawful unauthorized access to, acquisition of, disclosure, use, loss, alteration, destruction, or compromise of Company Data, including Personal Information, in the possession or control of any Loan Party or any of its Subsidiaries.

"DDA" means each checking, savings or other demand deposit account maintained by any of the Loan Parties. All funds in each DDA shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agent and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in any DDA.

"Debtor" has the meaning specified in the recitals hereto.

"<u>Debtor Relief Laws</u>" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect affecting the rights of creditors generally.

"<u>Default</u>" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"<u>Default Rate</u>" means, an interest rate equal to the interest rate (including the Applicable Margin) otherwise applicable to the Loans <u>plus</u> two percent (2%) per annum.

"<u>Defaulting Lender</u>" means, subject to <u>Section 2.15(b)</u>, any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder, or (ii) pay to the Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrower or the Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect, (c) has failed, within three Business Days after written request by the Agent or the Borrower, to confirm in writing to the Agent and the Borrower that it will comply with its prospective funding obligations hereunder (<u>provided</u> that such Lender shall cease to be a Defaulting Lender pursuant to this <u>clause (c)</u> upon receipt of such written confirmation by the Agent and the Borrower), (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity, or (iii) become the subject of a Bail-in Action; <u>provided</u> that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Agent or the Required Lenders that a Lender is a Defaulting Lender under any one or more of <u>clauses (a)</u> through <u>(d)</u> above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to <u>Section 2.15(b)</u>) as of the date established therefor by the Agent or the Required Lenders in a written notice of such determination, which shall be delivered by the Agent or the Required Lenders, as applicable, to the Borrower and each other Lender promptly following such determination.

"<u>Designated Jurisdiction</u>" means any country or territory to the extent that such country or territory is the subject of any Sanction.

"<u>DIP Draw Conditions</u>" has the meaning set forth in Section 2.01.

"<u>DIP Facility</u>" has the meaning set forth in the recitals hereto.

"<u>DIP Motion</u>" means the motion and proposed form of Interim DIP Order filed by the Loan Parties with the Bankruptcy Court on the Petition Date seeking approval, on an interim and final basis, of (among other things) the DIP Facility, and authorization for the use of cash collateral (including such terms and conditions relating to adequate protection in connection therewith), in each case, in form and substance acceptable to the Agent and the Required Lenders.

"DIP Orders" mean collectively, the Interim DIP Order and the Final DIP Order and separately, the Interim DIP Order or the Final DIP Order, as the context requires.

"DIP Superpriority Claims" has the meaning set forth in the DIP Orders.

"Disbursements Variance" has the meaning set forth in Section 6.20(b).

"Disposition" or "Dispose" means the sale, transfer, or other disposition (including any sale and leaseback transaction), whether in one transaction or in a series of transactions, of any property (including, without limitation, any Equity Interests) by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, (a) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, (b) is redeemable at the option of the holder thereof, or (c) provides for the scheduled payment of dividends in cash, in each case in whole or in part, on or prior to the date that is ninety-one (91) days after the Maturity Date; provided, however, that (i) only the portion of such Equity Interests which so matures or is mandatorily redeemable, is so convertible or exchangeable, is so redeemable at the option of the holder thereof or provides for such payment of dividends prior to such date shall be deemed to be Disqualified Stock and (ii) with respect to any Equity Interests issued to any employee or other service provider of Parent and its Subsidiaries, or to any plan for the benefit of employees or other service providers of Parent or its Subsidiaries or by any such plan to such employees or other service providers, such Equity Interest shall not constitute Disqualified Stock solely because it may be required to be repurchased by Parent or one of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of or following such employee's or service provider's termination of employment or service, resignation, death or disability (it being understood that any such repurchase shall be subject to Section 7.06), and if any class of Equity Interest of such Person that by its terms provides that such Person shall satisfy its obligations thereunder solely by delivery of an Equity Interest that is not Disqualified Stock, such Equity Interests shall not be deemed to be Disqualified Stock. Notwithstanding the preceding sentence, any Equity Interest that would constitute Disqualified Stock solely because the holders thereof have the right to require a Loan Party to repurchase such Equity Interest upon the occurrence of a change of control or an asset sale shall not constitute Disqualified Stock so long as any rights of the holders thereof upon the occurrence of such change of control or asset sale shall be subject to the prior repayment in full in cash of all Obligations and the termination of the New Money Loan Commitments. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Borrower and its Subsidiaries may become obligated to pay upon maturity of, or pursuant to any mandatory redemption or scheduled dividend provisions of, such Disqualified Stock or portion thereof, plus accrued dividends.

"Dollars" and "$" mean lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary that is a U.S. Person.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of

an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effect of Bankruptcy" means, with respect to any contractual obligation, contract or agreement to which a Loan Party is a party, any default or other legal consequences arising on account of the commencement or the filing of the Chapter 11 Case (including the implementation of any stay), or the rejection of any such contractual obligation, contract or agreement with the approval of the Bankruptcy Court if required under Applicable Law.

"Eligible Assignee" means (a) a Credit Party or any of its Affiliates; (b) a bank, insurance company, or company engaged in the business of making commercial loans, which Person, together with its Affiliates, has a combined capital and surplus in excess of $250,000,000; (c) an Approved Fund; (d) any Person to whom a Credit Party assigns its rights and obligations under this Agreement as part of an assignment and transfer of such Credit Party's rights in and to a material portion of such Credit Party's portfolio of asset based credit facilities, and (e) any other Person (other than a natural Person) satisfying the requirements of Section 10.06(b) hereof; provided that notwithstanding the foregoing, "Eligible Assignee" shall not include the Sponsor, any Loan Party or any of their respective Affiliates or Subsidiaries.

"Environmental Laws" means any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, obligation, damage, loss, claim, action, suit, judgment, order, fine, penalty, fee, expense, or cost, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal or presence of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" has the meaning specified in the UCC.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or non-voting,

and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with any Loan Party within the meaning of Section 414(b) or (c) of the Code or Section 4001 of ERISA (or Sections 414(m) or (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) the withdrawal of any Loan Party or any ERISA Affiliate from a Pension Plan or Multiple Employer Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is, or is expected to become, insolvent (within the meaning of Section 4245 of ERISA); (d) the filing of a notice of intent to terminate a Pension Plan, or the treatment of a Pension Plan amendment as a termination under Section 4041 or 4041A of ERISA; (e) the institution by the PBGC of proceedings to terminate a Pension Plan; (f) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (g) the determination that any Pension Plan is considered at-risk (within the meaning of Section 430 of the Code or Section 303 of ERISA) or that a Multiemployer Plan is in endangered or critical status within the meaning of Section 432 of the Code or Section 305 of ERISA; (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any ERISA Affiliate; (i) any failure by any Pension Plan to satisfy the minimum funding standards (within the meaning of Sections 412 or 430 of the Code or Section 302 of ERISA) applicable to such Pension Plan, whether or not waived; (j) the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Pension Plan, or the failure by any Loan Party or any of its ERISA Affiliates to make any required contribution to a Multiemployer Plan; or (k) the imposition of a Lien on the assets of any Loan Party or any ERISA Affiliate pursuant to Section 430(k) of the Internal Revenue Code or pursuant to Section 303(k) of ERISA with respect to any Pension Plan.

"Erroneous Payment" has the meaning specified in Section 9.18(a).

"Erroneous Payment Deficiency Assignment" has the meaning specified in Section 9.18(d).

"Erroneous Payment Impacted Class" has the meaning specified in Section 9.18(d).

"Erroneous Payment Return Deficiency" has the meaning specified in Section 9.18(d).

"Erroneous Payment Subrogation Rights" has the meaning specified in Section 9.18(d).

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning specified in Section 8.01.

"Excluded Accounts" means (a) any deposit accounts used exclusively as payroll, trust or escrow accounts, and (b) petty cash accounts and zero balance accounts funded by the Loan Parties in the

14

Ordinary Course of Business with an average aggregate account balance (after giving effect to any sweep) not in excess of $100,000.

"Excluded Subsidiaries" means, collectively, (a) Foreign Subsidiaries that are CFCs and (b) Domestic Subsidiaries that are CFC Holdcos.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or New Money Loan Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or New Money Loan Commitment (other than pursuant to an assignment request by the Borrower under Section 3.06(b) or Section 10.13) or (ii) such Lender changes its Lending Office, except in each case to the extent that, pursuant to Section 3.01, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office, (c) Taxes attributable to such Recipient's failure to comply with Section 3.01(e) and (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"Executive Order" has the meaning specified in Section 10.18.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"FCPA" has the meaning specified in Section 5.27(b).

"Federal Flood Insurance" shall mean Federally backed Flood Insurance available under the National Flood Insurance Program to owners of real property improvements located in Special Flood Hazard Areas in a community participating in the National Flood Insurance Program.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published by the Federal Reserve Bank on the Business Day next succeeding such day, provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average of the quotations for the day (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) for such transactions received by the Agent from three federal funds brokers of recognized standing selected by it.

"Fee Letter" means the letter agreement, dated as of the date hereof, by and among the Borrower, Main Street, Newstone, CION Investment Corporation, and certain Affiliates thereof.

"Final DIP Order" means an order of the Bankruptcy Court in the Chapter 11 Cases, which order (a) shall be in form and substance, and on terms and conditions satisfactory to the Required Lenders and Agent, (b) shall, subject to the foregoing, authorize and approve, on a final basis, among other things, the DIP Facility and the transactions related thereto (including, without limitation, the DIP Facility, the Roll-Up Loans, the making of the Loans, the New Money Loan Commitment Fee, and the incurrence of all other Obligations in accordance with the terms hereof), the Debtors' use of cash collateral, and the grant of adequate protection, (c) shall be in full force and effect, and (d) (i) shall not have been reversed, vacated, or stayed and (ii) shall not have been amended, supplemented or otherwise modified since entry thereof by the Bankruptcy Court.

"Final DIP Order Date" means the date on which the Final DIP Order is entered by the Bankruptcy Court.

"FIRREA" shall mean the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"First Day Motions" means any "first day" motions and pleadings to be filed by the Loan Parties with the Bankruptcy Court on the Petition Date in connection with the Chapter 11 Cases, including, without limitation, the DIP Motion, each of which shall be in form and substance reasonably acceptable to the Required Lenders.

"First Day Orders" means any order entered by the Bankruptcy Court in respect of First Day Motions.

"Fiscal Month" means any fiscal month of any Fiscal Year, which month shall end on or about the last day of each calendar month in accordance with the fiscal accounting calendar of the Loan Parties.

"Fiscal Quarter" means, any of the quarterly accounting periods of the Loan Parties ending on or about April 30, July 31, October 31 and January 31 of each Fiscal Year.

"Fiscal Year" means, any of the annual accounting periods of the Loan Parties ending on or about the Saturday closest to January 31 of each calendar year.

"Flood Insurance" shall mean, for any real property located in a Special Flood Hazard Area, Federal Flood Insurance or private insurance that meets the requirements set forth by FEMA in its Mandatory Purchase of Flood Insurance Guidelines. Flood Insurance shall be in an amount equal to the full, unpaid balance of the Loan and any prior liens on the Real Estate up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by the Agent or the Required Lenders.

"Floor" means the rate per annum of interest equal to 0.00%.

"Foreign Asset Control Regulations" has the meaning specified in Section 10.18.

"Foreign Lender" means any Lender that is not a U.S. Person.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part); or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor" means (a) the Parent and each Subsidiary of the Parent existing on the Closing Date, and (b) each other Subsidiary (other than any Excluded Subsidiary) of the Parent that executes and delivers a Guaranty Agreement pursuant to Section 6.11.

"Guaranty Agreement" means the Guaranty Agreement, dated as of the date hereof, made by the Parent and the other Guarantors in favor of the Agent and the other Credit Parties.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes, pharmaceutical wastes, per- and polyfluoroalkyl substances, and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)     net obligations of such Person under any Swap Contract;

(d)     all obligations of such Person to pay the deferred purchase price of property or services (other than compensation, employee benefits and trade accounts, in each case, payable in the Ordinary Course of Business and not past due for more than 60 days after the due date set forth in the original invoice therefor);

(e)     indebtedness secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)     all Attributable Indebtedness of such Person;

(g)     all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person (including, without limitation, Disqualified Stock), or any warrant, right or option to acquire such Equity Interest (other than equity-based compensation issued to an employee or other service provider of such Person or obligation related thereto), valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(h)     all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitees" has the meaning specified in Section 10.04(b).

"Information" has the meaning specified in Section 10.07.

"Initial Budget" means a cash flow forecast through April 1, 2023 that (a) sets forth, on a line-item, cumulative and aggregate basis, the Debtors' projections for all weekly receipts and disbursements/expenditures (including debt service costs, operating disbursements, and wind-down costs) expected to be collected, incurred or made (as the case may be) by the Debtors, in each case, during the period beginning with the calendar week ending on Saturday of the week in which the Petition Date occurs, and (b) is in all respects in form and substance satisfactory to the Required Lenders. For the

18

avoidance of doubt, Exhibit B to the Interim DIP Order shall constitute the Initial Budget (and a copy thereof is attached as Exhibit E hereto).

"Initial Lender" means each Person listed on the signature pages hereto as a "Lender" and holding New Money Loan Commitments on the Closing Date.

"Insolvency or Liquidation Proceeding" means (a) any voluntary or involuntary case or proceeding under any Debtor Relief Law with respect to any Loan Party, (b) any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Loan Party or with respect to any of its assets, (c) any liquidation, dissolution, reorganization or winding up of any Loan Party whether voluntary or involuntary and whether or not involving insolvency or bankruptcy (except for any voluntary liquidation, dissolution or other winding up to the extent permitted herein) or (d) any assignment for the benefit of creditors or any other marshalling of assets and liabilities of any Loan Party.

"Intellectual Property" has the meaning given to such term in the Security Agreement.

"Intellectual Property Security Agreement" means, as applicable, any intellectual property security agreement delivered pursuant to the terms of the Security Agreement among the applicable Loan Parties and the Agent, as amended and in effect from time to time.

"Interest Payment Date" means (a) as to any SOFR Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date and (b) as to any Base Rate Loan, the last Business Day of each March, June, September and December and the Maturity Date.

"Interest Period" means, as to each SOFR Loan, the period commencing on the date such SOFR Loan is disbursed or Converted to or continued as a SOFR Loan and ending on the date that is one month thereafter; provided that:

> (i)    any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the immediately preceding Business Day;

> (ii)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

> (iii)    no Interest Period shall extend beyond the Maturity Date.

For the purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent Conversion or continuation of such Borrowing.

"Interim DIP Order" means an order of the Bankruptcy Court in the Chapter 11 Cases in connection with the DIP Motion, which order shall (a) be in form and substance, and on terms and conditions, satisfactory to the Required Lenders, (b) subject to the foregoing, authorize and approve, on an interim basis, among other things, the DIP Facility and all other matters set forth in, and transactions contemplated by, the DIP Motion, (including, without limitation, the DIP Facility, the Roll-Up Loans, the making of the Loans, the New Money Loan Commitment Fee, and the incurrence of all other Obligations

in accordance with the terms hereof), the Debtors' use of cash collateral, and the grant of adequate protection, (c) be in full force and effect, and (d) not have been reversed, vacated, stayed or amended, supplemented or otherwise modified (unless the Required Lenders shall have previously consented thereto in writing).

"Interim DIP Order Date" means the date on which the Interim DIP Order is entered by the Bankruptcy Court.

"Inventory" has the meaning given that term in the UCC, and shall also include, without limitation, all: (a) goods which (i) are leased by a Person as lessor, (ii) are held by a Person for sale or lease or to be furnished under a contract of service, (iii) are furnished by a Person under a contract of service, or (iv) consist of raw materials, work in process, or materials used or consumed in a business; (b) goods of said description in transit; (c) goods of said description which are returned, repossessed or rejected; and (d) packaging, advertising, and shipping materials related to any of the foregoing.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor incurs Indebtedness under a Guarantee in respect of such other Person, or (c) any Acquisition or the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment net solely of any net cash proceeds consisting of returns of principal or equity actually received by the applicable Person with respect to such Investment.

"IPP Employer Entity" means Independent Pet Partners Employer Holdings, LLC, a Delaware limited liability company, and IPP Employer LLC.

"IPP Employer LLC" means Independent Pet Partners Employer, LLC, a Delaware limited liability company.

"IPP Holdings" means Independent Pet Partners Holdings, LLC, a Delaware limited liability company.

"IPP Intermediate" has the meaning specified in the introductory paragraph hereto.

"IRS" means the United States Internal Revenue Service.

"Joinder Agreement" means an agreement, in form reasonably satisfactory to the Agent and the Required Lenders pursuant to which, among other things, a Person becomes a party to, and bound by the terms of, this Agreement and/or the other Loan Documents in the same capacity and to the same extent as a Guarantor.

"Laws" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed

duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"<u>Lease</u>" means any written agreement pursuant to which a Loan Party is entitled to the use or occupancy of any real property (not owned by such Loan Party) for any period of time.

"<u>Lender</u>" means, collectively, each Initial Lender and any other Person that becomes a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"<u>Lender Consent</u>" has the meaning set forth in Section 6.20.

"<u>Lender Professionals</u>" means (a) Dechert LLP, New York counsel to the Lenders, (b) Paul Hastings LLP, New York counsel to the Agent, (c) Richards, Layton & Finger PA, Delaware counsel to certain Lenders and the Agent, (d) Vinson & Elkins LLP, as New York counsel to Newstone, (e) such other local counsel and special counsel to the Lenders and/or the Agent (as applicable) as shall be deemed necessary or advisable by them, and (f) such other consultants, and financial and other advisors to, accountants, and other professionals of, the Lenders as shall be deemed necessary or advisable by the Lenders.

"<u>Lending Office</u>" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Agent.

"<u>Lien</u>" means any mortgage, deed of trust, pledge, hypothecation, assignment as security, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale, Capital Lease Obligation, Synthetic Lease Obligation, or other title retention agreement, any similar encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"<u>Loan</u>" means each and any New Money Loan, Roll-Up Loan, DIP Facility Commitment Loan, and any other loan made (or deemed made) hereunder or pursuant hereto from time to time.

"<u>Loan Account</u>" has the meaning specified in <u>Section 2.11</u>.

"<u>Loan Documents</u>" means this Agreement, each Loan Note, the Agency Fee Letter, the Fee Letter, each Committed Loan Notice, the Security Documents, the Guaranty Agreement, the DIP Orders and any other document, instrument or agreement from time to time executed by any Loan Party or any Affiliate thereof or any Responsible Officer thereof and delivered in connection with the transactions contemplated by this Agreement.

"<u>Loan Note</u>" means any note issued to any of the Lenders evidencing any Loan or Borrowing funded by such Lenders in the form attached hereto as Exhibit B, in each case, as amended, restated, supplemented or otherwise modified from time to time.

"<u>Loan Parties</u>" means, collectively, the Borrower and each Guarantor.

"<u>Main Street</u>" means Main Street Capital Corporation, a Maryland corporation.

"Master Agreement" has the meaning specified in the definition of "Swap Contract."

"Material Adverse Effect" means a material adverse effect on the (i) business, condition (financial or otherwise), operations, performance, properties, contingent liabilities, material agreements or prospects of the Borrower and its Subsidiaries, taken as a whole (excluding (x) any matters disclosed in the declaration of Steve Coulombe in support of the petitions filed to commence the Chapter 11 Cases and the First Day Motions and Second Day Motions and the declaration of Adam Dunayer in support of the sale of assets and (y) the filing of the Chapter 11 Cases, the events and conditions related and/or leading up thereto as disclosed in such declaration and the effects thereof and any action required to be taken under the Loan Documents or under the DIP Orders), (ii) the validity or enforceability of any of the Loan Documents or the rights and remedies of the Agent and the Lenders thereunder, or (iii) any material portion of the Collateral or the Agent's liens on any material portion of the Collateral.

"Material Contract" means, with respect to any Person, each contract to which such Person is a party material to the business, condition (financial or otherwise), operations, performance, properties or prospects of such Person, the termination, non-renewal of which or failure to comply with which could reasonably be expected to result in a Material Adverse Effect.

"Material Indebtedness" means Indebtedness (other than the Obligations) of the Loan Parties in an aggregate principal amount exceeding $250,000. For the purposes of determining the amount of Material Indebtedness at any time, (a) the amount of the obligations in respect of any Swap Contract at such time shall be calculated at the Swap Termination Value thereof and (b) all amounts owing to all creditors under any combined or syndicated credit arrangement shall be included.

"Material Real Property" means each parcel of Real Estate held in fee simple by a Loan Party with an individual fair market value of greater than $500,000, as reasonably determined by the Borrower in good faith on the Closing Date for Real Estate owned on the Closing Date and on the date of acquisition of any Real Estate for any Real Estate acquired after the Closing Date, in each case except to the extent such parcel of Real Estate is located in an area identified by a Governmental Authority as a Special Flood Hazard Area, in which case such parcel of Real Estate may be deemed to not be "Material Real Property" by the Required Lenders in their sole discretion.

"Maturity Date" means April 16, 2023.

"Maximum Rate" has the meaning specified in Section 10.09.

"Milestones" means the following milestones relating to the Chapter 11 Cases (as any such time may be extended with the consent of the Required Lenders, in their sole discretion):

(a)    the Chapter 11 Cases shall have been filed on the Petition Date;

(b)    the Debtors shall have filed the Bid Procedures Motion on or prior to the date that is one (1) Business Day after the Petition Date;

(c)    the Bankruptcy Court shall have entered the Interim DIP Order on or prior to the date that is three (3) Business Days after the Petition Date;

(d)    the Bankruptcy Court shall have entered the Bid Procedures Order on or prior to the date that is nineteen (19) days after the Petition Date;

(e)    the Debtors shall have filed a motion for entry of the Store Closing Sales on or prior to the date that is one (1) Business Day after the Petition Date;

(f)    the Bankruptcy Court shall have entered the interim Store Closing Sales Order on or prior to the date that is three (3) Business Days after the Petition Date;

(g)    the Bankruptcy Court shall have entered the final Store Closing Sales Order on or prior to the date that is thirty-five (35) days after the Petition Date;

(h)    the consummation of the Store Closing Sales shall have occurred in accordance with the Store Closing Sales Order on or prior to the date that is thirty (30) days after the Petition Date;

(i)    the Bankruptcy Court shall have entered the Final DIP Order on or prior to the date that is thirty-five (35) days after the Petition Date;

(j)    the Bankruptcy Court shall have entered a Sale Order on or prior to the date that is fifty-five (55) days after the Petition Date;

(k)    the consummation of a Sale shall have occurred on or prior to the date that is seventy (70) days after the Petition Date.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage Documents" shall have the meaning set forth in Section 6.12.

"Mortgaged Property" shall mean each parcel of Real Estate and improvements thereto with respect to which a Mortgage is granted pursuant to the Loan Documents.

"Mortgages" means each and every mortgage or deed of trust, security agreement and assignment and other security document executed by the Loan Party owning the Material Real Property encumbered thereby in favor of the Agent, in form and substance reasonably satisfactory to the Agent and the Required Lenders.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Loan Party or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions or has any liability.

"Multiple Employer Plan" means a Plan which has two or more contributing sponsors (including any Loan Party or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"National Flood Insurance Program" shall mean the program created by the U.S. Congress pursuant to the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973, as revised by the National Flood Insurance Reform Act of 1994, that mandates the purchase of flood insurance to cover real property improvements located in Special Flood Hazard Areas in participating communities and provides protection to property owners through a Federal insurance program.

"Net Proceeds" means:

(a) with respect to any Disposition by any Loan Party or any of its Subsidiaries, the excess, if any, of (i) the sum of cash and cash equivalents received in connection with such transaction (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) <u>minus</u> (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the applicable asset by a Lien permitted hereunder to be (and which is) senior to the Agent's lien on such asset and that is required to be repaid (or to establish an escrow for the future repayment thereof) in connection with such transaction (other than Indebtedness under the Loan Documents), (B) the reasonable and customary out-of-pocket expenses incurred by such Loan Party or such Subsidiary in connection with such transaction (including, without limitation, appraisals, and brokerage, legal, title and recording or transfer tax expenses and commissions) paid by any Loan Party to third parties (other than Affiliates) and (C) the amount of all Taxes paid (or reasonably estimated to be payable) in connection with such Disposition, in each case during the year that such transaction occurred or the next succeeding year to the extent directly attributable to such transaction (as determined reasonably and in good faith by a Responsible Officer of the applicable Loan Party);

(b) with respect to any Casualty Event, the excess, if any, of (i) the amount of any insurance proceeds or condemnation awards received by any Loan Party or any of its Subsidiaries in connection with such Casualty Event <u>minus</u> (ii) the sum of (A) the reasonable and customary out-of-pocket collection expenses incurred by such Loan Party or such Subsidiary in connection with such Casualty Event and (B) the amount of all Taxes paid (or reasonably estimated to be payable) in connection with the receipt of such insurance proceeds or condemnation awards, in each case during the year that such Casualty Event occurred or the next succeeding year to the extent directly attributable to such Casualty Event (as determined reasonably and in good faith by a Responsible Officer of the applicable Loan Party); and

(c) with respect to the incurrence or issuance of any Indebtedness by any Loan Party or any of its Subsidiaries, the excess of (i) the sum of the cash and cash equivalents received in connection with such transaction <u>minus</u> (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Loan Party or such Subsidiary in connection therewith.

"<u>New Money Loan</u>" means a term loan made by a Lender to the Borrower under <u>Section 2.01(a)</u> pursuant to its New Money Loan Commitment.

"<u>New Money Loan Commitment</u>" means, as to each Lender, its obligation to make New Money Loans to the Borrower pursuant to <u>Section 2.01(a)</u>, in an aggregate principal amount at any one time outstanding not to exceed the amount in U.S. Dollars set forth opposite each Lender's name under the heading "New Money Loan Commitment" in Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender became a party hereto, as the same may be changed or reduced from time to time pursuant to the terms hereof.

"<u>New Money Loan Commitment Fee</u>" shall mean the payment (for the account of each Lender holding a New Money Loan Commitment) required to be made by the Borrower on the date of the Initial New Money Draw and on the date of the Final New Money Draw, as applicable, and otherwise in accordance with the Fee Letter.

"<u>Newstone</u>" means, each of, Newstone Capital Partners, LLC, a Delaware limited liability company, Newstone Capital Partners III, L.P., a Delaware limited partnership, Newstone Capital Partners III-A, L.P., a Delaware limited partnership and Newstone Capital Partners III-B, L.P., a Delaware limited partnership.

"Non-Consenting Lender" has the meaning specified in Section 10.01(c).

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means all debts (including, without limitation, principal, interest, premiums, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of any Loan Party arising under any Loan Document or otherwise with respect to any Loan (including all Loans resulting from, and deemed made in connection with payment of, the New Money Loan Commitment Fee) including, without limitation, payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest (including interest accruing after the Termination Date or other maturity of the Loans, and Post-Petition Interest), premiums, fees, costs, expenses and indemnities that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees costs, expenses and indemnities are allowed claims in such proceeding.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"Ordinary Course of Business" means in respect of any obligation of, transaction involving, action taken by, or agreement or arrangement entered into by, any Person, the ordinary course of such Person's business, as conducted by any such Person in accordance with past practice or otherwise undertaken by such Person in good faith and not for purposes of evading any covenant or restriction in, or any requirement of, any Loan Document or Applicable Law; *provided,* that, (i) any of the foregoing that occurs on or at any time after the Petition Date shall only be deemed to be in the Ordinary Course of Business if and to the extent that the same constitutes "Ordinary Course of Business" pursuant to section 363 of the Bankruptcy Code, and (ii) any payment, disbursement or liability made or arising as of the Petition Date shall only be deemed to be in the Ordinary Course of Business if, in addition to satisfying the foregoing requirements, the same shall be in accordance with the Approved Budget.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections to the extent arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.06 or Section 10.13).

"Outstanding Amount" means, with respect to Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Loans occurring on such date.

"Parent" has the meaning specified in the recitals hereto.

"Participant" has the meaning specified in Section 10.06(d).

"Participant Register" has the meaning specified in Section 10.06(d).

"Patriot Act" has the meaning specified in Section 10.17.

"Payment Recipient" has the meaning specified in Section 9.18(a).

"PBGC" means the Pension Benefit Guaranty Corporation.

"PCAOB" means the Public Company Accounting Oversight Board.

"Pension Act" means the Pension Protection Act of 2006.

"Pension Funding Rules" means the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Section 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"Pension Plan" means any employee pension benefit plan (including a Multiple Employer Plan, but excluding a Multiemployer Plan) that is maintained or is contributed to or is required to be contributed to (or has, within the past six (6) years, been maintained or contributed to, or was required to be contributed to) by any Loan Party or any ERISA Affiliate and is either covered by Title IV of ERISA or is subject to Sections 412 or 430 of the Code or Section 302 of ERISA.

"Permitted Disposition" means any of the following:

(a)    Dispositions of Inventory in the Ordinary Course of Business and dispositions of Inventory in the Store Closing Sales, in each case, in an aggregate amount not to exceed the amount set forth in the Approved Budget;

(b)    non-exclusive licenses of Intellectual Property of a Loan Party or any of its Subsidiaries, in the Ordinary Course of Business;

(c)    [reserved];

(d)    Dispositions of Equipment in the Ordinary Course of Business that are substantially worn, damaged, obsolete or, in the judgment of a Loan Party, no longer useful or necessary in its business or that of any Subsidiary;

(e)    sales, transfers and Dispositions among the Loan Parties or by any Subsidiary to a Loan Party;

(f)    sales, transfers and Dispositions by any Subsidiary which is not a Loan Party to another Subsidiary that is not a Loan Party; and

(g)    Dispositions that consist of the sale or discount in the Ordinary Course of Business of overdue accounts receivable in connection with the compromise, settlement or collection thereof, so long as (x) the aggregate amount of such sales, assignments, transfers or other dispositions does not exceed such amount set forth in the Approved Budget and (y) such transaction occurs in the Ordinary Course of Business and no Default or Event of Default exists or would result therefrom.

