## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| INDEPENDENT PET PARTNERS | ) |
| HOLDINGS, LLC, *et al.*,[1] | ) Case No. 23-10153 (LSS) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**MOTION OF DEBTORS FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING PROCEDURES FOR SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS, (B) APPROVING STALKING HORSE EXPENSE REIMBURSEMENT, (C) SCHEDULING AUCTION  AND HEARING TO APPROVE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (D) APPROVING FORM AND MANNER OF NOTICES OF SALE, AUCTION AND SALE HEARING, (E) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (F) GRANTING RELATED RELIEF; AND (II)(A) APPROVING SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (B) APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the  "Debtors") hereby submit this motion (the "Motion") for entry of an order, substantially in the form attached hereto as Exhibit A (the "Bidding Procedures Order"), pursuant to sections 105, 363, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"): (i)(a) authorizing and approving certain bidding procedures for the Sale attached hereto as Exhibit 1 (collectively, the "Bidding Procedures");

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Independent Pet Partners Holdings, LLC (5913), Independent Pet Partners Intermediate Holdings I, LLC (4827), Independent Pet Partners Intermediate Holdings II, LLC (7550), Independent Pet Partners Employer Holdings, LLC (6785), Independent Pet Partners Employer, LLC (7531), Independent Pet Partners Intermediate Holdings, LLC (8793), IPP - Stores, LLC (6147), IPP Stores Employer, LLC (0847), Especially For Pets, LLC (6801), Pet Life, LLC (3420), Whole Pet Central, LLC (7833), Natural Pawz, LLC (5615), and Pet Source, LLC (1905). The corporate headquarters and the mailing address for the Debtors is 8450 City Centre Dr., Woodbury, MN 55125.

(b) approving the Expense Reimbursement (as defined herein) provided by the Debtors to the Stalking Horse Purchaser in accordance with the terms and conditions set forth in the Stalking Horse APA and the Bidding Procedures; (c) scheduling a hearing (the "Sale Hearing") on approval of the proposed sale (the "Sale") of all or substantially all of the Debtors' assets (the "Assets"), free and clear of all Encumbrances other than Assumed Liabilities and Permitted Liens to IPP Buyer Acquisition, LLC (the "Stalking Horse Purchaser") or, in the event the Stalking Horse Purchaser is not the Winning Bidder (as defined herein), then to the Winning Bidder, and authorizing the assumption and assignment of certain executory contracts and unexpired leases (each executory contract and unexpired lease that is assumed and assigned, a "Purchased Contract," and collectively, the "Purchased Contracts") in connection therewith; (d) approving the form and manner of notices of sale, auction and sale hearing; (e) authorizing and approving certain assumption and assignment procedures for the Purchased Contracts provided for herein (collectively, the "Assumption and Assignment Procedures") and notice thereof; and (f) granting related relief; and (ii)(a) authorizing and approving the Debtors' entry into the Asset Purchase Agreement dated as of February 5, 2023, substantially in the form attached to the Motion as Exhibit B (the "Stalking Horse APA") with the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Winning Bidder, then an Alternative APA with the Winning Bidder and approving the Sale, free and clear of all liens (as defined in section 101(37) of the Bankruptcy Code), encumbrances, claims (as defined in section 101(5) of the Bankruptcy Code), charges, mortgages, deeds of trust, options, pledges, security interests or similar interests, title defects, hypothecations, easements, rights of way, rights of use, encroachments, judgments, rights of setoff, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use ("Encumbrances") other than Assumed Liabilities and Permitted Liens and entering an order with respect thereto (the "Sale Order"); (b) authorizing

and approving the assumption and assignment of the Purchased Contracts in connection therewith; and (c) granting related relief. In support of this Motion, the Debtors rely on and incorporate by reference *Declaration of Stephen Coulombe in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), [Docket No. 2].[2] In further support of this Motion, the Debtors state as follows:

## Jurisdiction and Venue

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over these chapter 11 cases (the "Chapter 11 Cases"), the Debtors and their estates and this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final order with respect to this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.      Venue of these Chapter 11 Cases in this District is proper under 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested in this Motion are 105, 363, 365, 503, and 507 of title 11 of the Bankruptcy Code, Rules 2002, 6004, and 6006 of the Bankruptcy Rules, and Rule 6004-1 of the Local Rules.

## Background

---

[2]      Capitalized terms used but not defined herein shall have the meaning ascribed to them in the First Day Declaration or the Stalking Horse APA, as applicable.

5.      On February 5, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the Debtors, their businesses, and the facts and circumstances supporting the Debtors' Chapter 11 Cases are set forth in greater detail in the First Day Declaration.

6.      The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  To date, no trustee or examiner or statutory committee has been appointed in these Chapter 11 Cases.

## Relief Requested

7.      By this Motion, pursuant to sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rule 6004-1, the Debtors request entry of the following:

(a)      the Bidding Procedures Order:

   i.      authorizing and approving the Bidding Procedures in connection with the Sale;

   ii.     approving the Expense Reimbursement for the Stalking Horse Purchaser in accordance with the terms and conditions set forth in the Stalking Horse APA;

   iii.    scheduling various dates in connection with the Sale process at set forth in paragraph 21 hereof;

   iv.     schedule, subject to the Court's availability, a Sale Hearing for **March 24, 2023**; and

   v.      authorizing and approving the (i) notice of the Sale, the Bid Deadline (as defined herein), the Auction, and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as Exhibit 2 thereto (the "Sale Notice"), and (ii) notice to each relevant counterparty (each, a "Counterparty," and collectively, the "Counterparties") to any executory contracts and unexpired leases that may be assumed and assigned (a "Potential Purchased Contract") and the cure amount, if any, that the Debtors believe is required to be paid to the applicable Counterparty under section 365(b)(1)(A) & (B) of the Bankruptcy Code

for each of the Potential Purchased Contracts (the "<u>Cure Amounts</u>"), substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 3</u> thereto (the "<u>Assumption Notice</u>");

vi.   authorizing and approving procedures for the assumption and assignment of Potential Purchased Contracts and the determination of Cure Amounts with respect thereto (collectively, the "<u>Assumption and Assignment Procedures</u>"); and

(b)   the Sale Order:

i.   authorizing and approving the Sale of the Assets to the Winning Bidder free and clear of liens, claims, interests and Encumbrances, except certain Assumed Liabilities and Permitted Liens as determined by the Debtors and the Winning Bidder;

ii.   authorizing and approving the assumption and assignment of certain Purchased Contracts in connection with the proposed Sale; and

iii.   granting related relief, including the relief set forth in paragraph 60 hereof.

## <u>Pre-Petition Marketing and Sale Process</u>

8.   As discussed in detail in the First Day Declaration, the Debtors retained Houlihan Lokey, Inc. ("<u>Houlihan</u>") in September 2022 as the Debtors' financial advisor and investment banker to assist with strategic alternatives. The Debtors, with Houlihan's assistance, evaluated options to improve the Debtors' liquidity and financial position, including lease concessions and deferrals, reductions of operating and capital expenditures, raising additional capital, and restructuring their funded debt and other liabilities.

9.   Houlihan also engaged in a prepetition marketing process with potential strategic and financial buyers to solicit interest in the company. Houlihan contacted over 100 potential acquirers (collectively, the "<u>Interested Parties</u>") and sent teasers and non-disclosure agreements to each of the parties. Sixty-five Interested Parties executed non-disclosure agreements and had access to an electronic data room, and also were invited to submit initial, non-binding letters of intent. Despite a thorough prepetition marketing process spanning approximately three (3) months,

the Debtors did not receive offers for the business that would repay a meaningful portion of the Debtors' funded debt obligations or that the Debtors' prepetition lenders otherwise would accept in satisfaction of their claims.  The Debtors are not aware of any parties outside of the Interested Parties contacted by Houlihan who would have the interest or ability to purchase the Debtors' business as a going concern.

10.    Thereafter, in consultation with their financial and legal advisors and the Prepetition Lender Group (as defined herein), the Debtors identified immediate steps to consolidate their store footprint and create a more sustainable and profitable enterprise.  More specifically, the Debtors decided to sell 66 of their better performing stores in Colorado, Minnesota, Illinois, Wisconsin, and Kansas under the Kriser's and Chuck and Don's banners (collectively, the "Go-Forward Stores"), and certain of the Debtors' assets required to run the Go-Forward Stores, including, among other things, the Go-Forward Stores' leases, inventory, accounts receivable, intellectual property, customer programs, and tangible personal property (collectively with the Go-Forward Stores, the "Go-Forward Business"), as a going concern through a section 363 sales process.  These discussions culminated in a stalking horse bid consisting of (a) a credit bid under section 363(k) of the Bankruptcy Code of $60,000,000 of DIP Obligations and Prepetition Secured Obligations (as defined in the DIP Order) by IPP Buyer Acquisition, LLC, formed and designated by Main Street Capital Corporation, Newstone Capital Partners, and CION Investment Corporation, or funds manage or controlled by such entities (collectively, the "Prepetition Lender Group"), and (b) certain Assumed Liabilities (collectively, the "Purchase Price") for the Go-Forward Business.

11.    The Debtors believe that completing the Sale of the Go-Forward Business through chapter 11 and on an expedited basis will provide the best chance of success for the business and its stakeholders.  The Debtors operate in a highly competitive industry where consumers have

numerous brick & mortar and e-commerce alternatives.  The success of the Debtors' operations depends on customer loyalty to the Debtors' high-quality offerings that sets them apart from the pet product giants.  Maintenance of such loyalty requires minimal disruption, especially at the Debtors' physical stores, which must be well stocked, clean and well-maintained, with sufficient employees to provide exceptional service to customers.  A long, drawn-out Sale process creates a risk of suppler disruptions and employee attrition, threatening the Debtors' access to product and ability to provide adequate customer service.  On the other hand, an expedited Sale process for the Go-Forward Business will reassure the Debtors' customer and supplier base, to the benefit all stakeholders.

12.    On February 5, 2023, the Debtors' Board authorized the Debtors to enter into the asset purchase agreement dated February 5, 2023 (the "Stalking Horse APA") between the Debtors and the Stalking Horse Purchaser, under which (as set forth more fully in, and subject to the terms and conditions of, the Stalking Horse APA) the Stalking Horse Purchaser agreed to purchase the Assets for the Purchase Price, subject to higher and better offers.

