**<u>Exhibit B</u>**

**Stalking Horse APA**

EXECUTION VERSION

**ASSET PURCHASE AGREEMENT**

**by and among**

**INDEPENDENT PET PARTNERS HOLDINGS, LLC,**

**THE SELLER SUBSIDIARIES SET FORTH ON SCHEDULE I ATTACHED**

**HERETO,**

**and**

**IPP BUYER ACQUISITION, LLC**

**February 5, 2023**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ............................................................................. 2

ARTICLE II PURCHASE AND SALE ........................................................... 18

Section 2.1     Purchase and Sale of Purchased Assets ..................... 18
Section 2.2     Excluded Assets ........................................................ 21
Section 2.3     Assumption of Assumed Liabilities............................ 22
Section 2.4     Excluded Liabilities .................................................. 23
Section 2.5     Consideration ............................................................ 25
Section 2.6     Assumption and Assignment of Contracts.................. 26
Section 2.7     Closing ...................................................................... 30
Section 2.8     Deliveries at Closing................................................. 30
Section 2.9     Allocation.................................................................. 31
Section 2.10    Withholding Rights.................................................... 31
Section 2.11    Conflict ..................................................................... 32

ARTICLE III SELLERS' REPRESENTATIONS AND WARRANTIES ............... 32

Section 3.1     Organization of Sellers; Good Standing. ................... 32
Section 3.2     Authorization of Transaction ..................................... 32
Section 3.3     Noncontravention; Consents and Approvals. ............. 33
Section 3.4     Compliance with Laws .............................................. 33
Section 3.5     Condition and Sufficiency of Assets.......................... 34
Section 3.6     Title to Purchased Assets .......................................... 34
Section 3.7     Contracts ................................................................... 34
Section 3.8     Inventory ................................................................... 36
Section 3.9     Intellectual Property.................................................. 36
Section 3.10    Litigation................................................................... 36
Section 3.11    Employees and Employment Matters. ........................ 36
Section 3.12    Employee Benefit Plans............................................. 37
Section 3.13    Real Property. ........................................................... 39
Section 3.14    Permits ...................................................................... 40
Section 3.15    Taxes ......................................................................... 41
Section 3.16    Environmental Matters............................................... 42
Section 3.17    Restrictions on Business Activities............................ 42
Section 3.18    Insurance ................................................................... 42
Section 3.19    Product Warranties; Product Liability. ...................... 42
Section 3.20    Data Privacy ............................................................. 43
Section 3.21    Certain Payments; OFAC. ......................................... 43
Section 3.22    Brokers' Fees ............................................................ 44
Section 3.23    No Other Representations or Warranties .................... 44
Section 3.24    No Outside Reliance .................................................. 45

ARTICLE IV BUYER'S REPRESENTATIONS AND WARRANTIES ................. 45

Section 4.1     Organization of Buyer................................................ 45

# TABLE OF CONTENTS
### (continued)

**Page**

Section 4.2    Authorization of Transaction. ............................................................... 45
Section 4.3    Noncontravention.............................................................................. 46
Section 4.4    Litigation......................................................................................... 46
Section 4.5    Financial Capacity ........................................................................... 46
Section 4.6    Adequate Assurances Regarding Executory Contracts........................... 47
Section 4.7    Good Faith Purchaser ...................................................................... 47
Section 4.8    Brokers' Fees .................................................................................. 47
Section 4.9    No Outside Reliance ........................................................................ 47

ARTICLE V PRE CLOSING COVENANTS ..................................................................... 48

Section 5.1    Certain Efforts; Cooperation............................................................. 48
Section 5.2    Notices and Consents....................................................................... 48
Section 5.3    Bankruptcy Actions.......................................................................... 50
Section 5.4    Conduct of Business ........................................................................ 52
Section 5.5    Access............................................................................................. 53
Section 5.6    Press Releases and Public Announcements .......................................... 54
Section 5.7    Bulk Transfer Laws.......................................................................... 54

ARTICLE VI OTHER COVENANTS ............................................................................... 54

Section 6.1    Cooperation..................................................................................... 54
Section 6.2    Further Assurances........................................................................... 54
Section 6.3    Availability of Business Records........................................................ 55
Section 6.4    Employee Matters. ........................................................................... 56
Section 6.5    Recording of Intellectual Property Assignment..................................... 58
Section 6.6    Transfer Taxes; Straddle Period........................................................ 58
Section 6.7    Wage Reporting ............................................................................... 59
Section 6.8    Release ........................................................................................... 59
Section 6.9    Collection of Accounts Receivable...................................................... 61
Section 6.10   Alternate Transactions ..................................................................... 61
Section 6.11   Plan Process ................................................................................... 61
Section 6.12   D&O Insurance Policies ................................................................... 62
Section 6.13   Transition Services........................................................................... 62
Section 6.14   Covenant Not to Sue ........................................................................ 62

ARTICLE VII CONDITIONS TO CLOSING ..................................................................... 63

Section 7.1    Conditions to Buyer's Obligations...................................................... 63
Section 7.2    Conditions to Sellers' Obligations ..................................................... 64
Section 7.3    No Frustration of Closing Conditions.................................................. 65
Section 7.4    Waiver of Conditions ....................................................................... 65

ARTICLE VIII TERMINATION ...................................................................................... 65

Section 8.1    Termination of Agreement................................................................. 65
Section 8.2    Procedure upon Termination.............................................................. 67
Section 8.3    Expense Reimbursement.................................................................... 67

# TABLE OF CONTENTS
(continued)

**Page**

Section 8.4     Effect of Termination............................................................... 67

ARTICLE IX MISCELLANEOUS ......................................................................... 68

Section 9.1     Remedies............................................................................... 68
Section 9.2     Expenses .............................................................................. 68
Section 9.3     Entire Agreement ................................................................. 68
Section 9.4     Incorporation of Schedules, Exhibits and Disclosure Schedule .............. 69
Section 9.5     Amendments and Waivers ....................................................... 69
Section 9.6     Succession and Assignment..................................................... 69
Section 9.7     Notices ................................................................................ 69
Section 9.8     Governing Law; Jurisdiction................................................... 70
Section 9.9     Consent to Service of Process ................................................. 71
Section 9.10    WAIVERS OF JURY TRIAL ................................................. 71
Section 9.11    Severability .......................................................................... 71
Section 9.12    No Third-Party Beneficiaries.................................................. 71
Section 9.13    No Survival of Representations, Warranties and Agreements................ 71
Section 9.14    Non-Recourse ...................................................................... 72
Section 9.15    Construction......................................................................... 72
Section 9.16    Computation of Time............................................................. 72
Section 9.17    Mutual Drafting .................................................................... 72
Section 9.18    Disclosure Schedule .............................................................. 72
Section 9.19    Headings; Table of Contents................................................... 73
Section 9.20    Counterparts; Facsimile and Email Signatures ........................... 73
Section 9.21    Action by Sellers .................................................................. 73

Exhibit A          -     Form of Bill of Sale
Exhibit B          -     Form of Assignment and Assumption Agreement
Exhibit C          -     Form of Intellectual Property Assignment Agreement
Exhibit D          -     Letter Agreement

Schedule I         -     Schedule of Additional Seller Entities
Schedule 1.1       -     Websites
Schedule 2.1(o)    -     Assumed Employee Benefit Plans
Schedule 2.2(k)    -     Excluded Assets
Schedule 2.6(a)(i) -     Assumed Contract List
Schedule 2.6(b)(i) -     Specified Commercial Contract List
Schedule 2.8(b)    -     Tax Certificate Jurisdictions
Schedule 5.4       -     Conduct of Business
Schedule 6.4       -     Employee Matters
Schedule 6.6(a)    -     Transfer Taxes
Schedule 6.13      -     Transition Services

BUSINESS.29776642.14

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of February 5, 2023, by and among INDEPENDENT PET PARTNERS HOLDINGS, LLC, a Delaware limited liability company ("IPP Holdings"), each of the Subsidiaries of IPP Holdings set forth on Schedule I attached hereto (the "Seller Subsidiaries", and together with IPP Holdings, "Sellers"), and IPP Buyer Acquisition, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). Sellers and Buyer are referred to collectively herein as the "Parties." Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Article I.

WHEREAS, Sellers presently conduct the business of operating retail pet stores in several states and over the internet (collectively, the "Business");

WHEREAS, on or before February 5, 2023, Sellers intend to file voluntary petitions for relief (the "Chapter 11 Cases") pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended (the "Bankruptcy Code");

WHEREAS, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to acquire and assume from Sellers, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets and the Assumed Liabilities upon the terms and subject to the conditions set forth herein;

WHEREAS, Sellers intend to seek the entry of the Sale Procedures Order by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") upon the terms and subject to the conditions set forth herein and in the Sale Procedures Order;

WHEREAS, Sellers intend to seek the entry of the Sale Order by the Bankruptcy Court approving this Agreement and authorizing Sellers to consummate the Contemplated Transactions upon the terms and subject to the conditions set forth herein and in the Sale Order;

WHEREAS, the board of managers, the board of directors or other applicable governing body of each Seller has determined that it is advisable and in the best interests of their respective estates and the beneficiaries of such estates to consummate the Contemplated Transactions provided for herein pursuant to the Sale Procedures Order and the Sale Order and has approved this Agreement, subject to higher or otherwise better offers as contemplated by the Sale Procedures Order; and

WHEREAS, the Contemplated Transactions are subject to the approval of the Bankruptcy Court, subject to higher or otherwise better offers as contemplated by the Sale Procedures Order, and will be consummated only pursuant to the Sale Order to be entered by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, the Parties, intending to be legally bound, hereby agree as follows:

# ARTICLE I
# DEFINITIONS

"Accounts Receivable" means (a) all accounts, accounts receivable, trade receivables, contractual rights to payment, notes, notes receivable, negotiable instruments, chattel paper, Credit Card Receivables, Financing Company Receivables, vendor and supplier rebates or refunds of Sellers in connection with the Business as conducted by the Sellers and other miscellaneous receivables, and (b) any security interest, claim, remedy or other right related to any of the foregoing.

"Administrative Expenses" means, collectively, the administrative expenses incurred by Sellers in the Chapter 11 Cases including expenses of the kind specified in Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 546(c), 546(d), or 726 (to the extent permitted by law) of the Bankruptcy Code, and any other provision of the Bankruptcy Code (including, subject to entry of the DIP Order, Section 506(c) of the Bankruptcy Code).

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Alternate Transaction" means a transaction or series of related transactions pursuant to which Sellers, pursuant to the Sale Procedures Order, (a) accept a Qualified Bid, other than that of Buyer, as the highest or otherwise best offer, or (b) sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Sellers or otherwise), including pursuant to a plan or refinancing, all or substantially all of the Purchased Assets (or agrees to do any of the foregoing) in a transaction or series of transactions to a Person or Persons other than Buyer, but does not mean the sale of assets to customers conducted in the Ordinary Course of Business.

"Apportioned Obligations" has the meaning set forth in Section 6.6(c).

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.8(a)(ii).

"Assumed Contract List" has the meaning set forth in Section 2.6(a).

"Assumed Contracts" means those Leases and Contracts that have been assumed by Sellers and assigned to Buyer pursuant to Section 2.6 and Section 365 of the Bankruptcy Code, including those Designated Contracts. For the avoidance of doubt, "Assumed Contracts" shall not include any Non-Real Property Contract or Lease that is excluded and rejected pursuant to Section 2.6, including those Non-Designated Contracts.

"Assumed Employee Benefit Plans" has the meaning set forth in Section 2.1(o).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumed Permits" means all Permits relating to the Business that are transferable in accordance with their terms and under applicable Law, but excluding all Permits to the extent related to any Excluded Asset (including any Lease that is not an Assumed Contract).

"Auction" means the auction for the sale and assignment of the Purchased Assets as specified in the Sale Procedures Order.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bankruptcy-Related Default" means any default or breach of a Contract that is not entitled to cure under section 365(b)(2) of the Bankruptcy Code, including a default or breach relating to the filing of the Chapter 11 Cases or the financial condition of Sellers.

"Bidding Procedures" has the meaning set forth in Section 5.3(b)(i).

"Bill of Sale" has the meaning set forth in Section 2.8(a)(i).

"Business" has the meaning set forth in the recitals.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks located in New York, New York shall be authorized or required by Law to close.

"Buyer" has the meaning set forth in the preamble.

"Buyer Equity Holders" means CION Investment Corporation, Main Street Capital Corporation, MCS Income Fund, Inc., NCP III Aggregator, L.P., Newstone Capital Partners III, L.P., Newstone Capital Partners III-A, L.P. and Newstone Capital Partners III-B, L.P.

"Buyer Group" means Buyer and the Buyer Equity Holders.

"Buyer Released Parties" has the meaning set forth in Section 6.8(a).

"Buyer Releasing Parties" has the meaning set forth in Section 6.8(b).

"Buyer's Express Representations" has the meaning set forth in Section 3.24.

"CARES Act" means the Coronavirus Aid, Relief, and Economic Security Act (H.R. 748) and any similar or successor legislation, together with any memoranda or executive orders relating to COVID-19.

"Causes of Action" means all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, recoupment, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement or similar rights, in each case, of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent,

3

derivative or direct), including the Purchased Avoidance Actions and all rights with respect to proofs of claim filed by or on behalf of any of the Sellers in any bankruptcy case other than the Chapter 11 Cases.

"Chapter 11 Cases" has the meaning set forth in the recitals.

"Claim" means a "claim" as defined in section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" has the meaning set forth in Section 2.7.

"Closing Date" has the meaning set forth in Section 2.7.

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, section 4980B of the Code, and any similar state Law.

"Cockrill Litigation" means *Luther Cockrill v. Independent Pet Partners Holdings, LLC, et al.*, filed in the United States District Court, Central District of California, on or about January 30, 2023.

"Code" means the United States Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, as the same may be in effect from time to time.

"Commercially Available Software" means commercially available software that has not been modified or customized by a third party for a Seller and that is licensed pursuant to a non-negotiated agreement.

"Committee" means any official committee of unsecured creditors appointed in the Chapter 11 Cases.

"Confidentiality Provision" means the confidentiality provision in Section 10.07 of the DIP Agreement, regarding the terms and conditions on which Sellers would make available certain information.

"Consent" means any approval, consent, ratification, permission, clearance, designation, qualification, waiver or authorization, or an order of the Bankruptcy Court that deems or renders unnecessary the same.

"Contemplated Transactions" means the sale by Sellers to Buyer, and the purchase by Buyer from Sellers, of the Purchased Assets and the assumption by Buyer of the Assumed Liabilities.

"Context Consideration" has the meaning set forth in Section 9.18.

"Contract" means any written or oral agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement, partnership

4

agreement or other arrangement, understanding, permission or commitment that, in each case, is legally-binding.

"COVID-19" means SARS-CoV-2 or COVID-19, and any strains, variants and/or evolutions thereof.

"COVID-19 Measures" means any action taken by any Seller directly in response to COVID-19, including any compliance with any quarantine, "shelter in place," "stay at home," social distancing, shut down, closure, sequester, safety or similar applicable Law, directive, guidelines or recommendations promulgated by any Governmental Entity, including the Centers for Disease Control and Prevention and the World Health Organization.

"Credit Bid" has the meaning set forth in Section 2.5.

"Credit Card Receivables" means all accounts receivable and other amounts owed to any Seller (whether current or non-current) in connection with any customer purchases that are made with credit cards or any other related amounts owing (including deposits or holdbacks to secure chargebacks, offsets or otherwise) from credit card processors to Sellers.

"Cure Amounts" has the meaning set forth in Section 2.6(a)(ii).

"Cure Notice" has the meaning set forth in Section 5.3(i).

"Current Employees" means all individuals employed by Sellers as of the Closing Date, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability with, in each case, the legal right to return to employment).

"Customer Deposits" has the meaning set forth in Section 2.1(c).

"D&O Insurance Policies" has the meaning set forth in Section 2.2(h).

"Dataroom" has the meaning set forth in Section 4.9.

"Decree" means any judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, stipulation, executive order, judicial order, administrative order or any other order of any Governmental Entity.

"Designated Contract" has the meaning set forth in Section 2.6(b)(iii).

"Designated Contract Objection Deadline" has the meaning set forth in Section 2.6(b)(iii).

"Designation Notice" has the meaning set forth in Section 2.6(b)(iii).

"Designation Period" has the meaning set forth in Section 2.6(b)(iii).

"DIP Agreement" means that certain Senior Secured Superpriority Priming Debtor-In-Possession Credit Agreement (including all exhibits and schedules attached thereto (including any budget)), dated as of February 5, 2023 among IPP Holdings, as Parent, Independent Pet Partners Intermediate Holdings, LLC, a Delaware limited liability company ("IPP Intermediate Holdings"),

as Borrower, the Seller Subsidiaries party thereto, as Loan Parties, Acquiom Agency Services LLC, as Agent, and the Lenders party thereto.

"<u>DIP Budget</u>" means the "Approved Budget" as defined in the DIP Agreement.

"<u>DIP Facility</u>" means the new senior secured superpriority debtor in possession term loan credit facility in an aggregate principal amount up to $27,258,311.48, as amended, modified or otherwise in effect from time to time, provided to Sellers by the DIP Lenders, as approved by the DIP Order.

"<u>DIP Lenders</u>" means all Persons who are lenders under the DIP Agreement, each in its capacity as such.

"<u>DIP Obligations</u>" means the "Obligations" as defined in the DIP Agreement.

"<u>DIP Order</u>" means the interim order or final order, as then applicable, authorizing the Sellers to incur post-petition financing under the DIP Facility and the use of cash collateral as entered by the Bankruptcy Court, in each case in form and substance satisfactory to Buyer in its sole and absolute discretion, which order shall provide adequate protection to the lenders under the Prepetition DDTL Credit Agreement, including TPG Independent Pet Partners, LLC, in its capacity as lender thereunder, in the form of the payment of the fees, costs, and expenses of Ropes & Gray LLP, as counsel to TPG Independent Pet Partners, LLC, in an amount not to exceed $290,000.00.

"<u>DIP Reversionary Interest</u>" means any amount remaining with respect to the Excluded Cash after all of the following amounts have been paid or otherwise satisfied in full: (i) Professional Fees and Expenses allowed by Final Orders of the Bankruptcy Court and (ii) Wind-Down Expenses of Sellers.

"<u>Disclosure Schedule</u>" has the meaning set forth in <u>Article III</u>.

"<u>Dispute</u>" has the meaning set forth in <u>Section 6.8(a)</u>.

"<u>E-Commerce Platform</u>" means the series of software and hardware applications integrated into, and through which Sellers sell inventory to consumers who place orders for such inventory through, the websites listed on <u>Schedule 1.1</u> (and similar permutations thereof), including the Contracts pursuant to which such software and hardware applications are owned or licensed by Sellers.

"<u>Employee Benefit Plan</u>" means each "employee benefit plan" (as such term is defined in section 3(3) of ERISA, whether or not subject to ERISA) and each other benefit, retirement, employment, consulting, compensation, incentive, bonus, stock option, restricted stock, stock appreciation right, phantom equity, change in control, severance, medical and hospitalization, insurance, life, disability, salary continuation, sick pay, vacation, paid time off, welfare and fringe-benefit or other compensation plan, program, policy, agreement or arrangement of any kind, in each case, (i) that are for the benefit of or relating to any current or former directors, officers, managers, employees, consultants or other service providers of any Seller or any ERISA Affiliate, or any spouse, dependent or beneficiary thereof, or (ii) that are maintained, sponsored or

6

contributed to or required to be contributed to, by any Seller or any ERISA Affiliate or in which any Seller or ERISA Affiliate participates or participated or (ii) under which Seller or any ERISA Affiliate has or may have any liability, contingent or otherwise, including as a result of any previously-terminated plan, program, policy, agreement or arrangement.

"Employees" means all individuals employed by Sellers as of the Petition Date, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability with, in each case, the legal right to return to employment).

"Environmental Laws" means all applicable Laws, Decrees or other legal requirements and judicial interpretations thereof of any Governmental Entity concerning or relating to pollution (or the cleanup thereof) or protection of the environment, human health (with respect to exposure to any Hazardous Substance), threatened or endangered species and natural resources, including in connection with the presence of Hazardous Substances in products and product packaging.

"Environmental Liabilities" means any Liability, including costs and liabilities for investigation, removal, remediation, restoration, abatement, monitoring, personal injury, property damage, natural resource damages, indemnification, reimbursement, contribution, court costs (including costs of enforcement proceedings or government responses) and reasonable attorneys' fees in connection with each of the foregoing, arising under or relating to any Environmental Law, Environmental Permit or Hazardous Substance, including in connection with any actual or alleged (a) violation of any Environmental Law, (b) generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Substances, (c) exposure to any Hazardous Substances, (d) Environmental Release or (e) Contract pursuant to which Liability is assumed or imposed with respect to any of the foregoing.

"Environmental Notice" means any written directive, notice of violation or infraction, or written notice relating to actual or alleged non-compliance with or Liability under any Environmental Law or any term or condition of any Permit issued to any Seller under or pursuant to any Environmental Law.

"Environmental Permit" means any Permit, letter, clearance, consent, waiver, closure, exemption or decision issued, granted, given, authorized by or made by any Governmental Entity pursuant to Environmental Law.

"Environmental Release" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing, or allowing to escape or migrate of any Hazardous Substance into or through the environment (including ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any Structure, facility, or fixture).

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business or other entity (whether or not incorporated) that, together with any Seller, would be deemed at any relevant time to be a "single employer" within the meaning of section 414 of the Code or section 4001 of ERISA.

7

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Cash" means, subject in all respects to the DIP Budget, all cash on hand of the Sellers sufficient to (i) satisfy the Professional Fees and Expenses, net of any amounts held by any professionals retained by Sellers, or any funds of Sellers held in escrow or reserve with respect to the fees and expenses of any professional retained by Sellers, and (ii) fund the Wind-Down Amount.

"Excluded Claims" means all Causes of Actions against third parties to the extent, and only to the extent, related to any Excluded Asset or Excluded Liability; provided, that, for the avoidance of doubt, any and all Causes of Action against the Subject Parties shall not constitute Excluded Claims.

"Excluded Employee" has the meaning set forth in Section 6.4(b).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Records" has the meaning set forth in Section 2.2(f).

"Expense Reimbursement" has the meaning set forth in Section 8.3.

"Express Representations" has the meaning set forth in Section 4.9.

"Final Allocation Schedule" has the meaning set forth in Section 2.9.

"Final Order" means an order entered by the Bankruptcy Court or other court of competent jurisdiction, the implementation, operation, or effect of which has not been stayed and as to which order (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing or writ of certiorari has expired and as to which no appeal or petition for review or rehearing or certiorari has been taken and is pending; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Code, may be filed relating to such order, shall not cause such order not to be a Final Order.

"Financing Company Receivables" means all accounts receivable and other amounts owed to any Seller (whether current or non-current) in connection with any customer purchases that are affected through customer's applications for and payment of any amounts owed to any Seller through a finance company.

"Former Employees" means all individuals who have been employed previously by the Sellers (or any of their predecessors) who are not Current Employees.

"Fraud" means fraud (excluding equitable fraud or any fraud claim based on constructive knowledge, negligent misrepresentation, recklessness or a similar theory) by or on behalf of any Party satisfying the requirements of establishing common law fraud under the Laws of the State of Delaware with respect to, in the case of Sellers, the representations and warranties set forth in Article III, the representations and warranties of Sellers set forth in the Related Agreements and the covenants and other obligations of the Sellers set forth in this Agreement and the Related Agreements, and in the case of Buyer, the representations and warranties set forth in Article IV,

8

the representations and warranties of Buyer set forth in the Related Agreements and the covenants and other obligations of Buyer set forth in this Agreement and the Related Agreements.

"Fundamental Documents" means the documents of a Person (other than a natural person) by which such Person establishes its legal existence or which govern its internal affairs. For example, the Fundamental Documents of a corporation would be its charter and bylaws and the Fundamental Documents of a limited liability company would be its certificate of formation and limited liability company agreement or operating agreement.

"GAAP" means generally accepted accounting principles in the United States.

"Gift Card Program" means the gift card program operated and administered by Sellers whereby customers may purchase, in stores or online, pre-paid gift cards that do not lose value which may be redeemed in store or online for merchandise from Sellers.

"Governmental Entity" means any United States federal, state or local or non-United States governmental or regulatory authority, agency, commission, court, body or other governmental entity.

"Hazardous Substance" means any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or man-made, that is defined or regulated as hazardous, acutely hazardous, toxic or words of similar import under Environmental Laws, as well as any per- or polyfluoroalkyl substance, petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos and lead or lead-containing materials.

"Indebtedness" shall mean, with respect to any Person, without duplication:

(a)     obligations of such Person for borrowed money, or otherwise evidenced by bonds, debentures, notes or similar instruments;

(b)     all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person, other than any such obligation made in the ordinary course of business;

(c)     all obligations of such Person issued or assumed as the deferred purchase price of property or services (excluding obligations of such Person to creditors for raw materials, inventory, services and supplies incurred in the ordinary course of such Person's business);

(d)     all obligations of such Person under leases that have been or should be treated, in accordance with GAAP, as capitalized lease obligations of such Person;

(e)     all obligations of others secured by any Lien on property or assets owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, other than any such obligation made in the ordinary course of business;

(f)     all obligations of such Person under interest rate or currency swap transactions (valued at the termination value thereof);

9

(g)     all letters of credit issued for the account of such Person (excluding letters of credit issued for the benefit of suppliers to support accounts payable to suppliers incurred in the ordinary course of business); and

(h)     all guarantees and arrangements having the economic effect of a guarantee of such Person of any Indebtedness of any other Person.

"Indemnification Claims" means claims for indemnification of any present or former officer, director, employee, partner or member of any Seller whether arising under a Seller's Fundamental Documents or any Contract arising prior to the Closing Date.

"Information Presentation" has the meaning set forth in Section 4.9.

"Insurance Policy" means each primary, excess and umbrella insurance policy, bond and other forms of insurance owned or held by or on behalf, or providing insurance coverage to the Business, Sellers and their operations, properties and assets, including all stop-loss insurance policies with respect to Sellers' self-insured medical and/or dental insurance programs.

"Intellectual Property" means any and all rights, title and interest in or relating to intellectual property of any type, which may exist or be created under the Laws of any jurisdiction throughout the world, including: (a) patents and patent applications, together with all reissues, continuations, continuations-in-part, divisionals, extensions and reexaminations in connection therewith; (b) trademarks, service marks, trade dress, logos, slogans, trade names, service names, brand names, Internet domain names and all other source or business identifiers and general intangibles of a like nature, along with all applications, registrations and renewals in connection therewith, and all goodwill associated with any of the foregoing; (c) rights associated with works of authorship, including exclusive exploitation rights, mask work rights, copyrights, database and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof; (d) trade secrets, know-how, business information and technical information (including formulas, techniques and processes) and rights to limit the use or disclosure thereof by any Person; (e) computer software and firmware, including data files, source code, object code and software-related specifications and documentation; (f) all other intellectual property rights related to the Business; and (g) all rights of action arising from any of the foregoing, including all claims for damages or equitable remedies by reason of present, past and future infringement or violation of the foregoing, all defenses relating to or arising from any of the foregoing, and all income, royalties and any other payments now and hereafter due and/or payable to a Seller in respect of the foregoing.

