**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| INDEPENDENT PET PARTNERS | ) |
| HOLDINGS, LLC, *et al.*,[1] | ) Case No. 23-10153 (LSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| ——————————————— | ) |
| | ) |
| NP ACQUISITION LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) ADV. PROC. NO. _____ |
| | ) |
| INDEPENDENT PET PARTNERS | ) |
| HOLDINGS, LLC, INDEPENDENT PET | ) |
| PARTNERS INTERMEDIATE HOLDINGS | ) |
| I, LLC, INDEPENDENT PET PARTNERS | ) |
| INTERMEDIATE HOLDINGS II, LLC, | ) |
| INDEPENDENT PET PARTNERS | ) |
| EMPLOYER HOLDINGS, LLC, | ) |
| INDEPENDENT PET PARTNERS | ) |
| EMPLOYER, LLC, INDEPENDENT PET | ) |
| PARTNERS INTERMEDIATE HOLDINGS, | ) |
| LLC, IPP - STORES, LLC, IPP STORES | ) |
| EMPLOYER, LLC, ESPECIALLY FOR | ) |
| PETS, LLC, PET LIFE, LLC, WHOLE PET | ) |
| CENTRAL, LLC, NATURAL PAWZ, LLC, | ) |
| PET SOURCE, LLC, and MR. STEVEN | ) |
| BALASIANO, not individually, but solely in | ) |
| his capacity as Trustee of THE IPP | ) |
| LIQUIDATING TRUST | ) |
| ——————————————— | ) |

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Independent Pet Partners Holdings, LLC (5913), Independent Pet Partners Intermediate Holdings I, LLC (4827), Independent Pet Partners Intermediate Holdings II, LLC (7550), Independent Pet Partners Employer Holdings, LLC (6785), Independent Pet Partners Employer, LLC (7531), Independent Pet Partners Intermediate Holdings, LLC (8793), IPP - Stores, LLC (6147), IPP Stores Employer, LLC (0847), Especially For Pets, LLC (6801), Pet Life, LLC (3420), Whole Pet Central, LLC (7833), Natural Pawz, LLC (5615), and Pet Source, LLC (1905). The corporate headquarters and the mailing address for the Debtors is 8450 City Centre Dr., Woodbury, MN 55125.

**COMPLAINT OF NP ACQUISITION LLC, APPLICATION FOR ALLOWANCE OF AN ADMINISTRATIVE EXPENSE UNDER 11 U.S.C. § 503(b)(1), AND REQUEST FOR AN ACCOUNTING AND OTHER RELIEF**

NP ACQUISITION LLC ("NP Acquisition") hereby files this *Complaint of NP Acquisition LLC, Application for Allowance of an Administrative Expense Under 11 U.S.C. § 503(b)(1), and Request for an Accounting and Other Relief* (the "Complaint") in the above-styled Chapter 11 proceedings (the "Bankruptcy Cases") and complains as follows against the following defendants: (i) Independent Pet Partners Holdings, LLC, (ii) Independent Pet Partners Intermediate Holdings I, LLC, (iii) Independent Pet Partners Intermediate Holdings II, LLC, (iv) Independent Pet Partners Employer Holdings, LLC, (v) Independent Pet Partners Employer, LLC, (vi) Independent Pet Partners Intermediate Holdings, LLC, (vii) IPP - Stores, LLC, (viii) IPP Stores Employer, LLC, (ix) Especially For Pets, LLC, (x) Pet Life, LLC, (xi) Whole Pet Central, LLC, (xii) Natural Pawz, LLC, (xiii) Pet Source, LLC (together, the "Debtors"), and (xiv) Mr. Steven Balasiano, not individually, but solely in his capacity as Trustee (the "Trustee") of The IPP Liquidation Trust (the "Trust"):

## I.
## INTRODUCTION

1.        On February 24, 2023, this Court entered the Sale Order[2] approving NP Acquisition's purchase from the Debtors of twenty-four (24) Store Leases identified in the Debtors' February 10, 2023 Sale Motion, as well as all the inventory, equipment, furniture, intellectual property (such as the "Natural Pawz" brand), customer data, and other related assets associated with these Store Leases (together, the "Transaction"). The Transaction closed on March 1, 2023 (the "Closing Date"). Both prior and subsequent to the Closing Date, the Debtors engaged

---

[2] All capitalized terms used in this Introduction are defined below.

in a course of conduct that caused significant damage to NP Acquisition and its assets and operations. The Debtors breached the APA and the other Transaction Documents in numerous respects, interfered with NP Acquisition's business operations and customer relationships, and converted property sold to NP Acquisition as part of the Transaction.

2.      Worse yet, prior to the Closing Date, the Debtors knowingly provided NP Acquisition with materially false and misleading information about the Transaction. NP Acquisition relied on that information in deciding to enter into the Transaction. As a direct result of the Debtors' actions (and inactions), NP Acquisition incurred substantial post-petition damages, costs, and other expenses. NP Acquisition is also entitled to an accounting from the Debtors (or the Trustee on behalf of the Trust) regarding the status of the assets, documents, and information transferred, and/or required to be delivered, to NP Acquisition under the APA and the other Transaction Documents. In the alternative, because of the Debtors' multiple breaches of contract and fraudulent misrepresentations regarding the Transaction, NP Acquisition seeks rescission of the Transaction, cancellation of the Transaction Documents, and the return to NP Acquisition of all funds it paid to the Debtors at the Closing.

3.      Furthermore, under Section 503(b)(1)(A) of Title 11 of the United States Code (the "Bankruptcy Code"), all the damages incurred by NP Acquisition in connection with the Transaction constitute administrative expenses of the Debtors' bankruptcy estates. *See* 11 U.S.C. § 503(b)(1)(A). NP Acquisition therefore seeks allowance of all its damages as administrative expenses under Bankruptcy Code § 503(b)(1) enforceable against the remaining Trust Assets (as defined in the Plan), as well as entry of an order directing the Trustee to pay these amounts as an Administrative Claim from the Trust Assets in accordance with the Plan, Confirmation, Bankruptcy Code, and Bankruptcy Rules.

**II.**
**JURISDICTION AND VENUE**

4.      This Court has jurisdiction over this adversary proceeding (the "Lawsuit") pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and this Court's *Order (A) Authorizing Debtors to Sell By Private Sale Certain of Debtors' Assets Free and Clear of Liens, Claims, and Encumbrances, With Such Interests to Attach to the Proceeds, (B) Authorizing the Assumption and Assignment of Certain Nonresidential Real Property Leases to Buyer, and (C) Granting Related Relief (NP Acquisition LLC)* [Bankr Doc. No. 185] (the "Sale Order") entered in the Bankruptcy Cases.[3]

5.      This Lawsuit is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and 1334 and has been properly referred to this Court by the United States District Court for the District of Delaware (the "District Court") in accordance with 28 U.S.C. § 157 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware,* dated February 29, 2012.

6.      Venue of this Lawsuit is proper in the District of Delaware under 28 U.S.C. § 1409 because the Bankruptcy Cases are pending in this District.

7.      This Court may enter a final order in this Lawsuit consistent with Article III of the United States Constitution. Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 7008-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware ("Local Rules"), NP Acquisition consents to entry of final orders and a judgment by the Court in this Lawsuit if it is determined that this Court, absent the parties' consent, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

---

[3] A copy of the Sale Order is attached to this Application as **Exhibit "A"**.

### III.
### PARTIES

8.      Plaintiff NP ACQUISITION, LLC is a limited liability company organized under the laws of the State of Texas, whose address is 12200 Stemmons Freeway, Suite 100, Dallas, Texas 75234.

9.      Defendant INDEPENDENT PET PARTNERS HOLDINGS, LLC is a limited liability company organized under the laws of the State of Delaware, whose address is 8450 City Centre Dr., Woodbury, MN 55125.

10.     Defendant INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS I, LLC is a limited liability company organized under the laws of the State of Delaware, whose address is 8450 City Centre Dr., Woodbury, MN 55125.

11.     Defendant INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS II, LLC is a limited liability company organized under the laws of the State of Delaware, whose address is 8450 City Centre Dr., Woodbury, MN 55125.

12.     Defendant INDEPENDENT PET PARTNERS EMPLOYER HOLDINGS, LLC is a limited liability company organized under the laws of the State of Delaware, whose address is 8450 City Centre Dr., Woodbury, MN 55125.

13.     Defendant INDEPENDENT PET PARTNERS EMPLOYER, LLC is a limited liability company organized under the laws of the State of Delaware, whose address is 8450 City Centre Dr., Woodbury, MN 55125.

14.     Defendant INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS, LLC is a limited liability company organized under the laws of the State of Delaware, whose address is 8450 City Centre Dr., Woodbury, MN 55125.

15.     Defendant IPP STORES EMPLOYER, LLC is a limited liability company

organized under the laws of the State of Delaware, whose address is 8450 City Centre Dr., Woodbury, MN 55125.

16.    Defendant IPP - STORES, LLC is a limited liability company organized under the laws of the State of Delaware, whose address is 8450 City Centre Dr., Woodbury, MN 55125.

17.    Defendant ESPECIALLY FOR PETS, LLC is a limited liability company organized under the laws of the State of Delaware, whose address is 8450 City Centre Dr., Woodbury, MN 55125.

18.    Defendant PET LIFE, LLC is a limited liability company organized under the laws of the State of Delaware, whose address is 8450 City Centre Dr., Woodbury, MN 55125.

19.    Defendant WHOLE PET CENTRAL, LLC is a limited liability company organized under the laws of the State of Delaware, whose address is 8450 City Centre Dr., Woodbury, MN 55125.

20.    Defendant NATURAL PAWZ, LLC is a limited liability company organized under the laws of the State of Delaware, whose address is 8450 City Centre Dr., Woodbury, MN 55125.

21.    Defendant PET SOURCE, LLC is a limited liability company organized under the laws of the State of Delaware, whose address is 8450 City Centre Dr., Woodbury, MN 55125.

22.    Defendant MR. STEVEN BALASIANO, not individually, but solely in his capacity as Trustee of THE IPP LIQUIDATING TRUST, is an individual and may be served with process by mailing a copy of this Complaint and summons by United States, first-class mail to: Steven Balasiano, Trustee of The IPP Liquidating Trust, c/o MHR Advisory Group, LLC, 2018 West Street, Brooklyn, New York, 11223.

# IV.
# FACTUAL BACKGROUND

## A.    The Post-Petition Transaction Between NP Acquisition and the Debtors

23.    In 2005, Mr. Carmen Louis "Biff" Picone ("Mr. Picone") and Ms. Nadine Joli-Coeur ("Ms. Joli-Coeur" and with Mr. Picone, the "Owners") founded the first "Natural Pawz" retail pet-food store in Houston, Texas. From 2005 to 2018, the Original Owners owned and managed the Natural Pawz business and expanded it to eventually include sixteen (16) stores in the State of Texas. The Owners sold this business to the Debtors in 2018, along with all the operating assets (including the Natural Pawz-related intellectual property) and the then-existing store leases.

24.    On February 5, 2023 (the "Petition Date"), the Debtors filed the Bankruptcy Cases in this Court, as debtors and debtors-in-possession under Bankruptcy Code §§ 1107(a) and 1108. Following the Petition Date, the Owners organized NP Acquisition as a Texas limited liability company for the purpose of (i) re-acquiring the Owners' original, sixteen (16) "Natural Pawz" stores from the Debtors and (ii) purchasing eight (8), additional Texas-based stores then-branded under the "Kriser's Natural Pet" trademark (collectively, the "Stores").[4] Because the Debtors' stalking-horse bidder did not intend to acquire any of their Texas-based assets, the Debtors intended to reject all the Stores' leases and shut down their operations. Not wanting to see decades of work disappear and wishing to save the employees' jobs (some of whom had previously worked for the Owners), the Owners decided, on February 7, 2023, to have NP Acquisition enter into a *Letter of Intent* ("LOI") with the Debtors regarding this proposed acquisition. The LOI contemplated that NP Acquisition would acquire the Stores' twenty-four (24) leases via an assumption-and-assignment process authorized under Bankruptcy Code § 365. At the same time,

---

[4] A list of the Stores is attached to this Complaint as **Exhibit "B"**.

NP Acquisition would also purchase all the Debtors' inventory, equipment, furniture, intellectual property (such as the "Natural Pawz" brand), customer data, and other, related assets associated with the Stores.

25.     On February 10, 2023, the Debtors filed their *Motion of Debtors For Entry of Order (A) Approving the Private Sale of Certain of Debtors' Assets Free and Clear of Liens, Claims, and Encumbrances, With Such Interests to Attach to the Proceeds, (B) Authorizing the Assumption and Assignment of Certain Nonresidential Real Property Leases to Buyer, and (C) Granting Related Relief (NP Acquisition LLC)* [Bankr. Doc. No. 88] (the "Sale Motion"). The Sale Motion asked this Court to approve the proposed Transaction between the Debtors and NP Acquisition. After the Sale Motion was filed, the Debtors and NP Acquisition executed that certain *Asset Purchase Agreement*, dated February 22, 2023 (the "APA"), which replaced the LOI and outlined the Transaction's terms.[5]

26.     This Court approved the Sale Motion, the APA, and the Transaction at a hearing on February 23, 2023 after the Debtors and NP Acquisition had resolved several cure-related objections raised by certain of the Debtors' landlords. This Court memorialized its approval of the Transaction and its decision to grant the Sale Motion in the Sale Order entered in the Bankruptcy Cases on February 24, 2023.

**B.     The Closing of the Post-Petition Transaction.**

27.     After the Sale Order was entered, the Debtors and NP Acquisition moved quickly to close the Transaction. During this interim period, they executed various ancillary documents,

---

[5] A copy of the *Notice of Filing of Exhibit* [Bankr. Doc. No. 168] (the "Exhibit Notice"), which was filed by the Debtors in the Bankruptcy Cases on February 22, 2023, is attached as **Exhibit "C"** to this Application. A copy of the executed APA appears as Exhibit 1 to the Exhibit Notice. All capitalized terms not otherwise defined in this Complaint have the meanings ascribed to them in the APA or the Plan, as the case may be.

resolved additional landlord concerns, and began the process of physically transferring the Store

Leases and other Purchased Assets to NP Acquisition. The Debtors also purported to provide NP

Acquisition with certain sales-performance and inventory data (the "Store Performance Data")

claiming to reflect, *inter alia*, the then-current inventory levels at the Stores and several years'

worth of historical sales performance at the Stores. The data on inventory levels was especially

important since the Consideration that NP Acquisition expected to pay at the closing included an

Inventory Payment totaling two hundred percent (200%) of the aggregate cost of the inventory in

the Stores on the closing date. (APA, Exh. C, § 4, p. 3).

28.     On March 1, 2023 (the "Closing Date"), NP Acquisition and the Debtors closed the

Transaction (the "Closing"). NP Acquisition paid the total purchase price (the "Purchase Price")

of $2,583,746.00 to the Debtors at the Closing.[6] (This Purchase Price included an inventory

payment of $2,108,746 representing two hundred percent (200%) of the cost of the inventory on

February 28, 2023, as reflected in the Debtors' purported Store Performance Data, which the

Debtors had updated for NP Acquisition on February 28, 2023). At the same time, the Debtors and

NP Acquisition also executed the following, additional documents in order to implement the

Transaction: (i) the *Intellectual Property Assignment Agreement*, dated March 1, 2023 (the "IP

Assignment"), (ii) the *Assignment and Assumption Agreement*, dated March 1, 2023 (the

"Assignment"), (iii) the *Bill of Sale*, dated March 1, 2023 (the "Bill of Sale"), (iv) the *Lease

Certificate*, dated March 1, 2023 (the "Lease Certificate"), and (v) the *Trademark License

Agreement*, dated March 1, 2023 (the "Trademark License").[7]

---

[6] A copy of the Settlement Statement for the Transaction is attached as **Exhibit "D"**.

[7] Copies of the IP Assignment, the Assignment, the Bill of Sale, the Lease Certificate, and the Trademark License are attached to this Application as **Exhibit "E"**, **Exhibit "F"**, **Exhibit "G"**, **Exhibit "H"**, and **Exhibit "I"**, respectively. The APA, the Settlement Statement, the IP Assignment, the Assignment, the Bill of Sale, the Lease Certificate, and the Trademark License are collectively referred to in this Complaint as the "Transaction Documents".

29.     The Debtors filed a *Notice of Occurrence of Sale Closing Date (NP Acquisition LLC)* [Bankr. Doc. No. 264] ("Closing Notice") on March 9, 2023 in the Bankruptcy Cases reflecting that the Closing had occurred on the Closing Date.

**C.     The Debtors' Repeated Breaches of the APA and Other Transaction Documents**

30.     Immediately after the Closing, NP Acquisition encountered resistance from the Debtors across several fronts when it sought to complete the transfer of the Purchased Assets from the Debtors, as required by the Transaction Documents. Indeed, the Debtors not only failed to comply with their obligations under the APA but, at times, actively impeded NP Acquisition's efforts to take custody and control of the Purchased Assets and to operate the business based on such assets.

31.     First, despite NP Acquisition's having acquired "all trademarks, goodwill, social media accounts, and domain name registrations and corresponding websites related to the 'Natural Pawz' business," (APA, Exh. C, § 1, p. 2 & Sch. D), the Debtors (and/or parties associated with them) did not immediately transfer the totality of this property (called the Purchased IP in the APA) to NP Acquisition after the Closing Date. In particular, key marketing domains like the "Natural Pawz" Facebook, Instagram, Linked-In, Yelp, and Twitter social-media accounts were not transferred to NP Acquisition for months after the Closing Date despite repeated requests to the Debtors' marketing personnel. In fact, even though NP Acquisition's personnel had directed their concerns to the Debtors' senior marketing executives, including the Debtors' Vice President of Marketing, Jennifer Patton, nothing happened for months.

32.     Worse yet, the Debtors' personnel maintained access to the Natural Pawz marketing domains and accounts and to the Stores' location and marketing data on key media platforms such as Yelp, Google, and Apple Maps. These personnel repeatedly used that access to NP Acquisition's

accounts for the improper purpose of "updating" them so that they would identify NP Acquisition's Stores as "permanently closed" even though they were actually open for business. Despite their continuing efforts to correct these blatant inaccuracies, NP Acquisition's personnel would often discover that corrected accounts had been "updated" more than once to show open Stores as "permanently closed". This interference went on for months after the Closing Date. In fact, the Natural Pawz Yelp account still had not been transferred as late as May 1, 2023, and it still showed several Stores as "permanently closed" at that time. Because of the Debtors' failure to transfer the Purchased IP and their continuing interference in NP Acquisition's use and enjoyment of its own property, NP Acquisition saw substantially-reduced sales volumes and customer foot-traffic at its Stores—to the great detriment of NP Acquisition's operations at those Stores. Through these breaches of contract and interference with NP Acquisition's use of the Purchased IP, the Debtors caused substantial harm and damage to NP Acquisition's business, with substantial operating losses directly attributable to this wrongful conduct.

33.    The Debtors also refused to deliver all the Natural Pawz Customer Records and Program Data to NP Acquisition in the format required under Transaction Documents. (APA, Exh. C, § 1, p. 2). The APA and Sale Order required the Debtors to deliver all this critical documentation and data to NP Acquisition, and NP Acquisition needed these Purchased Assets to run its business. But, the Debtors did not transfer the documentation and data in the format in which it was created and maintained. Specifically, the point-of-sale data on the Applicable Customers that the Debtors had provided to NP Acquisition were corrupted and unusable, with key data links and other information deliberately stripped out. This sabotage rendered the Customer Records and Program Data virtually worthless. According to Kliger-Weiss Infosystems, Inc., who was NP Acquisition's point-of-sale and inventory management vendor, little, if any, useful information could be

retrieved from these corrupted Customer Records and Program Data. As a result, the only worthwhile customer information available to NP Acquisition was whatever data its new customers provided to the Stores after the Closing Date.

34.     The failure to deliver all the Customer Records and Program Data was a substantial and material post-petition breach of the APA—one that left NP Acquisition flying blind in the operation of its business and unable to access the key metrics necessary to utilize the Purchased Assets. NP Acquisition expended nearly $200,000 in direct costs attempting (to no avail) to convert these corrupted records to a useful format. The Debtors' failure to deliver all the Customer Records and Program Data to NP Acquisition further impacted Store sales as it hampered NP Acquisition's efforts to engage with those customers (and potential customers) whose data had been affected.

35.     Third, the Debtors did not fulfill their obligations in connection with the assumption and assignment of the Store Leases to NP Acquisition under Bankruptcy Code § 365. Rather than simply have the Stores' utility accounts transferred to NP Acquisition as requested and expected, the Debtors instead terminated all those accounts as of the Closing Date. (APA, Exh. C, § 3, pp. 2-3). Because of this gratuitous and inexplicable decision, NP Acquisition had to pay additional deposits to the Stores' utilities to open new utility accounts for the Stores. NP Acquisition never expected to have to pay such costs.

36.     The Debtors also did not satisfy all the pre-Closing Liabilities associated with the Store Leases from the Deposit Amount as required by APA § 3—in particular, certain pre-Closing unpaid rent due to the landlords and unpaid utility bills. These unpaid obligations for which the Debtors were responsible under the APA (but that NP Acquisition had to pay) totaled well over $30,000.

37.     Fourth, after operating the Stores for some time following the Closing Date, NP Acquisition discovered that the Store Performance Data the Debtors had provided did not accurately reflect the Stores' operating performance and financial condition and appeared to have been deliberately adjusted to paint a rosier financial picture than the facts warranted. Among other deficiencies, the actual inventory levels at the Stores were much lower than those reflected in the Store Performance Data provided to NP Acquisition before the Closing Date. NP Acquisition therefore paid an artificially inflated Purchase Price at Closing because the inventory component of the Purchase Price was based on overstated inventory levels.

38.     Furthermore, the historical performance data the Debtors had provided for the twenty-four (24) Stores NP Acquisition acquired was revealed to be materially false and misleading. Specifically, the Debtors' data indicated that, during the most recent reporting period available, the Stores' aggregate monthly revenues were approximately $1,800,000. Following the Closing Date, NP Acquisition determined that the actual, aggregate monthly revenues generated by these Stores were closer to $1,200,000 per month. The difference between these two numbers is highly material and would have been outcome-determinative as to NP Acquisition's willingness to enter into the Transaction. Had the Stores generated revenues equivalent to the Debtors' numbers, then NP Acquisition could, on the whole, have operated them profitably. As it turned out, though, the Stores were losing money, and continue to do so. If NP Acquisition had received accurate numbers about the Stores' operations, it would not have purchased all twenty-four (24) Stores or would have declined to enter into the Transaction under any circumstances.

**D.      The Confirmation of the Debtors' Plan and the Creation of the Liquidating Trust**

39.     Even as NP Acquisition was struggling with the Debtors' interference and failure to transfer the Purchased Assets and learning that the Stores' actual operating performance did not

match the Debtors' rosy numbers, the Debtors continued moving forward with the Bankruptcy Cases and their other transactions. On June 30, 2023, this Court confirmed the *Combined Disclosure Statement and Chapter 11 Plan of Liquidation Proposed by the Debtors and the Official Committee of Unsecured Creditor*s [Bankr. Doc. No. 457] (the "<u>Plan</u>") pursuant to the *Findings of Fact, Conclusions, of Law, and Order (I) Approving the Adequacy of Disclosures on a Final Basis and (II) Confirming the Combined Disclosure Statement and Chapter 11 Plan of Liquidation Proposed by the Debtors and the Official Committee of Unsecured Creditors* [Bankr. Doc. No. 543] (the "<u>Confirmation Order</u>").

40.     The Plan went effective on June 30, 2023 (the "<u>Effective Date</u>"), as reflected in the *Notice of (A) Entry of Confirmation Order; (B) Occurrence of Effective Date; and (C) Deadline for Requests for Payment* [Bankr. Doc. No. 545] (the "<u>Effective Date Notice</u>").

41.     Under Section 10.3 of the Plan, the Debtors were deemed to have irrevocably transferred all their rights, title, and interest in the Trust Assets (as defined in the Plan) to the Trust on the Effective Date, and the Trust was vested with all the Trust Assets pursuant to Bankruptcy Code § 1123(b)(3). (Plan, Bankr. Doc. No. 457, § 10.3(d)). Under the Plan, the Trustee has the power and authority on behalf of the Trust to, *inter alia*, "address and resolve issues involving objections, reconciliation and allowance of Claims and Interests in accordance with [the Plan]…." (*Id*. § 10.3(k)). In light of these developments, the Trust now owns all remaining assets of the Debtors and has principal responsibility for the allowance and disallowance of claims against the Debtors, including claims for administrative expenses such as those asserted by NP Acquisition in this Lawsuit.

**E.      <u>Post-Petition Damages and Entitlement to Administrative Claim</u>**

42.     The Debtors, by both their actions and inactions in connection with the Transaction

and post-Closing Date activities, have harmed NP Acquisition and damaged it in an amount no less than $2,583,746. As set forth in this Complaint, the Debtors' actions (and inactions) constituted (i) breaches of the APA, (ii) interference with NP Acquisition's business, property, and economic advantage and (iii) fraudulent misrepresentations and fraudulent inducement to enter into the Transaction. The Debtors are liable for the damages incurred by NP Acquisition in connection with this wrongful conduct, all of which stems from a post-petition Transaction that directly benefited the Debtors' bankruptcy estates. Therefore, all damages to which NP Acquisition is entitled in this Lawsuit merit administrative-claim treatment under Bankruptcy Code § 503(b)(1), as further described below.

