**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| INDEPENDENT PET PARTNERS | ) | |
| HOLDINGS, LLC,[1] | ) | Case No. 23-10153 (LSS) |
| | ) | |
| Post-Confirmation Debtor. | ) | |
| | ) | |

### OBJECTION TO THE APPLICATION OF NP ACQUISITION LLC FOR ALLOWANCE AND PAYMENT OF A CHAPTER 11 ADMINISTRATIVE EXPENSE

The IPP Liquidation Trust (the "Trust") established in the above-captioned chapter 11 case pursuant to the confirmed Plan (defined below) of Independent Pet Partners Holdings, LLC (the "Debtor") and its debtor affiliates (collectively, the "Debtors"), by and through the Trust's undersigned counsel, hereby files this objection (the "Objection") to the *Application of NP Acquisition LLC for Allowance and Payment of a Chapter 11 Administrative Expense* (the "NP Administrative Claim").[2]  In support of the Objection, the Trust submits the *Declaration of Julie Maday* (the "Maday Declaration") substantially contemporaneous herewith.  In further support of the Objection, the Trust respectfully represents as follows:

### PRELIMINARY STATEMENT

1.      After purchasing from the Debtors twenty-four Stores[3] in Texas and operating them for nearly five months, NP Acquisition now has buyer's remorse. Recognizing that it has no legal basis to unwind the Transaction, NP Acquisition has instead concocted a multitude of baseless contract and tort claims against the Debtors, and is seeking a full refund of the Purchase Price in

---

[1]      The mailing address for the Trust established pursuant to the Plan and Confirmation Order (each as defined herein) is c/o MHR Advisory Group, LLC, 6701 Bay Parkway, 3rd Floor, Brooklyn, New York 11204, Attn: Steven Balasiano.

[2]      D.I. 580.

[3]      All capitalized terms used in this Preliminary Statement are defined below.

the form of damages.  NP Acquisition, however, has submitted no evidence whatsoever that supports its conclusory allegations that the Debtors misled it before the closing and "sabotaged" NP Acquisition's business thereafter. Rather, the indisputable evidence conclusively disproves each and every one of NP Acquisition's claims.

2.      Indeed, the Debtors were open and transparent with NP Acquisition throughout the negotiation and execution of the Transaction and satisfied all of their contractual obligations to NP Acquisition.  NP Acquisition's obvious disappointment in the Stores' performance over the past five months does not give rise to an enforceable claim against the Debtors. NP Acquisition's claims against the Debtors fail on both the law and the facts, and NP Acquisition's administrative expense claim should be disallowed.

## JURISDICTION

3.      This Court has jurisdiction to consider this Objection pursuant to 28 U.S.C. §§ 157 and 1334.

4.      This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B) and (O).

5.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The statutory bases for the relief requested herein are sections 105(a) and 502(b) of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 3007 and 9014 of the Federal Rules of Bankruptcy Procedure.

## PROCEDURAL BACKGROUND

7.      On February 5, 2023, the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code.

8.      On February 10, 2023, the Debtors filed a *Motion of Debtors for Entry of Order (A) Approving the Private Sale of Certain of Debtors' Assets Free and Clear of Liens, Claims and*

*Encumbrances, with Such Interests to Attach to the Proceeds, (B) Authorizing the Assumption and Assignment of Certain Nonresidential Real Property Leases to Buyer, and (C) Granting Related Relief* (the "Sale Motion").[4]  Attached to the Sale Motion was a Letter of Intent summarizing the terms of a proposed sale by the Debtors of certain assets to NP Acquisition.[5]

9.      On February 24, 2023, the Bankruptcy Court entered an *Order (A) Authorizing Debtors to Sell by Private Sale Certain of Debtors' Assets Free and Clear of Liens, Claims, and Encumbrances, with Such Interests to Attach to the Proceeds, (B) Authorizing the Assumption and Assignment of Certain Nonresidential Real Property Leases to NP Acquisition, and (C) Granting Related Relief (NP Acquisition LLC)* (the "Sale Order").[6]  An Asset Purchase Agreement ("APA"), dated February 22, 2023, between the Debtors and NP Acquisition LLC ("NP Acquisition") was attached as Exhibit 1 to, and was approved by, the Sale Order.[7]

10.      The Sale Order contains, among other things, an explicit finding by the Court that the APA and the transactions contemplated therein were negotiated, proposed, and entered into in good faith and from arm's length bargaining positions.[8]  The Sale Order further provides that in the event of a conflict between the terms of the Sale Order and the terms of the APA, the terms of the Sale Order shall control.[9]

11.      In light of various objections to the Sale Motion in connection with disputed cure amounts, the Sale Order required the Debtors to reserve certain amounts as "maximum Cure

---

[4]      D.I. 88.

[5]      D.I. 88-1.

[6]      D.I. 185.

[7]      D.I. 185-1.

[8]      D.I. 185 at 8.

[9]      *Id.* at 14.

Amounts" with respect to particular assumed Store Leases with five landlords,[10] and ordered the Debtors and landlord counterparties to such Assumed Leases to resolve their respective disputes as to those cure amounts within 30 days or seek a hearing.[11]  The Debtors negotiated with the landlords to reduce the cure amounts under these leases to well below the maximum Cure Amounts and the Debtors paid the landlords the agreed-upon amounts. The Sale Order further provides for Bankruptcy Court retention of exclusive jurisdiction to resolve any dispute concerning the Sale Order or APA.[12]

12.    On June 30, 2023, the Bankruptcy Court entered its order (the "Confirmation Order")[13] confirming the *Combined Disclosure Statement and Chapter 11 Plan of Liquidation Proposed by the Debtors and the Official Committee of Unsecured Creditors* (the "Plan").[14]  The Plan became effective on June 30, 2023.[15]

13.    Pursuant to the Plan and Confirmation Order, on the Effective Date, the Trust was created and Steven Balasiano (the "Trustee") was appointed as Trustee of the Trust.[16]  Among other things, the Plan provided for all of the Debtors' remaining assets to be transferred to the Trust on the effective date of the Plan, and authorized the Trust, through the Trustee, to administer certain post-effective date responsibilities, including objecting to and resolving claims against the Debtors.  Pursuant to section 10.3(i) of the Plan, the Trust, acting by and through the Trustee, is

---

[10]    Those five landlords were (1) Brixmor West U Marketplace, LLC, (2) Brixmor Lake Point Village, LLC, (3) Plaza in the Park (Edens), LLC, (4) Regency Centers, L.P., and (5) SITE Centers Corp., as managing agent for SCC Tanglewood LP.

[11]    *Id.* at 12-13.

[12]    *Id.* at 14.

[13]    D.I. 543.

[14]    D.I. 457.

[15]    D.I. 545.

[16]    D.I. 457; D.I. 543.

empowered to exercise all power and authority that may be exercised by any officer, director, or Holder of an Interest in the Debtors with like effect as if authorized, exercised, and taken by unanimous consent of such officers, directors, or Holders of Interests.[17]

14.    On July 31, 2023, NP Acquisition filed the NP Administrative Claim.[18]  NP Acquisition also filed the *Complaint of NP Acquisition LLC, Application for Allowance of an Administrative Expense Under 11 U.S.C. § 503(b)(1), and Request for an Accounting and Other Relief* (the "Complaint"), commencing an adversary proceeding before this Court, Adv. Proc. No. 23-50451.[19]  The Complaint alleges a myriad of purported post-petition torts and breaches of contract by the Debtors.[20]

15.    On August 28, 2023, NP Acquisition and the Trust entered into a *Stipulation Regarding the Complaint of NP Acquisition LLC, Application for Allowance of an Administrative Expense under 11 U.S.C. § 503(b)(1), and Request for an Accounting and Other Relief* (the "Stipulation").  The Stipulation provides for the Complaint to be voluntarily dismissed without prejudice and the claims and causes of action alleged therein by NP Acquisition pursued by means of the NP Administrative Claim.  On August 28, 2023, the Bankruptcy Court entered an Order approving the Stipulation.[21]

---

[17]    D.I. 457 at 48-49.