"Permitted Encumbrances" means Prior Senior Liens as defined in the DIP Order.

"Permitted Indebtedness" means each of the following:

(a)    Indebtedness outstanding on the Closing Date listed on Schedule 7.03;

(b)    Indebtedness of any Loan Party to any other Loan Party;

(c)    purchase money Indebtedness of any Loan Party to finance the acquisition of any personal property consisting solely of fixed or capital assets (excluding Real Estate), including Capital Lease Obligations, and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, provided, however, that the aggregate principal amount of Indebtedness permitted by this clause (c) shall not exceed the amount set forth in the Approved Budget;

(d)    [reserved];

(e)    contingent liabilities under surety, bid, appeal or performance bonds or similar instruments incurred in the Ordinary Course of Business in connection with the construction or improvement of Stores;

(f)    obligations (contingent or otherwise) of any Loan Party or any Subsidiary thereof existing or arising under any Swap Contract, provided that (i) such obligations are (or were) entered into by such Person in the Ordinary Course of Business for the purpose of directly mitigating risks associated with fluctuations in interest rates or foreign exchange rates, and not for purposes of speculation or taking a "market view" and (ii) such Swap Contract does not contain any provision exonerating the non-defaulting party from its obligation to make payments on outstanding transactions to the defaulting party;

(g)    [reserved];

(h)    [reserved];

(i)    the Obligations; and

(j)    (i) Prepetition ABL Secured Obligations, (ii) Prepetition DDTL Secured Obligations, and (iii) Prepetition Priming Secured Obligations.

"Permitted Investments" means each of the following:

(a)    readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof; provided that the full faith and credit of the United States of America is pledged in support thereof;

(b)    commercial paper issued by any Person organized under the laws of any state of the United States of America and rated at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than 360 days from the date of acquisition thereof;

(c)    time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States of America, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (b) of this definition and (iii) has combined capital and surplus of at least $500,000,000, in each case with maturities of not more than 360 days from the date of acquisition thereof;

(d)    fully collateralized repurchase agreements with a term of not more than thirty (30) days for securities described in clause (a) above (without regard to the limitation on maturity contained in such clause) and entered into with a financial institution satisfying the criteria described in clause (c) above or with any primary dealer and having a market value at the time that such repurchase agreement is entered into of not less than 100% of the repurchase obligation of such counterparty entity with whom such repurchase agreement has been entered into;

(e)    Investments, classified in accordance with GAAP as current assets of the Loan Parties, in any money market fund, mutual fund, or other investment companies that are registered under the Investment Company Act of 1940, as amended, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and which invest solely in one or more of the types of securities described in clauses (a) through (d) above;

(f)    Investments existing on the Closing Date set forth on Schedule 7.02, but not any increase in the amount thereof or any other modification of the terms thereof;

(g)    (i) Investments by any Loan Party and its Subsidiaries in their respective Subsidiaries outstanding on the Closing Date, (ii) additional Investments by any Loan Party in another Loan Party (other than the Parent), and (iii) additional Investments by Subsidiaries of the Loan Parties that are not Loan Parties in other Subsidiaries that are not Loan Parties;

(h)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the Ordinary Course of Business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(i)    Guarantees constituting Permitted Indebtedness;

(j)    Investments by any Loan Party in Swap Contracts permitted under clause (f) of the definition of "Permitted Indebtedness";

(k)    Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the Ordinary Course of Business;

(l)    advances to officers, directors and employees of the Loan Parties and Subsidiaries in the Ordinary Course of Business for travel, entertainment, relocation and similar ordinary business purposes in an aggregate amount not to exceed the amount set forth in the Approved Budget;

(m)    [reserved]; and

(n)    other Investments not otherwise specifically described herein not to exceed the amount set forth in the Approved Budget.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"Personal Information" means (i) all information identifying, or that alone or in combination with other information allows for the identification of, an individual; and (ii) all information that is defined as "personal data" or "personal information" under applicable Privacy Laws.

"Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Plan) maintained by any Loan Party or with respect to which any Loan Party is required to contribute or has any liability.

"Post-Petition Interest" means with respect to any Loans or other Obligations hereunder, all interest, fees, expenses and other charges accruing after the filing of any petition under the Bankruptcy Code, or the commencement of any proceeding under any Debtor Relief Law relating to any Loan Party and/or any of its Subsidiaries (including, as applicable, the Chapter 11 Cases), whether or not a claim for post-filing or postpetition interest is allowed or allowable under the Bankruptcy Code.

"Prepayment Event" means:

(a)    any Disposition (including pursuant to a sale and leaseback transaction) of any property or asset of a Loan Party or Subsidiary, excluding Permitted Dispositions described in any of clauses (a), (b), (e), and (f), of the definition thereof;

(b)    any Casualty Event involving any property or asset of a Loan Party or Subsidiary; or

(c)    the incurrence by a Loan Party or Subsidiary of any Indebtedness other than Permitted Indebtedness.

"Prepetition ABL Agent" means the administrative agent and collateral agent under the Prepetition ABL Credit Agreement.  As of the Closing Date, the Prepetition ABL Agent is Acquiom Agency Services LLC.

"Prepetition ABL Credit Agreement" means that certain Credit Agreement, dated as of December 22, 2017, by and among the Borrower and certain Subsidiaries of the Borrower as borrowers, the Guarantors (as defined therein) party thereto from time to time, the Lenders (as defined therein) party thereto from time to time, and the Prepetition ABL Agent (as supplemented by that certain Joinder to Loan Documents, dated as of May 29, 2018, as supplemented by that certain Joinder to Loan Documents, dated as of November 20, 2018, as amended by that certain First Amendment to Credit Agreement, dated as of November 20, 2018, as amended by that certain Limited Waiver and Second Amendment to Credit Agreement, dated as of July 29, 2019, as supplemented by that certain Joinder to Loan Documents, dated as of July 30, 2020, as amended by that certain Forbearance Agreement and Third Amendment to Credit Agreement, dated as of August 20, 2020, as amended by that certain Limited Waiver and Fourth Amendment to Credit Agreement, dated as of December 10, 2020, as amended by that certain Fifth Amendment to Credit Agreement, dated as of March 29, 2022, as amended by that certain Sixth Amendment to Credit Agreement, dated as of November 28, 2022, and as further amended, modified, restated, supplemented or extended from time to time to the extent permitted by this Agreement and the Prepetition Intercreditor Agreement).

"Prepetition ABL Lenders" means the lenders under the Prepetition ABL Credit Agreement and their respective successors and assigns.

"Prepetition ABL Loan Documents" has the meaning assigned to the term "Loan Documents" in the Prepetition ABL Credit Agreement.

"Prepetition ABL Loan Secured Parties" shall mean, collectively, the Prepetition ABL Lenders, the Prepetition ABL Agent and the other "Secured Parties," as such term is defined under the Prepetition ABL Loan Documents.

"Prepetition ABL Loans" has the meaning assigned to the term "Term Loans" under the Prepetition ABL Credit Agreement.

"Prepetition ABL Secured Obligations" has the meaning assigned to the term "ABL Secured Obligations" in the Prepetition Intercreditor Agreement.

"Prepetition Agents" means, collectively, the Prepetition ABL Agent, the Prepetition DDTL Agent, and the Prepetition Priming Agent (and each of them individually, a "Prepetition Agent").

"Prepetition Collateral" shall have the meaning assigned to such term in the DIP Order.

"Prepetition DDTL Agent" means Wilmington Trust, National Association, in its capacity as administrative agent and collateral agent under the Prepetition DDTL Credit Agreement, or any successor thereto or assignee thereof in such capacity.

"Prepetition DDTL Credit Agreement" means that certain Credit Agreement dated as of November 20, 2018 by and among IPP Intermediate, as borrower, Independent Pet Partners Intermediate Holdings II, LLC ("Original Parent"), as the parent and certain Subsidiaries of Original Parent, as guarantors, the Lenders (as defined therein) party thereto from time to time, and the Prepetition DDTL Agent (as amended by the First Incremental Delayed Draw Term Loan Amendment, dated as of February 12, 2019, as amended by that certain Limited Waiver Agreement and Second Amendment to Credit Agreement, dated as of March 2, 2020, as supplemented by that certain Joinder to Loan Documents, dated as of July 30, 2020, as amended by that certain Third Amendment to Delayed Draw Term Loan Agreement, dated as of November 4, 2020, as amended by the Limited Waiver and Fourth Amendment to Delayed Draw Term Loan Agreement, dated as of December 10, 2020, that certain Fifth Amendment to

Delayed Draw Term Loan Agreement, dated as of March 1, 2021, that certain Sixth Amendment to Delayed Draw Term Loan Agreement, dated as of March 29, 2022, that certain Seventh Amendment to Delayed Draw Term Loan Agreement, dated as of November 28, 2022, and as further amended, modified, restated, supplemented or extended from time to time to the extent permitted by this Agreement and the Prepetition Intercreditor Agreement).

"<u>Prepetition DDTL Lenders</u>" means the lenders under the Prepetition DDTL Credit Agreement and their respective successors and assigns.

"<u>Prepetition DDTL Loan Documents</u>" has the meaning assigned to the term "Loan Documents" in the Prepetition DDTL Credit Agreement.

"<u>Prepetition DDTL Loan Secured Parties</u>" shall mean, collectively, the Prepetition DDTL Lenders, the Prepetition DDTL Agent and the other "Secured Parties," as such term is defined under the Prepetition DDTL Loan Documents.

"<u>Prepetition DDTL Secured Obligations</u>" has the meaning assigned to the term "DDTL Secured Obligations" in the Prepetition Intercreditor Agreement.

"<u>Prepetition Debt</u>" means all debt incurred by the Debtors prior to, and outstanding as of, the Petition Date.

"<u>Prepetition Intercreditor Agreement</u>" means the Intercreditor Agreement, dated as of November 28, 2022, by and among the Prepetition Priming Agent, the Prepetition DDTL Agent and the Prepetition ABL Agent, as may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"<u>Prepetition Loan Documents</u>" means the Prepetition ABL Loan Documents, the Prepetition DDTL Loan Documents and the Prepetition Priming Loan Documents, collectively, and each of them individually, as the context may require.

"<u>Prepetition Priming Agent</u>" means the administrative agent and collateral agent under the Prepetition Priming Credit Agreement.  As of the Closing Date, the Prepetition Priming Agent is Acquiom Agency Services LLC.

"<u>Prepetition Priming Credit Agreement</u>" means that certain Credit Agreement, dated as of November 28, 2022, by and among Original Parent, and certain Subsidiaries of Original Parent, as guarantors, the Borrower, the Lenders (as defined therein) party thereto from time to time, and the Prepetition Priming Agent (as amended by the First Amendment to Credit Agreement, dated as of January 25, 2023, and as further amended, modified, restated, supplemented or extended from time to time to the extent permitted by this Agreement and the Prepetition Intercreditor Agreement).

"<u>Prepetition Priming Lenders</u>" means the lenders under the Prepetition Priming Credit Agreement and their respective successors and assigns.

"<u>Prepetition Priming Loan Documents</u>" has the meaning assigned to the term "Loan Documents" in the Prepetition Priming Credit Agreement.

"Prepetition Priming Loan Secured Parties" shall mean, collectively, the Prepetition Priming Lenders, the Prepetition Priming Agent and the other "Secured Parties," as such term is defined under the Prepetition Priming Loan Documents.

"Prepetition Priming Secured Obligations" has the meaning assigned to the term "Priming Secured Obligations" in the Prepetition Intercreditor Agreement.

"Prepetition Secured Obligations" means the Prepetition ABL Secured Obligations, the Prepetition DDTL Secured Obligations and the Prepetition Priming Secured Obligations, collectively, and each of them individually, as the context may require.

"Prepetition Secured Parties" means, collectively, the Prepetition ABL Loan Secured Parties, the Prepetition DDTL Loan Secured Parties, and the Prepetition Priming Loan Secured Parties (and each of them individually, a "Prepetition Secured Party").

"Prime Rate" means the rate of interest per annum which is identified as the "Prime Rate" and normally published in the Money Rates section of *The Wall Street Journal* (or, if such rate ceases to be so published, as quoted from such other generally available and recognizable source as the Agent may select); each change in the Prime Rate shall be effective from and including the date such change is announced as being effective.

"Privacy Laws" means all Applicable Laws with which any Loan Party or any of its Subsidiaries is required to comply that relate to privacy, data protection or data transfer issues, or the Processing of Personal Information, data breach disclosure and notification, or marketing.

"Processing" means any operation or set of operations performed upon Personal Information, whether or not by automated means, such as collection, recording, organization, structuring, storage, adaptation or alteration, retrieval, consultation, use, disclosure by transmission, dissemination or otherwise making available, combination, restriction, erasure or destruction.

"Professional Fee Variance" has the meaning set forth in Section 6.20(b).

"Real Estate" means all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights relating thereto and all leases, tenancies, and occupancies thereof.

"Receipts Variance" has the meaning set forth in Section 6.20(b).

"Recipient" means the Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder.

"Register" has the meaning specified in Section 10.06(c).

"Registered Public Accounting Firm" has the meaning specified by the Securities Laws and shall be independent of the Parent and its Subsidiaries as prescribed by the Securities Laws.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"<u>Relevant Governmental Body</u>" means the Board of Governors of the Federal Reserve System and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System and/or the Federal Reserve Bank of New York, or any successor thereto.

"<u>Removal Effective Date</u>" has the meaning specified in <u>Section 9.06</u>.

"<u>Reportable Event</u>" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived, by regulations or otherwise.

"<u>Reports</u>" has the meaning specified in <u>Section 9.12(b)</u>.

"<u>Required Lenders</u>" means, as of any date of determination, Lenders holding more than 50% of the sum of (a) the outstanding New Money Loan Commitments outstanding on such date and (b) the Total Outstandings on such date; provided that, (1) on any date on which Main Street (together with its Affiliates) holds more than 30% of the sum of (a) the outstanding New Money Loan Commitments outstanding on such date and (b) the Total Outstandings on such date, Required Lenders shall include Main Street and/or such applicable Affiliate and (2) on any date on which Newstone (together with its Affiliates) holds more than 30% of the sum of (a) the outstanding New Money Loan Commitments outstanding on such date and (b) the Total Outstandings on such date, Required Lenders shall include Newstone and/or such applicable Affiliate; provided further that the New Money Loan Commitment of, and the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making any determination of the Required Lenders or any calculation pursuant to this definition.

"<u>Resignation Effective Date</u>" has the meaning specified in <u>Section 9.06</u>.

"<u>Responsible Officer</u>" means the chief executive officer, president, chief financial officer, controller, treasurer or assistant treasurer of a Loan Party or any of the other individuals designated in writing to the Agent by an existing Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"<u>Restricted Payment</u>" means (a) any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment and (b) any management fee, transaction fee and similar fees payable to, and arrangements with, the Sponsor and the Sponsor's Affiliates. Without limiting the foregoing, "Restricted Payments" with respect to any Person shall also include all payments made by such Person with any proceeds of a dissolution or liquidation of such Person.

"<u>Roll-Up Loans</u>" has the meaning set forth in Section 2.02.

"Sale" means a sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code in the Chapter 11 Cases.

"Sale Order" means an order of the Bankruptcy Court in the Chapter 11 Cases approving a Sale that is an Acceptable Sale, which order shall be in form and substance, and on terms and conditions, satisfactory to the Required Lenders and Agent.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Sanction(s)" means any sanction administered or enforced by the United States Government (including, without limitation, OFAC), the United Nations Security Council, the European Union, Her Majesty's Treasury ("HMT") or other relevant sanctions authority.

"Sarbanes-Oxley" means the Sarbanes-Oxley Act of 2002.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Second Day Motions" means any "second day" motions and pleadings to be filed by the Loan Parties with the Bankruptcy Court on the Petition Date in connection with the Chapter 11 Cases, each of which shall be in form and substance reasonably acceptable to the Required Lenders.

"Second Day Orders" means any order entered by the Bankruptcy Court in respect of Second Day Motions.

"Secured Parties" means, collectively, the Credit Parties.

"Securities Laws" means the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley, and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the PCAOB.

"Securitization" has the meaning specified in Section 10.06(g).

"Security Agreement" means the Security Agreement, dated as of the date hereof, among the Loan Parties and the Agent.

"Security Documents" means the DIP Orders, the Security Agreement, any Intellectual Property Security Agreement, any Control Agreements, any Mortgages and each other security agreement or other instrument or document executed and delivered to the Agent pursuant to this Agreement or any other Loan Document granting a Lien to secure (or purporting to secure) any of the Obligations.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"SOFR Loan" means a Loan bearing interest based on Adjusted Term SOFR, other than pursuant to clause (c) of the definition of "Base Rate."

"Special Flood Hazard Area" shall mean (x) an area that FEMA's current flood maps indicate has at least a one percent (1%) chance of a flood equal to or exceeding the base flood elevation (a 100-year

flood) in any given year and (y) any other area identified by the Required Lenders in their reasonable discretion.

"Sponsor" means TPG Growth III Management, LLC.

"Stalking Horse Asset Purchase Agreement" means that certain Asset Purchase Agreement, dated as of February 5, 2023, by and among the Loan Parties and the Lenders or affiliates thereof, as purchasers, that is in form and substance satisfactory to the Required Lenders in their sole discretion and, among other terms and conditions, evidences the Sale, as may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"Store" means any retail store (which may include any Real Estate, fixtures, Equipment, Inventory and other property related thereto) operated, or to be operated, by any Loan Party.

"Store Closing Sales" means the going out of business and store closing sales to be conducted pursuant to the Store Closing Sales Order.

"Store Closing Sales Order" means the interim order or final order, as then applicable, authorizing Loan Parties to retain an inventory liquidation firm and conduct going out of business and store closing sales at certain of Loan Parties' stores, in each case in form and substance satisfactory to Required Lenders in their sole and absolute discretion.

"Subordinated Indebtedness" means Indebtedness which is (or is required to be) expressly subordinated in right of payment to the prior payment in full of the Obligations, it being understood that all Subordinated Indebtedness shall be subject to (x) a subordination agreement in form and substance reasonably satisfactory to the Agent and the Required Lenders or (y) subordination terms in form and substance reasonably satisfactory to the Required Lenders.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the Equity Interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of a Loan Party.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a)

for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges in the nature of a tax imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the earliest of the following: (a) the date that is thirty-five (35) days after the Petition Date (or such later date as may be agreed in writing by the Required Lenders) unless the Final DIP Order Date has occurred on or prior to such date, (b) the date of consummation of any sale of all or substantially all assets of the Debtors pursuant to section 363 of the Bankruptcy Code, (c) the Chapter 11 Plan Effective Date, (d) the Maturity Date, (e) the occurrence of any Event of Default under this Agreement or the other Loan Documents, (f) the date of entry of an order by the Bankruptcy Court approving (i) a motion seeking conversion or dismissal of any or all of the Chapter 11 Cases or (ii) a motion seeking the appointment or election of a trustee, receiver, a responsible officer or examiner with enlarged powers relating to the operation of the Debtors' business, or if the Borrower or any Guarantor files a motion or other pleading seeking such conversion or dismissal unless otherwise consented to in writing by the Lenders, (g) the date the Bankruptcy Court orders the conversion of any Chapter 11 Case to a liquidation pursuant to chapter 7 of the Bankruptcy Code, (i) if the Interim DIP Order expires by its terms or is terminated, unless the Final DIP Order has been entered and become effective prior thereto, (j) if the Final DIP Order ceases to be in full force and effect, and (k) the date on which the Loans are accelerated or otherwise declared (or become) due and payable in accordance with the terms of this Agreement (whether automatically, or upon any Event of Default or as otherwise provided hereunder).

"Term SOFR" means, for the applicable tenor, the Term SOFR Reference Rate on the day (such day, the "Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to (a) in the case of SOFR Loans, the first day of such applicable Interest Period, or (b) with respect to Base Rate, such day of determination of the Base Rate, in each case as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Term SOFR Determination Day.

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Agent and the Required Lenders in their reasonable discretion).

"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.

"Total Outstandings" means the aggregate Outstanding Amount of all Loans.

"Trading with the Enemy Act" has the meaning specified in Section 10.18.

"Type" means, with respect to a Loan, its character as a Base Rate Loan or a SOFR Loan.

"UCC" or "Uniform Commercial Code" has the meaning given to such term in the Security Agreement.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"United States" and "U.S." mean the United States of America.

"Unsecured Creditors Committee" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to Section 1102 of the Bankruptcy Code, if any.

"Updated Budget" has the meaning set forth in Section 6.20(a).

"U.S. Government Securities Business Day" means any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning specified in Section 3.01(e)(ii)(B)(III).

"Variance Report" has the meaning set forth in Section 6.20(b).

"Variance Report Deadline" has the meaning set forth in Section 6.20(b).

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

**1.02   Other Interpretive Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)   The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any

definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (iii) the words "<u>herein</u>," "<u>hereof</u>" and "<u>hereunder</u>," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory rules, regulations, orders and provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "<u>asset</u>" and "<u>property</u>" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "<u>from</u>" means "<u>from and including</u>;" the words "<u>to</u>" and "<u>until</u>" each mean "<u>to but excluding</u>;" and the word "<u>through</u>" means "<u>to and including</u>."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)    Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in Dollars in full in cash or immediately available funds of all of the Obligations other than unasserted contingent indemnification Obligations.

**1.03    Accounting Terms**. Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall be construed in conformity with GAAP. Financial statements and other information required to be delivered by the Loan Parties to the Lenders pursuant to this Agreement shall be prepared in accordance with GAAP as in effect at the time of such preparation. Notwithstanding the foregoing, for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Parent and its Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded.

**1.04    [Reserved]**.

**1.05    Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**1.06    [Reserved].**

**1.07    Currency Equivalents Generally**.  Any amount specified in this Agreement (other than in <u>Articles II</u>, <u>IX</u> and X) or any of the other Loan Documents to be in Dollars shall also include the equivalent of such amount in any currency other than Dollars, such equivalent amount thereof in the applicable currency to be determined at such time on the basis of the Spot Rate (as defined below).  For purposes of this <u>Section 1.07</u>, the "<u>Spot Rate</u>" for any currency,

the rate set forth in *The Wall Street Journal* (or, if such rate ceases to be so published, as quoted from such other generally available and recognizable source as the Agent and the Required Lenders may select) as the exchange rate of such currency into Dollars; each change in the Spot Rate for a currency shall be effective from and including the date such change is announced as being effective.

**1.08    Interest Rates.**  The Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Benchmark, any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Benchmark or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  The Agent and its affiliates or other related entities may engage in transactions that affect the calculation of the Benchmark, any alternative, successor or replacement rate (including any Benchmark Replacement) and/or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Agent may select information sources or services in its reasonable discretion to ascertain the Benchmark or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

## ARTICLE II
## THE LOANS

**2.01    New Money Loans**.

(a)    Subject to the satisfaction of the applicable conditions precedent set forth in Article IV (the "DIP Draw Conditions"), and subject further to the other terms hereof, and relying upon the representations and warranties set forth herein, the Lenders agree to severally, but not jointly, make New Money Loans to the Borrower (unless the Termination Date shall have occurred):

(i)    Upon notice and request by Borrower pursuant to Section 2.01(d) and entry of the Interim DIP Order, and subject to the conditions therein, an initial draw (the "Initial New Money Draw") in an aggregate principal amount of up to $5,263,157.89 (the "Interim New Money Loans");

(ii)    Upon notice and request by Borrower pursuant to Section 2.01(d) and entry of the Final DIP Order, and subject to the conditions therein, an additional draw (the "Final New Money Draw") in an aggregate principal amount that will not exceed, when combined with all Interim New Money Loans advanced prior to such date, an aggregate principal amount of up to $9,557,894.74 (the "Final New Money Loans").

Each Lender's New Money Loan Commitment shall automatically and permanently be reduced, on a dollar-for-dollar basis, by the amount of New Money Loans funded by it, and no amount of Loans that shall have been repaid or prepaid at any time may be re-borrowed. For the avoidance of doubt, in no event shall the Lenders be required to fund any Loans if such funding would cause the aggregate principal amount of Loans outstanding hereunder to exceed the aggregate amount authorized pursuant to the

Interim DIP Order (in the case of Interim New Money Loans made prior to the Final DIP Order Date) or the Final DIP Order (in the case of Final New Money Loans made as of the Final DIP Order Date).

(b)     In accordance with the Fee Letter, the Borrower shall be required to pay the New Money Loan Commitment Fee for the account of the Lenders, which payment shall be effectuated pursuant to a deemed making by the Lenders of Loans on the date of the Initial New Money Draw and on the date of the Final New Money Draw, in each case, in an aggregate principal amount equal to the amount of the New Money Loan Commitment Fee (the "DIP Facility Commitment Loans"), which DIP Facility Commitment Loans shall have the same pricing, rights, privileges and other terms as otherwise attach to all New Money Loans (whether or not any New Money Loans are outstanding as of such time), but shall be made automatically and immediately upon and concurrently with the occurrence of the Initial New Money Draw, and the Final New Money Draw, as applicable, without requirement for any cash to be advanced by any Lender. The Borrower hereby agrees that they shall be deemed to have incurred the DIP Facility Commitment Loans automatically as of the date of the Initial New Money Draw, and on the date of the Final New Money Draw, as applicable, in each case by operation of the provisions hereof, without any further action by any Person, and that all DIP Facility Commitment Loans shall be outstanding as of such time, and interest shall accrue thereon in the same manner as interest would accrue on New Money Loans if any were made on such date.

(c)     Once repaid or prepaid, no Loan (or portion thereof) may be reborrowed.

(d)     <u>Requests for Borrowings</u>. In the case of a Borrowing, the Borrower shall give the Agent irrevocable notice by delivery of a Committed Loan Notice to the Agent, in accordance with Section 2.03.

(e)     <u>Termination of New Money Loan Commitments</u>.   New Money Loan Commitments (if any remain unused, after giving effect to any funding of Loans on such date) shall automatically terminate on the Termination Date.   New Money Loan Commitments shall be automatically and permanently reduced upon the making of New Money Loans and DIP Facility Commitment Loans.

## 2.02   Roll-Up Loans

(a)     Subject to the entry of and the terms and conditions of the Interim DIP Order, effective immediately and automatically upon the Interim DIP Order Date, and without any further action by any party to this Agreement or the other Loan Documents, the Bankruptcy Court or any other Person, for the Initial New Money Draw, (i) $5,263,157.89 in an aggregate amount of Prepetition ABL Secured Obligations outstanding under the Prepetition ABL Credit Agreement as of the Interim DIP Order Date shall be automatically deemed (on a cashless dollar-for-dollar basis) to constitute U.S. Dollar-denominated term loans under this Agreement in an aggregate principal amount equal to the Initial New Money Draw (each, an "Initial Roll-Up Loan" and collectively, the "Initial Roll-Up Loans"), which Initial Roll-Up Loan shall be due and payable in accordance with the terms and conditions set forth in this Agreement as if originally funded hereunder at the time of the Initial New Money Draw, and (ii) $5,263,157.89 of the Prepetition ABL Secured Obligations, excluding any post petition interest, shall be automatically and irrevocably deemed reduced by the amount of the Initial Roll-Up Loan as if payment were made under the Prepetition ABL Credit Agreement.

(b)     Subject to the entry of and the terms and conditions of the Final DIP Order and effective immediately and automatically upon entry of the Final DIP Order, and without any further action by any party to this Agreement or the other Loan Documents, the Bankruptcy Court or any other Person, for the Final New Money Draw (i) $12,437,258.85 in aggregate amount of Prepetition ABL

Loans outstanding under the Prepetition ABL Credit Agreement as of the date the Final DIP Order is entered by the Bankruptcy Court shall be automatically deemed (on a cashless dollar-for-dollar basis) to constitute U.S. Dollar-denominated term loans under this Agreement in an aggregate principal amount of $12,437,258.85 (the "Final Roll-Up Loans" and together with the Initial Roll-Up Loans, the "Roll-Up Loans"), which Final Roll-Up Loans shall be due and payable in accordance with the terms and conditions set forth in this Agreement as if originally funded hereunder on the date of entry of the Final DIP Order, and (ii) and the outstanding aggregate amount of the Prepetition ABL Secured Obligations, excluding any post petition interest, shall be automatically and irrevocably deemed reduced by the Final Roll-Up Loans as if payment were made under the Prepetition ABL Credit Agreement.

(c)    The Roll-Up Loans shall be deemed to be made by each Lender (or an investment advisor, manager, or beneficial owner for the account of a Lender, or an affiliated fund or trade counterparty designated by such Lender) in an amount equal to such Lender's pro rata share of the aggregate outstanding Prepetition ABL Secured Obligations.

### 2.03    Conversions and Continuations of Loans.

(a)    Loans shall be either Base Rate Loans or SOFR Loans as the Borrower may request subject to and in accordance with this Credit Agreement.

(b)    Each Borrowing, each Conversion of Loans from one Type to the other, and each continuation of SOFR Loans shall be made upon the Borrower's irrevocable delivery to the Agent of a Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower. Each such Committed Loan Notice must be received by the Agent not later than 12:00 noon (i) five (5) Business Days prior to the requested date of any Conversion to or continuation of SOFR Loans or of any Conversion of SOFR Loans to Base Rate Loans, (ii) three (3) Business Days (or such shorter period of time as consented to by the Required Lenders and the Agent) prior to the anticipated Borrowing Date of SOFR Loans, and (iii) five (5) Business Day prior to the requested date of any Borrowing of Base Rate Loans.

(c)    Each Borrowing of, Conversion to or continuation of SOFR Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof. Each Borrowing of or Conversion to Base Rate Loans shall be in a principal amount of $250,000 or a whole multiple of $50,000 in excess thereof.