13.    The Stalking Horse APA also includes various customary representations, warranties, and covenants by the Debtors and the Stalking Horse Purchaser, and certain conditions to closing and rights of termination related to the Sale and the Chapter 11 Cases generally. Additionally, the Stalking Horse Agreement will provide the Stalking Horse Purchaser with an Expense Reimbursement if the Stalking Horse Purchaser ultimately is not the successful purchaser of the Debtors' assets.  Although break-up fees are often included in customary bid protections in connection with 363 sales, the Stalking Horse Purchaser has not requested, and the Stalking Horse APA does not provide for, a break-up fee.

14.    As the Debtors move forward with implementing the procedures outlined in this Motion, the Debtors will continue to market and solicit offers for the Assets to a wide range of

potential purchasers and will work diligently with all parties that have expressed an interest in the Debtors' Assets.  In this way, the Debtors intend to maximize the number of participants in the Sale process.[3]

### Need for an Expedited Sale Process

15.    The Debtors believe that the auction process and time periods set forth in the Bidding Procedures are reasonable and will provide parties with sufficient time and information necessary to formulate a bid to purchase the Assets.  Moreover, the Prepetition Lender Group shares the Debtors' concerns regarding potential damage to the Debtors' businesses from a protracted process discussed above, and the proposed Sale timeline is the product of consensus between the Debtors and the Prepetition Lender Group reached through arms' length, good faith negotiations.  Accordingly, the Prepetition Lender Group conditioned the agreement of the group's designee— the Stalking Horse Purchaser—to purchase the Assets, and the Prepetition Lender Group's agreement to provide the DIP Loan to continue to fund the Debtors' ongoing operations, on the completion of an expedited Sale process.  Given that the Debtors recently performed an extensive prepetition marketing process that targeted the universe of potential interested parties, the proposed timeline is more than sufficient to engage with and promote active bidding by interested parties, thereby completing a fair and open Sale process that will maximize the value received for the Assets.

### Stalking Horse Expense Reimbursement

16.    By this Motion, the Debtors request authority to, among other things, provide the Stalking Horse Purchaser with reimbursement of the Stalking Horse Purchaser's expenses incurred in  connection  with  the  Stalking  Horse  APA  in  an  amount  of  up  to  $750,000

---

[3] The Debtors have filed a motion seeking approval of certain going-out-of-business sale procedures at certain of the Debtors' stores where liquidation sales commenced prepetition. While these stores are not included in the Go-Forward Business, Houlihan has and will continue to market those stores to potential buyers either on a piecemeal basis or with the Go-Forward Business, until the leases for such stores are rejected.

(the "Expense Reimbursement"). The Expense Reimbursement, which is a mere 1.25% of the Purchase Price (not including substantial Assumed Liabilities), is well below the high end of the range of bid protections often allowed in 363 sale processes in this District, and is reasonable in light of, among other things, the Stalking Horse Purchaser's considerable efforts in setting a floor for the auction of the Assets.

17.    In addition, the Bidding Procedures and the Stalking Horse APA provide for an initial overbid amount of cash consideration equal to or exceeding the sum of (i) the aggregate dollar amount of the Credit Bid, (ii) the dollar amount equal to the Excluded Cash under the Stalking Horse APA, (iv) $750,000 for the Expense Reimbursement, and (v) $250,000 (the "Minimum Bid Amount").

### Summary of Stalking Horse Bid

18.    The chart below summarizes the terms of the Stalking Horse APA:[4]

| MATERIAL TERMS OF THE STALKING HORSE APA | |
|---|---|
| Purchased Assets/Excluded Assets | Purchased Assets:<br><br>All of the direct or indirect right, title and interest of Sellers in and to the tangible and intangible assets, properties, rights, claims and Contracts used, useful, or held for use in, or related to, the Business (but excluding Excluded Assets) as of the Closing, including:<br><br>(a) all Accounts Receivable of Sellers, including all Credit Card Receivables and Financing Company Receivables, as of the Closing;<br><br>(b) all Inventory of Sellers as of the Closing, including all rights of Sellers to receive such Inventory, supplies and materials which are on order as of the Closing;<br><br>(c) all deposits (including deposits in transit, customer deposits (the "Customer Deposits") and security deposits for rent, electricity, telephone, utilities or otherwise) and other prepaid |

---

[4] To the extent that there is any inconsistency between the terms of the Stalking Horse APA and the summary of such terms in this Motion, the terms of the Stalking Horse APA shall control. Capitalized terms used but not otherwise defined in this summary shall have the meanings ascribed to such terms in the Stalking Horse APA.

| **MATERIAL TERMS OF THE STALKING HORSE APA** |
| --- |

charges and expenses, credits, advance payments, charges and fees of Sellers;

(d) all Assumed Contracts that have been assumed by and assigned to Buyer pursuant to Section 2.6 of the Stalking Horse APA;

(e) all Intellectual Property owned, or purported to be owned, in whole or in part, by Sellers;

(f) all customer data and information derived from customer purchase files and branded loyalty promotion programs and other similar information related to customer purchases, including personal information and customer purchase history at a transaction level, including relating to customers of the E-Commerce Platform or any similar e-commerce platform owned, operated or controlled by Sellers;

(g) all rights of publicity and similar rights, including all marketing assets, including upcoming campaign material, current point-of-purchase material and historical digital assets;

(h) all industrial and motor vehicles owned by Sellers;

(i) all items of machinery, equipment, supplies, furniture, fixtures, other personal property and leasehold improvements (to the extent of Sellers' rights to any leasehold improvements under the Leases that are Assumed Contracts) owned by Sellers as of the Closing;

(j) all information technology assets, including licenses, software and hardware related to the Business or the ownership or operation of the Purchased Assets or the Business, including the E-Commerce Platform;

(k) all five-digit UPC codes and customer service phone numbers related to the Business;

(l) all Records (including Tax records, Tax Returns and personnel files and related information for all Transferred Employees) except for Excluded Records;

(m) all goodwill associated with the Business or the Purchased Assets, including all goodwill associated with the Intellectual Property owned by Sellers, the right to represent to third parties that Buyer is the successor to the Business, all rights under any non-disclosure and confidentiality, noncompete, or non-solicitation agreements with current or former employees,

| MATERIAL TERMS OF THE STALKING HORSE APA |
|---|

directors, independent contractors and agents of any Seller or with third parties for the benefit of any Seller, in each case to the extent relating to the Business, the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(n)  all of the Assumed Permits or all of the rights and benefits accruing under any Permits relating to the Business to the extent transferrable and held by Sellers;

(o)  all Employee Benefit Plans listed on Schedule 2.1(o) (the "Assumed Employee Benefit Plans") and trusts, Insurance Policies, rights and other assets set aside and specifically reserved solely to fund benefits payable under the applicable Assumed Employee Benefit Plan;

(p)  subject to Section 2.2(h) of the Stalking Horse APA, all current Insurance Policies relating or allocable to the Purchased Assets or Assumed Liabilities and all rights of any nature with respect thereto, including all prepaid premiums with respect thereto and insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(q)  all cash (including all cash drawn under the DIP Facility as of the Closing Date and all net cash proceeds of the Store Closing Sales), cash equivalents, bank deposits, prepayments (including all prepayments made to third party vendors), deferred assets, refunds, credits or overpayments, and similar cash items of Sellers (including all rights arising from any refunds due from federal, state and/or local Governmental Entities with respect to Taxes paid by Sellers or otherwise in respect of the Purchased Assets for periods ending on or prior to the Closing Date), except for the Excluded Cash, but including the DIP Reversionary Interest, if any;

(r)  all other rights, demands, claims, credits, allowances, rebates or other refunds and rights in respect of promotional allowances or rights of setoff and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), other than against Sellers, arising out of or relating to the Business as of the Closing, including all deposits (including Customer Deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances, prepayments and deferred assets;

(s)  except for the Excluded Claims, all Causes of Action;

(t)  all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors

| MATERIAL TERMS OF THE STALKING HORSE APA |
|---|

and any other Person to the extent relating to equipment purchased, products sold, or services provided, to Sellers or to the extent affecting any Purchased Assets and/or Assumed Liabilities;

(u)  all assets, rights and claims arising from or with respect to Taxes of any Seller, including all rights arising from any refunds due from federal, state and/or local Governmental Entities with respect to Taxes paid by Sellers, all deferred tax assets, Tax deposits, Tax prepayments and estimated Tax payments, in each case for Taxes owed the Sellers for periods ending on or prior to the Closing Date;

(v)  to the extent not covered above in <u>Section 2.1</u> of the Stalking Horse APA, all of the Sellers' telephone numbers, fax numbers, e-mail addresses, websites, URLs and internet domain names related to the Business; and

(w)  all right and claims under the Special Compensation Agreements; and

(x)  all other assets that are related to, used in or which could be used in connection with the Purchased Assets or the Business (but excluding all of the Excluded Assets).

<u>Excluded Assets:</u>

(a)  the Excluded Cash;

(b)  all of Sellers' Fundamental Documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, unit certificates and other documents relating to the organization, maintenance and existence of any Seller as a limited liability company, corporation or other entity;

(c)  all equity securities of any Seller or securities convertible into, exchangeable, or exercisable for any such equity securities and all net operating losses of any Seller;

(d)  all Leases (and related Leased Real Estate) and Contracts, in each case, other than the Assumed Contracts;

(e)  the Excluded Claims;