"Intellectual Property Agreements" means any and all agreements, permits, consents, orders and franchises relating to the license, development or use of any Intellectual Property included in the Purchased Assets, including agreements pursuant to which (a) a Seller uses or has been granted any license rights (including rights granted on a service basis) under any Intellectual Property owned by any other Person (other than Commercially Available Software); (b) a Seller has granted to any other Person any license rights under any Intellectual Property included in the Purchased Assets (other than non-exclusive licenses granted by a Seller in the ordinary course of business in connection with the sale, lease or transfer of finished products or services); or (c) any

Intellectual Property is or has been developed by or for a Seller, assigned to a Seller by any other Person, or assigned by a Seller to any other Person.

"Intellectual Property Assignment" has the meaning set forth in Section 2.8(a)(iii).

"Inventory" means all "inventory," as such term is defined in the Uniform Commercial Code, now owned or hereafter acquired by any Seller, wherever located, and, without limiting the foregoing, all (i) inventory, (ii) merchandise, (iii) goods and other personal property, (iv) raw materials, work or construction in process, (v) finished goods, returned goods, or materials or supplies of any kind, nature or description and (vi) products, equipment, and appliances, whether owned or on order, including all embedded software.

"IPP Holdings" has the meaning set forth in the preamble.

"IRS" means the United States Internal Revenue Service.

"Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Entity.

"Leased Real Estate" has the meaning set forth in Section 3.13(c).

"Leases" means all leases, subleases, licenses, concessions and other Contracts, including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, in each case pursuant to which any Seller holds any Leased Real Estate.

"Liability" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred, or asserted or when the relevant events occurred or circumstances existed.

"Lien" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, Claim, charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, rights of use, encroachments, judgments, rights of setoff, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

"Litigation" means any action, complaint, charge, prosecution, indictment, cause of action, suit, claim, investigation, mediation, audit, grievance, demand, hearing, investigation or proceeding, whether civil, criminal, administrative, arbitral, investigative or informal, whether at law or in equity and whether before any Governmental Entity or arbitrator.

11

"Material Adverse Effect" means any change, event, effect, development, condition, circumstance or occurrence (when taken together with all other changes, events, effects, developments, conditions, circumstances or occurrences), that has had, or would reasonably be expected to have, a material adverse effect on (a) the business, operations, Liabilities, properties, assets or condition (financial or otherwise) or results of operations of the Business, including the Purchased Assets and Assumed Liabilities, taken as a whole; provided, however, that no change, event, effect, development, condition, circumstance or occurrence to the extent arising or resulting from any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: (i) national or international business, economic, political or social conditions, including the engagement by the United States of America in hostilities, generally affecting the industry in which the Business operates, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military, cyber or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America; (ii) financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (iii) compliance with this Agreement or any Related Agreement, including the taking of any action expressly required hereby or thereby or the failure to take any action that is prohibited hereby or thereby (other than Sellers' obligations regarding conduct of the business in accordance with Section 5.4); (iv) any changes attributable to or arising from or relating to (A) the taking of any action expressly required by this Agreement or at the written request of Buyer, (B) the failure to take any action if such action is prohibited by this Agreement, or (C) the announcement of this Agreement or the transactions contemplated hereby or the identity, nature or ownership of Buyer, including the impact thereof on the relationships, contractual or otherwise, of the business of the Sellers with employees, customers, lessors, suppliers, vendors or other commercial partners; (v) COVID-19 and reasonable COVID-19 Measures; (vi) in the case of Sellers or the Business, (A) the failure, in and of itself, to meet or exceed any projection or forecast (but, for the avoidance of doubt, not the underlying changes, events, effects, developments, conditions, circumstances or occurrences relating to any such projection or forecast, each of which, individually and in the aggregate shall be taken shall be taken into account in determining whether there has been a Material Adverse Effect) or (B) changes in the business or operations of Sellers or any of their respective Affiliates (including changes in credit terms offered by suppliers or financing sources) resulting from the announcement, filing or pendency of the Chapter 11 Cases or Sellers' and their respective Affiliates' financial condition or Sellers' and certain of their respective Affiliates' status as debtors under Chapter 11 of the Bankruptcy Code; (vii) general business or economic conditions affecting the industry in which the Business operates, or (viii) changes in Law or in GAAP; or (b) the ability of any Seller to perform its obligations hereunder and consummate the transactions contemplated by this Agreement or the Related Agreements on the terms set forth herein and therein; except in the case of clauses (i), (ii), (v), (vii) and (viii) to the extent that such change, event, effect, development, condition, circumstance or occurrence has a disproportionate and material adverse effect on the Business relative to the adverse effect that such change, event, effect, development, condition, circumstance or occurrence has on other companies in the industry or geographies in which the Business operates, then such change, event, effect, development, condition, circumstance or occurrence may be taken into account in determining whether there has been a Material Adverse Effect but only with respect to the disproportionate portion thereof.

"Material Contract" has the meaning set forth in Section 3.7

"New Plans" has the meaning set forth in Section 6.4(a).

"Non-Designated Contract" has the meaning set forth in Section 2.6(b)(iii).

"Non-Real Property Contracts" means the Contracts to which any Seller is a party other than the Leases.

"OFAC" has the meaning set forth in Section 3.21(b).

"Ordinary Course of Business" means the ordinary course of business of Sellers taken as a whole consistent with past custom and practice and taking into account the commencement of the Chapter 11 Cases and the Store Closing Sales.

"Outside Date" has the meaning set forth in Section 8.1(c).

"Parties" has the meaning set forth in the preamble.

"Permit" means any franchise, approval, authorization, permit, license, order, registration, certificate, variance, Consent, exemption or similar right issued, granted, given or otherwise obtained from or by any Governmental Entity, under the authority thereof or pursuant to any applicable Law (including all applications, renewal applications, or documents filed, or fees paid, in connection therewith).

"Permitted Liens" means (a) Liens for utilities and Taxes not yet delinquent; (b) with respect to leased or licensed personal property, the terms and conditions of the lease or license applicable thereto to the extent constituting an Assumed Contract; (c) mechanics liens and similar liens for labor, materials or supplies provided with respect to real property incurred in the Ordinary Course of Business for amounts which are not delinquent and which are not material or which are being contested in good faith by appropriate proceedings; (d) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business, except where any such violation would not, individually or in the aggregate, materially impair the use, operation or transfer of the affected property or the conduct of the Business thereon as it is currently being conducted and (e) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects that do not or would not materially impair value or the use or occupancy of such real property or materially interfere with the operation of the Business at such real property.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

"Personal Information" means (i) all information identifying, or that alone or in combination with other information allows for the identification of, an individual; and (ii) any

13

information that is defined as "personal information" or "personal data" under applicable Privacy Laws.

"Petition Date" means the date of the filing of the Chapter 11 Cases.

"Post-Petition Date Tax Period" means any taxable period beginning after the Petition Date and, with respect to any taxable period beginning before and ending after the Petition Date, the portion of such taxable period beginning after the Petition Date.

"Pre-Petition Date Tax Period" means any taxable period ending on or before the Petition Date and, with respect to any taxable period beginning before and ending after the Petition Date, the portion of such taxable period ending on and including the Petition Date.

"Prepetition ABL Agent" means the administrative agent and collateral agent under the Prepetition ABL Credit Agreement.

"Prepetition ABL Credit Agreement" means that certain Credit Agreement, dated as of December 22, 2017, by and among IPP Intermediate Holdings and certain Subsidiaries of IPP Intermediate Holdings as borrowers, the Guarantors (as defined therein) party thereto from time to time, the Lenders (as defined therein) party thereto from time to time, and the Prepetition ABL Agent (as supplemented, amended, modified, restated, or extended from time to time).

"Prepetition DDTL Agent" means Wilmington Trust, National Association, in its capacity as administrative agent and collateral agent under the Prepetition DDTL Credit Agreement, or any successor thereto or assignee thereof in such capacity.

"Prepetition DDTL Credit Agreement" means that certain Credit Agreement dated as of November 20, 2018 by and among IPP Intermediate Holdings, as borrower, Independent Pet Partners Intermediate Holdings II, LLC, a Delaware limited liability company ("IPP Intermediate Holdings II") and certain Subsidiaries of IPP Intermediate Holdings II, as guarantors, the Lenders (as defined therein) party thereto from time to time, and the Prepetition DDTL Agent party thereto from time to time, and the Prepetition ABL Agent (as supplemented, amended, modified, restated, or extended from time to time).

"Prepetition DDTL Secured Obligations" has the meaning assigned to the term "DDTL Secured Obligations" in the Prepetition Intercreditor Agreement.

"Prepetition Intercreditor Agreement" means the Intercreditor Agreement, dated as of November 28, 2022, by and among the Prepetition Priming Agent, the Prepetition DDTL Agent and the Prepetition ABL Agent, as may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"Prepetition Priming Agent" means the administrative agent and collateral agent under the Prepetition Priming Credit Agreement.

"Prepetition Priming Credit Agreement" means that certain Credit Agreement, dated as of November 28, 2022, by and among IPP Intermediate Holdings II, IPP Intermediate Holdings, the Lenders (as defined therein) party thereto from time to time, and the Prepetition Priming Agent (as

14

amended by the First Amendment to Credit Agreement, dated as of January 25, 2023, and as further amended, modified, restated, supplemented or extended from time to time to the extent permitted by this Agreement and the Prepetition Intercreditor Agreement).

"Prepetition Priming Secured Obligations" has the meaning assigned to the term "Priming Secured Obligations" in the Prepetition Intercreditor Agreement.

"Privacy Laws" has the meaning set forth in Section 3.20.

"Privacy Policies" has the meaning set forth in Section 3.20.

"Professional Fees and Expenses" means the reasonable and documented fees and expenses of professionals of Sellers and any committee appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code that are accrued and unpaid as of the Closing Date, whether or not included in a fee statement or fee application at such time and whether or not allowed by the Bankruptcy Court at such time.

"Proposed Allocation Schedule" has the meaning set forth in Section 2.9.

"Purchase Price" has the meaning set forth in Section 2.5.

"Purchased Assets" has the meaning set forth in Section 2.1.

"Purchased Avoidance Actions" means all causes of action, lawsuits, claims, rights of recovery and other similar rights of any Seller, including avoidance claims or causes of action under Chapter 5 of the Bankruptcy Code relating to the Purchased Assets.

"Purchased Facilities" has the meaning set forth in Section 3.5(b).

"Qualified Bid" means competing bids qualified for the Auction in accordance with the Sale Procedures Order.

"Records" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, technical documentation, invention disclosures, software code, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Business or the Purchased Assets.

"Refund and Exchange Program" means the refund and exchange program whereby customers may return or exchange merchandise purchased, whether in stores or online, from Sellers and Sellers will honor returns and refunds or exchange items within forty-five (45) days from the original date or purchase.

"Registered" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Entity or domain name registrar.

"Rejection Damages Claims" means all claims under Section 502 of the Bankruptcy Code arising from or related to the rejection of a Contract under section 365 of the Bankruptcy Code.

"Related Agreements" means the Bill of Sale, the Assignment and Assumption Agreement and the Intellectual Property Assignment and any other instruments of transfer and conveyance as may be required under applicable Law to convey valid title of the Purchased Assets to Buyer.

"Released Seller Representatives" has the meaning set forth in Section 6.8(b).

"Representative" of a Person means such Person's Subsidiaries and the officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents of such Person or its Subsidiaries.

"Rewards Program" means the customer loyalty programs, including Wellness Pass and Friends of Chuck, administered and operated by Sellers whereby individuals accrue points that can be redeemed for discount certificates and free pet food.

"Robinson Litigation" means *Westley Robinson v. Independent Pet Partners Holdings, LLC, et al.*, Case Number 20SMCV01217, filed in the Los Angeles Superior Court, West District.

"Roll-Up Loans" has the meaning ascribed to such term in the DIP Agreement.

"Sale Hearing" means the hearing conducted in the Bankruptcy Court to seek approval of the Sale Motion and the Contemplated Transactions.

"Sale Motion" means a combined motion filed by the Sellers with the Bankruptcy Court in connection with the Chapter 11 Cases requesting the entry of the Sale Order.

"Sale Order" has the meaning set forth in Section 5.3(b)(ii).

"Sale Order Deadline" means March 31, 2023, unless extended by Sellers with the consent of Buyer.

"Sale Procedures Order" has the meaning set forth in Section 5.3(b)(i).

"Sale Procedures Order Deadline" means February 24, 2023, unless extended by Sellers with the consent of Buyer.

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Seller Subsidiaries" has the meaning set forth in the preamble.

"Sellers' Knowledge" means the actual knowledge of Julie Maday after reasonable inquiry.

"Sellers' Plan" has the meaning set forth in Section 6.11.

"Services" has the meaning set forth in Section 6.13.

"Special Compensation Agreements" mean those certain special compensation agreements entered into by and between IPP Holdings and certain Employees of Sellers whereby IPP Holdings has made a cash retention payment to such Employee prior to the date hereof.

"Specified Commercial Contract List" has the meaning set forth in Section 2.6(b)(i).

"Star Litigation" means *Randi Star, et al. v. IPP – Stores, LLC d/b/a Kriser's Natural Pet*, Case Number 21STCV38923, filed in the Los Angeles Superior Court.

"Store Closing Sales" means the going out of business and store closing sales to be conducted pursuant to the Store Closing Sales Order.

"Store Closing Sales Order" means the interim order or final order, as then applicable, entered by the Bankruptcy Court authorizing Sellers to retain an inventory liquidation firm and conduct going out of business and store closing sales at certain of Sellers' stores, in each case in form and substance satisfactory to Buyer in its reasonable discretion.

"Straddle Period" means a taxable period that begins before and ends after the Petition Date.

"Structures" means, collectively, buildings, structures, and fixtures on, and other improvements to, the Leased Real Estate.

"Subject Parties" has the meaning set forth in Section 6.14.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or other persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Tangible Personal Property" has the meaning set forth in Section 2.1(i).

"Tax" or "Taxes" means any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, escheat or unclaimed property Liability, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, sales, use, liquor, cigarette, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed

on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transfer Tax" has the meaning set forth in Section 6.6.

"Transferred Employee" has the meaning set forth in Section 6.4(a).

"Transition Services Agreement" has the meaning set forth in Section 6.13.

"WARN" has the meaning set forth in Section 3.11(c).

"Willful Breach" means a material breach of this Agreement that is a consequence of an act or failure to act with the knowledge (actual or the knowledge with which a person acting reasonably should have) that the taking of the act or failure to act would result (or would be reasonably likely to result in) in a material breach of this Agreement.

"Wind-Down Amount" means an amount not to exceed $2,000,000 to conduct an orderly wind-down of Sellers after the Closing Date.

"Wind-Down Expenses" means the actual obligations, costs, fees, and expenses incurred as a result of or otherwise related to the wind down of the Sellers' estates funded in whole or in part by the Wind-Down Amount, which such obligations, costs, fees, and expenses shall include amounts payable to each creditor and other stakeholder on account of such creditor's or other stakeholder's Claim under the Chapter 11 Cases.

## ARTICLE II
## PURCHASE AND SALE

**Section 2.1    Purchase and Sale of Purchased Assets**. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall purchase, acquire and accept from Sellers, on an "as is, where is" basis and without any representation or warranty on the part of Sellers as to fitness, merchantability or otherwise (other than, in each case, as set forth in this Agreement and/or in the Related Agreements), and Sellers shall sell, transfer, assign, convey and deliver to Buyer, all of the Purchased Assets, free and clear of all Liens (except for Permitted Liens and Assumed Liabilities), for the consideration specified in Section 2.5. "Purchased Assets" shall mean all of the direct or indirect right, title and interest of Sellers in and to the tangible and intangible assets, properties, rights, claims and Contracts used, useful, or held for use in, or related to, the Business (but excluding Excluded Assets) as of the Closing, including the following; provided, that for the avoidance of doubt, for all purposes of Article III, all references to the Purchased Assets include only those assets of Sellers as of the date hereof that will become Purchased Assets upon the consummation of the transactions contemplated by this Agreement or the Related Agreements (provided further that, for the avoidance of doubt, such proviso is not intended to, nor shall it exclude, for any purposes of Section 7.1(a) as such Section relates to the testing of the

18

representations and warranties made in Article III as of the Closing as if made as of the Closing, any assets that are acquired by any Seller after the date hereof and that constitute Purchased Assets as of the Closing).

(a)    all Accounts Receivable of Sellers, including all Credit Card Receivables and Financing Company Receivables, as of the Closing;

(b)    all Inventory of Sellers as of the Closing, including all rights of Sellers to receive such Inventory, supplies and materials which are on order as of the Closing;

(c)    all deposits (including deposits in transit, customer deposits (the "Customer Deposits") and security deposits for rent, electricity, telephone, utilities or otherwise) and other prepaid charges and expenses, credits, advance payments, charges and fees of Sellers;

(d)    all Assumed Contracts that have been assumed by and assigned to Buyer pursuant to Section 2.6;

(e)    all Intellectual Property owned, or purported to be owned, in whole or in part, by Sellers;

(f)    all customer data and information derived from customer purchase files and branded loyalty promotion programs and other similar information related to customer purchases, including personal information and customer purchase history at a transaction level, including relating to customers of the E-Commerce Platform or any similar e-commerce platform owned, operated or controlled by Sellers;

(g)    all rights of publicity and similar rights, including all marketing assets, including upcoming campaign material, current point-of-purchase material and historical digital assets;

(h)    all industrial and motor vehicles owned by Sellers;

(i)    all items of machinery, equipment, supplies, furniture, fixtures, other personal property and leasehold improvements (to the extent of Sellers' rights to any leasehold improvements under the Leases that are Assumed Contracts) owned by Sellers as of the Closing (the "Tangible Personal Property");

(j)    all information technology assets, including licenses, software and hardware related to the Business or the ownership or operation of the Purchased Assets or the Business, including the E-Commerce Platform;

(k)    all five-digit UPC codes and customer service phone numbers related to the Business;

(l)    all Records (including Tax records, Tax Returns and personnel files and related information for all Transferred Employees) except for Excluded Records;

(m) all goodwill associated with the Business or the Purchased Assets, including all goodwill associated with the Intellectual Property owned by Sellers, the right to represent to third parties that Buyer is the successor to the Business, all rights under any non-disclosure and confidentiality, noncompete, or nonsolicitation agreements with current or former employees, directors, independent contractors and agents of any Seller or with third parties for the benefit of any Seller, in each case to the extent relating to the Business, the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(n) all of the Assumed Permits or all of the rights and benefits accruing under any Permits relating to the Business to the extent transferrable and held by Sellers;

(o) all Employee Benefit Plans listed on Schedule 2.1(o) (the "Assumed Employee Benefit Plans") and trusts, Insurance Policies, rights and other assets set aside and specifically reserved solely to fund benefits payable under the applicable Assumed Employee Benefit Plan;

(p) subject to Section 2.2(h), all current Insurance Policies relating or allocable to the Purchased Assets or Assumed Liabilities and all rights of any nature with respect thereto, including all prepaid premiums with respect thereto and insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(q) all cash (including all cash drawn under the DIP Facility as of the Closing Date and all net cash proceeds of the Store Closing Sales), cash equivalents, bank deposits, prepayments (including all prepayments made to third party vendors), deferred assets, refunds, credits or overpayments, and similar cash items of Sellers (including all rights arising from any refunds due from federal, state and/or local Governmental Entities with respect to Taxes paid by Sellers or otherwise in respect of the Purchased Assets for periods ending on or prior to the Closing Date), except for the Excluded Cash, but including the DIP Reversionary Interest, if any;

(r) all other rights, demands, claims, credits, allowances, rebates or other refunds and rights in respect of promotional allowances or rights of setoff and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), other than against Sellers, arising out of or relating to the Business as of the Closing, including all deposits (including Customer Deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances, prepayments and deferred assets;

(s) except for the Excluded Claims, all Causes of Action;

(t) all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to equipment purchased, products sold, or services provided, to Sellers or to the extent affecting any Purchased Assets and/or Assumed Liabilities;

(u) all assets, rights and claims arising from or with respect to Taxes of any Seller, including all rights arising from any refunds due from federal, state and/or local Governmental Entities with respect to Taxes paid by Sellers, all deferred tax assets, Tax deposits,

Tax prepayments and estimated Tax payments, in each case for Taxes owed the Sellers for periods ending on or prior to the Closing Date;

(v)    to the extent not covered above in this Section 2.1, all of the Sellers' telephone numbers, fax numbers, e-mail addresses, websites, URLs and internet domain names related to the Business;

(w)    all rights and claims under the Special Compensation Agreements; and

(x)    all other assets that are related to, used in or which could be used in connection with the Purchased Assets or the Business (but excluding all of the Excluded Assets).

Section 2.2    **Excluded Assets**. Notwithstanding Section 2.1, Buyer expressly understands and agrees that Buyer is not purchasing or acquiring, and Seller is not selling or assigning, any of the following assets, properties and rights of Sellers (the "Excluded Assets"):

(a)    the Excluded Cash;

(b)    all of Sellers' Fundamental Documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, unit certificates and other documents relating to the organization, maintenance and existence of any Seller as a limited liability company, corporation or other entity;

(c)    all equity securities of any Seller or securities convertible into, exchangeable, or exercisable for any such equity securities and all net operating losses of any Seller;

(d)    all Leases (and related Leased Real Estate) and Contracts, in each case, other than the Assumed Contracts;

(e)    the Excluded Claims;

(f)    any (1) personnel files for Current Employees and Former Employees of Sellers who are not Transferred Employees, (2) Records containing confidential personal private information including confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the disclosure of such information is prohibited by applicable Law, (3) other Records that Sellers are required by Law to retain and (4) any Records or other documents of Sellers relating to the Chapter 11 Cases that are protected by the attorney-client privilege held by Sellers (collectively, the "Excluded Records"); provided that Buyer shall have the right to make copies of any portions of such Excluded Records (other than the Records referenced in subsection (4)) to the extent that such portions relate to the Business or any Purchased Asset;

(g)    all Permits other than the Assumed Permits;

(h)    all directors' and officers' liability Insurance Policies, including any tail Insurance Policies (the "D&O Insurance Policies"), and all rights of any nature with respect to any

such Insurance Policies, including any claims or recoveries thereunder and any rights to assess claims seeking any such recoveries (for the avoidance of doubt, any and all Liabilities arising out of or relating to such insurance, including with respect to any underlying claims that give rise to claims seeking recovery in connection therewith, constitute Excluded Liabilities); provided, that nothing in this clause (h) shall cause or be deemed to cause any Cause of Action against any Subject Party to be an Excluded Asset, it being acknowledged and agreed that all Causes of Action against any Subject Party shall be Purchased Assets;

(i)        any assets expressly excluded from Purchased Assets pursuant to Section 2.1;

(j)        all Employee Benefit Plans (other than the Assumed Employee Benefit Plans) and trusts, Insurance Policies, rights and other assets set aside and specifically reserved solely to fund benefits payable under the applicable Employee Benefit Plan (other than those related to the Assumed Employee Benefit Plans);

(k)        the assets listed on Schedule 2.2(k);

(l)        all assets of IPP Holdings and Independent Pet Partners Intermediate Holdings I, LLC, Delaware limited liability company ("IPP Intermediate Holdings I") other than the Assumed Contracts of such entities; and

(m)        the rights of Sellers under this Agreement and the Related Agreements and all cash and non-cash consideration payable or deliverable to Sellers under this Agreement.

**Section 2.3        Assumption of Assumed Liabilities**. On the terms and subject to the conditions of this Agreement, at the Closing (or, with respect to Assumed Liabilities under Assumed Contracts or Assumed Permits that are assumed by Buyer after the Closing, such later date of assumption as provided in Section 2.6), Buyer shall assume from Sellers (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers shall irrevocably convey, transfer, and assign to Buyer, the following Liabilities, without duplication and only to the extent not paid prior to the Closing and no other Liabilities (collectively, the "Assumed Liabilities"):

(a)        Liabilities under the Assumed Contracts (including the Cure Amounts, which are payable by Buyer pursuant to Section 2.6(a)(ii) and Section 2.6(b)(v)) and the Assumed Permits first accruing from and after the Closing Date (except as may otherwise be assumed from and after the Petition Date pursuant to Section 2.3(c)) as well as any Liabilities arising out of the conduct of the Business or the ownership of the Purchased Assets, in each case, by Buyer from and after the Closing Date (except as may otherwise be assumed from and after the Petition Date pursuant to Section 2.3(c)), expressly excluding any and all non-monetary Liabilities arising out of any breach, default or failure to perform on or prior to the Closing under any Assumed Contract or Assumed Permit that do not need to be cured under section 365 of the Bankruptcy Code as a condition to the assumption or assignment (with each such Liability constituting an Excluded Liability);

(b)        (i) unpaid payroll, wages, worker's compensation, bonuses, tips, commissions, vacation and payroll Taxes related to such amounts and (ii) accrued bonuses for

store managers, in each case, occurring in the Ordinary Course of Business and first accruing and relating solely to periods from and after the Petition Date, for all Employees, and solely to the extent due and payable in the Ordinary Course of Business following the Closing; provided, however, that the Assumed Liabilities shall not include any unpaid payroll, wages, worker's compensation, bonuses, tips, commissions, vacation or payroll Taxes which accrued or relate to periods prior to the Petition Date;

(c)    all accounts payable and insurance expenses of any Seller incurred in the Ordinary Course of Business first accruing and relating solely to periods from and after the Petition Date, and solely to the extent due and payable in the Ordinary Course of Business following the Closing; provided, however, that the Assumed Liabilities shall not include any unpaid accounts payable or other expense which accrued or relate to periods prior to the Petition Date;

(d)    all Liabilities relating to continuation of health care coverage, to the extent required by COBRA, to Current Employees and Former Employees of the Sellers (and their qualified beneficiaries) who left employment or otherwise experienced a COBRA qualifying event on or prior to the Closing Date;

(e)    all Liabilities for Customer Deposits as of the Closing Date;

(f)    all Tax Liabilities relating to the Purchased Assets or the Business attributable to a taxable period (or portion thereof) beginning after the Petition Date;

(g)    all Transfer Taxes in accordance with Section 6.6;

(h)    the Cure Amounts under any and all Assumed Contracts;

(i)    all Liabilities under the Assumed Employee Benefit Plans (including Cure Amounts), to the extent such Liabilities (i) do not arise from non-compliance with applicable Law and (ii) arise from the ordinary course operation of the applicable Assumed Employee Benefit Plans in accordance with the express terms thereof;

(j)    all accrued and unpaid Administrative Expenses incurred by Sellers prior to the Closing Date other than Professional Fees and Expenses; and

(k)    all Liabilities and obligations under the Refund and Exchange Program, the Rewards Program and the Gift Card Program as of the Closing Date (excluding any escheatment claims), solely to the extent relating to the Chuck & Don's and Kriser's stores operated by Sellers.