**V.**
**COUNT 1: BREACH OF CONTRACT**

43.     Paragraphs 1 through 42 of this Complaint are incorporated by reference as if fully set forth herein.

44.     The APA entered into between the Debtors and NP Acquisition as of February 22, 2023 constitutes a valid and binding contract, supported by good and legally sufficient consideration.

45.     The IP Assignment entered into between the Debtors and NP Acquisition as of March 1, 2023 constitutes a valid and binding contract, supported by good and legally sufficient consideration.

46.     The Assignment entered into between the Debtors and NP Acquisition as of March 1, 2023 constitutes a valid and binding contract, supported by good and legally sufficient consideration.

47.     The Bill of Sale executed by the Debtors and given to NP Acquisition as of March 1, 2023 constitutes a valid and binding contract, supported by good and legally sufficient consideration.

48.     NP Acquisition is the proper party to enforce the APA, the IP Assignment, the Assignment, and the Bill of Sale.

49.     NP Acquisition has fully performed all its obligations under the APA, the IP Assignment, the Assignment, and the Bill of Sale and has satisfied all conditions precedent to the enforcement of the APA, the IP Assignment, the Assignment, and the Bill of Sale. Specifically, NP Acquisition paid the entire Purchase Price of $2,583,746.00 to the Debtors at the Closing and delivered to the Debtors at that time all the Transaction Documents duly executed by NP Acquisition, as required by Section 9 of the APA. (APA, Exh. C, § 9(b), p. 5). NP Acquisition does not have any other obligations under the APA or the other Transaction Documents.

50.     By contrast, the Debtors have breached the APA, the IP Assignment, the Assignment, and the Bill of Sale in numerous respects, and continue to do so. First, the Debtors did not transfer the Purchased IP to NP Acquisition after the Closing Date as required by the Transaction Documents. Among other things, the Debtors did not provide NP Acquisition with effective control of all the Domain Names, social media accounts, and other Purchased IP despite their obligation to do so, and the Debtors continued to maintain control over these accounts long after the Closing Date and after NP Acquisition should have had exclusive possession and control of this Purchased IP. This refusal to transfer the Purchased IP to NP Acquisition breached the APA, the IP Assignment, the Assignment, and the Bill of Sale.

51.     Second, the Debtors did not deliver to NP Acquisition all the Customer Records, Program Data, and other customer information related to the Stores following the Closing Date in

the format in which the Debtors had previously maintained this information, as required by the APA and the other Transaction Documents. (*See, e.g.*, APA, Exh. C, § 1, p. 2). Instead, the Debtors manipulated and corrupted these data files before providing them to NP Acquisition, thereby rendering these files worthless and useless in NP Acquisition's business. The Debtors' failure to deliver all the Natural Pawz Customer Records, Program Data, and other related customer information breached the APA, the IP Assignment, the Assignment, and the Bill of Sale.

52.     Third, the Debtors violated their contractual obligation under the IP Assignment, the Assignment, and the Bill of Sale to take such further actions as NP Acquisition might reasonably request to carry out the intent of the APA, the IP Assignment, the Assignment, and the Bill of Sale. Despite repeated, reasonable requests from NP Acquisition, the Debtors did not ensure that all the Purchased Assets were delivered to NP Acquisition following the Closing Date (especially the Purchased IP, the Customer Records, and the Program Data), in accordance with the APA and the other Transaction Documents. The Debtors also posted inaccurate and misleading information as to the status of NP Acquisition's business on the social media sites and domains included in the Purchased IP. And, the Debtors failed to comply with NP Acquisition's reasonable requests to implement the APA and the other Transaction Documents after the Closing Date and, indeed, actively impeded NP Acquisition's efforts. In these actions and omissions, the Debtors breached the IP Assignment, the Assignment, and the Bill of Sale.

53.     Fourth, the Debtors did not fulfill their obligations in connection with the assumption and assignment of the Store Leases to NP Acquisition as required by the APA and Bankruptcy Code § 365. Rather than transfer the Stores' utility accounts to NP Acquisition as requested and expected, the Debtors terminated these accounts as of the Closing Date. The Debtors' actions required NP Acquisition to pay additional deposits to the Stores' utilities to open

new accounts for the Stores. In addition, the Debtors also failed to satisfy all the pre-Closing Liabilities associated with the Store Leases from the Deposit Amount as required by Section 3 of the APA. NP Acquisition ultimately had to pay all these amounts, which totaled over $30,000.

54.     Fifth, the Debtors breached the APA by providing false and misleading Store Performance Data to NP Acquisition at or prior to the Closing Date. Among other things, the Store Performance Data provided by the Debtors indicated that the Stores acquired by NP Acquisition had inventory of a greater quantity and value than was actually the case. As a result, NP Acquisition paid a higher Purchase Price at Closing than was warranted. Additionally, the Debtors also provided NP Acquisition with inaccurate historical performance data regarding the Stores. These data reflected that the Stores' historical monthly revenues were much higher than they actually were. Because of this bad data, NP Acquisition entered into the Transaction and Transaction Documents instead of declining to do so (which it would have done had it known the truth about the situation), and/or NP Acquisition acquired certain Stores (and their related assets and Store Leases) as part of the Transaction that it would not have otherwise acquired.

55.     Because of the Debtors' breach of the APA, the IP Assignment, the Assignment, and the Bill of Sale, NP Acquisition has been damaged in an amount not less than the entire Purchase Price of $2,583,746, together with pre-judgment and post-judgment interest, exemplary and consequential damages, costs, and attorneys' fees.

56.     The Debtors are therefore liable to NP Acquisition for breach of contract in an amount not less than the entire Purchase Price of $2,583,746, together with pre-judgment and post-judgment interest, exemplary and consequential damages, costs and attorneys' fees. Additionally, these amounts constitute a post-petition claim in the Bankruptcy Cases, and this claim should be allowed as an Administrative Claim under Bankruptcy Code § 503(b)(1) against all assets of the

Trust (including the Trust Assets). In the alternative, NP Acquisition requests that the APA and all Transaction Documents be cancelled, that the Transaction be rescinded *ab initio*, and that all amounts paid by NP Acquisition to the Debtors at the Closing (plus pre-judgment and post-judgment interest, exemplary and consequential damages, costs, and attorneys' fees) be disgorged from the Trust Assets and paid to NP Acquisition by the Trust.

## VI.
## COUNT 2: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

57.     Paragraphs 1 through 56 of this Complaint are incorporated by reference as if fully set forth herein.

58.     After the Closing Date, NP Acquisition reasonably expected based on the documents and information available to it that all twenty-four (24) Stores it had acquired in the Transaction would experience approximately the same volume of monthly retail sales and have the same, approximate number of retail customers as the Stores had had in the period leading up to the Closing Date. NP Acquisition reasonably expected that the Debtors' retail customers would continue to do business at the Stores after the Closing Date at the same level as they had done before that time. Indeed, NP Acquisition had good reason to believe that the number of customer visits at the Stores would increase because of improvements and operational efficiencies that NP Acquisition intended to make.

59.     However, the Debtors intentionally and improperly interfered with NP Acquisition's potential customers by refusing to transfer to NP Acquisition access and control over such key Natural Pawz marketing domains as the "Natural Pawz" Facebook, Instagram, Linked-In, Yelp, and Twitter social media accounts. Instead, the Debtors improperly and intentionally maintained this control and identified multiple NP Acquisition Stores as "permanently closed" on these social media accounts even though all the Stores were open for business. Furthermore, even

after NP Acquisition had corrected some accounts to show the Stores as open, the Debtors repeatedly changed them back to reflect that the Stores were "permanently closed" despite NP Acquisition's protests.

60.     By erroneously identifying open Stores as "permanently closed", the Debtors intentionally and improperly interfered with NP Acquisition's business relations with its customers. Among other things, the Debtors' inaccurate social media statements convinced potential customers that NP Acquisition's Stores were closed when they were not. As a result, these potential customers never patronized these Stores, causing NP Acquisition to lose sales that would have otherwise occurred. Because of this interference, NP Acquisition was damaged in an amount to be proven at trial and not less than $500,000 (together with pre-judgment and post-judgment interest, exemplary, consequential, and punitive damages, costs, and attorneys' fees).

61.     The Debtors are therefore liable to NP Acquisition for tortious interference with business relations in an amount to be proven at trial and not less than $500,000 (together with pre-judgment and post-judgment interest, exemplary, consequential, and punitive damages, costs, and attorneys' fees). These amounts constitute a post-petition claim in the Bankruptcy Cases, and this claim should therefore be allowed as an Administrative Claim under Bankruptcy Code § 503(b)(1) against the Trust Assets.

**VII.**
**COUNT 3: CONVERSION**

62.     Paragraphs 1 through 61 of this Complaint are incorporated by reference as if fully set forth herein.

63.     Following the Closing Date, NP Acquisition owned the Domain Names, Customer Data, and other Purchased IP free and clear of any and all claims, rights, or interests of the Debtors,

as provided in the Transaction Documents and the Sale Order. All the Purchased IP is NP Acquisition's personal property.

64.    After the Closing Date, the Debtors intentionally and wrongfully exercised complete dominion and control over NP Acquisition's property by, among other things, refusing to transfer to NP Acquisition access and control over the Natural Pawz social media accounts and certain other Purchased IP. The Debtors instead improperly and intentionally maintained control over this Purchased IP and deprived NP Acquisition of the full use and possession of its property. Furthermore, the Debtors routinely used their control over NP Acquisition's social media accounts to identify multiple NP Acquisition Stores as "permanently closed" even though the Stores were open for business. The Debtors' interference with NP Acquisition's ownership of the Purchased IP damaged NP Acquisition by, *inter alia*, driving away NP Acquisition's customers from Stores that they would have otherwise patronized and preventing NP Acquisition from using these Purchased Assets. The damages caused to NP Acquisition by the Debtors' interference with their personal property in an amount to be proven at trial and not less than $500,000 (together with pre-judgment and post-judgment interest, exemplary and consequential damages, costs, and attorneys' fees).

65.    The Debtors are therefore liable to NP Acquisition for conversion of the Purchased IP in an amount of no less than in an amount to be proven at trial and not less than $500,000 (together with pre-judgment and post-judgment interest, exemplary and consequential damages, costs, and attorneys' fees). These amounts constitute a post-petition claim in the Bankruptcy Cases, and this claim should therefore be allowed as an Administrative Claim under Bankruptcy Code § 503(b)(1) against the Trust Assets.

**VIII.**
**COUNT 4: TRESPASS TO CHATTELS**

66.     Paragraphs 1 through 65 of this Complaint are incorporated by reference as if fully set forth herein

67.     In the alternative, the Debtors are liable to NP Acquisition for trespass to chattels. Following the Closing Date, NP Acquisition owned the Domain Names, Customer Data, and other Purchased IP free and clear of any and all claims, rights, or interests of the Debtors, as provided in the Transaction Documents and the Sale Order. All the Purchased IP is NP Acquisition's personal property.

68.     After the Closing Date, the Debtors intentionally and wrongfully exercised partial dominion and control over NP Acquisition's property by, among other things, refusing to transfer to NP Acquisition access and control over the Natural Pawz social media accounts and certain other Purchased IP. The Debtors instead improperly and intentionally maintained control over this Purchased IP and deprived NP Acquisition of the full and unfettered use and possession of its property. Furthermore, the Debtors used their control over NP Acquisition's social media accounts to identify multiple NP Acquisition Stores as "permanently closed" even though the Stores were open for business. The Debtors' interference with NP Acquisition's ownership of the Purchased IP damaged NP Acquisition by, *inter alia*, driving away NP Acquisition's customers from Stores that they would have otherwise patronized and preventing NP Acquisition from using the Purchased Assets. The damages caused to NP Acquisition by the Debtors' partial interference with their personal property in an amount to be proven at trial and not less than $500,000 (together with pre-judgment and post-judgment interest, exemplary and consequential damages, costs, and attorneys' fees).

69.     The Debtors are therefore liable to NP Acquisition for trespass to the Purchased IP

in an amount to be proven at trial and not less than $500,000 (together with pre-judgment and post-

judgment interest, exemplary and consequential damages, costs, and attorneys' fees). These

amounts constitute a post-petition claim in the Bankruptcy Cases, and this claim should therefore

be allowed as an Administrative Claim under Bankruptcy Code § 503(b)(1) against the Trust

Assets.

## IX.
## COUNT 5: FRAUD AND FRAUDULENT INDUCEMENT

70.     Paragraphs 1 through 69 of this Complaint are incorporated by reference as if fully

set forth herein.

### A.     The Misrepresentation Regarding the Inventory

71.     On or before the Closing Date (March 1, 2023), the Debtors and their employees,

agents, and representatives delivered certain Store Performance Data to NP Acquisition reflecting,

among other things, that the inventory held at the Stores as of February 28, 2023 had a cost value

of $1,054,373, as set forth in the Settlement Statement. (Settlement Statement, Exh. D, p 1). This

$1,054,373 figure was incorporated into the Settlement Statement issued at the Closing on the

Closing Date. (*Id.*).

72.     The Debtors knew or should have known on or before the Closing Date that the

$1,054,373 valuation for the inventory was false and that the actual value of the inventory held at

the Stores at that time was much lower. The Debtors misrepresented the inventory's value to NP

Acquisition with the intention of inducing NP Acquisition to close the Transaction and to pay a

total of $2,108,746 for the inventory at Closing. The actual payment that should have been due on

account of the inventory under the APA and other Transaction Documents was substantially less

than $2,108,746.

73.     NP Acquisition reasonably relied on the Debtors' representation on February 28, 2023 that the cost of the inventory held at the Stores was $1,054,373. At that time, the Debtors owned and operated all the Stores and therefore had exclusive control over the Store Performance Data. Under the APA, NP Acquisition reasonably expected the Debtors to obtain this inventory information from the Debtors' POS System (as required by the APA) and provide it to NP Acquisition prior to Closing so that the final Purchase Price could be calculated accurately. NP Acquisition had no reason to believe that this inventory information would be false or inaccurate.

74.     As a result of the false inventory information provided by the Debtors, NP Acquisition was damaged when it paid $2,108,746 for the value of the inventory at Closing, as required by the APA. NP Acquisition should have paid substantially less for the inventory than $2,108,756. By making this false representation to NP Acquisition, the Debtors obtained a higher Purchase Price for the Purchased Assets than they should have otherwise received.

75.     The Debtors are therefore liable to NP Acquisition for fraud and fraudulent inducement based on the inflated inventory value of $2,108,746 in an amount not less than the entire Purchase Price of $2,583,746 (together with pre-judgment and post-judgment interest, exemplary, consequential, and punitive damages, costs, and attorneys' fees). These amounts constitute a post-petition claim in the Bankruptcy Cases, and this claim should therefore be allowed as an Administrative Claim under Bankruptcy Code § 503(b)(1) against the Trust Assets.

**B.      The Misrepresentation Regarding the Stores' Historical Performance**

76.     On or before the Closing Date the Debtors and their employees, agents, and representatives delivered certain Store Performance Data to NP Acquisition showing, among other

things, that the twenty-four (24) Stores that NP Acquisition was interested in purchasing had historical monthly revenues of approximately $1,800,000 in the aggregate.[8]

77.    The Debtors knew or should have known on or before the Closing Date that the Stores did not generate monthly revenues of $1,800,000 in the aggregate and that, on the contrary, the Stores' historic monthly revenues were closer to $1,200,000. The Debtors misrepresented the Stores' monthly performance to NP Acquisition intentionally in order to induce NP Acquisition to close the Transaction and acquire all twenty-four (24) Stores, as contemplated in the LOI (and as eventually set forth in the APA).

78.    NP Acquisition reasonably relied on the Debtors' representation on or before the Closing Date that the Stores' historic monthly performance (in the aggregate) was $1,800,000. Here again, the Debtors owned and operated all the Stores and therefore had exclusive control over the Store Performance Data. Under the LOI, NP Acquisition reasonably expected the Debtors to provide accurate Store Performance Data so that NP Acquisition could determine whether to enter into the APA for all twenty-four (24) Stores. NP Acquisition had no reason to believe that the information the Debtors provided would be false or inaccurate.

79.    Because of this false Store Performance Data, NP Acquisition was damaged when it was induced into executing the APA for all twenty-four (24) of the Stores listed in the APA. Had NP Acquisition known that the Stores' performance was closer to $1,200,000 per month in the aggregate, NP Acquisition would either have declined to execute the APA and enter into the Transaction at all, or it would have agreed only to purchase those Stores that it could make profitable. NP Acquisition was therefore damaged by the Debtors' fraud and fraudulent inducement in this regard.

---

[8] A summary of certain Store Performance Data provided by the Debtors on or before February 28, 2023 is attached as **Exhibit "J"**.

80.    For these reasons, the Debtors are liable to NP Acquisition for fraud and fraudulent inducement in an amount of no less than the entire Purchase Price of $2,583,746 (together with pre-judgment and post-judgment interest, exemplary, consequential, and punitive damages, costs, and attorneys' fees). These amounts constitute a post-petition claim in the Bankruptcy Cases, and this claim should therefore be allowed as an Administrative Claim under Bankruptcy Code § 503(b)(1) against the Trust Assets.

## X.
## COUNT 6: APPLICATION FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE UNDER BANKRUPTCY CODE § 503(b)(1)

81.    Paragraphs 1 through 80 of this Complaint are incorporated by reference as if fully set forth herein.

82.    Bankruptcy Code § 503(b) provides in part as follows

(b)    After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

(1)(A) the actual, necessary costs and expenses of preserving the estate….

11 U.S.C. § 503(b)(1)(A). Administrative expenses of a debtor's bankruptcy estate under § 503(b) rank second among all priority claims the estate may incur. *Id*. § 507(a)(2). A post-petition claim against a bankruptcy estate ordinarily qualifies as an administrative expense under § 503(b)(1) if: 1) it arises out of a transaction between the creditor and the debtor's estate post-petition, and 2) the consideration supporting the claimant's right to the expense was supplied to and benefits the debtor's estate. *E.g., In re Energy Future Holdings Corp.,* 990 F.3d 728, 741 (3d Cir. 2021)*; Ellis v. Westinghouse Elec. Co., LLC,* 11 F.4th 221, 230 (2d Cir. 2021); *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986); *Camelot Music, Inc. v. MHW Advert. & Pub. Rels., Inc. (In re CM Holdings, Inc.)*, 264 B.R. 141, 149 (Bankr. D. Del. 2000). This standard is easily satisfied here because (i) NP Acquisition and the Debtors entered into the

Transaction (including all the Transaction Documents) post-petition, and (ii) the Debtors' bankruptcy estates benefited directly from NP Acquisition's decision to consummate the Transaction and pay the Debtors the Purchase Price.

83.    Furthermore, all amounts to which the Debtors are liable to NP Acquisition in this Lawsuit should be allowed against the Trust Assets whether those amounts represent damages for breach of contract or for torts committed by the Debtors. Damages flowing from the trustee's or debtor-in-possession's breach of a post-petition contract (like the APA or the other Transaction Documents) qualify as administrative expenses under Bankruptcy Code § 503. *See, e.g., Fin. of Am., LLC v. Mortgage Winddown LLC (In re Ditech Holding Corp.)*, 630 F.Supp.3d 554, 566-67 (S.D.N.Y. 2022). Likewise, any damages arising from a debtor's commission of a tort during a bankruptcy case (such as the Debtors' fraud, their interference with NP Acquisition's business relations, or their conversion of its property) may also be treated as "actual and necessary" administrative expenses. *In re Hayes Lemmerz Int'l, Inc.*, 340 B.R. 461, 480 (Bankr. D. Del. 2006) *(citing Reading Co. v. Brown*, 391 U.S. 471, 482-85, 88 S. Ct. 1759, 20 L. Ed. 2d 751 (1968)) (holding that damages arising from a tort committed postpetition may be afforded administrative expense status).

84.    For these reasons, any and all damages awarded to NP Acquisition in this Lawsuit constitute administrative expenses under Bankruptcy Code § 503(b)(1). Upon this Court's allowing these amounts as administrative expenses in these Bankruptcy Cases, this Court should determine that these expenses constitute an Administrative Claim (as defined in the Plan) and direct the Trustee to pay this Administrative Claim to NP Acquisition from the Trust Assets in accordance with, *inter alia*, the Plan, the Confirmation Order, the Trust Agreement, the Bankruptcy Code, and the Bankruptcy Rules.

## XI.
## COUNT 7: DEMAND FOR AN ACCOUNTING

85.     Paragraphs 1 through 84 of this Complaint are incorporated by reference as if fully set forth herein.

86.     NP Acquisition is equitably entitled to a full and complete accounting from the Debtors (or from the Trustee, on behalf of the Trust and acting in the Debtors' stead pursuant to the Plan and Confirmation Order) of the entire amount of the Store Performance Data (including, without limitation, an accounting of the actual cost of the inventory held at the Stores as of February 28, 2023). All this information remains in the possession of the Debtors (or the Trustee) and was never available to NP Acquisition other than through the Debtors. As such, the Debtors (or the Trustee) have full and complete control of these data and should therefore provide an accounting to NP Acquisition, pursuant to the APA, the other Transaction Documents, and applicable law.

## XII.
## CONDITIONS PRECEDENT

87.     Any and all conditions precedent to NP Acquisition's right to recover on the claims stated in this Complaint have been satisfied or have occurred.

## XIII.
## PRAYER FOR RELIEF

WHEREFORE, NP ACQUISITION, LLC respectfully prays that this Court:

i.      Enter judgment in NP Acquisition's favor and against the Debtors in an amount not less than $2,583,746, plus pre-judgment and post-judgment interest, exemplary, consequential, and punitive damages, costs, and attorneys' fees;

ii.     In the alternative, enter judgment rescinding the Transaction *ab initio*, cancelling the APA and all other Transaction Documents, and ordering disgorgement of the entire Purchase Price of $2,583,746 in favor of NP Acquisition (plus pre-judgment and post-judgment interest, exemplary, consequential, and punitive damages, costs, and attorneys' fees), with such amounts to be paid from the Trust Assets;

iii.  Enter an order requiring the Debtors (or the Trustee, on behalf of the Trust) to provide NP Acquisition with a full and complete accounting of the Store Performance Data (including, without limitation, an accounting of the actual cost of the inventory held at the Stores as of February 28, 2023);

iv.  Allow the entire amount of the judgment entered in NP Acquisition's favor in this Lawsuit as an Administrative Claim (as defined in the Plan) in these Bankruptcy Cases, payable from the Trust Assets;

v.  Order the Trustee to pay the full amount of the Administrative Claim awarded to NP Acquisition in this Lawsuit from the Trust Assets, in accordance with *inter alia*, the Plan, the Confirmation Order, the Trust Agreement, the Bankruptcy Code, and the Bankruptcy Rules; and

vi.      Grant NP Acquisition such other and further relief as is just and equitable.

Dated: July 31 , 2023                **SULLIVAN • HAZELTINE • ALLINSON LLC**
      Wilmington, Delaware

***Draft***

William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Fax: (302) 428-8195
Email: bsullivan@sha-llc.com
       whazeltine@sha-llc.com

-and-

Jonathan W. Young
LOCKE LORD LLP
111 Huntington Avenue, 9th Floor
Boston, Massachusetts 02199
Tel: 617-239-0367
Fax: 855-595-1190
Email: jonathan.young@lockelord.com

-and-

W. Steven Bryant
LOCKE LORD LLP
300 Colorado Street, Ste. 2100
Austin, Texas 78701
Tel: 512-305-4726
Direct Fax: 512-305-4800
Email: sbryant@lockelord.com

*Counsel for NP Acquisition LLC*

**<u>EXHIBIT A</u>**

**Sale Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| INDEPENDENT PET PARTNERS | ) |
| HOLDINGS, LLC, *et al.*,[1] | ) Case No. 23-10153 (LSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Docket Ref. No. 88** |
| | ) |

**ORDER (A) AUTHORIZING DEBTORS TO SELL BY PRIVATE SALE CERTAIN OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, WITH SUCH INTERESTS TO ATTACH TO THE PROCEEDS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN NONRESIDENTIAL REAL PROPERTY LEASES TO BUYER, AND (C) GRANTING RELATED RELIEF (NP ACQUISITION LLC)**

Upon the *Motion of Debtors for Entry of Order (A) Authorizing Debtors to Sell by Private Sale Certain Assets Free and Clear of Liens, Claims, and Encumbrances, with Such Interests to Attach to the Proceeds, (B) Authorizing the Assumption and Assignment of Certain Nonresidential Real Property Leases to Buyer, and (C) Granting Related Relief (NP Acquisition LLC)* (the "Motion")[2] filed by the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), (a) authorizing the Debtors to sell, by private sale, certain of Debtors' assets free and clear of liens, claims, and encumbrances, with such interests to attach to the proceeds (the "Sale"), (b) authorizing the assumption and assignment of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Independent Pet Partners Holdings, LLC (5913), Independent Pet Partners Intermediate Holdings I, LLC (4827), Independent Pet Partners Intermediate Holdings II, LLC (7550), Independent Pet Partners Employer Holdings, LLC (6785), Independent Pet Partners Employer, LLC (7531), Independent Pet Partners Intermediate Holdings, LLC (8793), IPP - Stores, LLC (6147), IPP Stores Employer, LLC (0847), Especially For Pets, LLC (6801), Pet Life, LLC (3420), Whole Pet Central, LLC (7833), Natural Pawz, LLC (5615), and Pet Source, LLC (1905). The corporate headquarters and the mailing address for the Debtors is 8450 City Centre Dr., Woodbury, MN 55125.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meaning ascribed to such terms in the Motion.