[18]    D.I. 580.

[19]    D.I. 581.

[20]    *Id.*

[21]    Adv. Proc. No. 23-50451 (LSS), D.I. 4.  Paragraph 6 of the Stipulation provides, in pertinent part, that "the Trustee's response or other objection to the [NP Administrative Claim] shall include an answer to the allegations in the Complaint on a paragraph-by-paragraph basis, and shall be filed by no later than September 28, 2023."  *Id.*  The agreed-upon paragraph-by-paragraph response to the allegations in the Complaint is attached hereto as **Exhibit 1**.

## FACTUAL BACKGROUND

### I.    The Asset Purchase Agreement.

16.    On or about February 22, 2023, NP Acquisition and the Debtors entered into the APA for the sale by the Debtors of assets pertaining to twenty-four stores in Texas (the "Stores") to NP Acquisition.[22]

17.    Under the APA, NP Acquisition purchased specified assets from the Debtors (the "Purchased Assets"), namely: (i) the inventory, furniture, fixtures, and equipment for the Stores; (ii) the real estate leases associated with the Stores, including all deposits, prepayments, and other amounts held by the applicable landlord (the "Store Leases"); (iii) all trademarks, goodwill, social media accounts, and domain name registrations and corresponding websites related to the "Natural Pawz" business of the Debtors (the "Purchased IP"); (iv) the transaction history and customer records with respect to the Stores, including grooming records (the "Customer Records"); and (v) customer data with respect to the gift card and loyalty programs from the "Kriser's Natural Pet" business and the "Natural Pawz" business for customers in the State of Texas (the "Program Data").[23]

18.    Under the APA, NP Acquisition acquired the Purchased Assets on an "as is, where is" basis and "without any representation or warranty."[24]  The APA further provided that NP Acquisition waived "[t]o the fullest extent permitted by law" all rights it may have against the Debtors regarding any form of warranty relating to the Purchased Assets.[25]

---

[22]    D.I. 185-1.

[23]    *Id*. at 3 (APA § 1).

[24]    D.I. 185-1 at 3 (APA § 1).

[25]    *Id*. at 9 (APA § 14).

19.     The consideration for the Purchased Assets that NP Acquisition was required to pay included the sum of 200% of the "Inventory Amount" plus cash in the amount of $475,000 (collectively, the "Purchase Price").[26]  The APA defined Inventory Amount as "the aggregate cost of the Sellers' inventory in the Stores on [the] Closing Date, which shall be determined by the inventory reflected in the Debtors' POS System on the Closing Date with respect to each Store as mutually agreed upon in good faith by NP Acquisition and Debtors and set forth on the Lease Certificate."[27]  The "POS System" is the point-of-sale system used by the Debtors at the Stores as of the Closing Date.[28]

20.     The APA provided that NP Acquisition could request backup information reasonably acceptable to NP Acquisition to substantiate the Inventory Amount based upon the average cost of the inventory item at the SKU level.[29]

## II.     The Debtors' Efforts to Provide Pre-Closing Information to NP Acquisition.

21.     In connection with the transaction contemplated under the APA, the Debtors provided NP Acquisition with certain financial and business information relating to the Stores in advance of the Closing Date.[30]

22.     Among other information, the Debtors provided NP Acquisition with historical sales and other financial information relating to the Stores.[31]  The data reflected in Exhibit J of NP Acquisition's Complaint,[32] for example, was exported from the Debtors' NetSuite financial

---

[26]     *Id*. at 4 (APA § 4).

[27]     *Id*.

[28]     *Id*.

[29]     *Id*.

[30]     Maday Decl. ¶¶ 4-5.

[31]     *Id*. at ¶ 5.

[32]     D.I. 581-10.

reporting software, which the Stores used in connection with their operations, and was made available to NP Acquisition through a data site.[33]  Because it was extracted directly from the point of sale system through NetSuite, the sales data that the Debtors provided to NP Acquisition accurately reflects the historical performance of the Stores for the periods covered.

23.    The Debtors also transferred customer records and other data to NP Acquisition in the format in which it was maintained.  Jodi Funk, the Debtors' Vice President of Information Technology, directed the upload of customer-related data to a secure file transfer protocol operated by Amazon Web Services, to which NP Acquisition was given access.[34]  The Debtors uploaded data reflecting, among other things, loyalty and gift card balances for the Natural Pawz business, loyalty and gift card balances for the Kriser's Natural Pet business, and customer records for the Stores.[35]

24.    The Debtors also authorized their point-of-sale vendor, Kliger-Weiss Infosystems ("KWI"), to provide sales data for the Stores directly to NP Acquisition.[36]  On February 26, 2023, three days before the Closing Date, the Debtors signed a letter to KWI authorizing it to share with NP Acquisition detailed records with respect to the Stores' business, including SKU level inventory and transaction level data.[37]

25.    The same day, NP Acquisition and the Debtors executed a letter agreement in connection with the KWI data transfer (the "Letter Agreement").[38]  NP Acquisition acknowledged in the Letter Agreement that the collection and compilation of data "entails the likelihood of some

---

[33]    Maday Decl. ¶ 5.

[34]    *Id.* ¶ 10.

[35]    *Id.*

[36]    Maday Decl. ¶¶ 7-8.

[37]    *Id.*; *see also* Maday Decl. Ex. A.

[38]    Maday Decl. ¶ 9.

human and machine errors, omissions, delays, interruptions, and losses, including inadvertent loss of data or damage to media that may give rise to loss or damage."[39]  The letter agreement, like the APA, also provided that NP Acquisition would receive the KWI data "as is" and that "KWI makes no representation or warranty with respect to the accuracy, completeness, or currentness of the data."[40]  Under the Letter Agreement, NP Acquisition agreed "to use commercially reasonable efforts to work with KWI to redact and erase" certain "Proprietary Information" that was imbedded in and part of the data, which included "cost data of inventory, purchase orders and vendor discounts and incentives."[41]

26.     The Debtors also provided NP Acquisition with the Inventory Amount as of the close of business on February 27, 2023, which totaled $1,054,373.[42]  The Debtors pulled the Inventory Amount directly from the Debtors' point-of-sale system based on the average cost of the inventory, as required by the APA.[43]  NP Acquisition never requested any backup data concerning those numbers.[44]

### III.    <u>The Closing and Other Transaction Documents.</u>

27.     The transaction contemplated under the Sale Order and APA (the "<u>Transaction</u>") closed on March 1, 2023 (the "<u>Closing Date</u>"), at which time the Debtors and NP Acquisition executed ancillary transaction agreements required to fully document the Transaction (together with the APA, collectively, the "<u>Transaction Documents</u>").

---

[39]     Maday Decl. Ex. B.

[40]     *Id*.

[41]     *Id.*

[42]     Maday Decl. ¶ 14.

[43]     *Id.*

[44]     *Id.* at ¶ 15.

28.    First, the Debtors and NP Acquisition executed an Intellectual Property Assignment Agreement, effective March 1, 2023 (the "IP Assignment").[45]  Pursuant to the IP Assignment, the Debtors sold and assigned to NP Acquisition their title and interest in the "Purchased IP," which included the following items listed in Schedule A to the IP Assignment: (a) registered Trademark No. 3718921; (b) accounts for Twitter, Facebook, Instagram and LinkedIn ("Social Media Accounts"); and  (c) registered domain names for e-naturalpawz.com; NATURALPAWZ.COM; naturalpawz.org (the "Domain Names").[46]

29.    Second, the Debtors and NP Acquisition entered into an Assignment and Assumption Agreement, dated March 1, 2023 (the "Assignment Agreement").[47]  Pursuant to the Assignment Agreement, the Debtors assigned to NP Acquisition the nonresidential real property leases for the Stores and Assumed Liabilities (as defined in the APA) associated with the Purchased Assets.[48]

30.    Third, the Debtors and NP Acquisition executed a Bill of Sale, dated March 1, 2023 ("Bill of Sale").[49]  Pursuant to the Bill of Sale, the Debtors sold and assigned all of their interest in the Purchased Assets to NP Acquisition.[50]

31.    Fourth, NP Acquisition and the Debtors executed a document denominated a "Lease Certificate" effective March 1, 2023 (the "Lease Certificate"), which, among other things, set forth the parties' "agreement and understanding" regarding the Inventory Amounts.[51]  In the

---

[45]    D.I. 581-5.