(d)    Each Committed Loan Notice shall specify (A) whether the Borrower is requesting a Borrowing, a Conversion of Loans from one Type to another, or a continuation of SOFR Loans, (B) the requested date of the Borrowing, Conversion or continuation, as the case may be (which shall be a Business Day), (C) the principal amount of Loans to be borrowed, Converted or continued, (D) the Type of Loans to be borrowed or to which existing Loans are to be Converted (E) if applicable, the duration of the Interest Period with respect thereto and (F) in the case of a Borrowing of New Money Loans, the account of the Borrower to which the proceeds of such Loan are to be disbursed. If the Borrower fails to specify a Type of Loan in a Committed Loan Notice or if the Borrower fails to give a timely notice requesting a Conversion or continuation, then the applicable Loans shall be made as, or Converted to, Base Rate Loans. Any such automatic Conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable SOFR Loans. If the Borrower requests a Borrowing of, Conversion to, or continuation of SOFR Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one month.

(e)  Following receipt of a Committed Loan Notice, the Agent shall promptly notify each Lender of the amount of its Applicable Percentage of the applicable Loans, and if no timely notice of a Conversion or continuation is provided by the Borrower, the Agent shall notify each Lender of the details of any automatic Conversion to Base Rate Loans described in Section 2.03(b).  In the case of a Borrowing, each Lender shall make the amount of its New Money Loan available to the Agent in immediately available funds to the Agent's Account not later than 12:00 noon on the Business Day specified in the applicable Committed Loan Notice. Upon satisfaction of the applicable DIP Draw Conditions, the Agent shall promptly make all funds so received available to the Borrower in like funds as received by the Agent by wire transfer of such funds to the account of the Borrower designated in the Committed Loan Notice. The failure of any Lender to make any New Money Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the New Money Loan Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make New Money Loans as required.

(f)  Except as otherwise provided herein, a SOFR Loan may be continued or Converted only on the last day of an Interest Period for such SOFR Loan. During the existence of an Event of Default, no Loans may be requested as, Converted to or continued as SOFR Loans.

(g)  The Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for SOFR Loans upon determination of such interest rate. At any time that Base Rate Loans are outstanding, the Agent shall notify the Borrower and the Lenders of any change in the calculation of the Prime Rate used in determining the Base Rate promptly following such change.

(h)  After giving effect to all Borrowings, all Conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than one (1) Interest Period in effect with respect to SOFR Loans.

**2.04  [Reserved].**

**2.05  Prepayments**.

(a)  The Borrower may, upon irrevocable notice from the Borrower to the Agent, at any time or from time to time voluntarily prepay Loans in whole or in part; provided that (i) such notice must be received by the Agent not later than 12:00 noon (A) three (3) Business Days prior to any date of prepayment of SOFR Loans and (B) one (1) Business Day prior to any date of prepayment of Base Rate Loans; (ii) any prepayment of SOFR Loans shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof; and (iii) any prepayment of Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof or in each case, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment, the Type(s) of Loans to be prepaid and, if SOFR Loans, the Interest Period(s) of such Loans. The Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment. The Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein; provided that, notwithstanding the foregoing, such notice may state that the prepayment is conditioned upon the effectiveness of other transactions that are the source of proceeds for such prepayment, in which case such notice may be revoked by the Borrower if such condition is not satisfied (by giving written notice of such revocation to the Agent prior to the specified effective date of any such prepayment). Any prepayment of a SOFR Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.05. Subject to

42

Section 2.15(a)(ii), each such prepayment under this Section 2.05(a) shall be applied to the Loans of the Lenders in accordance with their respective Applicable Percentages.

(b)    [Reserved].

(c)    [Reserved].

(d)    [Reserved].

(e)    The Borrower shall, within 5 Business Days of receipt of Net Proceeds from a Prepayment Event, prepay the Loans in an amount equal to such Net Proceeds.

(f)    [Reserved].

(g)    Prepayments of Loans made pursuant to Sections 2.05(a) and (e) above shall be applied to reduce the outstanding principal amount of the Loans on a pro rata basis.

(h)    The Borrower shall notify the Agent in writing of any mandatory prepayment of Loans required to be made pursuant to clause (e) of this Section 2.05 at least one (1) Business Day prior to the date of such prepayment.  Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment.  The Agent will promptly notify each Lender of the contents of the Borrower's prepayment notice and of such Lender's ratable share of the prepayment.

**2.06    [Reserved].**

**2.07    Repayment of Obligations**.

The Borrower shall repay in full the aggregate outstanding principal amount of the Loans, together with all accrued and unpaid interest thereon and all other Obligations outstanding on such date, on the Maturity Date.  Notwithstanding anything else herein or elsewhere, the Obligations shall remain outstanding until such time as payment in full thereof shall have occurred. The Borrower shall pay in cash to the Agent on behalf of the Lenders (and the Agent shall promptly pay in cash to the Lenders each of Lenders' pro rata share thereof) the outstanding principal amount of the Obligations and all other Obligations on the Termination Date to the fullest extent necessary to constitute payment in full.

**2.08    Interest**.

(a)    Subject to the provisions of Section 2.08(b) below, (i) each SOFR Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to Adjusted Term SOFR for such Interest Period plus the Applicable Margin for SOFR Loans and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Margin for Base Rate Loans.

(b)    (i)    If any amount payable under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at an interest rate per annum at all times equal to the Default Rate to the extent permitted by Law.

(ii)      If any other Event of Default exists, then the Agent, upon the request of the Required Lenders, shall notify the Borrower in writing that all outstanding Obligations shall bear interest at an interest rate per annum at all times equal to the Default Rate and such Obligations shall bear interest at the Default Rate to the extent permitted by Law.

(iii)      Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable in cash upon demand.

(c)      Except as provided in Section 2.08(b), interest on each Loan shall be due and payable in cash in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein; provided that, at the election of the Borrower (which election shall be evidenced by written notice delivered to the Agent no later than twelve (12) Business Days prior to an Interest Payment Date), interest may be paid in-kind by adding the amount of such interest to the outstanding principal amount of the outstanding Loans on the applicable Interest Payment Date (whereupon from and after any such date such additional capitalized amounts shall also accrue interest pursuant to this Section 2.08 as a portion of the principal amount of the Loans). Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

**2.09    Fees**.

(a)      The Borrower shall pay to the Lenders for their own account the fees in the amounts and at the times specified in the Fee Letter. Such fees shall be fully earned when due and shall not be refundable for any reason whatsoever.

(b)      The Borrower shall pay to the Agent for its own account the fees in the amounts and at the times specified in the Agency Fee Letter. Such fees shall be fully earned when due and shall not be refundable for any reason whatsoever.

**2.10    Computation of Interest and Fees**.

All computations of interest for Base Rate Loans when the Base Rate is determined by reference to the Prime Rate shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed. Interest shall accrue on each Loan for the day on which such Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day. Each determination by the Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error. In connection with the use or administration of Term SOFR, the Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.  The Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

**2.11    Evidence of Debt**.

The Borrowings funded by each Lender shall be evidenced by one or more accounts or records maintained by the Agent (each a "Loan Account") in the ordinary course of business. In addition, each Lender may record in such Lender's internal records, an appropriate notation evidencing the date

and amount of each Loan from such Lender, each payment and prepayment of principal of any such Loan, and each payment of interest, fees and other amounts due in connection with the Obligations due to such Lender. The accounts or records maintained by the Agent and each Lender shall be conclusive absent manifest error of the amount of the Borrowings funded by the Lenders to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Agent in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest error and in the event of any conflict between the Register and the Loan Accounts or any other accounts and records of the Agent or any Lender in respect of such matters, the Register shall control. Upon the request of any Lender made through the Agent, the Borrower shall execute and deliver to the Agent (for onward delivery to such Lender) a Loan Note, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its Loan Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto. Upon receipt of an affidavit of a Lender as to the loss, theft, destruction or mutilation of such Lender's Loan Note and upon cancellation of such Loan Note, the Borrower will issue, in lieu thereof, a replacement Loan Note in favor of such Lender, in the same principal amount thereof and otherwise of like tenor.

### 2.12    Payments Generally; Agent's Right to Recoupment.

(a)    General. All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Agent, for the account of the respective Lenders to which such payment is owed, to the Agent's Account in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. The Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments by the Borrower received by the Agent after 2:00 p.m. may, at the option of the Agent, be deemed received on the next succeeding Business Day and any applicable interest or fee shall in such case continue to accrue for the resulting additional period. If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)    (i)    Funding by Lenders; Presumption by Agent. Unless the Agent shall have received notice from a Lender prior to the proposed date of any Borrowing of SOFR Loans, that such Lender will not make available to the Agent such Lender's share of such Borrowing, the Agent may assume that such Lender has made such share available on such date in accordance with Section 2.01(d) or Section 2.05, as applicable, and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Agent, then the applicable Lender and the Borrower severally agree to pay to the Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative processing or similar fees customarily charged by the Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrower, the interest rate applicable to Base Rate Loans. If the Borrower and such Lender shall pay such interest to the Agent for the same or an overlapping period, the Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period. If

such Lender pays its share of the applicable Borrowing to the Agent, then the amount so paid shall constitute such Lender's New Money Loan included in such Borrowing. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Agent.

(ii)     Payments by Borrower; Presumptions by Agent. Unless the Agent shall have received notice from the Borrower prior to the time at which any payment is due to the Agent for the account of any of the Lenders hereunder that the Borrower will not make such payment, the Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Agent, at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation.

A notice of the Agent to any Lender or the Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)     Failure to Satisfy Conditions Precedent. If any Lender makes available to the Agent funds for any New Money Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Agent because the DIP Draw Conditions are not satisfied or waived in accordance with the terms hereof, the Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)     Obligations of Lenders Several.  The obligations of the Lenders hereunder to make New Money Loans and to make payments hereunder are several and not joint. The failure of any Lender to make any New Money Loan or to make any payment hereunder on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its New Money Loan or to make its payment hereunder.

(e)     Funding Source.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any New Money Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any New Money Loan in any particular place or manner.

**2.13     Sharing of Payments by Lenders**. If any Credit Party shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of, interest on, or other amounts with respect to, any of the Obligations resulting in such Credit Party's receiving payment of a proportion of the aggregate amount of such Obligations greater than its pro rata share thereof as provided herein (including as in contravention of the priorities of payment set forth in Section 8.03), then the Credit Party receiving such greater proportion shall (a) notify the Agent of such fact, and (b) purchase (for cash at face value) participations in the Obligations of the other Credit Parties, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Credit Parties ratably and in the priorities set forth in Section 8.03, provided that:

(i)     if any such participations or sub-participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or sub-participations

46

shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)     the provisions of this Section 2.13 shall not be construed to apply to (x) any payment made by the Loan Parties pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any Eligible Assignee or Participant, other than to the Borrower or any Subsidiary thereof (as to which the provisions of this Section 2.13 shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

**2.14   [Reserved].**

**2.15   Defaulting Lenders.**

(a)     Adjustments. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by Applicable Law:

(i)     Waivers and Amendments. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and Section 10.01.

(ii)     Defaulting Lender Waterfall. Any payment of principal, interest, fees or other amounts received by the Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise) or received by the Agent from a Defaulting Lender pursuant to Section 10.08 shall be applied at such time or times as may be determined by the Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Agent hereunder; second, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any New Money Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Agent; third, if so determined by the Agent and the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to New Money Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any New Money Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such New Money Loans were made at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all New Money Loans are held by the Lenders pro

47

rata in accordance with the New Money Loan Commitments hereunder. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 2.15(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    Certain Fees. No Defaulting Lender shall be entitled to receive any fee payable under any Loan Document for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(b)    Defaulting Lender Cure. If the Borrower and the Agent agree in writing that a Lender is no longer a Defaulting Lender, the Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding New Money Loans of the other Lenders or take such other actions as the Agent may determine to be necessary or appropriate to cause the New Money Loans to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages, whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

## ARTICLE III
## TAXES, YIELD PROTECTION AND ILLEGALITY

### 3.01    Taxes.

(a)    Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes. Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Law. If any Applicable Law (as determined in the good faith discretion of the Loan Party or Agent, as the applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by the Agent or a Loan Party, then the Agent or such Loan Party shall be entitled to make such deduction or withholding, and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the such Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 3.01) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    Payment of Other Taxes by the Borrower. The Borrower shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, or at the option of the Agent timely reimburse it for the payment of, any Other Taxes.

(c)    Tax Indemnifications.

(i)    The Loan Parties shall, and each Loan Party does hereby, jointly and severally indemnify each Recipient, and shall make payment in respect thereof within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3.01) payable

or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Agent), or by the Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(ii)     Each Lender shall, and does hereby, severally indemnify, and shall make payment in respect thereof within 10 days after demand therefor, (x) the Agent against any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (y) the Agent and the Loan Parties, as applicable, against any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.06(d) relating to the maintenance of a Participant Register and (z) the Agent and the Loan Parties, as applicable, against any Excluded Taxes attributable to such Lender that are payable or paid by the Agent or a Loan Party in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Agent to set off and apply any and all amounts at any time owing to such Lender, as the case may be, under this Agreement or any other Loan Document against any amount due to the Agent under this clause (ii).

(d)     Evidence of Payments.  As soon as practicable after any payment of Taxes by a Loan Party to a Governmental Authority, such Loan Party shall deliver to the Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by Laws to report such payment or other evidence of such payment reasonably satisfactory to the Agent.

(e)     Status of Lenders; Tax Documentation.

(i)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Agent, at the time or times reasonably requested by the Borrower or the Agent and at the time or times prescribed by Applicable Laws, such properly completed and executed documentation reasonably requested by the Borrower or the Agent or prescribed by Applicable Laws as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower or the Agent as will enable the Borrower or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Sections 3.01(e)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

49

(A)      any Lender that is a U.S. Person shall deliver to the Borrower and the Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Agent), whichever of the following is applicable:

(I)      in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(II)      executed copies of IRS Form W-8ECI;

(III)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit D-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or W-8BEN-E, as applicable; or

(IV)      to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit D-2 or Exhibit D-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit D-4 on behalf of each such direct and indirect partner;

(C)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Agent), executed copies of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with

50

such supplementary documentation as may be prescribed by Applicable Law to permit the Borrower or the Agent to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Agent as may be necessary for the Borrower and the Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this <u>clause (D)</u>, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(iii)    Each Lender agrees that if any form or certification it previously delivered pursuant to this <u>Section 3.01</u> expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification (or any successor form or certification thereto) or promptly notify the Borrower and the Agent in writing of its legal inability to do so.

(f)    <u>Treatment of Certain Refunds</u>.  Unless required by Applicable Laws, at no time shall the Agent have any obligation to file for or otherwise pursue on behalf of a Lender or have any obligation to pay to any Lender any refund of Taxes withheld or deducted from funds paid for the account of such Lender. If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified by any Loan Party or with respect to which any Loan Party has paid additional amounts pursuant to this <u>Section 3.01</u>, it shall pay to the Loan Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by a Loan Party under this <u>Section 3.01</u> with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) incurred by such Recipient, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). The Loan Party, upon the request of the Recipient, agrees to repay the amount paid over to the Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Recipient in the event the Recipient is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this subsection, in no event will the applicable Recipient be required to pay any amount to the Loan Party pursuant to this subsection the payment of which would place the Recipient in a less favorable net after-Tax position than such Recipient would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Loan Party or any other Person.

(g)    <u>Survival</u>. Each party's obligations under this <u>Section 3.01</u> shall survive the resignation or replacement of the Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the New Money Loan Commitments and the repayment, satisfaction or discharge of all other Obligations.

(h)    <u>General</u>. For the purposes of this Section 3.01, "<u>Applicable Law</u>" includes FATCA.

**3.02    Illegality**. If any Lender determines in good faith that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund SOFR Loans, or to determine or charge interest rates based upon Term SOFR, then, on notice thereof by such Lender to the Borrower through the Agent, (i) any obligation of such Lender to make or continue Term SOFR Loans or to Convert Base Rate Loans to Term SOFR Loans shall be suspended, and (ii) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Term SOFR component of the Base Rate, the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Agent without reference to the Term SOFR component of the Base Rate, in each case, until such Lender notifies the Agent and the Borrower that the circumstances giving rise to such determination no longer exist (which each Lender agrees to promptly provide if the case). Upon receipt of such notice, (x) the Borrower shall, upon demand from such Lender (with a copy to the Agent), prepay or, if applicable, Convert all Term SOFR Loans of such Lender to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Agent without reference to the Term SOFR component of the Base Rate), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Term SOFR Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Term SOFR Loans and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon Term SOFR, the Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the Term SOFR component thereof until the Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon Term SOFR. Upon any such prepayment or Conversion, the Borrower shall also pay accrued interest on the amount so prepaid or Converted.

**3.03    Inability to Determine Rates; Effect of Benchmark Transition Event**.

(a)    Inability to Determine Rates. Subject to Section 3.03(b), if, on or prior to the first day of any Interest Period for any SOFR Loan:

(i)    the Agent or the Required Lenders determine (which determination shall be conclusive and binding absent manifest error) that Term SOFR cannot be determined, or

(ii)    the Required Lenders determine that for any reason in connection with any request for a SOFR Loan or a conversion thereto or a continuation thereof that Term SOFR for any requested Interest Period with respect to a proposed SOFR Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, and the Required Lenders have provided notice of such determination to the Agent, then the Agent will promptly so notify the Borrower and each Lender.  Upon notice thereof by the Agent to the Borrower, any obligation of the Lenders to make or continue SOFR Loans shall be suspended (to the extent of the affected SOFR Loans and, in the case of a SOFR Loan, the affected Interest Periods) until the Agent revokes such notice. Upon receipt of such notice, (i) the Borrower may revoke any pending request for a borrowing of, conversion to or continuation of SOFR Loans (to the extent of the affected SOFR Loans and, in the case of a SOFR Loans, the affected Interest Periods) or, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans in the amount specified therein and (ii) any outstanding affected SOFR Loans will be deemed to have been converted into Base Rate Loans at the end of the applicable Interest Period. Upon any such conversion, the Borrower shall also pay any additional amounts required pursuant to this Agreement.

(b)    Effect of Benchmark Transition Event.  Notwithstanding anything to the contrary herein or in any other Loan Document (and any Swap Contract shall be deemed not to be a "Loan Document" for the purposes of this Section 3.03):

(i)    Benchmark Replacement.  If a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior any setting of the then-current Benchmark, then (A) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (B) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.

(ii)    Conforming Changes. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(iii)    Notice; Standards for Decisions and Determinations. The Agent will promptly notify the Borrower and the Lenders of (A) the implementation of any Benchmark Replacement and (B) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  The Agent will promptly notify the Borrower of the removal or reinstatement of any tenor of a Benchmark pursuant to Section 3.03.  Any determination, decision or election that may be made by the Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 3.03, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 3.03.

(iv)    Unavailability of Tenor of Benchmark. At any time (including in connection with the implementation of a Benchmark Replacement) (A) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (1) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Agent in its reasonable discretion or (2) the administration of such Benchmark or the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative or in compliance with or aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks, then the Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such

unavailable, non-representative, non-compliant or non-aligned tenor and (B) if a tenor that was removed pursuant to clause (A) above either (1) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (2) ceases to be not be representative or in compliance with or aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks for a Benchmark (including a Benchmark Replacement), then the Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(v)     Benchmark Unavailability Period.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a SOFR Loan, or conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans.  During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of Base Rate.

### 3.04   Increased Costs; Reserves on SOFR Loans.

(a)     Increased Costs Generally.  If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in Term SOFR);

(ii)     subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)     impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or SOFR Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making, converting to, continuing or maintaining any SOFR Loan (or of maintaining its obligation to make any such Loan), or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender (with a copy provided to the Agent), the Loan Parties will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)     Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital or liquidity of such Lender's holding company, if any, as a consequence of this Agreement, the New Money Loan Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Loan

Parties will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     Certificates for Reimbursement.   A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in underline(a) or (b) of this Section 3.04 and delivered to the Borrower (with a copy provided to the Agent) shall be conclusive absent manifest error. The Loan Parties shall pay such Lender the amount so requested under any such certificate and owing under subsection (a) or (b) of this Section 3.04 within 10 Business Days after receipt of such certificate.

(d)     Delay in Requests. Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 3.04 shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Loan Parties shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section 3.04 for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

**3.05    Compensation for Losses**.   Upon demand of any Lender (with a copy to the Agent) from time to time, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)     any continuation, Conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)     any failure by the Borrower (for a reason other than the failure of such Lender to make a New Money Loan) to prepay, borrow, continue or Convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrower; or

(c)     any assignment of a SOFR Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to Section 10.13;

including any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained. The Borrower shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

**3.06    Mitigation Obligations; Replacement of Lenders**.

(a)     Designation of a Different Lending Office.  If any Lender requests compensation under Section 3.04, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and

would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    Replacement of Lenders.  If any Lender requests compensation under Section 3.04, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01 and, in each case, such Lender has not designated a different Lending Office in accordance with Section 3.06(a), the Borrower may replace such Lender in accordance with Section 10.13.

3.07    **Survival**.  All of the Borrower's obligations under this Article III shall survive termination of the New Money Loan Commitments, repayment of all other Obligations hereunder, and resignation of the Agent.

## ARTICLE IV
## CONDITIONS PRECEDENT

4.01    **Conditions Precedent to Closing Date**. The occurrence of the Closing Date, and the effectiveness of this Agreement, are subject to the Agent's and the Lenders' receipt of counterparts of (x) this Agreement, (y) the Agency Fee Letter in form and substance satisfactory to the Agent and (z) the Fee Letter, in each case, properly executed by a Responsible Officer of the signing Loan Party, the Lenders and the Agent, as applicable, sufficient in number for distribution to the Agent, each Lender and the Borrower, which shall be originals, telecopies or other electronic image scan transmission (e.g., "pdf" or "tif" via e-mail) (followed promptly by originals) and each in form and substance reasonably satisfactory to the Required Lenders.

4.03    **Conditions Precedent to the Initial New Money Draw**. The Lenders' obligations to make any Interim New Money Loans hereunder, are subject to the satisfaction (or waiver by the Agent and the Required Lenders, which such waiver may be communicated via e-mail by the Lender Professionals) of the following conditions precedent, in addition to the conditions precedent set forth in Section 4.01:

(a)    The Agent's and the Lenders' receipt of the following, each of which shall be originals, telecopies or other electronic image scan transmission (e.g., "pdf" or "tif" via e-mail) (followed promptly by originals) unless otherwise specified, each dated the date of the Initial New Money Draw (or, in the case of certificates of governmental officials, a recent date before the Initial New Money Draw) and each in form and substance reasonably satisfactory to the Required Lenders:

(i)    [reserved];

(ii)    a Loan Note executed by the Borrower in favor of each Lender requesting a Loan Note;

(iii)    such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Agent or the Required Lenders may reasonably require evidencing (A) the authority of each Loan Party to enter into this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party and (B) the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party;

(iv)    certified copies of the Organization Documents for each Loan Party and such other documents and certifications as the Agent or the Required Lenders may reasonably require to evidence that each such Person (x) is duly organized or formed, and is validly existing and in good standing in its jurisdiction of incorporation or formation, as applicable, and (y) is qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to so qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect;

(v)    a favorable opinion of McDonald Hopkins LLC, counsel to the Loan Parties, addressed to the Agent and each Lender, as to such matters concerning such Persons and the Loan Documents as the Agent or the Required Lenders may reasonably request;

(vi)    a certificate of a Responsible Officer of the Borrower certifying that (A) the conditions precedent specified at Sections 4.02(b) and (e) have been satisfied, and (B) either (1) no consents, licenses or approvals are required in connection with the execution, delivery and performance by such Loan Party and the validity against such Loan Party of the Loan Documents to which it is a party, or (2) that all such consents, licenses and approvals have been obtained and are in full force and effect;

(vii)    evidence that all insurance required to be maintained pursuant to the Loan Documents is in effect;

(viii)    the Security Documents and, to the extent applicable, certificates evidencing any certificated Equity Interests being pledged thereunder, together with undated transfer powers executed in blank, each duly executed by the applicable Loan Parties;

(ix)    all other Loan Documents, each duly executed by the applicable Loan Parties;

(x)    results of customary lien searches dated as of a date reasonably satisfactory to the Required Lenders indicating the absence of Liens on the assets of the Loan Parties, except for Permitted Encumbrances and Liens for which termination statements and releases, satisfactions and discharges of any mortgages, and releases or subordination agreements reasonably satisfactory to the Required Lenders are being tendered concurrently with such extension of credit or other arrangements reasonably satisfactory to the Required Lenders for the delivery of such termination statements, releases, satisfactions and discharges and subordinations have been made;

(xi)    all certificates, documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Agent or the Required Lenders to be filed, registered or recorded to create or perfect the first priority Liens over the Collateral; in each case intended to be created under the Loan Documents, and all such documents and instruments shall have been so filed, registered or recorded, or provision made therefor, to the reasonable satisfaction and the Required Lenders;

(xii)    such other assurances, certificates, documents, consents or opinions as the Agent or the Required Lenders reasonably may require, to the extent requested prior to the Initial New Money Draw; and

(xiii)    a duly executed Stalking Horse Asset Purchase Agreement, which shall not have been terminated according to its terms.

(b)    There is no Material Adverse Effect occurring as of the date of the Initial New Money Draw.

(c)    [Reserved].

(d)    [Reserved].

(e)    The consummation of the transactions contemplated hereby shall not violate any Law or any Organization Document of any Loan Party.

(f)    All Credit Party Expenses required to be paid to the Credit Parties pursuant to this Agreement, the Fee Letter or the Agency Fee Letter, as applicable, shall have been or shall substantially concurrently be paid in full.

(g)    [Reserved].

(h)    The Agent and the Lenders shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act, by a date not later than five (5) days prior to the Closing Date, including the results of background checks on the Borrower's key management and/or stockholders.

(i)    The Agent and the Lenders shall have received from the Loan Parties the Initial Budget, and the same shall be sufficient to constitute the Approved Budget in effect as of such time.

(j)    The Loan Parties shall have commenced the Chapter 11 Cases in the Bankruptcy Court and the Petition Date shall have occurred on February 5, 2023.

(k)    Each Loan Party shall be a debtor and debtor-in-possession in the Chapter 11 Cases, in each case, as otherwise satisfactory to the Required Lenders.

(l)    Not later than the date that is one (1) Business Day after the Petition Date, the Loan Parties shall have filed with the Bankruptcy Court (i) the First Day Motions, the DIP Motion, and (ii) all other motions and other documents required to be filed with or submitted to the Bankruptcy Court in connection with the Chapter 11 Cases, by such time as required pursuant to the Bankruptcy Code (or as requested by the Bankruptcy Court), in a form and in substance satisfactory to the Required Lenders.

(m)    All motions, orders and other documents to be filed with or submitted by the Debtors to the Bankruptcy Court on the Petition Date shall be in form and substance reasonably satisfactory to the Required Lenders.

(n)    All interim First Day Orders and the Interim DIP Order shall have been entered by the Bankruptcy Court, and such orders shall be in form and substance satisfactory to the Required Lenders (and with respect to any provisions that affect the rights or duties of the Agent, the Agent), be in full force and effect, and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the Required Lenders (and with respect to any provisions that affect the rights or duties of the Agent, the Agent).

(o)    The Loan Parties shall have made no payments after the Petition Date on account of any Prepetition Debt unless such payment is made pursuant to a Chapter 11 Order and, subject to any Permitted Variance (as defined in Section 7.19), in accordance with the Approved Budget.

(p)    The Interim DIP Order shall be effective to create, in favor of the Agent, for the benefit of the Secured Parties, a valid, binding, enforceable and fully and automatically perfected Lien on the Collateral, on the basis and with the priority set forth therein.

(q)    Each Milestone required to be satisfied prior to the Closing Date shall have been satisfied (or waived) in accordance with the terms hereof.

Without limiting the generality of the provisions of Section 9.04, for the purposes of determining compliance with the conditions specified in this Section 4.02, each Lender that has signed this Agreement shall be deemed to have consented to, approved, accepted or be satisfied with each document or other matter required thereunder to be consented to, approved by, acceptable to or satisfactory to a Lender unless the Agent shall have received notice from such Lender prior to the proposed Initial New Money Draw specifying its objection thereto.

**4.03    Conditions Precedent to all Borrowings**. The obligation of the Lenders to make any New Money Loan hereunder shall be subject to the fulfillment and satisfaction of all of the following conditions:

(a)    The representations and warranties of each Loan Party contained in Article V or in any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of such Borrowing, except (x) to the extent that any such representation or warranty is qualified by materiality, they shall be true and correct in all respects, (y) to the extent that any such representation or warranty specifically refers to an earlier date, they shall be true and correct in all material respects (or in all respects, as applicable) as of such earlier date, and (z) for the purposes of this Section 4.03(a), the representations and warranties contained in Sections 5.05(a) and (b) shall be deemed to refer to the most recent statements furnished pursuant to Section 6.20, respectively;

(b)    the Interim DIP Order (in the case of Loans made prior to the entry of the Final DIP Order) or the Final DIP Order (in the case of Loans made after the entry of the Final DIP Order) (a) shall be in full force and effect, (b) shall not have been reversed, vacated or stayed, (c) shall not have become the subject of any appeal or challenge, and (d) shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required Lenders;

(c)    the Stalking Horse Asset Purchase Agreement shall not have been terminated according to its terms;

(d)    in the case of a request for Borrowing made prior to the entry of the Final DIP Order, the Bankruptcy Court has granted approval of the incurrence by the Debtors of the full amount of the Roll-Up Loans in the Interim DIP Order;

(e)    in the case of a request for Borrowing made after the entry of the Final DIP order, the Bankruptcy Court has granted final approval of the Roll-Up Loans in the Final DIP Order;

(f)    each of the Milestones that were required to be satisfied prior to the time of the relevant request for Borrowing shall have been satisfied;

(g)     no Default or Event of Default exists at the time of the relevant request for Borrowing, or would result from such proposed Borrowing or from the application of the proceeds thereof;

(h)     there shall be an Approved Budget in full force and effect on and as of each of (a) the date of the applicable Borrowing for such Loan and (b) the time that such Loan is funded; and

(i)     the Agent shall have received a Committed Loan Notice in connection with the applicable New Money Loans in accordance with the requirements of this Agreement.