(f)  any (1) personnel files for Current Employees and Former Employees of Sellers who are not Transferred Employees, (2)

| MATERIAL TERMS OF THE STALKING HORSE APA | |
|---|---|
| | Records containing confidential personal private information including confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the disclosure of such information is prohibited by applicable Law, (3) other Records that Sellers are required by Law to retain and (4) any Records or other documents of Sellers relating to the Chapter 11 Cases that are protected by the attorney-client privilege held by Sellers (collectively, the "Excluded Records"); provided that Buyer shall have the right to make copies of any portions of such Excluded Records (other than the Records referenced in subsection 4 to the extent that such portions relate to the Business or any Purchased Asset); |
| | (g)  all Permits other than the Assumed Permits; |
| | (h)  all directors' and officers' liability Insurance Policies, including any tail Insurance Policies (the "D&O Insurance Policies"), and all rights of any nature with respect to any such Insurance Policies, including any claims or recoveries thereunder and any rights to assess claims seeking any such recoveries (for the avoidance of doubt, any and all Liabilities arising out of or relating to such insurance, including with respect to any underlying claims that give rise to claims seeking recovery in connection therewith, constitute Excluded Liabilities); provided, that nothing in this clause (h) shall be cause or be deemed to cause any Cause of Action against any Subject Party to be an Excluded Asset, it being acknowledged and agreed that all Causes of Action against any Subject Party shall be Purchased Assets; |
| | (i)  any assets expressly excluded from Purchased Assets pursuant to Section 2.1 of the Stalking Horse APA; |
| | (j)  all Employee Benefit Plans (other than the Assumed Employee Benefit Plans) and trusts, Insurance Policies, rights and other assets set aside and specifically reserved solely to fund benefits payable under the applicable Employee Benefit Plan (other than those related to the Assumed Employee Benefit Plans); |
| | (k)  the assets listed on Schedule 2.2(k) of the Stalking Horse APA; |
| | (l)  all assets of IPP Holdings and Independent Pet Partners Intermediate Holdings I, LLC, Delaware limited liability company other than the Assumed Contracts of such entities; and |

| MATERIAL TERMS OF THE STALKING HORSE APA | |
|---|---|
| | (m) the rights of Sellers under this Agreement and the Related Agreements and all cash and non-cash consideration payable or deliverable to Sellers under this Agreement. |
| **Purchase Price** | The aggregate consideration for the Purchased Assets shall consist of: (i) a credit bid under and in accordance with Section 363(k) of the Bankruptcy Code amount of $60,000,000.00 consisting of $27,258,311.48 in DIP Obligations,[5] $9,195,481.69 in Prepetition Priming Secured Obligations, and $23,546,206.83 in Prepetition DDTL Secured Obligations and (ii) the amount of the assumption of the Assumed Liabilities. |
| **Contract Designation Rights** | Schedule 2.6(b)(i) of the Stalking Horse APA (the "Specified Commercial Contract List") sets forth a list of all Contracts to which a Seller is a party and which Buyer has designated as specified commercial contracts (the "Specified Commercial Contracts"), together with the estimated Cure Amounts for each Specified Commercial Contract as of the Closing Date. |
| | (i) The Specified Commercial Contracts shall be Potential Purchased Contracts (as defined in the Bidding Procedures Order), and Sellers shall serve each counterparty to a Specified Commercial Contract (each, a "Specified Commercial Contract Counterparty") with an Assumption Notice (as defined in the Bidding Procedures Order) on or prior to the Assumption Notice Deadline (as defined in the Sale Bidding Procedures Order). The Specified Commercial Contracts and Specified Commercial Contract Counterparties shall be subject to the Assumption and Assignment Procedures (as defined in the Bidding Procedures Order), including the applicable deadlines for requesting information and filing Contract Objections (as defined in the Bidding Procedures Order). |
| | (ii) At any time during the period from the date the Bankruptcy Court enters the Bidding Procedures Order through the date that is forty-five (45) days after the Closing Date (the "Designation Period"), Buyer may, in its sole discretion, designate any Specified Commercial Contract either as (x) an Assumed Contract (a "Designated Contract"), or (y) a Contract that will not be an Assumed Contract (a "Non-Designated Contract") by providing written notice to Sellers (the "Designation Notice"). Within five (5) Business Days of Sellers' receipt of a Designation Notice, Sellers shall provide written notice to the applicable Specified Commercial Contract Counterparty of Sellers' intent to assume and assign such Designated Contract or reject such Non- |

---

[5] For the avoidance of doubt, the DIP Obligations include all obligations under the Prepetition ABL Credit Agreement that are rolled up into the DIP Facility pursuant to the final DIP Order.

| MATERIAL TERMS OF THE STALKING HORSE APA |
|---|

Designated Contract, as applicable.  With respect to Designated Contracts, such notice shall include (i) an updated proposed Cure Amount (the "Updated Proposed Cure Amount") associated with such Designated Contract and (ii) the deadline to file a supplemental objection solely on the grounds that the Updated Proposed Cure Amount is inadequate (a "Supplemental Contract Objection") to the assumption and assignment of such Designated Contract (the "Designated Contract Objection Deadline"), which deadline shall be no more than fourteen (14) calendar days from service of such notice.  If the Specified Commercial Contract Counterparty consents to the assumption and assignment on terms mutually agreed by Buyer (acting reasonably) and the Specified Commercial Contract Counterparty or does not timely object, the assumption and assignment of a Designated Contract shall be effective without further order of the Bankruptcy Court upon expiration of the applicable Supplemental Objection Deadline.  If Buyer, Sellers and a Specified Commercial Contract Counterparty are unable to resolve a timely served Supplemental Contract Objection, Sellers shall schedule the matter for hearing on no less than five (5) Business Days' notice.  To the extent that (i) Sellers settle a Supplemental Contract Objection or (ii) the Court enters an order resolving a Supplemental Contract Objection, and such settlement or order is not reasonably acceptable to Buyer, Buyer shall have the option to designate the relevant contract as a Non-Designated Contract, and neither Buyer nor any Seller shall be responsible for any Cure Amounts related to such Contract.  In the event Buyer does not provide a Designation Notice with respect to a Specified Commercial Contract prior to the expiration of the Designation Period, such Contract shall be deemed a Non-Designated Contract as of the date on which the Designation Period expires.

(iii) Notwithstanding Section 2.6(b)(iii) of the Stalking Horse APA during the Designation Period, Buyer may deliver a written notice to Sellers of Buyer's entry into an agreement with a Specified Commercial Contract Counterparty pursuant to which such Specified Commercial Contract Counterparty consents to the assumption and assignment to Buyer or its designee of its Specified Commercial Contract on the terms set forth in such agreement.  The assumption and assignment of any Specified Commercial Contract pursuant to Section 2.6(b)(iv) of the Stalking Horse APA shall be effective on the date set forth in the written notice provided to Sellers without further order of the Bankruptcy Court.

| MATERIAL TERMS OF THE STALKING HORSE APA |
|---|

(iv) In connection with the assumption and assignment to Buyer of any Specified Commercial Contract pursuant to <u>Section 2.6(b)</u> of the Stalking Horse APA, the Cure Amounts, if any, shall be paid by Buyer (i) at the time of effectiveness of such assumption and assignment pursuant to <u>Section 2.6(b)(iii)</u> or <u>(iv)</u> of the Stalking Horse APA (ii) at such later date as shall be approved by the Bankruptcy Court or (iii) as may be agreed to by the Specified Commercial Contract Counterparty.

(v) Sellers shall use their respective commercially reasonable efforts to assign the Designated Contracts to Buyer, including using commercially reasonable efforts to facilitate negotiations with the Specified Commercial Contract Counterparty and to obtain an order of the Bankruptcy Court (which may be the Sale Order) containing a finding that the proposed assignment to and assumption of the Designated Contracts by Buyer, on the terms set forth in <u>Section 2.6(b)</u> of the Stalking Horse APA satisfies all applicable requirements of section 365 of the Bankruptcy Code. At the time of effectiveness of such assumption and assignment pursuant to <u>Section 2.6(b)(iii)</u> or <u>(iv)</u> of the Stalking Horse APA, Sellers shall assign to Buyer each of the Designated Contracts that is capable of being assigned and assumed by Buyer.

(vi) In the event Sellers are unable to assign any such Designated Contract to Buyer without the Consent of another Person, then the Parties shall use their commercially reasonable efforts to obtain, and to cooperate in obtaining, all required Consents necessary to assume and assign such Designated Contracts to Buyer.

(vii) Notwithstanding the foregoing, a Specified Commercial Contract shall not be an Assumed Contract hereunder and shall not be assigned to, or assumed by, Buyer to the extent that such Specified Commercial Contract (i) is rejected by a Seller or terminated by a Seller in accordance with the terms hereof or by the other party thereto, or terminates or expires by its terms, on or prior to the time of effectiveness of such assumption and assignment pursuant to <u>Section 2.6(b)(iii)</u> or <u>(iv)</u> of the Stalking Horse APA and is not continued or otherwise extended upon assumption, (ii) requires a Consent of any Governmental Entity or other third party (except as permitted without such Consent by the Bankruptcy Code) in order to permit the sale or transfer to Buyer of Sellers' rights under such Specified Commercial Contract and no such Consent has been obtained prior to the time of effectiveness of such assumption and assignment pursuant to

| MATERIAL TERMS OF THE STALKING HORSE APA | |
|---|---|
| | Section 2.6(b)(iii) or (iv) of the Stalking Horse APA or (iii) constitutes an Employee Benefit Plan.<br><br>Buyer shall be responsible for any and all Liabilities of Sellers or any of their respective Affiliates under each Specified Commercial Contract that first accrue and are incurred during the period from and after the Petition Date through the earliest of (a) the effective date of such Specified Commercial Contract's assumption and assignment to Buyer, (b) seven (7) calendar days following the designation of such Specified Commercial Contract as a Non-Designated Contract and (c) seven (7) calendar days following the expiration of the Designation Period. |
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder**<br>Local Rule 6004-1(c)(i)(C) | Expense reimbursement of actual, necessary and documented out of pocket expenses associated with this Agreement in an amount not to exceed $750,000 (the "Expense Reimbursement"). Sellers' obligation to pay the Expense Reimbursement pursuant to this Section 8.3 of the Stalking Horse APA which is subject to Bankruptcy Court approval. |
| **Private Sale/No Competitive Bidding and Interim Arrangements with Stalking Horse Purchaser**<br>Local Rule 6004-1(b)(iv)(D)<br>Local Rule 6004-1(b)(iv)(G) | None. |
| **Privacy Ombudsman**<br>Local Rule 6004-1(b)(iii) | The Debtors expect that the Stalking Horse Purchaser or another Winning Bidder will agree that any personally identifiable information will be transferred subject to the Debtors' current privacy policy, which authorizes the Debtors to transfer such information in the context of the sale contemplated by this Motion. If the Stalking Horse Purchaser or another Winning Bidder seeks a transfer of such property in a manner that is contrary to such policy or otherwise requires the appointment of a consumer privacy ombudsman, the Debtors will seek such relief expeditiously, if necessary to comply with applicable law. |
| **Sale to Insider**<br><br>Local Rule 6004-1(b)(iv)(A) | None. |