Section 2.4    **Excluded Liabilities**. Notwithstanding anything herein to the contrary, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Sellers or the Business, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities (all such Liabilities that Buyer is not assuming being referred to collectively as the "Excluded Liabilities"), including:

(a)    any Liabilities or obligations under the Employee Benefit Plans, except as expressly assumed pursuant to Section 2.3(i);

(b)      any Liabilities and obligations that are not Assumed Liabilities relating to any current or former directors, officers, managers, employees, consultants or other service providers of any Seller or any ERISA Affiliate, with respect to their employment, engagement and/or termination of employment or engagement with any Seller or any ERISA Affiliate, or any spouse, dependent or beneficiary thereof, including any Liability or obligation under any Employee Benefit Plan or any other employee benefit plans, programs or arrangements with respect to which any Seller or ERISA Affiliate has or may have any Liability, contingent or otherwise, except as provided in Section 2.3(i), and any Liability under any employment agreement, offer letter, consulting agreement or similar agreement between any Seller or any ERISA Affiliate and any current or former directors, officers, managers, employees, consultants or other service providers of any Seller or ERISA Affiliate, excluding for purposes of clauses (a) and (b) of this Section 2.4 the Liabilities and obligations for (i) accrued payroll, accrued and unused vacation and accrued payroll Taxes related to such amounts for Transferred Employees, in each case, to the extent first arising and related solely to the period following the Petition Date, and (ii) accrued bonuses for store managers who are Transferred Employees, to the extent arising and related solely to the period following the Petition Date;

(c)      all obligations to garnish wages for all  Employees, to the extent arising and related to the period prior to the Closing Date;

(d)      any Liability of any Seller to the extent relating to or arising out of any Excluded Asset;

(e)      all Liabilities under Indebtedness of the Sellers (including any Indebtedness or accounts payable owing from any Seller to any Affiliate of such Seller), except as expressly assumed pursuant to Section 2.3(c);

(f)      (i) all Tax Liabilities of Sellers or their Affiliates for any taxable period, other than Assumed Liabilities, and (ii) all Tax Liabilities relating to the Purchased Assets or the Business attributable to a taxable period (or portion thereof) ending on or before the Petition Date;

(g)      all Rejection Damages Claims;

(h)      any tort Liabilities of any Seller;

(i)      all Liabilities relating to the CARES Act, including any obligation with respect to deferred payroll Taxes;

(j)      all Environmental Liabilities relating to, resulting from, caused by or arising out of the ownership, operation or control of the Business as currently or formerly conducted (including any real property currently or formerly owned, leased, occupied or operated in connection with the Business) or the Purchased Assets, to the extent accruing from, arising out of or relating to events, occurrences, acts or omissions first occurring or existing prior to the Closing Date;

(k)      all Litigation against any Seller, any of their respective assets, the Business and any of their past or present operations or activities, including for the avoidance of doubt, the following claims: (i) the Robinson Litigation, (ii) the Star Litigation, and (iii) the Cockrill

24

Litigation and, for the avoidance of doubt, notwithstanding anything to the contrary herein, any Liability associated with or resulting from any such Litigation or violations of Law asserted in any such Litigation;

(l)  all Indemnification Claims;

(m)  all Professional Fees and Expenses;

(n)  any Liability of any Seller, any of their Affiliates or any of their respective directors, officers, stockholders or agents (acting in such capacities), arising out of, or relating to, this Agreement or the other Related Agreements, whether incurred prior to, at, or subsequent to, the Closing, including all finder's or broker's fees and expenses and any and all fees and expenses of any representatives of any of them;

(o)  other than as specifically set forth herein and expressly included as an Assumed Liability (including those Assumed Liabilities arising and related to the time period following the Petition Date and/or Closing Date, in each case, if any, and to the extent expressly set forth herein as an Assumed Liability), any Liability relating to, occurring or existing in connection with, or arising out of, (A) the ownership of Sellers, (B) the ownership or operation of the Business prior to the Closing (including any Litigation outstanding as of the Closing where any of the Purchased Assets are subject or where a Seller is a defendant), or (C) the ownership, possession, use, operation or sale or other disposition prior to the Closing of any Purchased Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing, with the Business);

(p)  all accounts payable of any Seller, except as expressly assumed pursuant to Section 2.3(c); and

(q)  all Liabilities of IPP Holdings and IPP Intermediate Holdings I other than the Liabilities expressly assumed pursuant to Section 2.3(a);

(r)  any Liabilities or obligations under the Refund and Exchange Program, the Rewards Program and the Gift Card Program as of the Closing Date, except as expressly assumed pursuant to Section 2.3(k); and

(s)  any other Liability or obligation of any Seller or any of their Affiliates, whether relating to or arising from the Business, the Purchased Assets or otherwise, arising from facts, circumstances, occurrences, conditions, acts or omissions occurring prior to Closing, of whatever nature, whether known or unknown, accrued, contingent, absolute, determined, determinable, presently in existence or arising hereafter.

**Section 2.5    Consideration**. On the terms and subject to the conditions hereof, at the Closing, the aggregate consideration for the Purchased Assets shall consist of: (i) a credit bid under and in accordance with Section 363(k) of the Bankruptcy Code (the "Credit Bid") in the amount of $60,000,000.00 consisting of $27,258,311.48 in DIP Obligations, $9,195,481.69 in Prepetition Priming Secured Obligations and $23,546,206.83 in Prepetition DDTL Secured Obligations and (ii) the amount of the assumption of the Assumed Liabilities (the sum of clauses (i)-(ii), the "Purchase Price").

25

**Section 2.6**     **Assumption and Assignment of Contracts.**

(a)     This Section 2.6(a) shall apply to all Contracts and Leases other than Specified Commercial Contracts, and all references to Contracts or Leases in this Section 2.6(a) shall not include Specified Commercial Contracts, which shall be subject to the procedures set forth in Section 2.6(b).

(i)     Schedule 2.6(a)(i) (the "Assumed Contract List") sets forth a list of all Contracts and Leases to which a Seller is a party and which Buyer has designated to be included as an Assumed Contract, together with estimated Cure Amounts for each Assumed Contract; provided that if estimated Cure Amounts for any Contract or Lease listed on Schedule 2.6(a)(i) are not provided therein, Sellers shall deliver an updated Schedule 2.6(a)(i) with such missing estimated Cure Amounts within five (5) Business Days following execution of this Agreement. Buyer shall have the right to amend the Assumed Contract List in any respect at any time prior to the Closing Date.  Any Contract or Lease that is added to the Assumed Contract List by Buyer prior to the Closing Date and remains on the Assumed Contract list at the time of the Closing shall be an Assumed Contract, and any Contract or Lease that is removed from the Assumed Contract List by Buyer prior to the Closing Date and is not listed on the Assumed Contract list at the time of the Closing shall not be an Assumed Contract.

(ii)     In connection with the assumption and assignment to Buyer of any Assumed Contract pursuant to this Section 2.6(a), (i) the cure amounts, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Contracts for the assumption thereof and assignment to Buyer as provided herein and in the Sale Order (such amounts, the "Cure Amounts"), shall be paid by Buyer at the Closing, or at such later date as shall be approved by the Bankruptcy Court or as may be agreed to by the counterparty to such Assumed Contract, and not by Sellers, and Sellers shall have no Liability therefor, and (ii) Buyer shall provide sufficient adequate assurance of future performance as of the Sale Hearing necessary to satisfy the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to Assumed Contracts.

(iii)     Sellers shall use their respective commercially reasonable efforts to assign the Assumed Contracts to Buyer, including using commercially reasonable efforts to facilitate negotiations with the counterparties to such Assumed Contracts and to obtain an order of the Bankruptcy Court (which shall be the Sale Order) containing a finding that the proposed assignment to and assumption of the Assumed Contracts by Buyer, on the terms set forth in this Section 2.6(a), satisfies all applicable requirements of section 365 of the Bankruptcy Code. At the Closing, the Sellers shall, pursuant to the Sale Order and the Assignment and Assumption Agreement, assign to Buyer each of the Assumed Contracts that is capable of being assigned and assumed by Buyer pursuant to the terms of such Assumed Contract or the Sale Order.

(iv)     In the event Sellers are unable to assign any such Assumed Contract to Buyer without the Consent of another Person, which Consent has not been obtained prior to Closing or pursuant to an order of the Bankruptcy Court, then the Parties shall use their commercially reasonable efforts to obtain, and to cooperate in obtaining, all Consents from Governmental Entities and third parties necessary to assume and assign such Assumed Contracts to Buyer, including, in the case of Sellers, paying any applicable Cure Amounts.

(v)     Notwithstanding the foregoing, a Contract shall not be an Assumed Contract hereunder and shall not be assigned to, or assumed by, Buyer to the extent that such Contract (i) is rejected by a Seller or terminated by a Seller in accordance with the terms hereof or by the other party thereto, or terminates or expires by its terms, on or prior to the Closing and is not continued or otherwise extended upon assumption, (ii) requires a Consent of any Governmental Entity or other third party (except as permitted without such Consent by the Bankruptcy Code) in order to permit the sale or transfer to Buyer of Sellers' rights under such Contract, and no such Consent has been obtained prior to the Closing, or (iii) constitutes an Employee Benefit Plan. In addition, a Permit shall not be assigned to, or assumed by, Buyer to the extent that such Permit requires a Consent of any Governmental Entity or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer of Sellers' rights under such Permit, and no such Consent has been obtained prior to the Closing. If any such Consent shall not be obtained, or if any attempted assignment of such Contract or Permit would be ineffective or would impair Buyer's rights under such Contract or Permit in question so that Buyer would not in effect acquire the benefit of such rights, such Seller, to the maximum extent permitted by Law and the applicable Contract or Permit (and subject to any approval of the Bankruptcy Court that may be required) and at Buyer's sole cost and expense, shall act after the Closing as Buyer's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by Law and the applicable Contract or Permit, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer. Buyer shall reasonably cooperate with Sellers in order to enable Sellers to provide to Buyer the benefits contemplated by this Section 2.6(a)(v).

(b)     This Section 2.6(b) shall apply to Specified Commercial Contracts.

(i)     Schedule 2.6(b)(i) (the "Specified Commercial Contract List") sets forth a list of all Contracts to which a Seller is a party and which Buyer has designated as specified commercial contracts (the "Specified Commercial Contracts"), together with the estimated Cure Amounts for each Specified Commercial Contract as of the Closing Date; provided that if estimated Cure Amounts for any Contract listed on Schedule 2.6(b)(i) are not provided therein, Sellers shall deliver an updated Schedule 2.6(b)(i) with such missing estimated Cure Amounts within five (5) Business Days following execution of this Agreement.

27

(ii)     The Specified Commercial Contracts shall be Potential Purchased Contracts (as defined in the Sale Procedures Order), and Sellers shall serve each counterparty to a Specified Commercial Contract (each, a "Specified Commercial Contract Counterparty") with an Assumption Notice (as defined in the Sale Procedures Order) on or prior to the Assumption Notice Deadline (as defined in the Sale Procedures Order).  The Specified Commercial Contracts and Specified Commercial Contract Counterparties shall be subject to the Assumption and Assignment Procedures (as defined in the Sale Procedures Order), including the applicable deadlines for requesting information and filing Contract Objections (as defined in the Sale Procedures Order).

(iii)     At any time during the period from the date the Bankruptcy Court enters the Sale Procedures Order through the date that is forty-five (45) days after the Closing Date (the "Designation Period"), Buyer may, in its sole discretion, designate any Specified Commercial Contract either as (x) an Assumed Contract (a "Designated Contract"), or (y) a Contract that will not be an Assumed Contract (a "Non-Designated Contract") by providing written notice to Sellers (the "Designation Notice").  Within five (5) Business Days of Sellers' receipt of a Designation Notice, Sellers shall provide written notice to the applicable Specified Commercial Contract Counterparty of Sellers' intent to assume and assign such Designated Contract or reject such Non-Designated Contract, as applicable.  With respect to Designated Contracts, such notice shall include (i) an updated proposed Cure Amount (the "Updated Proposed Cure Amount") associated with such Designated Contract and (ii) the deadline to file a supplemental objection solely on the grounds that the Updated Proposed Cure Amount is inadequate (a "Supplemental Contract Objection") to the assumption and assignment of such Designated Contract (the "Designated Contract Objection Deadline"), which deadline shall be no more than fourteen (14) calendar days from service of such notice.  If the Specified Commercial Contract Counterparty consents to the assumption and assignment on terms mutually agreed by Buyer and the Specified Commercial Contract Counterparty or does not timely object, the assumption and assignment of a Designated Contract shall be effective without further order of the Bankruptcy Court upon expiration of the applicable Supplemental Objection Deadline.  If Buyer, Sellers and a Specified Commercial Contract Counterparty are unable to resolve a timely served Supplemental Contract Objection, Sellers shall schedule the matter for hearing on no less than five (5) Business Days' notice.  To the extent that (i) Sellers settle a Supplemental Contract Objection or (ii) the Court enters an order resolving a Supplemental Contract Objection, and such settlement or order is not acceptable to Buyer, Buyer shall have the option to designate the relevant contract as a Non-Designated Contract, and neither Buyer nor any Seller shall be responsible for any Cure Amounts related to such Contract.  In the event Buyer does not provide a Designation Notice with respect to a Specified Commercial Contract prior to the expiration of the Designation Period, such Contract shall be deemed a Non-Designated Contract as of the date on which the Designation Period expires.

28

(iv)     Notwithstanding Section 2.6(b)(iii), during the Designation Period, Buyer may deliver a written notice to Sellers of Buyer's entry into an agreement with a Specified Commercial Contract Counterparty pursuant to which such Specified Commercial Contract Counterparty consents to the assumption and assignment to Buyer or its designee of its Specified Commercial Contract on the terms set forth in such agreement.  The assumption and assignment of any Specified Commercial Contract pursuant to this Section 2.6(b)(iv) shall be effective on the date set forth in the written notice provided to Sellers without further order of the Bankruptcy Court.

(v)     In connection with the assumption and assignment to Buyer of any Specified Commercial Contract pursuant to this Section 2.6(b), the Cure Amounts, if any, shall be paid by Buyer (i) at the time of effectiveness of such assumption and assignment pursuant to Section 2.6(b)(iii) or (iv), (ii) at such later date as shall be approved by the Bankruptcy Court or (iii) as may be agreed to by the Specified Commercial Contract Counterparty.

(vi)     Sellers shall use their respective commercially reasonable efforts to assign the Designated Contracts to Buyer, including using commercially reasonable efforts to facilitate negotiations with the Specified Commercial Contract Counterparty and to obtain an order of the Bankruptcy Court (which may be the Sale Order) containing a finding that the proposed assignment to and assumption of the Designated Contracts by Buyer, on the terms set forth in this Section 2.6(b), satisfies all applicable requirements of section 365 of the Bankruptcy Code. At the time of effectiveness of such assumption and assignment pursuant to Section 2.6(b)(iii) or (iv), Sellers shall assign to Buyer each of the Designated Contracts that is capable of being assigned and assumed by Buyer.

(vii)     In the event Sellers are unable to assign any such Designated Contract to Buyer without the Consent of another Person, then the Parties shall use their commercially reasonable efforts to obtain, and to cooperate in obtaining, all required Consents necessary to assume and assign such Designated Contracts to Buyer.

(viii)     Notwithstanding the foregoing, a Specified Commercial Contract shall not be an Assumed Contract hereunder and shall not be assigned to, or assumed by, Buyer to the extent that such Specified Commercial Contract (i) is rejected by a Seller or terminated by a Seller in accordance with the terms hereof or by the other party thereto, or terminates or expires by its terms, on or prior to the time of effectiveness of such assumption and assignment pursuant to Section 2.6(b)(iii) or (iv) and is not continued or otherwise extended upon assumption, (ii) requires a Consent of any Governmental Entity or other third party (except as permitted without such Consent by the Bankruptcy Code) in order to permit the sale or transfer to Buyer of Sellers' rights under such Specified Commercial Contract and no such Consent has been obtained prior to the time of effectiveness of such assumption and assignment pursuant to Section 2.6(b)(iii) or (iv) or (iii) constitutes an Employee Benefit Plan.

29

(ix)    In addition to the Assumed Liabilities, Buyer shall be responsible for any and all Liabilities of Sellers or any of their respective Affiliates under each Specified Commercial Contract that first accrue and are incurred during the period from and after the Closing Date through the earliest of (a) the effective date of such Specified Commercial Contract's assumption and assignment to Buyer, (b) seven (7) calendar days following the designation of such Specified Commercial Contract as a Non-Designated Contract and (c) seven (7) calendar days following the expiration of the Designation Period.

**Section 2.7**    **Closing**. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place remotely by electronic exchange of counterpart signature pages commencing at 10:00 a.m. local time on the date (the "Closing Date") that is the first Business Day after the date on which all conditions to the obligations of Sellers and Buyer to consummate the Contemplated Transactions set forth in Article VII (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or at such other time or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto; provided, however, that in no event shall Buyer be required to effect the Closing prior to the date that is forty-five (45) days after the date hereof.

**Section 2.8**    **Deliveries at Closing**.

(a)    At the Closing, Sellers shall deliver to Buyer the following documents and other items, duly executed by Sellers, as applicable:

(i)    one or more Bills of Sale substantially in the form of Exhibit A attached hereto ("Bill of Sale");

(ii)    one or more Assignment and Assumption Agreements substantially in the form of Exhibit B attached hereto ("Assignment and Assumption Agreement");

(iii)    instrument of assignment substantially in the form of Exhibit C attached hereto for each registered patent, registered copyright, registered trademark and domain name, respectively, transferred or assigned hereby and for each pending application therefor (the "Intellectual Property Assignment");

(iv)    any other Related Agreements required to be executed by Sellers;

(v)    a copy of the Sale Order;

(vi)    the certificate described in Section 7.1(i);

(vii)    a valid, complete and accurate IRS Form W-9 in respect of each Seller, or, in the case of a Seller that is disregarded as separate from its owner for U.S. federal income tax purposes, in respect of such Seller's regarded owner; and

30

(viii)   such other bills of sale, assignments and other instruments of transfer or conveyance as Buyer may reasonably request or as may otherwise be necessary to evidence and effect the sale, assignment, transfer, conveyance and delivery of the Purchased Assets to Buyer and assumption of Assumed Liabilities by Buyer.

(b)     At the Closing, Buyer shall deliver to Sellers the following documents, cash amounts and other items, duly executed by Buyer, as applicable:

(i)     the Bill(s) of Sale;

(ii)    the Assignment and Assumption Agreement(s);

(iii)   the Intellectual Property Assignment;

(iv)    any other Related Agreements required to be executed by Buyer;

(v)     the certificate described in Section 7.2(e); and

(vi)    a duly executed Uniform Sale & Use Tax Resale Certificate or similar certificate for the states listed on Schedule 2.8(b) indicating Buyer's purchase of the Inventory is for resale and thereby exempt from sales taxes in those states (collectively, the "Tax Resale Certificates"); and

(vii)   such other bills of sale, assignments and other instruments of transfer or conveyance as Sellers may reasonably request or as may otherwise be necessary to evidence and effect the sale, assignment, transfer, conveyance and delivery of the Purchased Assets to Buyer and assumption of Assumed Liabilities by Buyer.

**Section 2.9    Allocation**. No later than sixty (60) days after Closing or within a reasonable time thereafter as agreed by Sellers and Buyer in writing, Buyer shall prepare and deliver to Sellers a proposed allocation of the Purchase Price and any other items that are treated as additional consideration for U.S. federal (and applicable state and local) income Tax purposes among the Purchased Assets which shall be prepared in a manner consistent with section 1060 of the Code. After receipt of the Proposed Allocation Schedule from Buyer, the Sellers shall have fifteen (15) days to review the Proposed Allocation Schedule. The Proposed Allocation Schedule will be considered final and binding on the Parties, unless Sellers communicate to Buyer reasonable objections to the Proposed Allocation Schedule, which Buyer shall consider in good faith before preparing a final allocation schedule (the "Final Allocation Schedule").  Buyer and Sellers shall each report the federal, state and local income and other Tax consequences of the transactions contemplated by this Agreement in a manner consistent with the Final Allocation Schedule, or if Sellers do not timely communicate any reasonable objections to the Proposed Allocation Schedule, the Proposed Allocation Schedule.

**Section 2.10   Withholding Rights**. Buyer and any other applicable withholding agent shall be entitled to deduct and withhold with respect to any payments made pursuant to this Agreement such amounts that are required to be deducted and withheld with respect to any such

31

payments under the Code or any other provision of applicable Law. Before making any such deduction or withholding, other than any deduction or withholding arising out of the failure of any Seller to deliver an IRS Form W-9 in accordance with <u>Section 2.8(a)(vii)</u>, Buyer shall use commercially reasonable efforts to provide Sellers with five (5) Business Days' prior written notice of any such deduction or withholding that Buyer proposes to make and Buyer shall use commercially reasonable efforts to cooperate with any reasonable request from Sellers to obtain reduction of, or relief from, such deduction or withholding.  Any amounts withheld in accordance with this <u>Section 2.10</u> shall be treated for all purposes of this Agreement as having been paid to such Persons in respect of which such deduction and withholding was made.

Section 2.11   <u>**Conflict**</u>. With respect to any asset of any Seller, in the event of any conflict between the terms of <u>Section 2.1</u> and <u>Section 2.2</u>, such asset shall be deemed a Purchased Asset unless otherwise consented to in writing by Buyer.  With respect to any Liability of any Seller, in the event of any conflict between the terms of <u>Section 2.3</u> and <u>Section 2.4</u>, such Liability shall be deemed an Excluded Liability unless otherwise consented to in writing by Buyer.

**ARTICLE III**
**SELLERS' REPRESENTATIONS AND WARRANTIES**

Sellers hereby jointly and severally represent and warrant to Buyer that, except as set forth in the disclosure schedule accompanying this Agreement (the "<u>Disclosure Schedule</u>"), but subject to <u>Section 9.18</u>, the statements contained in this <u>Article III</u> are true and correct.

Section 3.1   <u>**Organization of Sellers; Good Standing.**</u>

(a)   Each Seller is duly organized, validly existing and in good standing under the Laws of its state of formation and has all limited liability company power and authority to own, lease and operate its properties and to conduct its business in the manner in which its Business is currently being conducted. Each Seller has all requisite limited liability company power and authority to own, lease and operate its assets and to carry on the Business as currently conducted.

(b)   Except as a result of the commencement of the Chapter 11 Cases, each Seller is duly authorized to do business and is in good standing as a foreign corporation, limited partnership or limited liability company, as applicable, in each jurisdiction where the ownership or operation of the Purchased Assets or the conduct of the Business requires such qualification, except for failures to be so authorized or be in such good standing, as would not, individually or in the aggregate, have a Material Adverse Effect.

(c)   None of the Sellers has any Subsidiaries (other than other Sellers, if applicable).

Section 3.2   <u>**Authorization of Transaction**</u>. Subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing:

(a)   each Seller has all requisite limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder; the execution, delivery and performance of this Agreement and all Related Agreements to which a Seller is a party have been duly authorized by

such Seller and no other company action on the part of any Seller is necessary to authorize this Agreement or the Related Agreements to which it is party or to consummate the Contemplated Transactions; and

(b)     this Agreement has been duly and validly executed and delivered by each Seller, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which any Seller is a party will have been duly and validly executed and delivered by each such Seller, as applicable. Assuming that this Agreement constitutes a valid and legally-binding obligation of Buyer, this Agreement constitutes the valid and legally-binding obligations of Sellers, enforceable against Sellers in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that it is a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Buyer, each Related Agreement to which any Seller is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of such Seller, as applicable, enforceable against Sellers, as applicable, in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

Section 3.3     **Noncontravention; Consents and Approvals.**

(a)     Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the Related Agreements), will, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, (i) conflict with or result in a breach of the certificate of formation, operating agreement or other organizational documents of any Seller, (ii) violate any Decree or Law to which any Seller is, or its respective assets or properties are, subject, or (iii) subject to the entry of the Sale Order, conflict with, any Assumed Contract.

(b)     Except as set forth in Section 3.3(b) of the Disclosure Schedule, subject to the Sale Order having been entered and still being in effect (and not subject to any stay pending appeal at the time of Closing), no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement. After giving effect to the Sale Order and any applicable order of the Bankruptcy Court authorizing the assignment and assumption of any Contract that is an Assumed Contract hereunder, no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Person that is not a Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, have a Material Adverse Effect.

Section 3.4     **Compliance with Laws.** Sellers are in compliance in all material respects with, and since January 1, 2019 have been in compliance in all material respects with, all Laws applicable to the Business or the Purchased Assets. No Seller has received any written notice that it is, and to Sellers' Knowledge, none of the Sellers are, under investigation with respect to any violation of any applicable Laws.

33

**Section 3.5**     **Condition and Sufficiency of Assets**.

(a)     Each item of Tangible Personal Property is (i) structurally sound, is in good operating condition and repair (ordinary wear and tear expected), and is adequate for the uses to which it is being put, except in each case as would not be material to the Business taken as a whole, (ii) suitable in all material respects for the uses for which they are being utilized in the Business as currently conducted, and (iii) comply in all material respects with all requirements under any Laws and any licenses which govern the use and operation thereof. No item of Tangible Personal Property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs or maintenance and repairs that are not material to the Business taken as a whole.

(b)     Subject to requisite Bankruptcy Court approvals, and subject to assumption by Buyer of the Contracts and Leases primarily related to the Business, including without limitation those set forth on the Assumed Contract List and the Specified Commercial Contract List, the Purchased Assets are sufficient for the continued conduct of the Business at the facilities under which the Leases will be assumed pursuant to Section 2.6 (the "Purchased Facilities") in all material respects after the Closing in substantially the same manner as conducted prior to the Closing.

**Section 3.6**     **Title to Purchased Assets**. Sellers, as of immediately prior to the Closing, have good and valid title to, or, in the case of leased assets, have good and valid leasehold interests in, the Purchased Assets, free and clear of all Liens (except for Permitted Liens and Assumed Liabilities), subject to entry of the Sale Order. At the Closing or such time as title is conveyed under Section 2.7, Sellers will convey, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, good and valid title to, or valid leasehold interests in, all of the Purchased Assets, free and clear of all Liens (except for Permitted Liens and Assumed Liabilities), to the fullest extent permissible under Section 363(f) of the Bankruptcy Code and subject to the rights of licensees under Section 365(n) of the Bankruptcy Code.