{10972512:20 }

the Leases to **NP Acquisition LLC** (the "Buyer"), and (c) granting related relief, all as further described in the Motion; and upon consideration of the record of these Chapter 11 Cases; and this Court having found that (i) this Court has jurisdiction over the Debtors, their estates, property of their estates and to consider the Motion and the relief requested therein under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012, (ii) this Court may enter a final order consistent with Article III of the United States Constitution, (iii) this is a core proceeding under 28 U.S.C § 157(b)(2)(A), (iv) venue of this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409, and (v) no further or other notice of the Motion is required under the circumstances; and this Court having reviewed the Motion and having heard the statements in support of the relief requested in the Motion at a hearing before this Court; and having determined that the legal and factual bases set forth in the Motion and the record of these Chapter 11 Cases establish just cause for the relief granted in this Order; and this Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest; and after due deliberation and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS AND DETERMINES THAT:**

A.      The findings and conclusions in this Order constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any findings of fact constitute conclusions of law, they are adopted as such. To the extent that any conclusions of law constitute findings of fact, they are adopted as such.

B.      Actual written notice of the Motion was provided to the parties set forth in Paragraph 44 of the Motion (the "Notice Parties"). As evidenced by certain affidavits of service

previously filed with this Court, proper, timely, adequate, and sufficient notice of the Motion and the transactions contemplated thereby, including without limitation, the assumption and assignment of certain Store Leases (as defined in the Purchase Agreement, which is set forth in **Exhibit 1** attached hereto), has been provided in accordance with sections 105, 363, and 365, of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006.

C.        The Purchase Agreement was negotiated, proposed, and entered into by the Debtors and the Buyer, without collusion, in good faith, and from arms-length bargaining positions. Neither the Debtors nor the Buyer has engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code. Neither the Buyer nor its affiliates have acted in a collusive manner with any person. The Buyer is purchasing the Purchased Assets (as defined in the Purchase Agreement) in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code. The Buyer is therefore entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that, *inter alia:* (a) the Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the Purchased Assets; and (b) all payments to be made by the Buyer in connection with the proposed sale of the Purchased Assets have been disclosed.

D.        The offer to purchase the Purchased Assets made by the Buyer, under the terms and conditions set forth in the Purchase Agreement, and the consideration provided by the Buyer thereunder: (i) was made in good faith; (ii) is the highest or otherwise best offer obtained for the Purchased Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other alternative; (iii) is for fair, adequate, and sufficient consideration that constitutes reasonably equivalent value (as those terms are defined in each of the Uniform

Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) and fair consideration (under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia) for the Purchased Assets being conveyed to the Buyer; (iv) is fair and reasonable; (v) is in the best interests of the Debtors' estates, the Debtors' creditors, and other parties in interest; and (vi) would not have been made or given by the Buyer absent the protections afforded to the Buyer by the Purchase Agreement, the Bankruptcy Code, and this Order. No other person or entity or group of entities has offered to purchase the Purchased Assets for greater economic value to the Debtors' estates than the Buyer. Approval of the Motion and the Purchase Agreement and the consummation of the transactions contemplated thereby are in the best interests of the Debtors, their estates, creditors and other parties in interest.

E.      The Buyer, solely by virtue of the Sale and the Buyer's operation of the Purchased Assets, is not a mere continuation of the Debtors or their estates, and there is no continuity of enterprise between the Buyer and the Debtors solely by virtue of the sale and the Buyer's operation of the Purchased Assets. The Buyer is not holding itself out to the public as a continuation of the Debtors solely by virtue of the sale and the Buyer's operation of the Purchased Assets. The Buyer solely by virtue of the sale and the Buyer's operation of the Purchased Assets is not a successor to the Debtors or their estates, and the sale does not amount to a consolidation, merger, or and de facto merger of the Buyer and the Debtors.

**IT IS HEREBY FOUND AND DETERMINED AND ORDERED THAT:**

1.      The relief requested in the Motion is granted as set forth herein.

2.      All objections to the Motion or relief provided herein that have not been adjourned, continued, withdrawn, waived, or settled are hereby overruled and denied on the merits.

3.      The Purchase Agreement and all of its terms and conditions are hereby approved. The failure to specifically include any particular provisions of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of this Court that the Purchase Agreement be authorized and approved in its entirety.

4.      Pursuant to Bankruptcy Code sections 105(a), 363, and 365, the Debtors are authorized to consummate the transactions provided for in the Purchase Agreement effective immediately upon entry of this Order.

5.      The Debtors are authorized to execute and deliver, and empowered to perform under, consummate and implement, the Purchase Agreement and all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement, and to take all further actions as may be necessary for the purposes of assigning, transferring, granting, conveying and conferring the Purchased Assets (as defined in the Purchase Agreement) to Buyer NP Acquisition LLC, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreement.

6.      Except as set forth herein or in the Purchase Agreement, pursuant to Bankruptcy Code section 363(f), the sale of the Purchased Assets is, without need for any action by any party, free and clear of all liens, claims, encumbrances and interests, including, without limitation, fraudulent-transfer liability, successor, successor-in-interest, or related-to liability, or any other liability arising based on the common law doctrine of de facto merger or any

successor-in-interest theory, with all such liens, claims, encumbrances, and interests attaching

to the proceeds of such sale (the "Sale Proceeds") with the same validity, extent and priority

as had attached to such Purchased Assets immediately prior to such sale. The holder of any

valid lien, claim, encumbrance, or interest on such Purchased Assets shall, as of the effective

date of such sale, be deemed to have waived and released such lien, claim, encumbrance, or

interest on the Purchased Assets, without regard to whether such holder has executed or filed

any applicable release, and such lien, claim, encumbrance, or interest shall automatically, and

with no further action by any party, attach to the Sale Proceeds.  Except as set forth herein with

respect to the Assumed Leases, all persons or entities holding liens, claims, encumbrances or

interests of any kind or nature whatsoever in, to or against the Purchased Assets or the

operation of the Purchased Assets are hereby and forever barred, estopped, and permanently

enjoined from asserting against the Buyer or any of its successors, assigns or property

(including, without limitation, the Purchased Assets) any lien, claim, encumbrance or interest

existing, accrued or arising prior to the Closing (as defined below).  Notwithstanding the

foregoing, any such holder of such a lien, claim, encumbrance, or interest is authorized and

directed to execute and deliver any waivers, releases or other related documentation, as

reasonably requested by the Debtors.  For the avoidance of doubt, (i) the liens of the Texas

Taxing Authorities[3] shall attach to the Sale Proceeds from assets located within the taxing

jurisdiction of the Texas Taxing Authorities to the same extent and with the same priority as

the liens they now hold against the property of the Debtors, subject to any objections any party

---

[3]  For purposes of this Order, the Texas Taxing Authorities are:  Bexar County, Cypress-Fairbanks Independent School District, Fort Bend County, Harris County, Montgomery County, Fort Bend Independent School District, Fort Bend LID #2, First Colony MUD #10, Fort Bend LID #15, Fort Bend MUD #128, Klein Independent School District, Spring Independent School District, Harris County ID #18, Harris County MUD #433, Harris County MUD #468, Montgomery County MUD #67, Montgomery County MUD #46, Woodlands RUD #1, Woodlands Metro MUD, Montgomery County MUD #46, and the County of Williamson.

would otherwise be entitled to raise as to the priority, validity or extent of such liens, and the Debtors shall reserve and not distribute the amount of $110,000.00 of Sale Proceeds (the "Texas Tax Reserve"), which amount may be distributed (a) in payment of the claims and liens of the Texas Taxing Authorities upon agreement between the Texas Taxing Authorities, the Debtors (after consulting with the Committee), and the Required DIP Lenders (as defined in the DIP Order), or (b) by any order of the Court, and (ii) the Sale Proceeds shall be "DIP Collateral" and "Cash Collateral" under and as defined in the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Authorizing the Use of Cash Collateral; (IV) Granting Adequate Protection to Prepetition Secured Parties; (V) Modifying the Automatic Stay; (VI) Scheduling Final Hearing; and (VII) Granting Related Relief* [D.I. 66] (the "Interim DIP Order") and any final order approving the DIP Facility (as defined in the Interim DIP Order) (the "Final DIP Order," and the order approving the DIP Facility then in effect, the "DIP Order"), the DIP Liens and Adequate Protection Liens shall attach to the Sale Proceeds in accordance with the DIP Order and the DIP Loan Documents (as defined in the Interim DIP Order), and the Sale Proceeds shall be used by the Debtors only as authorized under and in accordance with the DIP Order and the DIP Loan Documents.

7.    This Order shall be good and sufficient evidence of the transfer of title in the Purchased Assets to the Buyer, and the sale consummated pursuant to this Order and the Purchase Agreement shall be binding upon and shall govern the acts of all persons and entities who may be required by operation of law, the duties of their office or contract to accept, file, register or otherwise record or release any documents or instruments, or who may be required

to report or insure any title or state of title in or to any of the Purchased Assets sold pursuant

to this Order, including, without limitation, all filing agents, filing officers, title agents, title

companies, recorders of mortgages, recorders of deeds, administrative agencies, governmental

departments, secretaries of state and federal, state and local officials, and each of such persons

and entities is hereby authorized to accept this Order as good and sufficient evidence of such

transfer of title and shall rely upon this Order in consummating the sales contemplated hereby.

A certified copy of this Order may be: (a) filed with the appropriate clerk or similar official,

(b) recorded with the applicable recorder of deeds or similar official, and/or (c) filed or

recorded with any other governmental agency to evidence the cancellation of any and all liens,

claims, encumbrances and interests with respect to the Purchased Assets.

8.      This Order shall be binding and enforceable in all respects upon (a) the Debtors

and all successors and assigns of the Debtors, (b) all creditors or interest holders, in each case,

whether known or unknown, of the Debtors, (c) the Buyer and its successors and permitted

assigns, and (d) any subsequent trustee appointed in the chapter 11 cases of the Debtors party

to the Purchase Agreement or upon conversion of such cases to chapter 7 of the Bankruptcy

Code.

9.      The Purchase Agreement and each of the transactions contemplated therein,

were negotiated, proposed, and entered into by the Debtors and Buyer, in good faith, without

collusion, and from arm's length bargaining positions. Buyer is a "good faith" purchaser within

the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all the

protections afforded thereby. None of the Debtors or Buyer have engaged in any conduct that

would cause or permit the Purchase Agreement to be avoided or costs and damages to be

imposed under section 363(n) of the Bankruptcy Code. The Purchase Agreement was not

entered into for the purpose of hindering, delaying, or defrauding present or future creditors of

the Debtors. None of the Debtors or Buyer is entering into the Purchase Agreement or

proposing to consummate the Sale, fraudulently, or for the purpose of statutory and common

law fraudulent conveyance and fraudulent transfer claims, whether under the Bankruptcy Code

or under the laws of the United States, any state, territory, possession thereof, or the District

of Columbia. Further, Buyer is not an "insider" of the Debtors.

10.     Buyer shall be responsible for the satisfaction of any and all assumed liabilities

set forth in the Purchase Agreement (the "Assumed Liabilities").  Except as provided in the

Purchase Agreement or this Order, after the closing of the Sale (the "Closing"), the Debtors

and their estates shall have no further liability or obligations with respect to any of the Assumed

Liabilities, including those arising under the unexpired nonresidential leases set forth on

**Exhibit 2** attached hereto, and assumed and assigned to the Buyer (the "Assumed Leases"),

and all holders of such claims are forever prohibited, barred, and estopped from asserting any

claims under any Assumed Liabilities including those arising under the Assumed Leases

against the Debtors, their successors or assigns, and their estates; provided however, that

nothing contained in this Order will prevent non-Debtor counterparties to Assumed Leases

from pursuing available insurance coverage under the Debtors' insurance policies, if any, with

respect to third-party claims asserted in connection with the Debtors' use and occupancy of the

applicable premises prior to the Closing as long as such pursuit does not result in any liability

to the Debtors or their estates.

11.     The Debtors are hereby authorized in accordance with sections 105(a), 363, and

365 of the Bankruptcy Code to assume and assign the Assumed Leases to Buyer free and clear

of any and all liens, claims, encumbrances, or other interests other than the Assumed Liabilities,

or obligations arising under the Assumed Leases, and to execute and deliver to Buyer such documents or other instruments as may be reasonably necessary to assign and transfer the Assumed Leases to Buyer, all as provided in the Purchase Agreement. Upon the assumption and assignment to Buyer of any Assumed Lease at Closing in accordance with this Order, Buyer shall succeed to the entirety of the Debtors' rights and obligations in respect of each Assumed Lease so assumed and assigned at Closing. Except as otherwise provided in this Order or the Purchase Agreement, upon payment of the applicable cure amount set forth in **<u>Exhibit 2</u>** attached to this Order under the column heading "Cure Amount" (each, a "<u>Cure Amount</u>" and, collectively, the "<u>Cure Amounts</u>"), to the extent set forth in section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to such Assumed Lease.

12.     All non-Debtor counterparties (with notice of the Sale) to each Assumed Lease shall be deemed to have consented to such assignment under section 365(c)(1)(B) of the Bankruptcy Code, section 365(e)(2)(A)(ii) of the Bankruptcy Code, or otherwise, and Buyer shall enjoy all of the rights and benefits under each such Assumed Lease as of the applicable effective date of assumption and assignment without the necessity of obtaining such person's written consent to the assumption or assignment of such Assumed Lease unless the Court orders otherwise. Any non-Debtor counterparty to an Assumed Lease that is a shopping center lease that has not objected to the assignment thereof is deemed to consent to such assignment pursuant to section 365(c) of the Bankruptcy Code unless the Court orders otherwise.

13.     With respect to any Assumed Lease that is assumed and assigned to Buyer at Closing, the Debtors shall pay to the applicable non-Debtor counterparty the Cure Amount set forth in **<u>Exhibit 2</u>** attached to this Order. The payment of the Cure Amounts shall be deemed to be in full satisfaction of and cure all defaults (as that concept is contemplated by section 365

of the Bankruptcy Code) under the Assumed Leases necessary to effectuate the assumption by the Debtors and the assignment to Buyer of such Assumed Leases pursuant to section 365 of the Bankruptcy Code, and, upon payment in accordance with the preceding sentence, such Assumed Leases shall be deemed to be in full force and effect, free of default for such purposes. To the extent a non-Debtor counterparty to an Assumed Lease failed to timely object to any proposed Cure Amounts listed in the Motion, the Cure Amounts listed therein have been and shall be deemed to be finally determined and any such non-Debtor counterparty shall be prohibited, barred, and estopped from challenging, objecting to, or denying the validity and finality of the Cure Amount at any time.  Each non-Debtor counterparty to an Assumed Lease is forever prohibited, barred, and estopped from asserting against the Debtors or Buyer, their affiliates, successors or assigns, or the property of any of them, any default existing as of the date of the hearing on this Motion if such default was not raised or asserted in a timely-filed objection.

14.     In connection with the assumption and assignment of the Assumed Leases pursuant to section 365 of the Bankruptcy Code, upon payment of the Cure Amounts and Buyer's assumption of the obligations under the Assumed Leases as set forth herein and in the Purchase Agreement, Buyer shall be deemed to have taken all actions reasonably required under section 365 to provide "adequate assurance of future performance" to the applicable non-Debtor counterparties as of the Closing.

15.     Pursuant to section 365(f)(3) of the Bankruptcy Code, no rent accelerations, assignment fees, increases or any other fees may be charged to the Buyer or to the Debtors as a result of the assumption and assignment of the Assumed Leases pursuant to this Order.

16.     Notwithstanding anything to the contrary in the Purchase Agreement or this Order, for the avoidance of doubt and as part of the Assumed Liabilities under the Purchase Agreement, as of the entry of this Order, Buyer has assumed all liabilities and obligations under the Assumed Leases that arise, are owed, or become due and payable on or after the earlier of March 1, 2023 and the Closing, including, without limitation, accrued and unbilled common area maintenance, insurance, taxes, or similar charges contained in such Assumed Lease that will come due on or after the effective date of assumption and assignment of such Assumed Lease, as applicable, regardless of whether such charges accrued or relate to a period before or after March 1, 2023.

17.     No bulk sales law, bulk transfer law, or similar law of any state or other jurisdiction shall apply in any way to the Sale. The Debtors and Buyer waive, and hereby shall be deemed to have waived, any requirement of compliance with, and any claims related to non-compliance with, the provisions of any bulk sales, bulk transfer, or similar law of any jurisdiction that may be applicable.

18.     In connection with the Purchased Assets, Buyer shall continue the Debtors' existing policy concerning the transfer of personally identifiable information upon Closing, as may be modified in accordance with the terms of such policy.

19.     No brokers for Buyer were involved in the consummation of the Sale, and no brokers' commissions are due by the Debtors to any person in connection with the Sale.

20.     Notwithstanding anything to the contrary in this Order or the Purchase Agreement, the Debtors shall reserve the amounts of (a) $4,523.30 as the maximum Cure Amount with respect to the Assumed Lease with Brixmor West U Marketplace, LLC in Houston, Texas, (b) $3,581.00 as the maximum Cure Amount with respect to the Assumed

Lease with Brixmor Lake Point Village, LLC in Sugar Land, Texas, and (c) $9,046.76 as the maximum Cure Amount with respect to the Assumed Lease with Plaza in the Park (Edens), LLC in Houston, Texas, and the Debtors and landlords to such Assumed Leases will seek to resolve such Cure Amounts within thirty (30) days from the date of this Order, subject to the parties agreement to further extend such time, or seek a hearing before the Bankruptcy Court on reasonable notice to applicable parties if an agreement is unable to be reached.

21.     Notwithstanding anything to the contrary in this Order or the Purchase Agreement, the Debtors shall reserve the amounts of $7,500 as the maximum Cure Amount with respect to the Assumed Leases with Regency Centers, L.P., and the Debtors and landlord to such Assumed Lease will seek to resolve such Cure Amounts or seek a hearing before the Bankruptcy Court on reasonable notice to applicable parties.

22.     Notwithstanding anything to the contrary in this Order or the Purchase Agreement, the Debtors shall reserve the amounts of $7,000 as the maximum Cure Amount with respect to the Assumed Lease with SITE Centers Corp., as managing agent for SCC Tanglewood LP, and the Debtors and landlord to such Assumed Lease will seek to resolve such Cure Amounts or seek a hearing before the Bankruptcy Court on reasonable notice to applicable parties.

23.     Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d) or any applicable provisions of the Local Rules, this Order shall be effective and enforceable immediately upon entry, and the fourteen (14)-day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply.  Time is of the essence in closing the Sale and the Debtors and Buyer intend to close the Sale as soon as practicable.

24.     In the event that there is a conflict between the terms of this Order and the terms of the Purchase Agreement, the terms of this Order shall control.

25.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation and enforcement of this Order and the Purchase Agreement.

LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1**

**Purchase Agreement**

*Execution Version*

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "***Agreement***"), is made and entered into as of February 22, 2023, by and among NP Acquisition LLC, a Texas limited liability company (the "***Buyer***"), Independent Pet Partners Holdings, LLC, a Delaware limited liability company ("***IPP Holdings***"), and each of the subsidiaries of IPP Holdings set forth on <u>Schedule A</u> attached hereto (collectively, the "***Seller Subsidiaries***" and together with IPP Holdings, the "***Sellers***").

### RECITALS

WHEREAS, Sellers presently conduct the business of operating retail pet stores in several states and over the internet (collectively, the "***Business***");

WHEREAS, on February 5, 2023, Sellers filed voluntary petitions for relief (the "***Chapter 11 Cases***") pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended (the "***Bankruptcy Code***"), with the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***");

WHEREAS, on February 5, 2023, Sellers entered into that certain Asset Purchase Agreement (the "***Stalking Horse APA***") with IPP Buyer Acquisition, LLC (the "***Stalking Horse Purchaser***"), the designee of certain lenders under the Sellers' DIP Agreement, Prepetition Priming Credit Agreement, Prepetition ABL Credit Agreement, and Prepetition DDTL Credit Agreement (each as defined in the Stalking Horse APA) (collectively, the "***Secured Lenders***") with respect to the acquisition of certain of the Sellers' assets as a going-concern in a sale process under Section 363 of the Bankruptcy Code, which is to be amended as provided in the Stalking Horse APA Amendment (as defined below); and

WHEREAS, Sellers desire to sell, transfer and assign to Buyer a portion of the assets covered by the Stalking Horse APA, and Buyer desires to acquire and assume from Sellers, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets (as defined below) and the Assumed Liabilities (as defined below) upon the terms and subject to the conditions set forth herein.

WHEREAS, Sellers filed that *Motion of Debtors for Entry of Order (A) Approving the Private Sale of Certain of Debtors' Assets Free and Clear of Liens, Claims, and Encumbrances, with Such Interests to Attach to the Proceeds, (B) Authorizing the Assumption and Assignment of Certain Nonresidential Real Property Leases to Buyer, and (C) Granting Related Relief (NP Acquisition LLC)* [Doc. No. 88] (the "***Motion to Sell***") in the Bankruptcy Court on February 10, 2023 requesting that the Court approve the acquisition and assumption of the Purchased Assets and the Assumed Liabilities, upon the terms and subject to the conditions set forth herein.

**NOW THEREFORE**, for and in consideration of the foregoing premises, and for other good and valuable consideration, the receipt and sufficiency are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

{10971975:23 }

1.      **Purchase and Sale of Purchased Assets**. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer hereby purchases, acquires and accepts from Sellers, on an "as is, where is" basis and without any representation or warranty on the part of Sellers as to fitness, merchantability or otherwise, and Sellers hereby sell, transfer, assign, convey and deliver to Buyer, all of the Purchased Assets, for the consideration set forth in Section 4. "***Purchased Assets***" means all of the direct or indirect right, title and interest of Sellers in and to (i) the inventory, furniture, fixtures, and equipment (excluding the Freezers) for and associated with the stores and only the stores set forth on Schedule B (collectively, the "***Stores***"); (ii) real estate leases associated with the Stores (and only such Stores) set forth on Schedule C, including, without limitation, all deposits, prepayments, and other similar amounts held or retained by the applicable landlord (which deposits, prepayments, and other similar amounts are listed on Schedule C) and any other credits or amounts due or for the benefit of the counterparties under such leases (the "***Store Leases***"); (iii) all trademarks, goodwill, social media accounts, and domain name registrations and corresponding websites related to the "Natural Pawz" business of the Sellers, including, without limitation, such intellectual property set forth on Schedule D (the "***Purchased IP***"); (iv) transaction history and customer records with respect to the Stores, including, without limitation, grooming records (the "***Customer Records***"); and (v) customer data (the "***Program Data***") solely with respect to the gift card and loyalty programs (the "***Loyalty Programs***") for the "Kriser's Natural Pet" business and the "Natural Pawz" business solely with respect to customers residing in the State of Texas (the "***Applicable Customers***").

2.      **Excluded Assets**. Notwithstanding Section 1, Buyer expressly understands and agrees that Buyer is not purchasing or acquiring, and Sellers are not selling or assigning, any of the following assets, properties, or rights of Sellers (the "***Excluded Assets***"): (i) to the extent owned by third parties or vendors, all freezers, and any agreements with any vendors with respect to such freezers, located at the Stores (the "***Freezers***"); (ii) any and all intellectual property associated with the Business or any Store, as well as all intellectual property otherwise used or owned by the Sellers (or for which Sellers have any other right, title or interest in), except for the Purchased IP (provided Buyer is obtaining the License Agreement as defined in Section 9 below); (iii) all cash and accounts receivable relating to the Stores; (iv) any asset that is to be included as a "Purchased Asset" under the Stalking Horse APA, other than the Purchased Assets which are removed from the assets covered by the Stalking Horse APA by the Stalking Horse APA Amendment, and Buyer hereby acknowledges that it has been provided a copy of the Stalking Horse APA (the "***Stalking Horse Assets***"); and (v) all assets, properties, or rights of the Sellers that are not Purchased Assets, including, without limitation, all contracts, agreements, leases or similar arrangements of the Sellers, other than the Store Leases, and all intangible property of the Sellers, other than the Purchased IP. For the avoidance of doubt, in the event of any conflict between the terms of Section 1 and Section 2(iv) with respect to any asset of any Seller, such asset shall be deemed a Stalking Horse Asset and, as a result, an Excluded Asset; provided, however in all events the Stores, Store Leases, Purchased IP, the Customer Records, and the Program Data, shall not be an Excluded Asset and shall be Purchased Assets.