[46]    *Id.* at 2, 8.

[47]    D.I. 581-6.

[48]    *Id.* at 2.

[49]    D.I 581-7.

[50]    *Id.* at 2.

[51]    Maday Decl., Ex C.

Lease Certificate, the parties agreed that the Inventory Amounts set forth in Schedule A thereto "are final and binding on the parties" and "not subject to modification or adjustment."[52]  The Debtors extracted the Inventory Amounts used to calculate that portion of the Purchase Price attributable to such Inventory Amounts directly from the Debtors' point-of-sale system, as required by the APA.[53]  The Inventory Amount reflected in Schedule A to the Lease Certificate was $1,054,373, yielding a total Purchase Price of approximately $2.58 million.[54]

## IV.   **The Debtors' Transfer of the Purchased IP to NP Acquisition**

32.    On or prior to the Closing Date, the Debtors transferred to NP Acquisition all of the Purchased IP listed in Schedule A of the IP Assignment.

33.    <u>Domain Names</u>. The Debtors transferred the Domain Names to NP Acquisition on or about February 27, 2023.[55]

34.    <u>Facebook</u>. The Debtors' transfer of administrator status with respect to the "Natural Pawz" Facebook account to NP Acquisition was completed on or about February 28, 2023, the day prior to the Closing Date.[56]  With this status, NP Acquisition could add or remove other authorized users with respect to the account.[57] After the Closing Date, NP Acquisition inquired about additional Facebook accounts that it believed were related to the Stores.[58]  The Debtors, however, confirmed that they did not own or operate the additional identified accounts.[59]

---

[52]    *Id.*

[53]    Maday Decl. ¶¶ 13, 14.

[54]    Maday Decl. Ex. C at 5.

[55]    Maday Decl. ¶ 17, Ex. D.

[56]    *Id.* at ¶ 18; Maday Decl. Ex. E.

[57]    *Id.*

[58]    Maday Decl. ¶ 26; Maday Decl. Ex. I.

[59]    *Id.*

35.    <u>Instagram</u>. The Debtors transferred the username and password for the Natural Pawz Instagram account to NP Acquisition on or about February 28, 2023, which provided NP Acquisition with the ability to change the password and update the contact information.[60]

36.    <u>LinkedIn</u>. On or about February 28, 2023, the Debtors added NP Acquisition as "Super Admin" on the Natural Pawz LinkedIn account, which provided NP Acquisition with the ability to add and remove access to the Natural Pawz LinkedIn.[61]

37.    <u>Twitter</u>. On or about February 28, 2023, the Debtors sent the username and password for the Natural Pawz Twitter account to NP Acquisition.[62]  With the login information, NP Acquisition could change the username and password.[63]

38.    On or after the Closing Date, NP Acquisition requested that the Debtors transfer to it control over additional accounts that were not identified in the IP Assignment or the APA.  The Debtors promptly responded to and complied with these additional requests.

39.    For example, on March 1, 2023 (*i.e.*, the Closing Date), NP Acquisition requested help accessing Google My Business.[64]  The Debtors responded just two hours later stating that while Google My Business was not on the list of Purchased IP, the Debtors would make a reasonable effort to transfer it as well.  The Debtors then proceeded to transfer ownership of the Google Business account to NP Acquisition that same day.[65]

40.    On May 3, 2023, NP Acquisition contacted the Debtors indicating that that after the transfer occurred, an unnamed user had changed the status of certain stores to that of

---

[60]    Maday Decl. ¶ 19; Maday Decl. Ex. E at 5.

[61]    Maday Decl. ¶ 20; Maday Decl. Ex. E at 3-4.

[62]    Maday Decl. ¶ 21; Maday Decl. Ex. E at 5-6.

[63]    *Id.*

[64]    Maday Decl. ¶ 22; Maday Decl. Ex. F at 3.

[65]    *Id.* at 1.

"permanently closed."[66]  In response, the Debtors advised NP Acquisition that after an account is transferred and administrator status is conferred on NP Acquisition, the Debtors no longer had the ability to control who accessed the account and that NP Acquisition would need to delete access for unauthorized users.[67]  In response, Ms. Jolie-Coeur of NP Acquisition stated: "I did not say that you are intentionally changing accounts."[68]

41.     On April 22, 2023, NP Acquisition reached out to the Debtors and requested assistance in assigning the Natural Pawz business page in Yelp to an NP Acquisition representative.[69]  The Debtors responded the same day, identifying Rachel Larson as a person that would be happy to work with NP Acquisition on the Debtors' behalf.[70]  NP Acquisition did not take the Debtors up on their offer of help until one week later when it again reached out to the Debtors about the Yelp page on May 1, 2023.[71]  Again, the Debtors responded on a same-day basis reiterating their willingness to help.  On May 2, 2023, the Debtors submitted a request to Yelp to transfer the account at NP Acquisition's request.[72]

## RELIEF REQUESTED

42.     By this Objection, the Trust objects to the NP Administrative Claim and seeks entry of an order (the "Proposed Order"), substantially in the form attached hereto as **Exhibit 2**, pursuant to sections 105(a), and 502(b) of the Bankruptcy Code and Bankruptcy Rule 3007 disallowing the NP Administrative Claim.

---

[66]     Maday Decl. ¶ 23; Maday Decl., Ex G.

[67]     *Id.*

[68]     *Id.*

[69]     Maday Decl. ¶ 24; Maday Decl. Ex. G at 6.

[70]     *Id*.

[71]     *Id.*

[72]     Maday Dec. ¶ 25; Maday Decl. Ex. H.

43.     In addition, as outlined below, the patently false statements alleged in the NP Administrative Claim and the Complaint have forced the Trust to incur significant time, effort and expense to refute, with limited resources to do so.  As such, the Trust reserves all rights to seek reimbursement of its attorneys' fees and expenses from NP Acquisition in connection with this Objection.

## ARGUMENT

44.     Section 502(a) of the Bankruptcy Code provides in relevant part that "[a] claim or interest, proof of which is filed under this section 501 of this title, is deemed allowed, unless a party in interest. . . objects."  11 U.S.C. § 502(a).  Once an objection to a claim is filed, the Court, after notice and hearing, shall determine the allowed amount of the claim.  *See* 11 U.S.C. § 502(b).

45.     Section 502(b) of the Bankruptcy Code further provides that a claim may not be allowed to the extent that it "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law."  11 U.S.C. § 502(b).  In this case, the NP Administrative Claim should be disallowed and expunged because NP Acquisition cannot establish any liability on the part of the Debtors.  Specifically, each of NP Acquisition's five causes of action fail to state a claim as a matter of law and are easily undermined by the evidence.  Accordingly, they are unenforceable against the Debtors and the Trust.

I.     **NP Acquisition Has Not and Cannot Establish Breach of Contract.**

46.     Under Delaware law, which governs the Transaction Documents, to establish a claim for breach of contract, the plaintiff must prove by a preponderance of the evidence that: (1) a contract existed between the parties; (2) the defendant breached its obligation under the contract, and (3) the plaintiff suffered damages as a result.  *H-M Wexford LLC v. Encorp, Inc*., 832 A.2d 129, 140 (Del. Ch. 2003).  Delaware courts "start by looking to the four corners of the contract to conclude whether the intent of the parties can be determined from its express language."  *Paul v.*

*Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009).  If the contract is clear and unambiguous on its face, Delaware courts will not rely on extrinsic evidence to interpret the contract.  *Pellaton v. Bank of N.Y.*, 592 A.2d 473, 478 (Del. 1991).