Each Committed Loan Notice submitted by the Borrower shall be deemed to be a representation and warranty by the Borrower that the conditions specified in Section 4.03 have been satisfied on and as of the date of the applicable Borrowing. The conditions set forth in this Section 4.03 are for the sole benefit of the Credit Parties but until the Required Lenders otherwise notify the Agent in writing that the Lenders will cease New Money Loans, the Lenders will fund their Applicable Percentage of all New Money Loans whenever made, which are requested by the Borrower and which, notwithstanding the failure of the Loan Parties to comply with the provisions of this Article IV, are agreed to by the Required Lenders, provided, however, that the making of any such New Money Loans shall not be deemed a modification or waiver by any Credit Party of the provisions of this Article IV on any future occasion or a waiver of any rights or the Credit Parties as a result of any such failure to comply.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

To induce the Credit Parties to enter into this Agreement and to make Loans hereunder, each Loan Party represents and warrants to the Agent and the other Credit Parties that:

**5.01     Existence, Qualification and Power**. Each Loan Party and each Subsidiary thereof (a) is a corporation, limited liability company, partnership or limited partnership, duly incorporated, organized or formed, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its incorporation, organization or formation, (b) has all requisite power and authority and all requisite governmental licenses, permits, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect. Schedule 5.01 sets forth, as of the Closing Date, each Loan Party's name as it appears in official filings in its state of incorporation, formation or organization, its state of incorporation, formation or organization, organization type, organization number, if any, issued by its state of incorporation, formation or organization, and its federal employer identification number.

**5.02     Authorization; No Contravention**.  The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, and the consummation by each Loan Party of the transactions contemplated hereby, has been duly authorized by all necessary corporate or other organizational action, and does not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach, termination, or contravention of, or constitute a default under (i) any Material Contract to which such Person is a party, (ii) any Material Indebtedness of such Person or (iii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; (c) result in or require the

creation of any Lien upon any asset of any Loan Party (other than Liens in favor of the Agent under the Security Documents); or (d) violate any Law.

5.03    **Governmental Authorization; Other Consents**. No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for (a) the filing of UCC financing statements or Intellectual Property Security Agreements to effect the perfection or maintenance of the Liens created under the Security Documents (including the first priority nature thereof, subject to Permitted Encumbrances), or (b) such as have been obtained or made and are in full force and effect.

5.04    **Binding Effect**.  This Agreement (a) has been, and each other Loan Document, when delivered, will have been, duly executed and delivered by each Loan Party that is party thereto; and (b) constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

5.05    **Financial Statements; No Material Adverse Effect**.

(a)    The Closing Date Financial Statements and all financial information furnished to the Agent (for onward delivery to the Lenders) hereunder present fairly in all material respects the financial position and results of operations of Parent and its Subsidiaries at the respective dates of such information and for the respective periods covered thereby, subject in the case of unaudited financial information, to changes resulting from normal year-end audit adjustments and to the absence of footnotes. The Closing Date Financial Statements and all of the balance sheets, all statements of income and cash flows, and all other financial information furnished hereunder, have been and will for all periods following the Closing Date be prepared in accordance with GAAP.

(b)    As of the Closing Date, there has been no event or circumstance, either individually or in the aggregate with respect to the Loan Parties, that has had or would reasonably be expected to have a Material Adverse Effect.

(c)    To the best knowledge of the Loan Parties, no event exists or has occurred since the date of the Closing Date Financial Statements that has resulted in or could reasonably be expected to result in a misstatement in any material respect, (i) in any financial information delivered or to be delivered to the Agent or the Lenders, or (ii) of the assets, liabilities, financial condition or results of operations of the Loan Parties. There are no material liabilities of any Loan Party of any kind whatsoever, whether accrued, contingent, absolute, determined, determinable or otherwise, and there is no existing condition, situation or set of circumstances which could reasonably be expected to result in any such liabilities, other than those liabilities provided for or disclosed in the Closing Date Financial Statements to the extent such liabilities are required under GAAP to be included in the financial statements.

5.06    **Litigation**.

(a)    Except as set forth on <u>Schedule 5.06(a)</u>, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its

Subsidiaries or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, (b) as of the Closing Date, could reasonably be expected to result in liabilities of the Loan Parties and their Subsidiaries in excess of $1,000,000, or (c) either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(b)    Except as set forth on Schedule 5.06(b), no Loan Party or any Subsidiary is in default under, or engaged in a material dispute with respect to, any lease or other contract to which such Person is a party that, individually or in the aggregate, is material to the business, financial condition, operations, performance or properties of the Loan Parties and their Subsidiaries.

5.07    **No Default**.    Except as set forth on Schedule 5.07, no Loan Party or any Subsidiary is in default under or with respect to, or party to, any Material Contract. No Default or Event of Default would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

### 5.08    Ownership of Property; Liens

(a)    Each of the Loan Parties and each Subsidiary thereof has good record and marketable title in fee simple to or valid leasehold interests in, or right to use, all Real Estate necessary or used in the ordinary conduct of its business, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Each of the Loan Parties and each Subsidiary has good and marketable title to, enforceable leasehold interests in, or valid right to use all personal property and assets material to the ordinary conduct of its business. The property of the Loan Parties and each Subsidiary thereof are subject to no Liens, other than Liens permitted by Section 7.01.

(b)    Schedule 5.08(b)(1) sets forth the address (including street address and state) of all Real Estate (excluding, for the avoidance of doubt, Real Estate held pursuant to Leases) that is owned by the Loan Parties and each of their Subsidiaries, together with a list of the holders of any Lien thereon, as of the Closing Date. Each Loan Party and each of its Subsidiaries has good, marketable and insurable fee simple title to the Real Estate owned by such Loan Party or such Subsidiary, free and clear of all Liens other than Permitted Encumbrances. Schedule 5.08(b)(2) sets forth, as of the Closing Date, the address (including street address and state) of all Real Estate held pursuant to Leases by the Loan Parties, together with the name of each lessor with respect to each such Lease, including, with respect to any distribution center or warehouse only, the notice address of such lessor. Each of such Leases is in full force and effect and the Loan Parties are in compliance with the terms of each of such Leases except for such non-compliance as could not reasonably be expected to have a Material Adverse Effect.

5.09    **Environmental Compliance.**  Except, in each case, as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect:

(a)    except as specifically disclosed in Schedule 5.09, no Loan Party or any Subsidiary thereof (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for it to be subject to any Environmental Liability.

(b)    except as otherwise set forth in Schedule 5.09, none of the properties currently or formerly owned or operated by any Loan Party or any Subsidiary thereof is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or is adjacent to any such

property; there are no and never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by any Loan Party or any Subsidiary thereof or, to the knowledge of the Loan Parties, on any property formerly owned or operated by any Loan Party or Subsidiary thereof; to the knowledge of the Loan Parties there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or Subsidiary thereof in violation of any Environmental Law; and Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof in violation of any Environmental Law.

(c)     except as otherwise set forth on Schedule 5.09, no Loan Party or any Subsidiary thereof is undertaking, and no Loan Party or any Subsidiary thereof has completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law; and, to the knowledge of the Loan Parties, all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof have been disposed of in a manner not reasonably expected to result in material liability to any Loan Party or any Subsidiary thereof.

**5.10    Insurance**.  The properties of the Loan Parties and their Subsidiaries are insured with financially sound and reputable insurance companies which are not Affiliates of the Loan Parties, in such amounts, with such deductibles and covering such risks (including, without limitation, workmen's compensation, public liability, business interruption, property damage and directors and officers liability insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties or the applicable Subsidiary operates. Schedule 5.10 sets forth a description of all insurance maintained by or on behalf of the Loan Parties and their Subsidiaries as of the Closing Date. As of the Closing Date, each insurance policy listed on Schedule 5.10 is in full force and effect.

**5.11    Taxes**.  The Loan Parties and their Subsidiaries have timely filed all Federal and state income and other material tax returns and reports required to be filed, and have timely paid all Federal and state income and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings being diligently conducted, for which adequate reserves have been provided in accordance with GAAP, to which no Tax Lien (other than Permitted Encumbrances) has been filed and to which contest effectively suspends the collection of the contested obligation and the enforcement of any Lien (other than Permitted Encumbrances) securing such obligation. There is no proposed tax assessment against any Loan Party or any Subsidiary that would, if made, have a Material Adverse Effect. No Loan Party or any Subsidiary thereof is a party to any tax sharing agreement.

**5.12    ERISA Compliance**.

(a)     Each Pension Plan (other than a Multiemployer Plan or a Multiple Employer Plan) and, to the knowledge of the Borrower, each Multiemployer Plan and Multiple Employer Plan, is in compliance, with the applicable provisions of ERISA, the Code and all other applicable Federal or state laws, except as has not resulted and would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect. Each Plan other than a Multiple Employer Plan and, to the knowledge of Borrower, each Multiple Employer Plan, in each case, that is intended to be a qualified

plan under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service to the effect that the form of such Plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the Internal Revenue Service to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the Internal Revenue Service. To the best knowledge of the Borrower, nothing has occurred that would reasonably be expected to prevent or cause the loss of such tax-qualified status.

(b)    There are no pending or, to the best knowledge of the Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that would reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or would reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect.

(c)    Except as has not resulted or would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, (i) no ERISA Event has occurred, and neither the Loan Parties nor any ERISA Affiliate is aware of any fact, event or circumstance that could reasonably be expected to constitute or result in an ERISA Event; (ii) each Loan Party and each ERISA Affiliate has met all applicable requirements under the Pension Funding Rules in respect of each Pension Plan, and no waiver of the minimum funding standards under the Pension Funding Rules has been applied for or obtained; (iii) as of the most recent valuation date for any Pension Plan, no Pension Plan is in "at risk status" (as defined in Section 430(i)(4) of the Code); (iv) neither any Loan Party nor any ERISA Affiliate has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due that are unpaid; (v) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that would reasonably be expected to be subject to Section 4069 or Section 4212(c) of ERISA; (vi) no Pension Plan has been terminated by the plan administrator thereof nor by the PBGC, and no event or circumstance has occurred or exists that could reasonably be expected to cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Pension Plan; and (vii) no Plan has engaged in a non-exempt prohibited transaction under Section 406 of Title I of ERISA or Section 4975 of the Code.

(d)    The Loan Parties are not entities deemed to hold "plan assets" for purposes of ERISA or the Code.

### 5.13    Subsidiaries; Equity Interests.

(a)    The Loan Parties have no Subsidiaries other than those specifically disclosed in Schedule 5.13(a) (as such Schedule may be updated from time to time after the Closing Date by written notice to the Agent), which Schedule sets forth the legal name, jurisdiction of incorporation, organization or formation (as applicable) and authorized Equity Interests of each such Subsidiary. All of the outstanding Equity Interests in the Loan Parties and their Subsidiaries have been validly issued, are fully paid and non-assessable and are owned in the amounts specified in Schedule 5.13(a), free and clear of all Liens except for (i) Liens created under the Security Documents, (ii) Liens created in favor of the Prepetition ABL Agent pursuant to the Prepetition ABL Loan Documents, (iii) Liens created in favor of the Prepetition Priming Agent pursuant to the Prepetition Priming Loan Documents and (iv) Liens created in favor of the Prepetition DDTL Agent pursuant to the Prepetition DDTL Loan Documents.

(b)    Except as set forth in Schedule 5.13(b), there are no outstanding rights to purchase any Equity Interests in any Subsidiary.

(c)    As of the Closing Date, the Loan Parties have no equity investments in any other corporation or entity other than those specifically disclosed in Schedule 5.13(c).

**5.14    Margin Regulations; Investment Company Act.**

(a)    No Loan Party is engaged or will be engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock. None of the proceeds of the New Money Loans shall be used directly or indirectly for the purpose of purchasing or carrying any margin stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any margin stock or for any other purpose that might cause any of the Loans to be considered a "purpose credit" within the meaning of Regulations T, U, or X issued by the FRB.

(b)    None of the Loan Parties, any Person Controlling any Loan Party, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**5.15    Disclosure**.    Each Loan Party has disclosed to the Agent all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party to the Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time and at the time made available to Agent.

**5.16    Compliance with Laws**.    Each of the Loan Parties and each Subsidiary is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**5.17    Intellectual Property; Licenses, Etc.**

(a)    The Loan Parties and their Subsidiaries own, or possess the right to use, all of the Intellectual Property, licenses, permits and other authorizations that are reasonably necessary for the operation of their respective businesses. To the knowledge of the Borrower, no Intellectual Property or other material now employed, or now contemplated to be employed, by any Loan Party or any Subsidiary or any product now offered, or now contemplated to be offered, by any Loan Party or any Subsidiary infringes upon any Intellectual Property rights held by any other Person. Except as specifically disclosed in Schedule 5.17, no claim or litigation regarding any of the foregoing is pending or, to the knowledge of the Borrower, threatened in writing, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(b)    Each Loan Party and its Subsidiaries complies and has at all times complied with applicable Privacy Laws. Each Loan Party and its Subsidiaries has established and maintains

commercially reasonable technical, physical and organizational measures designed to protect Company Data to which any Loan Party or any of its Subsidiaries has access or otherwise Processes, including against Data Security Breaches. No Loan Party nor any of its Subsidiaries has experienced a Data Security Breach.  No Loan Party nor any of its Subsidiaries has received any order, request, warning, reprimand, inquiry, notification, allegation or claims alleging that it is in violation of or has not complied in any respect with any Privacy Law. No Loan Party nor any of its Subsidiaries is currently and has not previously been under investigation, nor subject to any complaint, audit, proceeding, investigation, enforcement action, inquiry or claim, initiated by any (a) Governmental Authority, (b) state, federal or foreign self-regulating body, or (c) any Person, regarding or alleging that the Processing of Personal Information by any Loan Party or any of its Subsidiaries is in violation of any Privacy Law.

## 5.18    Labor Matters.

Except as list on Schedule 5.18 hereto, there are no strikes, lockouts, slowdowns, work stoppages, union election petitions, unfair labor practice charges, or other material labor disputes against any Loan Party or any Subsidiary thereof pending or, to the knowledge of any Loan Party, threatened. The hours worked by and payments made to employees of the Loan Parties comply and have complied with the Fair Labor Standards Act and any other applicable federal, state, local or foreign Law dealing with such matters, except as has not had and would not reasonably be expected to result in a Material Adverse Effect. No Loan Party or any of its Subsidiaries has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act or similar Law, except as has not had and would not reasonably be expected to have a Material Adverse Effect. All payments due from any Loan Party and its Subsidiaries, or for which any claim may be made against any Loan Party or any of its Subsidiaries, on account of wages, expense reimbursements, other compensation, and employee health and welfare insurance and other benefits, have been timely and properly paid or, if not yet due, properly accrued in accordance with GAAP as a liability on the books of such Loan Party, except as would not reasonably be expected to result in a Material Adverse Effect. Except as set forth on Schedule 5.18, no Loan Party or any Subsidiary is a party to or bound by any collective bargaining agreement or other contract with any labor organization, and no labor organization or group of employees of any Loan Party or any Subsidiary has made a pending demand for recognition or is represented by any labor organization.

## 5.19    Security Documents.

(a)    The Security Agreement creates in favor of the Agent, for the benefit of the Secured Parties referred to therein, a legal, valid, continuing and enforceable security interest in the Collateral (as defined in the Security Agreement), the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law. The financing statements, releases and other filings are in appropriate form and have been or will be filed in the offices specified in Schedule II of the Security Agreement. Upon such filings and/or the obtaining of "control" (as defined in the UCC) and/or the entry of the Interim DIP Order, the Agent will have a perfected Lien on, and security interest in, to and under all right, title and interest of the grantors thereunder in all Collateral that may be perfected under the UCC (in effect on the date this representation is made) by filing, recording or registering a financing statement or analogous document (including without limitation the proceeds of such Collateral subject to the limitations relating to such proceeds in the UCC) or by obtaining control, in each case prior and superior in right to any other Person.

(b)    When an Intellectual Property Security Agreement (or a short form thereof) is filed in the United States Patent and Trademark Office or the United States Copyright Office and when financing statements, releases and other filings in appropriate form are filed in the offices specified on Schedule II of the Security Agreement and/or the entry of the Interim DIP Order, the Agent shall have a

fully perfected Lien on, and security interest in, all right, title and interest of the applicable Loan Parties in assets constituting Intellectual Property Collateral (as defined in the Security Agreement) in which a security interest may be perfected by filing, recording or registering a security agreement, financing statement or analogous document in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, in each case prior and superior in right to any other Person.

(c) The Mortgages, if any, created in favor of the Agent, for the benefit of the Secured Parties referred to therein, a legal, valid, continuing and enforceable Lien on the Mortgaged Property (as defined in the Mortgages), the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law. Upon the filing or recording of the Mortgages, if any, with the appropriate Governmental Authorities, and/or the entry of the Interim DIP Order, the Agent will have a perfected Lien on, and security interest in, to and under all right, title and interest of the grantors thereunder in all Mortgaged Property (including without limitation the proceeds of such Mortgaged Property), in each case prior and superior in right to any other Person.

### 5.20   No Intent to Hinder, Delay, or Defraud.

No transfer of property has been or will be made by any Loan Party and no obligation has been or will be incurred by any Loan Party in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of any Loan Party.

### 5.21   Deposit Accounts.

Annexed hereto as Schedule 5.21 (as such Schedule may be updated from time to time after the Closing Date by written notice to the Agent) is a list of all deposit accounts (including DDAs) and securities accounts maintained by the Loan Parties as of the Closing Date, which Schedule includes, with respect to each such account, (i) the name of the applicable Loan Party; (ii) the account number(s) maintained with such depository, (iii) a description of the purpose of such account and (iv) the identification of each financial institution maintaining such DDA.

### 5.22   Brokers.  With the exception of Houlihan Lokey Capital, Inc., advisor to the Loan Parties and whose compensation earned, if any, is the responsibility of the Loan Parties, no broker or finder brought about the obtaining, making or closing of the Loans or transactions contemplated by the Loan Documents, and no Loan Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

### 5.23   Customer and Trade Relations.  There exists no actual or, to the knowledge of any Loan Party, threatened in writing, termination or cancellation of, or any material adverse modification or change in the business relationship of any Loan Party with, any supplier material to its operations which, in any such case, could not reasonably be expected to have a Material Adverse Effect.

### 5.24   Material Contracts.  Schedule 5.24 sets forth all Material Contracts to which any Loan Party is a party or is bound as of the Closing Date. Except as described on Schedule 5.24, all Material Contracts are in full force and effect and no material breaches, defaults, termination events or events of default are continuing thereunder.

### 5.25   Casualty.  Neither the businesses nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute,

drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.26     EEA Financial Institution.**   None of the Loan Parties is an EEA Financial Institution.

**5.27     Sanctions and Anti-Corruption Laws**.

(a)     No Loan Party, nor any Subsidiary, nor, to the knowledge of the Loan Parties, any director, officer, employee, agent, affiliate or representative thereof, is an individual or entity that is, or is owned or controlled by any individual or entity that is (i) currently the subject or target of any Sanctions, (ii) included on OFAC's List of Specially Designated Nationals, HMT's Consolidated List of Financial Sanctions Targets and the Investment Ban List, or any similar list enforced by any other relevant sanctions authority or financial authority located, organized or resident in a Designated Jurisdiction.

(b)     The Loan Parties and their Subsidiaries and their respective directors, officers and employees and, to the knowledge of each Loan Party, the agents of such Loan Party and its Subsidiaries, are in compliance with all applicable Sanctions and with the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (the "FCPA") and any other applicable anti-corruption law, in all material respects.

**5.28     Designated Senior Indebtedness.**   The Loan Documents and all of the Obligations have been deemed "designated senior indebtedness" or a similar concept thereto, if applicable, for the purposes of any expressly subordinated Material Indebtedness of the Loan Parties.

**5.29     Indictment.**   No Loan Party has been subject of any indictment or any legal process or proceeding under any federal, state, provincial, territorial, municipal, foreign or other criminal statute, rule, regulation, order, or other requirement having the force of law for a felony, except as could not reasonably be expected to have a Material Adverse Effect.

**5.30     Conduct of Business.**   None of Parent, Original Parent, Independent Pet Partners Intermediate Holdings I, LLC, nor any IPP Employer Entities owns any property, has any liabilities or obligations or engages in any business activities, in each case, except as expressly permitted in Section 7.08.

**5.31     Budget**. Each of the Initial Budget attached as Exhibit E, each Approved Budget, each Budget Supplement and each Updated Budget is based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made, in light of the circumstances under which they were made.

**5.32     Bankruptcy Matters.**

(a)     The Chapter 11 Cases were validly commenced on the Petition Date, and (x) proper notice under the circumstances of the motion seeking approval of the Loan Documents and entry of the DIP Orders was given, and (y) the hearing for the approval of the Interim DIP Order has been held by the Bankruptcy Court.

(b)     After the entry of the DIP Orders, the Obligations will constitute a DIP Superpriority Claim and the liens securing the Obligations shall be senior secured, valid, enforceable, and

automatically and properly perfected priming liens on the Collateral, having the priorities set forth in the DIP Orders, subject in all respects to the Carve-Out and other exceptions set forth in the DIP Orders and the Loan Documents.

      **5.33    Security Interests**.  This Agreement and the DIP Orders are effective to create, in favor of the Agent, for the benefit of the Secured Parties, a legal, valid, binding, enforceable first-priority Lien on and security interest in all right, title and interest of the Loan Parties in the Collateral, in each case, subject to the Carve-Out and junior only to any Permitted Encumbrances (other than as expressly provided in the DIP Orders). Pursuant to the terms of the DIP Orders, no filings or other action (including the taking of possession or control) are or shall at any time be necessary to perfect, preserve or protect such Liens and security interests; provided, that, notwithstanding the foregoing, the Loan Parties shall have executed and delivered the Security Agreement and made (or authorized the making by any Agent of) all filings, in each case, to the extent deemed reasonably necessary and/or appropriate, and requested, by any Agent or the Required Lenders.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

      So long as any Lender shall have any New Money Loan Commitment hereunder or any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification claims for which a claim has not been asserted), and so long as such actions are consistent with the relief requested in the First Day Orders, the Second Day Orders, the DIP Orders, the Store Closing Sales Orders, the Bid Procedures Order, and the Sale Order, the Loan Parties shall, and shall (except in the case of the covenants set forth 6.02, and 6.03) cause each Subsidiary to:

      **6.01    [Reserved]**.

      **6.02    Certificates; Other Information**.  Deliver to the Agent (for further distribution to the Lenders), in form and detail satisfactory to the Required Lenders:

        (a)      [reserved];

        (b)      [reserved];

        (c)      [reserved];;

        (d)      promptly (and in any event within three (3) Business Days) after receipt, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Loan Party by its Registered Public Accounting Firm in connection with the accounts or books of the Loan Parties or any Subsidiary, or any audit of any of them;

        (e)      promptly (and in any event within three (3) Business Days) after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the stockholders of the Loan Parties, and copies of all annual, regular, periodic and special reports and registration statements, which any Loan Party may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934 or with any national securities exchange;

        (f)      [reserved];

(g)      promptly (and in any event within three (3) Business Days) after the furnishing thereof, copies of any statement or report furnished to any holder of debt securities of any Loan Party or any Subsidiary thereof pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished to the Lenders pursuant to any clause of this Section 6.02;

(h)      [reserved];

(i)      promptly after the Agent's or any Lender's request therefor, copies of all Material Contracts and documents evidencing Material Indebtedness;

(j)      promptly, and in any event within five (5) Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of each notice or other correspondence received from any Governmental Authority (including, without limitation, the SEC (or comparable agency in any applicable non-U.S. jurisdiction)) concerning any proceeding with, or investigation or possible investigation or other inquiry by such Governmental Authority regarding financial or other operational results of any Loan Party or any Subsidiary thereof or any other matter which could reasonably expected to have a Material Adverse Effect;

(k)      promptly, such additional information regarding the business affairs, financial condition or operations of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Agent or any Lender (through the Agent) may from time to time reasonably request;

**6.03    Notices**.  Promptly (and in any event within three (3) Business Days after such occurrence) notify the Agent:

(a)      of the occurrence of any Default or Event of Default;

(b)      of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect,

(c)      (i) of any breach or non-performance of, or any default under, a Material Contract of any Loan Party or any Subsidiary thereof (ii) of any breach or non-performance of, or any default with respect to Material Indebtedness of any Loan Party or any Subsidiary thereof that could reasonably be expected to result in a Material Adverse Effect, in each case other than resulting from the Effect of Bankruptcy;

(d)      of receipt of notice of any dispute, litigation, investigation, proceeding or suspension between any Loan Party or any Subsidiary thereof and any Governmental Authority; or the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary thereof, including pursuant to any applicable Environmental Laws each of which, individually or in the aggregate, (x) results in liability to the Loan Parties and their Subsidiaries in excess of $1,000,000 that is an allowed administrative expense claim or (y) results in a Material Adverse Effect;

(e)      of the occurrence of any ERISA Event;

(f)      of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof, except as required by the Bankruptcy Code;

(g)      of the discharge by any Loan Party of its present Registered Public Accounting Firm or any withdrawal or resignation by such Registered Public Accounting Firm;

70

(h)    of any collective bargaining agreement or other similar labor contract to which a Loan Party becomes a party, the application for the certification of or demand for recognition of a collective bargaining agent, or labor dispute, any of which could reasonably be expected to result in a Material Adverse Effect;

(i)    any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any interest in a material portion of the Collateral under power of eminent domain or by condemnation or similar proceeding or if any material portion of the Collateral is damaged or destroyed;

(j)    of the filing of any Lien for unpaid Taxes against any Loan Party in excess of $100,000; and

(k)    of any amendment or modification to the Organization Documents of any Loan Party or Subsidiary.

Each notice pursuant to this Section 6.03 shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

6.04    **Payment of Obligations**.  Pay and discharge as the same shall become due and payable, all its obligations and liabilities in the Ordinary Course of Business, as required to be paid under the Bankruptcy Code, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, (b) all lawful claims (including, without limitation, claims of landlords, warehousemen, customs brokers, freight forwarders, consolidators, and carriers) which, if unpaid, would by Law become a Lien upon its property; and (c) all Material Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness, except, in each case, where (i) (x) the validity or amount thereof is being contested in good faith by appropriate proceedings, (y) such Loan Party has set aside on its books reserves with respect thereto in accordance with GAAP, and (z) such contest effectively suspends collection of the contested obligation and enforcement of any Lien (other than a Permitted Encumbrance) securing such obligation, or (ii) the failure to make such payment could not reasonably be expected to result in a Material Adverse Effect. Each Loan Party shall, and shall cause each of its respective Subsidiaries to, timely file all Tax returns required to be filed by it.

6.05    **Preservation of Existence, Etc.**  (a) Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization or formation except in a transaction permitted by Section 7.04 or 7.05; (b) preserve, renew and maintain in full force and effect its good standing under its jurisdiction of organization and qualification to do business except for any jurisdiction other than its jurisdiction of organization where failure to so maintain good standing or qualification could not reasonably be expected to result in a Material Adverse Effect and (c) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

6.06    **Maintenance of Properties**.  (a) Maintain, preserve and protect all of its properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; and (b) make all necessary repairs thereto and renewals and replacements thereof except, in each case, where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**6.07    Maintenance of Insurance**.

(a)    Maintain with financially sound and reputable insurance companies having an A.M. Best Rating of at least "A-" and which are not Affiliates of the Loan Parties, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business and operating in the same or similar locations or as is required by Law, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons and as are reasonably acceptable to the Required Lenders.

(b)    Maintain for themselves and their Subsidiaries, a Directors and Officers insurance policy, and a "Blanket Crime" policy including employee dishonesty, forgery or alteration, theft, disappearance and destruction, robbery and safe burglary, property, and computer fraud coverage with responsible companies in such amounts as are customarily carried by business entities engaged in similar businesses similarly situated, and will upon request by the Agent or the Required Lenders furnish the Agent certificates evidencing renewal of each such policy.

(c)    Cause fire and extended coverage policies maintained with respect to any Collateral to be endorsed or otherwise amended to include (i) a lenders' loss payable clause (regarding personal property), in form and substance reasonably satisfactory to the Required Lenders, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, Credit Parties or any other Person shall be a co-insurer and (iii) such other customary provisions as the Agent or Required Lenders may reasonably require from time to time to protect the interests of the Credit Parties.

(d)    Cause commercial general liability policies to be endorsed to name the Agent as an additional insured.

(e)    Cause business interruption policies to name the Agent as a loss payee and to be endorsed or amended to include (i) a provision that, from and after the Closing Date, the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, the Agent or any other party shall be a co-insurer and (iii) such other provisions as the Agent or Required Lenders may reasonably require from time to time to protect the interests of the Credit Parties.

(f)    Cause each such policy referred to in this Section 6.07 to also provide that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Agent (giving the Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not less than thirty (30) days' prior written notice thereof by the insurer to the Agent.

(g)    Deliver to the Agent (for onward delivery to the Lenders), prior to the cancellation, modification or non-renewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Agent (for onward delivery to the Lenders), including an insurance binder) together with evidence reasonably satisfactory to the Required Lenders of payment of the premium therefor.

(h)    Permit any representatives that are designated by the Agent or the Required Lenders to review the insurance policies maintained by or on behalf of the Loan Parties on an annual basis.

None of the Credit Parties, or their agents or employees, shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 6.07. Each Loan Party shall look solely to its insurance companies or any other parties other than the Credit Parties for the recovery of such loss or damage and such insurance companies shall have no rights of subrogation against any Credit Party or its agents or employees. If, however, the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then the Loan Parties hereby agree, to the extent permitted by Law, to waive their right of recovery, if any, against the Credit Parties and their agents and employees. The designation of any form, type or amount of insurance coverage by any Credit Party under this Section 6.07 shall in no event be deemed a representation, warranty or advice by such Credit Party that such insurance is adequate for the purposes of the business of the Loan Parties or the protection of their properties.