30100222.1

| MATERIAL TERMS OF THE STALKING HORSE APA | |
|---|---|
| | |
| **Agreements With Management**<br>Local Rule 6004-1(b)(iv)(B) | None. |
| **Releases**<br>Local Rule 6004-1(b)(iv)(B) | Mutual releases between the Seller and Buyer, and related parties, of claims, Contracts, demands, causes of action, disputes, controversies, suits, cross-claims, torts, losses, attorneys' fees and expenses, obligations, agreements, covenants, damages, Liabilities, costs and expenses arising on or prior to the Closing Date, whether direct or derivative, and whether known or unknown.<br><br>The Seller Releasing Parties are also releasing any claim, right or interest of Sellers in the Purchased Assets, provided that the Buyer is not released from the obligations under the Stalking Horse APA and the Related Agreements or any dispute related thereto, the DIP Agreement or the Prepetition Priming Loans, the Prepetition ABL Loans, and the Prepetition DDTL Loans (each as defined in the DIP Order), or any Special Compensation Agreement, fraud, or any counterclaim in connection with any claim made against a Seller Releasing Party by any Buyer Released Party. The release provided by the Buyer Releasing Parties also does not release Seller from its obligations under the Stalking Horse APA and the Related Agreements, including the DIP Agreement, the Prepetition Priming Loans, the Prepetition ABL Loans, and the Prepetition DDTL Loans (each as defined in the DIP Order), any Special Compensation Agreement, Fraud or Willful Breach, and any counterclaim in connection with any claim made against a Buyer Releasing Party by any Seller Released Party. |
| **Good Faith Deposit**<br>Local Rule 6004-1(b)(iv)(G) | The Stalking Horse Purchaser does not need to provide a deposit, but any additional Qualifying Bidder must provide a good faith cash deposit in an amount equal to ten percent (10%) of the purchase price provided for in the Alternative APA (or such additional amount as may be determined by the Debtors in their reasonable discretion). |
| **Tax Exemption**<br>Local Rule 6004-1(b)(iv)(I) | The purchase of Inventory for resale will be exempt from sales tax pursuant to applicable law. |

| MATERIAL TERMS OF THE STALKING HORSE APA | |
|---|---|
| **Record Retention**<br>Local Rule 6004-1(b)(iv)(J) | From and after the Closing, Buyer shall reasonably promptly provide to Sellers and their respective Representatives (after reasonable notice and during normal business hours) reasonable access to Records included in the Purchased Assets for periods prior to the Closing and reasonable access to Transferred Employees, in each case, to the extent such access is necessary in order for Sellers (as applicable) to comply with this Agreement, the Related Agreements and the transactions contemplated hereby and thereby, applicable Law or any contract to which it is a party, for liquidation, winding up, Tax reporting or other proper purposes and so long as such access is subject to an obligation of confidentiality and does not result in any material cost to Buyer or any Affiliate thereof, and shall preserve such Records until the latest of (i) seven years after the Closing Date, (ii) the required retention period for all government contact information, records or documents or (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases. Such reasonable access shall include reasonable access to information in electronic form to the extent reasonably available. Buyer acknowledges that Sellers have the right to retain originals or copies of all Records included in the Purchased Assets for periods prior to the Closing. Prior to destroying any Records included in the Purchased Assets for periods prior to the Closing, Buyer shall notify Sellers thirty (30) days in advance of any such proposed destruction of its intent to destroy such Records, and Buyer shall permit Sellers to retain such Records, at Sellers' cost and expense. With respect to any Litigation and claims that are Excluded Liabilities, Buyer shall use commercially reasonable efforts to render reasonable assistance that Sellers may request and which do not result in any material cost to Buyer or any of its Affiliates in defending or prosecuting such Litigation or claim and shall use reasonable best efforts to make available to Sellers such personnel as are most knowledgeable about the matter in question. |
| **Requested Findings as to Successor Liability**<br>Local Rule 6004-1(b)(iv)(L) | The Stalking Horse APA requires that Debtors file a sale motion seeking entry of an order that contains findings of fact and conclusions of law that the Buyer is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code and is not a successor to Seller. |
| **Credit Bid**<br>Local Rule 6004-1(b)(iv)(N) | The Purchase Price is a credit bid as described above. |

| MATERIAL TERMS OF THE STALKING HORSE APA | |
|---|---|
| **Relief from Bankruptcy Rule 6004(h)**<br><br>Local Rule 6004-1(b)(iv)(O) | The Debtors believe that any Sale should be consummated as soon as practicable to preserve and maximize value. Accordingly, the Debtors request that any Sale Order approving the sale of the Assets and the assumption and assignment of the Potential Purchased Contracts be effective immediately upon entry of such order and that the fourteen-day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived. |

### Bidding Procedures

**A.      Overview**

19.     The Bidding Procedures are designed to promote a competitive, fair, and efficient Sale process that seeks to maximize the value of the Debtors' estates.  If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids from potential buyers that constitute the highest or otherwise best offer for the Assets on a schedule consistent with the milestones detailed in the DIP Motion and the Debtors' chapter 11 objectives.

20.     As the Bidding Procedures are attached to the Bidding Procedures Order, they are not restated in their entirety herein.  Pursuant to Local Rule 6004-1, certain of the key terms of the Bidding Procedures are highlighted in the chart below.[6]

| MATERIAL TERMS OF THE BIDDING PROCEDURES AND ORDER | |
|---|---|
| **Qualification of Bidders**<br>Local Rule 6004-1(c)(i)(A) | To become a Qualifying Bidder, a Potential Bidder must submit to the Debtors and their advisors:<br><br>(a)    documentation identifying the interested party, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction;<br><br>(b)    an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors;<br><br>(c)    a statement and other factual support demonstrating to the Debtors' reasonable satisfaction, after consultation with the Consultation Parties (as defined herein), that the |

---

[6]    To the extent that there is any inconsistency between the terms of the Bidding Procedures and the summary of such terms in this Motion, the terms of the Bidding Procedures shall control. Capitalized terms used but not otherwise defined in this summary shall have the meanings ascribed to such terms in the Bidding Procedures.

| MATERIAL TERMS OF THE BIDDING PROCEDURES AND ORDER | |
|---|---|
| | interested party has a *bona fide* interest in consummating a sale transaction; and |
| | (d)    sufficient information, as determined by the Debtors, after consultation with the Consultation Parties, to allow the Debtors to determine that the interested party (x) has, or can obtain, the financial wherewithal and any required internal corporate, legal, or other authorizations to close a sale transaction, including, without limitation, current audited financial statements of the interested party (or such other form of financial disclosure acceptable to the Debtors in their discretion), and (y) can provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by the Debtors and assigned to such bidder, pursuant to section 365 of the Bankruptcy Code, in connection with the Sale. |
| **Qualified Bids** Local Rule 6004-1(c)(i)(B) | Other than in the case of the Stalking Horse Purchaser and the Stalking Horse APA, which shall be considered a Qualifying Bidder and a Qualifying Bid, respectively, for all purposes under the Bidding Procedures, without regard to any of the requirements or conditions set forth therein and without any other or further action by the Stalking Horse Purchaser, to be deemed a "Qualifying Bid," a bid must be received from a Qualifying Bidder on or before the Bid Deadline and satisfy each of the following requirements (each, a "Bid Requirement"):<br><br>(a)    be in writing;<br><br>(b)    fully disclose the identity of the Qualifying Bidder (and to the extent that the Qualifying Bidder is a newly formed acquisition entity or the like, the identity of the Qualifying Bidder's parent company or sponsor), and provide the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the bid submitted by the Qualifying Bidder;<br><br>(c)    set forth the purchase price to be paid by such Qualifying Bidder;<br><br>(d)    state the liabilities proposed to be paid or assumed by such Qualifying Bidder;<br><br>(e)    specify the Purchased Assets that are included in the bid and state that such Qualifying Bidder offers to (i) purchase some or all of the Purchased Assets, and (ii) assume liabilities upon substantially the same terms as, or terms |

| **MATERIAL TERMS OF THE BIDDING PROCEDURES AND ORDER** |
|---|

<table>
<tr><td></td><td></td><td>more favorable to the Debtors and their estates than, the terms set forth in the Stalking Horse APA;</td></tr>
<tr><td></td><td>(f)</td><td>be accompanied by an Alternative APA and a marked copy of the Alternative APA that reflects any variations from the Stalking Horse APA;</td></tr>
<tr><td></td><td>(g)</td><td>state that such Qualifying Bidder's offer is formal, binding, and unconditional, and is irrevocable until two (2) business days after the closing of the Sale;</td></tr>
<tr><td></td><td>(h)</td><td>state that such Qualifying Bidder is financially capable of consummating the transactions contemplated by the Alternative APA and provide written evidence in support thereof;</td></tr>
<tr><td></td><td>(i)</td><td>contain such financial and other information to allow the Debtors to make a reasonable determination, after consultation with the Consultation Parties, as to the Qualifying Bidder's financial and other capabilities to close the transactions contemplated by the Alternative APA, including, without limitation, such financial and other information supporting the Qualifying Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, including the Qualifying Bidder's financial wherewithal and willingness to perform under any Purchased Contracts ("<u>Adequate Assurance Information</u>").  By submitting a Bid, the Qualified Bidders agree that the Debtors may disseminate their Adequate Assurance Information to the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "<u>Creditors' Committee</u>") and, upon request, to Counterparties;</td></tr>
<tr><td></td><td>(j)</td><td>identify with particularity each and every executory contract and unexpired lease the assumption and assignment of which is a condition to close the transactions contemplated by the Alternative APA;</td></tr>
<tr><td></td><td>(k)</td><td>include a commitment to close the transactions contemplated by the Alternative APA by no later than April 14, 2023;</td></tr>
<tr><td></td><td>(l)</td><td>not request or entitle such Qualifying Bidder to any break-up fee, termination fee, expense reimbursement,</td></tr>
</table>

| MATERIAL TERMS OF THE BIDDING PROCEDURES AND ORDER |
|---|

substantial contribution claim, or similar type of fee or payment;

(m)    propose cash consideration equal to or exceeding the sum of (i) the aggregate dollar amount of the Credit Bid, (ii) the dollar amount equal to the Excluded Cash under the Stalking Horse APA, (iv) $750,000 for the Expense Reimbursement, and (v) $250,000;

(n)    not contain any contingencies of any kind (other than closing conditions consistent with, and no less favorable to the Debtors than, the closing conditions set forth in the Stalking Horse APA, to the extent applicable), including, without limitation, contingencies related to financing, internal approval, or due diligence;

(o)    contain a written acknowledgement and representation that the Qualifying Bidder (i) has had an opportunity to conduct any and all due diligence regarding the Purchased Assets, (ii) has relied solely upon its own independent review, investigation, or inspection of any documents and other information in making its Qualifying Bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Purchased Assets, or the completeness of any documents or other information provided in connection with the Bidding Procedures and the Sale;