**Section 3.7**     **Contracts**. Section 3.7 of the Disclosure Schedule sets forth an accurate list, as of the date hereof, of all material Contracts (including amendments, supplements or modifications thereto) to which a Seller is a party with respect to the Business, the Purchased Assets or the Assumed Liabilities as of the date hereof (each such Contract, a "Material Contract"; provided that any material Contract entered into after the date hereof shall also constitute a Material Contract), and, except as set forth on Section 3.7 of the Disclosure Schedule, Sellers have made available to Buyer copies of all such Material Contracts (other than those entered into after the date of this Agreement) that are true and complete in all material respects; provided, that for the avoidance of doubt, the following types of Contracts constitute Material Contracts:

(i)     the Leases related to the Leased Real Estate set forth in Section 3.13(c) of the Disclosure Schedule;

(ii)     joint venture, partnership, limited liability company or other similar Contracts other than the Fundamental Documents of any Seller;

(iii)     material leases for personal property;

34

(iv)    any Contract relating to any outstanding commitment for capital expenditures in excess of $10,000 individually or $30,000 in the aggregate;

(v)    all (i) Contracts with a Governmental Entity or (ii) Decrees or Consents of a Governmental Entity to which any Seller is subject;

(vi)    Contracts (or series of related Contracts) relating to the acquisition or disposition of any Person, business or material real property or other assets (whether by merger, sale of stock, sale of assets or otherwise);

(vii)    Contracts that (A) limit the freedom of any Seller or the Business to compete in any line of business or with any Person or in any geographic area or (B) contains exclusivity obligations or restrictions binding on any Sellers or the Business;

(viii)    any sales, distribution, agency or marketing Contract (or series of related Contracts) involving in excess of $25,000 in any annual period;

(ix)    any Contract (or series of related Contracts) relating to the purchase by any Sellers of any products or services under which the undelivered balance of such products or services is in excess of $10,000;

(x)    any Contracts relating to brands sold by any Seller;

(xi)    Contracts, other than Leases, containing any "change of control" or similar provisions;

(xii)    Contracts (including any "take-or-pay" or keepwell agreement) under which (A) any Person has directly or indirectly guaranteed any liabilities or obligations of any Sellers or (B) any Sellers has directly or indirectly guaranteed liabilities or obligations of any other Person;

(xiii)    Contracts with any current employee of any Seller with aggregate payments of at least $10,000 remaining under such Contract or providing for any severance Liabilities; or

(xiv)    Intellectual Property Agreements.

Except as set forth in Section 3.7 of the Disclosure Schedule, each Material Contract is valid, binding and enforceable against each such Seller, as applicable, and, to the Sellers' Knowledge, the other parties thereto, in accordance with its terms (subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity), and is in full force and effect. Except as set forth in Section 3.7 of the Disclosure Schedule and other than as a result of the filing and pendency of the Chapter 11 Cases, no Seller is in material breach of or material default under any Material Contract to which it is a party, and, to Sellers' Knowledge, no other Person is in material breach of or material default under any Material Contract.

35

**Section 3.8** **Inventory**. All Inventory consists of a quality and quantity usable and, with respect to finished goods, salable in the ordinary course of business consistent with past practice, except for obsolete, below-standard quality, damaged, defective, or slow-moving items that have been written off or written down to fair market value. No Inventory is held on a consignment basis, and following the Closing all Inventory will be owned by Buyer free and clear of all Liens (except for Permitted Liens and Assumed Liabilities). Since January 1, 2019, the Inventory levels of the Business have been maintained at the levels required for the operation of the Business as conducted prior to and as of the date hereof. All Inventory is free from material defects in materials and workmanship (normal wear and tear expected), except as would not be material to the Business.

**Section 3.9** **Intellectual Property.**

(a)     Section 3.9(a) of the Disclosure Schedule sets forth a true and complete list of (i) all Registered Intellectual Property and material unregistered Intellectual Property (including trademarks, copyrights, and software), in each case that is owned by, or purported to be owned by, in whole or in part, any Seller and used in or related to the Business and (ii) all Intellectual Property Agreements to which a Seller is a party. Sellers own all right, title, and interest in the Intellectual Property included in the Purchased Assets or set forth on Section 3.9(a) of the Disclosure Schedule free and clear of all Liens (except for Permitted Liens and Assumed Liabilities, and subject to entry of the Sale Order), and Sellers are entitled to use all Intellectual Property material to the Business subject only to the terms of the Intellectual Property Agreements and license agreements applicable to any Commercially Available Software, if applicable.  All Registered Intellectual Property owned by a Seller is valid, subsisting and, to Sellers' Knowledge, enforceable, and is not subject to any outstanding Decree adversely affecting Sellers' use thereof or rights thereto.

(b)     Except as set forth on Section 3.9(b) of the Disclosure Schedule, none of the use of the Intellectual Property included in the Purchased Assets or set forth on Section 3.9(a) of the Disclosure Schedule, the conduct of the Business as currently conducted, and as conducted in the last three (3) years, nor any of the products sold or services provided by Sellers or any of their Affiliates currently or in the last three (3) years in connection therewith, infringes upon, misappropriates, dilutes or otherwise violates the Intellectual Property of any other Person. To Sellers' Knowledge, no third party is infringing, misappropriating or otherwise violating any Intellectual Property owned by any Seller and included in the Purchased Assets or set forth on Section 3.9(a) of the Disclosure Schedule and material to the Business and no Seller has granted any license in settlement of an infringement, release, covenant not to sue or non-assertion assurance to any Person with respect to any Intellectual Property. No action has been asserted or, to Seller's Knowledge, is pending or threatened against any Seller with respect to any Intellectual Property included in the Purchased Assets or set forth on Section 3.9(a) of the Disclosure Schedule.

**Section 3.10** **Litigation**. Other than the Chapter 11 Cases, Section 3.10 of the Disclosure Schedule sets forth all unresolved material Litigation brought by or against any Seller with respect to the Business or any of the Purchased Assets, and to Sellers' Knowledge, there is no other material Litigation threatened in writing, before any Governmental Entity against any Seller which is reasonably likely to have a Material Adverse Effect or which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Contemplated Transactions.

**Section 3.11** **Employees and Employment Matters.**

36

(a)    No Seller is a party to, bound by, or negotiating any collective bargaining agreement or other Contract with a union, works council or labor organization (collectively, "**Union**"), nor is there any Union representing or purporting to represent any employee of the Sellers. There is no ongoing, and to Sellers' Knowledge there is not any threatened, strike, slowdown, lockout, walkout, work stoppage, or other similar labor disruption or dispute affecting any Seller with respect to the Business. To Sellers' Knowledge, no Union or group of employees is seeking to organize any employees of Sellers for the purpose of collective bargaining. Sellers have made available to Buyer a list of all Current Employees and the following information with respect to each such Current Employee: name; job title; full time or part time status; work location (including state); date of hire; the current year's base compensation and, separately, any promised or targeted bonus, commission or other incentive-based compensation; exempt or non-exempt status; visa status if not a United States citizen; and, if on leave, date of expected return. Except as set forth in Section 3.11(a) of the Disclosure Schedule, all Current Employees are "employees at will," and their employment may be terminated at any time and without severance or similar Liability. As of the Petition Date, except as set forth in Section 3.11(a) of the Disclosure Schedule, all compensation, including wages, wage premiums, commissions, bonuses, fees, expense reimbursements and other compensation, payable to all employees, independent contractors or consultants of Sellers for services performed have been paid in the Ordinary Course of Business in accordance with the Sellers' normal payroll practices.

(b)    Except as set forth in Section 3.11(b) of the Disclosure Schedule, Sellers are, and since January 1, 2019 have been, in compliance in all material respects with all applicable Laws respecting labor and employment practices pertaining to any of its current and former employees, consultants and independent contractors, including Laws concerning fair employment practices, terms and conditions of employment, employment discrimination, harassment, retaliation, disability rights, labor relations and collective bargaining, employee classification (as exempt or non-exempt, and as employee or independent contractor), wages, hours, overtime compensation, paid time off and leaves of absence, privacy, occupational health and safety, workers' compensation, unemployment and immigration.

(c)    Except as set forth in Section 3.11(c) of the Disclosure Schedule, since December 31, 2019, none of the Sellers has engaged in any "mass layoff" or "plant closing," as those terms are defined in the Worker Adjustment and Retraining Notification Act or any similar Law (collectively, "WARN"), or any other actions that required notice under WARN, and none of the Sellers has any outstanding WARN Liabilities. Except in connection with the Store Closing Sales, Sellers have no plans to undertake any action that would trigger WARN.

**Section 3.12    Employee Benefit Plans.**

(a)    Section 3.12(a) of the Disclosure Schedule sets forth a true and complete list of all Employee Benefit Plans.

(b)    With respect to each Employee Benefit Plan of any Seller:

(i)    such Employee Benefit Plan, if intended to meet the requirements of a "qualified plan" under section 401(a) of the Code, has received a favorable determination letter from the IRS on the current form of the Employee Benefit Plan

37

or is based on a master or prototype plan that has received a favorable opinion letter issued by the IRS upon which it can rely, as to the qualified and tax-exempt status of the Employee Benefit Plan and related trust, and nothing has occurred, and, to the Sellers' Knowledge, no conditions or circumstances exist, that would reasonably be expected to cause the revocation of such qualified or tax-exempt status; and

(ii)    Sellers have provided to Buyer copies of all such Employee Benefit Plans and any related trusts, Insurance Policies or other such funding vehicles, and any other documents as Buyer has reasonably requested.

(c)    Each Employee Benefit Plan has been established, funded, maintained and administered, in each case, in all material respects, in accordance with its terms and all applicable Laws, including, ERISA, the Code, the Health Insurance Portability and Accountability Act of 1996, as amended, and the Patient Protection and Affordable Care Act of 2010, as amended. As of the date hereof, there is no pending or, to Sellers' Knowledge, threatened, Litigation relating to any Employee Benefit Plan.

(d)    Neither Seller, nor any ERISA Affiliate, has at any time been a party to or maintained, sponsored, contributed to, or been obligated to contribute to, or had any liability, contingent or otherwise, with respect to: (i) any plan subject to the minimum funding standards of Section 302 of ERISA or Title IV of ERISA or Sections 412 and 430 of the Code; (ii) any "multiemployer plan" (as defined in Section 3(37) or 4001(a)(3) of ERISA or Code Section 414(f)); (iii) any "multiple employer plan" (within the meaning of ERISA or Section 413(c) of the Code); (iv) any voluntary employees' beneficiary association (within the meaning of Section 501(c)(9) of the Code); or (v) any "multiple employer welfare arrangement" as defined in Section 3(40) of ERISA.

(e)    Other than as required under COBRA, no Employee Benefit Plan provides benefits or coverage in the nature of health, life, disability insurance or other welfare benefits (other than death benefits when termination occurs upon death) following retirement or other termination of employment. No Tax under Sections 4980B, 4980D, 4980H, 5000, 6721 or 6722 of the Code has been incurred with respect to any Employee Benefit Plan and, to the Sellers' Knowledge, no circumstance exists which could give rise to any such Tax.

(f)    All required contributions (including all employer contributions and employee salary reduction contributions), premiums and other payments for the current plan year or any plan year ending on or before the Closing Date that are due on or before the Closing Date, under all Employee Benefit Plans will have been made or properly accrued on or before the Closing Date. All contributions to any Employee Benefit Plan have been contributed within the time specified in ERISA and the Code and the respective regulations thereunder.

(g)    The consummation of the transactions contemplated by this Agreement alone, or in combination with any other event, (i) will not give rise to any Liability under any Employee Benefit Plan or (ii) accelerate the time of payment or vesting or increase the amount, or require the funding, of compensation or benefits due to any employee, director or other service provider of Seller or its ERISA Affiliates (whether current, former or retired) or their beneficiaries.

**Section 3.13    Real Property.**

(a)      Except as set forth in <u>Section 3.13(a)</u> of the Disclosure Schedule, Sellers (i) do not own and have never owned any real property, (ii) have good and valid leasehold interest in and to all Leased Real Estate and (iii) have good and valid title to all other Purchased Assets constituting Structures or otherwise have the right to use such other Purchased Assets pursuant to a valid and enforceable lease, license or similar contractual arrangement, in each case free and clear of any Liens, other than Permitted Liens and Assumed Liabilities.

(b)      Except as set forth in <u>Section 3.13(b)</u> of the Disclosure Schedule, the Leased Real Estate constitutes all of the real property assets used by Sellers for the conduct of the Business in substantially the same manner as such Business is being operated as of the date hereof. The Structures included in the Purchased Assets are in good repair, working order and operating condition, subject only to ordinary wear and tear. Except as set forth in <u>Section 3.13(b)</u> of the Disclosure Schedule, to the Sellers' Knowledge, there are no facts or conditions affecting any Leased Real Estate that could reasonably be expected, individually or in the aggregate, to interfere with the current use, occupancy or operation of such Leased Real Estate. Except as set forth in <u>Section 3.13(b)</u> of the Disclosure Schedule, only Sellers conduct the Business and the Business is not conducted through any other divisions or any direct or indirect Subsidiary or Affiliate of any Seller.

(c)      <u>Section 3.13(c)</u> of the Disclosure Schedule sets forth a complete and correct list of all of the real property leased, licensed or otherwise granted to Sellers (the "<u>Leased Real Estate</u>"), including the addresses thereof and the expiration dates of the Leases related thereto. Except as set forth on <u>Section 3.13(c)</u> of the Disclosure Schedule, Sellers have delivered to Buyer copies of all Leases that are true, correct, and complete in all material respects, including all written amendments or modifications thereto, and the Leases are unmodified and in full force and effect. No Seller is a sublessor or grantor under any sublease or other instrument granting to another Person any right to the possession, lease, occupancy or enjoyment of the Leased Real Estate, except as set forth on <u>Section 3.13(c)</u> of the Disclosure Schedule. With respect to each Lease, except as set forth in <u>Section 3.13(c)</u> of the Disclosure Schedule and except with respect to any Bankruptcy-Related Default:

(i)      except with respect to any Bankruptcy-Related Defaults, the Leases are in full force and effect and are valid, binding and enforceable against the applicable Seller and, to the Sellers' Knowledge, any counterparty to such Leases in accordance with their respective terms;

(ii)      no amount payable under any Lease is past due;

(iii)      each Seller is in compliance in all material respects with all commitments and obligations on its part to be performed or observed under each Lease and to the Sellers' Knowledge there is no failure by any other party to any Lease to comply in all material respects with all of its commitments and obligations thereunder;

39

(iv)     no Seller has received any written notice (A) of a default (which has not been cured), offset or counterclaim under any Lease, or, any other written communication calling upon it to comply with any provision of any Lease or asserting noncompliance, or asserting such Seller has waived or altered its rights thereunder, and no event or condition has happened or presently exists which constitutes a default or, after notice or lapse of time or both, would constitute a default under any Lease on the part of any Seller or, to Sellers' Knowledge, any other party, or (B) of any Litigation against any party under any Lease which if adversely determined would result in such Lease being terminated; and

(v)     except as disclosed in Section 3.13(c) of the Disclosure Schedule, no Seller has assigned, sublease, sublicensed, mortgaged, pledged or otherwise encumbered or transferred its interest, if any, under any Lease; and

(vi)     to the extent that any Lease is within the period prescribed in such Lease for exercise of any renewal, each Seller has timely exercised any option to extend or renew the term thereof.

(d)     Except as disclosed in Section 3.13(d) of the Disclosure Schedule, (i) there are no pending or, to Sellers' Knowledge, threatened condemnation proceedings by or before any Governmental Entity with respect to any Leased Real Estate and (ii) no Seller has received any material written notice from any Governmental Entity of any zoning, ordinance, building, fire, health or safety code or other legal violation in respect of any Lease. Each parcel of real property comprising the Leased Real Estate has legal access to and from such property to a legally-dedicated, paved public right-of-way.

(e)     To Sellers' Knowledge, the use and operation of the Leased Real Estate in the conduct of the Business does not violate in any material respect any Law, Consent, Lien or agreement of any Governmental Entity. No improvements constituting a part of the Leased Real Estate encroach on any real property not owned, leased or licensed by Sellers to the extent that removal of such encroachment could reasonably be expected to materially impair the manner and extent of the current use, occupancy and operation of such improvements. There are no Liens, other than Permitted Liens, affecting the Leased Real Estate that materially impair the ability of any Seller to use such property in the operation of the Business as currently conducted.

(f)     To Sellers' Knowledge, there are no pending or contemplated special assessments or reassessments of any parcel included in the Leased Real Estate that would reasonably be expected to result in a material increase in the real property Taxes or other similar charges payable by any Sellers in the rent, additional rent or other sums and changes payable by any Sellers under the Leases.

(g)     Except as disclosed in Section 3.13(c) of the Disclosure Schedule and except with respect to any Bankruptcy-Related Default, Sellers are in possession of the Leased Real Estate, respectively, and enjoy peaceful and undisturbed possession of such real property.

Section 3.14    **Permits**. Section 3.14 of the Disclosure Schedule contains a list of all material Permits (including Environmental Permits) that Sellers hold as of the date hereof in

connection with the operations of the Business. There is no Litigation pending or threatened in writing, or to Sellers' Knowledge, otherwise threatened, that seeks the revocation, cancellation, suspension, failure to renew or adverse modification of any Assumed Permits, except where a failure of this representation and warranty to be so true and correct would not reasonably be expected to be material and adverse to the operation of the Business as a whole. All required filings with respect to the Assumed Permits have been made and all required applications for renewal thereof have been filed, except where a failure of this representation and warranty to be so true and would not reasonably be expected to be material and adverse to the operation of the Business as a whole.

Section 3.15   **Taxes**. Except as set forth on <u>Section 3.15</u> of the Disclosure Schedule:

(a)     (i) All material Tax Returns required to be filed by or on behalf of any Seller have been filed, and all such Tax Returns are true, correct and complete in all material respects, (ii) all Taxes due and payable by any Seller, whether or not shown on any such Tax Return, have been timely paid and (iii) there are no Liens for Taxes with respect to the Purchased Assets, other than Permitted Liens;

(b)     No Seller is the subject of any action with respect to Taxes or its Tax Returns nor has any such action been threatened in writing (or, to the Sellers' Knowledge, otherwise);

(c)     Each Seller has timely withheld and paid, or caused to be paid, all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any Person and all IRS Forms W-2 and Forms 1099 (or any other applicable form) with respect thereto have been properly and timely distributed;

(d)     Sellers have not participated in any "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4(b)(2);

(e)     (i) No Seller has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency which waiver or extension remains outstanding and (ii) no audits, investigations, disputes, notices of deficiency, claims or other proceedings for or relating to any liability for Taxes are pending or have been threatened in writing;

(f)     No claim has been made in writing by any Governmental Entity in a jurisdiction where a Seller does not file Tax Returns that such Seller is or may be subject to taxation by that jurisdiction;

(g)     No Seller has (i) claimed an employee retention Tax credit under Section 2301 of the CARES Act or deferred Taxes under IRS Notice 2020-65 (or any similar notice or ruling), or (ii) deferred the payment of any Taxes under the CARES Act that remains unpaid; and

(h)     Each Seller is, and at all times since its formation has been, properly classified as a partnership, or as a disregarded entity as described in Section 301.7701-3 of the Treasury Regulations, for U.S. federal and applicable state tax purposes and each such Seller will be so classified up to and including the Closing Date.

41

**Section 3.16    Environmental Matters**. Except as set forth in Section 3.16 of the Disclosure Schedule:

(a)    Each Seller is, and has been during the prior five (5) years, in compliance in all material respects with all applicable Environmental Laws, which compliance has included obtaining and maintaining all Environmental Permits required under applicable Environmental Laws in connection with ownership of the Purchased Assets or the operations of the Business (as currently or formerly conducted);

(b)    No Seller has received during the prior five (5) years written notice, or to Sellers' Knowledge any other notice, from any Governmental Entity or other Person regarding any actual or alleged violation of or Liability under Environmental Laws in connection with the Business (as currently or formerly conducted);

(c)    No Seller has received any: (i) Environmental Notice or written environmental claim; or (ii) written request for information or investigation pursuant to Environmental Law, in either case with respect to operations of the Business (as currently or formerly conducted), the Purchased Assets or any Leased Real Estate; and

(d)    There has been no Environmental Release by any Seller or, to Sellers' Knowledge, by any other Person at any real property currently or formerly owned, leased, occupied or operated in connection with the Business (as currently or formerly conducted), in each case in violation of any Environmental Law or that would reasonably be expected to result in any Liability in connection with the Business.

**Section 3.17    Restrictions on Business Activities**. With the exception of any Decree relating to COVID-19, there is no Contract or Decree binding upon any Seller or to which any Seller is a party that by its terms prohibits or impairs any business practice of any Seller, any acquisition of property by any Seller or the conduct of the Business in any geographic region. No Seller has entered into any Contract under which it is restricted from selling, licensing or otherwise distributing any of its products or providing any of its services to, customers or potential customers or any class of customers, in any geographic area, during any period of time or in any segment of the market.

**Section 3.18    Insurance**. Each Seller has all material policies of insurance covering such Seller and the Business and any of its respective employees, properties or assets, including policies of property, fire, workers' compensation, products liability, directors' and officers' liability and other casualty and liability insurance, that is customarily carried by a Person conducting business similar to that of Sellers. Section 3.18 of the Disclosure Schedule sets forth all Insurance Policies maintained by Sellers with respect to the Purchased Assets. All such Insurance Policies are in full force and effect, no notice of cancellation has been received and there is no existing default or event that, with notice or lapse of time or both, would constitute a default by any insured thereunder.

**Section 3.19    Product Warranties; Product Liability.**

(a)    Sellers have complied in all material respects with all Laws and their policies, procedures and specifications with respect to design, manufacture, labeling, testing,

BUSINESS.29776642.14

inspection and sale of products. There have been no recalls with respect to any of the products sold by Sellers. All products manufactured, sold, licensed, leased, provided or delivered by any Seller to customers on or prior to the Closing conform (or will conform on the date provided or delivered) in all material respects to applicable contractual commitments, express and undisclaimed implied warranties, service level commitments, product specifications and product documentation and to any representations made to such customers or users. Except to the extent reserved for on the most recent balance sheets included in the Financial Statements, no Seller has any liabilities or obligations (whether absolute, contingent or otherwise) (and, to the Sellers' Knowledge, there is no legitimate basis for any present or future suits, actions, claims, proceedings or investigations against any Seller giving rise to any material liabilities or obligations) for replacement, repair or redelivery of any products or services.

(b)     Except as set forth in <u>Section 3.19(b)</u> of the Disclosure Schedule, no Seller has, since December 31, 2019, received any written notice, or to Sellers' Knowledge any other notice, with respect to any product liability claim against any Seller asserting that an alleged defect in any product of any Seller (including any past, prior or discontinued product) caused any material injury to any individual or property. Since December 31, 2019, there have been no notices, citations or decisions by any Governmental Entity that any products sold by any Seller are defective or fail to meet any applicable standards or other regulatory requirements promulgated by any such Governmental Entity.

**Section 3.20    Data Privacy**. Sellers are and have been at all times in compliance with (i) publicly posted privacy policies ("<u>Privacy Policies</u>") and (ii) all applicable Laws and contractual obligations relating to data privacy, data protection and data security ("<u>Privacy Laws</u>"), including Laws related to obligations with respect to Sellers' websites, customers and employees, and the collection, storage, transmission, transfer (including cross-border transfers), disclosure, destruction and use of Personal Information. Sellers have taken commercially reasonable measures to protect Personal Information to which Sellers have access or process against loss, damage, unauthorized access disclosure, modification or other misuse. Since December 31, 2019, there has been no loss, damage, unauthorized access, disclosure, modification, or other misuse of any Personal Information by any Seller that would reasonably be expected to result in any Liability. Sellers have obtained all necessary rights, permissions, and consents to permit the transfer of Personal Information in connection with the transactions contemplated by this Agreement. Since December 31, 2019, no orders, requests, warnings, reprimands, inquiries, notifications, allegations, complaints, audits, investigations, actions, suits, claims, hearings, arbitrations or other proceedings have existed or to Seller's Knowledge been threatened regarding any, (x) violation of such Privacy Policies or any implementation of the Privacy Policies by a Seller, or (y) violation of any Privacy Laws by a Seller.

**Section 3.21    Certain Payments; OFAC.**

(a)     Since December 31, 2017, no director, officer, agent or employee of any Seller or any other Person acting for or on behalf of any Seller, has directly or indirectly, (i) made any contribution, gift, bribe, rebate, payoff, influence payment, kickback, or other payment to any Person, private or public, regardless of form, whether in money, property, or services (A) to obtain favorable treatment in securing business, (B) to pay for favorable treatment for business secured, (C) to obtain special concessions or for special concessions already obtained, for or in respect of

43

any Seller, or (D) in violation of any Law, or (ii) established or maintained any fund or asset that has not been recorded in the Records of any Seller.

(b)    Since December 31, 2017, no Seller has been a party to any Contract with, and has not conducted business or participated in any transaction involving, (i) any Person identified on the Office of Foreign Assets Control's ("OFAC") list of Specially Designated Nationals and Blocked Persons or targeted by an OFAC Sanctions Program; (ii) the government, including any political subdivision, agency, instrumentality, or national thereof, of any country with respect to which the United States or any jurisdiction in which any Seller is operating or located administers or imposes economic or trade sanctions or embargoes; (iii) any Person acting, directly or indirectly, on behalf of, or an entity that is owned or controlled by, a Specially Designated National and Blocked Person or by a government or Person identified in clause (ii) above, or (iv) a Person on any other similar export control, terrorism, money laundering or drug trafficking related list administered by any Governmental Entity either within or outside the United States with whom it is illegal to conduct business pursuant to applicable Law in each case, in violation of any applicable Law.

Section 3.22    **Brokers' Fees**. Except for amounts due to Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), no Seller has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Buyer could become liable or obligated to pay.

Section 3.23    **No Other Representations or Warranties**. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS Article III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULE) AND THE RELATED AGREEMENTS, NEITHER A SELLER NOR ANY OTHER PERSON MAKES (AND BUYER IS NOT RELYING UPON) ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, THE BUSINESS, THE PURCHASED ASSETS (INCLUDING THE VALUE, CONDITION OR USE OF ANY PURCHASED ASSET), THE ASSUMED LIABILITIES OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AND SELLERS DISCLAIM ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER MADE BY SELLERS, ANY AFFILIATE OF SELLERS OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS Article III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULE) AND IN THE RELATED AGREEMENTS, EACH SELLER (I) EXPRESSLY DISCLAIMS AND NEGATES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE, RELATING TO THE CONDITION OF THE PURCHASED ASSETS (INCLUDING ANY IMPLIED OR EXPRESSED WARRANTY OF TITLE, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR OF THE PROBABLE SUCCESS OR PROFITABILITY OF THE OWNERSHIP, USE OR OPERATION OF THE BUSINESS OR THE PURCHASED ASSETS BY BUYER AFTER THE CLOSING), AND (II) DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO BUYER (INCLUDING ANY OPINION,

44

INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO BUYER BY ANY DIRECTOR, OFFICER, EMPLOYEE, AGENT, CONSULTANT OR REPRESENTATIVE OF ANY SELLER OR ANY OF THEIR AFFILIATES). BUYER HAS PERFORMED AN INDEPENDENT INVESTIGATION, ANALYSIS, AND EVALUATION OF THE PURCHASED ASSETS.

**Section 3.24    No Outside Reliance**. Notwithstanding anything contained in this <u>Article III</u> or any other provision of this Agreement to the contrary, Sellers acknowledge and agree that the representations and warranties made by Buyer to Sellers in <u>Article IV</u> (as qualified by the Disclosure Schedule and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) and the representations and warranties made by Buyer in the Related Agreements (the "<u>Buyer's Express Representations</u>") are the sole and exclusive representations and warranties of any kind made to Sellers and on which Sellers are relying in connection with the Contemplated Transactions. Sellers acknowledge and agree that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than with respect to the Buyer's Express Representations) including in any projections, meetings, calls or correspondence with management of Buyer and their Representatives, or any other Person on behalf of Buyer or any of their respective Affiliates or Representatives and (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, contracts, and prospects of Buyer, or the quality, quantity or condition of Buyer's assets, are, in each case, specifically disclaimed by Buyer and that Sellers have not relied on any such representations, warranties or statements.