3.      **Assumption of Assumed Liabilities; No Assumption of Excluded Liabilities**. At the Closing, Buyer hereby assumes and agrees to timely pay, perform, and discharge when

due all liabilities associated with the Purchased Assets, including, without limitation, all amounts owed under each Store Lease, and all liabilities under and with respect to the Loyalty Programs solely with respect to the Applicable Customers (the "***Assumed Liabilities***"); provided, however, that Sellers shall satisfy all pre-Closing liabilities under the Store Leases and amounts owed to each counterparty to each Store Lease to cure defaults under such Store Lease as contemplated by Section 365 of the Bankruptcy Code from the Deposit Amount (as defined below), other than amounts for 2022 reconciliations of CAM, taxes and insurance under the Store Leases (the "***2022 CAM Reconciliations***"), which Buyer shall assume and constitute an Assumed Liability; provided in no event does Buyer assume any liabilities related to claims against Sellers for damage or injury to persons or property arising prior to Closing (including worker's compensation claims) or for any other matters covered by any Seller insurance policies for periods prior to Closing. Notwithstanding any other provision of this Agreement to the contrary, neither the Buyer nor any of its affiliates shall assume, succeed to, be liable for, be subject to, be obligated for, or become responsible for, nor shall the Purchased Assets be subject to, any claims against, or liabilities or obligations of, the Sellers or the Business of whatever nature, whether presently in existence or arising hereafter, that are not Assumed Liabilities, including without limitation any liabilities based on successor liability theories, of, or action against, Sellers or any of their affiliates. Buyer is assuming only the Assumed Liabilities and is not assuming any other claim against, or liability or obligation of, the Sellers of whatever nature. All such other claims and liabilities not being assumed (collectively, the "***Excluded Liabilities***") shall be retained by and remain the liabilities of the Sellers.

4. <u>**Consideration**</u>. The aggregate consideration (the "***Consideration***") for the Purchased Assets shall be an amount equal to the sum of (i) two hundred percent (200%) of the Inventory Amount (the "***Inventory Payment***"); *plus* (ii) Four Hundred Seventy-Five Thousand Dollars ($475,000), subject to adjustment pursuant to <u>Section 7</u> (the "***Cash Payment***" and, together with the Inventory Payment and the Prepayment Amount, the "***Closing Payment***"); *plus* (iii) the Prepayment Amount; *plus* (iv) the assumption of the Assumed Liabilities. The Buyer shall pay, or cause to be paid, the Consideration, as adjusted pursuant to <u>Section 5</u>, to the Sellers by wire transfer of immediately funds to an account or accounts designated by the Sellers in writing prior to the Closing. "***Inventory Amount***" means the aggregate cost of the Sellers' inventory in the Stores on Closing Date, which shall be determined by the inventory reflected in the Sellers' POS System on the Closing Date with respect to each Store as mutually agreed upon in good faith by Buyer and Sellers and set forth on the Lease Certificate (as defined below). "***POS System***" means the point-of-sale system used by the Sellers at the Stores as of the Closing Date. Following Buyer's request, Sellers shall provide Buyer with backup, in form and substance reasonably acceptable to Buyer, to substantiate the Inventory Amount based upon the average cost of the inventory item at the SKU level.

5. <u>**Deposit Amount**</u>. On or about February 6, 2023, Buyer paid to the Sellers a deposit in the amount of Two Hundred Fifty Thousand Dollars ($250,000) (the "***Deposit Amount***"). Except as set forth in <u>Section 11(c)</u>, the Deposit Amount is non-refundable; provided, however, that the Deposit Amount shall be credited against the Consideration otherwise paid at the Closing by Buyer.

6. **Rent, Deposits, and Prepayments**. Buyer shall pay, or cause to be paid, to the Sellers, the aggregate amount of all deposits, prepayments and other amounts retained by the Buyer in connection with any Store or Store Lease subsequent to the Closing, as set forth in the Lease Certificate (the "***Prepayment Amounts***"). To the extent that Closing occurs prior to February 28, 2023, Buyer shall pay, or cause to be paid, to the Sellers the Buyer's prorated share of the rent under each Store Lease for any portion of the month of February 2023 during which the Buyer occupies the Store with respect to each such Store Lease. Buyer shall pay, or cause to be paid, to the applicable landlord the amount of rent due under each Store Lease for the month of March 2023 when such rent becomes due and payable and otherwise in accordance with the terms of the applicable Store Lease (but not before Closing in any event); provided however, if Closing occurs after March 1, 2023, Buyer shall pay the March 2023 rent due under each Store Lease for the month of March 2023, and Seller shall provide Buyer a credit in the amount of the prorated share of the rent under each Store Lease for any portion of the month of March 2023 during which the Seller occupies the Store with respect to each such Store Lease (the "***Rent Credit***").

7. **Cash Payment Adjustment**. Any Rent Credit or outstanding amounts of any pre-Closing liabilities under the Store Leases (excluding the 2022 CAM Reconciliations) and any amounts necessary to cure any defaults with respect thereto shall be paid from, or shall reduce, dollar-for-dollar, the Cash Payment made by Buyer at the Closing.

8. **Closing**. The closing (the "***Closing***") of the transactions contemplated by this Agreement (the "***Contemplated Transactions***") shall take place remotely on the date (the "***Closing Date***") that is the first business day following the date on which all conditions to the obligations of Sellers and Buyer to consummate the Contemplated Transactions set forth in <u>Section 10</u> (other than conditions with respect to actions Sellers or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or at such other time or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto; <u>provided</u>, <u>however</u>, that the parties shall use reasonable best efforts to effectuate the Closing on or before February 28, 2023.

9. **Closing Deliverables**.

(a) <u>Sellers' Closing Deliverables</u>: At or prior to the Closing, Sellers shall deliver to Buyer the following documents and other items:

(i) a bill of sale, in form reasonably satisfactory to the parties (the "***Bill of Sale***"), duly executed by the Sellers;

(ii)     an assignment and assumption agreement, in form reasonably satisfactory to the parties (the "***Assignment and Assumption Agreement***"), duly executed by the Sellers;

(iii)     an intellectual property assignment agreement, in form reasonably satisfactory to the parties (the "***IP Assignment***"), duly executed by the Sellers;

(iv)     a certificate (the "***Lease Certificate***"), duly executed by IPP Holdings, setting forth (i) the aggregate cost of the Sellers' inventory in the Stores on Closing Date, which shall be determined by the inventory reflected in the Sellers' POS System on the Closing Date with respect to each Store and (ii) the Prepayment Amounts with respect to each Store as of the Closing Date;

(v)     the Stalking Horse APA Amendment (as defined below), duly executed by the parties thereto; and

(vi)     a license agreement, in form reasonably satisfactory to the parties (the "***License Agreement***"), duly executed by Sellers, with respect to any Stalking Horse Assets reasonably required with respect to operation of the Stores for a reasonable period, not to exceed sixty (60) days, following the Closing.

(b)     <u>Buyer's Closing Deliverables</u>: At or prior to the Closing, Buyer shall deliver to the Sellers the following documents and other items:

(i)     the Closing Payment;

(ii)     the Bill of Sale, duly executed by the Buyer;

(iii)     the Assignment and Assumption Agreement, duly executed by the Buyer;

(iv)     the IP Assignment, duly executed by the Buyer;

(v)     the Lease Certificate, duly executed by the Buyer; and

(vi)     the License Agreement, duly executed by the Buyer.

10.     **<u>Closing Conditions</u>**.

(a)     Buyer's obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or waiver (to the extent waiveable) of the following conditions:

(i)     entry of a final order by the Bankruptcy Court granting the Motion to Sell and approving the Contemplated Transactions by no later than March 7, 2023 and there is no pending stay or motion to stay (the "***Bankruptcy Court Approval***");

(ii)      receipt of the written consent of the Secured Lenders constituting the Required Lenders under and as defined in the DIP Agreement for the Contemplated Transactions (the "**Lender Group Approval**");

(iii)      receipt of an amendment to the Stalking Horse APA, duly executed by all of the parties thereto, in form reasonably satisfactory to the Buyer, to remove the Purchased Assets from the assets to be purchased by the Stalking Horse Purchaser thereunder (the "**Stalking Horse APA Amendment**"); and

(iv)      delivery of the documents set forth in <u>Section 9(a)</u> by the Sellers to the Buyer.

(b)      The Sellers' obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or waiver (to the extent waiveable) of the following conditions:

(i)      receipt of the Bankruptcy Court Approval;

(ii)      receipt of Lender Group Approval; and

(iii)      delivery of the documents set forth in <u>Section 9(b)</u> by the Buyer to the Sellers.

11.      <u>**Termination**</u>.

(a)      At any time prior to the Closing, this Agreement may be terminated in accordance with this <u>Section 11(a)</u> and the Contemplated Transactions abandoned:

(i)      by the mutual written consent of Buyer, on the one hand, and Sellers, on the other hand; or

(ii)      by written notice from Buyer to Sellers or the Sellers to the Buyer, if one or more of the conditions set forth in <u>Section 10</u> cannot be satisfied.

(b)      In the event of termination of this Agreement pursuant to <u>Section 11(a)</u>, this Agreement shall become null and void and of no further force and effect, except (i) as otherwise expressly set forth herein and (ii) that <u>Sections 11(b)</u>, <u>11(c)</u>, <u>12(a)</u>, and <u>15</u> shall survive any termination of this Agreement.

(c)      The Sellers shall have no obligation to refund any portion of the Deposit Amount. Notwithstanding the foregoing, in the event that this Agreement is terminated pursuant to <u>Section 11</u> due to (i) the failure of the Sellers and the Stalking Horse Purchaser to enter into and adopt the Stalking Horse APA Amendment or (ii) the failure of the Sellers to obtain the Bankruptcy Court Approval, then the Sellers shall refund and pay to the Buyer an amount equal to the Deposit Amount within five (5) business days following termination of this Agreement.

12. **Covenants**.

(a)     Following the Closing, Buyer shall follow and comply with Sellers' policies and procedures, in place as of the Closing, and applicable law with respect to the collection, storage, maintenance, and use of personal information, including, without limitation, the Customer Records and the Program Data, and Buyer shall use any and all personal information, including, without limitation, any personally identifiable information of any customers of the Sellers residing in the State of California, Customer Records, and the Program Data, acquired in connection with this Agreement or the Contemplated Transactions in accordance with the California Consumer Privacy Act, as amended from time to time, including, without limitation, by the California Privacy Rights Act, and shall not materially alter how Buyer uses or shares such personal information, including, without limitation, Customer Records and the Program Data, unless Buyer provides written notice of its new or changed practices with respect to such use or sharing of personal information to such customers, all upon the terms and conditions necessary to satisfy all statutory and regulatory requirements.

(b)     The Sellers shall use commercially reasonable efforts to assume and assign the Store Leases in accordance with Section 365 of the Bankruptcy Code.

(c)     Within sixty (60) days following the Closing, the Buyer shall use its best efforts to re-brand each Store operating under the "Kriser's Natural Pet" banner to the "Natural Pawz" banner and from and after such date neither Buyer nor any of its successors or assigns shall use "Kriser's Natural Pet" or any similar name in connection with the operation of its business or otherwise in connection with the acquired Stores.

(d)     The Sellers shall continue to operate the Stores in ordinary course of their business through the Closing Date but shall not be obligated to replenish inventories at any Store from the date hereof through the earlier to occur of the Closing Date or February 28, 2023, and the Sellers shall not move inventory from any of their stores that are not included in the Stores, to the Stores without to Buyer's approval, not to be unreasonably withheld.

(e)     Prior to the Closing, Buyer will use commercially reasonable efforts to put in a place a new point-of-sale system at the Stores as of the Closing Date.

13. **Employees**. At least three (3) days prior to the Closing Date, Buyer shall provide Sellers with notice of the employees of the Sellers with respect to the Stores that Buyer intends to offer employment (the "***Business Employees***"); provided, however, that Buyer shall not provide an offer of employment to any Employee (as defined in the Stalking Horse APA) set forth on Schedule 6.4 of the Stalking Horse APA. Upon reasonable request by Buyer, the Sellers shall cooperate with and shall not impair Buyer's efforts to obtain the employment of such Business Employees. Each Business Employee who receives and accepts such offer of employment prior to the Closing and commences work with Buyer on or promptly after the Closing Date shall be referred to herein as a "Transferred Employee." The Buyer shall assume, and be responsible for, all liabilities and obligations after the Closing arising from, or related to, any Transferred Employee, and the Buyer expressly disclaims, waives, and releases the Sellers

and their respective officers, directors, managers and employees from any claim or liability on account or, relating to, or with respect to any Business Employee; provided in no event does Buyer assume any liabilities for any claims (including workers compensation claims) by Transferred Employees that arise due to acts or omissions occurring prior to Closing. The Buyer shall not assume, and shall have no responsibility for, any liabilities or obligations arising from, or related to, any Business Employee who is not a Transferred Employee. Buyer is offering new employment to Transferred Employees and the employer-employee relationship between each Transferred Employee and Buyer shall commence at Closing. Nothing herein, express or implied, shall confer upon any employee or former employee of any Seller any rights or remedies (including any right to employment or continued employment for any specified period) of any nature or kind whatsoever, under or by reason of this Agreement. Buyer and Sellers agree that the provisions contained herein are not intended to be for the benefit of or otherwise be enforceable by, any third party, including any employee or former employee of Sellers.

14. **Waiver**. TO THE FULLEST EXTENT PERMITTED BY LAW, SELLERS HEREBY DISCLAIM, AND BUYER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES AND RELEASES ANY AND ALL ACTUAL OR POTENTIAL RIGHTS BUYER MAY HAVE AGAINST ANY SELLER OR ANY AFFILIATE OF ANY SELLER REGARDING ANY FORM OF WARRANTY, EXPRESS OR IMPLIED, OF ANY KIND OR TYPE, RELATING TO ANY PURCHASED ASSET OR ASSUMED LIABILITY.

15. **Miscellaneous**. At any time and from time to time after the Closing, at Buyer's reasonable request and without further consideration, the Sellers shall execute and deliver to Buyer such other instruments of sale, transfer, conveyance, assignment, and confirmation, provide such materials and information and take such other actions as Buyer may reasonably deem necessary or desirable in order to more effectively transfer, convey, and assign to Buyer, and to confirm the foregoing assignment and Buyer's rights to all of the Purchased Assets, and, to the fullest extent permitted by law, the Assumed Liabilities. This Agreement may not be amended, modified, altered, or supplemented other than by means of a written instrument duly executed and delivered on behalf of Buyer and the Sellers. If any one or more of the provisions of this Agreement shall be determined to be invalid, illegal, or unenforceable in any respect under any applicable law, the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired; provided, however, that in any such case the parties agree to use their best efforts to achieve the purpose of the invalid provision by a new legally valid provision. This Agreement shall be interpreted and construed according to, and governed by, the laws of the State of Delaware, excluding any such laws that might direct the application of the laws of another jurisdiction. All costs and expenses incurred in connection with this Agreement and the Contemplated Transactions shall be paid by the party incurring such costs and expenses. Except as otherwise provided herein, references to Sections and Schedules herein are references to Sections and Schedules of this Agreement. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile or portable document format (PDF) signatures will be deemed to be original signatures for all applicable purposes.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the parties have duly executed this Asset Purchase Agreement as of the date first above written.

**SELLERS:**

**INDEPENDENT PET PARTNERS HOLDINGS, LLC**

By _____
    Name: Julie Maday
    Title:  Chief Executive Officer

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS I, LLC**

By _____
    Name: Julie Maday
    Title:  Chief Executive Officer

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS II, LLC**

By _____
    Name: Julie Maday
    Title:  Chief Executive Officer

**INDEPENDENT PET PARTNERS EMPLOYER HOLDINGS, LLC**

By _____
    Name: Julie Maday
    Title:  Chief Executive Officer

**INDEPENDENT PET PARTNERS EMPLOYER, LLC**

By _____
    Name: Julie Maday
    Title:  Chief Executive Officer

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS, LLC**

By _____
    Name: Julie Maday
    Title:  Chief Executive Officer

**IPP - STORES, LLC**

By _____
    Name: Julie Maday
    Title:  Chief Executive Officer

**IPP STORES EMPLOYER, LLC**

By _____
    Name: Julie Maday
    Title:  Chief Executive Officer

**PET LIFE, LLC**

By _____
    Name: Julie Maday
    Title:  Chief Executive Officer

**ESPECIALLY FOR PETS, LLC**

By _____
    Name: Julie Maday
    Title:  Chief Executive Officer

**WHOLE PET CENTRAL, LLC**

By _____
   Name: Julie Maday
   Title:  Chief Executive Officer

**NATURAL PAWZ, LLC**

By _____
   Name: Julie Maday
   Title:  Chief Executive Officer

**PET SOURCE, LLC**

By _____
   Name: Julie Maday
   Title:  Chief Executive Officer

**BUYER:**

**NP ACQUISITION LLC**

By _____

Name: C.L. Picone

Title: CEO

## SCHEDULE A

## Schedule of Additional Seller Entities

1. Independent Pet Partners Intermediate Holdings I, LLC, a Delaware limited liability company

2. Independent Pet Partners Intermediate Holdings II, LLC, a Delaware limited liability company

3. Independent Pet Partners Employer Holdings, LLC, a Delaware limited liability company

4. Independent Pet Partners Employer, LLC, a Delaware limited liability company

5. Independent Pet Partners Intermediate Holdings, LLC, a Delaware limited liability company

6. IPP - Stores, LLC, a Delaware limited liability company

7. IPP Stores Employer, LLC, a Delaware limited liability company

8. Pet Life, LLC, a Delaware limited liability company

9. Especially for Pets, LLC, a Delaware limited liability company

10. Whole Pet Central, LLC, a Delaware limited liability company

11. Natural Pawz, LLC, a Delaware limited liability company

12. Pet Source, LLC, a Delaware limited liability company

**SCHEDULE B**

**Schedule of Stores**

| Store No. | Store | Location |
|---|---|---|
| 338178 | Kriser's Natural Pet | 20th Street, Houston, Texas |
| 338181 | Kriser's Natural Pet | Austin Arboretum, Austin Texas |
| 338176 | Kriser's Natural Pet | Buffalo, Texas |
| 338177 | Kriser's Natural Pet | Champions, Texas |
| 338184 | Kriser's Natural Pet | South Lamar, Texas |
| 338180 | Kriser's Natural Pet | Stone Oak, Texas |
| 338182 | Kriser's Natural Pet | West Gray, Texas |
| 338179 | Kriser's Natural Pet | Woodland Hughes, Texas |
| 338185 | Natural Pawz | Bridgeland, Texas |
| 338186 | Natural Pawz | Cedar Park, Texas |
| 338188 | Natural Pawz | Cypress, Texas |
| 338189 | Natural Pawz | Garden Oaks, Texas |
| 338191 | Natural Pawz | Kingwood, Texas |
| 338224 | Natural Pawz | Montrose, Texas |
| 338195 | Natural Pawz | Pinecroft, Texas |
| 338215 | Natural Pawz | Riverstone, Texas |
| 338198 | Natural Pawz | Springwoods, Texas |
| 338199 | Natural Pawz | Steiner Ranch, Texas |
| 338200 | Natural Pawz | Sterling Ridge, Texas |
| 338201 | Natural Pawz | Sugarland, Texas |
| 338230 | Natural Pawz | Tanglewood, Texas |
| 338203 | Natural Pawz | Vintage Park, Texas |
| 338236 | Natural Pawz | Washington Ave., Houston, Texas |
| 338204 | Natural Pawz | West University, Texas |

**SCHEDULE C**

**Schedule of Store Leases**

[Prepayment Amounts and Security Deposits to be updated by the parties at Closing]

| Store No. | Store | Location | Lease | Prepayment Amounts | Security Deposits |
|---|---|---|---|---|---|
| 338178 | Kriser's Natural Pet | 20th Street, Houston, Texas | Lease Agreement, dated December 6, 2013, by and between Rutland & 20th Realty Ltd., as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant, as amended by that certain First Amendment to Lease, dated February 13, 2014. | | $7,500.00 |
| 338181 | Kriser's Natural Pet | Austin Arboretum, Austin, Texas | Sublease, dated June 8, 2016, by and between Vitamin Shoppe Industries Inc., as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant. | | N/A |

131871514v.8

| 338176 | Kriser's Natural Pet | Buffalo, Texas | Lease, dated October 10, 2013, by and between Plaza In the Park (Edens), LLC, successor to AmREIT Plaza In The Park, LP, as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant, as amended by that certain First Amendment to Lease, dated March 1, 2019, and Second Amendment to Lease, dated March 1, 2022. | $7,083.33 |
| 338177 | Kriser's Natural Pet | Champions, Texas | Shopping Center Lease, dated March 24, 2014, by and between Vintage Marketplace Ltd., as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant. | $7,872.00 |
| 338184 | Kriser's Natural Pet | South Lamar, Texas | Lease Agreement, dated July 12, 2017, by and between Mirabeau Office Partners, LLC, as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant. | N/A |

13187514v.8

| 338180 | Kriser's Natural Pet | Stone Oak, Texas | Standard Commercial Shopping Center Lease, dated September 2, 2015, by and between Sonterra Village, L.P., as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant, as amended by that certain Lease Amendment, dated August 14, 2020, and Second Lease Amendment and Extension Agreement, dated September 9, 2022. | | $8,550.00 |
| 338182 | Kriser's Natural Pet | West Gray, Texas | Shopping Center Lease, dated June 6, 2016, by and between W. Gray & Peden Realty, Ltd., as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant. | | $11,992.50 |
| 338179 | Kriser's Natural Pet | Woodland Hughes, Texas | Retail Row Lease, dated October 31, 2014, by and between HHC Hughes Landing Retail, LLC, successor to HL Retail Row, LLC, as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant | | $10,001.58 |
| 338185 | Natural Pawz | Bridgeland, Texas | Lease Agreement, dated November 9, 2015, by and between Cypress Creek Plaza, LLC, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant. | | N/A |

13187151v.8

| 338186 | Natural Pawz | Cedar Park, Texas | Shopping Center Lease, dated August 13, 2015, by and between Lakeline Center Cedar Park Phase IV LTD, as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., as tenant, as amended by that certain Assignment and Assumption of Lease and Consent, dated August 3, 2018, and Amendment to Lease #2, dated June 1, 2021. | N/A |
| 338188 | Natural Pawz | Cypress, Texas | Shopping Center Lease Agreement, dated July 25, 2012, by and between IA Cypress Cyfair Limited Partnership, successor to Inland American Retail Management, LLC, as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant, as amended by that certain Lease Extension Agreement, dated October 5th, 2017, Assignment and Assumption of Lease and Amendment to Lease, dated August 9, 2018, and Lease Amendment, dated August 8, 2022. | $3,942.00 |

13187514v.8

| 338189 | Natural Pawz | Garden Oaks, Texas | Retail Lease, dated June 26, 2017, by and between The Shops at Oak Forest, LP, as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., as tenant, as amended by that certain Assignment and Assumption of Lease and Consent, dated July 30, 2018. | | N/A |
| 338191 | Natural Pawz | Kingwood, Texas | Lease, dated May 28, 2013, by and between LH North Park, LLC, successor to NEC Northpark/59, L.C., as landlord and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant, as amended by that certain Assignment and Assumption of Lease and Consent, dated August 2, 2018. | | $4,786.67 |
| 338224 | Natural Pawz | Montrose, Texas | Commercial Lease Agreement, dated March 12, 2019, by and between Tommey-Guseman Family Limited Partnership, as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant | | N/A |

13187514v.8

| 338195 | Natural Pawz | Pinecroft, Texas | Shopping Center Lease, dated October 20, 2009, by and between CSHV Woodlands, L.P., as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., as tenant, as amended by that certain First Amendment to Shopping Center Lease, dated December 5, 2014, Consent to Assignment of Lease, dated August 3, 2018, Assignment and Assumption of Lease, dated December 2, 2019, and Second Amendment to Shopping Center Lease, dated October 25, 2021, | $4,486.81 |
| 338215 | Natural Pawz | Riverstone, Texas | Shopping Center Lease, dated May 5, 2017, by and between The Village at Riverstone, LLC, as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant, as amended by that certain Assignment and Assumption Agreement, dated August 2, 2018, First Modification to Lease Agreement, dated September 20, 2018, Second Modification to Lease Agreement, dated January 7, 2019, and Assignment and Assumption of Lease, dated October 2019. | N/A |

13187151v.8

| 338198 | Natural Pawz | Springwoods, Texas | Shopping Center Lease, dated April 13, 2017, by and between Spring Stuebner RRC I Inc., as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant, as amended by that certain Assignment and Assumption of Lease, dated October 2019. | | N/A |
| 338199 | Natural Pawz | Steiner Ranch, Texas | Lease Agreement, dated November 6, 2015, by and between Whitestone Quinlan Crossing LLC, as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant, as amended by that certain Assignment of Lease Interest, dated August 9, 2018, Assignment and Assumption of Lease, dated October 2019, and Second Amendment to Lease, dated March 3, 2022. | | $4,830.05 |

13187151v.8

| 338200 | Natural Pawz | Sterling Ridge, Texas | Shopping Center Lease, dated June 14, 2005, by and between REG8 Sterling Ridge, LLC, successor to Regency Centers, L.P., as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant, as amended by that certain First Modification to Lease Agreement, dated June 22, 2010, Second Modification to Lease, dated April 29, 2015, Third Modification to Lease, dated August 31, 2016, Assignment and Assumption Agreement, dated August 2, 2018, Omnibus Rent Deferral Lease Amendment, dated July 1, 2020, Fourth Modification to Lease, dated December 7, 2021, Fifth Modification to Lease, dated June 15, 2022, and Sixth Modification to Lease. | $4,062.67 |