47.      Notwithstanding the multitude of baseless theories advanced in the Complaint[73]— based primarily (if not exclusively) on fabrication by NP Acquisition—the evidence shows that the Debtors have fully complied with all of their contractual obligations under the APA and other Transaction Documents.  NP Acquisition's breach of contract claims are unsupported by the plain terms of the Transaction Documents and are otherwise belied by the facts.

A.      **The Debtors Transferred All Purchased IP in Accordance with the Transaction Documents.**

48.      NP Acquisition falsely asserts that the Debtors breached the APA by failing to transfer "key marketing domains" to NP Acquisition for months after the Closing Date.[74]  In fact, the Debtors transferred all of the Purchased IP identified in the Transaction Documents to NP Acquisition on or before the Closing Date. The Debtors also promptly responded to NP Acquisition's post-Closing Date requests to transfer additional accounts to NP Acquisition and took commercially reasonable measures to ensure that those accounts were timely transferred as well.

49.      Under the APA, NP Acquisition purchased the "trademarks, goodwill, social media accounts, and domain name registrations" related to the Natural Pawz business—i.e. the Purchased IP.[75]  Schedule D of the APA listed particular items that were included within the Purchased IP.[76]

---

[73]      Although the Complaint was dismissed by mutual agreement in accordance with the Stipulation, it is attached to the NP Administrative Claim as Exhibit 1 thereto and is expressly incorporated by reference "as if it were fully set forth in [the NP Administrative Claim]."  *See* D.I. 580 at 4 ¶ 8.

[74]      D.I. 581 at 10.

[75]      D.I. at 185-1 at 3.

[76]      *Id.* at 26.

On March 1, 2023, the parties entered into the IP Assignment, which set forth additional terms governing the sale of the Purchased IP and likewise identified particular items that were included in the Purchased IP.[77]  Schedule A of the IP Assignment matched Schedule D of the APA.[78]

50.     Prior to the Closing Date, the Debtors transferred to NP Acquisition ownership of, and control over, all of the intellectual property reflected in Schedule D of the APA and Schedule A of the IP Assignment and NP Acquisition provided the Debtors with written confirmation of the transfers.[79]  NP Acquisition's allegation that the Debtors failed to transfer the "Natural Pawz" Facebook, Instagram, Linked-In, and Twitter accounts for months after the Closing Date is therefore demonstrably false.[80]  Any portion of the NP Administrative Claim predicated upon the Debtors' alleged failure to timely transfer these assets is completely meritless.[81]

51.     In addition, on or after the Closing Date, NP Acquisition requested that the Debtors transfer control over additional business pages or accounts to NP Acquisition that were not identified in the Transaction Documents.  The Debtors timely responded to and complied with each of NP Acquisition's requests.

52.     For example, on March 1, 2023 (i.e. the Closing Date), NP Acquisition requested that Debtors transfer control over a Google My Business account.[82]  This account was not

---

[77]     D.I. 581-5.

[78]     *Id.* at 8.

[79]     Maday Decl. ¶ 16.

[80]     After the Closing Date, NP Acquisition inquired about an additional Facebook account that it believed was tied to the Stores. IPP confirmed that it did not own the account and that it may have been operated by a groomer. (Maday Decl. ¶ 26.)

[81]     Strikingly, all of the allegations in the NP Administrative Claim, inclusive of the Complaint incorporated therein, are bald assertions unsupported by any declaration signed under penalty of perjury.  Nevertheless, the NP Administrative Claim is subject to the penalties set forth in 18 U.S.C. §§ 157 and 3571 to the same extent as if Official Form 410 had been used to assert the claims set forth therein, as well as, *inter alia*, Bankruptcy Rule 9011.  The Trust reserves all rights.

[82]     Maday Decl. ¶ 22, Ex. F.

identified anywhere in the APA or IP Assignment. Nevertheless, the Debtors responded immediately to NP Acquisition's request and worked cooperatively to transfer control over the account.[83]

53.     NP Acquisition's assertion that the Debtors did not timely transfer control over a Yelp business page is also meritless.  The Yelp business page is another account that was not identified in the Transaction Documents.  Despite being under no obligation to do so, the Debtors timely responded to NP Acquisition's post-Closing Date request to transfer control over the page.[84]

54.     Indeed, NP Acquisition reached out to the Debtors on April 22, 2023, and requested assistance in assigning the Natural Pawz business page in Yelp to an NP Acquisition representative.[85]  The Debtors responded *the same day* offering to assist with the transfer, and identifying an individual within their organization who could be a resource.[86]  NP Acquisition reached out again on May 1, 2023.  Again, the Debtors responded *the same day* asking how they could help. When NP Acquisition reached out again two days later, the Debtors confirmed that they had already submitted a request to Yelp to transfer the account on May 2, 2023.[87]

55.     NP Acquisition's assertion that the Debtors' personnel "maintained access" to certain accounts after the Debtors transferred control over them to NP Acquisition is also meritless.[88]  Once NP Acquisition acquired control over any of these accounts, NP Acquisition had the exclusive authority to add or remove authorized users, not the Debtors.[89]  NP Acquisition

---

[83]     *Id*.

[84]     Maday Decl. ¶¶ 24, 25, Exs. G, H.

[85]     *Id.*

[86]     *Id.*

[87]     Maday Decl. Ex. G; *see also* Ex. H.

[88]     *See* D.I. 508-1 at ¶ 32.

[89]     Maday Decl. ¶¶ 22, 23, Ex. G.

is well-aware of this truism not only as a matter of basic common sense, but also because the Debtors told them.  For example, in May 2023, NP Acquisition contacted the Debtors to complain that after NP Acquisition obtained control over the Google account, the status of certain Stores was changed to permanently closed.[90]  The Debtors advised NP Acquisition that "once ownership is transferred you all will need to delete access of others to the accounts. It's not something we are able to do."[91]  Any unauthorized changes to the external-facing status of the Stores on the internet that occurred after an account was transferred were therefore NP Acquisition's responsibility to prevent.

56.    The Debtors fully performed all of their obligations under the APA and IP Assignment with respect to the Purchased IP, and then some.  The Debtors transferred all of the Purchased IP identified in the Transaction Documents on or prior to the Closing Date.  The Debtors also worked diligently with NP Acquisition to ensure the timely transfer of additional accounts upon request from NP Acquisition.  NP Acquisition's breach of contract claim is meritless and NP Acquisition is not entitled to an allowed administrative expense claim in any amount.

**B.    The Debtors Delivered the Customer Records and Program Data as Required Under the APA.**

57.    NP Acquisition's second breach of contract theory is that the Debtors allegedly did not deliver Customer Records and Program Data in the format required under the APA.[92]  This claim is both legally and factually meritless.

58.    As an initial matter, the APA did not require the Debtors to provide NP Acquisition with the Customer Records or Program Data in a particular format.  Nor did the APA require that

---

[90]    Maday Dec. Ex. G at 4.

[91]    *Id.* at 3.

[92]    D.I. 581 at ¶ 51.

the information be "useful."  The Debtors made no representations about the form and function of the data whatsoever.  Rather, the APA provided that NP Acquisition would acquire the Customer Records and Program Data "on an as is, where is basis" and "without any representation or warranty on the part of Sellers as to fitness, merchantability or otherwise."[93]  NP Acquisition also waived "to the fullest extent permitted by law" all potential rights regarding any form of warranty, express or implied, relating to any Purchased Assets, including the Customer Records and Program Data.[94]  Accordingly, as a legal matter, NP Acquisition's breach of contract claim on this theory flatly fails.