**6.08    Compliance with Laws**.  Comply with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

**6.09    Books and Records; Accountants.**

(a)    Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP in all material respects consistently applied shall be made of all financial transactions and matters involving the assets and business of the Loan Parties or such Subsidiary, as the case may be;

(b)    Maintain such books of record and account referred to in the foregoing clause (a) in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Loan Parties or such Subsidiary, as the case may be.

**6.10    Inspection Rights.**

(a)    Permit representatives and, subject to the provisions of Section 10.07 hereof, independent contractors of the Agent or the Required Lenders to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and Registered Public Accounting Firm, all at the reasonable expense of the Loan Parties and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice (except when an Event of Default exists) to the Borrower.

(b)    [Reserved].

(c)    [Reserved].

**6.11    Additional Loan Parties**.  Notify the Agent at the time that any Person becomes a Subsidiary, and promptly thereafter (and in any event within thirty (30) days or such longer period as the Required Lenders may agree in its sole discretion), cause any such Person (a) which is not an Excluded Subsidiary to (i) become a Guarantor (or, subject to the consent of the Required Lenders, a Borrower) by executing and delivering to the Agent a Joinder Agreement and such other documents as the Agent or the Required Lenders shall deem reasonably necessary for such purpose, (ii) grant a Lien to the Agent on such Person's assets of the same type that constitute Collateral to secure the Obligations, and (iii) deliver to the Agent documents of the types referred to in clauses (iii) and (iv) of Section 4.02 and if requested by the Required Lenders, favorable opinions of counsel to such Person (which shall

cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in clause (a)), and (b) if any Equity Interests or Indebtedness of such Subsidiary are owned by or on behalf of any Loan Party, to pledge such Equity Interests and promissory notes evidencing such Indebtedness (provided that no such pledge shall be required in the case of an Excluded Subsidiary, except that in the case of a first-tier Foreign Subsidiary that is a CFC or first-tier CFC Holdco of a Loan Party, 65% of the outstanding voting Equity Interests and 100% of the outstanding non-voting Equity Interests of such Foreign Subsidiary or CFC Holdco shall be pledged). In no event shall compliance with this Section 6.11 waive or be deemed a waiver or consent to any transaction giving rise to the need to comply with this Section 6.11 if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute, with respect to any Subsidiary, an approval of such Person as a Guarantor or Borrower hereunder.

### 6.12    Real Estate.

If any fee simple interest in Material Real Property is acquired by any Loan Party after the Closing Date, the Borrower will notify the Agent thereof and, within forty-five (45) days (or such longer period acceptable to the Required Lenders in their sole discretion) after such acquisition, will cause such assets to be subjected to a first priority Lien securing the applicable Obligations and will take, and cause the other Loan Parties to take, such actions as shall be necessary or reasonably requested by the Agent or the Required Lenders to grant and/or perfect such Liens, all at the sole cost and expense of the Borrower; provided, however, that to the extent such acquired Material Real Property is located in a state that imposes mortgage recording tax, the amount of Obligations secured by such Lien shall be limited to 100% of the fair market value of such Material Real Property. Any Mortgage delivered to the Agent in accordance with the preceding sentence shall be accompanied by (A) an extended coverage policy or policies (or unconditional binding commitment thereof) of title insurance in an amount at least equal to 100% of the fair market value of the Mortgaged Property issued by a nationally recognized title insurance company insuring the Lien of each Mortgage as a valid Lien (with the priority described therein) on the Mortgaged Property described therein, free of any other Liens except Permitted Encumbrances, together with such endorsements and reinsurance as the Agent or the Required Lenders may reasonably request, (B) A.L.T.A. surveys, certified to the Agent by a licensed surveyor sufficient to allow the issuer of the lender's title insurance policy to issue such policy without a survey exception, (C) a customary opinion of local counsel to the applicable Loan Party or Loan Parties in form and substance reasonably satisfactory to the Required Lenders, (D) a life of loan flood hazard determination together with a notice to the Borrower about special flood hazard area status duly executed by the applicable Loan Parties and if the Mortgaged Property is located in a Special Flood Hazard Area, Federal Flood Insurance, (E) if requested by the Required Lenders, an environmental site assessment prepared by a qualified firm reasonably acceptable to the Required Lenders, in form and substance reasonably satisfactory to the Required Lenders, and (F) if requested by the Required Lenders, an appraisal complying with FIRREA (each such Mortgage, together with the items described in (A) through (F) above, the "Mortgage Documents").

6.13    **Information Regarding the Collateral**.  Furnish to the Agent at least five (5) days' prior written notice (or such shorter period as the Required Lenders may agree to (including retroactively) in its sole discretion) of any change in: (i) any Loan Party's name or in any trade name used to identify it in the conduct of its business or in the ownership of its properties; (ii) the location of any Loan Party's chief executive office, its principal place of business or any office in which it maintains material books or records relating to Collateral owned by it; (iii) any Loan Party's organizational structure or jurisdiction of incorporation or formation; or (iv) any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its state of organization. The Loan Parties shall not effect or permit any change referred to in the preceding sentence if such change could reasonably be expected to adversely affect the validity, enforceability or perfection of the Lien of the Credit Parties in any of the Collateral, unless prior to the making of any such change all necessary filings have been made under the UCC and other applicable filing systems in order for the Agent to continue to hold, at all times, a perfected security interest in the Collateral.

6.14    **Cash Management**.

(a)    Promptly (x) deposit (in no case later than the second Business Day after receipt thereof) all cash, checks, drafts and other items including cash proceeds of accounts receivable, and cash equivalents only into deposit accounts and securities accounts of the Loan Parties and (y) deposit into payroll accounts and disbursement accounts only amounts not materially in excess of the amounts necessary to pay current payroll or disbursement obligations or to meet minimum balance requirements and (z) use commercially reasonable efforts to concentrate all cash into such accounts which are subject to Control Agreements in favor of the Agent.

(b)    Within 15 days of the request of the Required Lenders, the Loan Parties shall execute and deliver to the Agent a Control Agreement with respect to each of their respective securities accounts and deposit accounts set forth on Schedule 5.21 other than Excluded Accounts.

(c)    Except as required by the Bankruptcy Code, so long as no Event of Default has occurred and is continuing, the Loan Parties may establish or acquire new deposit accounts or securities accounts so long as (i) the Loan Parties deliver to the Agent an amended Schedule 5.21 including such account and (ii) on or prior to the date on which such new account is established, the Loan Parties deliver to the Agent a Control Agreement with respect to such account (except to the extent such account is an Excluded Account).

6.15    **Environmental Laws**.

Except where failure to take actions under (a) through (c) could not reasonably be expected to result in a Material Adverse Effect:

(a)    Conduct its operations and keep and maintain its Real Estate in compliance with all Environmental Laws;

(b)    Obtain and renew all environmental permits necessary for its operations and properties; and

(c)    Implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to maintain the value and marketability of the Real Estate or to otherwise comply with Environmental Laws pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate; provided, however, that neither a Loan Party nor any of its Subsidiaries

shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and adequate reserves have been set aside and are being maintained by the Loan Parties with respect to such circumstances in accordance with GAAP.

**6.16    Post-Closing Obligations and Further Assurances.**

(a)    Execute any and all documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other similar documents), that may be required under any Applicable Law, or which the Agent or Required Lenders may reasonably request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties. The Loan Parties also agree to provide to the Agent, from time to time upon request, evidence reasonably satisfactory to the Required Lenders as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b)    If any assets are acquired by any Loan Party after the Closing Date (other than assets constituting Collateral under the Security Documents that become subject to the perfected first-priority Lien in favor of the Agent under the Security Documents upon acquisition thereof without the necessity of further action by any Person), notify the Agent thereof, and the Loan Parties will cause such assets to be subjected to a Lien securing the Obligations and will take such actions as shall be necessary or shall be requested by the Required Lenders to grant and perfect such Liens, including actions described in paragraph (a) of this <u>Section 6.16</u>, all at the expense of the Loan Parties. In no event shall compliance with this <u>Section 6.16(b)</u> waive or be deemed a waiver or consent to any transaction giving rise to the need to comply with this <u>Section 6.16(b)</u> if such transaction was not otherwise expressly permitted by this Agreement.

(c)    Within fifteen (15) days after the Closing Date (or such later date as the Required Lenders may agree in their sole discretion), the Loan Parties shall cause to be delivered to the Agent final endorsements with respect to each Loan Party's insurance policies as required under <u>Section 6.07</u> of this Agreement.

**6.17    Compliance with Terms of Leaseholds.**

Except as may be occasioned as an Effect of Bankruptcy, (a) make all payments and otherwise perform all obligations in respect of all Leases to which any Loan Party or any of its Subsidiaries is a party and keep such Leases in full force and effect, (b) not allow such Leases to lapse or be terminated or any rights to renew such Leases to be forfeited or cancelled except in the Ordinary Course of Business, (c) notify the Agent of any default by any Loan Party with respect to such Leases and reasonably cooperate with the Agent and Required Lenders in all respects to cure any such default to the extent any Loan Party is permitted to cure the particular default pursuant to such Lease, and (d) cause each of its Subsidiaries to do the foregoing, except, in the case of any of clauses (a) through (d) above, where the failure to do so, individually and in the aggregate, with all other affected Leases (excluding the Leases listed on Schedule 6.17), would have an immaterial adverse effect on the operations of the Loan Parties and their Subsidiaries.

**6.18    Material Contracts**.

Except as may be occasioned as an Effect of Bankruptcy, (a) perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, (b) maintain each such

Material Contract in full force and effect except to the extent such Material Contract is no longer used or useful in the conduct of the business of the Loan Parties in the Ordinary Course of Business, (c) enforce each such Material Contract in accordance with its terms, and (d) cause each of its Subsidiaries to do the foregoing, except, in any case, where the failure to do so, either individually or in the aggregate, could not be reasonably likely to have a Material Adverse Effect.

**6.19    [Reserved].**

**6.20    Budget Reporting**.

(a)    Not later than 3:00 p.m. Central time every Monday occurring after the Petition Date and thereafter (commencing with Monday of the calendar week immediately after the Closing Date, (the "Budget Reporting Deadline")), the Debtors shall deliver to the Agent for further delivery to the Lenders a supplement to the Approved Budget then in effect (each, a "Budget Supplement"), covering the period commencing with Monday of the calendar week immediately preceding such Budget Reporting Deadline through and including April 1, 2023, the form, scope and level of detail of which Budget Supplement shall be consistent with the Initial Budget, and which Budget Supplement shall be otherwise in form and substance satisfactory to the Required Lenders in their sole discretion (as confirmed and approved in writing (including via email) by the Required Lenders or the Agent (at the Required Lender's direction)) (each Budget Supplement, if, but solely if, approved in accordance with the foregoing, an "Updated Budget"), provided, however, should the Debtors and Required Lenders reasonably agree, on or before March 15, 2023, that the dates associated with the Milestones shall be exceeded, the Budget Supplement shall be amended to run through and including April 17, 2023.  For the avoidance of doubt, no Updated Budget shall become the Approved Budget unless and until approved by the Required Lenders (which approval shall be deemed granted upon receipt by the Borrower or its counsel of written notice (which may be via email) of such consent from the Required Lenders or the Agent (at the Required Lender's direction) or their respective counsel on their behalf) (such approval or consent in accordance with the foregoing, the "Lender Consent"), and in the event that such Updated Budget is not so approved by the Required Lenders, the prior Approved Budget shall remain in effect; provided, however, that neither the Agent nor any of the Lenders shall have any obligation to approve any Budget Supplement or any Updated Budget, and, no modification to any Updated Budget or any Approved Budget, or any reforecasting of any information relating to any period covered by any other Updated Budget or any Approved Budget, as the case may be, shall in any event be effective without Lender Consent.

(b)    Not later than 3:00 p.m. Central time every Tuesday (commencing on the second Tuesday after the Petition Date) (each such Tuesday, a "Variance Report Deadline"), and on each Tuesday thereafter, the Loan Parties shall deliver to the Lenders a variance report, in each case, in form, scope and detail satisfactory to the Required Lenders (each such report, a "Variance Report") showing the difference, on a line-item basis, between (a)(i) actual receipts for the immediately preceding calendar week (the "Applicable Period") and (ii) budgeted receipts for the Applicable Period (as set forth in the Approved Budget in effect for such Applicable Period) (each line-item variance, a "Receipts Variance"), (b)(i) actual disbursements for the Applicable Period and (ii) budgeted disbursements for the Applicable Period (as set forth in the Approved Budget in effect for such Applicable Period), (each line-item variance, a "Disbursements Variance"), and (c)(i) actual professional fees and expenses for the Applicable Period and (ii) budgeted professional fees and expenses for the Applicable Period (as set forth in the Approved Budget in effect for such Applicable Period) (each line-item variance, a "Professional Fee Variance"), and the available cash on hand for the end of such week, in each case, for the prior week,

together with a reasonably detailed explanation of such Receipts Variance, Disbursements Variance and Professional Fee Variance.

(c)     [Reserved].

(d)     The Loan Parties shall arrange for a teleconference with Lenders to take place at 4:00 p.m. Central time (or at such other time as is reasonably satisfactory to the Required Lenders) every Tuesday (commencing with Tuesday, February 14, 2023 (or such other day as is reasonably satisfactory to the Required Lenders)) until payment in full of the Obligations occurs, which teleconference shall (i) require, at the election of the Required Lenders, participation by at least one senior officer of Borrower's management team and/or professional advisors to the Borrower, and (ii) be intended for purposes of discussing Parent and its Subsidiaries' financials (including any budget proposed to be the Approved Budget, Variance Reports and any projections) and such other information and matters reasonably related thereto or requested by any Lender; *provided,* that such teleconference shall not be required in any week if and to the extent that the Lenders shall have previously waived or postponed the same by written notice to the Borrower.

**6.21    Milestones**. Satisfy the requirements with respect to each Milestone (including by the time, to the extent, and in the manner required thereby).

## 6.22    Bankruptcy Related Matters.

(a)     Cause all proposed (i) First Day Orders, (ii) Second Day Orders, (iii) orders related to or affecting the Obligations and/or the Loan Documents, the Prepetition Debt and applicable loan documents, any other financing or use of cash collateral, any sale or other disposition of Collateral outside the Ordinary Course of Business or adequate protection, (iv) any disclosure statement related thereto, (v) orders concerning the financial condition of the Debtors, or other Indebtedness of the Debtors and (vi) orders establishing procedures for administration of the Chapter 11 Cases or approving significant transactions submitted to the Bankruptcy Court, in each case, proposed by the Debtors, to be in accordance with the terms of this Agreement.

(b)     Comply in all respects with each order entered by the Bankruptcy Court in connection with the Chapter 11 Cases.

(c)     Deliver to, and obtain the consent of, the Agent and the Lender Professionals not less than three (3) Business Days (or, if and solely to the extent that, as a result of exigent circumstances, there is a need to file on an expedited basis, not less than one (1) Business Day) prior to any filing, copies of all proposed pleadings, motions, applications, orders, financial information and other documents (other than retention applications and ministerial motions) to be filed by or on behalf of the Debtors with the Bankruptcy Court in the Chapter 11 Cases, or distributed by or on behalf of the Loan Parties to the Chapter 11 Unsecured Creditors Committee (or any other official or unofficial committee appointed or appearing in the Chapter 11 Cases or any other party in interest).

(d)     If not otherwise provided through the Bankruptcy Court's electronic docketing system, as soon as available, deliver to the Agent and to the Lender Professionals promptly as soon as available, copies of all final pleadings, motions, applications, orders, financial information and other documents distributed by or on behalf of the Debtors to the Chapter 11 Unsecured Creditors Committee (or any other official or unofficial committee appointed or appearing in the Chapter 11 Cases or any other party in interest).

(e)    Provide written notice to the Lenders (via the Agent) and the Lender Professionals not less than five (5) Business Days (or such shorter period as may be consented to in writing by the Required Lenders or by the Agent, acting at the Required Lenders' direction) prior to any assumption or rejection of any Debtor's or any Subsidiary's Material Contracts or non-residential real property leases pursuant to Section 365 of the Bankruptcy Code, and no such contract or lease shall be assumed or rejected if the Agent (acting at the direction of the Required Lenders) or the Required Lenders informs the Borrower in writing within three (3) Business Days of receipt of the notice from the Borrower referenced above that it objects to such assumption or rejection, as applicable.

**6.23    Priority of Liens and Claims**.  Cause the Obligations to, upon and at all times as of entry of the Interim DIP Order (including upon and at all times as of entry of the Final DIP Order) (i) constitute DIP Superpriority Claims having the priority and rights set forth in the DIP Orders and (ii) be secured by a valid, binding, continuing, enforceable and perfected first priority (subject only to the Carve-Out and any other liens expressly permitted by the DIP Orders) security interest in, and Lien, on all Collateral.

## ARTICLE VII
## NEGATIVE COVENANTS

So long as any Lender shall have any New Money Loan Commitment hereunder or any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification claims for which a claim has not been asserted), no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

**7.01    Liens**.

Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, or file or suffer to exist under the UCC or any similar Law or statute of any jurisdiction a financing statement that names any Loan Party or any Subsidiary thereof as debtor; sign or suffer to exist any security agreement authorizing any Person thereunder to file such financing statement, other than, as to all of the above, Permitted Encumbrances.

**7.02    Investments**.  Make any Investments, except Permitted Investments.

**7.03    Indebtedness; Disqualified Stock; Equity Issuances**

(a) Create, incur, assume, guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness, except Permitted Indebtedness; (b) issue Disqualified Stock unless (i) the terms of such Disqualified Stock are acceptable to the Required Lenders in their sole discretion and (ii) all Restricted Payments in respect of such Disqualified Stock are expressly subordinated to the Obligations, or (c) issue and sell any other Equity Interests unless (A) (i) such Equity Interests shall be issued solely by the Parent and not by a Subsidiary of a Loan Party, (ii) such Equity Interests shall not be subject to redemption other than redemption at the option of the Parent and otherwise expressly permitted under this Agreement, and (iii) all Restricted Payments in respect of such Equity Interests are expressly subordinated to the Obligations or (B) such issuance or sale is made by Parent to an employee or service provider of the Loan Parties as equity-based compensation that is otherwise permitted by this Agreement.

**7.04    Fundamental Changes**.

Merge, dissolve, liquidate, consolidate with or into another Person, (or agree to do any of the foregoing), or file a certificate of division, adopt a plan of division or otherwise take any action to

effectuate a division pursuant to Section 18-217 of the Delaware Limited Liability Company Act (or any analogous action taken pursuant to Applicable Law) with respect to any corporation, limited liability company, partnership or other entity.

### 7.05    Dispositions.

Make any Disposition or enter into any agreement to make any Disposition, except Permitted Dispositions.

### 7.06    Restricted Payments.

Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that each of the following shall be permitted:

(a)    each Subsidiary of a Loan Party may make Restricted Payments to any Loan Party other than the Parent so long as such payment is based on the relative ownership interests of the relevant class of Equity Interests;

(b)    the Loan Parties and each Subsidiary of a Loan Party may declare and make dividend payments or other distributions payable solely in the common stock or other common Equity Interests of such Person;

(c)    [reserved]; and

(d)    the Borrower may make distributions to Parent, an amount sufficient to pay customary corporate and overhead expenses incurred by Parent in the Ordinary Course of Business in an amount, during the term of this Agreement, not to exceed $50,000 in the aggregate.

### 7.07    Prepayments of Indebtedness.

Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner the principal of any Indebtedness, or make any payment in respect of any Indebtedness.

### 7.08    Change in Nature of Business.    Notwithstanding any provision of any Loan Document to the contrary,

(a)    In the case of the Parent, engage in any business or activity or incur any liabilities other than (i) the direct ownership of the Equity Interests of the Borrower and the IPP Employer Entities or the indirect ownership of all outstanding Equity Interests in the other Loan Parties, (ii) maintaining its corporate existence, (iii) participating in tax, accounting and other administrative activities as the parent of the consolidated group of companies, including the Loan Parties, (iv) the execution and delivery of the Loan Documents, and (v) immaterial activities incidental to the businesses or activities described in clauses (i) through (iv) of this Section 7.08(a).

(b)    In the case of the Loan Parties, engage in any line of business substantially different from the general nature of the business conducted by the Loan Parties and their Subsidiaries on the Closing Date or any business that is reasonably related, ancillary, complimentary or incidental thereto.

(c)    In the case of the IPP Employer Entities, engage in any business or activity or incur any liabilities other than (i) in the case of Independent Pet Partners Employer Holdings, LLC, the ownership of the Equity Interests of Independent Pet Partners Employer, LLC, (ii) maintaining its corporate existence, (iii) participating in tax, accounting and other administrative activities as the parent of the consolidated group of companies, including the Loan Parties, (iv) the execution and delivery of the Loan Documents, (v) entering into reasonable and customary employment arrangements with the employees of the Loan Parties to the extent not otherwise prohibited hereunder and the payment of amounts pursuant to such employment arrangements to the extent constituting reasonable and customary compensation, benefits and expense reimbursement, (vi) entering into transactions with other Loan Parties to the extent permitted under Section 7.09(c) (subject to the limitations set forth in Section 7.02), and (vii) immaterial activities incidental to the businesses or activities described in clauses (i) through (vi) of this Section 7.08(c). Without limiting the generality of the foregoing, no IPP Employer Entity shall (x) have any right, title or interest in any asset or property used or useful in, or necessary for, the operation of the business of any other Loan Party or any Subsidiary, except for such assets which are immaterial and incidental to the performance of the functions described in the previous sentence or as expressly set forth on Schedule 7.08, or (y) shall make any Acquisition or Investment or form any Subsidiary.

**7.09    Transactions with Affiliates.**

Enter into, renew, extend or be a party to any transaction of any kind with any Affiliate of any Loan Party, whether or not in the Ordinary Course of Business, other than transactions not involving payments in excess of $50,000 in the aggregate, on fair and reasonable terms substantially as favorable to the Loan Parties or such Subsidiary as would be reasonably obtainable by the Loan Parties or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate, provided that the foregoing restriction shall not apply to:

(a)    a transaction between or among the Loan Parties; provided that transactions between any IPP Employer Entity, on the one hand, and any other Loan Party, on the other hand shall not be permitted except for transactions in the Ordinary Course of Business consisting of the funding of the IPP Employer Entities by the other Loan Parties of amounts that in aggregate do not materially exceed such amounts required by the IPP Employer Entities over a future period of two-weeks from the date of such transaction to engage, carry out, or incur, as applicable, the business, activities and liabilities expressly permitted under Section 7.08(c);

(b)    any transactions described on Schedule 7.09 hereto;

(c)    advances for commissions, travel and other similar purposes in the Ordinary Course of Business to directors, officers, employees and other service providers;

(d)    the payment of reasonable fees (in an aggregate amount not to exceed $50,000 during the term of this Agreement for any non-executive director), reasonable and documented out-of-pocket costs to directors, and reasonable and customary compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers, employees and other service providers of the Parent or any of its Subsidiaries in the Ordinary Course of Business (in each case, excluding such payments to the Sponsor and to any director or other personnel affiliated with the Sponsor); and

(e)    as long as no Change of Control results therefrom, any issuances of Equity Interests of the Parent (other than Equity Interests not permitted hereunder) or other non-cash payments, awards or grants pursuant to employment or consulting agreements, stock options, stock ownership or

other equity-based compensation plans (in each case in respect of Equity Interests in the Parent) of the Parent or any of its Subsidiaries.

**7.10    Burdensome Agreements**.

Enter into or permit to exist any Contractual Obligation (other than this Agreement, any other Loan Document, the Prepetition DDTL Credit Agreement, any other DDTL Loan Document, the Prepetition ABL Credit Agreement and any other ABL Loan Document) that:

(a)    limits the ability (i) of any Subsidiary to make Restricted Payments or other distributions to any Loan Party or to otherwise transfer property to or invest in a Loan Party, (ii) of any Subsidiary to Guarantee the Obligations, (iii) of any Subsidiary to make or repay loans to a Loan Party, or (iv) of the Loan Parties or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Agent; provided, however, that this clause (iv) shall not prohibit any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under clauses (c) or (d) of the definition of Permitted Indebtedness solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness; or

(b)    requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person; provided that, this Section 7.10 shall not prohibit any Contractual Obligations that (A) are binding on a Subsidiary at the time such Subsidiary first becomes a Subsidiary, so long as such Contractual Obligations were not entered into in contemplation of such Person becoming a Subsidiary; (B) [reserved]; (C) are customary restrictions that arise in connection with (x) any Permitted Encumbrance and relate to the property subject to such Lien or (y) any Permitted Disposition and relate solely to the assets or Person subject to such Permitted Disposition; (D) are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under this Agreement and applicable solely to such joint venture and its equity; (E) are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the property interest, rights or the assets subject thereto; (F) are customary provisions restricting subletting, transfer or assignment of any lease governing a leasehold interest of any Credit Party; (G) are customary provisions restricting assignment or transfer of any lease, license or agreement; (H) are restrictions on cash or other deposits imposed by customers under contracts entered into in the Ordinary Course of Business; (I) arise in connection with cash or other deposits or net worth imposed by customers; (J) are restrictions regarding licensing or sublicensing by the Credit Parties of intellectual property in the Ordinary Course of Business; or (K) are restrictions or conditions in connection with Indebtedness permitted pursuant to Section 7.03 to the extent such restrictions or conditions are not materially more restrictive, taken as a whole, than the restrictions and conditions in the Loan Documents.

**7.11    Use of Proceeds**.

Use the proceeds of any New Money Loan, whether directly or indirectly, and whether immediately, incidentally or ultimately:

(a)    to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund Indebtedness originally incurred for such purpose; or

(b)    for any purposes other than (a) for working capital and general corporate purposes of the Loan Parties; (b) to fund costs and expenses related to the Chapter 11 Cases; (c) to fund the payment of interest, fees, costs, and expenses related to the DIP Facility, including the reasonable

and documented fees and expenses of the Lender Professionals; and (d) to finance disbursements, in each case, in accordance with the Approved Budget, this Agreement, and the Chapter 11 Orders. For the avoidance of doubt, other than in connection with the Roll-Up Loans, the proceeds of the New Money Loans shall not be used to pay any obligations under the Prepetition ABL Credit Agreement, the Prepetition ABL Loan Documents, the Prepetition DDTL Credit Agreement or the Prepetition DDTL Loan Documents.

### 7.12    Amendment of Material Documents.

(i) Amend, modify or waive any of a Loan Party's rights under its Organization Documents in a manner materially adverse to the Credit Parties, or (ii) amend, modify or waive any of a Loan Party's rights under any Material Contract or Material Indebtedness, in each case to the extent that such amendment, modification or waiver would result in a Default or Event of Default under any of the Loan Documents, would be reasonably expected to adversely impact the interests of the Lenders or otherwise would be reasonably likely to have a Material Adverse Effect.

### 7.13    Fiscal Year.

Change the Fiscal Year of any Loan Party, or the accounting policies or reporting practices of the Loan Parties, except as required by GAAP.

### 7.14    Deposit Accounts.

Open new deposit accounts (including DDAs) or securities accounts.

### 7.15    Sanctions.

Directly or indirectly use any Borrowing or the proceeds of any New Money Loan, or lend, contribute or otherwise make available such Borrowing or the proceeds of any New Money Loan to any Person, to fund any activities of or business with any Person, or in any Designated Jurisdiction, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by any Person, including any Person participating in the transaction (whether as Lender, Agent or otherwise) of Sanctions.

### 7.16    Anti-Corruption Laws.

Directly or indirectly, use any Borrowing or the proceeds of any New Money Loan for any purpose which would breach the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 and other similar anti-corruption legislation in other jurisdictions.

### 7.17    [Reserved].

### 7.18    [Reserved].

### 7.19    Budget Covenant. The Loan Parties shall not permit (i) for the rolling four-week period ending on any Variance Report Deadline beginning with the fourth Variance Report Deadline), the Loan Parties' actual disbursements (in the aggregate for the prior four weeks) to be more than 115% of the projected disbursements (in the aggregate for all disbursements included in the four prior weeks in the Approved Budget) as set forth in the Approved Budget with respect to such rolling four-week period (a

variance of 15% or less, a "Permitted Disbursements Variance"); and (ii) for the rolling four-week period ending on any Variance Report Deadline beginning with the fourth Variance Report Deadline, the Loan Parties' actual receipts (in the aggregate for the prior four weeks)) to be less than 85% of the projected receipts (in the aggregate for all receipts included in the four prior weeks in the Approved Budget) as set forth in the Approved Budget with respect to such rolling four-week period (a variance of 15% or more, a "Permitted Receipts Variance," and each of a Permitted Receipts Variance and a Permitted Disbursements Variance, a "Permitted Variance"; all references herein to "Approved Budget" shall mean the Approved Budget as it is subject to Permitted Variances). For the avoidance of doubt, for purposes of budget variances testing, the amounts set forth in the Approved Budget under "Professional Fees" shall be excluded.

### 7.20    Chapter 11 Case.

The Loan Parties shall not:

(a)    Other than the claims and Liens of the Agent arising from this Agreement, and other than the adequate protection claims as permitted in the DIP Orders, as applicable, and except for the Carve-Out and Permitted Encumbrances, incur, create, assume, suffer to exist or permit, or file any motion seeking, any other DIP Superpriority Claim which is pari passu with, or senior to the claims and Liens of, the Agent and Lenders.

(b)    Make or permit to be made any amendment or change to the DIP Orders, as applicable, without the consent of the Required Lenders.

(c)    Commence any adversary proceeding, contested matter or other action asserting any claims or defenses or otherwise against any Agent, any Lender or any Prepetition Secured Party with respect to any Loan Document or any Prepetition Loan Document, or any of the liens, claims, rights, benefits or protections granted hereunder or thereunder, or any of the transactions contemplated hereby or thereby.

(d)    Make (i) any prepetition "critical vendor" payments or other payments on account of any creditor's prepetition unsecured claim, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code or (iii) payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except in amounts and on terms and conditions that (a) are approved by a Chapter 11 Order after notice and a hearing, and (b) are expressly permitted by, and in compliance with, the terms of the Loan Documents (including the Budget Covenant and the Approved Budget, subject to any Permitted Variance), or otherwise with the prior written consent of the Required Lenders.