(p)    set forth (i) a statement or evidence that the Qualifying Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings, and (ii) any regulatory and third-party approvals required for the Qualifying Bidder to close the transactions contemplated by the Alternative APA, and the time period within which the Qualifying Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than five (5) days following execution and delivery of such Qualifying Bidder's Alternative APA, those actions the bidder will take to ensure receipt of such approval(s) as promptly as possible); *provided* that a Qualifying Bidder agrees that its legal counsel will coordinate in good faith with the Debtors' legal counsel to

| MATERIAL TERMS OF THE BIDDING PROCEDURES AND ORDER | |
|---|---|
| | discuss and explain Qualifying Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the Alternative APA; *provided, further* that the offer contains a covenant to cooperate with the Debtors to provide pertinent factual information regarding the bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements; |
| | (q)   provide for the Qualifying Bidder to serve as a back-up bidder (the "Back-Up Bidder") if the Qualifying Bidder's bid is the next highest or otherwise best bid (the "Back-Up Bid") after the Winning Bid, in accordance with the terms of the Alternative APA as submitted or modified at the Auction; |
| | (r)   include written evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the Alternative APA; |
| | (s)   provide a good faith cash deposit (the "Deposit") in an amount equal to ten percent (10%) of the purchase price provided for in the Alternative APA (or such additional amount as may be determined by the Debtors in their reasonable discretion); and |
| | (t)   provide that in the event of the Qualifying Bidder's breach of, or failure to perform under, the Alternative APA, the Qualifying Bidder shall forfeit its Deposit to the Debtors, and the Debtors shall be entitled to pursue all available legal and equitable remedies, including, without limitation, additional damages and/or specific performance. |
| **Credit Bidding** Local Rule 6004-1(b)(iv)(N) | The consideration to be provided by the Stalking Horse Purchaser under the Stalking Horse APA is (i) a credit bid under section 363(k) of the Bankruptcy Code in the amount $60,000,000.00 consisting of $27,258,311.48 in DIP Obligations, $9,195,481.69 in Prepetition Priming Secured Obligations, and $23,546,206.83 in Prepetition DDTL Secured Obligations and (ii) the amount of the assumption of the Assumed Liabilities and (ii) the amount of the assumption of the Assumed Liabilities. |

| MATERIAL TERMS OF THE BIDDING PROCEDURES AND ORDER | |
|---|---|
| **No-Shop or No-Solicitation Provisions**<br>Local Rule 6004-1(c)(i)(C)(1) | None. |
| **Break-Up Fee and Expense Reimbursement**<br>Local Rule 6004-1(c)(i)(C)(2) | $750,000 Expense Reimbursement for the Stalking Horse Purchaser pursuant to the conditions set forth in the Stalking Horse APA and the Bidding Procedures. |
| **Initial Overbid and Bidding Increments**<br>Local Rule 6004-1(c)(i)(C)(3) | <u>Initial overbid</u>: cash consideration equal to or exceeding the sum of (i) the aggregate dollar amount of the Credit Bid, (ii) the dollar amount equal to the Excluded Cash under the Stalking Horse APA, (iv) $750,000 for the Expense Reimbursement, and (v) $250,000.<br><br><u>Bidding Increments</u>: successive bids in increments of at least $250,000, *provided* that: (i) each such successive bid must be a Qualifying Bid; and (ii) the Debtors shall retain the right to modify the bid increment requirements at the Auction. |
| **Modification of Bidding and Auction Procedures**<br>Local Rule 6004-1(c)(i)(D) | The Debtors and their estates reserve the right to, after consultation with the Consultation Parties, and with the prior written consent of the DIP Lenders with respect to (a) the date by which the transactions contemplated by an Alternative APA must close and (b) the minimum amount of cash consideration required for an Alternative APA to be a Winning Bid pursuant to Section 11(q), modify the Bidding Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth herein, modify bidding increments, waive terms and conditions set forth herein with respect to any or all Potential Bidders (including, without limitation, the Bid Requirements), impose additional terms and conditions with respect to any or all Potential Bidders, adjourn or cancel the Auction at or prior to the Auction, and adjourn the Sale Hearing. |
| **Closing with Alternative Back-Up Bidders**<br>Local Rule 6004-1(c)(i)(E) | In the event that the Winning Bidder fails to close the Sale on or before April 14, 2023 (or such date as may be extended by the Debtors with the consent of the DIP Lenders and in consultation with the Consultation Parties) and a Back-Up Bidder(s) has been previously identified, the Debtors shall (1) file and serve a notice of intent to proceed with a Back-Up Bid (a "<u>Notice of Intent to Proceed with Back-Up Bid</u>"), and (2) schedule a telephonic status conference, which may be expedited, upon reasonable notice under the circumstances, at which time a briefing and hearing schedule will be established for those Counterparties that do not consent to a proposed assumption and assignment to the Back-Up Bidder. The Back-Up Bidder, as identified in the Notice of Successful Bidder, shall not be considered or approved at the Sale Hearing, nor |

| MATERIAL TERMS OF THE BIDDING PROCEDURES AND ORDER | |
|---|---|
| | shall affected landlords or counterparties be required to object to Back-Up Bidder prior to the filing and service of the Notice of Intent to Proceed with the Back-Up Bid. The Back-Up Bid will then be deemed to be the Winning Bid, the Back-Up Bidder will be deemed to be the Winning Bidder, and the Debtors shall be authorized, but not directed, to close the Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without the need for further order of the Court and without the need for further notice to any interested parties. |

**B.      Key Dates and Deadlines**

21.      The Debtors propose the below key dates and deadlines for the Sale process, certain of which dates and deadlines may be subject to extension in accordance with the Bidding Procedures.[7]

| DATE | DEADLINE/EVENT |
|---|---|
| February 17, 2023 | Deadline for Debtors to file proposed Sale Order |
| One (1) business day after entry of the Bidding Procedures Order | Deadline for Debtors to serve Assumption Notices on each Counterparty to a Potential Purchased Contract |
| March 7, 2023 | Deadline for Stalking Horse Purchaser to provide Adequate Assurance Information to the Debtors |
| One (1) business day after receiving such information | Deadline for Debtors to provide Adequate Assurance Information of Stalking Horse Purchaser to requesting Counterparties (as defined in the Bidding Procedures Order) |
| March 15, 2023 at 5:00 p.m. (ET) | Bid Deadline (1) for the submission of Qualifying Bids, (2) for the Stalking Horse Purchaser (subject to the provisions of the Stalking Horse APA allowing the Stalking Horse Purchaser to (a) amend the list of Potential Purchased Contracts and (b) designate Specified Commercial Contracts as Designated Contracts) and any Qualifying Bidder to designate Potential Purchased Contracts as Purchased Contracts, and (3) for any Qualifying Bidder (other than the |

---

[7]   The Debtors reserve the right to modify the proposed sale-related dates and deadlines.

|  | Stalking Horse Purchaser) to provide Adequate Assurance Information to the Debtors<br><br>Deadline to file Sale Objections and Contract Objections (other than to Adequate Assurance Objections to Winning Bidder or Back-Up Bidder that is not the Stalking Horse Bidder) |
| --- | --- |
| March 17, 2023 | Deadline for Debtors to designate Qualifying Bids and Baseline Bid |
| March 20, 2023 at 10:00 a.m. (ET) | Auction |
| One (1) day after cancellation or completion of the Auction | Deadline to file and serve Notice of Winning Bidder<br><br>Deadline for Debtors to provide Adequate Assurance Information of Winning Bidder and Back-Up Bidder (other than the Stalking Horse Purchaser) to requesting Counterparties |
| March 22, 2023 at 12:00 p.m. (ET) | Deadline to file Winning Bidder Adequate Assurance Objection |
| One (1) day before Sale Hearing at 12:00 p.m. (ET) | Deadline to file and serve a reply to any Sale Objection or Contract Objection |
| March 24, 2023 at __:__ a.m. (ET) (subject to the Court's availability) | Sale Hearing |
| April 14, 2023 | Deadline for Winning Bidder to close the transaction contemplated by its Winning Bid |

## C.   Noticing Procedures and Determination of Qualified Bids

22.     The Debtors propose to serve the Sale Notice within three (3) business days of the

entry of the Bidding Procedures Order by regular mail on: (a) the U.S. Trustee; (b) counsels to the

Stalking Horse Purchaser, the Prepetition Agent (as defined in the DIP Order), and the DIP Agent

(as defined in the DIP Order); (c) all parties known by the Debtors to assert a lien or Encumbrance

on any of the Assets; (d) all persons known or reasonably believed to have asserted an interest in

or claim to any of the Assets; (e) all persons known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the Assets within the one (1) year prior to the Petition Date; (f) the Office of the United States Attorney for the District of Delaware; (g) the Office of the Attorney General in each state in which the Debtors have operated; (h) the Office of the Secretary of State in each state in which the Debtors have operated; (i) the Internal Revenue Service and all state and local taxing authorities in the states in which the Debtors have or may have any tax liability; (j) the Federal Trade Commission; (k) all Counterparties to any of the Potential Purchased Contracts; (l) all of the Debtors' other known creditors and equity security holders; and (m) all other parties that have filed a notice of appearance and demand for service of papers in the Chapter 11 Cases as of the service date (collectively, the "Sale Notice Parties").

23.    The Debtors will also post the Sale Notice, the Assumption Notice, and the Bidding Procedures Order on the website of the Debtors' claims and noticing agent.

24.    No later than seven (7) calendar days of the entry of this Order, the Debtors shall cause the Sale Notice to be published once in the national edition of USA Today or another nationally circulated newspaper, with any modifications necessary for ease of publication.  The Debtors submit that publication of the Sale Notice conforms to the requirements of Bankruptcy Rules 2002(l) and 9008 and is reasonably calculated to provide notice to any affected party, including, without limitation, any Potential Bidders, and afford the affected party the opportunity to exercise any rights affected by the Motion.

25.    After the Bid Deadline and before the Auction, the Debtors shall: (i) notify Qualifying Bidders whether their bids have been determined to be a Qualifying Bid; and (ii) determine, in consultation with the Consultation Parties, which of the Qualifying Bids, at such time, is the highest or otherwise best bid for purposes of constituting the opening bid of the Auction (the "Baseline Bid" and the Qualifying Bidder submitting the Baseline Bid, the "Baseline Bidder"),

and shall promptly notify the Stalking Horse Purchaser and all Qualifying Bidders with Qualifying

Bids of the Baseline Bid.

26.    The Debtors submit that these procedures constitute adequate and reasonable notice

of the key dates and deadlines for the Sale process.  Accordingly, the Debtors request that the Court

find that these procedures are adequate and appropriate under the circumstances and comply with

the requirements of Bankruptcy Rule 2002 and Local Rule 2002-1.