## ARTICLE IV
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer hereby represents and warrants to Sellers that the statements contained in this <u>Article IV</u> are true and correct.

**Section 4.1    Organization of Buyer**. Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite limited liability company power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

**Section 4.2    Authorization of Transaction.**

(a)    Buyer has full limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.

(b)    The execution, delivery and performance of this Agreement and all other Related Agreements to which Buyer is a party have been duly authorized by Buyer, and no other limited liability company action on the part of Buyer is necessary to authorize this Agreement or the Related Agreements to which it is a party or to consummate the Contemplated Transactions.

(c)    This Agreement has been duly and validly executed and delivered by Buyer, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which Buyer is a party will have been duly and validly executed and delivered by Buyer. Assuming that this Agreement constitutes a valid and legally-binding obligation of Sellers, this Agreement constitutes a valid and legally-binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that they are a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Sellers, each Related Agreement to which Buyer is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 4.3    Noncontravention**. Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the assignments and assumptions referred to in <u>Section 2.6</u>) will (i) conflict with or result in a breach of the certificate of formation, operating agreement, or other organizational documents, of Buyer, (ii) be subject to any consents required to be obtained from any Governmental Entity, violate any Decree or Law to which Buyer is, or its assets or properties are subject, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (ii) or (iii), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Related Agreements. Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Entity in order for the Parties to consummate the transactions contemplated by this Agreement or any of the Related Agreements, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Related Agreements.

**Section 4.4    Litigation**. Other than the Sale Procedures Order, there is no Litigation pending or, to Buyer's knowledge, threatened against or affecting Buyer that will adversely affect Buyer's performance under this Agreement or the consummation of the transactions contemplated by this Agreement in any material respect.

**Section 4.5    Financial Capacity**. As of the Closing Buyer will have sufficient funds in an aggregate amount necessary to pay the Purchase Price, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other transactions contemplated by this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Buyer in connection with the transactions contemplated by this Agreement. As of the Closing and immediately after consummating the transactions contemplated by this Agreement, Buyer will not, assuming the accuracy of the Sellers' representations and warranties under this Agreement, (a) be insolvent (either because its financial

condition is such that the sum of its debts is greater than the fair value of its assets or because the present fair value of its assets will be less than the amount required to pay its liability on its debts as they become absolute and matured), (b) have unreasonably small capital with which to engage in its business, or (c) have incurred or plan to incur debts beyond its ability to repay such debts as they become absolute and matured. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of any Sellers.

Section 4.6    **Adequate Assurances Regarding Executory Contracts**. Buyer is and shall be capable of satisfying as of the Sale Hearing the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

Section 4.7    **Good Faith Purchaser**. Buyer is a "good faith" purchaser, as such term is used in the Bankruptcy Code and the court decisions thereunder. Buyer is entitled to the protections of section 363(m) of the Bankruptcy Code with respect to all of the Purchased Assets. Buyer has negotiated and entered into this Agreement in good faith and without any improper conduct, including collusion or fraud of any kind.

Section 4.8    **Brokers' Fees**. Neither Buyer nor any of its Affiliates has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which any Seller could become liable or obligated to pay.

Section 4.9    **No Outside Reliance**. Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, Buyer acknowledges and agrees that the representations and warranties made by the Sellers to Buyer in Article III (as qualified by the Disclosure Schedule and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) and the representations and warranties made by Sellers in the Related Agreements (the "Sellers' Express Representations") are the sole and exclusive representations and warranties of any kind made to Buyer and on which Buyer is relying in connection with the Contemplated Transactions. Buyer acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than with respect to the Sellers' Express Representations) including in the Confidential Information Memorandum prepared by Houlihan Lokey (the "Information Presentation"), that certain datasite administered by Datasite (the "Dataroom"), any projections, meetings, calls or correspondence with management of Sellers and their Representatives, or any other Person on behalf of Sellers or any of their respective Affiliates or Representatives and (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, contracts, and prospects of Sellers, or the quality, quantity or condition of Sellers' assets, are, in each case, specifically disclaimed by Sellers and that Buyer has not relied on any such representations, warranties or statements. Subject to the foregoing, including its reliance on the Sellers' Express Representations, and other than based on Fraud, Buyer will accept the Purchased Assets and assume the Assumed Liabilities at the Closing "AS IS," "WHERE IS" AND "WITH ALL FAULTS."

47

## ARTICLE V
## PRE CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

### Section 5.1   Certain Efforts; Cooperation.

(a)   Subject to the terms and conditions of this Agreement, each of the Parties shall use its commercially reasonable efforts, subject to the orders of the Bankruptcy Court, to make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the conditions to the obligations of the Parties to consummate the Contemplated Transactions set forth in Article VII), except as otherwise provided in Section 5.2; provided, however, Sellers shall be entitled to take such actions as are required in connection with the discharge of their fiduciary duties during the Chapter 11 Cases (including soliciting higher or better offers for the Purchased Assets in any Auction).

(b)   From and after the execution of this Agreement, Sellers and Buyer shall use their commercially reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done by Sellers and Buyer all things necessary under applicable Law, and to execute and deliver such documents, ancillary agreements and other papers as may be required to carry out the provisions of this Agreement and consummate and make effective the Contemplated Transactions, including in order to vest in Buyer all of Sellers' right, title and interest to the Purchased Assets, free and clear of all Liens (other than Permitted Liens and Assumed Liabilities expressly contemplated by the Sale Order or this Agreement) at the Closing.

(c)   From and after the execution of this Agreement, Sellers shall reasonably cooperate with Buyer (including with respect to the provision of information and engaging with third parties) in connection with any reasonable requests from Buyer regarding the operation of the Business, including assistance with preparation and acquisition of the Tax Resale Certificates and preparation for commencement thereof by Buyer as of the Closing Date, including with respect to the acquisition or assignment of licenses, permits, insurance policies, vendor arrangements, payment processing, administration of payroll and any other day-to-day activity currently undertaken in the Ordinary Course of Business, whether or not any such arrangement is currently provided under a Contract that will be assumed as of the Closing.

### Section 5.2   Notices and Consents.

(a)   To the extent expressly required by the Bankruptcy Code or the Bankruptcy Court, Sellers shall give any notices to third parties, and each Seller shall use its commercially reasonable efforts to obtain any third-party Consents or sublicenses requested in accordance with this Agreement.

(b)   Sellers and Buyer shall cooperate with one another (i) in promptly determining whether any filings are required to be or should be made or consents, approvals, permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the Contemplated Transactions and (ii) in promptly making

48

any such filings, furnishing information required in connection therewith and seeking to obtain timely any such consents, permits, authorizations, approvals or waivers.

(c)     Subject to the terms and conditions set forth in this Agreement and applicable Law, each of Buyer and Sellers shall (A) promptly notify the other Party of, and if in writing, furnish the other Party with copies of (or in the case of oral communications, advise the other Party of the contents of) any communication to that Party from any Governmental Entity in respect of any filing, investigation or inquiry concerning this Agreement or the Contemplated Transactions, (B) permit the other Party the opportunity to review and discuss in advance all the information relating to Sellers and their respective Subsidiaries or Buyer and its Affiliates, as the case may be, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Entity in connection with this Agreement and the transactions contemplated by this Agreement and incorporate the other Party's reasonable comments, (C) not independently participate in any meeting or discussion with any Governmental Entity in respect of any filing, investigation, or inquiry concerning this Agreement and the transactions contemplated by this Agreement unless it consults with the other Party in advance, and, to the extent permitted by such Governmental Entity, gives the other Party the opportunity to attend, and (D) furnish the other Party with copies of all material correspondences, filings, and written communications between them and their Subsidiaries and Representatives, on the one hand, and any Governmental Entity or its respective staff, on the other hand, with respect to this Agreement and the transactions contemplated by this Agreement, provided, however, that any materials or information provided pursuant to any provision of this Section 5.2(c) may be redacted before being provided to the other Party (i) to remove references concerning the valuation of Buyer, Sellers, or any of their Subsidiaries, (ii) to remove references concerning financing arrangements, (iii) as necessary to comply with contractual arrangements, and (iv) as necessary to address reasonable privilege or confidentiality issues. Sellers and Buyer may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 5.2(c) as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel and any retained consultants or experts of the recipient and shall not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Sellers or Buyer, as the case may be). Each of Sellers and Buyer shall promptly notify the other Party if such Party becomes aware that any third party has any objection to this Agreement on antitrust or anti-competitive grounds.

(d)     Notwithstanding anything herein to the contrary and subject to clause (B) of the following sentence, the Parties understand and agree that commercially reasonable efforts of Buyer hereto shall not be deemed to include: (i) entering into any settlement, undertaking, consent decree, stipulation or agreement with any Governmental Entity in connection with the transactions contemplated hereby or defending against or initiating any lawsuit, action or proceeding, judicial or administrative, challenging this Agreement or the transactions contemplated hereby, or (ii) proposing, negotiating, agreeing to or offering to commit to any sale, divestiture, license, disposition or separation (including by establishing a trust or otherwise) of, or any limitation on any operation or business of, any of its or its Affiliate's businesses, assets or properties. In furtherance, and not in limitation, of the foregoing in this Section 5.2(d), (A) other than in connection with an Alternate Transaction or dispositions of Inventory in the Ordinary Course of Business (which, in each case, shall not require any consent of Buyer), Sellers shall not,

and shall cause their Affiliates not to, propose, negotiate, agree to or offer to commit to any sale, divestiture, license, disposition or separation of any Purchased Asset, without the prior written consent of Buyer, and (B) Buyer shall not be required to agree to any divestiture, sale or other disposition of any of the Purchased Assets or any assets of Buyer or any of Buyer's Affiliates or agree to any limitation on any operation or business of the Buyer or any of its Affiliates.

**Section 5.3    Bankruptcy Actions.**

(a)    Sellers will commence the Chapter 11 Cases on or before February 5, 2023.

(b)    Sellers shall file the Sale Motion no later than one (1) Business Day after the Petition Date, which motion shall seek the Bankruptcy Court's:

(i)    entry of an order on or before the Sale Procedures Order Deadline, in form and substance satisfactory to Buyer in its sole and absolute discretion, as amended, modified or supplemented with the prior written consent of Buyer (the "Sale Procedures Order"), among other things, (A) establishing bidding procedures governing the sale of the Purchased Assets, as amended, modified or supplemented with the prior written consent of Buyer (the "Bidding Procedures") (B) approving payment of the Expense Reimbursement, to the extent payable by the terms of this Agreement or the Sale Procedures Order, and (C) providing that the Expense Reimbursement shall constitute administrative expenses of the Sellers. The Bankruptcy Court must enter the Sale Procedures Order by the Sale Procedures Order Deadline; and

(ii)    entry of an order on or before the Sale Order Deadline, in form and substance satisfactory to Buyer in its reasonable discretion, as amended, modified or supplemented with the prior written consent of Buyer, authorizing and approving, inter alia, (A) the sale of the Purchased Assets to Buyer on the terms and conditions set forth herein, free and clear of all Liens and Claims (to the extent set forth therein), and (B) the assignment and assumption by Buyer of each Assumed Contract (the "Sale Order"). The Sale Order shall, among other things: (I) approve the sale of the Purchased Assets to the Buyer free and clear of all Liens, Claims, and encumbrances, pursuant to (among other provisions) sections 105, 363, and 365 of the Bankruptcy Code, in each case to the extent set forth in this Agreement; (II) approve the assumption and assignment to the Buyer of the Assumed Contracts pursuant to section 365 of the Bankruptcy Code; (III) contain findings of fact and conclusions of law that the Buyer is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code and is not a successor to Seller; and (IV) contain such other terms that are otherwise acceptable to Buyer, in its reasonable discretion.

(c)    The Sellers shall file a motion seeking entry of the Store Closing Sales Order (the "Store Closing Motion") no later than one (1) Business Day after the Petition Date.

(d)    The Sellers shall also file a motion seeking entry of an order scheduling an expedited hearing to consider approval of the Sales Procedure Order upon 14 days' notice to the

50

creditors of Sellers and other parties of interest no later than three (3) Business Days after the Petition Date.

(e)       Sellers shall provide Buyer with a reasonable opportunity to review and comment (but in no event less than twenty four (24) hours) upon all motions, applications, and supporting papers directly relating to the transactions contemplated by this Agreement prepared by Sellers or any Affiliates (including forms of orders and notices to interested parties) prior to the filing thereof in the Chapter 11 Cases. All motions, applications, and supporting papers prepared by Sellers and relating to the transactions contemplated by this Agreement to be filed on behalf of Sellers after the date hereof must be reasonably satisfactory in form and substance to Buyer.

(f)       If the Sale Procedures Order, Sale Order, the Store Closing Sales Order or any other orders of the Bankruptcy Court directly relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacatur, stay, rehearing or reargument shall be filed with respect to the Sale Order, Sale Procedures Order or other such order), and this Agreement has not otherwise been terminated pursuant to Article VIII, the Sellers shall use their commercially reasonable efforts to diligently defend such appeal, petition or motion and shall use its commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion.

(g)       Each Seller shall promptly provide Buyer and its counsel with copies of all notices, filings and orders of the Bankruptcy Court that such Seller has in its possession (or receives) pertaining to the Contemplated Transaction, the Sale Order, Sale Procedures Order, the Store Closing Sales Order or any other order related to any of the transactions contemplated by this Agreement, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to Buyer and its counsel. If any Seller seeks any modification to the Bidding Procedures, Sale Procedures Order, Sale Order or Store Closing Sales Order by the Bankruptcy Court or any other Governmental Entity of competent jurisdiction to which a decision relating to the Chapter 11 Cases has been appealed, in each case, without the prior written consent of Buyer, such modification shall comply with the terms of this Agreement.

(h)       Each of Buyer and Sellers shall continue to act in good faith and without any improper conduct, including collusion or fraud of any kind.

(i)       Each of Buyer and Sellers will promptly take such actions as are reasonably requested by the other party to assist in obtaining entry of the Sale Order, the Sale Procedures Order and the Store Closing Sales Order including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by Sellers of their obligations under this Agreement and the Related Agreements and demonstrating that Buyer is a good faith buyer under section 363(m) of the Bankruptcy Code.

(j)       Pursuant to the terms of the proposed Sale Procedures Order, Buyer shall provide information to the Sellers to be disseminated to counterparties to Assumed Contracts, sufficient to satisfy a finding of adequate assurance of future performance as required in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

(k)     Pursuant to the terms of the Bidding Procedures and the proposed Sale Procedures Order, Sellers will solicit bids from other prospective purchasers for the sale of all or substantially all of the Purchased Assets in accordance with the procedures set forth in the proposed Sale Procedures Order.

(l)     Sellers shall use commercially reasonable efforts to provide appropriate notice of the hearings on the Sale Motion and Store Closing Motion to all Persons entitled to notice, including, for the Sale Motion, all Persons that have asserted Liens on the Purchased Assets, all parties to the Assumed Contracts and all Taxing authorities in jurisdictions applicable to Sellers and as otherwise required by the Bankruptcy Code and bankruptcy rules.

(m)     Sellers shall file with the Bankruptcy Court and serve a cure notice (the "Cure Notice") by first class mail on all non-debtor counterparties to all Contracts and Leases as required by the Sale Procedures Order and provide a copy of the same to Buyer.

**Section 5.4     Conduct of Business**. Until the earlier of the termination of this Agreement (in accordance with its terms) and the Closing, subject to the terms and conditions of the Sales Procedures Order and any other orders of the Bankruptcy Court, and except as expressly contemplated by this Agreement or as set forth on Schedule 5.4, as required under the Bankruptcy Code or other applicable Law, to the extent waived by Buyer or with the prior written consent of Buyer:

(a)     Sellers shall use commercially reasonable efforts to maintain, preserve and protect all of the assets of Sellers (other than Excluded Assets) in the condition in which they exist on the date hereof, except for ordinary wear and tear and except for replacements, modifications or maintenance in the Ordinary Course of Business (and in connection therewith shall not, save for the discharge of fiduciary duties during the Chapter 11 Cases with respect to soliciting higher or better offers for the Purchased Assets, enter into any Contract or arrangement to, or otherwise, sell, transfer or dispose of any asset of Sellers (other than an Excluded Asset) or adversely modify, or encumber any Assumed Liability, in each case other than with respect to the sale of inventory as contemplated in the Store Closing Sales Order or in the Ordinary Course of Business or the disposal of assets in the Ordinary Course of Business as a result of being no longer useful as a result of ordinary wear and tear);

(b)     Sellers shall use commercially reasonable efforts not to take, or agree to or commit to assist any other Person in taking, any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (ii) that would reasonably be expected to impair the ability of Sellers or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation;

(c)     Sellers shall make all post-petition payments related to Assumed Contracts that become or became due or payable pursuant to the terms thereof to the extent provided in the DIP Budget;

(d)     Sellers shall comply in all material respects with all material Laws applicable to them or having jurisdiction over the Business or any Purchased Asset;

(e)     Sellers shall maintain in full force and effect each Assumed Permit held by any Seller as of the date hereof or otherwise obtained by any Seller prior to the Closing, and shall comply with the terms of each such Permit and no Seller shall permit any such Permit to terminate, expire or lapse other than in the Ordinary Course of Business;

(f)     Sellers shall not sell or otherwise issue new gift certificates with respect to the Business other than in the Ordinary Course of Business, but shall continue to honor in all respects any outstanding gift certificates issued by the Business in the Ordinary Course of Business, nor shall Sellers offer any discounts or promotions related to any products, good or services, in each case, other than in accordance with the Store Closing Sales Order or in the Ordinary Course of Business or manipulate any historic working capital practices in any manner that could reasonably be expected to be materially adverse to the Business or Buyer from and after the Closing;

(g)     Sellers shall (i) conduct the Business in the Ordinary Course of Business, other than as contemplated in the Store Closing Sales Order, (ii) use commercially reasonable efforts to preserve the existing business organization and keep management of the Business intact, (iii) use commercially reasonable efforts to keep available the services of the Current Employees, and (iv) use commercially reasonable efforts to maintain the existing relations with customers, carriers, suppliers, creditors, business partners, Current Employees and others having business dealings with the Business; and

(h)     Sellers shall not: (i) cancel, compromise, waive or release any right with respect to any Purchased Asset; (ii) enter into or amend, modify, supplement, restate or renew in any respect or cancel or terminate or waive any rights under or with respect to any Assumed Contract or Assumed Permit; or (iii) except for such Contracts that Sellers shall file a motion with the Bankruptcy Court as of the Petition Date to reject, assume, reject or assign any Contract that may become an Assumed Contract other than through the assumption and assignment of the Assumed Contracts, as contemplated by this Agreement, to Buyer (or to a third party in connection with an Alternate Transaction).

Nothing contained in this Agreement is intended to give Buyer or its Affiliates, directly or indirectly, the right to control or direct the business of Sellers prior to the Closing.

**Section 5.5    <u>Access.</u>**

(a)     Upon reasonable advance written request by Buyer, Sellers shall permit Buyer and its Representatives to have reasonable access during normal business hours, subject to the terms of Leases and in a manner so as not to interfere unreasonably with the normal business operations of Sellers, to all premises, properties, personnel, Records,  Contracts and Leases related to the Business, in each case, for the sole purpose of evaluating the Business; provided, however, that, for avoidance of doubt, the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Law.

(b)     All information obtained pursuant to this <u>Section 5.5</u> shall be subject to the terms and conditions of the Confidentiality Provision and Buyer, to the extent not a party thereto,

shall be subject to the same terms and conditions as set forth therein as though an original party thereto; provided, that notwithstanding anything in the Confidentiality Provision to the contrary, the Parties agree that the obligations thereunder shall terminate no earlier than the Closing Date and not the date hereof.

**Section 5.6    Press Releases and Public Announcements**. After notice to and consultation with Buyer, Sellers shall be entitled to disclose this Agreement and all information provided by Buyer in connection herewith to the Bankruptcy Court, the Committee, parties in interest in the Chapter 11 Cases and other Persons bidding on assets of Sellers. Other than statements made in the Bankruptcy Court (or in pleadings filed therein), no Party shall issue (prior to, on or after the Closing) any press release or make any public statement or public communication without the prior written consent of the other Parties, which shall not be unreasonably withheld, conditioned, or delayed; provided, however, (i) Sellers, without the prior consent of Buyer, may (A) issue such press release or make such public statement, filing or disclosure as may, upon the advice of counsel, be required by applicable Law or any Governmental Entity with competent jurisdiction or as otherwise appropriate in light of the commencement of the Chapter 11 Cases, and (B) communicate with its and its Affiliates' equity holders, investors and potential investors relating to the transactions contemplated by this Agreement and (ii) Buyer, without the prior consent of Sellers, may issue such press release or make such public statement, filing or disclosure as may, upon the advice of counsel, be required by applicable Law or any Governmental Entity with competent jurisdiction.

**Section 5.7    Bulk Transfer Laws**. Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement, and hereby waives all claims related to the noncompliance therewith. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any Liens on the Purchased Assets (other than Permitted Liens and Assumed Liabilities), including any Liens arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

# ARTICLE VI
# OTHER COVENANTS

The Parties agree as follows with respect to the period from and after the Closing, provided that Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed:

**Section 6.1    Cooperation**. Each of the Parties shall cooperate with each other, and shall use their commercially reasonable efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Purchased Assets and Assumed Liabilities from Sellers to Buyer and to minimize the disruption to the Business resulting from the Contemplated Transactions.

**Section 6.2    Further Assurances**. In case at any time from and after the Closing any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the Sale

54

Order, at any Party's request and sole cost and expense, each Party shall take such further action (including the execution and delivery to any other Party of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information) as another Party may reasonably request as shall be necessary to transfer, convey and assign to Buyer all of the Purchased Assets, to confirm Buyer's assumption of the Assumed Liabilities and to confirm Sellers' retention of the Excluded Assets and Excluded Liabilities. Without limiting the generality of this Section 6.2, to the extent that either Buyer or Sellers discovers any additional assets or properties which the Parties mutually agree should have been transferred or assigned to Buyer as Purchased Assets but were not so transferred or assigned, Buyer and Sellers shall cooperate and execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to Buyer. Without limiting the generality of this Section 6.2, to the extent that either Buyer or Sellers discovers any assets or properties which the Parties mutually agree should have been retained by Sellers as Excluded Assets, Buyer and Sellers shall cooperate and execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to Sellers. If any Seller, Buyer or any of their respective Subsidiaries, from time to time, identifies any Assumed Liability that was not transferred to Buyer, or any Excluded Liability that was transferred to Buyer, Sellers and Buyer shall use their commercially reasonable efforts to transfer those Liabilities to the correct Party as promptly as reasonably practicable after Closing.

Section 6.3 **Availability of Business Records**. From and after the Closing, Buyer shall reasonably promptly provide to Sellers and their respective Representatives (after reasonable notice and during normal business hours) reasonable access to Records included in the Purchased Assets for periods prior to the Closing and reasonable access to Transferred Employees, in each case, to the extent such access is necessary in order for Sellers (as applicable) to comply with this Agreement, the Related Agreements and the transactions contemplated hereby and thereby, applicable Law or any contract to which it is a party, for liquidation, winding up, Tax reporting or other proper purposes and so long as such access is subject to an obligation of confidentiality and does not result in any material cost to Buyer or any Affiliate thereof, and shall preserve such Records until the latest of (i) seven years after the Closing Date, (ii) the required retention period for all government contact information, records or documents or (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases. Such reasonable access shall include reasonable access to information in electronic form to the extent reasonably available. Buyer acknowledges that Sellers have the right to retain originals or copies of all Records included in the Purchased Assets for periods prior to the Closing. Prior to destroying any Records included in the Purchased Assets for periods prior to the Closing, Buyer shall notify Sellers thirty (30) days in advance of any such proposed destruction of its intent to destroy such Records, and Buyer shall permit Sellers to retain such Records, at Sellers' cost and expense. With respect to any Litigation and claims that are Excluded Liabilities, Buyer shall use commercially reasonable efforts to render reasonable assistance that Sellers may request and which do not result in any material cost to Buyer or any of its Affiliates in defending or prosecuting such Litigation or claim and shall use reasonable best efforts to make available to Sellers such personnel as are most knowledgeable about the matter in question.

**Section 6.4      Employee Matters.**

(a)      Prior to the Closing, Buyer shall offer (or cause a designee of Buyer to offer), by written offer letter outlining the terms and conditions of the offer of employment for employment (i) in a position that is reasonably comparable to such Employee's position immediately prior to the Closing, and (ii) with a level of base salary, wages and employee benefits (excluding cash bonus opportunities, equity-based incentives, non-qualified deferred compensation benefits, retiree benefits, benefits under a defined benefit pension plan, change in control or retention bonuses or benefits under any severance plan) that is reasonably comparable in the aggregate to such Employee's base salary, wages and employee benefits (excluding cash bonus opportunities, equity-based incentives, non-qualified deferred compensation benefits, retiree benefits, benefits under a defined benefit pension plan, change in control or retention bonuses or benefits under any severance plan) immediately prior to the Closing, to employ on an at will basis the Employees listed on Schedule 6.4; provided that such Employees remain employed in good standing by Sellers as of the Closing. For purposes of this Agreement, each Employee who receives and accepts such offer of employment prior to the Closing and commences work with Buyer on or promptly after the Closing Date shall be referred to herein as a "Transferred Employee"; provided, however, any Employee who is on short-term disability, leave of absence, paid or unpaid, or long-term disability as of the Closing Date shall remain employed by Sellers, shall not commence employment with Buyer or its designee, and shall not be considered a Transferred Employee, unless and until such Employee returns to and commences active employment with Buyer or its designee. Buyer agrees that, from and after the Closing Date, Buyer shall, and shall cause its Subsidiaries to, grant all Transferred Employees credit for any service with Sellers earned prior to the Closing Date for eligibility, vesting, and benefits (but not for any purpose under any equity-based incentive plan or for benefit accrual purposes under any defined benefit pension plan or post-retirement or post-employment health or welfare plan) under the benefit and compensation plans, programs, agreements or arrangements in which the Transferred Employees commence to participate on or after the Closing Date (the "New Plans"), except as would result in duplication of benefits.  In addition, Buyer shall use commercially reasonable efforts to (x) cause to be waived all preexisting condition exclusions and actively-at-work requirements and similar limitations, eligibility waiting periods and evidence of insurability requirements under any New Plans to the extent waived or satisfied by a Transferred Employee under any Employee Benefit Plan as of the date on which commencement of participation in such New Plan begins, and (y) cause any deductible, co-insurance and covered out-of-pocket expenses paid during the calendar year in which commencement of participation in such New Plan begins and prior to such commencement of participation by any Transferred Employee (or covered dependent thereof) to be taken into account for purposes of satisfying the corresponding deductible, coinsurance and maximum out-of-pocket provisions under such New Plan in the year of initial participation.

(b)      Each Employee or Current Employee of Sellers who is not or does not become a Transferred Employee shall be referred to herein as an "Excluded Employee."  Other than the Assumed Liabilities, Sellers shall bear responsibility for all Liabilities arising out of, relating to, or with respect to any compensation and employee benefits relating to the employment or termination of employment with the Sellers and their Affiliates of the Current Employees relating to or arising on or prior to the time they become Transferred Employees and for Current

Employees and Employees who are or become Excluded Employees relating to or arising on, prior to or after the Closing Date.