{10971975:23 }

131871514v.8

| 338201 | Natural Pawz | Sugarland, Texas | Lease Amendment, dated April 8, 2008, by and between Lake Pointe Shopping Center, LP, successor to Lake Pointe Town Center, Ltd., as landlord, and JC&P Enterprises, LLC, d/b/a Natural Pawz, as tenant, as amended by that certain First Amendment to Lease, dated April 30, 2013, and Second Amendment to Lease, dated December 15, 2017. | | $5,286.67 |
| 338230 | Natural Pawz | Tanglewood, Texas | Retail Lease Agreement, dated April 30, 2019, by and between SCC Tanglewood LP, successor to MBL 2200 Main II, LLC, as landlord, and IPP – Stores, LLC, as tenant, as amended by that certain First Amendment to Retail Lease Agreement, dated August 22, 2019. | | N/A |

13187514v.8

| 338203 | Natural Pawz | Vintage Park, Texas | Shopping Center Lease, dated April 6, 2011, by and between Vintage Marketplace LTD, successor to Vintage Park LLC, as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., as tenant, as amended by that certain First Amendment to Shopping Center Lease, dated January 5, 2016, Second Amendment to Shopping Center Lease, dated June 5, 2020, and Third Amendment to Shopping Center Lease, dated June 1, 2021. | | $3,325.00 |
| 338236 | Natural Pawz | Washington Ave., Houston, Texas | Lease Agreement, dated June 17, 2019, by and between DZ Washington, LLC, as landlord, and IPP – Stores, LLC, as tenant, as amended by that certain First Amendment to Lease Agreement, dated December 2, 2020. | | N/A |

13187151v.8

| 338204 | Natural Pawz | West University, Texas | Shopping Center Lease, dated November 6, 2008, by and between Brixmor West U Marketplace LLC , successor to U West Marketplace Associates, LP, as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., as tenant, as amended by that certain First Amendment to Shopping Center Lease, dated October 23, 2009, Second Amendment to Shopping Center Lease, dated November 4, 2013, Third Amendment to Shopping Center Lease, dated June 28, 2017, Assignment and Assumption of Lease Agreement with Landlord's Consent, date July 31, 2018, and Lease Amendment No. 4, dated September 2, 2022. | $3,106.00 |

131871514v.8

**SCHEDULE D**

**Purchased IP**

Registered Trademarks:

| Jurisdiction | Registration No. | Registration Date | Filing Date | Mark |
|:---:|:---:|:---:|:---:|:---:|
| USA | 3718921 | 12/01/09 | 02/08/08 | NATURAL PAWZ |

Social Media Accounts:

1. https://www.facebook.com/NaturalPawz

2. https://www.instagram.com/naturalpawz/

3. https://www.linkedin.com/company/natural-pawz/

4. https://twitter.com/NaturalPawz

Registered Domain Names:

1. e-naturalpawz.com

2. NATURALPAWZ.COM

3. naturalpawz.org

**Exhibit 2**

**Unexpired Leases**

|  | **Location of Unexpired Lease of Real Property** | **Contact Information for Counterparty to Unexpired Lease** | **Cure Amount** |
|---|---|---|---|
| 1. | 20th Street, Houston, Texas | c/o Braun Enterprises<br>3217 Montrose, Ste 200<br>Houston, TX 77006 | $0.00 |
| 2. | Austin Arboretum, Texas | Vitamin Shoppe Industries Inc.<br>2101-91st Street<br>North Bergen, NJ 07047 | $0.00 |
| 3. | Bridgeland, Texas | Cypress Creek Plaza, LLC<br>1400 Post Oak Blvd., Suite 650<br>Houston, TX 77056 | $0.00 |
| 4. | Buffalo, Texas | c/o Edens Limited Partnership<br>1221 Main St, Suite 1000<br>Columbia, SC 29201 | $0.00 |
| 5. | Cedar Park, Texas | Lakeline Center Cedar Park Phase IV LTD<br>PO Box 684807<br>Austin, TX 78763 | $0.00 |
| 6. | Champions, Texas | Vintage Marketplace LTD<br>1900 W Loop S, Suite 1250<br>Houston, TX 77027 | $0.00 |
| 7. | Cypress, Texas | IA Cypress Cyfair Limited Partnership<br>25704 Northwest Freeway Suit G<br>Cypress, TX 77429 | $2,587.08 |
| 8. | Garden Oaks, Texas | The Shop at Oak Forest LP<br>5599 San Felipe Street, Suite 110<br>Houston, TX 77056 | $0.00 |
| 9. | Kingwood, Texas | LH North Park, LLC,<br>25653 US Hwy 59<br>Kingwood, TX 77339 | $0.00 |
| 10 | Montrose, Texas | Toomey-Guseman FLP<br>26400 Kuykendahl Rd. Ste C180-312<br>The Woodlands, TX 77375 | $0.00 |
| 11 | Pinecroft, Texas | c/o Fidelis Realty Partners 4500<br>Bissonnet St, Ste 200<br>Bellaire, TX 77401 | $0.00 |
| 12 | Riverstone, Texas | c/o Regency Centers Corporation<br>One Independent Drive, Suite 114<br>Jacksonville, FL 32202-5019 | $0.00 |

| 13 | South Lamar, Texas | Mirabeau Office Partners, LLC - 55<br>PO Box 50550<br>Austin, TX 78763 | $0.00 |
| 14 | Springwoods, Texas | c/o Regency Centers Corporation<br>One Independent Drive, Suite 114<br>Jacksonville, FL 32202-5019 | $0.00 |
| 15 | Steiner Ranch, Texas | c/o Whitestone REIT<br>2600 South Gessner Rd, Suite 500<br>Houston, TX 77063 | $0.00 |
| 16 | Sterling Ridge, Texas | Regency Centers<br>One Independent Drive Suite 114<br>Jacksonville, FL 32202 | $0.00 |
| 17 | Stone Oak, Texas | c/o InvenTrust Property Management,<br>LLC<br>3025 Highland Pkwy, Suite 350<br>Downers Grove, IL 60515 | $164.35 |
| 18 | Sugarland, Texas | c/o Invesco Advisers, Inc.<br>2001 Ross Avenue, Suite 3400<br>Dallas, TX 75201 | $0.00 |
| 19 | Tanglewood, Texas | c/o SITE Centers Corp<br>3300 Enterprise Pkwy<br>Beachwood, OH 44122 | $0.00 |
| 20 | Vintage Park, Texas | Vintage Park LLC<br>1400 Post Oak Boulevard, Suite 150<br>Houston, TX 77056 | $0.00 |
| 21 | Washington Ave, Houston, Texas | DZ Washington, LLC<br>9225 Katy Freeway Suite 208<br>Houston, TX 77024 | $0.00 |
| 22 | West Gray, Texas | c/o Braun Enterprises<br>3217 Montrose, Ste 200<br>Houston, TX 77006 | $0.00 |
| 23 | West University, Texas | c/o Brixmor Property Group, Inc<br>450 Lexington Ave, 13th Floor<br>New York, NY 10017 | $0.00 |
| 24 | Woodland Hughes, Texas | c/o The Woodlands Land Development<br>Company L.P.,<br>1790 Hughes Landing Blvd., Suite 600<br>The Woodlands, TX 77380 | $0.00 |

## EXHIBIT B

## Store List

**SCHEDULE B**

**Schedule of Stores**

| Store No. | Store | Location |
|-----------|-------|----------|
| 338178 | Kriser's Natural Pet | 20th Street, Houston, Texas |
| 338181 | Kriser's Natural Pet | Austin Arboretum, Austin Texas |
| 338176 | Kriser's Natural Pet | Buffalo, Texas |
| 338177 | Kriser's Natural Pet | Champions, Texas |
| 338184 | Kriser's Natural Pet | South Lamar, Texas |
| 338180 | Kriser's Natural Pet | Stone Oak, Texas |
| 338182 | Kriser's Natural Pet | West Gray, Texas |
| 338179 | Kriser's Natural Pet | Woodland Hughes, Texas |
| 338185 | Natural Pawz | Bridgeland, Texas |
| 338186 | Natural Pawz | Cedar Park, Texas |
| 338188 | Natural Pawz | Cypress, Texas |
| 338189 | Natural Pawz | Garden Oaks, Texas |
| 338191 | Natural Pawz | Kingwood, Texas |
| 338224 | Natural Pawz | Montrose, Texas |
| 338195 | Natural Pawz | Pinecroft, Texas |
| 338215 | Natural Pawz | Riverstone, Texas |
| 338198 | Natural Pawz | Springwoods, Texas |
| 338199 | Natural Pawz | Steiner Ranch, Texas |
| 338200 | Natural Pawz | Sterling Ridge, Texas |
| 338201 | Natural Pawz | Sugarland, Texas |
| 338230 | Natural Pawz | Tanglewood, Texas |
| 338203 | Natural Pawz | Vintage Park, Texas |
| 338236 | Natural Pawz | Washington Ave., Houston, Texas |
| 338204 | Natural Pawz | West University, Texas |

# EXHIBIT C

**Exhibit Notice (APA)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| INDEPENDENT PET PARTNERS | ) |
| HOLDINGS, LLC, *et al.*,[1] | ) Case No. 23-10153 (LSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) Ref. Docket No. 88 and 167 |
| | ) |

## NOTICE OF FILING OF EXHIBIT

**PLEASE TAKE NOTICE** that, on February 10, 2023, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Motion of Debtors for Entry of an Order (A) Approving the Private Sale of Certain of Debtors' Assets Free and Clear of Liens, Claims, and Encumbrances, with Such Interests to Attach to the Proceeds, (B) Authorizing the Assumption and Assignment of Certain Nonresidential Real Property Leases to Buyer, and (C) Granting Related Relief (NP Acquisition LLC)* [D.I. 88] (the "Motion")[2] with the United States Bankruptcy Court for the District of Delaware. Attached to the Motion was a proposed form of order approving the relief sought in the Motion (the "Proposed Sale Order").

**PLEASE TAKE FURTHER NOTICE** that, on February 22, 2023, the Debtors filed a revised version of the Proposed Sale Order (the "Revised Proposed Sale Order") [D.I. 167]. Attached hereto is **Exhibit 1** to the Revised Proposed Order, the Purchase Agreement.

*[Signature page follows]*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Independent Pet Partners Holdings, LLC (5913), Independent Pet Partners Intermediate Holdings I, LLC (4827), Independent Pet Partners Intermediate Holdings II, LLC (7550), Independent Pet Partners Employer Holdings, LLC (6785), Independent Pet Partners Employer, LLC (7531), Independent Pet Partners Intermediate Holdings, LLC (8793), IPP - Stores, LLC (6147), IPP Stores Employer, LLC (0847), Especially For Pets, LLC (6801), Pet Life, LLC (3420), Whole Pet Central, LLC (7833), Natural Pawz, LLC (5615), and Pet Source, LLC (1905). The corporate headquarters and the mailing address for the Debtors is 8450 City Centre Dr., Woodbury, MN 55125.

[2]    All Capitalized terms used but not otherwise defined herein shall be given the meanings ascribed to them in the Motion.

Dated: February 23, 2023
Wilmington, Delaware

Respectfully submitted,

/s/ *S. Alexander Faris*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Andrew L. Magaziner (No. 5426)
S. Alexander Faris (No. 6278)
Kristin L. McElroy (No. 6871)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile:  (302) 571-1253
Email:  amagaziner@ycst.com
        afaris@ycst.com
        kmcelroy@ycst.com

- and -

**MCDONALD HOPKINS LLC**
David A. Agay
Marc Carmel
Joshua Gadharf
Maria G. Carr
Ashley Jericho
300 North LaSalle Street, Suite 1400
Chicago, Illinois 60654
Telephone: (312) 280-0111
Facsimile:  (312) 280-8232
Email: dagay@mcdonaldhopkins.com
        mcarmel@mcdonaldhopkins.com
        jgadharf@mcdonaldhopkins.com
        mcarr@mcdonaldhopkins.com
        ajericho@mcdonaldhopkins.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## **Exhibit 1**

**Purchase Agreement**

30143300.1

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "***Agreement***"), is made and entered into as of February 22, 2023, by and among NP Acquisition LLC, a Texas limited liability company (the "***Buyer***"), Independent Pet Partners Holdings, LLC, a Delaware limited liability company ("***IPP Holdings***"), and each of the subsidiaries of IPP Holdings set forth on <u>Schedule A</u> attached hereto (collectively, the "***Seller Subsidiaries***" and together with IPP Holdings, the "***Sellers***").

## RECITALS

WHEREAS, Sellers presently conduct the business of operating retail pet stores in several states and over the internet (collectively, the "***Business***");

WHEREAS, on February 5, 2023, Sellers filed voluntary petitions for relief (the "***Chapter 11 Cases***") pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended (the "***Bankruptcy Code***"), with the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***");

WHEREAS, on February 5, 2023, Sellers entered into that certain Asset Purchase Agreement (the "***Stalking Horse APA***") with IPP Buyer Acquisition, LLC (the "***Stalking Horse Purchaser***"), the designee of certain lenders under the Sellers' DIP Agreement, Prepetition Priming Credit Agreement, Prepetition ABL Credit Agreement, and Prepetition DDTL Credit Agreement (each as defined in the Stalking Horse APA) (collectively, the "***Secured Lenders***") with respect to the acquisition of certain of the Sellers' assets as a going-concern in a sale process under Section 363 of the Bankruptcy Code, which is to be amended as provided in the Stalking Horse APA Amendment (as defined below); and

WHEREAS, Sellers desire to sell, transfer and assign to Buyer a portion of the assets covered by the Stalking Horse APA, and Buyer desires to acquire and assume from Sellers, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets (as defined below) and the Assumed Liabilities (as defined below) upon the terms and subject to the conditions set forth herein.

WHEREAS, Sellers filed that *Motion of Debtors for Entry of Order (A) Approving the Private Sale of Certain of Debtors' Assets Free and Clear of Liens, Claims, and Encumbrances, with Such Interests to Attach to the Proceeds, (B) Authorizing the Assumption and Assignment of Certain Nonresidential Real Property Leases to Buyer, and (C) Granting Related Relief (NP Acquisition LLC)* [Doc. No. 88] (the "***Motion to Sell***") in the Bankruptcy Court on February 10, 2023 requesting that the Court approve the acquisition and assumption of the Purchased Assets and the Assumed Liabilities, upon the terms and subject to the conditions set forth herein.

**NOW THEREFORE**, for and in consideration of the foregoing premises, and for other good and valuable consideration, the receipt and sufficiency are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

{10971975:23 }

1.     __Purchase and Sale of Purchased Assets__. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer hereby purchases, acquires and accepts from Sellers, on an "as is, where is" basis and without any representation or warranty on the part of Sellers as to fitness, merchantability or otherwise, and Sellers hereby sell, transfer, assign, convey and deliver to Buyer, all of the Purchased Assets, for the consideration set forth in Section 4. "__*Purchased Assets*__" means all of the direct or indirect right, title and interest of Sellers in and to (i) the inventory, furniture, fixtures, and equipment (excluding the Freezers) for and associated with the stores and only the stores set forth on Schedule B (collectively, the "__*Stores*__"); (ii) real estate leases associated with the Stores (and only such Stores) set forth on Schedule C, including, without limitation, all deposits, prepayments, and other similar amounts held or retained by the applicable landlord (which deposits, prepayments, and other similar amounts are listed on Schedule C) and any other credits or amounts due or for the benefit of the counterparties under such leases (the "__*Store Leases*__"); (iii) all trademarks, goodwill, social media accounts, and domain name registrations and corresponding websites related to the "Natural Pawz" business of the Sellers, including, without limitation, such intellectual property set forth on Schedule D (the "__*Purchased IP*__"); (iv) transaction history and customer records with respect to the Stores, including, without limitation, grooming records (the "__*Customer Records*__"); and (v) customer data (the "__*Program Data*__") solely with respect to the gift card and loyalty programs (the "__*Loyalty Programs*__") for the "Kriser's Natural Pet" business and the "Natural Pawz" business solely with respect to customers residing in the State of Texas (the "__*Applicable Customers*__").

2.     __Excluded Assets__. Notwithstanding Section 1, Buyer expressly understands and agrees that Buyer is not purchasing or acquiring, and Sellers are not selling or assigning, any of the following assets, properties, or rights of Sellers (the "__*Excluded Assets*__"): (i) to the extent owned by third parties or vendors, all freezers, and any agreements with any vendors with respect to such freezers, located at the Stores (the "__*Freezers*__"); (ii) any and all intellectual property associated with the Business or any Store, as well as all intellectual property otherwise used or owned by the Sellers (or for which Sellers have any other right, title or interest in), except for the Purchased IP (provided Buyer is obtaining the License Agreement as defined in Section 9 below); (iii) all cash and accounts receivable relating to the Stores; (iv) any asset that is to be included as a "Purchased Asset" under the Stalking Horse APA, other than the Purchased Assets which are removed from the assets covered by the Stalking Horse APA by the Stalking Horse APA Amendment, and Buyer hereby acknowledges that it has been provided a copy of the Stalking Horse APA (the "__*Stalking Horse Assets*__"); and (v) all assets, properties, or rights of the Sellers that are not Purchased Assets, including, without limitation, all contracts, agreements, leases or similar arrangements of the Sellers, other than the Store Leases, and all intangible property of the Sellers, other than the Purchased IP. For the avoidance of doubt, in the event of any conflict between the terms of Section 1 and Section 2(iv) with respect to any asset of any Seller, such asset shall be deemed a Stalking Horse Asset and, as a result, an Excluded Asset; provided, however in all events the Stores, Store Leases, Purchased IP, the Customer Records, and the Program Data, shall not be an Excluded Asset and shall be Purchased Assets.

3.     __Assumption of Assumed Liabilities; No Assumption of Excluded Liabilities__. At the Closing, Buyer hereby assumes and agrees to timely pay, perform, and discharge when

due all liabilities associated with the Purchased Assets, including, without limitation, all amounts owed under each Store Lease, and all liabilities under and with respect to the Loyalty Programs solely with respect to the Applicable Customers (the "***Assumed Liabilities***"); provided, however, that Sellers shall satisfy all pre-Closing liabilities under the Store Leases and amounts owed to each counterparty to each Store Lease to cure defaults under such Store Lease as contemplated by Section 365 of the Bankruptcy Code from the Deposit Amount (as defined below), other than amounts for 2022 reconciliations of CAM, taxes and insurance under the Store Leases (the "***2022 CAM Reconciliations***"), which Buyer shall assume and constitute an Assumed Liability; provided in no event does Buyer assume any liabilities related to claims against Sellers for damage or injury to persons or property arising prior to Closing (including worker's compensation claims) or for any other matters covered by any Seller insurance policies for periods prior to Closing. Notwithstanding any other provision of this Agreement to the contrary, neither the Buyer nor any of its affiliates shall assume, succeed to, be liable for, be subject to, be obligated for, or become responsible for, nor shall the Purchased Assets be subject to, any claims against, or liabilities or obligations of, the Sellers or the Business of whatever nature, whether presently in existence or arising hereafter, that are not Assumed Liabilities, including without limitation any liabilities based on successor liability theories, of, or action against, Sellers or any of their affiliates. Buyer is assuming only the Assumed Liabilities and is not assuming any other claim against, or liability or obligation of, the Sellers of whatever nature. All such other claims and liabilities not being assumed (collectively, the "***Excluded Liabilities***") shall be retained by and remain the liabilities of the Sellers.

4.      **Consideration**. The aggregate consideration (the "***Consideration***") for the Purchased Assets shall be an amount equal to the sum of (i) two hundred percent (200%) of the Inventory Amount (the "***Inventory Payment***"); *plus* (ii) Four Hundred Seventy-Five Thousand Dollars ($475,000), subject to adjustment pursuant to Section 7 (the "***Cash Payment***" and, together with the Inventory Payment and the Prepayment Amount, the "***Closing Payment***"); *plus* (iii) the Prepayment Amount; *plus* (iv) the assumption of the Assumed Liabilities. The Buyer shall pay, or cause to be paid, the Consideration, as adjusted pursuant to Section 5, to the Sellers by wire transfer of immediately funds to an account or accounts designated by the Sellers in writing prior to the Closing. "***Inventory Amount***" means the aggregate cost of the Sellers' inventory in the Stores on Closing Date, which shall be determined by the inventory reflected in the Sellers' POS System on the Closing Date with respect to each Store as mutually agreed upon in good faith by Buyer and Sellers and set forth on the Lease Certificate (as defined below). "***POS System***" means the point-of-sale system used by the Sellers at the Stores as of the Closing Date. Following Buyer's request, Sellers shall provide Buyer with backup, in form and substance reasonably acceptable to Buyer, to substantiate the Inventory Amount based upon the average cost of the inventory item at the SKU level.

5.      **Deposit Amount**. On or about February 6, 2023, Buyer paid to the Sellers a deposit in the amount of Two Hundred Fifty Thousand Dollars ($250,000) (the "***Deposit Amount***"). Except as set forth in Section 11(c), the Deposit Amount is non-refundable; provided, however, that the Deposit Amount shall be credited against the Consideration otherwise paid at the Closing by Buyer.

6.     **Rent, Deposits, and Prepayments**. Buyer shall pay, or cause to be paid, to the Sellers, the aggregate amount of all deposits, prepayments and other amounts retained by the Buyer in connection with any Store or Store Lease subsequent to the Closing, as set forth in the Lease Certificate (the "***Prepayment Amounts***"). To the extent that Closing occurs prior to February 28, 2023, Buyer shall pay, or cause to be paid, to the Sellers the Buyer's prorated share of the rent under each Store Lease for any portion of the month of February 2023 during which the Buyer occupies the Store with respect to each such Store Lease. Buyer shall pay, or cause to be paid, to the applicable landlord the amount of rent due under each Store Lease for the month of March 2023 when such rent becomes due and payable and otherwise in accordance with the terms of the applicable Store Lease (but not before Closing in any event); provided however, if Closing occurs after March 1, 2023, Buyer shall pay the March 2023 rent due under each Store Lease for the month of March 2023, and Seller shall provide Buyer a credit in the amount of the prorated share of the rent under each Store Lease for any portion of the month of March 2023 during which the Seller occupies the Store with respect to each such Store Lease (the "***Rent Credit***").

7.     **Cash Payment Adjustment**. Any Rent Credit or outstanding amounts of any pre-Closing liabilities under the Store Leases (excluding the 2022 CAM Reconciliations) and any amounts necessary to cure any defaults with respect thereto shall be paid from, or shall reduce, dollar-for-dollar, the Cash Payment made by Buyer at the Closing.

8.     **Closing**. The closing (the "***Closing***") of the transactions contemplated by this Agreement (the "***Contemplated Transactions***") shall take place remotely on the date (the "***Closing Date***") that is the first business day following the date on which all conditions to the obligations of Sellers and Buyer to consummate the Contemplated Transactions set forth in Section 10 (other than conditions with respect to actions Sellers or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or at such other time or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto; provided, however, that the parties shall use reasonable best efforts to effectuate the Closing on or before February 28, 2023.

9.     **Closing Deliverables**.

(a)     Sellers' Closing Deliverables: At or prior to the Closing, Sellers shall deliver to Buyer the following documents and other items:

(i)     a bill of sale, in form reasonably satisfactory to the parties (the "***Bill of Sale***"), duly executed by the Sellers;

(ii)     an assignment and assumption agreement, in form reasonably satisfactory to the parties (the "***Assignment and Assumption Agreement***"), duly executed by the Sellers;

(iii)     an intellectual property assignment agreement, in form reasonably satisfactory to the parties (the "***IP Assignment***"), duly executed by the Sellers;

(iv)     a certificate (the "***Lease Certificate***"), duly executed by IPP Holdings, setting forth (i) the aggregate cost of the Sellers' inventory in the Stores on Closing Date, which shall be determined by the inventory reflected in the Sellers' POS System on the Closing Date with respect to each Store and (ii) the Prepayment Amounts with respect to each Store as of the Closing Date;

(v)     the Stalking Horse APA Amendment (as defined below), duly executed by the parties thereto; and

(vi)     a license agreement, in form reasonably satisfactory to the parties (the "***License Agreement***"), duly executed by Sellers, with respect to any Stalking Horse Assets reasonably required with respect to operation of the Stores for a reasonable period, not to exceed sixty (60) days, following the Closing.

(b)     Buyer's Closing Deliverables: At or prior to the Closing, Buyer shall deliver to the Sellers the following documents and other items:

(i)     the Closing Payment;

(ii)     the Bill of Sale, duly executed by the Buyer;

(iii)     the Assignment and Assumption Agreement, duly executed by the Buyer;

(iv)     the IP Assignment, duly executed by the Buyer;

(v)     the Lease Certificate, duly executed by the Buyer; and

(vi)     the License Agreement, duly executed by the Buyer.

10.     **Closing Conditions**.

(a)     Buyer's obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or waiver (to the extent waiveable) of the following conditions:

(i)     entry of a final order by the Bankruptcy Court granting the Motion to Sell and approving the Contemplated Transactions by no later than March 7, 2023 and there is no pending stay or motion to stay (the "***Bankruptcy Court Approval***");

(ii)    receipt of the written consent of the Secured Lenders constituting the Required Lenders under and as defined in the DIP Agreement for the Contemplated Transactions (the "*Lender Group Approval*");

(iii)    receipt of an amendment to the Stalking Horse APA, duly executed by all of the parties thereto, in form reasonably satisfactory to the Buyer, to remove the Purchased Assets from the assets to be purchased by the Stalking Horse Purchaser thereunder (the "*Stalking Horse APA Amendment*"); and

(iv)    delivery of the documents set forth in <u>Section 9(a)</u> by the Sellers to the Buyer.