59.    It is also factually untrue.  To the extent possible, the Debtors provided NP Acquisition with data and information in the same manner as the Debtors or their POS vendor maintained it.  The Debtors maintained detailed records with respect to the Stores' business, including SKU level inventory and transaction level data, through their third-party vendor, KWI.[95]

60.    On February 26, 2023, the Debtors arranged for and authorized KWI to provide that data directly to NP Acquisition.[96]  NP Acquisition agreed that KWI would provide the data "as is," and NP Acquisition further acknowledged the possibility that some of the data may be lost or damaged in the transfer.[97]  NP Acquisition's allegation that the Debtors "sabotaged" or "manipulated" the data is therefore baseless, as the KWI data never went through the Debtors. Moreover, if certain data was damaged, missing or otherwise not useful, NP Acquisition waived any claims it would have under those circumstances.

---

[93]    D.I. 185-1 at 3 (APA § 1.)

[94]    D.I. 185-1 at 9 (APA § 14.)

[95]    Maday Decl. ¶ 7.

[96]    *Id.* at ¶ 8, Ex. A.

[97]    *Id.* at ¶ 9, Ex. B.

61.     In addition to the data transferred from KWI, the Debtors provided NP Acquisition with voluminous data from their own systems.  For example, the Debtors provided NP Acquisition with information pertaining to the "Kriser's Natural Pet" and "Natural Pawz" loyalty and gift card programs.  This information was exported from the Debtors' Clutch platform where it was maintained.[98]  The export was uploaded to a secure transfer site where it was accessed by NP Acquisition.  NP Acquisition's allegation that the Debtors "sabotaged" or "manipulated" any data is unsubstantiated and false.[99]

### C.      Debtors Did Not Breach Any Obligations with Respect to the Store Leases.

62.     NP Acquisition's next attempt to assert a claim for breach of contract is premised on the Debtors' alleged failure to transfer the Store Leases in accordance with the APA.[100]  This claim likewise fails to state any basis for liability against the Debtors and is belied by the facts.

63.     First, NP Acquisition claims that the Debtors terminated certain utility accounts for the Stores rather than transferring them to NP Acquisition, and that NP Acquisition incurred expenses opening new utility accounts in its own name.  As an initial matter, NP Acquisition cites to nothing in the APA or any other agreement that required the Debtors to transfer utility accounts to NP Acquisition.

64.     Furthermore, as NP Acquisition is well-aware, the Debtors exercised enormous efforts to transfer utility accounts to NP Acquisition, to the extent reasonably possible.  The

---

[98]     *Id.* at ¶ 10.

[99]     For the same reasons described here and *supra* ¶¶ 48-56, NP Acquisition's claim that the Debtors failed to take "such further actions as NP Acquisition might reasonably request to carry out the intent of the [Transaction Documents] also fails.  (D.I. 581 at ¶ 52.)  NP Acquisition does not identify any reasonable request with which the Debtors refused to comply.  The Debtors undertook extensive efforts to respond to each and every request from NP Acquisition and NP Acquisition repeatedly expressed its gratitude to Debtors throughout the process.  (*See, e.g.*, Maday Decl. Exs. D-K.)

[100]    D.I. 581 at ¶ 53.

utility accounts that were terminated were either those that could not be transferred at all, or those that required extraordinary effort and expense to do so that could not be justified given the Debtors' fiduciary duties to creditors.  For example, with respect to an AT&T account, NP Acquisition consented to cancel the account, which the Debtors (inclusive of their retained restructuring advisors at Berkley Research Group billing at hourly professional rates) had spent numerous hours trying to transfer to no avail.[101]  Advised of this situation, Biff Picone of NP Acquisition agreed with the Debtors that it was "a waste of time" to continue spending hours on the phone with AT&T attempting to transfer the account.[102]

65.    Second, NP Acquisition contends that the Debtors failed to satisfy all pre-Closing Liabilities associated with the Store Leases and that NP Acquisition "ultimately had to pay all these amounts."[103]  NP Acquisition fails to identify the Store Leases under which it claims to have paid pre-Closing Liabilities.  In any event, to the extent NP Acquisition paid any amounts directly to landlords, which it has not substantiated, any such amounts were paid by NP Acquisition on its own behalf and it is not entitled to reimbursement from the Debtors.

66.    The Court's Sale Order addressed the parties' respective obligations concerning cure amounts.  Exhibit 2 of the Sale Order identified $2,751.43 in cure amounts that were owed in connection with the assumed leases for the Stores.[104]  The Settlement Statement reflects that the Debtors provided NP Acquisition with a credit in that amount off of the price for the Purchased Assets.[105]

---

[101]    Maday Decl. ¶ 28.

[102]    Maday Decl. Ex. J.

[103]    D.I. 581 (Compl. ¶ 53).

[104]    D.I. 185-1 at 27-28.

[105]    D.I. 581-4 at 2.

67.    In connection with certain landlords' objections to the Sale Motion, the Sale Order identified certain disputed Cure Amounts relating to five specific nonresidential real property leases.[106]  It further required the Debtors to reserve for the disputed cures at the maximum potential amount while negotiating with affected landlords toward a consensual resolution of the dispute, or alternatively, a hearing before the Bankruptcy Court if a settlement did not materialize.[107]  After dutifully reserving the required amounts and engaging in fruitful discussions, the Debtors successfully reached agreements with the landlord counterparties, and paid the resulting negotiated cure amounts out of those reserves.  The Trust is aware of no other Cure Amounts that needed to be paid, nor did NP Acquisition point to any.  NP Acquisition's assertion that it paid $30,000 in pre-Closing Date cure amounts otherwise the responsibility of the Debtors is entirely unsubstantiated.

### D.    The Inventory Amounts Were Prepared in Accordance with the APA and are Final and Binding.

68.    NP Acquisition next contends that the Debtors breached the APA by providing inaccurate data regarding the inventory of the Stores, resulting in an inflated Purchase Price.[108]  Unsurprisingly, this is another falsehood.  Not only was the Inventory Amount determined in accordance with the APA, but NP Acquisition's claim is precluded by the plain terms of the Lease Certificate, which is final and binding as to the Inventory Amount and, in turn, the Purchase Price under the Transaction Documents.[109]

---

[106]    D.I. 185.

[107]    D.I. 185 at 12-13 (¶¶ 20-22).

[108]    D.I. 581 (Compl. ¶ 54).

[109]    Maday Decl. Ex. C.

69.     Under the APA, part of the consideration NP Acquisition provided in exchange for the Purchased Assets was "two hundred percent (200%) of the Inventory Amount."[110]  The "Inventory Amount" means "the aggregate cost of [the Debtors'] inventory in the Stores on Closing Date," as determined by "the inventory reflected in [Debtors'] POS System on the Closing Date with respect to each Store as mutually agreed upon in good faith by NP Acquisition and Debtors and set forth on the Lease Certificate."[111]  As a failsafe, NP Acquisition was entitled to request "backup, in the form and substance reasonably acceptable to [NP Acquisition], to substantiate the Inventory Amount based upon the average cost of the inventory item at the SKU level."[112]

70.     The Debtors disclosed to NP Acquisition the aggregate cost of the Debtors' inventory in the Stores as reflected in the Debtors' POS system as of the close of business February 27, 2023.[113]  NP Acquisition did not exercise its right to request further backup concerning the inventory amounts.[114]  Instead, on March 1, 2023, the parties executed the Lease Certificate, in which NP Acquisition acknowledged and agreed that the Inventory Amounts in the Lease Certificate—which matched the amounts the Debtors disclosed on February 28, 2023—are "final and binding on the parties" and "not subject to modification or adjustment."[115]  The Lease Certificate therefore expressly precludes any further claims with respect to the Inventory Amounts.