(e)    File any material pleading, motion, or application with the Bankruptcy Court with regard to actions taken outside the Ordinary Course of Business of the Debtors without consulting with the Lenders and providing the Lenders prior (in any case, not less than three (3) Business Days' (or as soon as reasonably practicable, but not less than one (1) Business Day, if three (3) Business Days in advance is not reasonably practicable)) notice and the opportunity to review and comment on each such motion.

(f)    Subject to the applicable DIP Order, object to, contest, delay, prevent, or interfere in any manner with, the exercise of any rights and remedies by the Agent or the Lenders with respect to the Collateral following the occurrence and during the continuance of an Event of Default.

(g)    Make any key employee retention payment or other bonus, incentive or similar payment unless the Required Lenders shall have previously consented thereto in writing or such amounts are in compliance with the Store Closing Sales Orders.

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

8.01    **Events of Default**.  Any of the following shall constitute an Event of Default:

(a)    <u>Non-Payment</u>.  The Borrower or any other Loan Party fails to pay when and as required to be paid, (i) any amount of principal of any Loan, or (ii) within three (3) Business Days after the date when due, any interest on any Loan or any fee due hereunder, or (iii) any other amount payable hereunder or under any other Loan Document within five (5) Business Days after the date when due; or

(b)    <u>Specific Covenants</u>.  Any Loan Party fails to perform or observe (x) any term, covenant or agreement contained in <u>Section 6.02</u> and such failure continues for twelve (12) Business Days, and (y) any term, covenant or agreement contained in any of <u>Sections 6.03</u>, <u>6.05</u>, <u>6.07</u>, <u>6.10</u>, <u>6.11</u>, <u>6.13</u>, <u>6.14</u>, <u>6.16</u>, <u>6.20</u>, <u>6.21</u>, <u>6.22</u>, <u>6.23</u> or <u>Article VII</u>; or

(c)    <u>Other Defaults</u>.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in <u>subsection (a)</u> or <u>(b)</u> above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days; or

(d)    <u>Representations and Warranties</u>.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)    <u>[Reserved]</u>; or

(f)    <u>[Reserved]</u>; or

(g)    <u>[Reserved]</u>; or

(h)    <u>[Reserved]</u>; or

(i)    <u>ERISA</u>.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which, alone or when combined with any ERISA Event, has resulted or could reasonably be expected to result in liability of any Loan Party to the Pension Plan, Multiemployer Plan or the PBGC which results in or would be reasonably likely to result in a Material Adverse Effect, (ii) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan which results in or would be reasonably likely to result in a Material Adverse Effect, or (iii) the imposition of a Lien on the assets of any Loan Party or any ERISA Affiliate pursuant to Section 430(k) of the Code or pursuant to Section 303(k) of ERISA with respect to any Pension Plan, which results in or would be reasonably likely to result in a Material Adverse Effect; or

(j)    <u>Invalidity of Loan Documents</u>.  (i) Any provision of any Loan Document, at any time after its execution and delivery and for any reason, ceases to be in full force and effect; or any Loan Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any

provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Security Document (in each case other than as permitted under and/or in compliance with the Loan Documents); or (ii) any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on a material portion of the Collateral with the priority required by the applicable Security Document; or

(k)     Change of Control.  There occurs any Change of Control; or

(l)     Cessation of Business.  Except as otherwise expressly permitted hereunder, including, without limitation, actions that are actions consistent with the relief requested in the First Day Orders, the Second Day Orders, the DIP Orders, the Store Closing Sales Orders, the Bid Procedures Order, and the Sale Order, any Loan Party shall take any action, or shall make a determination, whether or not yet formally approved by any Loan Party's management or board of directors, to (i) suspend the operation of all or a material portion of the business of such Loan Party in the Ordinary Course of Business, (ii) suspend the payment of any material obligations in the Ordinary Course of Business or suspend the performance under material contracts in the Ordinary Course of Business, (iii) solicit proposals for the liquidation of, or undertake to liquidate, all or a material portion of the assets of such Loan Party or Store locations, or (iv) solicit proposals for the employment of, or employ, an agent or other third party to conduct a program of closings, liquidations, or "Going-Out-Of-Business" sales of any material portion of the business of such Loan Party; or

(m)     Loss of Collateral. There occurs any uninsured loss to any material portion of the Collateral;

(n)     Guaranty.  The termination or attempted termination of the Guaranty Agreement occurs except as expressly permitted hereunder or under any other Loan Document;

(o)     Subordination.  (i) The subordination provisions of the documents evidencing or governing any Subordinated Indebtedness (collectively, the "Subordination Provisions") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Indebtedness or such holder shall fail to comply with such Subordination Provisions; or (ii) the Borrower or any other Loan Party shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Subordination Provisions, (B) that the Subordination Provisions exist for the benefit of the Credit Parties, or (C) that all payments of principal of or premium and interest on the applicable Subordinated Indebtedness, or realized from the liquidation of any property of any Loan Party, shall be subject to any of the Subordination Provisions; or

(p)     [Reserved].

(q)     Events in Chapter 11 Cases. There shall have occurred any of the following in the Chapter 11 Cases:

(i)     the failure to meet any of the Milestones unless (x) such failure is the result of any act, omission, or delay on the part of any of the Lenders seeking termination, (y) such failure is the result of scheduling issues of the Bankruptcy Court, or (z) such Milestone is waived or extended by Lenders in writing;

(ii)     the Loan Parties propose, support, or file any plan of liquidation, asset sale of all or any material portion of the Loan Parties' assets or plan of reorganization

other than a plan of liquidation or reorganization acceptable to the Required Lenders in their sole discretion (an "Acceptable Plan") or a Sale consummated in compliance with the Bid Procedures Order or other sale of the Loan Parties' assets acceptable to the Required Lenders in their sole discretion (an "Acceptable Sale"); provided, that an Acceptable Plan and Acceptable Sale include any plan of reorganization or asset sale that provides for the indefeasible payment in full in cash of the Obligations and the Prepetition Secured Obligations on the effective date or date of consummation thereof and an Acceptable Sale includes any asset sale that provides for the indefeasible payment in full in cash of the Obligations and the Prepetition Secured Obligations on the date of consummation thereof as part of the relief requested in the Bid Procedures Motion;

(iii)    the Loan Parties fail to provide the Lenders with draft copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers the Loan Parties intend to file with the Bankruptcy Court in connection with the plan or sale process within a reasonable period of time prior to the date such party intends to file any of the foregoing and fail to consult in advance in good faith with the Lenders regarding the form and substance of any such proposed filing with the Bankruptcy Court;

(iv)    the Loan Parties file any document necessary to effectuate an Acceptable Plan or Acceptable Sale without the reasonable consent of the Lenders;

(v)    any Loan Party or any of its directors, officers or managers publicly announces, or communicates in writing to any other person or entity, its intention not to support or pursue an Acceptable Plan or an Acceptable Sale;

(vi)    the Bankruptcy Court enters an order, or the Loan Parties file any motion or any request for relief or consent to or support any motion or request for relief (other than with the consent of the Lenders) that seeks, to (a) dismiss any of the Chapter 11 Cases, (b) convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (c) appoint a trustee or examiner with expanded powers beyond those set forth in section 1106 of the Bankruptcy Code; or (d) terminate the Debtors' exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code;

(vii)    the Bankruptcy Court enters an order granting relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) to authorize any party to proceed against any material asset of the Loan Parties or in such a manner that would adversely affect the Loan Parties' ability to operate their businesses in the Ordinary Course of Business;

(viii)    the Bankruptcy Court enters an order authorizing or directing the assumption, assumption and assignment, or rejection of an executory contract (including any employment agreement, severance agreement or other employee benefit plan) or unexpired lease, other than an assumption or rejection that is consented to in writing by the Lenders;

(ix)    after entry by the Bankruptcy Court of any DIP Order, the Bid Procedures Order, an order confirming an Acceptable Plan, or an order approving an Acceptable Sale (which may be the Sale Order), such order is reversed, stayed, dismissed, vacated, reconsidered, modified or amended, in each case, in a manner materially inconsistent with the terms set forth herein or without the consent of the Lenders;

(x)    the imposition of any material award, claim, fine, penalty, or other monetary judgment by any Governmental Authority, including the Bankruptcy Court, against any Loan Party that would not be dischargeable pursuant to the Bankruptcy Code, the Confirmation Order (as defined in the DIP Order) or any other order of the Bankruptcy Court;

(xi)    the failure of the Debtors to comply with the DIP Orders, including failure to make Adequate Protection Payments when due, which remains uncured for a period of two (2) Business Days after the receipt of written notice of such event or is not otherwise waived in accordance with the terms thereof;

(xii)    (a) the Loan Parties object or otherwise challenge, or support any objection or challenge, to the validity, security, perfection, priority, extent or enforceability of the Loan Documents, the Obligations, the Liens securing the Obligations the Prepetition Loan Documents, the Prepetition Secured Obligations, or the Liens securing the Prepetition Secured Obligations including without limitation seeking to equitably subordinate or avoid such liens or claims, or (b) the Debtors engage in any investigation or assert any claims or causes of action (or directly or indirectly support assertion of the same) against any of the Lenders or the Prepetition Secured Parties;

(xiii)    the commencement of a suit or an action by any party (but not including a motion for standing to commence a suit or an action) seeking entry of a judgment or order by the Bankruptcy Court (i) sustaining any defense, objection or challenge to the validity, security, perfection, priority, extent or enforceability of the Loan Documents, the Obligations, the Liens securing the Obligations, the Prepetition Loan Documents, the Prepetition Secured Obligations, or the Liens securing the Prepetition Secured Obligations, or (ii) invalidating, disallowing avoiding, subordinating, recharacterizing, limiting or otherwise impairing any of the Loan Documents, the Obligations, the Liens securing the Obligations, the Prepetition Loan Documents, the Prepetition Secured Obligations, or the Liens securing the Prepetition Secured Obligations, and the continuation thereof without dismissal for thirty (30) days after service thereof;

(xiv)    the entry of any order in any of the Chapter 11 Cases surcharging any of the Collateral or Prepetition Collateral with respect to the Lenders or Prepetition Secured Parties, as applicable, whether under Section 506(c) of the Bankruptcy Code or otherwise;

(xv)    the filing of a motion or the taking of any action in any Chapter 11 Case by any Debtor seeking the entry of an order by the Bankruptcy Court, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case, precluding or limiting the right of (a) the Agent to credit bid all or any portion of the Obligations in connection with any sale of all or any portion of the Collateral or (b) any Prepetition Agent to credit bid all or any portion of the applicable Prepetition Secured Obligations, in connection with any sale of all or any portion of any applicable Prepetition Collateral;

(xvi)    the consensual use of prepetition cash collateral is terminated, or the entry of an order by the Bankruptcy Court terminating or modifying the use of cash collateral, in each case, without the prior written consent of the Lenders;

(xvii)    the reversal or modification of the Roll-Up Loans provided for hereunder by the Bankruptcy Court without the consent of the Lenders

(xviii)    the Debtors create or incur any claim that is senior to or pari passu with the Adequate Protection Claims without the prior written consent of the Required Lenders;

(xix)    the Loan Parties fail to pay any of the fees and expenses of the Lender Professionals as and when due pursuant to the terms of any applicable engagement letters, fee reimbursement letters, the Bankruptcy Code, any DIP Order, or any other orders of the Bankruptcy Court and such failure to pay is not cured within two (2) Business Days;

(xx)    the modification of the Approved Budget in a manner not acceptable to the Required Lenders;

(xxi)    the Debtors file a motion or take any action in any Chapter 11 Case, or the Bankruptcy Court enters any order in any Chapter 11 Case authorizing the Debtors: (i) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement or the DIP Order, as the case may be, except (x) as may be permitted by the Required Lenders and (y) to the extent that such new financing shall pay in full in cash the Obligations substantially concurrently with the incurrence of such new financing or (ii) except as provided in the DIP Orders, to use cash collateral of the Prepetition Agents or lenders owed Prepetition Secured Obligations under Section 363(c) of the Bankruptcy Code without the prior written consent of the Required Lenders;

(xxii)    the Debtors file a motion or the take any action in any Chapter 11 Case by seeking the entry by the Bankruptcy Court of any order in any Chapter 11 Case, or the Bankruptcy Court enters any order in any Chapter 11 Case, granting any Lien that is *pari passu* or senior to the Liens on the Collateral securing the Obligations, other than Liens expressly permitted under this Agreement or the DIP Orders;

(xxiii)    the Debtors file a motion or take any action in any Chapter 11 Case seeking the entry by the Bankruptcy Court of any order, or the Bankruptcy Court enters any order in any Chapter 11 Case, amending, supplementing, staying, vacating or otherwise modifying any Loan Document, the DIP Order or the First Day Orders, in each case, in a manner that is adverse to the Lenders, in their capacities as such, without the prior written consent of the Required Lenders;

(xxiv)    the Debtors file a motion or take any action in any Chapter 11 Case seeking the entry by the Bankruptcy Court of any order, or the Bankruptcy Court enters any order in any Chapter 11 Case, avoiding or requiring repayment by any Lender of any portion of the payments made by any Debtor on account of the Obligations owing under this Agreement or the other Loan Documents;

(xxv)    the Debtors file a motion or take any action in any Chapter 11 Case seeking the entry by the Bankruptcy Court of any order, or the Bankruptcy Court enters any order in any Chapter 11 Case, granting any superpriority claim which is senior or

*pari passu* with the Lenders' claims or with the claims of the lenders under the Prepetition Loan Documents;

(xxvi)   any Loan Party attempts to reduce, set off or subordinate the Obligations or the Liens securing such Obligations to any other Indebtedness;

**8.02    Remedies Upon Event of Default**.

If any Event of Default occurs and is continuing, exceeding any applicable cure period, at the request of the Required Lenders, the Agent shall take any or all of the following actions:

(a)    terminate the Loan Parties' use of any cash collateral, freeze all monies and balances in all Accounts subject to (or required to be subject to) a Control Agreement, set-off any and all amounts in the controlled accounts and any and all accounts maintained by the Loan Parties against the Obligations, or otherwise enforce any and all rights against the Collateral, including, without limitation, the Security Agreement, and disposition of the Collateral for application of the proceeds thereof towards the Obligations;

(b)    declare the New Money Loan Commitments of each Lender to make New Money Loans to be terminated, whereupon such New Money Loan Commitments and Obligations shall be terminated;

(c)    declare the unpaid principal amount of all Outstanding Amounts, all interest accrued and unpaid thereon, and all other Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties, whereupon such amounts shall become immediately due and payable; and

(d)    whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, proceed to protect, enforce and exercise all rights and remedies of the Credit Parties under this Agreement, any of the other Loan Documents or Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties;

(e)    make a demand for payment upon any Guarantor pursuant to the Guaranty Agreement delivered by such Guarantor;

(f)    take any other actions or exercise any other rights or remedies permitted under the DIP Orders, the Loan Documents or applicable law;

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

**8.03    Application of Funds**.  After the exercise of remedies provided for in <u>Section 8.02</u>, any amounts received on account of the Obligations shall be applied by the Agent in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, Credit Party Expenses and other amounts (including fees, charges and disbursements of counsel to the Agent and amounts payable under Article III) payable to the Agent;

Second, to payment of that portion of the Obligations constituting indemnities (including indemnities due under Section 10.03 hereof), Credit Party Expenses, and other amounts (other than principal, interest and fees) payable to the Lenders (including Credit Party Expenses to the respective Lenders and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Second payable to them;

Third, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and any other Obligations, and fees (including any commitment fees), ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Lenders (and Affiliates thereof) in proportion to the respective amounts described in this clause Fourth held by them;

Fifth, to payment of all other Obligations, ratably among the Credit Parties in proportion to the respective amounts described in this clause Fifth held by them; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Loan Parties or as otherwise required by Law.

## ARTICLE IX
## THE AGENT

9.01    **Appointment and Authority**. Each of the Lenders (in its capacity as a Lender) hereby irrevocably appoints Acquiom Agency Services LLC, to act on its behalf as the administrative agent and collateral agent hereunder and under the other Loan Documents and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof (including, without limitation, acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations), together with such actions and powers as are reasonably incidental thereto. Without limiting the generality of the foregoing, the Lenders hereby expressly authorize the Agent to (i) execute any and all documents (including releases) with respect to the Collateral and the rights of the Lenders with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents and (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders and, in each case, acknowledge and agree that any such action by the Agent shall bind the Lenders. The provisions of this Article are solely for the benefit of the Agent and the other Credit Parties, and no Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any Applicable Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties. The provisions of this Article are solely for the benefit of the Agent and the other Credit Parties, and no Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under

91

agency doctrine of any Applicable Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties. Any corporation or association into which the Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Agent is a party, will be and become the successor Agent under this Agreement and will have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

9.02    **Rights as a Lender**.  The Person serving as the Agent hereunder shall, if also acting as a Lender, have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include, if applicable, the Person serving as the Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with the Loan Parties or any Subsidiary or other Affiliate thereof as if such Person were not the Agent hereunder and without any duty to account therefor to the Lenders.

9.03    **Exculpatory Provisions**.  Neither the Agent nor any Lender shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, neither the Agent nor any Lender:

(a)    shall be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b)    shall have any duty to take any discretionary action or exercise any discretionary powers, except, in the case of the Agent, discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Applicable Lenders, underlined provided that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law;

(c)    shall, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and the Agent shall not be liable for the failure to disclose, any information relating to the Loan Parties or any of its Affiliates that is communicated to or obtained by the Person serving as the Agent or any of its Affiliates in any capacity;

(d)    shall be liable for any apportionment or distribution of payments made by it in good faith and if any such apportionment or distribution is subsequently determined to have been made in error, the sole recourse of any Lender to whom payment was due but not made shall be to recover pro rata from other Lenders any payment equal to the amount to which they are determined to be entitled (and such other Lenders hereby agree to return to such Lender any such erroneous payments received by them);

(e)    shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Applicable Lenders (as the Agent shall believe in good faith shall be necessary under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent

jurisdiction (provided that the provisions of this clause (e) shall not be construed to modify any payment or other obligations owing by the Lenders to the Agent pursuant to the express terms of the Loan Documents);

(f)        shall be deemed to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Agent by the Loan Parties or a Lender. In the event that the Agent receives such a notice, the Agent shall give prompt notice thereof to each of the other Credit Parties. Upon the occurrence of a Default or an Event of Default, the Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Applicable Lenders. Unless and until the Agent shall have received such direction, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as it shall deem advisable in the best interest of the Credit Parties. In no event shall the Agent be required to comply with any such directions to the extent that the Agent believes that its compliance with such directions would be unlawful;

(g)        shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent;

(h)        shall be responsible for (i) perfecting, maintaining, monitoring, preserving or protecting the security interest or lien granted under this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, (ii) the filing, re-filing, recording, re-recording or continuing or any document, financing statement, mortgage, assignment, notice, instrument of further assurance or other instrument in any public office at any time or times, (iii) providing, maintaining, monitoring or preserving insurance on or the payment of taxes with respect to any of the Collateral or (iv) inspecting the properties, books or records of any Loan Party or any Affiliate thereof.  The actions described in items (i) through (iii) shall be the sole responsibility of the Borrower; and

(i)        shall be liable for any failure or delay in the performance of their respective obligations under this Agreement or any related documents because of circumstances beyond the Agent's control, including, but not limited to, a failure, termination, or suspension of a clearing house, securities depositary, settlement system or central payment system in any applicable part of the world or acts of God, flood, war (whether declared or undeclared), civil or military disturbances or hostilities, nuclear or natural catastrophes, political unrest, explosion, severe weather or accident, earthquake, terrorism, fire, riot, labor disturbances, strikes or work stoppages for any reason, embargo, government action, including any laws, ordinances, regulations or the like (whether domestic, federal, state, county or municipal or foreign) which delay, restrict or prohibit the providing of the services contemplated by this Agreement or any related documents, or the unavailability of communications or computer facilities, the failure of equipment or interruption of communications or computer facilities, or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility, or any other causes beyond the Agent's control whether or not of the same class or kind as specified above.

9.04     **Reliance by Agent**.

The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including, but not limited to, any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a New Money Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Agent may presume that such condition is satisfactory to such Lender unless the Agent shall have received written notice to the contrary from such Lender prior to the making of such New Money Loan. The Agent may consult with legal counsel (who may be counsel for any Loan Party), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. The Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate. The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders.

9.05     **Delegation of Duties**.  The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Agent. The Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this <u>Article IX</u> shall apply to any such sub-agent and to the Related Parties of the Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Agent. The Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

9.06     **Resignation and Removal of Agent**.  The Agent (x) may at any time give thirty (30) days' prior written notice of its resignation to the Lenders and the Borrower and (y) may be removed by the affirmative vote of the Required Lenders upon ten (10) days' prior written notice to the Agent and the Borrower. Upon receipt of any such notice of resignation or removal, the Required Lenders shall have the right, in consultation with and, so long as no Event of Default shall have occurred and be continuing, with the consent of the Borrower (which consent of the Borrower shall not be unreasonably withheld or delayed), to appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation (the "<u>Resignation Effective Date</u>") or 30 days after Agent has been provided with a written notice of removal hereunder (the "<u>Removal Effective Date</u>"), then the retiring or removed Agent may (but shall not be obligated to) on behalf of the Lenders appoint a successor Agent meeting the qualifications set forth above; <u>provided</u> that if no successor agent has accepted appointment as the Agent by the Resignation Effective Date or the Removal Effective Date, as applicable, then the resignation or removal, as applicable, of the Agent shall nonetheless become effective and (1) the retiring or removed Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by the Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender directly, until such time

as the Required Lenders appoint a successor Agent as provided for above in this <u>Section 9.06</u>. Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or removed) Agent (other than as provided in <u>Section 3.01(g)</u> and other than any rights to indemnity payments or other amounts owed to the retiring or removed Agent as of the effective date of its resignation or removal), and the retiring or removed Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this <u>Section 9.06</u>). The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring or removed Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this <u>Article IX</u> and <u>Section 10.04</u> shall continue in effect for the benefit of such retiring or removed Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Agent was acting as Agent hereunder.

**9.07     Non-Reliance on Agent and Other Lenders**.  Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder. Except as provided in <u>Section 9.12</u>, the Agent shall not have any duty or responsibility to provide any Credit Party with any other credit or other information concerning the affairs, financial condition or business of any Loan Party that may come into the possession of the Agent.

**9.08     [Reserved].**

**9.09     Agent May File Proofs of Claim**.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Loan Parties) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Agent and the other Credit Parties (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Agent, such Credit Parties and their respective agents and counsel and all other amounts due to the Lenders, the Agent and such Credit Parties under <u>Sections</u> 2.08 and 10.04) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Agent and to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due the Agent under <u>Sections</u> 9 and 10.04.

Nothing contained herein shall be deemed to authorize the Agent to authorize or consent to or accept or adopt on behalf of any Credit Party any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Credit Party or to authorize the Agent to vote in respect of the claim of any Credit Party in any such proceeding.

**9.10    Collateral and Guaranty Matters**.  The Credit Parties irrevocably authorize and direct the Agent:

(a)    to release any Lien on any property granted to or held by the Agent under any Loan Document (i) upon termination of the New Money Loan Commitments and payment in full of all Obligations (other than contingent indemnification obligations for which no claim has been asserted), (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing by the Applicable Lenders in accordance with Section 10.01;

(b)    to subordinate any Lien on any property granted to or held by the Agent under any Loan Document to the holder of any Lien on such property that is permitted by clause (h) of the definition of Permitted Encumbrances;

(c)    [reserved]; and

(d)    to release any Guarantor from its obligations under the Guaranty Agreement if such Person ceases to be a Subsidiary as a result of a transaction expressly permitted hereunder.

Upon request by the Agent at any time, the Applicable Lenders will confirm in writing the Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty Agreement pursuant to this Section 9.10. In each case as specified in this Section 9.10, the Agent will, at the Loan Parties' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Guaranty Agreement, in each case in accordance with the terms of the Loan Documents and this Section 9.10 (provided that if requested by the Agent, the Borrower shall provide a written certification to the Agent that the transaction giving rise to such release or subordination is permitted by this Agreement (and the Credit Parties hereby authorize and direct the Agent to conclusively rely on such certification as evidence that the applicable transaction is permitted under the Loan Documents in performing its obligations under this paragraph)).

**9.11    Notice of Transfer**.  The Agent may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Assumption shall have become effective as set forth in Section 10.06.

**9.12    Reports**.  By signing this Agreement, each Lender:

(a)    is deemed to have requested that the Agent furnish, and the Agent agrees to furnish, to such Lender, promptly after receipt by the Agent, copies of all notices required to be delivered by the Borrower hereunder;

(b)      is deemed to have requested that the Agent furnish, and the Agent agrees to furnish, to such Lender, promptly after receipt by the Agent, copies of all Budget Supplements and Variance Reports (collectively, the "Reports") received by the Agent;

(c)      expressly agrees and acknowledges that the Agent makes no representation or warranty as to the accuracy of the Reports, and shall not be liable for any information contained in any Report;

(d)      [reserved];

(e)      agrees to keep all Reports confidential in accordance with the provisions of Section 10.07 hereof; and

(f)      without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any Borrowings that the indemnifying Lender has funded or may fund to the Borrower, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, any Loans; and (ii) to pay and protect, and indemnify, defend, and hold the Agent and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

**9.13    Agency for Perfection**.  Each Credit Party hereby appoints each other Credit Party as agent for the purpose of perfecting Liens for the benefit of the Credit Parties, in assets which, in accordance with Article 9 of the UCC or any other Law of the United States, can be perfected only by possession or control. Should any Credit Party (other than the Agent) obtain possession or control of any such Collateral, such Credit Party shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such Collateral to the Agent or otherwise deal with such Collateral in accordance with the Agent's instructions.

**9.14    Indemnification of Agent**.  Without limiting the obligations of the Loan Parties hereunder, to the extent that the Borrower or any of the other Loan Parties for any reason fail to indefeasibly pay any amount required under Section 10.04 to be paid by them to the Agent (or any sub-agent thereof) or any Related Party of the Agent, then the Lenders shall pay to the Agent, such sub-agent thereof or such Related Party of the Agent, as the case may be, ratably according to their respective Applicable Percentages as in effect on the date on which the applicable unreimbursed expense or indemnification is sought under this Section 9.14 (or, if such unreimbursed expense or indemnification is sought on or after the Termination Date, in proportion to their respective Applicable Percentages as in effect immediately prior to such date), such unpaid amount; provided, that no Lender shall be liable for any portion of such unpaid amount resulting from the Agent's, such sub-agent's and such Related Party's, as the case may be, gross negligence or willful misconduct as determined by a final and nonappealable judgment of a court of competent jurisdiction; provided further that no action taken in accordance with the directions of the Applicable Lenders shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 9.14. Each Lender hereby authorizes the Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Agent to such Lender from any source against any amount due to the Agent under this Section 9.14.  The undertaking in this Section 9.14 shall survive termination of the New Money Loan Commitments, the payment of all other Obligations, the resignation or removal of the Agent, and the

exercise of Write-Down and Conversion Powers by an EEA Resolution Authority with respect to any Lender that is an EEA Financial Institution.

9.15    **Relation among Lenders**. The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Agent) authorized to act for, any other Lender.

9.16    **PATRIOT Act**.  Each Lender subject to the PATRIOT Act hereby notifies each Loan Party that, pursuant to the requirements of the PATRIOT Act, it may be required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender to identify such Loan Party in accordance with the PATRIOT Act.

9.17    **Intercreditor Agreements**.

(a)    The Agent shall be authorized to enter into the Intercreditor Agreement and, upon the direction of the Applicable Lenders, any other document evidencing an intercreditor arrangement to the extent contemplated by the terms hereof. Each Lender hereby agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement or any other document evidencing an intercreditor arrangement entered into by the Agent upon the direction of the Applicable Lenders, (b) hereby authorizes and instructs the Agent to enter into the Intercreditor Agreement and any other document evidencing an intercreditor arrangement entered into pursuant to the immediately preceding sentence and, in each case, to subject the Liens on the Collateral securing the Obligations to the provisions thereof and (c) the Agent shall take actions under the Intercreditor Agreement solely at the direction of the Applicable Lenders. In addition, upon the direction of the Applicable Lenders, the Agent shall be authorized to enter into any amendment to any document evidencing an intercreditor arrangement, including the Intercreditor Agreement, in each case to the extent required to give effect to the establishment of intercreditor rights and privileges as contemplated and required by this Agreement or the other Loan Documents. Promptly after execution thereof, the Agent shall provide each Lender with a copy of any other document entered into by the Agent evidencing an intercreditor arrangement, and any amendment to or other modification of any of the foregoing.

9.18    **Erroneous Payments**.

(a)    If the Agent notifies a Lender or Secured Party, or any Person who has received funds on behalf of a Lender or Secured Party (any such Lender, Secured Party or other recipient (and each of their respective successors and assigns), a "Payment Recipient") that the Agent has determined in its reasonable discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds received by such Payment Recipient from the Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, Secured Party or other Payment Recipient on its behalf)  (any such funds, whether transmitted or received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "Erroneous Payment") and demands in writing the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Agent, and such Lender or Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than ten (10) Business Days thereafter, return to the Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon (except to the extent waived in writing by the Agent)

in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of the Agent to any Payment Recipient under this <u>clause (a)</u> shall be conclusive, absent manifest error; provided that the Agent's rights and remedies under this <u>Section 9.18</u> is subject to the Agent providing notice to a Payment Recipient of an Erroneous Payment within fifteen (15) Business Days after such Payment Recipient receives such Erroneous Payment.