**D.    Assumption and Assignment Procedures**

27.    The Debtors propose the following procedures with respect to the assignment and

assumption of executory contracts and unexpired leases:

a.    On or before one (1) business day after the entry of this Order, the Debtors shall file with the Court and serve an Assumption Notice, via overnight delivery, on each counterparty to a Potential Purchased Contract.  The Assumption Notice served on each Specified Commercial Contract Counterparty shall include notice that such party's Potential Purchased Contract is a Specified Commercial Contract that is subject to Section 2.6(b) of the Stalking Horse Purchase Agreement (or similar provision in an Alternative APA).

b.    The Assumption Notice shall include, without limitation, the cure amount, if any, that the Debtors believe is required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code for each of the Potential Purchased Contracts in the event such Potential Purchased Contracts are assumed and assigned by the Debtors. If a Counterparty (including, without limitation, a Specified Commercial Contract Counterparty) objects to (i) the assumption and assignment of the Counterparty's Potential Purchased Contract (including, without limitation, on the basis that the Stalking Horse Purchaser cannot provide adequate assurance of future performance) or (ii) the Cure Amount for any of its Potential Purchased Contracts, the Counterparty must file with the Court and serve on the Objection Notice Parties (as defined herein) a written objection (a "<u>Contract Objection</u>") on or before the applicable objection deadline set forth in these Assumption and Assignment Procedures.

c.    Any Contract Objection shall: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801 <u>on or before 5:00 p.m. (ET) on March 15, 2023</u> (the "<u>Contract Objection Deadline</u>"), and proof of service of such Contract Objection upon the Objection Notice Parties shall be filed with the Court as and when required

by the Local Rules; (iv) be served upon the Objection Notice Parties; and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated Cure Amount and the legal and factual bases for any unliquidated Cure Amount that the Counterparty believes is required to be paid under section 365(b)(1)(A) & (B) of the Bankruptcy Code for the Purchased Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto and any objection to the provision of adequate assurance of future performance by the Stalking Horse Purchaser.

d.   In the event that the Stalking Horse Purchaser is not the Winning Bidder, the deadline to object to the provision of adequate assurance of future performance by a Winning Bidder or Back-Up Bidder that is not the Stalking Horse Purchaser (a "Winning Bidder Adequate Assurance Objection") shall be 12:00 p.m. (ET) on March 22, 2023, and any Winning Bidder Adequate Assurance Objections must be filed and served in the same manner as Contract Objections.

e.   The "Objection Notice Parties" are as follows: (i) counsel to the Debtors, McDonald Hopkins LLC, 300 North LaSalle Street, Suite 1400, Chicago, Illinois 60654 (Attn: David Agay, Esq. (dagay@mcdonaldhopkins.com), Marc Carmel, Esq. (mcarmel@mcdonaldhopkins.com), and Joshua Gadharf, Esq. (jgadharf@mcdonaldhopkins.com)); (ii) co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 1980 (Attn: Andrew Magaziner, Esq. (amagaziner@ycst.com)); (iii) counsel to any official committee of unsecured creditors appointed in the Chapter 11 Cases; (iv) counsel to the DIP Lenders, Dechert LLP, 1095 Avenue of the Americas, New York, New York 10036 (Attn: Shmuel Vasser, Esq. (shmuel.vasser@dechert.com) and Stephen Wolpert, Esq. (stephen.wolpert@dechert.com)), and co-counsel to the DIP Lenders, Richards, Layton & Finger, P.A., P.O. Box 551, Wilmington, Delaware 19899 (Attn: Russell Silberglied, Esq. (silberglied@rlf.com) and Brendan Schlauch, Esq. (schlauch@rlf.com)); and (v) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), 855 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Rosa Sierra-Fox).

f.   Within one (1) day after the cancellation or completion of the Auction, the Debtors shall file with the Court a notice identifying the Winning Bidder (a "Notice of Winning Bidder"), which shall set forth, among other things, (i) the Winning Bidder and Back-Up Bidder (if any) and the amount of each of the Winning Bid and the Back-Up Bid (if any), (ii) the Selected Purchased Contracts (as defined herein), and (iii) the proposed assignee(s) of such Selected Purchased Contracts, and serve the Notice of Winning Bidder by overnight mail and, if available, electronic mail, upon each affected Counterparty and its counsel (if known).

g.  At the Sale Hearing, the Debtors will seek Court approval of the assumption and assignment to the Winning Bidder of only those Potential Purchased Contracts, including, without limitation, Specified Commercial Contracts, that have been selected by the Winning Bidder to be assumed and assigned (each, a "Selected Purchased Contract," and collectively, the "Selected Purchased Contracts").

h.  Specified Commercial Contracts that are not designated as Selected Purchased Contracts in the Notice of Winning Bidder shall be subject to the procedures set forth in Section 2.6(b) of the Stalking Horse Purchase Agreement (or similar provision in an Alternative APA).

i.  If no Contract Objection is timely received with respect to a Selected Purchased Contract (including, without limitation, Specified Commercial Contracts that are designated as Selected Purchased Contracts in the Notice of Winning Bidder): (i) the Counterparty to such Selected Purchased Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Winning Bidder of the Selected Purchased Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Winning Bidder); (ii) any and all defaults under the Selected Purchased Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code; and (iii) the Cure Amount for such Selected Purchased Contract shall be controlling, notwithstanding anything to the contrary in such Selected Purchased Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Selected Purchased Contract against the Debtors and their estates or the Winning Bidder, or the property of any of them, that existed prior to the entry of the Sale Order.  If no Contract Objection is timely received with respect to a Specified Commercial Contract that is not designated as a Selected Purchased Contract in the Notice of Winning Bidder, the Specified Commercial Contract Counterparty to such Specified Commercial Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Winning Bidder of the Specified Commercial Contract in the event such contract is designated a Designated Contract prior to the expiration of the Designation Period under Section 2.6(b) of the Stalking Horse Purchase Agreement (or similar provision in an Alternative APA), and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Winning Bidder), subject only to the Specified Commercial Contract Counterparty's right to file a Supplemental Contract Objection to its Updated Proposed Cure Amount under Section 2.6(b) of the Stalking Horse Purchase Agreement (or similar provision in an Alternative APA).

j.  To the extent that the Debtors and a Counterparty are unable to consensually resolve any such Contract Objection prior to the commencement of the Sale Hearing, such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be determined by the Debtors, in consultation with the Winning Bidder, or otherwise fixed by the Court.  In the case of a Contract Objection filed by a Specified Commercial Contract Counterparty with respect to a Specified Commercial Contract that is not designated as a Selected Purchased Contract in the Notice of Winning Bidder, the issues raised in the Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be determined by the Debtors, subject only to the Specified Commercial Contract Counterparty's right to file a Supplemental Contract Objection to its Updated Proposed Cure Amount under Section 2.6(b) of the Stalking Horse Purchase Agreement (or similar provision in an Alternative APA).  To the extent that (i) the Debtors settle a Contract Objection or Supplemental Contract Objection or (ii) the Court enters an order resolving the Contract Objection or Supplemental Contract Objection, and such settlement or order is not acceptable to the Winning Bidder, the Winning Bidder shall have the option to designate the relevant Contract as no longer a Purchased Contract, in which case such Contract shall not be assumed by the Debtors or assigned to the Winning Bidder, and neither the Debtors nor the Winning Bidder shall be responsible for any Cure Amounts related to such Contract.

k.  Notwithstanding anything to the contrary herein, if, after the Sale Hearing or the entry of the Sale Order, additional executory contracts or unexpired leases of the Debtors are determined to be Purchased Contracts, as soon as practicable thereafter, the Debtors shall file with the Court and serve, by regular mail, on the Counterparties an Assumption Notice, and such Counterparties shall file any Contract Objections (including, without limitation, with respect to adequate assurance of future performance of the Winning Bidder and the Cure Amount) not later than fourteen (14) days thereafter. If no Contract Objection is timely received, the Debtors shall be authorized to assume and assign such Purchased Contracts to the Winning Bidder, without further notice to creditors or other parties in interest and without the need for further order of the Court, and such assumption and assignment shall be subject to the terms of the Sale Order.

## I.  Approval of the Relief Requested Is Warranted and in the Best Interests of the Debtors and Their Economic Stakeholders

### A.  The Proposed Bidding Procedures Are Fair, Appropriate and Should Be Approved

28.  The Bidding Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of property of a debtor's estate: maximizing the value of sale proceeds received by the estate.  See Burtch v. Ganz (In re Mushroom Co.),

382 F.3d 325, 339 (3d Cir. 2004) (finding that a debtor had a fiduciary duty to maximize and protect the value of the estate's assets); In re Food Barn Stores, Inc., 107 F 3d 558, 564-65 (8th Cir. 1997) (recognizing that main goal of any proposed sale of property of a debtor's estate is to maximize value).  Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate.  See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing that sale procedures "encourage bidding and . . . maximize the value of the debtor's assets").

29.    The Bidding Procedures provide for an orderly, uniform and appropriately competitive process through which interested parties may submit offers to purchase the Assets. Given the case timeline negotiated with the Prepetition Lender Group and the Stalking Horse Purchaser,  and  taking  into consideration the prepetition marketing process, the Debtors have structured the Bidding Procedures to promote active bidding by interested parties and to confirm the highest or otherwise best offer reasonably available for the Assets.  Additionally, the Bidding Procedures will allow the Debtors to conduct the Auction in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to consummate a timely Sale.  The Bidding Procedures also allow the Debtors to determine that a single Qualifying Bid or several Qualifying Bids in the aggregate represent the highest or otherwise best offer for the Debtors' assets.  Accordingly, the Bidding Procedures should be approved because, under the circumstances, they are reasonable, appropriate, and in the best interests of the Debtors, their estates, and all parties in interest.

###### B.    The Expense Reimbursement Should Be Approved

30.    The Stalking Horse APA provides for an Expense Reimbursement in an amount of up to $750,000.  The Debtors believe that the Expense Reimbursement is an essential prerequisite for the Stalking Horse Purchaser to enter into the Stalking Horse Agreement.  In addition, the Debtors believe that the presence of the Stalking Horse Purchaser will set a floor for the value of the Assets and attract other potential buyers to bid for such assets, thereby maximizing the realizable value of the Assets for the benefit of the Debtors' estates, their creditors and all other parties in interest.

31.    Approval of the Expense Reimbursement is governed by standards for determining the appropriateness of bid protections in the bankruptcy context.  Courts have identified at least two instances in which bid protections may benefit the estate.  *First*, a break-up or expense reimbursement fee may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  In re O'Brien Envtl. Energy, Inc., 181 F.3d at 533.  *Second*, if the availability of a break-up fee or expense reimbursement was to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth.  See id.; see also In re Reliant Energy Channel View LP, 594 F.3d 200, 206-08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse purchaser to remain committed to a purchase).