(c)     Following the date of this Agreement:

(i)     Sellers will allow Buyer or any of its Representatives reasonable access upon reasonable advance notice to meet with and interview the Employees and Current Employees who are members of executive management and other employees reasonably requested during normal business hours, provided that Sellers shall be afforded an opportunity to have a Representative of Sellers present in such meetings;

(ii)     Sellers shall not, nor shall any Seller authorize or direct or give express permission to any Affiliate, officer, director or employee of any Seller or any Affiliate to, (A) interfere with Buyer's or its Representatives' rights under Section 6.4(a) to make offers of employment to any Employee, or (B) solicit or encourage any Employee not to accept, or to reject, any such offer of employment;

(iii)     Sellers shall provide reasonable cooperation and information to Buyer or the relevant Representative as reasonably requested by Buyer or such Representative with respect to its determination of terms and conditions of employment for any Employee and with respect to making offers of employment to any Employees;

(iv)     Sellers shall provide all information reasonably requested by Buyer to determine the Transferred Employees' status as full-time employees under the Patient Protection and Affordable Care Act of 2010, as amended;

(v)     Sellers shall process the payroll for and pay, or cause to be paid, the base wages, base salary and benefits that are due and payable with respect to all Current Employees (prior to becoming Transferred Employees), Employees and Former Employees of Sellers. Sellers shall withhold and remit all applicable payroll taxes as required by Law with respect to all Current Employees (prior to becoming Transferred Employees), Employees and Former Employees of Sellers; and

(vi)     None of the foregoing shall be construed as requiring, and neither Sellers nor any of their Affiliates shall take any affirmative action with the primary purpose and that would have the effect of requiring, Buyer to continue any specific employee benefit plan or to continue the employment of any specific person. Nothing in this Agreement is intended to establish, create or amend, nor shall anything in this Agreement be construed as establishing, creating or amending, any employee benefit plan, practice or program of Buyer, any of its Affiliates or any of Sellers' Employee Benefit Plans, nor shall anything in this Agreement create or be construed as creating any contract of employment or as conferring upon any Transferred Employee or upon any other person, other than the parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise. This Section shall be binding upon and inure

57

solely to the benefit of each of the parties to this Agreement, and nothing in this Section, express or implied, shall confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Section.

(d)     Except as explicitly designated an Assumed Liability under <u>Section 2.3(b)</u>, <u>Section 2.3(d)</u> or <u>Section 2.3(i)</u>, and without limiting the generality of <u>Section 2.4</u>, Sellers shall be exclusively responsible for, without limitation, (i) all Liabilities and obligations arising prior to the Closing Date from Seller's employment or termination of employment of any employee of any Seller, and all Liabilities and obligations arising prior to, on, or after the Closing Date from Seller's employment or termination of employment of any employee of any Seller who does not become a Transferred Employee (including any severance and other similar costs), (ii) all Liabilities and obligations related to Seller's non-compliance with the applicable Laws governing any Employee Benefit Plan or arise from the ordinary course operation of the applicable Employee Benefit Plans in accordance with the express terms thereof, and (iii) all employment-related Liabilities arising prior to the Closing Date from Seller's conduct, and, in each case, all such Liabilities will constitute Excluded Liabilities under this Agreement.

**Section 6.5     <u>Recording of Intellectual Property Assignment</u>**. Buyer shall be responsible, at its sole cost and expense, for recording and filing the Intellectual Property Assignment with the appropriate Governmental Entities.

**Section 6.6     <u>Transfer Taxes; Straddle Period</u>**.

(a)     Buyer shall pay any and all sales, use, stamp, documentary, registration, transfer (including real estate transfer tax), stock transfer, registration, gross receipts, duty, securities transactions, stamp, documentary, registration, transfer, value added or similar Tax (each, a "<u>Transfer Tax</u>") imposed under any applicable Law in connection with the transactions contemplated by this Agreement, regardless of the Person liable for such Transfer Taxes under applicable Law; <u>provided</u>, that the Parties agree that an estimate of the aggregate amount of all such Transfer Taxes to be paid by Buyer pursuant to this <u>Section 6.6(a)</u> are set forth on <u>Schedule 6.6(a)</u>. Sellers and Buyer shall cooperate to prepare any Tax Returns required to be filed in connection with Transfer Taxes described in the immediately preceding sentence. The Party that is responsible under applicable law to file such Tax returns, shall timely file such returns.

(b)     Sellers shall prepare and timely file (i) all Tax Returns with respect to the Purchased Assets for any Tax period ending on or before the Closing Date and (ii) all Tax Returns of Sellers. Except to the extent any Tax reflected on a return required to be prepared and filed by Sellers pursuant to this <u>Section 6.6(b)</u> is otherwise reflected as an adjustment to Purchase Price or constitutes an Assumed Liability, Sellers shall be liable and responsible for, and pay any Taxes relating to periods covered by such Tax Returns.

(c)     All real property taxes, personal property taxes, ad valorem and similar periodic Taxes and obligations levied on or with respect to the Purchased Assets for any Straddle Period (collectively, the "<u>Apportioned Obligations</u>") shall be apportioned between Sellers, on the one hand, and Buyer, on the other hand, based on the number of days of such taxable period included in the Pre-Petition Date Tax Period and the number of days included in the Post-Petition Date Tax Period. Sellers shall be liable for the proportionate amount of such Taxes that is

attributable to the Pre-Petition Date Tax Period ("Straddle Period Taxes") and Buyer shall be liable for the proportionate amount of such Taxes that is attributable to the Post-Petition Date Tax Period. The Apportioned Obligations shall be prorated (based on the most recent available Tax statement, latest Tax valuation and latest bills) as of the Petition Date. If the Petition Date occurs before the Tax rate is fixed for the then current fiscal or calendar year, whichever is applicable, the proration of the corresponding Taxes shall be on the basis of the tax rate for the last preceding year applied to the latest assessed valuation.

Section 6.7    **Wage Reporting**. Buyer and Sellers agree to utilize, or cause their respective Affiliates to utilize, the standard procedure set forth in IRS Revenue Procedure 2004-53 with respect to wage reporting.

Section 6.8    **Release**.

(a)     Effective upon the Closing, Sellers, on behalf of themselves and their respective past, present and future subsidiaries, parents, equityholders, divisions, Affiliates, agents, representatives, advisors, attorneys, successors and assigns, all solely in such capacity, (collectively, the "Seller Releasing Parties"), hereby release, remise, acquit and forever discharge (i) the Buyer and its past, present and future subsidiaries, parents, divisions, Affiliates, agents, representatives, advisors, attorneys, successors and assigns, and each of its and their respective directors, managers, officers, employees, shareholders, members, agents, representatives, advisors, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies and partners (collectively, the "Buyer Released Parties"), from any and all claims, Contracts, demands, causes of action, disputes, controversies, suits, cross-claims, torts, losses, attorneys' fees and expenses, obligations, agreements, covenants, damages, Liabilities, costs and expenses (collectively, "Disputes") arising on or prior to the Closing Date, whether direct or derivative, whether known or unknown, whether anticipated or unanticipated, whether claimed or suspected, whether fixed or contingent, whether yet accrued or not, whether damage has resulted or not, whether at law or in equity, whether arising out of agreement or imposed by statute, common law of any kind, nature, or description, including any claim by way of indemnity or contribution, which any Seller Releasing Party has, may have had or may hereafter assert against any Buyer Released Party and (ii) any claim, right or interest of Sellers (whether known or unknown, whether anticipated or unanticipated, whether claimed or suspected, whether fixed or contingent, whether yet accrued or not, whether at law or in equity, whether arising out of agreement or imposed by statute, common law of any kind, nature, or description) in the Purchased Assets; provided, that notwithstanding the foregoing, Seller Releasing Parties do not in any event release any Buyer Released Party from (x) its obligations relating to the transactions contemplated under this Agreement or the Related Agreements, including (i) relating to any breach hereof or thereof, (ii) any Dispute relating to or arising out of compliance with the terms of this Agreement as it relates to any Purchased Asset, Excluded Asset, Assumed Liability or Excluded Liability, (x) the DIP Agreement or the Prepetition Priming Loans, the Prepetition ABL Loans, and the Prepetition DDTL Loans (each as defined in the DIP Order), or any Special Compensation Agreement, (y) fraud, as determined by a Final Order entered by a court of competent jurisdiction, or (z) any counterclaim in connection with any claim made against a Seller Releasing Party by any Buyer Released Party. In addition, if Sellers file a Chapter 11 plan, such plan shall be consistent with this Agreement in all respects and will include releases and exculpation provisions in favor of Buyer Released Parties to the maximum extent permitted by law. Each Seller, on behalf of the

59

Seller Releasing Parties, agrees that the release in this Section 6.8(a) applies not only to Disputes that are presently known, suspected, or disclosed to such Seller Releasing Party, but also to Disputes that are presently unknown, unsuspected, or undisclosed to such Seller Releasing Party. Each Seller, on behalf of the Seller Releasing Parties, hereby acknowledges and agrees that such Seller Releasing Party is aware of the provisions of Section 1542 of the California Civil Code ("Section 1542") regarding the effectiveness of this release on unknown or unsuspected Disputes and, to the extent applicable (if at all), hereby knowingly waives its protection and the protection of any similar Law.  Section 1542 provides: "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."  Each Seller, on behalf of the Seller Releasing Parties, acknowledges that such Seller Releasing Party is assuming the risk that the facts may turn out to be different from what such Seller Releasing Party believes them to be and agrees that the release in this Section 6.8(a) shall be in all respects effective and not subject to termination or rescission because of such mistaken belief.

(b)  Effective upon the Closing, Buyer, on behalf of itself, the Buyer Equity Holders, and its and their respective past, present and future subsidiaries, parents, divisions, Affiliates, agents, representatives, advisors, attorneys, successors and assigns (collectively, the "Buyer Releasing Parties"), hereby release, remise, acquit and forever discharge the Sellers and the Sellers' respective past, present and future subsidiaries, parents, equityholders, partners, officers, directors, divisions, Affiliates, agents, representatives, attorneys, successors and assigns (in each case, in their capacity as such) (each such subsidiary, parent, equityholder, officer, director, manager, division, Affiliate, agent, representative,  attorney, successor and assign, other than the Sellers themselves, collectively, "Released Seller Representatives"), and each of such Released Seller Representative's respective past, present and future subsidiaries, parents, equityholders, partners, officers, directors, managers, divisions, Affiliates, agents, representatives, advisors, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies, successors and assigns (in each case, in their capacity as such)  (collectively, the "Seller Released Parties"), from any and all Disputes arising on or prior to the Closing Date, whether direct or derivative, whether known or unknown, whether anticipated or unanticipated, whether claimed or suspected, whether fixed or contingent, whether yet accrued or not, whether damage has resulted or not, whether at law or in equity, whether arising out of agreement or imposed by statute, common law of any kind, nature, or description, including any claim by way of indemnity or contribution, which any Buyer Releasing Party has, may have had or may hereafter assert against any Seller Released Party; provided, that notwithstanding the foregoing, Buyer Releasing Parties do not in any event release any Seller Released Party from (w) its respective obligations relating to the transactions contemplated under this Agreement or the Related Agreements, including (i) relating to any breach hereof or thereof, (ii) any Dispute relating to or arising out of compliance with the terms of this Agreement as it relates to any Purchased Asset, Excluded Asset, Assumed Liability or Excluded Liability, (x) the DIP Agreement, or the Prepetition Priming Loans, the Prepetition ABL Loans, and the Prepetition DDTL Loans (each as defined in the DIP Order), or any Special Compensation Agreement, (y) fraud, as determined by a Final Order entered by a court of competent jurisdiction, or (z) any counterclaim in connection with any claim made against a Buyer Releasing Party by any Seller Released Party. Buyer, on behalf of the Buyer Releasing Parties, agrees that the release in this Section 6.8(b) applies not only to Disputes that are presently known, suspected, or disclosed to any Buyer Releasing Party, but also to Disputes that are presently

unknown, unsuspected, or undisclosed to the Buyer Releasing Parties. Buyer, on behalf of the Buyer Releasing Parties, hereby acknowledges and agrees that each Buyer Releasing Party is aware of the provisions of Section 1542 regarding the effectiveness of this release on unknown or unsuspected Disputes and, to the extent applicable (if at all), hereby knowingly waives its protection and the protection of any similar Law. Section 1542 provides: "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party." Buyer, on behalf of the Buyer Releasing Parties acknowledges that each Buyer Releasing Party is assuming the risk that the facts may turn out to be different from what such Buyer Releasing Party believes them to be and agrees that the release in this Section 6.8(b) shall be in all respects effective and not subject to termination or rescission because of such mistaken belief.

**Section 6.9    Collection of Accounts Receivable.**

(a)    As of the Closing Date, each Seller hereby (i) authorizes Buyer to open any and all mail addressed to any Seller relating to the Business or the Purchased Assets and delivered to the offices of the Business or otherwise to Buyer if received on or after the Closing Date and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, made payable or endorsed to any Seller or Sellers' order, for Buyer's own account.

(b)    As of the Closing Date, each Seller agrees that any monies, checks or negotiable instruments received by any Seller after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, shall be held in trust by such Seller for Buyer's benefit and account, and promptly upon receipt by a Seller of any such payment (but in any event within five (5) Business Days of such receipt), such Seller shall pay over to Buyer or its designee the amount of such payments. In addition, Buyer agrees that, after the Closing, it shall hold and shall promptly transfer and deliver to Sellers, from time to time as and when received by Buyer or its Affiliates, any cash, checks with appropriate endorsements, or other property that Buyer or its Affiliates may receive on or after the Closing which properly belongs to Sellers hereunder, including any Excluded Assets.

(c)    As of the Closing Date, Buyer shall have the sole authority to bill and collect Accounts Receivable that are Purchased Assets and accounts receivable relating to work performed by Buyer after the Closing.

**Section 6.10    Alternate Transactions**. Notwithstanding any provision herein to the contrary, subject to Section 8.3 and related provisions of this Agreement, nothing in this Agreement shall restrict Sellers' right to pursue one or more Alternate Transactions, including marketing the Sellers' assets or providing due diligence materials.

**Section 6.11    Plan Process.** Buyer, on behalf of itself and the Buyer Equity Holders, hereby agrees that, in respect of all of their Claims against Sellers, the Buyer and the Buyer Equity

Holders, in their respective capacities as holders of Claims against Sellers, from and after the Closing, shall not object to, and shall timely vote in favor of, any joint Chapter 11 plan filed by Sellers that (i) includes customary debtor and third-party releases and exculpation in favor of the Buyer, the Buyer Equity Holders (in any and all capacities), Sellers, Sellers' current and former directors, managers and officers, and Sellers' direct and indirect equity holders (in any and all capacities), and Affiliates, officers, directors, managers, employees, advisors, and other representatives of each of the foregoing, (ii) includes a provision effectuating the payment of the DIP Reversionary Interest, if any, and (iii) is otherwise reasonably acceptable to the Buyer Equity Holders.

**Section 6.12   D&O Insurance Policies.**   Each Seller agrees to use commercially reasonable efforts to render reasonable assistance, provided that such assistance does not result in any material costs to any Seller, to all current and former directors and officers of any Seller (including Transferred Employees and any Representative of any entity in the Buyer Group, in each case constituting current or former directors or officers of Sellers) in making a claim against the D&O Insurance Policies.

**Section 6.13   Transition Services.**   Following the Closing, in order to address the process and mechanism for accomplishing an orderly transfer of the Purchased Assets and Assumed Liabilities to Buyer while allowing for Sellers' continued access to resources necessary for the administration of the Chapter 11 Case, pursuit of confirmation of a Chapter 11 plan, and ultimate wind down of Sellers' estate, Buyer and Sellers shall use their reasonable best efforts to provide, or cause to be provided, (i) such services as set forth on Schedule 6.13 attached hereto, (ii) such services referenced in Section 5.1(c) and (iii) any services mutually agreed upon between Buyer and Sellers (collectively, the "Services"), on the terms and conditions to be set forth in a transition services agreement (the "Transition Services Agreement") in form and substance reasonably acceptable to Buyer and Sellers and be entered into reasonably promptly following the Closing by and among Buyer and each Seller; provided that the foregoing obligation shall not require any Party to use extraordinary efforts, engage any third parties, incur material out-of-pocket expenditures or require Buyer or any of its personnel to engage in any activity that would interfere with the operation of the business of Buyer. The Transition Services Agreement shall provide that the Services are to be rendered during the normal business hours of Buyer and Sellers and in a manner so as to not materially disrupt or impair the operations of Buyer and Sellers. The Services shall be, and the Transition Services Agreement shall reflect, provided at no cost to Buyer and any Seller.

**Section 6.14   Covenant Not to Sue.**   Buyer hereby covenants and agrees that it shall not bring suit or otherwise assert any Causes of Action (other than in respect of any Special Compensation Agreement) against the current or former directors, managers or equityholders of IPP Holdings or their respective subsidiaries, parents, equityholders, partners, employees, officers, directors, managers, divisions, Affiliates, agents, representatives, advisors, attorneys, successors and assigns (in each case, in their capacity as such) (collectively, the "Subject Parties"), which claims for the avoidance of doubt constitute Purchased Assets, before any court, arbitrator, mediator, or administrative agency anywhere in the world, except in the case of fraud, gross negligence or willful misconduct on the part of the Subject Parties, in each case, as determined by a Final Order entered by a court of competent jurisdiction. Buyer further covenants and agrees

that it shall not assign any Causes of Action (other than in respect of any Special Compensation Agreement) against any Subject Party to any third party.

## ARTICLE VII
## CONDITIONS TO CLOSING

**Section 7.1      Conditions to Buyer's Obligations**. Subject to Section 7.3, Buyer's obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or waiver (to the extent waiveable) of the following conditions:

(a)      as of the date hereof and as of the Closing as if made as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 3.1, Section 3.2, Section 3.3, Section 3.6 and Section 3.22 shall be true and correct in all respects other than de minimis exceptions, and (ii) each other representation or warranty set forth in Article III shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" or any other similar qualification contained in such representations and warranties shall be disregarded (other than the word "Material" when used in the instances of the defined term "Material Contract");

(b)      Sellers shall have performed and complied with their covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Sellers shall have caused the documents and instruments required by Section 2.8(a) to be delivered to Buyer (or tendered subject only to Closing);

(c)      no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)      (i) (A) the Bankruptcy Court shall have entered the Sale Procedures Order by the Sale Procedures Order Deadline and the Sale Order by the Sale Order Deadline, and (B) the Sale Procedures Order and the Sale Order shall each be a Final Order on the Closing Date; and (ii) the Sale Procedures Orders and the Sale Order, as entered by the Bankruptcy Court, shall be in form and substance reasonably satisfactory to Buyer;

(e)      the Bankruptcy Court shall not have entered any order (i) appointing a trustee or examiner with respect to the Chapter 11 Cases, (ii) converting the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or (iii) dismissing the Chapter 11 Cases;

(f)      from the date of this Agreement until the Closing Date, there shall not have occurred any Material Adverse Effect;

(g)      all Consents, if any, required to consummate the transactions contemplated by this Agreement, including with respect to the assignment of any Assumed Contract or Assigned Permit, shall have been obtained;

(h)      the DIP Agreement shall be in full force and effect;

(i)      Sellers shall have delivered a certificate from an authorized officer of Sellers to the effect that each of the conditions specified in <u>Section 7.1(a)</u>, <u>Section 7.1(b)</u> and <u>Section 7.1(f)</u> has been satisfied;

(j)      Sellers shall have completed the Store Closing Sales in accordance with the procedures set forth in the Store Closing Sales Order; and

(k)      the Bankruptcy Court shall have entered the final DIP Order approving the incurrence by Sellers of all DIP Obligations, including the Roll-Up Loans, and the final DIP Order shall be a Final Order as of the Closing Date.

**Section 7.2**    <u>**Conditions to Sellers' Obligations**</u>. Subject to <u>Section 7.3</u>, Sellers' obligation to consummate the Contemplated Transactions in connection with the Closing are subject to satisfaction or waiver (to the extent waiveable) of the following conditions:

(a)      as of the date hereof and as of the Closing as if made as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in <u>Section 4.1</u>, <u>Section 4.2</u>, <u>Section 4.3</u> and <u>Section 4.8</u> shall be true and correct in all respects other than de minimis exceptions, and (ii) each other representation or warranty set forth in <u>Article IV</u> shall be true and correct in all material respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, would not reasonably be expected to materially prevent, restrict or delay the consummation of the Contemplated Transactions;

(b)      Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Buyer shall have caused the documents, instruments and payments required by <u>Section 2.8(b)</u> to be delivered to Sellers (or tendered subject only to Closing);

(c)      no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)      the Sale Order shall have been entered by the Bankruptcy Court and shall not be subject to a stay pending appeal; and

(e)      Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in <u>Section 7.2(a)</u> and <u>Section 7.2(b)</u> has been satisfied.

BUSINESS.29776642.14

**Section 7.3    No Frustration of Closing Conditions**. Neither Buyer nor Sellers may rely on the failure of any condition to its obligation to consummate the Contemplated Transactions set forth in Section 7.1 or Section 7.2, as the case may be, to be satisfied if such failure was primarily caused by such Party's failure to use its commercially reasonable efforts with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the consummation of the Contemplated Transactions or other breach of a representation, warranty or covenant hereunder.

**Section 7.4    Waiver of Conditions**. Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing.

## ARTICLE VIII
## TERMINATION

**Section 8.1    Termination of Agreement**. This Agreement may be terminated in accordance with this Article VIII and the Contemplated Transactions abandoned at any time prior to the Closing:

(a)    by the mutual written consent of Buyer, on the one hand, and Sellers, on the other hand;

(b)    by written notice of either Buyer or Sellers, upon the issuance by any Governmental Entity of a Decree restraining, enjoining, or otherwise prohibiting the consummation of the Contemplated Transactions or declaring unlawful the transactions contemplated by this Agreement, and such Decree having become final, binding and non-appealable; provided that no termination may be made by a Party under this Section 8.1(b) if the issuance of such Decree was caused by the breach or action or inaction of such Party;

(c)    by written notice of either Buyer or Sellers, if the Closing shall not have occurred on or before the date that is seventy-five (75) days after the date hereof (the "Outside Date"); provided, that Buyer may extend such date in its sole discretion by giving written notice to Sellers provided there is sufficient liquidity under the DIP Budget for Sellers to operate in the Ordinary Course of Business; provided, further, that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(c) if the failure of the Closing to have occurred by the Outside Date was caused by the breach or action or inaction of such Party;

(d)    by written notice of Buyer, if the Chapter 11 Cases are dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner is appointed in the Chapter 11 Cases;

(e)    by Buyer by giving written notice to Sellers at any time prior to Closing (i) in the event there has been a breach of or inaccuracy in any representation or warranty made by Sellers in this Agreement or if Sellers have breached any covenant contained in this Agreement in any respect, which breach, inaccuracy or failure to perform (A) gives rise to a failure of the conditions set forth in Section 7.1(a) or Section 7.1(b) to be satisfied and (B) (y) is not capable of being cured by the Outside Date or (z) if capable of being cured by the Outside Date, is not cured

65

by the earlier of the Outside Date and fifteen (15) days after delivery by Buyer of written notice to Sellers of such breach, or (ii) in the event that any condition set forth in <u>Section 7.1</u> shall become incapable of being satisfied by the Outside Date and such condition is not waived by Buyer;

(f)    by Sellers by giving written notice to Buyer at any time prior to Closing (i) in the event there has been a breach of or inaccuracy in any representation or warranty made by Buyer in this Agreement or if Buyer has breached any covenant contained in this Agreement in any respect, which breach, inaccuracy or failure to perform (A) gives rise to a failure of the conditions set forth in <u>Section 7.2(a)</u> or <u>Section 7.2(b)</u> to be satisfied and (B) (y) is not capable of being cured by the Outside Date or (z) if capable of being cured by the Outside Date, is not cured by the earlier of the Outside Date and fifteen (15) days after delivery by Sellers of written notice to Buyer of such breach, or (ii) in the event that any condition set forth in <u>Section 7.2</u> shall become incapable of being satisfied by the Outside Date, unless such failure shall be due to the failure of Sellers to perform or comply with any of the covenants hereof to be performed or complied with by them prior to the Closing, and such condition is not waived by Buyer;

(g)    by written notice from Sellers to Buyer, and a four (4) Business Day opportunity to cure, if all of the conditions set forth in <u>Section 7.1</u> have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Buyer fails to complete the Closing at the time required by <u>Section 2.7</u>;

(h)    by written notice from Buyer to Sellers, and a four (4) Business Day opportunity to cure, if all of the conditions set forth in <u>Section 7.2</u> have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Sellers fails to complete the Closing at the time required by <u>Section 2.7</u>;

(i)    by written notice from Sellers to Buyer, if any Seller or the board of managers (or similar governing body) of any Seller determines in good faith, on advice in the opinion of outside legal counsel, that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would breach its or such Person's or body's fiduciary duties;

(j)    automatically and without any action or notice by Sellers to Buyer, or Buyer to Sellers, immediately upon:

(i)    approval by the Bankruptcy Court of an Alternate Transaction, unless Buyer is designated a "back-up bidder" under the Sale Order; or

(ii)    the consummation of an Alternate Transaction;

(k)    by written notice from Buyer to Sellers if: (i) the Bankruptcy Court does not enter the Sale Procedure Order by the Sale Procedures Order Deadline; (ii) the Bankruptcy Court does not enter the Sale Order by the Sale Order Deadline; or (iii) following entry of the Sale Order or the Sale Procedures Order, either the Sale Order or the Sale Procedures Order is stayed, reversed, modified, vacated or amended in any material respect that is materially adverse to Buyer without the prior written consent of Buyer (such consent not to be unreasonably withheld,

66

conditioned, or delayed), and such stay, reversal, modification, vacation or amendment is not eliminated within fourteen (14) days of any such stay, reversal, modification, vacation or amendment;

(l)        by written notice from Buyer to Sellers if (i) the DIP Agreement matures or is in default (unless otherwise extended or waived by the DIP Lender) or (ii) the DIP Order or the DIP Agreement is modified in any materially adverse respect without the consent of Buyer;

(m)        by written notice from Buyer to Sellers if the Bankruptcy Court approves a disclosure statement with respect to a Chapter 11 plan filed by any party other than Sellers;

(n)        by written notice from Buyer to Sellers if Seller files a Chapter 11 plan that (i) does not satisfy the DIP Facility in full in cash or (ii) is not consistent with this Agreement, without the consent of Buyer; or

(o)        by written notice from Buyer to Sellers, if for any reason whatsoever, Buyer is unable to include the Credit Bid as part of the Purchase Price, in any amount consistent with applicable Law that Buyer deems fit, for the Purchased Assets.

**Section 8.2    Procedure upon Termination**. In the event of termination and abandonment by Buyer, on the one hand, or Sellers, on the other hand, or both, pursuant to <u>Section 8.1</u>, written notice thereof shall forthwith be given to the other Party or Parties, and, other than as expressly set forth herein, this Agreement shall terminate and the Contemplated Transactions shall be abandoned, without further action by Buyer or Sellers. Nothing in this Agreement shall be deemed to release or relieve (i) any Party from any Liability for any Fraud or Willful Breach by such Party of the terms and provisions of this Agreement or (ii) Sellers from the obligation to pay the Expense Reimbursement pursuant to <u>Section 8.3</u>, if payable.