(b)    The Sellers' obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or waiver (to the extent waiveable) of the following conditions:

(i)    receipt of the Bankruptcy Court Approval;

(ii)    receipt of Lender Group Approval; and

(iii)    delivery of the documents set forth in <u>Section 9(b)</u> by the Buyer to the Sellers.

11.    <u>**Termination**</u>.

(a)    At any time prior to the Closing, this Agreement may be terminated in accordance with this <u>Section 11(a)</u> and the Contemplated Transactions abandoned:

(i)    by the mutual written consent of Buyer, on the one hand, and Sellers, on the other hand; or

(ii)    by written notice from Buyer to Sellers or the Sellers to the Buyer, if one or more of the conditions set forth in <u>Section 10</u> cannot be satisfied.

(b)    In the event of termination of this Agreement pursuant to <u>Section 11(a)</u>, this Agreement shall become null and void and of no further force and effect, except (i) as otherwise expressly set forth herein and (ii) that <u>Sections 11(b)</u>, <u>11(c)</u>, <u>12(a)</u>, and <u>15</u> shall survive any termination of this Agreement.

(c)    The Sellers shall have no obligation to refund any portion of the Deposit Amount. Notwithstanding the foregoing, in the event that this Agreement is terminated pursuant to <u>Section 11</u> due to (i) the failure of the Sellers and the Stalking Horse Purchaser to enter into and adopt the Stalking Horse APA Amendment or (ii) the failure of the Sellers to obtain the Bankruptcy Court Approval, then the Sellers shall refund and pay to the Buyer an amount equal to the Deposit Amount within five (5) business days following termination of this Agreement.

{10971975:23 }    6

12.     **Covenants**.

(a)     Following the Closing, Buyer shall follow and comply with Sellers' policies and procedures, in place as of the Closing, and applicable law with respect to the collection, storage, maintenance, and use of personal information, including, without limitation, the Customer Records and the Program Data, and Buyer shall use any and all personal information, including, without limitation, any personally identifiable information of any customers of the Sellers residing in the State of California, Customer Records, and the Program Data, acquired in connection with this Agreement or the Contemplated Transactions in accordance with the California Consumer Privacy Act, as amended from time to time, including, without limitation, by the California Privacy Rights Act, and shall not materially alter how Buyer uses or shares such personal information, including, without limitation, Customer Records and the Program Data, unless Buyer provides written notice of its new or changed practices with respect to such use or sharing of personal information to such customers, all upon the terms and conditions necessary to satisfy all statutory and regulatory requirements.

(b)     The Sellers shall use commercially reasonable efforts to assume and assign the Store Leases in accordance with Section 365 of the Bankruptcy Code.

(c)     Within sixty (60) days following the Closing, the Buyer shall use its best efforts to re-brand each Store operating under the "Kriser's Natural Pet" banner to the "Natural Pawz" banner and from and after such date neither Buyer nor any of its successors or assigns shall use "Kriser's Natural Pet" or any similar name in connection with the operation of its business or otherwise in connection with the acquired Stores.

(d)     The Sellers shall continue to operate the Stores in ordinary course of their business through the Closing Date but shall not be obligated to replenish inventories at any Store from the date hereof through the earlier to occur of the Closing Date or February 28, 2023, and the Sellers shall not move inventory from any of their stores that are not included in the Stores, to the Stores without to Buyer's approval, not to be unreasonably withheld.

(e)     Prior to the Closing, Buyer will use commercially reasonable efforts to put in a place a new point-of-sale system at the Stores as of the Closing Date.

13.     **Employees**. At least three (3) days prior to the Closing Date, Buyer shall provide Sellers with notice of the employees of the Sellers with respect to the Stores that Buyer intends to offer employment (the "***Business Employees***"); provided, however, that Buyer shall not provide an offer of employment to any Employee (as defined in the Stalking Horse APA) set forth on Schedule 6.4 of the Stalking Horse APA. Upon reasonable request by Buyer, the Sellers shall cooperate with and shall not impair Buyer's efforts to obtain the employment of such Business Employees. Each Business Employee who receives and accepts such offer of employment prior to the Closing and commences work with Buyer on or promptly after the Closing Date shall be referred to herein as a "Transferred Employee." The Buyer shall assume, and be responsible for, all liabilities and obligations after the Closing arising from, or related to, any Transferred Employee, and the Buyer expressly disclaims, waives, and releases the Sellers

and their respective officers, directors, managers and employees from any claim or liability on account or, relating to, or with respect to any Business Employee; provided in no event does Buyer assume any liabilities for any claims (including workers compensation claims) by Transferred Employees that arise due to acts or omissions occurring prior to Closing. The Buyer shall not assume, and shall have no responsibility for, any liabilities or obligations arising from, or related to, any Business Employee who is not a Transferred Employee. Buyer is offering new employment to Transferred Employees and the employer-employee relationship between each Transferred Employee and Buyer shall commence at Closing. Nothing herein, express or implied, shall confer upon any employee or former employee of any Seller any rights or remedies (including any right to employment or continued employment for any specified period) of any nature or kind whatsoever, under or by reason of this Agreement. Buyer and Sellers agree that the provisions contained herein are not intended to be for the benefit of or otherwise be enforceable by, any third party, including any employee or former employee of Sellers.

14. **Waiver**. TO THE FULLEST EXTENT PERMITTED BY LAW, SELLERS HEREBY DISCLAIM, AND BUYER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES AND RELEASES ANY AND ALL ACTUAL OR POTENTIAL RIGHTS BUYER MAY HAVE AGAINST ANY SELLER OR ANY AFFILIATE OF ANY SELLER REGARDING ANY FORM OF WARRANTY, EXPRESS OR IMPLIED, OF ANY KIND OR TYPE, RELATING TO ANY PURCHASED ASSET OR ASSUMED LIABILITY.

15. **Miscellaneous**. At any time and from time to time after the Closing, at Buyer's reasonable request and without further consideration, the Sellers shall execute and deliver to Buyer such other instruments of sale, transfer, conveyance, assignment, and confirmation, provide such materials and information and take such other actions as Buyer may reasonably deem necessary or desirable in order to more effectively transfer, convey, and assign to Buyer, and to confirm the foregoing assignment and Buyer's rights to all of the Purchased Assets, and, to the fullest extent permitted by law, the Assumed Liabilities. This Agreement may not be amended, modified, altered, or supplemented other than by means of a written instrument duly executed and delivered on behalf of Buyer and the Sellers. If any one or more of the provisions of this Agreement shall be determined to be invalid, illegal, or unenforceable in any respect under any applicable law, the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired; provided, however, that in any such case the parties agree to use their best efforts to achieve the purpose of the invalid provision by a new legally valid provision. This Agreement shall be interpreted and construed according to, and governed by, the laws of the State of Delaware, excluding any such laws that might direct the application of the laws of another jurisdiction. All costs and expenses incurred in connection with this Agreement and the Contemplated Transactions shall be paid by the party incurring such costs and expenses. Except as otherwise provided herein, references to Sections and Schedules herein are references to Sections and Schedules of this Agreement. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile or portable document format (PDF) signatures will be deemed to be original signatures for all applicable purposes.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties have duly executed this Asset Purchase Agreement as of the date first above written.

**SELLERS:**

**INDEPENDENT PET PARTNERS HOLDINGS, LLC**

By _____
    Name: Julie Maday
    Title:  Chief Executive Officer

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS II, LLC**

By _____
    Name: Julie Maday
    Title:  Chief Executive Officer

**INDEPENDENT PET PARTNERS EMPLOYER, LLC**

By _____
    Name: Julie Maday
    Title:  Chief Executive Officer

**IPP - STORES, LLC**

By _____
    Name: Julie Maday
    Title:  Chief Executive Officer

**PET LIFE, LLC**

By _____
    Name: Julie Maday
    Title:  Chief Executive Officer

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS I, LLC**

By _____
    Name: Julie Maday
    Title:  Chief Executive Officer

**INDEPENDENT PET PARTNERS EMPLOYER HOLDINGS, LLC**

By _____
    Name: Julie Maday
    Title:  Chief Executive Officer

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS, LLC**

By _____
    Name: Julie Maday
    Title:  Chief Executive Officer

**IPP STORES EMPLOYER, LLC**

By _____
    Name: Julie Maday
    Title:  Chief Executive Officer

**ESPECIALLY FOR PETS, LLC**

By _____
    Name: Julie Maday
    Title:  Chief Executive Officer

**WHOLE PET CENTRAL, LLC**                          **NATURAL PAWZ, LLC**

By _____          By _____
     Name: Julie Maday                              Name: Julie Maday
     Title:   Chief Executive Officer               Title:   Chief Executive Officer

**PET SOURCE, LLC**

By _____
     Name: Julie Maday
     Title:   Chief Executive Officer

**BUYER:**

**NP ACQUISITION LLC**

By _____

Name: C. L. Picone

Title: CEO

## SCHEDULE A

### Schedule of Additional Seller Entities

1. Independent Pet Partners Intermediate Holdings I, LLC, a Delaware limited liability company

2. Independent Pet Partners Intermediate Holdings II, LLC, a Delaware limited liability company

3. Independent Pet Partners Employer Holdings, LLC, a Delaware limited liability company

4. Independent Pet Partners Employer, LLC, a Delaware limited liability company

5. Independent Pet Partners Intermediate Holdings, LLC, a Delaware limited liability company

6. IPP - Stores, LLC, a Delaware limited liability company

7. IPP Stores Employer, LLC, a Delaware limited liability company

8. Pet Life, LLC, a Delaware limited liability company

9. Especially for Pets, LLC, a Delaware limited liability company

10. Whole Pet Central, LLC, a Delaware limited liability company

11. Natural Pawz, LLC, a Delaware limited liability company

12. Pet Source, LLC, a Delaware limited liability company

# SCHEDULE B

## Schedule of Stores

| Store No. | Store | Location |
|---|---|---|
| 338178 | Kriser's Natural Pet | 20th Street, Houston, Texas |
| 338181 | Kriser's Natural Pet | Austin Arboretum, Austin Texas |
| 338176 | Kriser's Natural Pet | Buffalo, Texas |
| 338177 | Kriser's Natural Pet | Champions, Texas |
| 338184 | Kriser's Natural Pet | South Lamar, Texas |
| 338180 | Kriser's Natural Pet | Stone Oak, Texas |
| 338182 | Kriser's Natural Pet | West Gray, Texas |
| 338179 | Kriser's Natural Pet | Woodland Hughes, Texas |
| 338185 | Natural Pawz | Bridgeland, Texas |
| 338186 | Natural Pawz | Cedar Park, Texas |
| 338188 | Natural Pawz | Cypress, Texas |
| 338189 | Natural Pawz | Garden Oaks, Texas |
| 338191 | Natural Pawz | Kingwood, Texas |
| 338224 | Natural Pawz | Montrose, Texas |
| 338195 | Natural Pawz | Pinecroft, Texas |
| 338215 | Natural Pawz | Riverstone, Texas |
| 338198 | Natural Pawz | Springwoods, Texas |
| 338199 | Natural Pawz | Steiner Ranch, Texas |
| 338200 | Natural Pawz | Sterling Ridge, Texas |
| 338201 | Natural Pawz | Sugarland, Texas |
| 338230 | Natural Pawz | Tanglewood, Texas |
| 338203 | Natural Pawz | Vintage Park, Texas |
| 338236 | Natural Pawz | Washington Ave., Houston, Texas |
| 338204 | Natural Pawz | West University, Texas |

**SCHEDULE C**

**Schedule of Store Leases**

[Prepayment Amounts and Security Deposits to be updated by the parties at Closing]

| Store No. | Store | Location | Lease | Prepayment Amounts | Security Deposits |
|---|---|---|---|---|---|
| 338178 | Kriser's Natural Pet | 20th Street, Houston, Texas | Lease Agreement, dated December 6, 2013, by and between Rutland & 20th Realty Ltd., as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant, as amended by that certain First Amendment to Lease, dated February 13, 2014. | | $7,500.00 |
| 338181 | Kriser's Natural Pet | Austin Arboretum, Austin, Texas | Sublease, dated June 8, 2016, by and between Vitamin Shoppe Industries Inc., as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant. | | N/A |

| 338176 | Kriser's Natural Pet | Buffalo, Texas | Lease, dated October 10, 2013, by and between Plaza In the Park (Edens), LLC, successor to AmREIT Plaza In The Park, LP, as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant, as amended by that certain First Amendment to Lease, dated March 1, 2019, and Second Amendment to Lease, dated March 1, 2022. | | $7,083.33 |
| --- | --- | --- | --- | --- | --- |
| 338177 | Kriser's Natural Pet | Champions, Texas | Shopping Center Lease, dated March 24, 2014, by and between Vintage Marketplace Ltd., as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant. | | $7,872.00 |
| 338184 | Kriser's Natural Pet | South Lamar, Texas | Lease Agreement, dated July 12, 2017, by and between Mirabeau Office Partners, LLC, as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant. | | N/A |

| 338180 | Kriser's Natural Pet | Stone Oak, Texas | Standard Commercial Shopping Center Lease, dated September 2, 2015, by and between Sonterra Village, L.P., as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant, as amended by that certain Lease Amendment, dated August 14, 2020, and Second Lease Amendment and Extension Agreement, dated September 9, 2022. |  | $8,550.00 |
| 338182 | Kriser's Natural Pet | West Gray, Texas | Shopping Center Lease, dated June 6, 2016, by and between W. Gray & Peden Realty, Ltd., as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant. |  | $11,992.50 |
| 338179 | Kriser's Natural Pet | Woodland Hughes, Texas | Retail Row Lease, dated October 31, 2014, by and between HHC Hughes Landing Retail, LLC, successor to HL Retail Row, LLC, as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant |  | $10,001.58 |
| 338185 | Natural Pawz | Bridgeland, Texas | Lease Agreement, dated November 9, 2015, by and between Cypress Creek Plaza, LLC, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant. |  | N/A |

| 338186 | Natural Pawz | Cedar Park, Texas | Shopping Center Lease, dated August 13, 2015, by and between Lakeline Center Cedar Park Phase IV LTD, as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., as tenant, as amended by that certain Assignment and Assumption of Lease and Consent, dated August 3, 2018, and Amendment to Lease #2, dated June 1, 2021. | | N/A |
| --- | --- | --- | --- | --- | --- |
| 338188 | Natural Pawz | Cypress, Texas | Shopping Center Lease Agreement, dated July 25, 2012, by and between IA Cypress Cyfair Limited Partnership, successor to Inland American Retail Management, LLC, as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant, as amended by that certain Lease Extension Agreement, dated October 5th, 2017, Assignment and Assumption of Lease and Amendment to Lease, dated August 9, 2018, and Lease Amendment, dated August 8, 2022. | | $3,942.00 |

| 338189 | Natural Pawz | Garden Oaks, Texas | Retail Lease, dated June 26, 2017, by and between The Shops at Oak Forest, LP, as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., as tenant, as amended by that certain Assignment and Assumption of Lease and Consent, dated July 30, 2018. | | N/A |
|---|---|---|---|---|---|
| 338191 | Natural Pawz | Kingwood, Texas | Lease, dated May 28, 2013, by and between LH North Park, LLC, successor to NEC Northpark/59, L.C., as landlord and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant, as amended by that certain Assignment and Assumption of Lease and Consent, dated August 2, 2018. | | $4,786.67 |
| 338224 | Natural Pawz | Montrose, Texas | Commercial Lease Agreement, dated March 12, 2019, by and between Tommey-Guseman Family Limited Partnership, as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant | | N/A |

| 338195 | Natural Pawz | Pinecroft, Texas | Shopping Center Lease, dated October 20, 2009, by and between CSHV Woodlands, L.P., as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., as tenant, as amended by that certain First Amendment to Shopping Center Lease, dated December 5, 2014, Consent to Assignment of Lease, dated August 3, 2018, Assignment and Assumption of Lease, dated December 2, 2019, and Second Amendment to Shopping Center Lease, dated October 25, 2021, | | $4,486.81 |
| 338215 | Natural Pawz | Riverstone, Texas | Shopping Center Lease, dated May 5, 2017, by and between The Village at Riverstone, LLC, as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant, as amended by that certain Assignment and Assumption Agreement, dated August 2, 2018, First Modification to Lease Agreement, dated September 20, 2018, Second Modification to Lease Agreement, dated January 7, 2019, and Assignment and Assumption of Lease, dated October 2019. | | N/A |

| 338198 | Natural Pawz | Springwoods, Texas | Shopping Center Lease, dated April 13, 2017, by and between Spring Stuebner RRC I Inc., as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant, as amended by that certain Assignment and Assumption of Lease, dated October 2019. | | N/A |
| --- | --- | --- | --- | --- | --- |
| 338199 | Natural Pawz | Steiner Ranch, Texas | Lease Agreement, dated November 6, 2015, by and between Whitestone Quinlan Crossing LLC, as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant, as amended by that certain Assignment of Lease Interest, dated August 9, 2018, Assignment and Assumption of Lease, dated October 2019, and Second Amendment to Lease, dated March 3, 2022. | | $4,830.05 |

| 338200 | Natural Pawz | Sterling Ridge, Texas | Shopping Center Lease, dated June 14, 2005, by and between REG8 Sterling Ridge, LLC, successor to Regency Centers, L.P., as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant, as amended by that certain First Modification to Lease Agreement, dated June 22, 2010, Second Modification to Lease, dated April 29, 2015, Third Modification to Lease, dated August 31, 2016, Assignment and Assumption Agreement, dated August 2, 2018, Omnibus Rent Deferral Lease Amendment, dated July 1, 2020, Fourth Modification to Lease, dated December 7, 2021, Fifth Modification to Lease, dated June 15, 2022, and Sixth Modification to Lease. | | $4,062.67 |

| 338201 | Natural Pawz | Sugarland, Texas | Lease Amendment, dated April 8, 2008, by and between Lake Pointe Shopping Center, LP, successor to Lake Pointe Town Center, Ltd., as landlord, and JC&P Enterprises, LLC, d/b/a Natural Pawz, as tenant, as amended by that certain First Amendment to Lease, dated April 30, 2013, and Second Amendment to Lease, dated December 15, 2017. | | $5,286.67 |
| 338230 | Natural Pawz | Tanglewood, Texas | Retail Lease Agreement, dated April 30, 2019, by and between SCC Tanglewood LP, successor to MBL 2200 Main II, LLC, as landlord, and IPP – Stores, LLC, as tenant, as amended by that certain First Amendment to Retail Lease Agreement, dated August 22, 2019. | | N/A |

| 338203 | Natural Pawz | Vintage Park, Texas | Shopping Center Lease, dated April 6, 2011, by and between Vintage Marketplace LTD, successor to Vintage Park LLC, as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., as tenant, as amended by that certain First Amendment to Shopping Center Lease, dated January 5, 2016, Second Amendment to Shopping Center Lease, dated June 5, 2020, and Third Amendment to Shopping Center Lease, dated June 1, 2021. | | $3,325.00 |
| 338236 | Natural Pawz | Washington Ave., Houston, Texas | Lease Agreement, dated June 17, 2019, by and between DZ Washington, LLC, as landlord, and IPP – Stores, LLC, as tenant, as amended by that certain First Amendment to Lease Agreement, dated December 2, 2020. | | N/A |

| 338204 | Natural Pawz | West University, Texas | Shopping Center Lease, dated November 6, 2008, by and between Brixmor West U Marketplace LLC , successor to U West Marketplace Associates, LP, as landlord, and  IPP – Stores, LLC, successor to CL&J Enterprises, Inc., as tenant, as amended by that certain First Amendment to Shopping Center Lease, dated October 23, 2009, Second Amendment to Shopping Center Lease, dated November 4, 2013, Third Amendment to Shopping Center Lease, dated June 28, 2017, Assignment and Assumption of Lease Agreement with Landlord's Consent, date July 31, 2018, and Lease Amendment No. 4, dated September 2, 2022. | | $3,106.00 |

**SCHEDULE D**

**Purchased IP**

<u>Registered Trademarks</u>:

| <u>Jurisdiction</u> | <u>Registration No.</u> | <u>Registration Date</u> | <u>Filing Date</u> | <u>Mark</u> |
|---|---|---|---|---|
| USA | 3718921 | 12/01/09 | 02/08/08 | NATURAL PAWZ |

<u>Social Media Accounts</u>:

1. https://www.facebook.com/NaturalPawz

2. https://www.instagram.com/naturalpawz/

3. https://www.linkedin.com/company/natural-pawz/

4. https://twitter.com/NaturalPawz

<u>Registered Domain Names</u>:

1. e-naturalpawz.com

2. NATURALPAWZ.COM

3. naturalpawz.org

# **EXHIBIT D**

**Settlement Statement**

## **SETTLEMENT STATEMENT**

| | |
|---|---|
| BUYER: | NP Acquisition LLC |
| SELLER(S): | Independent Pet Partners Holdings, LLC, a Delaware limited liability company ("***IPP Holdings***"), and each of the subsidiaries of IPP Holdings set forth on  the signature block below |
| PROPERTY: | Each of the Stores listed on Schedule B of the Asset Purchase Agreement |
| DATE OF TRANSACTION: | March 1, 2023 |

| | | |
|---|---|---:|
| Base Purchase Price | | $475,000.00 |
| Inventory Adjustment (200% of Inventory as of the close of Business 2/28) $1,054,373 x 2 = | | $2,108,746.00 |
| Total Purchase Price | | $2,583,746.00 |
| | SELLER(S) | |
| Seller Credits from Buyer: | | |
| Prepayment Amounts | | $0.00 |
| Security Deposits | | $86,825.28 |
| | | |
| Total Credits: | | $86,825.28 |
| | | |
| Less credits to Buyer: | | |
| Cure Amounts | $2,751.43 | |
| Deposit | $250,000.00 | |
| | | |
| Total deductions: | | $252,751.43 |
| | | |
| NET TO SELLER: | | $2,417,819.85 |

---

| | | |
|---|---|---:|
| Purchase Price | | $2,583,746.00 |
| | BUYER | |
| Purchaser Credits to Seller | | |
| | | $86,825.280 |
| Less: | | |
| Credits from Seller | $2,751.43 | |
| Deposit | $250,000.00 | |
| | | $252,751.43 |
| | | |
| TOTAL DUE FROM BUYER: | | $2,417,819.85 |

**IN WITNESS WHEREOF**, the parties have duly executed this Settlement Statement as of March 1, 2023.

<u>**SELLERS**</u>**:**

**INDEPENDENT PET PARTNERS HOLDINGS, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS I, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS II, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS EMPLOYER HOLDINGS, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS EMPLOYER, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**IPP - STORES, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**IPP STORES EMPLOYER, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**PET LIFE, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**ESPECIALLY FOR PETS, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**WHOLE PET CENTRAL, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**PET SOURCE, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**NATURAL PAWZ, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**BUYER:**

NP ACQUISITION LLC

By _____

Name: _CARMEN L. PICONE_

Title: _CEO_

## **EXHIBIT E**

**IP Assignment**

## INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

This Intellectual Property Assignment Agreement (this "Assignment") is made and entered into as of March 1, 2023 the "Effective Date") by and among INDEPENDENT PET PARTNERS HOLDINGS, LLC, a Delaware limited liability company ("IPP Holdings"), each of the Seller Subsidiaries (each, an "Assignor" and together, the "Assignors"), and NP ACQUISITION LLC, a Texas limited liability company (the "Assignee"). Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement, dated as of February 21, 2023 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

WHEREAS, the Assignors and the Assignee have entered into the Asset Purchase Agreement, pursuant to which the Assignee has acquired all of the Purchased IP; and

WHEREAS, the Assignors desire to deliver to the Assignee such instruments of sale, transfer, assignment, conveyance and delivery as are required to vest in Assignee all of each of the Assignors' right, title and interest in and to the Purchased IP.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and pursuant to the Asset Purchase Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    Assignment.  Each Assignor hereby forever sells, assigns, transfers, conveys and delivers to the Assignee and its successors and assigns, and the Assignee hereby accepts from each Assignor, all of each Assignor's right, title and interest in, to and under the Purchased IP, including the Purchased IP listed on Schedule A.

2.    Assignor's Waiver. Each Assignor and the Assignee acknowledge and agree that as of the Effective Date all Purchased IP is owned by the Assignee to the maximum extent permitted by law.  If any Assignor has any rights in or to any Purchased IP that cannot, under applicable Law, be assigned to the Assignee or owned by the Assignee, each Assignor hereby unconditionally and irrevocably waives the enforcement of such rights and all claims and causes of action of any kind against the Assignee and their designees and successors and assigns with respect to such rights.

3.    Further Assurances. After the Effective Date, each party shall, upon the reasonable request of the other, execute and deliver or cause to be executed and delivered such further instruments of sale, conveyance, assignment, transfer and assumption, and take such further action, as may reasonably be requested in order to more effectively carry out the purposes and intent of the Asset Purchase Agreement and this Assignment. Each Assignor agrees to effect the transfer of all domain names included in the Purchased IP ("Domain Names") to the Assignee, including to electronically transfer the Domain Names from each Assignor's account at their respective domain name registrars to Assignee's account (as designated by the Assignee) as quickly as reasonably practicable and executing and delivering any necessary documents to the Assignee, the registrars for the Domain Names, and any other party as requested by the Assignee and any of its successors and assigns.