71.     NP Acquisition's attempt to challenge the accuracy of the Inventory Amounts, after agreeing that they were final and binding, is meritless.  NP Acquisition's breach of contract claims

---

[110]     D.I. 185-1 at 4 (APA § 4).

[111]     *Id.*

[112]     *Id.*

[113]     Maday Decl. ¶ 14.

[114]     *Id.* at ¶ 15.

[115]     Maday Decl. Ex. C.

fail as a matter of law as a result, and its belated request for an accounting is foreclosed. Moreover, like numerous other NP Acquisition accusations discredited above, because the data was extracted directly from the Debtors' system, the allegation is meritless as a matter of fact. The NP Administrative Claim should be disallowed.

**E.     The Debtors Did Not Breach Any Contractual Obligation with Respect to the Historical Sales Data.**

72.     NP Acquisition's final breach of contract theory is based on an unsupported claim that the Debtors provided inaccurate historical performance data for the Stores.[116] Not only does NP Acquisition provide no factual basis for its false assertion that the sales data that the Debtors provided is inaccurate, but it fails to identify any contractual provision that the Debtors arguably breached. Indeed, there is no representation in the APA or any other agreement concerning the accuracy of the historical performance data that the Debtors provided to NP Acquisition. NP Acquisition purchased the assets on an "as is" basis with no representations and warranties at all.[117] NP Acquisition's unsupported assertion that the performance data was inaccurate therefore does not state a claim for breach of contract.

73.     Moreover, the factual premise of NP Acquisition's claim is wrong. The sales data that the Debtors provided to NP Acquisition was taken directly from the Debtors' historical sales records and accurately reflects the historical performance of the Stores. The data reflected in Exhibit J to the Complaint, for example, was pulled directly from the NetSuite financial reporting software that the Debtors used in connection with their business.[118] The Debtors also authorized

---

[116]     D.I. 581 (Compl. ¶¶ 54).

[117]     D.I. 185-1 at 3, 9 (APA §§ 1, 14).

[118]     Maday Decl. ¶ 5.

KWI to provide complete transaction level details from the Debtors' POS System to NP Acquisition.[119]

74.     Repeating a clear pattern, in the face of data extracted or exported from the Debtors' books and records and made readily available to NP Acquisition, NP Acquisition has alleged no facts, much less submitted any evidence, to substantiate its baseless allegation that the Debtors furnished false sales data.

## II.     Debtors Did Not Tortiously Interfere with NP Acquisition's Customer Relationships.

75.     NP Acquisition contends that the Debtors "tortiously interfered" with NP Acquisition's relationships with unidentified "potential customers" by "improperly and intentionally" maintaining control over social media accounts and identifying multiple Stores as closed online.[120]   NP Acquisition, however, cannot establish any of the elements of tortious interference.

76.     To prevail on a claim for tortious interference with business relations, a party must prove four elements: (a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages. *See Mondero v. Lewes Surgical & Med. Assocs., P.A.*, No. CV 14-00588-RGA, 2018 WL 1532429, at *4 (D. Del. Mar. 29, 2018).

77.     With respect to the first element, NP Acquisition makes only vague statements about unknown customers, which is insufficient as a matter of law to establish the reasonable probability of a business opportunity.  *See Organovo Holdings, Inc. v. Dimitrov,* 162 A.3d 102, 122–23 (Del. Ch. 2017).  "To plead a reasonable probability of a business opportunity, a plaintiff

---

[119]     *Id.* ¶ 7.

[120]     D.I. 581 (Compl. ¶¶ 58-61).

must identify a specific party who was prepared to entered into a business relationship but was dissuaded from doing so by the defendant and cannot rely on generalized allegations of harm." *Id.* (internal quotations omitted). "A plaintiff cannot plead this element by alleging a nebulous, unascertainable class of business relationships." *Id.* (internal quotations omitted). Yet that is exactly what NP Acquisition attempts to do. NP Acquisition speculates that a nebulous group of "potential customers" did not patronize the Stores because they were "convinced" that the Stores were closed.[121] NP Acquisition has failed to identify any specific customer relationships that the Debtors allegedly harmed. For this reason alone, its tortious interference claim fails.

78.    NP Acquisition likewise cannot establish the second element of its claim—intentional interference by the Debtors. NP Acquisition alleges that the Debtors intentionally interfered with its business relations by (i) "refusing to transfer to NP Acquisition" control over marketing domains and (ii) identifying NP Acquisition Stores as permanently closed on social media accounts.[122] Both of these allegations are belied by the facts.

79.    First, as discussed extensively above,[123] the Debtors did not refuse to transfer any marketing domains to NP Acquisition. Rather, the evidence demonstrates that the Debtors transferred all of the Purchased IP identified in the Transaction Documents to NP Acquisition prior to the Closing Date. Any allegation by NP Acquisition to the contrary is an outright falsehood. Moreover, the Debtors promptly complied with NP Acquisition's subsequent requests that the Debtors transfer control over additional accounts not specified in the Transaction Documents as Purchased IP after the Closing Date.

---

[121]    D.I. 581 (Compl. ¶ 60).

[122]    D.I. 581 (Compl. ¶ 59).

[123]    *See supra* ¶¶ 48-56.

80.     NP Acquisition also provides no evidence that the Debtors improperly changed the status of Stores to closed with the intent to interfere with NP Acquisition's business.  When NP Acquisition told the Debtors that stores were erroneously reflected online as "closed" through Google and Apple, the Debtors advised NP Acquisition that the Debtors could not delete access to the accounts because the accounts had already been transferred to NP Acquisition, which had exclusive control.[124]  The Debtors assured NP Acquisition that it did not intentionally attempt to access or change status of any of the NP listings.[125]  NP Acquisition's co-owner, Nadine Joli-Coeur, confirmed in response that she was not accusing the Debtors of wrongdoing: "I did not say that you are intentionally changing accounts. It did happen from someone outside our organization and we did not have visibility of their access."[126]  Ms. Joli-Coeur's email undermines NP Acquisition's tortious interference claim.  NP Acquisition admitted that it did not know who made the changes and made no allegation that the changes were intentional, much less for the purpose of interfering with NP Acquisition's business.

81.     Finally, the economic loss doctrine bars NP Acquisition's tortious interference claim.  "[A] plaintiff cannot recover for tortious interference with prospective business relations if the defendant's only alleged 'wrong' was breach of the defendant's contract with the plaintiff." *Automated Precision, Inc. v. Pare*, 631 F. Supp. 3d 185, 201 (D. Del. 2022).  The entire premise of NP Acquisition's tortious interference claim is that the Debtors purportedly refused to transfer access and control over the Purchased IP—obligations that are governed by the Transaction Documents and with which the Debtors complied, easily debunking the breach of contract

---

[124]    Maday Decl. Ex. G.

[125]    *Id*.

[126]    *Id.*

claims—but without more, NP Acquisition cannot viably maintain a cause of action for tortious interference.

### III.  NP Acquisition's Claim for Conversion Contains Multiple Defects.

82.  NP Acquisition asserts a claim for conversion premised on the Debtors' purported failure to transfer access and control over Purchased IP.[127]  The conversion claim fails for multiple reasons.

83.  First, like the tortious interference claim, the conversion claim is duplicative of NP Acquisition's breach of contract claim.  "It is well settled under Delaware law that a plaintiff cannot bring a claim of conversion arising solely out of a breach of contract claim."  *Sheehan v. AssuredPartners, Inc.*, No. CV 2019-0333-AML, 2020 WL 2838575, at *14 (Del. Ch. May 29, 2020). Where a claim for conversion arises solely from an alleged breach of contract, the plaintiff must "sue in contract, and not in tort."  *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 889 (Del. Ch. 2009) (internal quotations omitted).  Because the APA and IP Assignment govern the parties' respective rights concerning the Purchased IP, NP Acquisition is required to proceed under contract law, not tort.  And as discussed extensively above, NP Acquisition's contract claims are completely baseless.