(b)    Without limiting immediately preceding <u>clause (a)</u>, each Lender or Secured Party, or any Person who has received funds on behalf of a Lender or Secured Party (and each of their respective successors and assigns) hereby further agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Agent (or any of its Affiliates), or (z) that such Lender, Secured Party, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case:

(i)    (A) in the case of immediately preceding <u>clauses (x)</u> or <u>(y)</u>, an error shall be presumed to have been made (absent written confirmation from the Agent to the contrary) or (B) an error has been made (in the case of immediately preceding <u>clause (z)</u>), in each case, with respect to such payment, prepayment or repayment; and

(ii)    to the extent it becomes aware of such error, such Lender or Secured Party shall use commercially reasonable efforts to (and shall use commercially reasonable efforts to cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of such error) notify the Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Agent pursuant to this <u>Section 9.18(b)</u>.

(c)    Each Lender or Secured Party hereby authorizes the Agent to set off, net and apply any and all amounts at any time owing to such Lender or Secured Party under any Loan Document, or otherwise payable or distributable by the Agent to such Lender or Secured Party from any source pursuant to the Loan Documents, against any amount due to the Agent under immediately preceding <u>clause (a)</u> or under the indemnification provisions of this Agreement.

(d)    In the event that an Erroneous Payment (or portion thereof) is not recovered by the Agent for any reason, after demand therefor by the Agent in accordance with immediately preceding <u>clause (a)</u>, from any Lender that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf) (such unrecovered amount, an "<u>Erroneous Payment Return Deficiency</u>"), upon the Agent's notice to such Lender at any time, then effective immediately (with the consideration therefor being acknowledged by the parties hereto), (i) such Lender shall be deemed to have assigned its Loans (but not its Commitments) with respect to which such Erroneous Payment was made (the "<u>Erroneous Payment Impacted Class</u>") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Agent may

specify) (such assignment of the Loans (but not Commitments) of the Erroneous Payment Impacted Class, the "Erroneous Payment Deficiency Assignment") (on a cashless basis and such amount calculated at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Agent in such instance)), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment and Assumption (or, to the extent applicable, an agreement incorporating an Assignment and Assumption by reference pursuant to an approved platform as to which the Agent and such parties are participants) with respect to such Erroneous Payment Deficiency Assignment, and such Lender shall deliver any notes evidencing such Loans to the Borrower or the Agent, (ii) the Agent as the assignee Lender shall be deemed to acquire the Erroneous Payment Deficiency Assignment, (iii) upon such deemed acquisition, the Agent as the assignee Lender shall become a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall cease to be a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement and its applicable Commitments which shall survive as to such assigning Lender, (iv) the Agent and the Borrower shall each be deemed to have waived any consents required under this Agreement to any such Erroneous Payment Deficiency Assignment, and (v) the Agent may reflect in the Register its ownership interest in the Loans subject to the Erroneous Payment Deficiency Assignment. The Agent may, in its discretion, sell any Loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of such Loan (or portion thereof), and the Agent shall retain all other rights, remedies and claims against such Lender (and/or against any recipient that receives funds on its respective behalf). For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the Commitments of any Lender and such Commitments shall remain available in accordance with the terms of this Agreement.  In addition, each party hereto agrees that, except to the extent that the Agent has sold a Loan (or portion thereof) acquired pursuant to an Erroneous Payment Deficiency Assignment, and irrespective of whether the Agent may be equitably subrogated, the Agent shall be contractually subrogated to all the rights and interests of the applicable Lender or Secured Party under the Loan Documents with respect to each Erroneous Payment Return Deficiency (the "Erroneous Payment Subrogation Rights").

(e)        The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Agent from the Borrower or any other Loan Party for the purpose of making such Erroneous Payment.

(f)        To the extent permitted by Applicable Law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine

(g)        Each party's obligations, agreements and waivers under this Section 9.18 shall survive the resignation or replacement of the Agent, any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Commitments and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

9.19        **Credit Bidding**.

Subject to the DIP Orders, the Loan Parties and the Lenders hereby irrevocably authorize Agent, based upon the written instruction of the Required Lenders, to (a) credit bid and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Section 363 of the Bankruptcy Code or any similar laws in any other jurisdictions to which a Loan Party is subject, or (b) credit bid and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any other sale or foreclosure conducted by (or with the consent or at the direction of) Agent (whether by judicial action or otherwise) in accordance with Applicable Law.  In connection with any such credit bid and purchase, the Obligations owed to the Lenders shall be entitled to be, and shall be, credit bid on a ratable basis and the Lenders whose Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) in the asset or assets so purchased (or in the stock of the acquisition vehicle or vehicles that are used to consummate such purchase). In connection with any such bid (i) the Agent shall be authorized to assign the relevant Obligations to an acquisition vehicle pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any stock and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any Secured Party or acquisition vehicle to take any further action and (ii) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the stock and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action. Except as provided above and otherwise expressly provided for herein or in the other Loan Documents, Agent will not execute nor deliver a release of any Lien on any Collateral.  Upon request by Agent at any time, the Lenders will confirm in writing Agent's authority to release any such Liens on particular types or items of Collateral pursuant to, and in accordance with, this Section 9.19.  Each Secured Party whose Obligations are credit bid under this Section 9.19 shall be entitled to receive interests in the Collateral or any other asset acquired in connection with such credit bid (or in the stock of the acquisition vehicle or vehicles that are used to consummate such acquisition) on a ratable basis in accordance with the percentage obtained by dividing (y) the amount of the Obligations of such Secured Party that were credit bid in such credit bid, by (z) the aggregate amount of all Obligations that were credit bid in such credit bid. In furtherance of any such credit bid and purchase, the Agent shall take any action in accordance with any direction or written instruction of the Required Lenders.

9.20        **Plan Process.**

Lenders and Agent hereby agree that, in respect of all of their Claims against the Loan Parties, from and after the closing of an Acceptable Sale of substantially all of the Loan Parties' assets, they shall not object to, and shall vote in favor of, a joint Chapter 11 plan filed by the Loan Parties that (i) includes customary debtor and third-party releases and exculpation in favor of the Lenders (in any and all capacities), the Agent, the Loan Parties, the Loan Parties' current and former directors and officers, and the Loan Parties' direct and indirect equity holders, and Affiliates, officers, directors, employees, and other representatives of each of the foregoing, (ii) includes a provision effectuating the payment of the DIP Reversionary Interest (as defined in the Stalking Horse Purchase Agreement), and (iii) is otherwise acceptable to the Lenders and the Agent in their sole discretion.

**ARTICLE X**
**MISCELLANEOUS**

### 10.01  Amendments, Etc.

(a)  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Agent, with the consent of the Required Lenders and the Borrower or the applicable Loan Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(i)  increase the New Money Loan Commitment of any Lender (or reinstate any New Money Loan Commitment terminated pursuant to Section 8.02) without the written consent of such Lender;

(ii)  as to any Lender, postpone any date fixed by this Agreement or any other Loan Document for (i) any scheduled payment (including the Maturity Date) of principal, interest, fees or other amounts due hereunder or under any of the other Loan Documents without the written consent of such Lender entitled to such payment, or (ii) any scheduled or mandatory reduction or termination of the New Money Loan Commitments hereunder or under any other Loan Document, without the written consent of such Lender;

(iii)  as to any Lender, reduce the principal of, or the rate of interest specified herein on, any Loan held by such Lender, or any fees or other amounts payable hereunder or under any other Loan Document to or for the account of such Lender, without the written consent of such Lender; provided, however, that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

(iv)  as to any Lender, change Section 2.13 or Section 8.03 in a manner that would alter the pro rata sharing of payments required thereby without the written consent of such Lender;

(v)  change any provision of this Section 10.01 or the definition of "Required Lenders", or any other provision hereof or of any Loan Document specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or under any other Loan Document or make any determination or grant any consent hereunder or thereunder, without the written consent of each Lender;

(vi)  except as expressly permitted hereunder or under any other Loan Document, release, or limit the liability of, any Loan Party without the written consent of each Lender;

(vii)  except as provided in Section 9.10, release all or substantially all of the Collateral from the Liens of the Security Documents without the written consent of each Lender;

(viii)  increase the New Money Loan Commitments without the written consent of each Lender; and

(ix)    subordinate the Obligations hereunder or the Liens granted hereunder or under the other Loan Documents, to any other Indebtedness or Lien, as the case may be, without the written consent of each Lender;

and, provided further, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Agent in addition to the Lenders required above, affect the rights or duties of the Agent under this Agreement or any other Loan Document; and (ii) the Fee Letter and the Agency Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the New Money Loan Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

(b)    Notwithstanding anything to the contrary in this Agreement or any other Loan Document, any Loan Document may be amended or waived with the prior written consent of the Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order to cure obvious and immaterial ambiguities or defects.

(c)    If any Lender does not consent (a "Non-Consenting Lender") to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each Lender and that has been approved by the Required Lenders, the Borrower may replace such Non-Consenting Lender in accordance with Section 10.13; provided that such amendment, waiver, consent or release can be effected as a result of the assignment contemplated by such Section (together with all other such assignments required by the Borrower to be made pursuant to this paragraph).

(d)    Notwithstanding anything contained herein, each of the Lenders hereby agree that, until all of the Obligations hereunder have been paid in full:

(i)    No Credit Party shall provide or consent to any third-party providing any financing under Section 364 of the Bankruptcy Code or any similar provision in any Applicable Law ("DIP Financing") unless (1) such DIP Financing has been consented to by Required Lenders, and (2) each Lender shall have been offered the opportunity to participate in such DIP Financing on a pro rata basis (i.e., in an amount sufficient to maintain the equivalent of such Lender's portion of Loans under this Agreement) (and provided that such proposed DIP Financing contains voting provisions that would be consistent with such Credit Party's rights under Section 10.01 hereof (including, without limitation, the definition of Required Lenders hereunder specifically including such Lender to the extent such Lender provides 30.0% or more of such DIP Financing) should such Credit Party participate).

(ii)    No Credit Party shall consent to any sale of any material portion of the Collateral in one or more transactions under Section 363 of the Bankruptcy Code, whether for cash or other consideration (including, without limitation, a credit bid under Section 363(k) of the Bankruptcy Code) without the consent of the Required Lenders.

(iii)    For the avoidance of doubt, each of the Credit Parties expressly acknowledge that this Section 10.01(d) and Section 9.17 of this Agreement is a "subordination

agreement" under Section 510(a) of the Bankruptcy Code and shall be applicable prior to and after the commencement of any Insolvency or Liquidation Proceeding.

(iv)    For the avoidance of doubt, this Section 10.01(d) is intended to be an agreement among the Lenders and does not purport to bind the Parent or the Loan Parties or any Subsidiary thereof, or otherwise impair such parties' rights under the Bankruptcy Code, solely in respect of this Section 10.01(d).

**10.02  Notices; Effectiveness; Electronic Communications**.

(a)    <u>Notices Generally</u>.  Except as provided in <u>subsection (b)</u> below, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier or electronic mail as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to the Loan Parties or the Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person on <u>Schedule 10.02</u>; and

(ii)    if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in <u>subsection (b)</u> below, shall be effective as provided in such <u>subsection (b)</u>.

(b)    <u>Electronic Communications</u>.  Notices and other communications to the Agent or the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agent or the applicable Lender, <u>provided</u> that the foregoing shall not apply to notices to the Agent or any Lender (provided such Lender has notified the Agent) pursuant to <u>Article II</u> if the Agent or such Lender is incapable of receiving notices under such Article by electronic communication. The Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, <u>provided</u> that approval of such procedures may be limited to particular notices or communications.

Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing <u>clause (i)</u> of notification that such notice or communication is available and identifying the website address therefor; <u>provided</u> that, for both <u>clauses (i)</u> and <u>(ii)</u>, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice, email or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(c)    [Reserved].

(d)    Change of Address, Etc.  Each of the Loan Parties and the Agent may change its address, telecopier or telephone number for notices and other communications hereunder by written notice to the other parties hereto in accordance with this Section 10.02. Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by written notice to the Borrower and the Agent in accordance with this Section 10.02. In addition, each Lender agrees to notify the Agent from time to time to ensure that the Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)    Reliance by Agent and Lenders.  The Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Loan Parties even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Loan Parties shall indemnify the Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Loan Parties. All telephonic notices to and other telephonic communications with the Agent may be recorded by the Agent, and each of the parties hereto hereby consents to such recording.

(f)    Each of the Borrower and Parent hereby acknowledges that (a) the Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, the "Borrower Materials") by posting the Borrower Materials on Intralinks, SyndTrak, DebtDomain or another similar electronic system (the "Platform") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Borrower, the Parent or their securities) (each, a "Public Lender").  The Borrower shall use commercially reasonable efforts to (and, at the request of the Agent, shall) clearly designate as such all Borrower Materials provided to the Agent by or on behalf of the Borrower that are suitable to be made available to Public Lenders.  The Borrower hereby agrees that (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to the Borrower or its securities for purposes of United States federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.07); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor;" and (z) the Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Investor." Notwithstanding the foregoing, the following Borrower Materials shall be marked "PUBLIC", unless the Borrower notifies the Agent promptly that any such document contains material non-public information:  (1) the Loan Documents, (2) notification of changes in the terms of this Agreement or the other Loan Documents and (3) all certificates delivered pursuant to Section 6.02.

(g)    Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and Applicable Law, including United States Federal and state securities laws, to make reference to communications that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public

information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws.

(h)     THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". NEITHER THE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL THE AGENT OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH PERSON'S GROSS NEGLIGENCE, BAD FAITH OR WILLFUL MISCONDUCT.

### 10.03  No Waiver; Cumulative Remedies.

(a)     No failure by any Credit Party to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges provided herein and in the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether any Credit Party may have had notice or knowledge of such Default or Event of Default at the time.

(b)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at Law in connection with such enforcement shall be instituted and maintained exclusively by, the Agent in accordance with Section 8.02 for the benefit of all the Lenders; provided, however, that the foregoing shall not prohibit (a) the Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Agent) hereunder and under the other Loan Documents, or (b) any Lender from exercising setoff rights in accordance with Section 10.08 (subject to the terms of Section 2.13); and provided, further, that if at any time there is no Person acting as Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Agent pursuant to Section 8.02 and (ii) in addition to the matters set forth in clause (b) of the preceding proviso and subject to Section 2.13, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

10.04     **Expenses; Indemnity; Damage Waiver**.

(a)     Costs and Expenses.  Upon request by any Credit Party, the Borrower shall pay all due and payable Credit Party Expenses within five (5) Business Days of such request.

(b)     Indemnification by the Loan Parties.  The Loan Parties shall indemnify the Agent (and any sub-agent thereof), each other Credit Party, and each Related Party of any of the foregoing Persons (collectively, the "Indemnitees" and each such Person individually being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related expenses (including the reasonable fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or the administration of this Agreement and the other Loan Documents, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Subsidiaries, (iv) any claims of, or amounts paid by any Credit Party to, an account bank or other Person which has entered into a Control Agreement with any Credit Party pursuant to this Agreement, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party or any of the Loan Parties' directors, equityholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee, provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or the Related Parties of such Indemnitee. This Section 10.04(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)     Waiver of Consequential Damages, Etc.  To the fullest extent permitted by Law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.

(d)     Payments.     All amounts due under this Section 10.04 shall be payable immediately on demand therefor.

(e)     Limitation of Liability.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee, in each case as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(f)    Survival.  The agreements in this Section 10.04 shall survive the resignation or removal of the Agent, the assignment of any New Money Loan Commitment or Loan by any Lender, the replacement of any Lender, the termination of the New Money Loan Commitments and the repayment, satisfaction or discharge of all the other Obligations.

### 10.05  Payments Set Aside.

To the extent that any payment by or on behalf of the Loan Parties is made to any Credit Party, or any Credit Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Credit Party in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Agent upon demand its Applicable Percentage (without duplication) of any amount so recovered from or repaid by the Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect. The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

### 10.06  Successors and Assigns.

(a)    Successors and Assigns Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written consent of the Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of Section 10.06(b), (ii) by way of participation in accordance with the provisions of Section 10.06(d), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.06(f) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Credit Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Lenders.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its New Money Loan Commitment(s) and the Loan(s) at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)    Minimum Amounts.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's New Money Loan Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, no minimum amount need be assigned; and

(B)    in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the New Money Loan Commitments and the outstanding principal

amount of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $500,000 unless each of the Agent and, so long as no Default or Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)     Proportionate Amounts.   Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the New Money Loan Commitment assigned;

(iii)     Required Consents.   No consent shall be required for any assignment except to the extent required by Section 10.06(b)(i)(B) and, in addition, the consent of the Required Lenders (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of any New Money Loan Commitment or Loans if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender;

(iv)     Assignment and Assumption.   The parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, provided, however, that the Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it shall not be a Lender, shall deliver to the Agent (x) an Administrative Questionnaire, (y) the tax forms required under Section 3.01 and (z) all documentation and other information about such assignee as shall have been reasonably requested by the Agent in connection with applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the Patriot Act.

(v)     No Assignment to Certain Persons.   No such assignment shall be made (A) to the Sponsor or any of its Affiliates, (B) to the Loan Parties or any of the Loan Parties' Subsidiaries, (C) to any Defaulting Lender or any of its Subsidiaries or Affiliates, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (C), or (D) to a natural Person.

(vi)     Certain Additional Payments.   In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or sub-participations, or other compensating actions, including funding, with the consent of the Borrower and the Agent, the applicable pro rata share of New Money Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all New Money Loans in accordance with its Applicable Percentage. Notwithstanding the foregoing, if any assignment of rights and obligations of any Defaulting Lender hereunder shall

become effective under Applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Agent pursuant to <u>subsection (c)</u> of this <u>Section 10.06</u>, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of <u>Sections 3.01</u>, <u>3.04</u>, <u>3.05</u>, and <u>10.04</u> with respect to facts and circumstances occurring prior to the effective date of such assignment; <u>provided</u>, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender. Upon request, the Borrower (at its expense) shall execute and deliver a Loan Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with <u>Section 10.06(d)</u>.

(c)     <u>Register</u>.  The Agent, acting solely for the purpose of this <u>Section 10.06(c)</u> as a non-fiduciary agent of the Borrower (and such agency being solely for tax purposes), shall maintain at one of its offices in the United States a copy of each Assignment and Assumption delivered to it (or the equivalent thereof in electronic form) and a register for the recordation of the names and addresses of the Lenders, and the New Money Loan Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "<u>Register</u>"). The entries in the Register shall be conclusive, absent manifest error, and the Loan Parties, the Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(d)     <u>Participations</u>.  (i) Any Lender may at any time, without the consent of, or notice to, the Loan Parties or the Agent, sell participations to any Person (other than a natural person or the Loan Parties or any of the Loan Parties' Affiliates or Subsidiaries) (each, a "<u>Participant</u>") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its New Money Loan Commitment and/or the Loans owing to it); <u>provided</u> that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties and the Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any Participant shall agree in writing to comply with all confidentiality obligations set forth in <u>Section 10.07</u> as if such Participant was a Lender hereunder.

(ii)     Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; <u>provided</u> that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in <u>clauses (i)</u> through <u>(iv)</u> of the first proviso to <u>Section 10.01</u> that affects such Participant. Subject to <u>Section 10.06(e)</u>, the Loan Parties agree

110

that each Participant shall be entitled to the benefits of <u>Sections 3.01</u>, <u>3.04</u> and <u>3.05</u> to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to <u>Section 10.06(b)</u>. To the extent permitted by law, each Participant also shall be entitled to the benefits of <u>Section 10.08</u> as though it were a Lender, <u>provided</u> such Participant agrees to be subject to <u>Section 2.03(e)</u> as though it were a Lender.

(iii)    Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "<u>Participant Register</u>"); <u>provided</u> that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any New Money Loan Commitments, Loans or its other Obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such New Money Loan Commitment, Loan or other Obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Agent (in its capacity as Agent) shall have no responsibility for maintaining a Participant Register.

(e)    <u>Limitations upon Participant Rights</u>.  A Participant shall not be entitled to receive any greater payment under <u>Section 3.01</u> or <u>3.04</u> than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Without limiting the foregoing, a Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of <u>Section 3.01</u> unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Loan Parties, to comply with <u>Section 3.01(e)</u> as though it were a Lender.

(f)    <u>Certain Pledges</u>.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Loan Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; <u>provided</u> that no such pledge or assignment shall release such Lender from any of its obligations hereunder. Notwithstanding any provision of any Loan Document to the contrary, no consent of any party hereto shall be required with respect to an assignment of Loans or New Money Loan Commitments to a Lender's financing sources, including in connection with the exercise of remedies by any such financing source with respect to a security interest permitted under this Section.

(g)    <u>Securitization</u>.  The Loan Parties hereby acknowledge that the Lenders and their Affiliates may securitize the Loans (a "<u>Securitization</u>") through the pledge of the Loans as collateral security for loans to the Lenders or their Affiliates or through the sale of the Loans or the issuance of direct or indirect interests in the Loans to their Controlled Affiliates, which loans to the Lenders or their Affiliates or direct or indirect interests will be rated by Moody's, S&P or one or more other rating agencies. The Credit Parties shall, to the extent commercially reasonable, cooperate with the Lenders and their Affiliates to effect any and all Securitizations.

**10.07  Treatment of Certain Information; Confidentiality**.

Each of the Credit Parties agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates, Approved Funds, and to its and its Affiliates' and Approved Funds' respective partners, directors, officers, employees, agents, funding sources, joint venture partners, attorneys, advisors and representatives (it being understood that

the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority), (c) to the extent required by Laws or regulations or by any subpoena or similar legal process, (d) to any other party to the Loan Documents, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (ii) any actual or prospective counterparty (or its advisors) to any Swap Contract relating to any Loan Party and its obligations, (iii) in connection with the establishment of any special purpose funding vehicle with respect to the Loans, (iv) in connection with any Securitization permitted under Section 10.06(g), and (v) in connection with any actual or proposed credit facility for loans, letters of credit or other extensions of credit to or for the account of Agent or Lender or any of its Affiliates, or any other actual or proposed investment in Agent or Lender or any of its Affiliates, in each case to any Person providing or proposing to provide such loan, letter of credit or other extension of credit or investment or agent, trustee or representative of such Person, or any rating agency; provided, that in the case of this clause (f), the Person to whom Information is so disclosed is advised of and has been directed to comply with the provisions of this Section 10.07, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section, (ii) becomes available to any Credit Party or any of their respective Affiliates on a non-confidential basis from a source other than the Loan Parties or (iii) was independently derived by any Credit Party without the use of the Information.

For purposes of this Section, "Information" means all information received from the Loan Parties or any Subsidiary thereof relating to the Loan Parties or any Subsidiary thereof or their respective businesses, other than any such information that is available to any Credit Party on a non-confidential basis prior to disclosure by the Loan Parties or any Subsidiary thereof. Any Person required to maintain the confidentiality of Information as provided in this Section 10.07 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Notwithstanding the foregoing, (A) each of the Agent, the Lenders and any Affiliate thereof is hereby expressly permitted by the Loan Parties to refer to any Loan Party and any of their respective Subsidiaries in connection with any promotion or marketing undertaken by the Agent, such Lender or Affiliate, including materials relating to the financing transactions contemplated by this Agreement (which may identify the type and amount of the Loans made available hereunder), and, for such purpose, Agent, any Lender or Affiliate may utilize any trade name, trademark, logo or other distinctive symbol associated with such Loan Party or such Subsidiary or any of their businesses and (B) any information that is or becomes generally available to the public (other than as a result of prohibited disclosure by the Agent or such Lender) shall not be subject to the provisions of this Section 10.07. Without limiting the generality of the foregoing, Main Street and its Related Parties may include general, operational and performance information relating to the Loan Parties and their Subsidiaries and the Lenders' investment in compilations and reports assembled by Main Street and its Related Parties used to assist in and validate portfolio, industry and credit research and analysis for Main Street and its Related Parties and to conduct and support fundraising efforts for Main Street and its Related Parties. The Loan Parties understand and acknowledge that Agent and each Lender and one or more of their respective members and affiliates (including Main Street Capital II, LP, Main Street Mezzanine Fund, LP, Main Street Capital Corporation, Main Street Equity Interests, Inc., Main Street Capital Partners, LLC, HMS Income Fund, Inc. and HMS Equity Holding, LLC) will likely have certain regulatory requirements in order to maintain compliance with the rules and regulations of the SEC and certain public disclosure practices which are consistent for publicly traded companies, and as such each Loan Party approves and

consents to the disclosure of the transactions contemplated by this Agreement and the Information for such purposes.

**10.08    Right of Setoff**.  If an Event of Default shall have occurred and be continuing or if any Lender shall have been served with a trustee process or similar attachment relating to property of a Loan Party, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Required Lenders, to the fullest extent permitted by Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) or other property at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any and all of the Obligations now or hereafter existing under this Agreement or any other Loan Document to such Lender, regardless of the adequacy of the Collateral, and irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness; provided, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Agent for further application in accordance with the provisions of Section 2.15(a)(ii) and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender and their respective Affiliates under this Section 10.08 are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have. Each Lender agrees to notify the Borrower and the Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

**10.09    Interest Rate Limitation**.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by Law (the "Maximum Rate"). If the Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans and other Obligations or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by the Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**10.10    Counterparts; Integration; Effectiveness**.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Agent and when the Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopy, pdf or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement.

**10.11    Survival**.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Credit Parties, regardless of any investigation made by any Credit Party or on their behalf and notwithstanding that any Credit Party may have had notice or knowledge of any Default or Event of Default at the time of any Borrowing and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied. Further, the provisions of Sections 3.01, 3.04, 3.05 and 10.04 and Article IX shall survive and remain in full force and effect regardless of the repayment of the Obligations or the termination of the New Money Loan Commitments or the termination of this Agreement or any provision hereof. In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Agent may require such indemnities and collateral security as it shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked, and (y) any Obligations that may thereafter arise under Section 10.04 hereof.

**10.12    Severability**.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 10.12, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

**10.13    Replacement of Lenders**.  If any Lender requests compensation under Section 3.04, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.06), all of its interests, rights (other than its existing rights to payments pursuant to Section 3.01 and 3.04) and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(a)    the Borrower shall have paid to the Agent the assignment fee specified in Section 10.06(b);

(b)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c)    in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter; and

114

(d)      such assignment does not conflict with Applicable Laws; and

(e)      in the case of an assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

**10.14  Governing Law; Jurisdiction; Etc**.

(a)      <u>GOVERNING LAW</u>.    THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET FORTH THEREIN) AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)      <u>SUBMISSION TO JURISDICTION</u>.    EACH LOAN PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO, IN ANY FORUM OTHER THAN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE AND ANY APPELLATE COURT THEREFROM, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH COURTS TO THE FULLEST EXTENT PERMITTED BY LAW.    IN THE EVENT THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE DOES NOT HAVE OR REFUSES TO EXERCISE JURISDICTION, ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THE LOAN DOCUMENTS SHALL BE BROUGHT EXCLUSIVELY IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF.    EACH LOAN PARTY HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)      <u>WAIVER OF VENUE</u>.    EACH LOAN PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN <u>PARAGRAPH (B)</u> OF THIS SECTION. EACH LOAN PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE

FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    SERVICE OF PROCESS.    EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

**10.15   Waiver of Jury Trial**. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**10.16   No Advisory or Fiduciary Responsibility**. In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Credit Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by Law, any claims that it may have against each of the Credit Parties with respect to any breach or alleged breach of agency or fiduciary duty.

**10.17    USA PATRIOT Act Notice**.  Each Lender that is subject to the Patriot Act (as hereinafter defined) and the Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Agent, as applicable, to identify each Loan Party in accordance with the Patriot Act. No part of the proceeds of the New Money Loans will be used by the Loan Parties, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended. The Loan Parties shall, promptly following a request by the Agent or any Lender, provide all documentation and other information that the Agent or such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act.

**10.18    Foreign Asset Control Regulations**.  Neither of the advance of the New Money Loans nor the use of the proceeds of any thereof will violate the Trading with the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading with the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)). Furthermore, neither the Borrower nor its Affiliates (a) will become a "blocked person" as described in the Executive Order, the Trading with the Enemy Act or the Foreign Assets Control Regulations or (b) will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

**10.19    Time of the Essence**.  Time is of the essence of the Loan Documents.

**10.20    Press Releases**.

(a)      Each Credit Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of the Agent, any Lender or their Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to the Agent and the applicable Lender and without the prior written consent of the Agent or such applicable Lender unless (and only to the extent that) such Credit Party or Affiliate is required to do so under Law and then, in any event, such Credit Party or Affiliate will consult with the Agent or such applicable Lender before issuing such press release or other public disclosure.

(b)      Notwithstanding any other provision of this Agreement or the other Loan Documents, each Loan Party consents to the publication by the Agent or any Lender of a tombstone or similar advertising material relating to the financing transactions contemplated by this Agreement, and Agent reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

## 10.21  Additional Waivers.

(a)  The Obligations are the joint and several obligation of each Loan Party. To the extent permitted by Law, the obligations of each Loan Party shall not be affected by (i) the failure of any Credit Party to assert any claim or demand or to enforce or exercise any right or remedy against any other Loan Party under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement or any other Loan Document, (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Agent or any other Credit Party, or (iv) any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or that would otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the indefeasible payment in full in cash of all the Obligations after the termination of the New Money Loan Commitments or express release of a Loan Party from the Guaranty Agreement). The obligations of each Loan Party shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Obligations (other than contingent indemnification claims for which a claim has not been asserted) after the termination of the New Money Loan Commitments), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise.

(b)  To the extent permitted by Law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than the indefeasible payment in full in cash of all the Obligations (other than contingent indemnification claims for which a claim has not been asserted) and the termination of the New Money Loan Commitments. The Agent and the other Credit Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder except to the extent that all of the Obligations (other than contingent indemnification claims for which a claim has not been asserted) have been indefeasibly paid in full in cash and the New Money Loan Commitments have been terminated. Each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party.

(c)  Upon payment by any Loan Party of any Obligations, all rights of such Loan Party against any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior indefeasible payment in full in cash of all of the Obligations (other than contingent indemnification claims for which a claim has not been asserted) and the termination of the New Money Loan Commitments. In addition, any indebtedness of any Loan Party now or hereafter held by any other Loan Party is hereby subordinated in right of payment to the prior indefeasible payment in full of the Obligations (other than contingent indemnification claims for which a claim has not been asserted) and no Loan Party will demand, sue for or otherwise attempt to collect any such indebtedness. If any amount shall erroneously be paid to any Loan Party on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Credit Parties and shall forthwith be paid to the Agent to be

credited against the payment of the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents.