32.    In O'Brien, the Third Circuit reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee or expense reimbursement:

a.    the presence of self-dealing or manipulation in negotiating the break-up fee;

b.    whether the fee harms, rather than encourages, bidding;

c.    the reasonableness of the break-up fee relative to the purchase price;

d.    whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

e.    the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

f.    the correlation of the fee to a maximum value of the debtor's estate;

g.    the support of the principal secured creditors and creditors' committees of the break-up fee;

h.    the benefits of the safeguards to the debtor's estate; and

i.    the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

See In re O'Brien Envtl. Energy, Inc., 181 F.3d at 536.

33.    While none of the factors is dispositive, an application of the facts to several of such factors supports the approval of the Expense Reimbursement. In particular, the Expense Reimbursement is necessary to preserve the value of the Debtors' estates because it will enable the Debtors to secure an adequate floor for the Assets—a clear benefit to the Debtors' estates. Given that the Debtors' prepetition marketing process resulted in no bids for the Assets, it is clear the Stalking Horse Purchaser's bid provides the floor.

34.    Moreover, there has been no showing of any self-dealing or manipulation of any kind in the negotiation of the Expense Reimbursement. Rather, the Expense Reimbursement was the result of good faith, arm's-length negotiations between the Debtors and the Stalking Horse Purchaser. In fact, the Prepetition Lender Group only agreed to provide the financing for the Debtors' cases conditioned upon the transaction structure detailed herein, which provides for the Expense Reimbursement; the Prepetition Lender Group is not requesting approval of a break-up fee, as is seen in many similar transactions. The Debtors believe that the agreement to pay the

Expense Reimbursement is reasonable and necessary to induce the Stalking Horse Bidder to enter into the transactions encompassed by the Stalking Horse APA.

35.    Further, the Stalking Horse Purchaser would not agree to act as a stalking horse without the Expense Reimbursement, given the substantial time and expense that it incurred in connection with entering into definitive documentation and the risk that it will be outbid at the Auction.  Without the Expense Reimbursement, the Debtors might lose the opportunity to obtain the highest or otherwise best offer for the Assets, may have lost the financing for these Chapter 11 Cases, and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Purchaser.  See, e.g., In re Enjoy Technology, Inc., Case No. 22-10580 (Bankr. D. Del. July 26, 2022) (approving break-up fee and expense reimbursement for lender providing credit bid).  Additionally, without the floor established by the Stalking Horse Purchaser, the bids received at auction for the Assets could be substantially lower than the bid offered by the Stalking Horse Purchaser.

36.    Pursuant to the Bidding Procedures, any bidder that wishes to participate in the Auction must submit an offer that is higher or otherwise better than the bid of the Stalking Horse Purchaser, which would be used to fund the Expense Reimbursement.  The bid of the Stalking Horse Purchaser attracts additional bidders because, among other things, additional bidders will be able to save considerable time and expense because they can use many of the documents that the Stalking Horse Purchaser heavily negotiated, including the Stalking Horse APA and the schedules thereto, in making their bid.  In sum, if the Assets are sold to a Winning Bidder other than the Stalking Horse Purchaser, the Sale likely will be the result of the Stalking Horse Purchaser's crucial role as an initial bidder generating interest in the Assets and establishing a minimum acceptable price and offer against which other parties can bid.

37.    Finally, the dollar amount of the Expense Reimbursement is exceedingly

reasonable, as it is a mere 1.25% of the Purchase Price (not including substantial Assumed Liabilities). The Debtors believe that the amount of the Expense Reimbursement is appropriate when compared to bid protections approved in other cases in this District.[8]

### C. The Debtors Have Demonstrated a Sound Business Justification for the Proposed Sale

38.     Ample authority exists for approval of the Sale contemplated by this Motion. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of a debtor's estate, courts have approved the authorization of a sale of a debtor's assets if such sale is based upon the sound business judgment of the debtor. See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (citing In re Schipper, 933 F.2d 513 (7th Cir. 1991)); In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992); Stephen Indus., Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986); Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983).

39.     Courts typically consider the following factors in determining whether a proposed

---

[8]   See, e.g., In re Brooks Bros. Grp., Inc., Case No. 20-11785 (CSS) Bankr. D. Del. Aug. 3, 2020) [D.I. 285] (authorizing a break-up fee of 3% and an expense reimbursement capped at $1 million, for total bid protections of up to 3.3%); In re Lucky Brand Dungarees, LLC, Case No. 20-11768 (CSS) (Bankr. D. Del. July 30, 2020) [D.I. 251] (authorizing an expense reimbursement capped at $1 million and a break-up fee of 3% of the sum of the purchase price, credit bid, value of standby letters of credit, and $7 million of assumed liabilities, for total bid protections of approximately 3.5%); In re Templar Energy LLC, Case No. 20-11441 (BLS) (Bankr. D. Del. June 29, 2020) [D.I. 130] (authorizing break-up fee of 3% of the cash component of the stalking horse purchase price and expense reimbursement up to $350,000, for total bid protections of approximately 3.5%); In re Lucky's Market Parent Co., LLC, Case No. 20-10166 (JTD) (Bankr. D. Del. Feb. 26, 2020) [D.I. 282] (authorizing a break-up fee of 3% of the purchase price and expense reimbursement of $250,000, for total bid protections of approximately 5.2%); In re Celadon Grp., Inc., Case No. 19- 12606 (KBO) (Bankr. D. Del. Jan. 6, 2020) [D.I. 219] (authorizing break-up fee of 3% of the purchase price and expense reimbursement of 1.5% of the purchase price, for total bid protections of 4.5%); In re Bumblebee Parent Inc., Case No. 19-12502 (LSS) (Bankr D. Del. Dec. 19, 2019) [D.I. 171] (authorizing break-up fee of approximately 2.5% and expense reimbursement in the maximum amount of $2.5 million, for total bid protections of approximately 3%).

sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was provided to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. See In re Decora Indus., Inc., No. 00-4459 (JJF), 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991)). Where a debtor demonstrates a valid business justification for a decision, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." In re Integrated Res., Inc., 147 B.R. at 656.

40.    A sound business purpose for the sale of a debtor's assets outside the ordinary course of business exists where such sale is necessary to preserve the value of the estate for the benefit of creditors and interest holders. See, e.g., In re Abbotts Dairies of Pa., Inc., 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F 2d at 1063; In re Food Barn Stores, Inc., 107 F.3d at 564-65 (recognizing the paramount goal of any proposed sale of property of estate is to maximize value).

41.    As set forth herein, a strong business justification exists for the sale of the Assets as described herein.  An orderly and expeditious sale of the Assets is critical to maximizing the value of the Debtors' estates and recoveries for the Debtors' economic stakeholders.  The Debtors believe that the proposed Sale process will produce a fair and reasonable purchase price for the Assets.  The Stalking Horse Bid is an offer to purchase the Assets for a price that the Debtors, with the advice of the Debtors' advisors, already have determined to be fair and reasonable.  Given the extensive prepetition marketing process and that the Stalking Horse Bid will serve as a floor for Qualifying Bids for the Assets, the Debtors are confident that the post-petition Sale process will culminate in the Debtors obtaining the highest or otherwise best offer for such assets.  The

Debtors also have reserved the right in the Bidding Procedures to determine either that a single Qualifying Bid for all of the Assets or several Qualifying Bids in the aggregate for different Assets represent the highest and best offer received by the Debtors.

      **D.**    **The Assets Should Be Sold Free and Clear of Liens, Claims, Interests and Encumbrances Under Section 363(f) of the Bankruptcy Code**

      42.    In the interest of attracting the best offers, the Assets should be sold free and clear of any and all liens, claims, interests and other Encumbrances, in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, interests and Encumbrances attaching to the proceeds of the applicable sale. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and Encumbrances if any one of the following conditions is satisfied:

      a.    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

      b.    such entity consents;

      c.    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

      d.    such interest is in bona fide dispute; or

      e.    such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); see also In re Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

      43.    Section 363(f) of the Bankruptcy Code is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a); see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re

White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of [the Bankruptcy Code]."). The Debtors submit, and to the extent necessary will demonstrate at the Sale Hearing, that the sale of the Assets free and clear of all liens, claims, interests and Encumbrances will satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code. Moreover, the Debtors will send the Sale Notice to purported lienholders. If such lienholders do not object to the proposed Sale, then their consent should be presumed. Accordingly, the Debtors request that, unless a party asserting a prepetition lien, claim or Encumbrance on any of the Assets timely objects to this Motion, such party shall be deemed to have consented to any Sale approved at the Sale Hearing. See Hargave v. Twp. of Pemberton, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to a sale motion, a creditor is deemed to consent to the relief requested therein). Accordingly, the Debtors request that the Court authorize the sale of the Assets free and clear of any liens, claims, interests and Encumbrances, in accordance with section 363(f) of the Bankruptcy Code, subject to such liens, claims, interests and Encumbrances attaching to the proceed thereof in the same order of relative priority, with the same validity, force and effect as prior to such.

E.    **The Winning Bidder Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code**

44.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) of the Bankruptcy Code states the following:

> The reversal or modification on appeal of an authorization under [section 363(b) of the Bankruptcy Code] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).   Section 363(m) of the Bankruptcy Code fosters the "policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely." In re Abbotts Dairies, 788 F.2d at 147; see also Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal.").

45.     While the Bankruptcy Code does not define "good faith," the Third Circuit has held that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" *In re Abbotts Dairies*, 788 F.2d at 147 (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders); see also In re Bedford Springs Hotel, Inc., 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); In re Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J. 1995).

46.     In other words, a party would have to show fraud or collusion between the Debtors and bidders to demonstrate a lack of good faith. See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F .3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders").   Due to the absence of a bright-line test for good faith, the determination is based on the facts of each case, with a focus on the "integrity of [a bidder's] conduct in the course of the sale proceedings." In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1998 (7th Cir. 1978)).

47.     The Debtors submit that the Stalking Horse Purchaser is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code.   The Debtors and the Stalking Horse

Purchaser, and their respective advisors, have entered into the Stalking Horse APA without collusion, in good faith and after extensive arm's-length negotiations. To the best of the Debtors' knowledge, information and belief, no party has engaged in any conduct that would cause or permit the Stalking Horse APA to be set aside under section 363(m) of the Bankruptcy Code.

48.     Further, as set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process. Each Qualifying Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or the sale of any of the Assets. Any asset purchase agreement with a Winning Bidder executed by the Debtors will be negotiated at arm's-length and in good faith. Accordingly, the Debtors seek a finding that any Winning Bidder (including the Stalking Horse Purchaser) is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

49.     The Debtors submit, and the testimony presented at the Sale Hearing will demonstrate, that the terms and conditions of the Sale will have been negotiated by the Debtors and the Stalking Horse Purchaser or Winning Bidder, as applicable, at arm's length and in good faith, with the assistance of the Debtors' professional advisors, and that the parties did not engage in any conduct that would cause or permit the Sale to be avoided under section 363(n) of the Bankruptcy Code.