**Section 8.3    Expense Reimbursement**. Upon the termination of this Agreement pursuant to <u>Section 8.1(a)</u> through <u>Section 8.1(e)</u>, <u>Section 8.1(h)</u> or <u>Section 8.1(j)</u> through <u>Section 8.1(o)</u>, Sellers shall immediately pay to Buyer an expense reimbursement of actual, necessary and documented out of pocket expenses associated with this Agreement in an amount not to exceed $750,000 (the "<u>Expense Reimbursement</u>"). Sellers' obligation to pay the Expense Reimbursement pursuant to this <u>Section 8.3</u> shall be subject to Bankruptcy Court approval and, notwithstanding anything to the contrary herein, shall survive termination of this Agreement and shall constitute an administrative expense of Sellers to be paid under section 503(b) of the Bankruptcy Code. If Buyer is entitled to receipt of the Expense Reimbursement pursuant to this <u>Section 8.3</u>, the receipt of the Expense Reimbursement shall (i) be paid by wire transfer of immediately available funds to an account designated by Buyer within three (3) Business Days of the consummation of an Alternate Transaction or the confirmation of a Chapter 11 plan and (ii) be the liquidated damages of Buyer.

**Section 8.4    Effect of Termination.**

(a)        Except as otherwise expressly set forth in this Agreement, nothing herein shall relieve any Party from Liability for any breach of covenant occurring prior to any termination of this Agreement.

(b)    Notwithstanding anything to the contrary in the Confidentiality Provision, the Confidentiality Provision shall survive any termination of this Agreement and nothing in this Section 8.4 shall relieve Buyer or Sellers of their respective obligations under the Confidentiality Provision, and Buyer, to the extent not a party thereto, shall be subject to the same terms and conditions as set forth therein as though an original party thereto.

(c)    No termination of this Agreement pursuant to Section 8.1 shall be effective until written notice thereof is given to the non-terminating Party specifying the provision hereof pursuant to which such termination is made. If the transactions contemplated hereby are not consummated as a result of this Agreement being terminated in accordance with its terms, this Agreement shall become null and void and of no further force and effect (except (x) as otherwise expressly set forth herein and (y) that Article I (Definitions), Article IX (Miscellaneous),  this Article VIII (Termination) and the other provisions of this Agreement that by their terms survive termination shall survive any such termination).

(d)    Nothing herein shall preclude either of the Parties from exercising their remedies under Section 9.1.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.1    Remedies**. (i) Each Party recognizes that if such Party breaches or refuses to perform any covenant hereunder, monetary damages alone would not be adequate to compensate the non-breaching Party or Parties for their injuries, (ii) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to seek specific performance of, or to enjoin the violation of, the terms of such covenants, (iii) if any action, claim or proceeding is brought by the non-breaching Party to enforce such covenants, the Party in breach shall waive the defense that there is an adequate remedy at law, (iv) each Party agrees to waive any requirement for the security or posting of any bond in connection with any action, claim or proceeding seeking specific performance of, or to enjoin the violation of, such covenants and (v) each Party agrees that the only permitted objection that it may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants.

**Section 9.2    Expenses**. Except as otherwise provided in this Agreement or a Related Agreement, Sellers and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Related Agreements and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions.

**Section 9.3    Entire Agreement**. This Agreement and the Related Agreements constitute the entire agreement among the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof, except for the Confidentiality Provision (as modified pursuant to Section 5.5(b)).

**Section 9.4**    <u>**Incorporation of Schedules, Exhibits and Disclosure Schedule**</u>. The schedules, appendices and exhibits to this Agreement, and the documents and other information made available in the Disclosure Schedule are incorporated herein by reference and made a part hereof.

**Section 9.5**    <u>**Amendments and Waivers**</u>. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this <u>Section 9.5</u> except as expressly provided herein. Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

**Section 9.6**    <u>**Succession and Assignment**</u>. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. None of the Parties may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of all Parties; <u>provided</u>, <u>however</u>, that Buyer shall be permitted to assign any of its rights hereunder to one or more of its Affiliates, as designated by Buyer in writing to Sellers, subject to such Affiliate or Affiliates satisfying any requirement to provide adequate assurance of future performance in accordance with Section 365 of the Bankruptcy Code; <u>provided</u>, that Sellers shall be permitted to assign any of their rights hereunder pursuant to a confirmed chapter 11 plan or pursuant to an order of the Bankruptcy Court. Notwithstanding the foregoing, after (or concurrently with) the Closing, Buyer may assign this Agreement, in whole or in part, without the consent of any other Party hereto for collateral security purposes to any lender or in connection with the sale of all or substantially all of the business of Buyer, but no such assignment shall relieve Buyer of its obligations hereunder. Any purported assignment in violation of the foregoing shall be void ab initio.

**Section 9.7**    <u>**Notices**</u>. All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient; (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (iii) when sent by email (provided that no "bounce back" or similar message of non-delivery is received with respect thereto); or (iv) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to any Sellers, then to:

69

           Independent Pet Partners Holdings, LLC
           8450 City Centre Drive
           Woodbury, MN 55125
           Attn: Julie Maday, Chief Executive Officer
           Email: jmaday@ipphl.com

with a copy (which shall not constitute notice) to:

           McDonald Hopkins LLC
           300 North LaSalle Street, Suite 1400
           Chicago, IL 60654
           Attention: David Agay
                    Marc Carmel
           Email: dagay@mcdonaldhopkins.com
                    mcarmel@mcdonaldhopkins.com

If to Buyer, then to:

           IPP Buyer Acquisition, LLC
           c/o Main Street Capital
           1300 Post Oak Blvd., Suite 800
           Houston, TX 77056
           Attention: Nick Meserve, President
           Email: nmeserve@mainstcapital.com

with a copy (which shall not constitute notice) to:

           Dechert LLP
           Three Bryant Park
           1095 Avenue of the Americas
           New York, NY 10036
           Attention:    Shmuel Vasser
                       Christian Matarese
           Email:       shmuel.vasser@dechert.com
                       christian.matarese@dechert.com

Any Party may change the mailing address or email address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this <u>Section 9.7</u>.

      **Section 9.8**      <u>**Governing Law; Jurisdiction**</u>. This Agreement and all matters arising out of or related to this Agreement, shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws. The Parties agree that any Litigation one Party commences against any other Party pursuant to this Agreement shall be brought exclusively in the Bankruptcy Court and each of the Parties hereby irrevocably

70

consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum; provided that if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the courts of the State of Delaware, sitting in New Castle County, Delaware, and the federal courts of the United States of America sitting in New Castle County, Delaware, shall have exclusive jurisdiction over such Litigation.

Section 9.9    **Consent to Service of Process**. Each of the Parties hereby consents to process being served by any Party, respectively, in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 9.7.

Section 9.10    **WAIVERS OF JURY TRIAL**. EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE RELATED AGREEMENTS OR THE CONTEMPLATED TRANSACTIONS OR THEREBY.

Section 9.11    **Severability**. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

Section 9.12    **No Third-Party Beneficiaries**. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns; provided, however, that each of the Subject Parties shall be a third-party beneficiary of Section 6.14 hereof and have the right to enforce or pursue remedies in connection with such Section.

Section 9.13    **No Survival of Representations, Warranties and Agreements**. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that, other than a claim based on Fraud, no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement to the extent such covenant or agreement contemplates or

71

requires performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, until fully performed.

**Section 9.14   Non-Recourse**. Except to the extent based on Fraud, this Agreement may only be enforced against, and any Litigation based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future direct or indirect shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or representative of any party to this Agreement will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Litigation based upon, arising out of or related to this Agreement; provided that nothing set forth in this Section 9.14 shall limit any claim based on Fraud.

**Section 9.15   Construction**. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa. The word "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation." The words "herein," "hereto" and "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement. Unless expressly stated in connection therewith or the context otherwise requires, the phrase "relating to the Business" and other words of similar import shall be deemed to mean "relating to the operation of the Business as conducted as of the date hereof." Except as otherwise provided herein, references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Exhibits, Appendices and the Disclosure Schedule herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Appendices, Exhibits and the Disclosure Schedule of this Agreement. Any reference herein to any Law (or any provision thereof) shall include such Law (or any provision thereof) and any rule or regulation promulgated thereunder, in each case, including any successor thereto, and as it may be amended, modified or supplemented from time to time. Any reference herein to "dollars" or "$" means United States dollars.

**Section 9.16   Computation of Time**. In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

**Section 9.17   Mutual Drafting**. Each of the Parties has participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**Section 9.18   Disclosure Schedule**. The Disclosure Schedule has been arranged for purposes of convenience in separately numbered Sections corresponding to the Sections of this Agreement, and each Section of the Disclosure Schedule will deemed to be an exception to (or, as

applicable, a disclosure for purposes of) (a) the representations and warranties (or covenants, as applicable) of the Sellers that are set forth in the corresponding section or subsection of this Agreement; and (b) other representations and warranties of Sellers that are set forth in this Agreement only to the extent that it is readily apparent on the face of such disclosure that it is an exception to (or, as applicable, a disclosure for purposes of) such representation or warranty. The specification of any dollar amount or the inclusion of any item in the Disclosure Schedule or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business or consistent with past practice, in each case, unless the context requires otherwise (the "Context Consideration"), and, subject to the Context Consideration, no party will use the fact of the setting of the amounts or the fact of the inclusion of any item in the Disclosure Schedule or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in the Disclosure Schedule or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business. In addition, matters reflected in the Disclosure Schedule are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedule, such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Disclosure Schedule will be deemed to broaden in any way the scope of the parties' representations and warranties unless the express language of such information affirmatively makes a statement that a Party would reasonably rely upon. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Disclosure Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item. The information contained in the Disclosure Schedule and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of contract.

Section 9.19 **Headings; Table of Contents**. The Section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.20 **Counterparts; Facsimile and Email Signatures**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

Section 9.21 **Action by Sellers**. IPP Holdings shall be entitled to act on behalf of each Seller for any action required or permitted to be taken by any Seller under this Agreement.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLERS:**

**INDEPENDENT PET PARTNERS HOLDINGS, LLC**

By _____
    Name: Julie Maday
    Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS II, LLC**

By _____
    Name: Julie Maday
    Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS EMPLOYER, LLC**

By _____
    Name: Julie Maday
    Title: Chief Executive Officer

**IPP - STORES, LLC**

By _____
    Name: Julie Maday
    Title: Chief Executive Officer

**PET LIFE, LLC**

By _____
    Name: Julie Maday
    Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS I, LLC**

By _____
    Name: Julie Maday
    Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS EMPLOYER HOLDINGS, LLC**

By _____
    Name: Julie Maday
    Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS, LLC**

By _____
    Name: Julie Maday
    Title: Chief Executive Officer

**IPP STORES EMPLOYER, LLC**

By _____
    Name: Julie Maday
    Title: Chief Executive Officer

**ESPECIALLY FOR PETS, LLC**

By _____
    Name: Julie Maday
    Title: Chief Executive Officer

*[Signature Page to Asset Purchase Agreement]*

**WHOLE PET CENTRAL, LLC**

By _____
    Name: Julie Maday
    Title: Chief Executive Officer

**PET SOURCE, LLC**

By _____
    Name: Julie Maday
    Title: Chief Executive Officer

**NATURAL PAWZ, LLC**

By _____
    Name: Julie Maday
    Title: Chief Executive Officer

**<u>BUYER</u>:**

**IPP Buyer Acquisition, LLC**


By _____
      Name:  Nick Meserve
      Title:    President

**SCHEDULE I**

**Schedule of Additional Seller Entities**

1. Independent Pet Partners Intermediate Holdings I, LLC, a Delaware limited liability company

2. Independent Pet Partners Intermediate Holdings II, LLC, a Delaware limited liability company

3. Independent Pet Partners Employer Holdings, LLC, a Delaware limited liability company

4. Independent Pet Partners Employer, LLC, a Delaware limited liability company

5. Independent Pet Partners Intermediate Holdings, LLC, a Delaware limited liability company

6. IPP - Stores, LLC, a Delaware limited liability company

7. IPP Stores Employer, LLC, a Delaware limited liability company

8. Pet Life, LLC, a Delaware limited liability company

9. Especially for Pets, LLC, a Delaware limited liability company

10. Whole Pet Central, LLC, a Delaware limited liability company

11. Natural Pawz, LLC, a Delaware limited liability company

12. Pet Source, LLC, a Delaware limited liability company

**EXHIBIT A**

**Form of Bill of Sale**

[See attached.]

A-1

## BILL OF SALE

This Bill of Sale, dated as of [_____], 2023 (this "<u>Bill of Sale</u>"), is made and entered into by and among INDEPENDENT PET PARTNERS HOLDINGS, LLC, a Delaware limited liability company ("<u>IPP Holdings</u>"), each of the Seller Subsidiaries (together with IPP Holdings, "<u>Sellers</u>"), and [BUYER ENTITY][1], a Delaware limited liability company (together with its permitted successors, designees and assigns, "<u>Buyer</u>"). Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement, dated as of February [●], 2023 (the "<u>Asset Purchase Agreement</u>"), by and among Buyer and Sellers.

WHEREAS, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the rights, titles and interests of Sellers in and to the Purchased Assets, free and clear of all Liens (other than Permitted Liens and Assumed Liabilities); and

WHEREAS, Sellers desire to deliver to Buyer such instruments of sale, transfer assignment, conveyance and delivery as are required to vest in Buyer all of Sellers' rights, titles and interests in and to the Purchased Assets.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      Each Seller hereby sells, transfers, assigns, conveys and delivers to Buyer all of its right, title and interest in and to the Purchased Assets, free and clear of all Liens (other than Permitted Liens and Assumed Liabilities).

2.      From time to time after the Closing Date, each party shall, upon the reasonable request of the other, execute and deliver or cause to be executed and delivered such further instruments of sale, conveyance, assignment, transfer and assumption, and take such further action, as may reasonably be requested in order to more effectively carry out the purposes and intent of the Asset Purchase Agreement and this Bill of Sale.

3.      This Bill of Sale is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

4.      No provision of this Bill of Sale, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Bill of Sale or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and

---

[1] **NTD**: Subsidiaries of Buyer may execute one or more bills of sale.

agreements contained in this Bill of Sale shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

5.      The provisions of this Bill of Sale shall be deemed severable, and the invalidity or unenforceability of any provision of this Bill of Sale shall not affect the validity or enforceability of any other provisions of this Bill of Sale. If any provision of this Bill of Sale, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Bill of Sale and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

6.      None of the provisions of this Bill of Sale may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the party(ies) against whom the waiver is to be effective.

7.      This Bill of Sale is subject in all respects to the terms and conditions of the Asset Purchase Agreement. Nothing contained in this Bill of Sale shall be deemed to supersede or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Bill of Sale as provided by, and subject to the limitations set forth in, the Asset Purchase Agreement. To the extent any provision of this Bill of Sale is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

8.      Except as otherwise set forth in the Asset Purchase Agreement, nothing expressed or implied in this Bill of Sale shall be deemed to be an assumption by Buyer of any Excluded Liabilities of Sellers.

9.      This Bill of Sale and all matters arising out of or related to this Bill of Sale shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the parties hereto shall be determined in accordance with such Laws. The parties hereto agree that any Litigation one party commences against any other party pursuant to this Bill of Sale shall be brought exclusively in the Bankruptcy Court and each of the parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum; provided that if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the courts of the State of Delaware, sitting in New Castle County, Delaware, and the federal courts of the United States of America sitting in New Castle County, Delaware, shall have exclusive jurisdiction over such Litigation.

2

10.    This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Bill of Sale or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

[*Signature Page Follows*]

3

IN WITNESS WHEREOF, the parties have caused this Bill of Sale to be duly executed by their respective authorized officers as of the date first above written.

**SELLERS:**

**INDEPENDENT PET PARTNERS HOLDINGS, LLC**

By _____
    Name:
    Title:

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS II, LLC**

By _____
    Name:
    Title:

**INDEPENDENT PET PARTNERS EMPLOYER, LLC**

By _____
    Name:
    Title:

**IPP - STORES, LLC**

By _____
    Name:
    Title:

**PET LIFE, LLC**

By _____
    Name:
    Title:

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS I, LLC**

By _____
    Name:
    Title:

**INDEPENDENT PET PARTNERS EMPLOYER HOLDINGS, LLC**

By _____
    Name:
    Title:

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS, LLC**

By _____
    Name:
    Title:

**IPP STORES EMPLOYER, LLC**

By _____
    Name:
    Title:

**ESPECIALLY FOR PETS, LLC**

By _____
    Name:
    Title:

*[Signature Page to Bill of Sale]*

**WHOLE PET CENTRAL, LLC**

By _____
     Name:
     Title:

**NATURAL PAWZ, LLC**

By _____
     Name:
     Title:

**PET SOURCE, LLC**

By _____
     Name:
     Title:

**<u>BUYER</u>:**

**[BUYER ENTITY]**

By _____
      Name:
      Title:

**EXHIBIT B**

**Form of Assignment and Assumption Agreement**

[See attached.]

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement, dated as of [_____], 2023 (this "Agreement"), is made and entered into by and among INDEPENDENT PET PARTNERS HOLDINGS, LLC, a Delaware limited liability company ("IPP Holdings"), each of the Seller Subsidiaries (together with IPP Holdings, "Sellers"), and [BUYER ENTITY][1], a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement, dated as of February [●], 2023 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

WHEREAS, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the rights, titles and interests of Sellers in and to the Purchased Assets including, without limitation, the Assumed Contracts, free and clear of all Liens (other than Permitted Liens and Assumed Liabilities); and

WHEREAS, pursuant to Section 2.3 of the Asset Purchase Agreement, Buyer has agreed to assume, effective as of the Closing, the Assumed Liabilities.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      Sellers hereby assign and delegate the Assumed Contracts and the Assumed Liabilities to Buyer and Buyer hereby accepts assignment and delegation of and assumes the Assumed Contracts and the Assumed Liabilities as set forth in the Asset Purchase Agreement. Buyer assumes none of the Excluded Liabilities and the parties agree that all such Excluded Liabilities remain the responsibility of Sellers.

2.      From time to time after the Closing Date, each party shall, upon the reasonable request of the other, execute and deliver or cause to be executed and delivered such further instruments of sale, conveyance, assignment, transfer and assumption, and take such further action, as may reasonably be requested in order to more effectively carry out the purposes and intent of the Asset Purchase Agreement and this Agreement.

3.      This Agreement is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

4.      No provision of this Agreement, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Agreement or

---

[1] **NTD**: Subsidiaries of Buyer may execute one or more assignment and assumption agreements.

any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Agreement shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

5.    The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

6.    None of the provisions of this Agreement may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the party(ies) against whom the waiver is to be effective.

7.    This Agreement is subject in all respects to the terms and conditions of the Asset Purchase Agreement. Nothing contained in this Agreement shall be deemed to supersede or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Agreement as provided by, and subject to the limitations set forth in, the Asset Purchase Agreement. To the extent any provision of this Agreement is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

8.    This Agreement and all matters arising out of or related to this Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the parties hereto shall be determined in accordance with such Laws. The parties hereto agree that any Litigation one party commences against any other party pursuant to this Agreement shall be brought exclusively in the Bankruptcy Court and each of the parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum; provided that if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the courts of the State of Delaware, sitting in New Castle County, Delaware, and the federal courts of the United States of America sitting in New Castle County, Delaware, shall have exclusive jurisdiction over such Litigation.

9.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This

BUSINESS.29839082.8

Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

*[Signature page follows]*

3

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**SELLERS:**

**INDEPENDENT PET PARTNERS HOLDINGS, LLC**

By _____
    Name:
    Title:

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS II, LLC**

By _____
    Name:
    Title:

**INDEPENDENT PET PARTNERS EMPLOYER, LLC**

By _____
    Name:
    Title:

**IPP - STORES, LLC**

By _____
    Name:
    Title:

**PET LIFE, LLC**

By _____
    Name:
    Title:

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS I, LLC**

By _____
    Name:
    Title:

**INDEPENDENT PET PARTNERS EMPLOYER HOLDINGS, LLC**

By _____
    Name:
    Title:

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS, LLC**

By _____
    Name:
    Title:

**IPP STORES EMPLOYER, LLC**

By _____
    Name:
    Title:

**ESPECIALLY FOR PETS, LLC**

By _____
    Name:
    Title:

*[Signature Page to Assignment and Assumption Agreement]*

**WHOLE PET CENTRAL, LLC**                    **NATURAL PAWZ, LLC**

By _____        By _____
      Name:                                             Name:
      Title:                                              Title:

**PET SOURCE, LLC**

By _____
      Name:
      Title:

BUSINESS.29839082.8

**<u>BUYER</u>:**

**IPP Buyer Acquisition, LLC**

By _____
    Name:
    Title:

**EXHIBIT C**

**Form of Intellectual Property Assignment Agreement**

[See attached.]

EXHIBIT C

## INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

This Intellectual Property Assignment Agreement (this "<u>Assignment</u>") is made and entered into as of [●], 2023 the "<u>Effective Date</u>") by and among INDEPENDENT PET PARTNERS HOLDINGS, LLC, a Delaware limited liability company ("<u>IPP Holdings</u>"), each of the Seller Subsidiaries (each, an "<u>Assignor</u>" and together, the "<u>Assignors</u>"), and [BUYER ENTITY][1], a Delaware limited liability company (together with its permitted successors, designees and assigns, the "<u>Assignee</u>"). Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement, dated as of February [•], 2023 (the "<u>Asset Purchase Agreement</u>"), by and among Buyer and Sellers.

WHEREAS, the Assignors and the Assignee have entered into the Asset Purchase Agreement, pursuant to which the Assignee has acquired all of the Intellectual Property owned, or purported to be owned, in whole or in part, by each of the Assignors, (collectively, the "<u>Assigned Intellectual Property</u>"). Capitalized terms not defined in this Assignment shall have the meaning assigned to them in the Asset Purchase Agreement; and

WHEREAS, the Assignors desire to deliver to the Assignee such instruments of sale, transfer, assignment, conveyance and delivery as are required to vest in Assignee all of each of the Assignors' right, title and interest in and to the Assigned Intellectual Property.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    <u>Assignment</u>.  Each Assignor hereby forever sells, assigns, transfers, conveys and delivers to the Assignee and its successors and assigns, and the Assignee hereby accepts from each Assignor, free and clear of all Liens (other than Permitted Liens and Assumed Liabilities), all of each Assignor's right, title and interest in, to and under the Assigned Intellectual Property, including the Assigned Intellectual Property listed on <u>Schedule A</u>, and including (i) all rights to sue for past, present and future infringement, misappropriation or other violation with respect thereto and all goodwill associated with any Assigned Intellectual Property, (ii) all information technology assets, including licenses, software and hardware related to the Business or the ownership or operation of the Purchased Assets or the Business, including the E-Commerce Platform, and (iii) all Records related to any of the foregoing, including, (A) documentation or other tangible embodiments that comprise, embody, disclose or describe any of the foregoing, including engineering drawings, technical documentation, databases, spreadsheets, business records, inventors' notebooks, invention disclosures, digital files, software code embodied in media or firmware and (B) files related to the prosecution or enforcement of any of the foregoing, including such patent, trademark or copyright prosecution or enforcement files in the custody of an Assignor's outside legal counsel, and all attorney client privileges and work product immunities associated with such files and such prosecution and enforcement activities.

---

[1] **NTD**: Subsidiaries of Buyer may execute one or more IP assignment agreements.

2.      Assignor's Waiver. Each Assignor and the Assignee acknowledge and agree that as of the Effective Date all Assigned Intellectual Property is owned by the Assignee to the maximum extent permitted by Law.  If any Assignor has any rights in or to any Assigned Intellectual Property that cannot, under applicable Law, be assigned to the Assignee or owned by the Assignee, each Assignor hereby unconditionally and irrevocably waives the enforcement of such rights and all claims and causes of action of any kind against the Assignee and their designees and successors and assigns with respect to such rights.

3.      Further Assurances. After the Effective Date, each party shall, upon the reasonable request of the other, execute and deliver or cause to be executed and delivered such further instruments of sale, conveyance, assignment, transfer and assumption, and take such further action, as may reasonably be requested in order to more effectively carry out the purposes and intent of the Asset Purchase Agreement and this Assignment. Each Assignor agrees to effect the transfer of all domain names included in the Assigned Intellectual Property ("Domain Names") to the Assignee, including to electronically transfer the Domain Names from each Assignor's account at their respective domain name registrars to Assignee's account (as designated by the Assignee) as quickly as reasonably practicable and executing and delivering any necessary documents to the Assignee, the registrars for the Domain Names, and any other party as requested by the Assignee and any of its successors and assigns.

4.      Successors and Assigns.  This Assignment shall be binding upon each Assignor and the Assignee, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the Effective Date.

5.      No Third Party Beneficiaries.  No provision of this Assignment, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Assignment or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Assignment shall be for the sole and exclusive benefit of the parties hereto, and their respective successors and permitted assigns.

6.      Severability.   The provisions of this Assignment shall be deemed severable, and the invalidity or unenforceability of any provision of this Assignment shall not affect the validity or enforceability of any other provisions of this Assignment. If any provision of this Assignment, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Assignment and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

7.      Modification and Waiver.   None of the provisions of this Assignment may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by each of the parties hereto, or in the case of a waiver, by the party(ies) against whom the waiver is to be effective.

2

8.    <u>Interpretation</u>. This Assignment is subject in all respects to the terms and conditions of the Asset Purchase Agreement. Nothing contained in this Assignment shall be deemed to supersede or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Assignment as provided by, and subject to, the limitations set forth in the Asset Purchase Agreement. To the extent any provision of this Assignment is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

9.    <u>Governing Law</u>.  This Assignment shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the parties hereto shall be determined in accordance with such Laws. The parties hereto agree that any Litigation one party commences against any other party pursuant to this Assignment shall be brought exclusively in the Bankruptcy Court and each of the parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum; provided that if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the courts of the State of Delaware, sitting in New Castle County, Delaware, and the federal courts of the United States of America sitting in New Castle County, Delaware, shall have exclusive jurisdiction over such Litigation.

10.    <u>Counterparts</u>.  This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Assignment or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

BUSINESS.29859822.8

IN WITNESS WHEREOF, the parties have caused this Assignment to be duly executed by their respective authorized officers as of the date first above written.