1

4.    <u>Successors and Assigns</u>.  This Assignment shall be binding upon each Assignor and the Assignee, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the Effective Date.

5.    <u>No Third Party Beneficiaries</u>.  No provision of this Assignment, express or implied, is intended or shall be construed to confer upon or give to any person, other than the parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Assignment or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Assignment shall be for the sole and exclusive benefit of the parties hereto, and their respective successors and permitted assigns.

6.    <u>Severability</u>.   The provisions of this Assignment shall be deemed severable, and the invalidity or unenforceability of any provision of this Assignment shall not affect the validity or enforceability of any other provisions of this Assignment. If any provision of this Assignment, or the application thereof to any person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Assignment and the application of such provision to other persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

7.    <u>Modification and Waiver</u>.   None of the provisions of this Assignment may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by each of the parties hereto, or in the case of a waiver, by the party(ies) against whom the waiver is to be effective.

8.    <u>Interpretation</u>. This Assignment is subject in all respects to the terms and conditions of the Asset Purchase Agreement. Nothing contained in this Assignment shall be deemed to supersede or modify any of the covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Assignment as provided by, and subject to, the limitations set forth in the Asset Purchase Agreement. To the extent any provision of this Assignment is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

9.    <u>Governing Law</u>.  This Assignment shall in all aspects be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the parties hereto shall be determined in accordance with such laws. The parties hereto agree that any suit, action or proceeding one party commences against any other party pursuant to this Assignment shall be brought exclusively in the Bankruptcy Court and each of the parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has

2

been brought in an inconvenient forum; provided that if the Bankruptcy Court is unwilling or unable to hear any such suit, action or proceeding, then the courts of the State of Delaware, sitting in New Castle County, Delaware, and the federal courts of the United States of America sitting in New Castle County, Delaware, shall have exclusive jurisdiction over such Litigation.

10.    <u>Counterparts</u>.  This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Assignment or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

[<em>Signature Page Follows</em>]

IN WITNESS WHEREOF, the parties have caused this Assignment to be duly executed by their respective authorized officers as of the date first above written.

**<u>ASSIGNORS</u>:**

**INDEPENDENT PET PARTNERS HOLDINGS, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS I, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS II, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS EMPLOYER HOLDINGS, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS EMPLOYER, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**IPP - STORES, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**IPP STORES EMPLOYER, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**PET LIFE, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**ESPECIALLY FOR PETS, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

*[Signature Page to IP Assignment Agreement]*

**WHOLE PET CENTRAL, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**PET SOURCE, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**NATURAL PAWZ, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**ASSIGNEE**:

**NP ACQUISITION LLC**

By: _____
Name: CARMEN L. Picone
Title: CEO

[*Signature Page to IP Assignment Agreement*]

**SCHEDULE A**

**Purchased IP**

Registered Trademarks:

| Jurisdiction | Registration No. | Registration Date | Filing Date | Mark |
|:---:|:---:|:---:|:---:|:---:|
| USA | 3718921 | 12/01/09 | 02/08/08 | NATURAL PAWZ |

Social Media Accounts:

1. https://www.facebook.com/NaturalPawz

2. https://www.instagram.com/naturalpawz/

3. https://www.linkedin.com/company/natural-pawz/

4. https://twitter.com/NaturalPawz

Registered Domain Names:

1. e-naturalpawz.com

2. NATURALPAWZ.COM

3. naturalpawz.org

**<u>EXHIBIT F</u>**

**Assignment**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement, dated as of March 1, 2023 (this "Agreement"), is made and entered into by and among INDEPENDENT PET PARTNERS HOLDINGS, LLC, a Delaware limited liability company ("IPP Holdings"), each of the Seller Subsidiaries (together with IPP Holdings, "Sellers"), and NP ACQUISITION LLC, a Texas limited liability company ("Buyer"). Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement, dated as of February 21, 2023 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

WHEREAS, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the rights, titles and interests of Sellers in and to the Purchased Assets, including, without limitation, the Store Leases; and

WHEREAS, pursuant to Section 3 of the Asset Purchase Agreement, Buyer agreed to assume, effective as of the Closing, the Assumed Liabilities.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      Sellers hereby assign and delegate the Store Leases and the Assumed Liabilities to Buyer and Buyer hereby accepts assignment and delegation of and assumes the Store Leases and the Assumed Liabilities as set forth in the Asset Purchase Agreement. The schedule of the Store Leases from the Asset Purchase Agreement is attached hereto as Schedule A.

2.      From time to time after the Closing Date, each party shall, upon the reasonable request of the other, execute and deliver or cause to be executed and delivered such further instruments of sale, conveyance, assignment, transfer and assumption, and take such further action, as may reasonably be requested in order to more effectively carry out the purposes and intent of the Asset Purchase Agreement and this Agreement.

3.      This Agreement is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

4.      No provision of this Agreement, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Agreement or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Agreement shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

5.       The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. If any provision of this Agreement, or the application thereof to any person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

6.       None of the provisions of this Agreement may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the party(ies) against whom the waiver is to be effective.

7.       This Agreement is subject in all respects to the terms and conditions of the Asset Purchase Agreement. Nothing contained in this Agreement shall be deemed to supersede or modify any of the covenants or other agreements contained in the Asset Purchase Agreement. To the extent any provision of this Agreement is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

8.       This Agreement and all matters arising out of or related to this Agreement shall in all aspects be governed by and construed in accordance with the laws of the United States and the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the parties hereto shall be determined in accordance with such laws; provided to the extent the laws of the State of Texas requires Texas law to govern the assignment of the Store Leases because the leasehold interests are real property located in the State of Texas, Texas law shall govern such assignment. The parties hereto agree that any suit, action or proceeding one party commences against any other party pursuant to this Agreement shall be brought exclusively in the Bankruptcy Court and each of the parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum; provided that if the Bankruptcy Court is unwilling or unable to hear any such suit, action or proceeding, then the courts of the State of Delaware, sitting in New Castle County, Delaware, and the federal courts of the United States of America sitting in New Castle County, Delaware, shall have exclusive jurisdiction over such suit, action or proceeding.

9.     This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**SELLERS:**

**INDEPENDENT PET PARTNERS HOLDINGS, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS I, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS II, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS EMPLOYER HOLDINGS, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS EMPLOYER, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**IPP - STORES, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**IPP STORES EMPLOYER, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**PET LIFE, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**ESPECIALLY FOR PETS, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

*[Signature Page to Assignment and Assumption Agreement]*

**WHOLE PET CENTRAL, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**PET SOURCE, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**NATURAL PAWZ, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

[*Signature Page to Assignment and Assumption Agreement*]

**BUYER**:

NP ACQUISITION LLC, a Texas limited liability company

By _____
Name: CARMEN L. Picore
Title: CEO

[*Signature Page to Assignment and Assumption Agreement*]

**SCHEDULE A**

**Schedule of Store Leases**

| Store No. | Store | Location | Lease |
|---|---|---|---|
| 338178 | Kriser's Natural Pet | 20th Street, Houston, Texas | Lease Agreement, dated December 6, 2013, by and between Rutland & 20th Realty Ltd., as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant, as amended by that certain First Amendment to Lease, dated February 13, 2014. |
| 338181 | Kriser's Natural Pet | Austin Arboretum, Austin, Texas | Sublease, dated June 8, 2016, by and between Vitamin Shoppe Industries Inc., as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant. |
| 338176 | Kriser's Natural Pet | Buffalo, Texas | Lease, dated October 10, 2013, by and between Plaza In the Park (Edens), LLC, successor to AmREIT Plaza In The Park, LP, as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant, as amended by that certain First Amendment to Lease, dated March 1, 2019, and Second Amendment to Lease, dated March 1, 2022. |
| 338177 | Kriser's Natural Pet | Champions, Texas | Shopping Center Lease, dated March 24, 2014, by and between Vintage Marketplace Ltd., as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant. |
| 338184 | Kriser's Natural Pet | South Lamar, Texas | Lease Agreement, dated July 12, 2017, by and between Mirabeau Office Partners, LLC, as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant. |
| 338180 | Kriser's Natural Pet | Stone Oak, Texas | Standard Commercial Shopping Center Lease, dated September 2, 2015, by and between Sonterra Village, L.P., as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant, as amended by that certain Lease Amendment, dated August 14, 2020, and Second Lease Amendment and Extension Agreement, dated September 9, 2022. |

| 338182 | Kriser's Natural Pet | West Gray, Texas | Shopping Center Lease, dated June 6, 2016, by and between W. Gray & Peden Realty, Ltd., as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant. |
|---|---|---|---|
| 338179 | Kriser's Natural Pet | Woodland Hughes, Texas | Retail Row Lease, dated October 31, 2014, by and between HHC Hughes Landing Retail, LLC, successor to HL Retail Row, LLC, as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant |
| 338185 | Natural Pawz | Bridgeland, Texas | Lease Agreement, dated November 9, 2015, by and between Cypress Creek Plaza, LLC, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant. |
| 338186 | Natural Pawz | Cedar Park, Texas | Shopping Center Lease, dated August 13, 2015, by and between Lakeline Center Cedar Park Phase IV LTD, as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., as tenant, as amended by that certain Assignment and Assumption of Lease and Consent, dated August 3, 2018, and Amendment to Lease #2, dated June 1, 2021. |
| 338188 | Natural Pawz | Cypress, Texas | Shopping Center Lease Agreement, dated July 25, 2012,  by and between IA Cypress Cyfair Limited Partnership, successor to Inland American Retail Management, LLC, as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant, as amended by that certain Lease Extension Agreement, dated October 5th, 2017, Assignment and Assumption of Lease and Amendment to Lease, dated August 9, 2018, and Lease Amendment, dated August 8, 2022. |
| 338189 | Natural Pawz | Garden Oaks, Texas | Retail Lease, dated June 26, 2017, by and between The Shops at Oak Forest, LP, as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., as tenant, as amended by that certain Assignment and Assumption of Lease and Consent, dated July 30, 2018. |

| 338191 | Natural Pawz | Kingwood, Texas | Lease, dated May 28, 2013, by and between LH North Park, LLC, successor to NEC Northpark/59, L.C., as landlord and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant, as amended by that certain Assignment and Assumption of Lease and Consent, dated August 2, 2018. |
| --- | --- | --- | --- |
| 338224 | Natural Pawz | Montrose, Texas | Commercial Lease Agreement, dated March 12, 2019, by and between Tommey-Guseman Family Limited Partnership, as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant |
| 338195 | Natural Pawz | Pinecroft, Texas | Shopping Center Lease, dated October 20, 2009, by and between CSHV Woodlands, L.P., as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., as tenant, as amended by that certain First Amendment to Shopping Center Lease, dated December 5, 2014, Consent to Assignment of Lease, dated August 3, 2018, Assignment and Assumption of Lease, dated December 2, 2019, and Second Amendment to Shopping Center Lease, dated October 25, 2021, |
| 338215 | Natural Pawz | Riverstone, Texas | Shopping Center Lease, dated May 5, 2017, by and between The Village at Riverstone, LLC, as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant, as amended by that certain Assignment and Assumption Agreement, dated August 2, 2018, First Modification to Lease Agreement, dated September 20, 2018, Second Modification to Lease Agreement, dated January 7, 2019, and Assignment and Assumption of Lease, dated October 2019. |

| 338198 | Natural Pawz | Springwoods, Texas | Shopping Center Lease, dated April 13, 2017, by and between Spring Stuebner RRC I Inc., as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant, as amended by that certain Assignment and Assumption of Lease, dated October 2019. |
|---|---|---|---|
| 338199 | Natural Pawz | Steiner Ranch, Texas | Lease Agreement, dated November 6, 2015, by and between Whitestone Quinlan Crossing LLC, as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant, as amended by that certain Assignment of Lease Interest, dated August 9, 2018, Assignment and Assumption of Lease, dated October 2019, and Second Amendment to Lease, dated March 3, 2022. |
| 338200 | Natural Pawz | Sterling Ridge, Texas | Shopping Center Lease, dated June 14, 2005, by and between REG8 Sterling Ridge, LLC, successor to Regency Centers, L.P., as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant, as amended by that certain First Modification to Lease Agreement, dated June 22, 2010, Second Modification to Lease, dated April 29, 2015, Third Modification to Lease, dated August 31, 2016, Assignment and Assumption Agreement, dated August 2, 2018, Omnibus Rent Deferral Lease Amendment, dated July 1, 2020, Fourth Modification to Lease, dated December 7, 2021, Fifth Modification to Lease, dated June 15, 2022, and Sixth Modification to Lease. |

| 338201 | Natural Pawz | Sugarland, Texas | Lease Amendment, dated April 8, 2008, by and between Lake Pointe Shopping Center, LP, successor to Lake Pointe Town Center, Ltd., as landlord, and JC&P Enterprises, LLC, d/b/a Natural Pawz, as tenant, as amended by that certain First Amendment to Lease, dated April 30, 2013, and Second Amendment to Lease, dated December 15, 2017. |
|---|---|---|---|
| 338230 | Natural Pawz | Tanglewood, Texas | Retail Lease Agreement, dated April 30, 2019, by and between SCC Tanglewood LP, successor to MBL 2200 Main II, LLC, as landlord, and IPP – Stores, LLC, as tenant, as amended by that certain First Amendment to Retail Lease Agreement, dated August 22, 2019. |
| 338203 | Natural Pawz | Vintage Park, Texas | Shopping Center Lease, dated April 6, 2011, by and between Vintage Marketplace LTD, successor to Vintage Park LLC, as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., as tenant, as amended by that certain First Amendment to Shopping Center Lease, dated January 5, 2016, Second Amendment to Shopping Center Lease, dated June 5, 2020, and Third Amendment to Shopping Center Lease, dated June 1, 2021. |
| 338236 | Natural Pawz | Washington Ave., Houston, Texas | Lease Agreement, dated June 17, 2019, by and between DZ Washington, LLC, as landlord, and IPP – Stores, LLC, as tenant, as amended by that certain First Amendment to Lease Agreement, dated December 2, 2020. |

| 338204 | Natural Pawz | West University, Texas | Shopping Center Lease, dated November 6, 2008, by and between Brixmor West U Marketplace LLC , successor to U West Marketplace Associates, LP, as landlord, and  IPP – Stores, LLC, successor to CL&J Enterprises, Inc., as tenant, as amended by that certain First Amendment to Shopping Center Lease, dated October 23, 2009, Second Amendment to Shopping Center Lease, dated November 4, 2013, Third Amendment to Shopping Center Lease, dated June 28, 2017, Assignment and Assumption of Lease Agreement with Landlord's Consent, date July 31, 2018, and Lease Amendment No. 4, dated September 2, 2022. |

**<u>EXHIBIT G</u>**

**Bill of Sale**

## BILL OF SALE

This Bill of Sale, dated as of March 1, 2023 (this "<u>Bill of Sale</u>"), is made and entered into by and among INDEPENDENT PET PARTNERS HOLDINGS, LLC, a Delaware limited liability company ("<u>IPP Holdings</u>"), each of the Seller Subsidiaries (together with IPP Holdings, "<u>Sellers</u>"), and NP ACQUISITION LLC, a Texas limited liability company ("<u>Buyer</u>"). Capitalized terms used, but not defined, herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement, dated as of February 21, 2023 (the "<u>Asset Purchase Agreement</u>"), by and among Buyer and Sellers.

WHEREAS, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer, and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the rights, titles and interests of Sellers in and to the Purchased Assets; and

WHEREAS, Sellers desire to deliver to Buyer such instruments of sale, transfer assignment, conveyance and delivery as are required to vest in Buyer all of Sellers' rights, titles and interests in and to the Purchased Assets.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and pursuant to the Asset Purchase Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

1.     Each Seller hereby sells, transfers, assigns, conveys and delivers to Buyer all of its right, title and interest in and to the Purchased Assets. "<u>Purchased Assets</u>" means all of the direct or indirect right, title and interest of Sellers in and to (i) the inventory, furniture, fixtures, and equipment (excluding the Freezers) for and associated with the stores and only the stores set forth on <u>Schedule A</u> (collectively, the "<u>Stores</u>"); (ii) real estate leases associated with the Stores (and only such Stores) set forth on <u>Schedule B</u>, including, without limitation, all deposits, prepayments, and other similar amounts held or retained by the applicable landlord and any other credits or amounts due or for the benefit of the counterparties under such leases (the "<u>Store Leases</u>"); (iii) all trademarks, goodwill, social media accounts, and domain name registrations and corresponding websites  related to the "Natural Pawz" business of the Sellers, including, without limitation, such intellectual property set forth on <u>Schedule C</u> (the "<u>Purchased IP</u>"); (iv) transaction history and customer records with respect to the Stores, including, without limitation, grooming records (the "<u>Customer Records</u>"); and (v) customer data (the "<u>Program Data</u>") solely with respect to the gift card and loyalty programs (the "<u>Loyalty Programs</u>") for the "Kriser's Natural Pet" business and the "Natural Pawz" business solely with respect to customers residing in the State of Texas (the "<u>Applicable Customers</u>"). Freezers means, to the extent owned by third parties or vendors, all freezers, and any agreements with any vendors with respect to such freezers, located at the Stores.

2.     From time to time after the Closing Date, each party shall, upon the reasonable request of the other, execute and deliver or cause to be executed and delivered such further instruments of sale, conveyance, assignment, transfer and assumption, and take such further action,

1

as may reasonably be requested in order to more effectively carry out the purposes and intent of the Asset Purchase Agreement and this Bill of Sale.

3.      This Bill of Sale is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

4.      No provision of this Bill of Sale, express or implied, is intended or shall be construed to confer upon or give to any person, other than the parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Bill of Sale or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Bill of Sale shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

5.      The provisions of this Bill of Sale shall be deemed severable, and the invalidity or unenforceability of any provision of this Bill of Sale shall not affect the validity or enforceability of any other provisions of this Bill of Sale. If any provision of this Bill of Sale, or the application thereof to any person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Bill of Sale and the application of such provision to other persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

6.      None of the provisions of this Bill of Sale may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the party(ies) against whom the waiver is to be effective.

7.      This Bill of Sale is subject in all respects to the terms and conditions of the Asset Purchase Agreement. Nothing contained in this Bill of Sale shall be deemed to supersede or modify any of the covenants or other agreements contained in the Asset Purchase Agreement. To the extent any provision of this Bill of Sale is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

8.      This Bill of Sale and all matters arising out of, or related to, this Bill of Sale shall in all aspects be governed by, and construed in accordance with, the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the parties hereto shall be determined in accordance with such laws. The parties hereto agree that any suit, action, or proceeding one party commences against any other party pursuant to this Bill of Sale shall be brought exclusively in the Bankruptcy Court, and each of the parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in the Bankruptcy Court or that any such suit, action, or proceeding

which is brought in the Bankruptcy Court has been brought in an inconvenient forum; provided that if the Bankruptcy Court is unwilling or unable to hear any such suit, action, or proceeding, then the courts of the State of Delaware, sitting in New Castle County, Delaware, and the federal courts of the United States of America sitting in New Castle County, Delaware, shall have exclusive jurisdiction over such suit, action, or proceeding.

9.      This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Bill of Sale or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties have caused this Bill of Sale to be duly executed by their respective authorized officers as of the date first above written.

**SELLERS:**

**INDEPENDENT PET PARTNERS HOLDINGS, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS I, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS II, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS EMPLOYER HOLDINGS, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS EMPLOYER, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**IPP - STORES, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**IPP STORES EMPLOYER, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**PET LIFE, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**ESPECIALLY FOR PETS, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**WHOLE PET CENTRAL, LLC**

By _____
     Name: Julie Maday
     Title: Chief Executive Officer

**NATURAL PAWZ, LLC**

By _____
     Name: Julie Maday
     Title: Chief Executive Officer

**PET SOURCE, LLC**

By _____
     Name: Julie Maday
     Title: Chief Executive Officer

[*Signature Page to Bill of Sale*]

**BUYER**:

NP ACQUISITION LLC

By _____
Name: CARMEN L. PICONE
Title: CEO

[*Signature Page to Bill of Sale*]

**SCHEDULE A**

**Schedule of Stores**

| Store No. | Store | Location |
|---|---|---|
| 338178 | Kriser's Natural Pet | 20th Street, Houston, Texas |
| 338181 | Kriser's Natural Pet | Austin Arboretum, Austin Texas |
| 338176 | Kriser's Natural Pet | Buffalo, Texas |
| 338177 | Kriser's Natural Pet | Champions, Texas |
| 338184 | Kriser's Natural Pet | South Lamar, Texas |
| 338180 | Kriser's Natural Pet | Stone Oak, Texas |
| 338182 | Kriser's Natural Pet | West Gray, Texas |
| 338179 | Kriser's Natural Pet | Woodland Hughes, Texas |
| 338185 | Natural Pawz | Bridgeland, Texas |
| 338186 | Natural Pawz | Cedar Park, Texas |
| 338188 | Natural Pawz | Cypress, Texas |
| 338189 | Natural Pawz | Garden Oaks, Texas |
| 338191 | Natural Pawz | Kingwood, Texas |
| 338224 | Natural Pawz | Montrose, Texas |
| 338195 | Natural Pawz | Pinecroft, Texas |
| 338215 | Natural Pawz | Riverstone, Texas |
| 338198 | Natural Pawz | Springwoods, Texas |
| 338199 | Natural Pawz | Steiner Ranch, Texas |
| 338200 | Natural Pawz | Sterling Ridge, Texas |
| 338201 | Natural Pawz | Sugarland, Texas |
| 338230 | Natural Pawz | Tanglewood, Texas |
| 338203 | Natural Pawz | Vintage Park, Texas |
| 338236 | Natural Pawz | Washington Ave., Houston, Texas |
| 338204 | Natural Pawz | West University, Texas |