84.  Second, an action for conversion has traditionally applied to the wrongful exercise of dominion over *tangible* goods.  *Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.*, No. 13950, 1995 WL 694397, at *16 (Del. Ch. Nov. 21, 1995) (citing Restatement (Second) of Torts § 222A, cmt. a).  While Delaware courts have "tentatively expanded the doctrine to encompass some intangible goods where the intangible property relations are merged into a document," NP Acquisition does not contend that the social media and other accounts were merged into any

---

[127]    Compl. ¶¶ 63-65.

document that Debtors converted.  *Id.*; *see also Acierno v. Preit-Rubin, Inc.*, 199 F.R.D. 157, 165 (D. Del. 2001).  Accordingly, NP Acquisition's conversion claim fails on this front too.

85.     Third, "consistent with its descendance from the old common law action of trover, conversion cannot lie in the absence of the physical possession of the actual good or chattel owned by the plaintiff."  *Bavarian Nordic A/S v. Acambis Inc.*, 486 F. Supp. 2d 354, 363 (D. Del. 2007) (citing Restatement (Second) of Torts § 222A, cmt. a).  NP Acquisition cannot maintain a claim for conversion where the chattel sought to be returned was never in its actual possession. Assuming the truth of NP Acquisition's allegation that Debtors "refus[ed] to transfer" the Purchased IP,[128] then NP Acquisition was never in possession of the purported chattel prior to the alleged conversion, such that it could be "returned."  *Bavarian Nordic*, 486 F. Supp. 2d at 363 (under both Maryland and Massachusetts law, conversion claim failed where the plaintiff was never in the possession of the property).

86.     Fourth, "conversion is not vindicable unless a defendant has exercised ***exclusive*** control over the property."  *Bavarian Nordic*, 486 F. Supp. 2d at 363.  Accordingly, a claim for conversion fails if the plaintiff has possession and use of the chattel.  *Id.*  The documentary evidence refutes all conclusory allegations by NP Acquisition that it did not have use of the social media accounts by the Closing Date. NP Acquisition confirmed in writing that it received access to the Purchased IP.

87.     Finally, "before a plaintiff can bring an action for conversion, the plaintiff must first show that it made a demand that the property be returned and the defendant refused the demand."  *4C, Inc. v. Pouls*, No. CV1100778JEIKMW, No. 11–00778, 2014 WL 1047032, at *9 (D. Del. Mar. 5, 2014).  Here, the Debtors transferred all of the Purchased IP identified in the

---

[128]     D.I. 581 (Compl. at ¶ 64).

Transaction Documents on or before the Closing Date, and transferred control over additional accounts not expressly constituting Purchased IP as soon as NP Acquisition requested them. Thus, there was no conversion and NP Acquisition's claim based on that theory should be disallowed and expunged.

## IV.   **Debtors Did Not Trespass to Any Chattels.**

88.     NP Acquisition asserts yet another redundant claim based on its allegations that the Debtors failed to transfer over the Purchased IP—trespass to chattels.  This claim likewise fails because it is based on NP Acquisition's false allegations that the Debtors refused to transfer the Purchase IP.[129]  The trespass claim also fails as a matter of law.

89.     Trespass to chattel requires the defendant to dispossess the plaintiff or interfere with the plaintiff's possession of a "chattel."  *See, e.g*., Restatement (Second) of Torts § 217.  A chattel is a "[m]ovable or transferable property; personal property; esp., a physical object capable of manual delivery and not the subject matter of real property."  *Mullane v. Mortg.*, No. CV 19-010-RGA, 2022 WL 2438802, at \*5 (D. Del. July 5, 2022).  As trespass to chattel claim "must still maintain some link to a physical object."  *Universal Tube & Rollform Equip. Corp. v. Youtube, Inc*., 504 F. Supp. 2d 260, 268 (N.D. Ohio 2007) (dismissing trespass to chattels claim based on interference with plaintiff's domain name and website).  An internet account is an "intangible object . . . without physical substance, and it is therefore impossible to make 'physical contact' with it."  *Id*.  Thus, NP Acquisition's trespass to chattel claim fails because it does not contend that the Debtors physically trespassed on any chattel.

90.     Moreover, even if the Domain Names and Social Media Accounts qualified as chattels, NP Acquisition does not allege any harm to the chattels themselves.  "A plaintiff may not

---

[129]     *See supra* ¶¶ 48-56.

recover for trespass to chattels unless the chattel was impaired as to its condition, quality, or value."
*See Discovery Educ., Inc. v. Schools PLP, LLC*, No. 1:20-CV-1623-SB, 2021 WL 2292223, at \*2
(D. Del. June 4, 2021) (citing Restatement (Second) of Torts § 218) (holding that even if DE courts
treated websites as chattels, plaintiff's claim failed because it did not show that the website itself
was harmed).  NP Acquisition alleges damages in the form of reduced sales to the Stores—not
damage to the social media and other accounts themselves.[130]

## V.   NP Acquisition's Fraud Claims Fails Because It Did Not Reasonably Rely on Any False Statement by the Debtors.

91.     NP Acquisition alleges fraud and fraudulent inducement based on alleged
misrepresentations that Debtors made about (1) the value of the inventory held at the Stores as of
February 28, 2023; and (2) the historical performance of the Stores.  NP Acquisition cannot meet
Delaware's high burden for asserting fraud or fraudulent inducement based on either allegation.

92.     The elements of fraud under Delaware law are well established. A party claiming
fraud must allege: (i) a false representation, usually one of fact, made by the defendant; (ii) the
defendant's knowledge or belief that the representation was false, or was made with reckless
indifference to the truth; (iii) an intent to induce the plaintiff to act or to refrain from acting; (iv) the
plaintiff's action or inaction taken in justifiable reliance upon the representation; and (v) damage
to the plaintiff as a result.  *See Hauspie v. Stonington Partners, Inc*., 945 A.2d 584, 586 (Del.
2008).

### A.      The Debtors Did Not Make Any False Statements of Fact.

93.     It is plain from NP Acquisition's Complaint, carried through to the NP
Administrative Claim, that it cannot establish even the first and most fundamental of the

---

[130]    D.I. 581 (Compl. ¶ 68).

elements—a false statement by the Debtors.  The Inventory Amount was determined in accordance with the APA.  It was determined based on the amounts reflected in the Debtors' POS System.[131] NP Acquisition has not identified any facts whatsoever to suggest that the Inventory Amount was not determined by the inventory reflected in the Debtors' POS System.

94.     Furthermore, under the APA, the Debtors were not solely responsible for confirming the Inventory Amount.  Rather, the amount was "mutually agreed upon in good faith by Buyer and Sellers."[132]  The Inventory Amount, therefore, was not a representation by the Debtors, but a mutually agreed upon number.

95.     Notably, despite having the express contractual right to request backup to substantiate the Inventory Amount, NP Acquisition never did so.[133]  And then NP Acquisition itself signed the Lease Certificate, contending that the Inventory Amount set forth therein represented its own "understanding" and that the amount stated is "final and binding."[134]  Thus, to the extent there was a misrepresentation about the Inventory Amount—though there was none— it is equally a misrepresentation by NP Acquisition, who signed all of the same documents reflecting that figure.

96.     Therefore, the Inventory Amount reflected on the Settlement Statement cannot form the basis for a claim of fraud because (1) it is not false, given that (a) it is actually the amount reflected on the Debtors' POS system and (b) NP Acquisition does not contend otherwise; and (2) it was not a statement by the Debtors but instead a number pulled from the POS and agreed upon by both the Debtors and NP Acquisition.

---

[131]     Maday Decl. ¶¶ 13-14.

[132]     D.I. 185-1 at 4(APA § 4.)

[133]     Maday Decl. ¶ 15.)

[134]     Maday Decl. Ex. C.