**10.22   No Strict Construction.**  The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

**10.23   Attachments.**  The exhibits, schedules and annexes attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail.

**10.24   Electronic Execution of Assignments and Certain Other Documents.**  The words "execute," "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**10.25   Release**.  In consideration for the Lenders and the Agent entering into this Agreement, each of the Loan Parties, for itself and its successors, assigns, parents, subsidiaries, affiliates, predecessors, employees, agents, heirs and executors, as applicable, hereby fully and unconditionally releases each of the Lenders and the Agent, and each of their respective directors, officers, employees, subsidiaries, affiliates, attorneys, agents, representatives, successors and assigns (collectively, the "Released Parties") from any and all claims, causes of action, costs, losses, or demands of whatever kind or nature, from the beginning of time to the date of this Agreement, whether known or unknown, liquidated or unliquidated, fixed or contingent, asserted or unasserted, foreseen or unforeseen, or matured or unmatured, which any Loan Party may have had against the Released Parties by reason of any act or omission on the part of the Released Parties occurring prior to the date hereof, in each case regarding or relating to the Prepetition Loan Documents. Each of the Loan Parties represents and warrants that (i) it has no knowledge of any such claims by it against the Released Parties and (ii) the foregoing constitutes a full and complete release of all such claims against each of the Released Parties. THE FOREGOING RELEASE EXTENDS TO ALL CLAIMS WHETHER OR NOT CLAIMED OR SUSPECTED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, BY THE LOAN PARTIES AND CONSTITUTES AN EXPRESS WAIVER OF ALL RIGHTS AND BENEFITS CONFERRED UPON THE LOAN PARTIES BY THE PROVISIONS OF SECTION 1542 OF THE CALIFORNIA CIVIL CODE OR ANY SIMILAR PROVISIONS OF APPLICABLE LAW.

**10.26   Acknowledgement and Consent to Bail-In of EEA Financial Institutions**.

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an EEA Financial Institution arising under any Loan Document, to the

extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to. and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an EEA Financial Institution: and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of. such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it. and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

**10.27    Acknowledgments**.  Each Loan Party hereby acknowledges that: (a) it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents; and (b) no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Loan Parties and the Lenders.

**10.28    Managerial Assistance.**    Borrower acknowledges that certain Lenders have offered and continue to offer **to** make available managerial, consulting or other assistance upon Borrower's request.

**10.29    The DIP Orders**. The Loan Parties, the Agent and the Lenders hereby expressly agree that, in the event of any conflict or inconsistency between this Agreement (or any other Loan Document), on the one hand, and any DIP Order, on the other hand, the DIP Order then in effect shall control. Notwithstanding anything to the contrary herein, the provisions of this Agreement are subject to the terms, covenants, conditions and provisions of, the DIP Orders, as applicable. This Agreement is subject in all respects (including with respect to all obligations and agreements of the Loan Parties provided for hereunder) to the terms of the Interim DIP Order (and, when applicable, the Final DIP Order) and, notwithstanding anything in the foregoing, the Loan Parties shall not be required to undertake any obligation, make any agreement or take any action that is prohibited by the terms of the Interim DIP Order (and, when applicable, the Final DIP Order).

*[Remainder of page left intentionally blank; signature pages follow]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS, LLC**, as Borrower

By: _____
Name: Julie Maday
Title:  Chief Financial Officer

**INDEPENDENT PET PARTNERS HOLDINGS, LLC**, as Parent

By: _____
Name: Julie Maday
Title:  Chief Financial Officer

**INDEPENDENT PET PARTNERS
INTERMEDIATE HOLDINGS II, LLC**, as a
Guarantor

By: _____
Name: Julie Maday
Title:  Chief Financial Officer

**INDEPENDENT PET PARTNERS
INTERMEDIATE HOLDINGS I, LLC**, as a
Guarantor

By: _____
Name: Julie Maday
Title:  Chief Financial Officer

**PET LIFE, LLC**, as a Guarantor

By: _____
Name: Julie Maday
Title:  Chief Financial Officer

**IPP-STORES, LLC**, as a Guarantor

By: _____
Name: Julie Maday
Title:  Chief Financial Officer

**ESPECIALLY FOR PETS, LLC**, as a
Guarantor

By: _____
Name: Julie Maday
Title:  Chief Financial Officer

**WHOLE PET CENTRAL, LLC**, as a
Guarantor

By: _____
Name: Julie Maday
Title:  Chief Financial Officer

**NATURAL PAWZ, LLC**, as a Guarantor


By: _____
Name: Julie Maday
Title:  Chief Financial Officer

**PET SOURCE, LLC**, as a Guarantor


By: _____
Name: Julie Maday
Title:  Chief Financial Officer


**INDEPENDENT PET PARTNERS
EMPLOYER, LLC**, as a Guarantor


By: _____
Name: Julie Maday
Title:  Chief Financial Officer

**INDEPENDENT PET PARTNERS
EMPLOYER HOLDINGS, LLC**, as a
Guarantor


By: _____
Name: Julie Maday
Title:  Chief Financial Officer



**IPP STORES EMPLOYER, LLC**, as a
Guarantor

By: _____
Name: Julie Maday
Title:  Chief Financial Officer

**ACQUIOM AGENCY SERVICES LLC**, as
Agent


By: _____
Name:
Title:

**MAIN STREET CAPITAL
CORPORATION**, as a Lender

By: _____
Name:
Title:


**MSC INCOME FUND, INC.**, as a Lender


By: _____
 Name:
 Title:

**NEWSTONE CAPITAL PARTNERS III, L.P.,** as a Lender

**BY:     NEWSTONE PARTNERS III, L.P.,** its General Partner

**BY:     NEWSTONE PARTNERS III, LLC,** its General Partner

By:
Name:
Its:


**NEWSTONE CAPITAL PARTNERS III-A, L.P.,** as a Lender

**BY:     NEWSTONE PARTNERS III, L.P.,** its General Partner

**BY:     NEWSTONE PARTNERS III, LLC,** its General Partner

By:
Name:
Its:


**NEWSTONE CAPITAL PARTNERS III-B, L.P.,** as a Lender

**BY:     NEWSTONE PARTNERS III, L.P.,** its General Partner

**BY:     NEWSTONE PARTNERS III, LLC,** its General Partner

By:
Name:
Its:

**CION INVESTMENT CORPORATION,** as a
Lender

By: _____
Name:
Title:

**:**

{10809021:2 }
29848397

*Final Form*

## EXHIBIT A

## FORM OF COMMITTED LOAN NOTICE

Date: _____, _____

To:    Acquiom Agency Services LLC, as Agent

To the addressees hereof:

Reference is made to the Senior Secured Superpriority Priming Debtor In Possession Credit Agreement, dated as of February 5, 2023 (as amended, modified, supplemented or restated from time to time, the "Credit Agreement"), among INDEPENDENT PET PARTNERS HOLDINGS, LLC, a Delaware limited liability company, as Parent, INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS, LLC, a Delaware limited liability company (the "Borrower"), as borrower, the other Loan Parties from time to time party thereto, the Lenders (as defined therein) from time to time party thereto, and Acquiom Agency Services LLC, as administrative agent and collateral agent for the Lenders. All capitalized terms used herein and not otherwise defined shall have the same meaning herein as in the Credit Agreement.

**1.**    Pursuant to Section 2 of the Credit Agreement, the Borrower hereby requests [a Borrowing][a Conversion of Loans from one Type to another][a continuation of SOFR Loans][1]:

   **(a)**    On _____ (a Business Day)[2]

   **(b)**    In the amount of $_____ [3]

   **(c)**    Comprised of:[4]

           Borrowing of [Base Rate][SOFR] Loans

           Conversion of [Base Rate Loans to SOFR Loans][SOFR Loans to Base Rate Loans]

           Continuation of SOFR Loans

---

[1] Subject to Section 2.03 of the Credit Agreement, Borrowings of more than one Type may be incurred at the same time.

[2] Each Committed Loan Notice must be received by the Agent not later than 12:00 noon (i), five (5) Business Days prior to the requested date of any Conversion to or continuation of SOFR Loans or of any Conversion of SOFR Loans to Base Rate Loans, (ii) three (3) Business Days (or such shorter period of time as consented to by the Required Lenders and the Agent) prior to the anticipated Borrowing Date of SOFR Loans, and (iii) five (5) Business Days prior to the requested date of any Borrowing of Base Rate Loans.

[3] Each Borrowing of, Conversion of, or continuation of SOFR Loans must be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof. Each Borrowing of or conversion to Base Rate Loans must be in a principal amount of $250,000 or a whole multiple of $50,000 in excess thereof.

[4] Loans may be either Base Rate Loans or SOFR Loans. If the Type of Loan is not specified or timely notice requesting a Conversion or continuation is not given, then the applicable Loans will be made as Base Rate Loans.

**(d)**    For an Interest Period of one month.[5]

**(e)**    [The wiring information of the account of the Borrower to which funds are to be disbursed is:

|                   |              |
|-------------------|--------------|
| Bank Name:        | [_____] |
| Address:          | [_____] |
| ABA Number:       | [_____] |
| Account Number:   | [_____] |
| Account Name:     | [_____] |

**2.**    The Borrower hereby represents and warrants that the Borrowing requested herein complies with <u>Section 2.03</u> and the other provisions of the Credit Agreement.

[Signature page follows]

---

[5] For SOFR Loans.

Dated as of the date above first written.

**INDEPENDENT PET PARTNERS
INTERMEDIATE HOLDINGS, LLC**,
as Borrower

By: _____
Name: _____
Title: _____

**EXHIBIT B**

**FORM OF LOAN NOTE**

*LOAN NOTE*

$ _____ (the "<u>Principal Amount</u>")               _____, ____

      FOR **VALUE RECEIVED**, the Borrower (as defined below) jointly and severally promises to pay _____ (hereinafter, with any subsequent holders, the "<u>Lender</u>"), the principal sum of _____ ($_____), or, if less, the aggregate unpaid principal balance of Loans made by the Lender to or for the account of the Borrower pursuant to the Senior Secured Superpriority Priming Debtor In Possession Credit Agreement, dated as of February 5, 2023 (as amended, modified, supplemented or restated from time to time, the "<u>Credit Agreement</u>"), among INDEPENDENT PET PARTNERS HOLDINGS, LLC, a Delaware limited liability company, as Parent, INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS, LLC, a Delaware limited liability company (the "<u>Borrower</u>"), as borrower, the other Loan Parties from time to time party thereto, the Lenders (as defined therein) from time to time party thereto, and Acquiom Agency Services LLC, as Agent, with interest at the rate and payable in the manner stated therein.

      This is a "Loan Note" to which reference is made in the Credit Agreement and is subject to all terms and provisions thereof. The principal of, and interest on, this Loan Note shall be payable to Acquiom Agency Services LLC as administrative agent for the Lender at the times, in the manner and in the amounts as provided for in the Credit Agreement and shall be subject to prepayment and acceleration as provided for therein. Capitalized terms used and not defined herein shall have the meanings assigned to such terms in the Credit Agreement.

      The Agent's books and records concerning the Loans, the accrual of interest thereon, and the repayment or prepayment of such Loans, shall be prima facie evidence of the indebtedness to the Lender hereunder. The Credit Agreement provides for, among other things, (a) the making of Loans by the Lender to the Borrower in an aggregate amount not to exceed at any time outstanding the Principal Amount set forth above, the indebtedness of the Borrower resulting from such Loans being evidenced by this Loan Note, (b) acceleration of the maturity of the unpaid principal amount of this Loan Note upon the occurrence of certain stated events and (c) for prepayments on account of the Principal Amount hereof prior to the maturity thereof upon the terms and conditions specified therein.

      No delay or omission by the Agent or the Lender in exercising or enforcing any of the Agent's or the Lender's powers, rights, privileges, remedies or discretions hereunder shall operate as a waiver thereof on that occasion nor on any other occasion. No waiver of any Event of Default shall operate as a waiver of any other Event of Default, nor as a continuing waiver of any such Event of Default.

The Borrower, for itself, together with its successors and assigns, waives presentment, demand, notice, and protest, and also waives any delay on the part of the holder hereof. The Borrower assents to any extension or other indulgence (including, without limitation, the release or substitution of Collateral) permitted by the Agent and/or the Lender with respect to this Loan Note and/or any Collateral or any extension or other indulgence with respect to any other liability or any collateral given to secure any other liability of the Borrower or any other Person obligated on account of this Loan Note.

This Loan Note shall be binding upon the Borrower and its respective successors, assigns, and representatives, and shall inure to the benefit of the Lender and its successors and assigns.

THIS LOAN NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THEREOF.

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF**, the Borrower has caused this Loan Note to be duly executed as of the date set forth above.

**BORROWER:**

**INDEPENDENT PET PARTNERS
INTERMEDIATE HOLDINGS, LLC**

By: _____
Name: _____
Title: _____

## EXHIBIT C

## FORM OF ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (this "<u>Assignment and Assumption</u>") is dated as of the Effective Date set forth below and is entered into by and between [the][each][6] Assignor identified in item 1 below ([the][each, an] "<u>Assignor</u>") and [the][each][7] Assignee identified in item 2 below ([the][each, an] "<u>Assignee</u>"). [It is understood and agreed that the rights and obligations of [the Assignors][the Assignees][8] hereunder are several and not joint.][9] Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (the "<u>Credit Agreement</u>"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the Assignee][the respective Assignees], and [the][each] Assignee hereby irrevocably purchases and assumes from [the Assignor][the respective Assignors], subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Agent as contemplated below (i) all of [the Assignor's][the respective Assignors'] rights and obligations in [its capacity as a Lender][their respective capacities as Lenders] under the Credit Agreement and the other Loan Documents to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of [the Assignor][the respective Assignors] under the respective facilities identified below and (ii) to the extent permitted to be assigned under Applicable Laws, all claims, suits, causes of action and any other right of [the Assignor (in its capacity as a Lender)][the respective Assignors (in their respective capacities as Lenders)] against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other Loan Documents or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by [the][any] Assignor to [the][any] Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as [the][an] "<u>Assigned Interest</u>"). Each such sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by [the][any] Assignor.

---

[6] For bracketed language here and elsewhere in this form relating to the Assignor(s), if the assignment is from a single Assignor, choose the first bracketed language. If the assignment is from multiple Assignors, choose the second bracketed language.

[7] For bracketed language here and elsewhere in this form relating to the Assignee(s), if the assignment is to a single Assignee, choose the first bracketed language. If the assignment is to multiple Assignees, choose the second bracketed language.

[8] Select as appropriate.

[9] Include bracketed language if there are either multiple Assignors or multiple Assignees.

1.    Assignor[s]    _____

_____

2.    Assignee[s]    _____

_____

[for each Assignee, indicate if [Affiliate][Approved Fund] of [*identify Lender*]]

3.    <u>Borrower</u>: Independent Pet Partners Intermediate Holdings, LLC, a Delaware limited liability company.

4.    <u>Agent</u>: Acquiom Agency Services LLC, as administrative agent and collateral agent for the Lenders.

5.    <u>Credit Agreement</u>: Senior Secured Superpriority Priming Debtor In Possession Credit Agreement, dated as February 5, 2023 (as amended, modified, supplemented or restated from time to time), among INDEPENDENT PET PARTNERS HOLDINGS, LLC, a Delaware limited liability company, as Parent, the Borrower, the other Loan Parties from time to time party thereto, the Lenders (as defined therein) from time to time party thereto, and the Agent.

6.    <u>Assigned Interest[s]</u>:

| Assignor[s][10] | Assignee[s][11] | Amount of Assignor's Loans[12] | Amount of Loans Assigned[13] | Percentage of Assignor's Loans[14] | Resulting Loans of Assignor | Resulting Loans of Assignee |
|---|---|---|---|---|---|---|
| | | $_____ | $_____ | ____% | $_____ | ____% |
| | | $_____ | $_____ | ____% | $_____ | ____% |
| | | $_____ | $_____ | ____% | $_____ | ____% |
| | | $_____ | $_____ | ____% | $_____ | ____% |

---

[10] List each Assignor, as appropriate.

[11] List each Assignee, as appropriate.

[12] Amounts in this column and in the column immediately to the right to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.

[13] Subject to minimum amount requirements pursuant to <u>Section 10.06(b)(i)</u> of the Credit Agreement and subject to proportionate amount requirements pursuant to <u>Section 10.06(b)(ii)</u> of the Credit Agreement.

[14] Set forth, to at least 9 decimals, as a percentage of the Loans of all Lenders thereunder.

2

| Assignor[s][15] | Assignee[s][16] | Amount of Assignor's Loans Commitments[17] | Amount of Loans Commitment Assigned[18] | Percentage of Assignor's Loans Commitments[19] | Resulting Loans Commitments of Assignor | Resulting Loans Commitments of Assignee |
|---|---|---|---|---|---|---|
| | | $_____ | $_____ | ____% | $_____ | _____% |
| | | $_____ | $_____ | ____% | $_____ | _____% |
| | | $_____ | $_____ | ____% | $_____ | _____% |
| | | $_____ | $_____ | ____% | $_____ | _____% |

[8.    Trade Date: _____][20]

Effective Date: _____, 20__ [TO BE INSERTED BY THE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

---

[15] List each Assignor, as appropriate.

[16] List each Assignee, as appropriate.

[17] Amounts in this column and in the column immediately to the right to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.

[18] Subject to minimum amount requirements pursuant to Section 10.06(b)(i) of the Credit Agreement and subject to proportionate amount requirements pursuant to Section 10.06(b)(ii) of the Credit Agreement.

[19] Set forth, to at least 9 decimals, as a percentage of the Loan Commitments of all Lenders thereunder.

[20] To be completed if the Assignor and the Assignee intend that the minimum assignment amount is to be determined as of the Trade Date.

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR
[NAME OF ASSIGNOR]


By: _____
Name: _____
Title: _____



ASSIGNEE
[NAME OF ASSIGNEE]


By: _____
Name: _____
Title: _____



[Consented to and][21] Accepted:

ACQUIOM AGENCY SERVICES LLC, as Agent



By: _____
Name: _____
Title: _____



[                    ], as Lender[22]



By: _____
Name: _____
Title: _____

---

[21] To the extent that the Agent's consent is required under Sections 10.06(b)(i)(B) or 10.06(b)(iii) of the Credit Agreement.

[22] To the extent that the Required Lenders' consent is required under Sections 10.06(b)(i)(B) or 10.06(b)(iii) of the Credit Agreement.

[Consented to:][23]

INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS,
LLC, as Borrower


By: _____
Name: _____
Title: _____

---

[23] To the extent required under Section 10.06(b)(i)(B) of the Credit Agreement.

### *ANNEX 1 TO ASSIGNMENT AND ASSUMPTION*

Reference is made to made to the Senior Secured Superpriority Priming Debtor In Possession Credit Agreement entered into as of February 5, 2023 (as amended, modified, supplemented or restated from time to time, the "Credit Agreement"), among INDEPENDENT PET PARTNERS HOLDINGS, LLC, a Delaware limited liability company, as Parent, INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS, LLC, a Delaware limited liability company (the "<u>Borrower</u>"), as borrower, the other Loan Parties from time to time party thereto, the Lenders (as defined therein) from time to time party hereto, and Acquiom Agency Services LLC, as administrative agent and collateral agent for the Lenders (the "<u>Agent</u>").

### STANDARD TERMS AND CONDITIONS FOR
### ASSIGNMENT AND ASSUMPTION

1.    <u>Representations and Warranties</u>.

1.1.    <u>Assignor</u>. [The][Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the][[the relevant] Assigned Interest, (ii) [the][such] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Loan Parties or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Loan Parties or any other Person of any of their respective obligations under any Loan Document.

1.2.    <u>Assignee</u>. [The][Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all the requirements to be an Eligible Assignee under the Credit Agreement (subject to such consents, if any, as may be required under <u>Section 10.06(b)</u> of the Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of [the][the relevant] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by [the][such] Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire [the][such] Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, (vi) it has, independently and without reliance upon the Agent or any Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, (vii) if it is a Foreign Lender, attached hereto is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by [the][such] Assignee, and (viii) it is not any Person listed in <u>Section 10.06(b)(v)</u> of the Credit

Agreement; and (b) agrees that (i) it will, independently and without reliance upon the Agent, [the][any] Assignor or any Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.    <u>Payments</u>. From and after the Effective Date, the Agent shall make all payments in respect of [the][each] Assigned Interest (including payments of principal, interest, fees and other amounts) to [the][the relevant] Assignor for amounts which have accrued up to but excluding the Effective Date and to [the][the relevant] Assignee for amounts which have accrued from and after the Effective Date. Notwithstanding the foregoing, the Agent shall make all payments of interest, fees or other amounts paid or payable in kind from and after the Effective Date to the Assignee.

3.    <u>General Provisions</u>. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

4.    <u>Fees</u>. Unless waived by the Agent in accordance with <u>Section 10.06(b)(iv)</u> of the Credit Agreement, this Assignment and Assumption shall be delivered to the Agent with a processing and recordation fee of $3,500.

5.    <u>Delivery</u>. If the Assignee is not a Lender, the Assignee shall deliver to the Agent an Administrative Questionnaire.

**EXHIBIT D-1**

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**

**(For Foreign Lenders That Are Not Treated as Partnerships or Other Pass Through Entities for U.S. Federal Income Tax Purposes)**

Reference is made to the Senior Secured Superpriority Priming Debtor In Possession Credit Agreement, dated as of February 5, 2023 (as amended, modified, supplemented or restated from time to time, the "Credit Agreement"), among INDEPENDENT PET PARTNERS HOLDINGS, LLC, a Delaware limited liability company, as Parent, INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS, LLC, a Delaware limited liability company (the "Borrower"), as borrower, the other Loan Parties from time to time party thereto, the Lenders (as defined therein) from time to time party thereto, and Acquiom Agency Services LLC, as administrative agent and collateral agent for the Lenders. All capitalized terms used herein and not otherwise defined shall have the same meaning herein as in the Credit Agreement.

Pursuant to the provisions of Section 3.01(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Loan Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Agent in writing, and (2) the undersigned shall have at all times furnished the Borrower and the Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]

By: _____

Name: _____

Title: _____

Date: _____, 20[__]

1

**EXHIBIT D-2**

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**

**(For Foreign Participants That Are Not Treated as Partnerships or Other Pass Through Entities for U.S. Federal Income Tax Purposes)**

Reference is made to the Senior Secured Superpriority Priming Debtor In Possession Credit Agreement, dated as of February 5, 2023 (as amended, modified, supplemented or restated from time to time, the "Credit Agreement"), among INDEPENDENT PET PARTNERS HOLDINGS, LLC, a Delaware limited liability company, as Parent, INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS, LLC, a Delaware limited liability company (the "Borrower"), as borrower, the other Loan Parties from time to time party thereto, the Lenders (as defined therein) from time to time party thereto, and Acquiom Agency Services LLC, as administrative agent and collateral agent for the Lenders. All capitalized terms used herein and not otherwise defined shall have the same meaning herein as in the Credit Agreement.

Pursuant to the provisions of Section 3.01(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]

By: _____

Name: _____

Title: _____

Date: _____, 20[__]

**EXHIBIT D-3**

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**

**(For Foreign Participants That Are Treated as Partnerships or Other Pass Through Entities for U.S. Federal Income Tax Purposes)**

Reference is made to the Senior Secured Superpriority Priming Debtor In Possession Credit Agreement, dated as of February 5, 2023 (as amended, modified, supplemented or restated from time to time, the "Credit Agreement"), among INDEPENDENT PET PARTNERS HOLDINGS, LLC, a Delaware limited liability company, as Parent, INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS, LLC, a Delaware limited liability company (the "Borrower"), as borrower, the other Loan Parties from time to time party thereto, the Lenders (as defined therein) from time to time party thereto, and Acquiom Agency Services LLC, as administrative agent and collateral agent for the Lenders. All capitalized terms used herein and not otherwise defined shall have the same meaning herein as in the Credit Agreement.

Pursuant to the provisions of Section 3.01(e) of the Credit Agreement, the undersigned hereby certifies (with respect to its direct or indirect partners/members that are claiming the portfolio interest exemption) that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect to such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code and (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]

By: _____

Name: _____

Title: _____

Date: _____, 20[__]

**EXHIBIT D-4**

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**

**(For Foreign Lenders That Are Treated as Partnerships or Other Pass Through Entities for U.S. Federal Income Tax Purposes)**

Reference is made to the Senior Secured Superpriority Priming Debtor In Possession Credit Agreement, dated as of February 5, 2023 (as amended, modified, supplemented or restated from time to time, the "Credit Agreement"), among INDEPENDENT PET PARTNERS HOLDINGS, LLC, a Delaware limited liability company, as Parent, INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS, LLC, a Delaware limited liability company (the "Borrower"), as borrower, the other Loan Parties from time to time party thereto, the Lenders (as defined therein) from time to time party thereto, and Acquiom Agency Services LLC, as administrative agent and collateral agent for the Lenders. All capitalized terms used herein and not otherwise defined shall have the same meaning herein as in the Credit Agreement.

Pursuant to the provisions of Section 3.01(e) of the Credit Agreement, the undersigned hereby certifies (with respect to its direct or indirect partners/members that are claiming the portfolio interest exemption) that (i) it is the sole record owner of the Loan(s) (as well as any Loan Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Loan Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to the Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code and (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]

By: _____

Name: _____

29881676

Title: _____

Date: _____, 20[__]

## **Exhibit B**

**Initial Budget**

IPP
DIP Budget
$ in M

| Month / Year | Petition Feb-23 PROJ | Feb-23 PROJ | Feb-23 PROJ | Feb-23 PROJ | Mar-23 PROJ | Mar-23 PROJ | Mar-23 PROJ | Mar-23 PROJ | Sale Close Mar-23 PROJ | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Actual / Projection | | | | | | | | | | |
| Week Ending | 4-Feb | 11-Feb | 18-Feb | 25-Feb | 4-Mar | 11-Mar | 18-Mar | 25-Mar | 1-Apr | 9 Weeks |
| 1.) Cash Receipts | 4.6 | 6.9 | 5.4 | 4.5 | 3.2 | 2.7 | 1.7 | 2.6 | 2.7 | 34.3 |
| **Operating Disbursements** | | | | | | | | | | |
| 2.) Payroll | (2.0) | (0.0) | (1.9) | 0.0 | (1.8) | 0.0 | (1.1) | (0.0) | (0.9) | (7.8) |
| 3.) Rent & Occupancy | (1.4) | (0.4) | (0.1) | (0.1) | (0.6) | (0.2) | (0.0) | (0.0) | - | (2.8) |
| 4.) Merchandise and Operating Disbursements | (3.6) | (0.1) | (0.1) | (0.1) | (0.1) | (0.3) | (2.1) | (2.3) | (1.6) | (10.0) |
| 5.) **Subtotal** | **(7.0)** | **(0.5)** | **(2.1)** | **(0.1)** | **(2.5)** | **(0.5)** | **(3.2)** | **(2.4)** | **(2.5)** | **(20.6)** |
| **Non-Operating Disbursements** | | | | | | | | | | |
| 6.) CapEx | - | - | (0.1) | (0.1) | (0.1) | (0.1) | - | - | - | (0.2) |
| 7.) **Subtotal** | **-** | **-** | **(0.1)** | **(0.1)** | **(0.1)** | **(0.1)** | **-** | **-** | **-** | **(0.2)** |
| **Restructuring Expense** | | | | | | | | | | |
| 8.) Professional Fees | (0.8) | (1.0) | (0.4) | (0.3) | (0.5) | (0.9) | (0.3) | (0.3) | (2.7) | (7.1) |
| 9.) Critical Vendor Relief | - | (2.5) | (3.0) | (2.9) | (2.5) | (1.3) | - | - | - | (12.4) |
| 10.) KERP | (0.8) | - | - | - | - | - | - | - | - | (0.8) |
| 11.) Utility Deposit | - | (0.2) | - | - | - | - | - | - | 0.2 | - |
| 12.) DIP Interest and Fees | - | (0.3) | - | - | - | (0.2) | - | - | - | (0.5) |
| 13.) Severance & Accrued PTO | (1.0) | (0.0) | (0.0) | (0.2) | (0.0) | (0.0) | (0.0) | (0.0) | (0.2) | (1.4) |
| 14.) D&O Insurance | (0.2) | - | - | - | - | - | - | - | - | (0.2) |
| 15.) Other Restructuring Expenses | (0.2) | (0.2) | (0.2) | (0.1) | - | - | - | - | - | (0.7) |
| 16.) Purchased Assets (Cash) | - | - | - | - | - | - | - | - | (4.8) | (4.8) |
| 17.) **Subtotal** | **(3.0)** | **(4.1)** | **(3.6)** | **(3.5)** | **(3.0)** | **(2.4)** | **(0.4)** | **(0.3)** | **(7.6)** | **(27.9)** |
| 18.) **Net Cash Flow Prior to Financing** | **(5.3)** | **2.3** | **(0.3)** | **0.8** | **(2.4)** | **(0.2)** | **(1.9)** | **0.0** | **(7.4)** | **(14.4)** |
| 19.) Beginning Cash | 6.8 | 1.5 | 9.1 | 8.7 | 9.6 | 7.2 | 11.2 | 9.3 | 9.4 | 6.8 |
| 20.) Net Cash Flow | (5.3) | 2.3 | (0.3) | 0.8 | (2.4) | (0.2) | (1.9) | 0.0 | (7.4) | (14.4) |
| 21.) Principal Borrowings / (Paydown) | - | 5.3 | - | - | - | 4.3 | - | - | - | 9.6 |
| 22.) **Ending Cash** | **1.5** | **9.1** | **8.7** | **9.6** | **7.2** | **11.2** | **9.3** | **9.4** | **2.0** | **2.0** |

DRAFT – PRIVILEGED AND CONFIDENTIAL
SUBJECT TO MATERIAL CHANGE