50.     Based on the foregoing, the Debtors submit that they have demonstrated that the proposed Sale is a sound exercise of the Debtors' business judgment and should be approved as a good faith transaction.

**F.      Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized**

51.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Courts employ the business judgment standard in determining

whether to approve a debtor's decision to assume or reject an executory contract or unexpired lease. See, e.g., In re Market Square Inn, Inc., 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that a debtor's decision to assume or reject executory contract is governed by business judgment standard and may only be overturned if decision is product of bad faith, whim, or caprice). The "business judgment" test in this context only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate. See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 40 (3d Cir. 1989).

52.     Any assumption of the Purchased Contracts is an exercise of the Debtors' sound business judgment because the transfer of such Potential Purchased Contracts is necessary to the Debtors' ability to obtain the best value for the Assets. Given that consummation of the Sale is critical to the Debtors' efforts to maximize value for their estates and stakeholders, the Debtors' assumption of Potential Purchased Contracts is an exercise of sound business judgment and, therefore, should be approved.

53.     The consummation of any Sale involving the assignment of Purchased Contracts will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code. Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Potential Purchased Contracts to be assumed be cured or that the Debtors provide adequate assurance that such defaults will be promptly cured. The Debtors' assumption and assignment of the Purchased Contracts will be contingent upon payment of the Cure Amounts and effective only upon the closing of an applicable Sale or any later applicable date of assumption and assignment of such Purchased Contracts. As set forth herein, the Debtors propose to file with the Court and serve on each Counterparty an Assumption Notice, which will set forth the Debtors'

good faith calculations of Cure Amounts with respect to each of the Potential Purchased Contracts listed on such Potential Assumption and Assumption Notice.   Counterparties will have a meaningful opportunity to raise any objections to the proposed assumption of their respective Potential Purchased Contracts in advance of the Sale Hearing.

54.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) (finding that, "[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance").  Among other things, adequate assurance may be provided by evidencing the assignee's financial health and experience in managing the type of enterprise or property assigned.  See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when the prospective assignee of a lease has financial resources and has expressed willingness to devote sufficient funding to the business to give it a strong likelihood of succeeding).

55.    As set forth herein and in the Bidding Procedures, for a bid to qualify as a Qualifying Bid, a Potential Bidder must include with its bid information regarding its ability (and the ability of its designated assignee, if applicable) to perform under the Potential Purchased Contracts that it wishes for the Debtors to assume and assign.   Each affected Counterparty will have an

opportunity to object to the ability of the Winning Bidder to provide adequate assurance as provided in the Bidding Procedures Order.  To the extent necessary, the Debtors will present facts at the Sale Hearing to show the financial wherewithal, willingness and ability of the Winning Bidder to perform under the Potential Purchased Contracts that it wishes for the Debtors to assume and assign.

### G.    The Designation Rights Are Appropriate

56.    The Stalking Horse APA contemplates that the Stalking Horse Purchaser will be permitted to designate certain executory contracts (and not any real property leases) identified as Specified Commercial Contracts as assumed or rejected for a limited period after the Closing Date. The designation rights allow the Winning Bidder to receive the benefits of certain Specified Commercial Contracts while it considers whether to have the Specified Commercial Contracts assumed and assigned or rejected.  Under the designation rights, the Counterparties will be compensated pursuant to the terms of their Specified Commercial Contract.  The Stalking Horse Purchaser has required this concept as an essential condition of the Stalking Horse APA, but such designation rights will be available to any Winning Bidder.

57.    The designation rights will provide the Winning Bidder and the counterparties to Specified Commercial Contract with an opportunity to negotiate the Specified Commercial Contract prior to a decision regarding whether to assume and assign or reject the Potential Purchased Contract.  Ultimately, this is expected to result in the Winning Bidder continuing business relationships with more counterparties to the Specified Commercial Contracts than if all decisions related to Potential Assumed Contracts were forced to be made on or before the Closing Date.

58.    Bankruptcy courts in this District and other jurisdictions have approved similar designation rights. See, e.g., In re Francesca's Holdings Corporation, Case No. 20-13076 (BLS)

(Bankr. D. Del. Jan. 22, 2021) (designation rights period extending up to 150 days after closing date); In re Alpha Entm't LLC, Case No. 20-10940 (LSS) (Bankr. D. Del. Aug. 7, 2020) (designation rights period extending through the earlier of (a) plan confirmation occurring no earlier than 70 days after closing date, or (b) 90 days from and after closing date); In re Brooks Bros. Grp., Inc., Case No. 20-11785 (CSS) (Bankr. D. Del. Aug. 3, 2020) (designation rights period extending post-closing until the later of plan confirmation or Dec. 31, 2020); In re PQ New York, Inc., Case No. 20-11266 (JTD) (Bankr. D. Del. June 29, 2020) (post-closing date designation deadline 10 days following entry of sale order); In re Sugarfina, Inc., Case No. 19- 11973 (MFW) (Bankr. D. Del. Oct. 15, 2019) (designation rights period extending 90 days from and after closing date); In re RM Holdco LLC, Case No. 18-11795 (MFW) (Bankr. D. Del. Sept. 6, 2018) (same).

### H. Provisions of Sale Order

59.      At the Sale Hearing, the Debtors will seek entry of a Sale Order that, among other provisions: (i) authorizes and approves the Sale to the Winning Bidder pursuant to the terms and conditions set forth in the Stalking Horse APA or Alternative APA submitted by the Winning Bidder; (ii) finding that the Winning Bidder is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code; (iii) as appropriate, exempting the Sale(s) and conveyance(s) of the Purchased Assets from any transfer tax, stamp tax, or similar tax, or deposit under any applicable bulk sales statute; and (iv) in the event that the Stalking Horse Purchaser is not the Winning Bidder, except as otherwise provided in the DIP Order, directing that all cash proceeds generated from the Sale, other than any Excluded Cash (as defined in the Stalking Horse APA), shall, upon closing of the Sale, (w) be paid to the DIP Agent (for the benefit of the DIP Lenders) for application in accordance with the terms and conditions of the DIP Order, until the DIP Obligations are paid in full, and, (x) with respect to any cash proceeds remaining after payment in full of all DIP Obligations, to the Prepetition Priming Agent (as defined in the DIP Order) for application in

accordance with the terms of the Prepetition Priming Credit Agreement (as defined in the DIP Order) until the Prepetition Priming Secured Obligations (as defined in the DIP Order) are paid in full, (y) with respect to any cash proceeds remaining after payment in full of all Prepetition Priming Secured Obligations, to the Prepetition DDTL Agent (as defined in the DIP Order) for application in accordance with the terms of the Prepetition DDTL Credit Agreement (as defined in the DIP Order) until the Prepetition DDTL Secured Obligations (as defined in the DIP Order) are paid in full, and (z) with respect to any cash proceeds remaining after payment in full of all Prepetition DDTL Secured Obligations, to the Prepetition ABL Agent (as defined in the DIP Order) for application in accordance with the terms of the Prepetition ABL Credit Agreement (as defined in the DIP Order) until the Prepetition ABL Secured Obligations (as defined in the DIP Order) are paid in full, and the Excluded Cash will be deposited into a separate escrow account of the Debtors.[9]  The Debtors intend to file a proposed Sale Order on or prior to February 17, 2023, which is prior to the requested hearing date on the proposed Bidding Procedures Order.

### Waiver of Bankruptcy Rules 6004(a), 6004(h) and 6006(d)

60.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6006(d).

---

[9]    Notwithstanding that all proceeds of any Sale (including Excluded Cash) are collateral securing the DIP Obligations and Prepetition Secured Obligations, the DIP Secured Parties and Prepetition Secured Parties (each as defined in the DIP Order) have agreed that, subject to the closing of a Sale in accordance with the Bidding Procedures Order and an acceptable Sale Order, Excluded Cash (which includes a $2,000,000 post-closing wind down budget) shall be used to (i) pay allowed fees and expenses of professionals retained in these Chapter 11 Cases as of the closing date of such Sale, and (ii) fund a process for confirmation of a chapter 11 plan of liquidation and orderly wind down of the Debtors' estates.

61.     The Debtors believe that any Sale should be consummated as soon as practicable to preserve and maximize value.  Accordingly, the Debtors request that any Sale Order approving the sale of the Assets and the assumption and assignment of the Potential Purchased Contracts be effective immediately upon entry of such order and that the fourteen-day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

### Notice

62.     Notice of this Motion will be provided to: (a) the Office of the United States Trustee (Attn: Rosa Sierra-Fox); (b) the Debtors' prepetition secured lenders; (c) the Debtors' proposed debtor in possession financing lenders; (d) the Internal Revenue Service; (e)  the parties included on the Debtors' consolidated list of their 30 largest unsecured creditors; (f) the United States Attorney for the District of Delaware; (g) the state attorneys general in states where the Debtors are authorized to do business; (h) all parties known by the Debtors to assert a lien or Encumbrance on any of the Assets; (i) all persons known or reasonably believed to have asserted an interest in or claim to any of the Assets; (j) all persons known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the Assets within the one (1) year prior to the Petition Date; (k) the Federal Trade Commission; (l) all Counterparties to any of the Potential Purchased Contracts; and (m) all parties entitled to notice pursuant to Bankruptcy Rule 2002.  The Debtors respectfully submit that, in light of the nature of the relief requested, no further notice of this Motion is required.

**WHEREFORE**, the Debtors respectfully request that the Court enter the Bidding Procedures Order, substantially in the form attached hereto as Exhibit A, and, after the Sale Hearing, the Sale Order, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated:  February 6, 2023
Wilmington, Delaware

Respectfully submitted,

/s/ *Andrew L. Magaziner*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Andrew L. Magaziner (No. 5426)
S. Alexander Faris (No. 6278)
Kristin L. McElroy (No. 6871)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile:  (302) 571-1253
Email:  amagaziner@ycst.com
      afaris@ycst.com
      kmcelroy@ycst.com

- and -

**MCDONALD HOPKINS LLC**
David A. Agay
Marc Carmel
Joshua Gadharf
Maria G. Carr
Ashley Jericho
300 North LaSalle Street, Suite 1400
Chicago, Illinois 60654
Telephone: (312) 280-0111
Facsimile:  (312) 280-8232
Email: dagay@mcdonaldhopkins.com
      mcarmel@mcdonaldhopkins.com
      jgadharf@mcdonaldhopkins.com
      mcarr@mcdonaldhopkins.com
      ajericho@mcdonaldhopkins.com

*Proposed Counsel to the Debtors and Debtors in Possession*