**ASSIGNORS:**

**INDEPENDENT PET PARTNERS HOLDINGS, LLC**

By _____
    Name:
    Title:

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS II, LLC**

By _____
    Name:
    Title:

**INDEPENDENT PET PARTNERS EMPLOYER, LLC**

By _____
    Name:
    Title:

**IPP - STORES, LLC**

By _____
    Name:
    Title:

**PET LIFE, LLC**

By _____
    Name:
    Title:

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS I, LLC**

By _____
    Name:
    Title:

**INDEPENDENT PET PARTNERS EMPLOYER HOLDINGS, LLC**

By _____
    Name:
    Title:

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS, LLC**

By _____
    Name:
    Title:

**IPP STORES EMPLOYER, LLC**

By _____
    Name:
    Title:

**ESPECIALLY FOR PETS, LLC**

By _____
    Name:
    Title:

**WHOLE PET CENTRAL, LLC**

By _____
      Name:
      Title:

**PET SOURCE, LLC**

By _____
      Name:
      Title:

**NATURAL PAWZ, LLC**

By _____
      Name:
      Title:

**ASSIGNEE**:

**[BUYER ENTITY]**

By: _____
    Name:
    Title:

## SCHEDULE A
## TO INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

1.    The following trademark registrations and applications:

| Mark | Jurisdiction | Owner | Serial No./ Filing Date | Reg. No./ Re. Date |
|---|---|---|---|---|
| ATTACHMENT THEORY | U.S. | Independent Pet Partners Intermediate Holdings LLC | App. No.: 97319912<br><br>App. Date: Mar. 18, 2022 | N/A - app. pending |
| 5 PILLARS OF PET WELLNESS | U.S. | Independent Pet Partners Intermediate Holdings LLC | App. No.: 88735104<br><br>App. Date: Dec. 20, 2019 | Reg. No.: 6512148<br><br>Reg. Date: Oct. 05, 2021 |
| 5 PILLARS OF WELLNESS | U.S. | Independent Pet Partners Intermediate Holdings LLC | App. No.: 88726380<br><br>App. Date: Dec. 13, 2019 | N/A - app. pending |
| FIVE PILLARS OF WELLNESS | U.S. | Independent Pet Partners Intermediate Holdings LLC | App. No.: 88735083<br><br>App. Date: Dec. 20, 2019 | Reg. No.: 6329867<br><br>Reg. Date: Apr. 20, 2021 |
| FIVE PILLARS OF WELLNESS | U.S. | Independent Pet Partners Intermediate Holdings LLC | App. No.: 88729137<br><br>App. Date: Dec. 16, 2019 | N/A - app. pending |
| HAPPY PET CBD | U.S. | Independent Pet Partners Intermediate Holdings LLC | App. No.: 90774737<br><br>App. Date: Jun. 15, 2021 | N/A - app. pending |
| LOYAL COMPANION (Design mark)<br><br> | U.S. | Independent Pet Partners Intermediate Holdings LLC | App. No.: 6048698<br><br>App. Date: Dec. 20, 2018 | Reg. No.: 6048698<br><br>Reg. Date: May 05, 2020 |

| Mark | Jurisdiction | Owner | Serial No./<br>Filing Date | Reg. No./<br>Re. Date |
|------|--------------|-------|----------------------------|-----------------------|
| LOYAL COMPANION | U.S. | Independent Pet Partners Intermediate Holdings LLC | App. No.: 88237831<br><br>App. Date: Dec. 20, 2018 | Reg. No.: 6428738<br><br>Reg. Date: Jul. 20, 2021 |
| YOUR LOYAL COMPANION | U.S. | Independent Pet Partners Intermediate Holdings LLC | App. No.: 88237853<br><br>App. Date: Dec. 20, 2018 | N/A - app. pending |
| ROOSEVELT | U.S. | Independent Pet Partners Intermediate Holdings LLC | App. No.: 97424521<br><br>App. Date: May 23, 2022 | N/A - app. pending |
| ROOSEVELT | U.S. | Independent Pet Partners Intermediate Holdings LLC | App. No.: 88976661<br><br>App. Date: Dec. 20, 2018 | Reg. No.: 6015384<br><br>Reg. Date: Mar. 17, 2020 |
| ROOSEVELT | U.S. | Independent Pet Partners Intermediate Holdings LLC | App. No.: 88237807<br><br>App. Date: Dec. 20, 2018 | Reg. No.: 6789887<br><br>Reg. Date:<br>Jul. 12, 2022 |
| WILDSAINT | U.S. | Independent Pet Partners Intermediate Holdings LLC | App. No.: 97029857<br><br>App. Date: Sep. 15, 2021 | N/A - app. pending |
|  | U.S. | IPP-STORES, LLC | App. No.: 88096104<br><br>App. Date: Aug. 28, 2018 | Reg. No.: 5726823<br><br>Reg. Date: Apr. 16, 2019 |
|  | U.S. | IPP - STORES, LLC | App. No.: 77426703<br><br>App. Date: Mar. 19, 2008 | Reg. No.: 3575189<br><br>Reg. Date: Feb. 17, 2009 |
| BARKIN' MEWS | U.S. | IPP-STORES, LLC | App. No.: 85882829<br><br>App. Date: Mar. 21, 2013 | Reg. No.: 4421921<br><br>Reg. Date: Oct. 22, 2013 |

| Mark | Jurisdiction | Owner | Serial No./ Filing Date | Reg. No./ Re. Date |
|------|-------------|-------|------------------------|-------------------|
| CHUCK & DON'S | U.S. | IPP-STORES, LLC | App. No.: 85883019<br><br>App. Date: Mar. 21, 2013 | Reg. No.: 4421934<br><br>Reg. Date: Oct. 22, 2013 |
| CHUCK & DON'S WE MAKE PETS HAPPY! | U.S. | IPP-STORES, LLC | App. No.: 85882996<br><br>App. Date: Mar. 21, 2013 | Reg. No.: 4512385<br><br>Reg. Date: Apr. 08, 2014 |
| CHUCK'S BUCKS | U.S. | IPP-STORES, LLC | App. No.: 85882931<br><br>App Date: Mar. 21, 2013 | Reg. No.: 4446901<br><br>Reg. Date: Dec. 10, 2013 |
| FRIENDS OF CHUCK | U.S. | IPP-STORES, LLC | App. No.: 77919066<br><br>App. Date: Jan. 25, 2010 | Reg. No.:3856074<br><br>Reg. Date: Oct. 05, 2010 |
| KRISER'S | U.S. | IPP - STORES, LLC | App. No.: 85722917<br><br>App. Date: Sep. 07, 2012 | Reg. No.: 4345929<br><br>Reg. Date: Jun. 04, 2013 |
| KRISER'S NATURAL PET | U.S. | IPP - STORES, LLC | App. No.: 86458003<br><br>App. Date: Nov. 18, 2014 | Reg. No.: 4776474<br><br>Reg. Date: Jul. 21, 2015 |
| KRISER'S NATURAL PET | U.S. | IPP - STORES, LLC | App. No.: 86458006<br><br>App. Date: Nov. 18, 2014 | Reg. No.: 4776475<br><br>Reg. Date:  Jul. 21, 2015 |
| NATURE PAWZ | U.S. | NATURAL PAWZ, LLC | App. No.: 76686659<br><br>App. Date: Feb. 08, 2008 | Reg. No.: 3718921<br><br>Reg. Date:<br><br>Dec. 01, 2009 |
| ESPECIALLY FOR PETS (logo) | U.S. | Especially For Pets, LLC | App. No.:77748767<br><br>App. Date: Jun. 01, 2009 | Reg. No. 3736436<br><br><br>Reg. Date: Jan. 12, 2010 |
| WHOLE PET CENTRAL WHERE HEALTHY FOOD | U.S. | Whole Pet Central, LLC | App. No. 77340501 | Reg. No. 3519397 |

BUSINESS.29859822.8

| Mark | Jurisdiction | Owner | Serial No./ Filing Date | Reg. No./ Re. Date |
|---|---|---|---|---|
| COMES NATURALLY (logo) | | | App. Date: Nov. 29, 2007 | Reg Date: Oct. 21, 2008 |
| PET LIFE | U.S. | PET LIFE LLC | App. No.: 90773895<br><br>App. Date: Jun. 15, 2021 | Reg. No. 6898432<br><br>Reg. Date: Nov. 15, 2022 |
| PET LIFE (Logo) | U.S. | PET LIFE LLC | App. No.: 87671177<br><br>App. Date: Nov. 03, 2017 | Reg. No. 5533692<br><br>Reg. Date: Aug 7, 2018 |
| VITAWAG DRIP N' SIP (logo) | U.S. | PET LIFE LLC | App. No.: 86900145<br><br>App. Date: Feb. 07, 2016 | Reg. No. 5048649<br><br>Reg. Date: Sep 27, 2016 |

2.      The following copyright registration:

| Country | Copyright Title | Reg. Date | Owner | Reg. No. |
|---|---|---|---|---|
| USA | Friends of Chuck Logo | 2010-02-12 | IPP-Stores, LLC | VAu001014178 |

3.      The following social media accounts:

A.      https://www.facebook.com/ChuckAndDons

B.      https://www.facebook.com/kriserspets

C.      https://www.facebook.com/loyalcompanionpets

D.      https://www.facebook.com/NaturalPawz

E.      https://www.instagram.com/chuck_and_dons/

F.      https://www.instagram.com/kriserspets/

G.      https://www.instagram.com/loyalcompanionpets/

H.      https://www.instagram.com/naturalpawz/

I.      https://www.linkedin.com/company/chuck-and-dons-pet-food-and-supplies/

J.      https://www.linkedin.com/company/kriser's---for-your-pets-all-natural-life/

K.      https://www.linkedin.com/company/loyal-companion-pets/

L.      https://www.linkedin.com/company/natural-pawz/

M.      https://www.linkedin.com/company/independent-pet-partners/mycompany/

N.      https://twitter.com/ChuckandDons

O.      https://twitter.com/KrisersPets

P.      https://twitter.com/LoyalCompanion_

Q.      https://twitter.com/NaturalPawz

4.      The following domain name registrations (and associated websites):

| Domain Name | Status | Registrant | Expiration Date |
|---|---|---|---|
| ABBYSPETPLACE.COM | Active | Independent Pet Partners | 4/11/2024 |
| allpawsks.com | Active | Independent Pet Partners | 12/27/2023 |
| allpawspetcenter.com | Active | Independent Pet Partners | 12/26/2023 |
| allpawspetcenter.net | Active | Independent Pet Partners | 12/11/2023 |
| appcks.com | Active | Independent Pet Partners | 12/27/2023 |
| attachmenttheorypet.com | Active | Independent Pet Partners | 3/29/2024 |
| attachmenttheorytoys.com | Active | Independent Pet Partners | 3/29/2024 |
| cbdpetpartners.com | Active | Independent Pet Partners | 2/11/2024 |
| cbdpetshop.co | Active | Independent Pet Partners | 2/11/2024 |
| chuckanddons.com | Active | Independent Pet Partners | 6/29/2026 |
| CHUCKANDDONS.INFO | Active | Independent Pet Partners | 6/10/2030 |
| CHUCKANDDONS.NET | Active | Independent Pet Partners | 6/10/2030 |
| chuckanddonsdelivers.com | Active | Independent Pet Partners | 5/30/2027 |
| chuckdelivers.com | Active | Independent Pet Partners | 8/2/2027 |

| Domain Name | Status | Registrant | Expiration Date |
|---|---|---|---|
| e-chuckanddons.com | Active | Independent Pet Partners | 5/29/2023 |
| e-ippwellness.com | Active | Independent Pet Partners | 10/6/2023 |
| e-krisers.com | Active | Independent Pet Partners | 9/27/2023 |
| e-loyalcompanion.com | Active | Independent Pet Partners | 9/27/2023 |
| e-naturalpawz.com | Active | Independent Pet Partners | 9/27/2023 |
| fetch.co | Active | Independent Pet Partners | 1/3/2024 |
| fetchdelivers.com | Active | Independent Pet Partners | 8/8/2026 |
| GRINTOWIN.COM | Active | Independent Pet Partners | 2/13/2024 |
| independentpetpartners.com | Active | Independent Pet Partners | 7/12/2023 |
| ippcbd.com | Active | Independent Pet Partners | 2/11/2024 |
| ippfam.com | Active | Independent Pet Partners | 9/24/2024 |
| ippfamily.com | Active | Independent Pet Partners | 9/24/2024 |
| ipphl.com | Active | Independent Pet Partners | 7/27/2025 |
| ipppet.com | Active | Independent Pet Partners | 8/21/2024 |
| ippwellness.com | Active | Independent Pet Partners | 9/24/2024 |
| krisers.com | Active | Independent Pet Partners | 10/28/2024 |
| kriserspetsupplies.com | Active | Independent Pet Partners | 10/28/2024 |
| littlelionscat.com | Active | Independent Pet Partners | 12/2/2024 |
| lovelittlelions.com | Active | Independent Pet Partners | 12/2/2024 |
| loyalcompanion.io | Active | Independent Pet Partners | 9/21/2024 |
| loyalcompanionpets.com | Active | Independent Pet Partners | 8/1/2024 |
| MNPAW.NET | Active | Independent Pet Partners | 3/31/2030 |
| MNPAW.ORG | Active | Independent Pet Partners | 3/31/2030 |
| mypetwellnessstore.com | Active | Independent Pet Partners | 8/26/2024 |

| Domain Name | Status | Registrant | Expiration Date |
|---|---|---|---|
| mypetwellnessstores.com | Active | Independent Pet Partners | 9/9/2024 |
| partnerscbd.com | Active | Independent Pet Partners | 2/11/2024 |
| petsource.biz | Active | Independent Pet Partners | 4/29/2023 |
| petwellness.boston | Active | Independent Pet Partners | 8/26/2024 |
| petwellness.pet | Active | Independent Pet Partners | 8/26/2024 |
| petwellnessexp.com | Active | Independent Pet Partners | 8/10/2024 |
| petwellnessexperience.com | Active | Independent Pet Partners | 8/10/2024 |
| petwellnesspass.com | Active | Independent Pet Partners | 9/9/2024 |
| rooseveltpet.com | Active | Independent Pet Partners | 9/30/2024 |
| rooseveltpets.com | Active | Independent Pet Partners | 9/30/2024 |
| SASSYFELINE.COM | Active | Independent Pet Partners | 2/14/2024 |
| theorypets.com | Active | Independent Pet Partners | 3/29/2024 |
| theorytoys.com | Active | Independent Pet Partners | 3/29/2024 |
| thepetwellnessexperience.com | Active | Independent Pet Partners | 8/10/2024 |
| thepetwellnessstore.com | Active | Independent Pet Partners | 8/26/2024 |
| thepetwellnessstores.com | Active | Independent Pet Partners | 9/9/2024 |
| wildsaint.com | Active | Independent Pet Partners | 7/30/2024 |
| wildsaintgrooming.com | Active | Independent Pet Partners | 8/23/2024 |
| wildsaintpet.com | Active | Independent Pet Partners | 8/23/2024 |
| wildsaints.com | Active | Independent Pet Partners | 7/30/2024 |
| wildsaintsalon.com | Active | Independent Pet Partners | 8/23/2024 |
| barknatural.com | Active | Independent Pet Partners | 3/1/2024 |
| dogmaforpets.com | Active | Independent Pet Partners | 5/23/2023 |
| especiallyforpets.com | Active | Independent Pet Partners | 6/3/2023 |

| Domain Name | Status | Registrant | Expiration Date |
|---|---|---|---|
| ipppack.com | Active | Independent Pet Partners | 11/7/2023 |
| loveroosevelt.com | Active | Independent Pet Partners | 2/7/2024 |
| loyalcompanion.com | Active | Independent Pet Partners | 3/22/2024 |
| NATURALPAWZ.COM | Active | Independent Pet Partners | 5/3/2024 |
| naturalpawz.org | Active | Independent Pet Partners | 6/13/2023 |
| petlifestores.com | Active | Independent Pet Partners | 6/22/2023 |
| petpartnersinternational.com | Active | Independent Pet Partners | 7/6/2023 |
| happypetcbd.com | Active | Independent Pet Partners | 2/11/2024 |

**EXHIBIT D**

**<u>Letter Agreement</u>**

[See attached.]

BUSINESS.29776642.14

*Execution Version*

### Letter Agreement

Reference is made to (i) that certain Credit Agreement, dated as of November 20, 2018, by and among Independent Pet Partners Intermediate Holdings II, LLC, Independent Pet Partners Intermediate Holdings, LLC (the "Borrower"), as the borrower, the Guarantors (as defined therein), as guarantors, Wilmington Trust, National Association, as Administrative Agent and Collateral Agent, and the lenders party thereto from time to time, including TPG Independent Pet Partners, LLC (f/k/a TPG Independent Pet Partners L.P.) (the "TPG Lender"), Main Street Capital Corporation, MSC Income Fund, Inc., Newstone Capital Partners III, L.P., Newstone Capital Partners III-A, L.P., Newstone Capital Partners III-B, L.P., NCP III Aggregator, L.P., and Cion Investment Corporation (collectively, excluding the TPG Lender, the "Non-TPG Lenders," and together with the TPG Lender, the "DDTL Lenders") (as amended, restated, supplemented, or otherwise modified from time to time, the "DDTL Credit Agreement"), (ii) that certain Credit Agreement, dated as of November 28, 2022 (as amended by the First Amendment to Credit Agreement, dated as of January 25, 2023 and as further amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Priming Credit Agreement"), (iii) that certain Credit Agreement, dated as of December 22, 2017 (as amended, restated, supplemented, or otherwise modified from time to time, the "ABL Credit Agreement," and together with the DDTL Credit Agreement and the Prepetition Priming Credit Agreement, the "Credit Agreements"), and (iv) that certain Asset Purchase Agreement, dated as of February 5, 2023, by and among Independent Pet Partners Holdings, LLC ("IPP Holdings"), the Seller Subsidiaries set forth on Schedule I thereto (together with IPP Holdings and the Borrower, the "Sellers"), and IPP Buyer Acquisition, LLC (the "Buyer") (as amended, restated, supplemented, or otherwise modified from time to time, the "APA").[1]

**WHEREAS**, the Sellers intend to commence chapter 11 cases (collectively, the "Bankruptcy Case") under title 11 of the United States Code (the "Bankruptcy Code") on or around February 5, 2023 to effectuate, subject to a marketing and auction process and Bankruptcy Court approval, the transactions contemplated by the APA;

**WHEREAS**, in the Bankruptcy Case, the Non-TPG Lenders intend to provide a debtor-in-possession loan to the Sellers ("DIP Loan," and the budget for the DIP Loan, the "DIP Budget");

**WHEREAS**, in the Bankruptcy Case, the DDTL Lenders are entitled to (i) adequate protection of their Claims against the Sellers under the DDTL Credit Agreement pursuant to Section 364 of the Bankruptcy Code and (ii) receive a recovery on account of such Claims and their security interests in accordance with applicable provisions of the Bankruptcy Code, the DDTL Credit Agreement, and any other financing documents entered into by and among the Sellers, the agents thereunder, and the lenders thereunder (together with the DDTL Lenders, the "Lenders"); and

**WHEREAS**, the TPG Lender has agreed to waive certain of its rights under the DDTL Credit Agreement in exchange for, among other things: (i) the Non-TPG Lenders' agreeing that the TPG Lender is entitled to adequate protection in the form of reimbursement of its professional fees in an amount not to exceed $290,000 and providing for $290,000 in the DIP Budget as

---

[1]  Capitalized terms used but not defined herein have the meanings given to them in the APA.

adequate protection for the TPG Lender's interests; (ii) the release set forth herein; and (iii) the agreement of the Non-TPG Lenders to support a Chapter 11 plan that provides a customary release by the Sellers in favor of the DDTL Lenders as described herein;

       **NOW, THEREFORE**, in consideration of the mutual promises herein made and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties hereto (the "<u>Parties</u>"), the Parties, intending to be legally bound, hereby agree as follows:

       1.    The TPG Lender and the Non-TPG Lenders hereby agree that (a) the TPG Lender is entitled to adequate protection in the form of payment for, or reimbursement of, its professional fees of no less than $290,000 (the "<u>Fee Amount</u>") (b) the Non-TPG Lenders' providing for $290,000 in the DIP Budget as adequate protection for the TPG Lender's interests; <u>provided</u>, that to the extent the Fee Amount is not paid as adequate protection for whatever reason prior to the Closing, any unpaid balance of the Fee Amount shall be paid to the TPG Lender (whether as adequate protection or otherwise) upon the Closing and such payment shall be a condition to the Closing.

       2.    The TPG Lender hereby agrees to (a) waive its rights under the following provisions of the DDTL Credit Agreement: <u>clauses (iv)</u> and <u>(vi)</u> of the definition of Sponsor Lender Restrictions not to be treated disproportionately to the other DDTL Lenders, <u>Section 2.13</u> (Sharing of Payments by Lenders) and <u>Section 8.03</u> (Application of Funds), and any other provision of the DDTL Credit Agreement and related Loan Documents (as defined in the DDTL Credit Agreement) that would provide for the TPG Lender's sharing in any "credit bid" made by the Non-TPG Lenders under the DDTL Credit Agreement, and (b) take commercially reasonable actions in respect of the foregoing as requested by the Non-TPG lenders (including giving directions to the agent under the DDTL Credit Agreement); <u>provided</u>, that no action shall require the TPG Lender or any other TPG Entity (as defined below) to incur (i) non-reimbursed costs and expenses or (ii) legal or financial risk (including through the provision of an indemnity).

       3.    Effective upon the execution of this Letter Agreement, the Lenders, on behalf of themselves and their respective past, present and future subsidiaries, parents, equityholders, divisions, Affiliates, agents, representatives, insurers, advisors, attorneys, successors and assigns, all solely in such capacity, (collectively, the "<u>Lender Releasing Parties</u>"), hereby release, remise, acquit and forever discharge each other Lender, the TPG Entities with respect to any Lender unaffiliated with a TPG Entity, and its past, present and future subsidiaries, parents, divisions, Affiliates, agents, representatives, insurers, attorneys, successors and assigns, and each of its and their respective directors, managers, officers, employees, shareholders, members, agents, representatives, advisors, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies and partners (collectively, the "<u>Lender Released Parties</u>"), from any and all claims, Contracts, demands, causes of action, disputes, controversies, suits, cross-claims, torts, losses, attorneys' fees and expenses, obligations, agreements, covenants, damages, Liabilities, costs and expenses (collectively, "<u>Disputes</u>") arising on or prior to the date of execution of this Letter Agreement, whether direct or derivative, whether known or unknown, whether anticipated or unanticipated, whether claimed or suspected, whether fixed or contingent, whether yet accrued or not, whether damage has resulted or not, whether at law or in equity, whether arising out of agreement or imposed by statute, common law of any kind, nature, or description, including any claim by way of indemnity or contribution, which any Lender Releasing Party has, may have had

or may hereafter assert against any Lender Released Party in connection with or related to the Credit Agreements or the Sellers; provided, that notwithstanding the foregoing, the Lender Releasing Parties do not in any event release any Lender Released Party from (x) any obligations or liabilities arising under this Letter Agreement, (y) Fraud or Willful Breach, or (z) any counterclaim in connection with any claim made against a Lender Releasing Party by any Lender Released Party, in each case (y) and (z), as determined by a final order entered by a court of competent jurisdiction that remains in full force and effect and is not subject to appeal.  Each Lender, on behalf of its Lender Releasing Parties, agrees that this release applies not only to Disputes that are presently known, suspected, or disclosed to such Lender Releasing Party, but also to Disputes that are presently unknown, unsuspected, or undisclosed to such Lender Releasing Party.  Each Lender, on behalf of its Lender Releasing Parties, hereby acknowledges and agrees that such Lender Releasing Party is aware of the provisions of Section 1542 of the California Civil Code ("Section 1542") regarding the effectiveness of this release on unknown or unsuspected Disputes and, to the extent applicable (if at all), hereby knowingly waives its protection and the protection of any similar Law.  Section 1542 provides: "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."  Each Lender, on behalf of its Lender Releasing Parties, acknowledges that such Lender Releasing Party is assuming the risk that the facts may turn out to be different from what such Lender Releasing Party believes them to be and agrees that this release shall be in all respects effective and not subject to termination or rescission because of such mistaken belief.

4.      The Buyer, on behalf of itself and the Buyer Equity Holders, hereby agrees that, in respect of all of their Claims against the Sellers, the Buyer and the Buyer Equity Holders, in their respective capacities as holders of Claims against Sellers, from and after the Closing, shall not object to, and shall timely vote in favor of, any joint Chapter 11 plan filed by the Sellers that includes customary debtor and third-party releases and exculpation in favor of the Buyer, the Buyer Equity Holders (in any and all capacities), the Sellers, the Sellers' current and former directors and officers, the TPG Entities,[2] and the Sellers' direct and indirect equity holders (in any and all capacities), and Affiliates, officers, directors, employees, advisors, and other representatives of each of the foregoing, which releases shall be of similar scope as the releases set forth herein and in the APA, provided that such plan is otherwise reasonably acceptable to the Non-TPG Lenders.

*[Signature Pages Follow]*

---

[2]  "TPG Entities" means: (i) TPG Holdings II, LP; (ii) TPG Growth III DE AIV GenPar Advisors, LLC; (iii) TPG Growth III DE AIV GenPar, LP; (iv) TPG Growth III DE AIV I, LP; (v) TPG Growth III BDH, LP; (vi) TPG Growth III Independent Pet BL, LP; (vii) TPG Growth III Media Finance, LP; (viii) the TPG Lender; (ix) TPG Growth III DE AIV II, LP; (x) TPG Holdings III, LP; (xi) TPG Growth III (C) GenPar Advisors, Inc.; (xii) TPG Growth III (C) GenPar, LP; and (xiii); TPG Growth III (C), LP.

IN WITNESS WHEREOF, the Parties hereto have executed this Letter Agreement as of the date first above written.

**BUYER:**
**IPP BUYER ACQUISITION, LLC**

By _____
Name: Nick Meserve
Title: President

**LENDERS:**

| **MAIN STREET CAPITAL CORPORATION** | **MSC INCOME FUND, INC.** |
|---|---|

By _____

Name: Nick Meserve
Title: Managing Director

By _____

Name: Nick Meserve
Title: Managing Director

**NEWSTONE CAPITAL PARTNERS III, L.P.**

**BY:    NEWSTONE PARTNERS III, L.P.,**
its General Partner

**BY:    NEWSTONE PARTNERS III, LLC,**
its General Partner

By:_____
Name: John C. Rocchio
Title: Managing Director

**NEWSTONE CAPITAL PARTNERS III-A, L.P.**

**BY:    NEWSTONE PARTNERS III, L.P.,**
its General Partner

**BY:    NEWSTONE PARTNERS III, LLC,**
its General Partner

By:_____
Name: John C. Rocchio
Title: Managing Director

**NEWSTONE CAPITAL PARTNERS III-B, L.P.**

**BY:    NEWSTONE PARTNERS III, L.P.,**
its General Partner

**BY:    NEWSTONE PARTNERS III, LLC,**
its General Partner

By:_____
Name: John C. Rocchio
Title: Managing Director

**NCP III AGGREGATOR, L.P.**

**BY:    NEWSTONE PARTNERS III, L.P.,**
its General Partner

**BY:    NEWSTONE PARTNERS III, LLC,**
its General Partner

By:_____
Name: John C. Rocchio
Title: Managing Director

**CION INVESTMENT CORPORATION**

By _____
               Name: Gregg Bresner
               Title: President

**TPG INDEPENDENT PET PARTNERS, LLC**

By: TPG Growth III Media Finance, L.P., its
managing member

By: TPG Growth III DE AIV GenPar, L.P., its
general partner

By: TPG Growth III DE AIV GenPar Advisors,
LLC, its general partner

By: _____
Name: Ken Murphy
Title:   Chief Operating Officer

[*Signature Page to Letter Agreement*]