**SCHEDULE B**

**Schedule of Store Leases**

| Store No. | Store | Location | Lease |
|---|---|---|---|
| 338178 | Kriser's Natural Pet | 20th Street, Houston, Texas | Lease Agreement, dated December 6, 2013, by and between Rutland & 20th Realty Ltd., as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant, as amended by that certain First Amendment to Lease, dated February 13, 2014. |
| 338181 | Kriser's Natural Pet | Austin Arboretum, Austin, Texas | Sublease, dated June 8, 2016, by and between Vitamin Shoppe Industries Inc., as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant. |
| 338176 | Kriser's Natural Pet | Buffalo, Texas | Lease, dated October 10, 2013, by and between Plaza In the Park (Edens), LLC, successor to AmREIT Plaza In The Park, LP, as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant, as amended by that certain First Amendment to Lease, dated March 1, 2019, and Second Amendment to Lease, dated March 1, 2022. |
| 338177 | Kriser's Natural Pet | Champions, Texas | Shopping Center Lease, dated March 24, 2014, by and between Vintage Marketplace Ltd., as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant. |
| 338184 | Kriser's Natural Pet | South Lamar, Texas | Lease Agreement, dated July 12, 2017, by and between Mirabeau Office Partners, LLC, as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant. |

| 338180 | Kriser's Natural Pet | Stone Oak, Texas | Standard Commercial Shopping Center Lease, dated September 2, 2015, by and between Sonterra Village, L.P., as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant, as amended by that certain Lease Amendment, dated August 14, 2020, and Second Lease Amendment and Extension Agreement, dated September 9, 2022. |
|---|---|---|---|
| 338182 | Kriser's Natural Pet | West Gray, Texas | Shopping Center Lease, dated June 6, 2016, by and between W. Gray & Peden Realty, Ltd., as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant. |
| 338179 | Kriser's Natural Pet | Woodland Hughes, Texas | Retail Row Lease, dated October 31, 2014, by and between HHC Hughes Landing Retail, LLC, successor to HL Retail Row, LLC, as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant |
| 338185 | Natural Pawz | Bridgeland, Texas | Lease Agreement, dated November 9, 2015, by and between Cypress Creek Plaza, LLC, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant. |
| 338186 | Natural Pawz | Cedar Park, Texas | Shopping Center Lease, dated August 13, 2015, by and between Lakeline Center Cedar Park Phase IV LTD, as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., as tenant, as amended by that certain Assignment and Assumption of Lease and Consent, dated August 3, 2018, and Amendment to Lease #2, dated June 1, 2021. |

| 338188 | Natural Pawz | Cypress, Texas | Shopping Center Lease Agreement, dated July 25, 2012, by and between IA Cypress Cyfair Limited Partnership, successor to Inland American Retail Management, LLC, as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant, as amended by that certain Lease Extension Agreement, dated October 5th, 2017, Assignment and Assumption of Lease and Amendment to Lease, dated August 9, 2018, and Lease Amendment, dated August 8, 2022. |
| --- | --- | --- | --- |
| 338189 | Natural Pawz | Garden Oaks, Texas | Retail Lease, dated June 26, 2017, by and between The Shops at Oak Forest, LP, as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., as tenant, as amended by that certain Assignment and Assumption of Lease and Consent, dated July 30, 2018. |
| 338191 | Natural Pawz | Kingwood, Texas | Lease, dated May 28, 2013, by and between LH North Park, LLC, successor to NEC Northpark/59, L.C., as landlord and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant, as amended by that certain Assignment and Assumption of Lease and Consent, dated August 2, 2018. |
| 338224 | Natural Pawz | Montrose, Texas | Commercial Lease Agreement, dated March 12, 2019, by and between Tommey-Guseman Family Limited Partnership, as landlord, and IPP – Stores, LLC, successor to Kriser's Feeding Pets for Life, LLC, as tenant |

| 338195 | Natural Pawz | Pinecroft, Texas | Shopping Center Lease, dated October 20, 2009, by and between CSHV Woodlands, L.P., as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., as tenant, as amended by that certain First Amendment to Shopping Center Lease, dated December 5, 2014, Consent to Assignment of Lease, dated August 3, 2018, Assignment and Assumption of Lease, dated December 2, 2019, and Second Amendment to Shopping Center Lease, dated October 25, 2021, |
| --- | --- | --- | --- |
| 338215 | Natural Pawz | Riverstone, Texas | Shopping Center Lease, dated May 5, 2017, by and between The Village at Riverstone, LLC, as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant, as amended by that certain Assignment and Assumption Agreement, dated August 2, 2018, First Modification to Lease Agreement, dated September 20, 2018, Second Modification to Lease Agreement, dated January 7, 2019, and Assignment and Assumption of Lease, dated October 2019. |
| 338198 | Natural Pawz | Springwoods, Texas | Shopping Center Lease, dated April 13, 2017, by and between Spring Stuebner RRC I Inc., as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant, as amended by that certain Assignment and Assumption of Lease, dated October 2019. |

| 338199 | Natural Pawz | Steiner Ranch, Texas | Lease Agreement, dated November 6, 2015, by and between Whitestone Quinlan Crossing LLC, as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant, as amended by that certain Assignment of Lease Interest, dated August 9, 2018, Assignment and Assumption of Lease, dated October 2019, and Second Amendment to Lease, dated March 3, 2022. |
|---|---|---|---|
| 338200 | Natural Pawz | Sterling Ridge, Texas | Shopping Center Lease, dated June 14, 2005, by and between REG8 Sterling Ridge, LLC, successor to Regency Centers, L.P., as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., d/b/a Natural Pawz, as tenant, as amended by that certain First Modification to Lease Agreement, dated June 22, 2010, Second Modification to Lease, dated April 29, 2015, Third Modification to Lease, dated August 31, 2016, Assignment and Assumption Agreement, dated August 2, 2018, Omnibus Rent Deferral Lease Amendment, dated July 1, 2020, Fourth Modification to Lease, dated December 7, 2021, Fifth Modification to Lease, dated June 15, 2022, and Sixth Modification to Lease. |

| 338201 | Natural Pawz | Sugarland, Texas | Lease Amendment, dated April 8, 2008, by and between Lake Pointe Shopping Center, LP, successor to Lake Pointe Town Center, Ltd., as landlord, and JC&P Enterprises, LLC, d/b/a Natural Pawz, as tenant, as amended by that certain First Amendment to Lease, dated April 30, 2013, and Second Amendment to Lease, dated December 15, 2017. |
|---|---|---|---|
| 338230 | Natural Pawz | Tanglewood, Texas | Retail Lease Agreement, dated April 30, 2019, by and between SCC Tanglewood LP, successor to MBL 2200 Main II, LLC, as landlord, and IPP – Stores, LLC, as tenant, as amended by that certain First Amendment to Retail Lease Agreement, dated August 22, 2019. |
| 338203 | Natural Pawz | Vintage Park, Texas | Shopping Center Lease, dated April 6, 2011, by and between Vintage Marketplace LTD, successor to Vintage Park LLC, as landlord, and IPP – Stores, LLC, successor to CL&J Enterprises, Inc., as tenant, as amended by that certain First Amendment to Shopping Center Lease, dated January 5, 2016, Second Amendment to Shopping Center Lease, dated June 5, 2020, and Third Amendment to Shopping Center Lease, dated June 1, 2021. |
| 338236 | Natural Pawz | Washington Ave., Houston, Texas | Lease Agreement, dated June 17, 2019, by and between DZ Washington, LLC, as landlord, and IPP – Stores, LLC, as tenant, as amended by that certain First Amendment to Lease Agreement, dated December 2, 2020. |

| 338204 | Natural Pawz | West University, Texas | Shopping Center Lease, dated November 6, 2008, by and between Brixmor West U Marketplace LLC , successor to U West Marketplace Associates, LP, as landlord, and  IPP – Stores, LLC, successor to CL&J Enterprises, Inc., as tenant, as amended by that certain First Amendment to Shopping Center Lease, dated October 23, 2009, Second Amendment to Shopping Center Lease, dated November 4, 2013, Third Amendment to Shopping Center Lease, dated June 28, 2017, Assignment and Assumption of Lease Agreement with Landlord's Consent, date July 31, 2018, and Lease Amendment No. 4, dated September 2, 2022. |

**SCHEDULE C**

**Purchased IP**

Registered Trademarks:

| Jurisdiction | Registration No. | Registration Date | Filing Date | Mark |
|:---:|:---:|:---:|:---:|:---:|
| USA | 3718921 | 12/01/09 | 02/08/08 | NATURAL PAWZ |

Social Media Accounts:

1. https://www.facebook.com/NaturalPawz

2. https://www.instagram.com/naturalpawz/

3. https://www.linkedin.com/company/natural-pawz/

4. https://twitter.com/NaturalPawz

Registered Domain Names:

1. e-naturalpawz.com

2. NATURALPAWZ.COM

3. naturalpawz.org

# **EXHIBIT H**

**Lease Certificate**

## LEASE CERTIFICATE

This Lease Certificate (this "Certificate") is entered into as of March 1, 2023 and delivered in connection with that certain Asset Purchase Agreement, dated as of February 21, 2023 (the "Purchase Agreement"), by and among Independent Pet Partners Holdings, LLC, a Delaware limited liability company ("IPP Holdings"), the Seller Subsidiaries, and NP ACQUISITION LLC, A Texas limited liability company  (the "Buyer"). This Certificate sets forth the agreement and understanding among the undersigned parties regarding the Inventory Amounts (as defined below) and the Prepayment Amounts pursuant to the Purchase Agreement. All capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed to them in the Purchase Agreement.

1. Attached hereto as Schedule A is the schedule setting forth (i) the aggregate cost of the inventory of IPP Holdings and the Seller Subsidiaries in the Stores on the Closing Date, determined in accordance with the Purchase Agreement (the "Inventory Amounts"), (ii) the Prepayment Amounts with respect to each Store as of the Closing Date, and (iii) the Cure Amounts for each of the Store Leases  (the "Lease Schedule").

2. The parties acknowledge and agree that the Inventory Amounts, the Prepayment Amounts, and the Cure Amounts set forth on the Lease Schedule (i) are final and binding on the parties hereto and (ii) are not subject to modification or adjustment following the date hereof.

3. The undersigned may execute this instrument in one or more counterparts, all of which will be considered one and the same instrument and will become effective when one or more counterparts have been signed by each of the undersigned and delivered to the other undersigned. Counterparts may be delivered via facsimile, electronic mail (including .pdf or electronic signature) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

*[Signatures Appear on the Following Page]*

IN WITNESS WHEREOF, the parties have executed this Lease Certificate as of the date first written above.

<u>IPP HOLDINGS</u>:

INDEPENDENT PET PARTNERS
HOLDINGS, LLC

By: _____
Julie Maday, Chief Executive Officer

[*Signatures continue on following page.*]

[Signature Page to Lease Certificate]

BUYER:

NP ACQUISITION LLC

By: _____
Name: _CARMEN L. Picone_
Title: _CEO_

[Signature Page to Lease Certificate]

**SCHEDULE A**

Lease Schedule

See attached.

# **EXHIBIT I**

## **Trademark License**

# TRADEMARK LICENSE AGREEMENT

This **TRADEMARK LICENSE AGREEMENT** (this "Agreement"), is made as of March 1, 2023 (the "Effective Date") by and between Independent Pet Partners Holdings, LLC, a Delaware limited liability company, with an address at 8450 City Centre Drive, Woodbury, Minnesota 55125, and each of the Seller Subsidiaries (as defined in the Asset Purchase Agreement) (collectively, the "Licensor"), and NP Acquisition LLC, a Texas limited liability company, with an address at 12200 Stemmons Freeway, Suite 100, Dallas, TX 75243 (the "Licensee").

## BACKGROUND

**WHEREAS**, Licensor and Licensee are parties to that certain Asset Purchase Agreement, dated as of February 21, 2023 (the "Asset Purchase Agreement"), pursuant to which Licensee has acquired the Purchased Assets (as defined in the Asset Purchase Agreement) related to the business of operating those retail pet stores identified in the Asset Purchase Agreement as the "Stores" (as defined in the Asset Purchase Agreement) (the "Business"). Capitalized terms used herein, unless otherwise defined to the contrary, shall have the meanings assigned to those terms in the Asset Purchase Agreement; and

**WHEREAS**, Licensee desires to receive a limited license to use the Licensed Marks (defined below) for a limited period of time to allow it to transition away from use of the Licensed Marks in connection with the Business, and Licensor is willing to grant such a license, on the terms and subject to the conditions set forth in this Agreement and the Asset Purchase Agreement.

**NOW**, **THEREFORE**, in consideration of the premises and agreements set forth herein and in the Asset Purchase Agreement, the parties, each intending to be legally bound hereby, agree as follows:

## ARTICLE I
### LICENSE

1.1.    Grant of License. Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee, and Licensee hereby accepts, during the Term (defined below), a limited, non-exclusive, royalty-free, non-transferable, non-sublicensable license to use the trademarks set forth on Schedule A (the "Licensed Marks") solely to wind down use of the Licensed Marks at the Stores acquired by Licensee pursuant to the Asset Purchase Agreement in connection with the Business (the "License"). For purpose of clarity Licensor and Licensee acknowledge and agree that the Licensed Marks do not include the Purchased IP.

1.2.    Restrictions on Use. Licensee's use of the Licensed Marks shall be limited solely to such uses of the Licensed Marks that were made in connection with the Business as of the Effective Date, and only in the manner so used as of the Effective Date. Licensee may not use the Licensed Marks (a) on or in connection with any new or modified products, services or other materials (including marketing and promotional materials), it being understood that the Licensed Marks may be used only on and in connection with those products, services and materials that were distributed and sold by the Business as of the Effective Date, (b) in any manner that would represent, suggest or imply that Licensee is affiliated or sponsored in any way with Licensor or any of its affiliates, successors or assigns, or (c) in connection with any agreements entered into after the Effective Date. To the extent

Licensee uses the Licensed Marks in connection with the sale, promotion and distribution of products and services, Licensee shall limit such use to the products acquired pursuant to the Asset Purchase Agreement that constitute "Purchased Assets" thereunder and services existing as of the Effective Date, each of a level of quality consistent with the level of quality of such products and services as of the Effective Date.

      1.3.   <u>Trademark Rights</u>.

      (a)   Licensor shall retain all right, title and interest in and to the Licensed Marks and Licensee will not obtain any rights therein (other than the license described above). All goodwill generated by Licensee's use of the Licensed Marks as set forth herein shall inure solely to the benefit of Licensor.

      (b)   Licensee shall not, directly or indirectly, (i) apply to register or register any (x) trademark that is substantially or confusingly similar to any Licensed Mark, whether in whole or in part, or in combination with any other trademark, word or slogan or (y) domain name that incorporates a Licensed Mark or any trademark that is substantially or confusingly similar to any Licensed Mark, whether in whole or in part, or (ii) object to or challenge Licensor's ownership or rights in a Licensed Mark (or any trademark that is substantially or confusingly similar thereto) or Licensor's applications or registrations for a Licensed Mark (or any trademark that is substantially or confusingly similar thereto) anywhere in the world.

      1.4.   <u>Infringement</u>. Licensee shall notify Licensor promptly in the event that it becomes aware of any actual or potential infringement or other violation of the Licensed Marks. Licensor shall have the sole and exclusive right to enforce the Licensed Marks.

**ARTICLE II**
TERM AND TERMINATION

      2.1.   <u>Term</u>. The term of this Agreement (the "<u>Term</u>") shall commence on the Effective Date, and shall continue for a period of sixty (60) days from the Effective Date, unless terminated in accordance with this <u>Article II</u>.

      2.2.   <u>Termination for Breach</u>. Licensor may terminate this Agreement in the event of a material breach of any provision hereof by Licensee, on ten (10) days written notice to Licensee specifying such breach, *provided that* in the event that Licensee should remedy or otherwise cure such breach within such ten (10) day period, this Agreement shall not be terminated.

      2.3.   <u>Termination of APA</u>. Licensor may terminate this Agreement upon written notice effective immediately in the event that the Asset Purchase Agreement has been terminated.

      2.4.   <u>Termination Upon Notice</u>. Licensee shall have the right to terminate the Agreement without cause by giving Licensor ten (10) days prior written notice thereof.

      2.5.   <u>Termination for Insolvency</u>. Licensor may terminate this Agreement upon written notice effective immediately in the event Licensee (a) files a bankruptcy petition or is the subject of an involuntary bankruptcy petition; (b) becomes insolvent or admits in writing its inability to pay its debts

generally as they become due; or (c) goes into receivership or makes an assignment for the benefit of its creditors.

2.6.    <u>Termination for Assignment</u>. Unless Licensor has provided its prior written consent to an assignment or transfer pursuant to <u>Section 5.1</u>, Licensor may terminate this Agreement upon written notice effective immediately in the event of Licensee's breach of <u>Section 5.1</u>.

2.7.    <u>Consequences of Termination</u>. Upon expiration or termination of this Agreement, the License shall immediately terminate and Licensee shall immediately cease all use of the Licensed Marks.

## ARTICLE III
### DISCLAIMERS

3.1.    <u>No Obligation</u>. Licensor shall have no obligation hereunder to register, apply to register, maintain, defend or enforce any of the Licensed Marks.

3.2.    <u>Disclaimer</u>. LICENSOR MAKES NO REPRESENTATIONS OR WARRANTY AS TO THE LICENSED MARKS OR THE USE THEREOF. TO THE FULLEST EXTENT PERMITTED BY LAW, LICENSOR EXCLUDES ANY AND ALL OTHER WARRANTIES, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF ACCURACY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE, OR RESULTS. LICENSOR DOES NOT WARRANT THAT THE LICENSED MARKS ARE VALID OR ENFORCEABLE OR THAT THEY DO NOT INFRINGE THE RIGHTS OF ANY PERSON. UNDER NO CIRCUMSTANCES SHALL LICENSOR BE LIABLE FOR ANY INCIDENTAL, SPECIAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT OR FOR LOSS OF REVENUE, LOSS OF GOODWILL, LOSS OF BUSINESS OPPORTUNITY, LOSS OF DATA, OR LOSS OF PROFITS ARISING IN ANY MANNER FROM THIS AGREEMENT OR THE PERFORMANCE OR NONPERFORMANCE OF ANY OBLIGATIONS HEREUNDER REGARDLESS OF THE FORESEEABILITY THEREOF.

## ARTICLE IV
### OTHER OBLIGATIONS OF THE PARTIES

4.1.    <u>Confidentiality</u>. Each party covenants and agrees that it shall not disclose, sell, transfer, publish, display or otherwise make available to any third party any confidential or proprietary information of the other party disclosed to it in connection with this Agreement without the other party's prior written consent. Each party shall employ commercially reasonable efforts to prevent any unauthorized or unlawful use, disclosure, dissemination or copying of the confidential information of the other party. As used hereunder, confidential information shall not include information that the receiving party can demonstrate is, (i) known to the receiving party, without breach of a duty of confidentiality, prior to disclosure to the receiving party, (ii) publicly available, through no fault of the receiving party; (iii) disclosed to the receiving party by a third party having no obligation of confidentiality to the owner of such confidential information, or (iv) required to be disclosed by the receiving party as a matter of law.

**ARTICLE V**
MISCELLANEOUS

5.1.    <u>Assignment</u>.  Licensee may not assign or transfer this Agreement or any of its rights or obligations hereunder to any person or entity, whether by operation of law, Change of Control (as defined below) or otherwise, without the prior written consent of Licensor. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns (which in the case of Licensor, each Party expressly agrees shall include the Secured Lenders (as defined in the Asset Purchase Agreement), to whom this Agreement and the benefits provided herein shall be freely assignable (including pursuant to an amended Stalking Horse APA (as defined in the Asset Purchase Agreement) or otherwise) without any required approval or consent on the part of Licensee or any other person). Any purported assignment of this Agreement in violation of this <u>Section 5.1</u> shall be null and void, *ab initio*. "<u>Change Of Control</u>" means, with respect to Licensee, any direct or indirect acquisition at any time by any other person or entity of: (a) the power to direct (or cause the direction of) the management and policies of Licensee, whether through ownership of voting securities, through contract or otherwise; or (b) ownership of more than fifty percent (50%) of the voting stock, shares or interests of Licensee.

5.2.    <u>Amendment; Modification</u>. This Agreement may not be amended, modified, altered, or supplemented other than by means of a written instrument duly executed and delivered on behalf of Licensor, Licensee and the Secured Lenders (as defined in the Asset Purchase Agreement), who are express third-party beneficiaries of this Agreement with the right to enforce the same as if a direct party hereto. If any one or more of the provisions of this Agreement shall be determined to be invalid, illegal, or unenforceable in any respect under any applicable law, the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired; provided, however, that in any such case the parties agree to use their best efforts to achieve the purpose of the invalid provision by a new legally valid provision.

5.3.    <u>Governing Law</u>. This Agreement shall be interpreted and construed according to, and governed by, the laws of the State of Delaware, excluding any such laws that might direct the application of the laws of another jurisdiction.

5.4.    <u>Specific Performance</u>. Licensee acknowledges and agrees that Licensor would be damaged immediately, extensively and irreparably and no adequate remedy at law would exist in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached or violated. Accordingly, in addition to, and not in limitation of, any other remedy available to Licensor at law or in equity, Licensee hereby acknowledges and agrees that Licensor shall be entitled to an injunction or injunctions to prevent any breaches or violations of the provisions of this Agreement and to the remedy of specific performance of this Agreement and the terms and provisions hereof. Licensee hereby waives, and agrees not to assert, to the fullest extent permitted by law, (a) any defense that a remedy of injunctive relief or specific performance is unenforceable, invalid, contrary to law or inequitable for any reason; (b) any defense in any action for injunctive relief or specific performance, including the defense that a remedy at law would be adequate or that monetary damages would provide an adequate remedy; (c) any requirement under any law to post bond or other security as a prerequisite to obtaining equitable relief; and (d) any defense that injunctive relief or specific performance will cause an undue hardship to Licensee.

- 4 -

5.5.    <u>Costs</u>. All costs and expenses incurred in connection with this Agreement shall be paid by the party incurring such costs and expenses.

5.6.    <u>Interpretation</u>. Except as otherwise provided herein, references to Sections and Schedules, herein are references to Sections and Schedules of this Agreement.

5.7.    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile or portable document format (PDF) signatures will be deemed to be original signatures for all applicable purposes.

[*Signature Page Follows*]

**IN WITNESS WHEREOF**, the parties hereto have executed this Trademark License Agreement on the date and year first above written.

**LICENSOR:**

**INDEPENDENT PET PARTNERS HOLDINGS, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS I, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS II, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS EMPLOYER HOLDINGS, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS EMPLOYER, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**INDEPENDENT PET PARTNERS INTERMEDIATE HOLDINGS, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**IPP - STORES, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**IPP STORES EMPLOYER, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**PET LIFE, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

**ESPECIALLY FOR PETS, LLC**

By _____
Name: Julie Maday
Title: Chief Executive Officer

*[Signature page to Trademark License Agreement]*

**WHOLE PET CENTRAL, LLC**

By _____
　　Name: Julie Maday
　　Title: Chief Executive Officer

**NATURAL PAWZ, LLC**

By _____
　　Name: Julie Maday
　　Title: Chief Executive Officer

**PET SOURCE, LLC**

By _____
　　Name: Julie Maday
　　Title: Chief Executive Officer

*[Signature page to Trademark License Agreement]*

**LICENSEE:**

NP ACQUISITION LLC

By:
Name:   CARMEN L. Piccine
Title:   CEO

*[Signature page to Trademark License Agreement]*

SCHEDULE A

Licensed Marks

Registered Trademarks

| Name of Party | Jurisdiction | Registration No. | Registration Date | Filing Date | Mark |
|---|---|---|---|---|---|
| IPP-Stores, LLC | USA | 4345929 | 06/04/13 | 09/07/12 | Kriser's<br><br>KRISER'S |
| IPP-Stores, LLC | USA | 4776474 | 07/21/15 | 11/18/14 | KRISER'S NATURAL PET<br><br>KRISER'S NATURAL PET |
| IPP-Stores, LLC | USA | 4776475 | 07/21/15 | 11/18/14 | KRISER'S NATURAL PET<br><br>KRISER'S NATURAL PET |
| Independent Pet Partners Intermediate Holdings LLC | USA | 6512148 | Oct 5, 2021 | 12/20/2019 | 5 PILLARS OF PET WELLNESS |
| Independent Pet Partners Intermediate Holdings LLC | USA | 6329867 | Apr 20, 2021 | 12/20/2019 | FIVE PILLARS OF PET WELLNESS |
| Independent Pet Partners Intermediate Holdings LLC | USA | 6015384 | Mar 17, 2020 | 12/20/2018 | ROOSEVELT |
| Independent Pet Partners Intermediate Holdings LLC | USA | 6789887 | Jul 12, 2022 | 12/20/2018 | ROOSEVELT |
| Independent Pet Partners Intermediate Holdings LLC | USA | 6892954 | Nov. 8, 2022 | Sep. 15, 2021 | WILDSAINT |

Trademarks with Pending Trademark Applications

| Name of Party | Jurisdiction | Application No. | Filing Date | Mark |
|---|---|---|---|---|
| Independent Pet Partners Intermediate Holdings LLC | USA | 88729137 | Dec 16, 2019 | FIVE PILLARS OF WELLNESS |
| Independent Pet Partners Intermediate Holdings LLC | USA | 88726380 | Dec 13, 2019 | 5 PILLARS OF WELLNESS |
| Independent Pet Partners Intermediate Holdings LLC | USA | 97319912 | Mar 18, 2022 | ATTACHMENT THEORY |
| Independent Pet Partners Intermediate Holdings LLC | USA | 97424521 | May 23, 2022 | ROOSEVELT |

# **EXHIBIT J**

## **Store Performance Data**

Data Sent by IPP for Due Dilligence

Page 31 of Fall 2017 CIM

| | 2014 | 2015 | 2016 | 2020 | 2021 | 9 Mos. YTD 2022 | Annualized 2022 |
|---|---|---|---|---|---|---|---|
| Sales | $ 10,054,000 | 11,165,000 | 12,323,000 | $ 17,820,769 | 21,979,835 | 17,317,245 | 23,089,660 |
| COGS | $ 6,273,000 | 6,499,000 | 7,064,000 | 10,815,419 | 13,010,331 | 10,489,485 | 13,985,980 |
| Gross Profit | $ 3,781,000 | 4,666,000 | 5,259,000 | 7,005,351 | 8,969,504 | 6,827,760 | 9,103,680 |
| % Margin | 37.6% | 41.8% | 42.7% | 39.3% | 40.8% | 39.4% | 39.4% |
| | | | | | | | |
| Wages | $ 898,000 | 1,027,000 | 1,213,000 | $ 3,167,369 | 3,559,068 | 2,837,856 | 3,783,808 |
| Rent | $ 884,000 | 1,139,000 | 1,367,000 | 2,050,149 | 2,128,667 | 1,645,700 | 2,194,266 |
| CAM & Taxes | $ 228,000 | 245,000 | 278,000 | 716,808 | 822,288 | 552,255 | 736,339 |
| Other Opex | $ 2,010,000 | 2,411,000 | 2,858,000 | 1,006,101 | 1,177,345 | 979,491 | 1,305,988 |
| Total Opex | | | | 6,934,427 | 7,687,368 | 6,015,301 | 8,020,401 |
| | | | | | | | |
| EBITDA | $ 1,771,000 | 2,255,000 | 2,401,000 | 70,923 | 1,282,136 | 812,459 | 1,083,279 |
| % Margin | 17.6% | 20.2% | 19.5% | 0.4% | 5.8% | 4.7% | 4.7% |
| | | | | | | | |
| Corporate | $ 1,607,000 | 1,705,000 | 2,023,000 | | | | |
| EBITDA | $ 164,000 | 550,000 | 378,000 | | | | |
| % Margin | 1.6% | 4.9% | 3.1% | | | | |
| | | | | | | | |
| Expenses as % of Total Sales | | | | | | | |
| Wages | 8.9% | 9.2% | 9.8% | 17.8% | 16.2% | 16.4% | 16.4% |
| Rent | 8.8% | 10.2% | 11.1% | 11.5% | 9.7% | 9.5% | 9.5% |
| CAM & Taxes | 2.3% | 2.2% | 2.3% | | | | |
| Other Opex | 16.0% | 15.3% | 16.4% | 5.6% | 5.4% | 5.7% | 5.7% |
| Corporate | | | | | | | |