97.    NP Acquisition's allegations are similarly infirm as it concerns the historical monthly revenues of the Stores.  The Complaint alleges generally that, despite Debtors' data reflecting aggregate historical monthly Stores revenues of approximately $1.8 million, "on the contrary, the Stores' historic monthly revenues were closer to [$1.2 million]."[135]  In support of its bald assertion that the Debtors misrepresented the aggregate monthly revenue, NP Acquisition states vaguely that it "determined" that the actual aggregate monthly revenues "were closer to [$1.2 million]."[136]  It does not, however, identify any basis for this claim whatsoever.  NP Acquisition's vague suspicion is insufficient to maintain a claim for fraud under Delaware law.

## B.    NP Acquisition Fails to Allege that the Debtors Made Any Knowingly False or Reckless Statements.

98.    NP Acquisition also fails to allege the second element—that the Debtors *knowingly* or *recklessly* made the alleged false statement.  *MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 211 (3d Cir. 2005) (for fraudulent inducement claim, misrepresentation must be intentional or reckless).  NP Acquisition makes only the conclusory allegation that (1) "the Debtors knew or should have known"[137] that the Inventory Amount was incorrect, and (2) "the Debtors knew or should have known on or before the Closing Date that the Stores did not generate monthly revenue of $1,800,000 in the aggregate."[138]  Such an allegation falls well short of pleading scienter.  *See, e.g.*, *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc*., 854 A.2d 121, 144 (Del. Ch. 2004) ("to say 'Defendant knew or should have known' is not adequate"); *Red Clay Consol. Sch. Dist. v. T.S.,* No. CIV. 10-00784-LPS, 2011 WL 4498964, at *4 (D. Del. Sept. 27, 2011)

---

[135]    D.I. 581 (Compl. ¶¶ 38, 77).

[136]    D.I. 581 (Compl. ¶ 38).

[137]    *Id.* (Compl. ¶ 72).

[138]    *Id.* (Compl. ¶ 77).

(same). The Debtors pulled the Inventory Amount and sales data directly from their POS platform. NP Acquisition alleges no facts plausibly supporting a conclusion that Debtors knew or recklessly disregarded the risk that any statements they made to NP Acquisition regarding Inventory Amounts or sales data were false.

### C.     The APA Precludes NP Acquisition's Claim of Justifiable Reliance

99.     NP Acquisition also cannot establish that it justifiably relied on any allegedly false statements by the Debtors because, among other reasons, the APA expressly disclaimed any representation or warranty relating to the Purchased Assets.   NP Acquisition purchased the Purchased Assets "as is," and "without any representation." [139]   It cannot now claim that it reasonably relied on any extra-contractual representations by the Debtors with respect to the Purchased Assets and "[a] failure of justifiable reliance is fatal" to a fraud claim.   *Progressive Int'l Corp. v. E.I. DuPont de Nemours & Co*., No. C.A. 19209, 2002 WL 1558382, at *7 (Del.Ch. 2002).

100.     Under Delaware law, an unambiguous statement in a purchase agreement explicitly disclaiming any reliance on non-contractual representations precludes a finding of justifiable reliance.   *See, e.g.*, *id*., at *1 ("[Plaintiff's] unambiguous decision to forsake reliance on any representations not contained in the [written] Agreement renders its allegations of reasonable reliance unsustainable as a matter of law.); *Great Lakes Chem. Corp. v. Pharmacia Corp*., 788 A.2d 544, 556 (Del. Ch. 2001); *MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 218 (3d Cir. 2005).

101.     In *Great Lakes*, the court held that disclaimers in a purchase agreement barred the plaintiff's fraud claim.   Vice Chancellor Jacobs explained:

> Were this court to allow [the buyer] to disregard the clear terms of
> its disclaimers and to assert its claims of fraud, the carefully

---

[139]     D.I. 185-1 at 3 (APA ¶ 1).

> negotiated and crafted Purchase Agreement between the parties
> would [] not be worth the paper it is written on. To allow [the buyer]
> to assert, under the rubric of fraud, claims that are explicitly
> precluded by contract would defeat the reasonable commercial
> expectations of the contracting parties and eviscerate the utility of
> written contractual agreements.

788 A.2d at 556. The Chancery court's reasoning also applies here. NP Acquisition agreed that the Debtors made no representation or warranty as to the Purchased Assets. Its claim that it "reasonably relied on the Debtors' representation[s]" [140] is therefore entirely at odds with the APA's plain terms.

102. Indeed, if the Debtors' alleged representations about the inventory levels or the historical sales performance were important to NP Acquisition's decision to contract, it "could have negotiated to have those representations reduced to writing and included in the Agreement." *Progressive Intern. Corp.*, 2002 WL 1558382, at *8. "The Court of Chancery has consistently held that sophisticated parties to negotiated commercial contracts may not reasonably rely on information that they contractually agreed did not form a part of the basis for their decision to contract." *H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 141–42, n.18 (Del. Ch. 2003). In *H-M Wexford*, for example, the court held that because the alleged false financial representations were not incorporated into the purchase agreement, they could not serve as the basis of a fraud claim. *Id.* at 134, 140-143; *see also In re Rynda*, No. 09-41568 EDJ 7, 2010 WL 2179165, at *2 (Bankr. N.D. Cal. May 24, 2010) ("as is, where is" clause and disclaimer of representations or warranties precluded defense of fraud).

103. NP Acquisition also could not have justifiably relied on any representations with respect to the Inventory Amount because it had a right under the APA to request information

---

[140]    D. I. 581 (Compl. ¶¶ 73, 78).

"reasonably acceptable to Buyer, to substantiate the Inventory Amount."[141]  NP Acquisition also executed the Lease Certificate, which provides that the Inventory Amount reflected therein was "final and binding" and "not subject to modification or adjustment."[142]  To the extent that NP Acquisition alleges to have blindly relied on information provided by the Debtors, notwithstanding its contractual right to request further information to confirm the Inventory Amount's accuracy, any such reliance by NP Acquisition was unjustifiable.

## RESERVATION OF RIGHTS

104.    The Trust hereby reserves the right to object in the future to any of the claims that are the subject of this Objection on any additional ground, and to amend, modify, and/or supplement this Objection.

## NOTICE

105.    Notice of this Objection shall be provided to (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to NP Acquisition; and (iii) the renewed list of all entities requesting notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Trust submits that no further notice is required.

---

[141]     D.I. 185-1 at 3 (APA § 4).

[142]     Maday Decl. Ex. C.

WHEREFORE, the Trust respectfully requests entry of an Order substantially in the form

of the Proposed Order attached hereto as Exhibit 2, disallowing the NP Administrative Claim and

granting such further relief as the Court deems just and proper.

| Dated: Wilmington, Delaware | /s/ Maria Kotsiras |
| September 28, 2023 | **POTTER ANDERSON & CORROON LLP** |

Dated: Wilmington, Delaware
    September 28, 2023

/s/ Maria Kotsiras
**POTTER ANDERSON & CORROON LLP**
Christopher M. Samis (No. 4909)
Aaron H. Stulman (No. 5807)
Maria Kotsiras (No. 6840)
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Tel: (302) 984-6000
Fax: (302) 658-1192
Email: csamis@potteranderson.com
       astulman@potteranderson.com
       mkotsiras@potteranderson.com

-and-

**KELLEY DRYE & WARREN LLP**
James S. Carr (admitted *pro hac vice*)
Levi Downing (admitted *pro hac vice*)
Dana P. Kane
Rebecca B. Durrant (admitted *pro hac vice*)
3 World Trade Center
175 Greenwich Street
New York, New York 10007
Tel: (212) 808-7800
Fax: (212) 808-7897
Email: jcarr@kelleydrye.com
       ldowning@kelleydrye.com
       dkane@kelleydrye.com
       rdurrant@kelleydrye.com

*Counsel to the IPP Liquidation Trust*